No. 26-1301

# In the United States Court of Appeals for the Seventh Circuit

-------------------------------

ELI LILLY AND COMPANY,

*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY JR., ET AL,

*Defendants-Appellees.*

-------------------------------

On Appeal from the United States District Court
for the Southern District of Indiana
No. 24-cv-1503 (Hon. Tanya Walton Pratt)

-------------------------------

## BRIEF OF APPELLANT

-------------------------------

Allon Kedem
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for Eli Lilly and Company*

March 30, 2026

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 26-1301

Short Caption: Eli Lilly and Company v. Robert F. Kennedy, Jr., et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

 Eli Lilly and Company

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

 Taft Stettinius & Hollister LLP

 Arnold & Porter Kaye Scholer LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and

        None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 NA

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 NA

---

Attorney's Signature: /s/ Allon Kedem     Date: March 30, 2026

Attorney's Printed Name:  Allon Kedem

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑   **No** ☐

Address:  Arnold & Porter Kaye Scholer LLP

 601 Massachusetts Ave., NW, Washington, DC 20001-3743

Phone Number: (202) 942-6234      Fax Number:  (202) 942-5999

E-Mail Address: allon.kedem@arnoldporter.com

rev. 12/19 AK

**TABLE OF CONTENTS**

RULE 26.1 DISCLOSURE..................................................................................i

TABLE OF CONTENTS ...................................................................................ii

TABLE OF AUTHORITIES.............................................................................iv

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED.......................................................................................2

INTRODUCTION ..............................................................................................4

STATUTES AND REGULATIONS...................................................................7

STATEMENT OF THE CASE ..........................................................................9

    A.   The FDCA Requires Prompt Determinations That "Protein[s]" and
"Analogous Product[s]" Are Biological Products............................................9

    B.   Lilly Develops Retatrutide to Treat Obesity, Diabetes, and Other
Conditions.......................................................................................................11

    C.   FDA Denies Lilly's Request to Designate Retatrutide as a Biological
Product.............................................................................................................13

    D.   The District Court Finds That FDA's Decision Was Contrary to Law, But
Remands to the Agency Without Acknowledging the Statutory Deadline ..........15

SUMMARY OF ARGUMENT ........................................................................17

STANDARD OF REVIEW..............................................................................19

ARGUMENT ...................................................................................................20

I.   RETATRUTIDE IS A PROTEIN AND THUS A BIOLOGICAL PRODUCT ...............................20

    A.   Retatrutide Is a Protein Under the Protein Definition's Plain Text
Because it is "Greater Than 40 Amino Acids in Size"......................................20

    B.   The Remaining Grounds for Counting Only Alpha Amino Acids Are
Unsound and Conflict with the Regulatory Text...............................................29

    C.   Because Retatrutide Is a Protein, No Remand to FDA Is Warranted.................36

II.   THE DISTRICT COURT INDEPENDENTLY ERRED IN REMANDING TO THE
AGENCY...........................................................................................................37

CONCLUSION ................................................................................................42

CERTIFICATE OF COMPLIANCE ...............................................................44

CERTIFICATE OF FILING AND SERVICE .................................................45

SHORT APPENDIX .......................................................................................................................... 1a

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30 ..................................... 2a

SHORT APPENDIX TABLE OF CONTENTS .................................................................. 3a

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abt v. Mazda Am. Credit,*
25 F. Supp. 2d 860 (N.D. Ill. 1998) ........................................................................ 24

*Am. Train Dispatchers Ass'n v. ICC,*
26 F.3d 1157 (D.C. Cir. 1994) ................................................................................ 36

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) .............................................................................. 32

*Auer v. Robbins,*
519 U.S. 452 (1997) ................................................................................................ 15

*Baez-Sanchez v. Barr,*
947 F.3d 1033 (7th Cir. 2020) ................................................................................ 36

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) ................................................................................................ 23

*Bittner v. United States,*
598 U.S. 85 (2023) .................................................................................................. 27

*Carcieri v. Salazar,*
555 U.S. 379 (2009) ................................................................................................ 23

*City & Cnty. of San Francisco v. EPA,*
604 U.S. 334 (2025) .......................................................................................... 23, 26

*Clean Wisconsin v. EPA,*
964 F.3d 1145 (D.C. Cir. 2020) .............................................................................. 42

*Commodity Carriers, Inc. v. Fed. Motor Carrier Safety Admin.,*
434 F.3d 604 (D.C. Cir. 2006) ................................................................................ 30

*Consolidation Coal Co. v. Dir., Off. of Workers' Comp. Programs,*
129 F.4th 409 (7th Cir. 2025) ................................................................................. 27

*Conway v. O'Malley,*
96 F.4th 1275 (9th Cir. 2024) ................................................................................. 24

*DHS v. MacLean,*
574 U.S. 383 (2015) ...................................................................................... 16, 23, 24

iv

*Fort Stewart Sch. v. FLRA,*
  495 U.S. 641 (1990) ................................................................. 19

*Gallardo v. Marstiller,*
  596 U.S. 420 (2022) ................................................................. 22

*Gendron v. United States,*
  154 F.3d 672 (7th Cir. 1998) ................................................... 29

*Kisor v. Wilkie,*
  588 U.S. 558 (2019) ................................................. 15, 35, 36

*Laclede Gas Co. v. FERC,*
  873 F.2d 1494 (D.C. Cir. 1989) ............................................... 30

*Lindh v. Murphy,*
  521 U.S. 320 (1997) ................................................................. 23

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ................................................ 9, 19, 20, 35, 36

*McBride v. Grice,*
  576 F.3d 703 (7th Cir. 2009) ................................................... 29

*McNutt v. Bd. of Trustees of Univ. of Ill.,*
  141 F.3d 706 (7th Cir. 1998) ................................................... 23

*Mlsna v. Union Pac. R.R. Co.,*
  975 F.3d 629 (7th Cir. 2020) ............................................. 22, 26

*Nat'l Wildlife Fed'n v. Army Corps of Eng'rs,*
  75 F.4th 743 (7th Cir. 2023) ................................................... 19

*Neumann's Pharmacy, L.L.C. v. DEA,*
  167 F.4th 320 (5th Cir. 2026) ................................................. 35

*Ortiz v. McDonough,*
  6 F.4th 1267 (Fed. Cir. 2021) ................................................. 35

*Pepper v. United States,*
  562 U.S. 476 (2011) ................................................................. 38

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ................................................................... 20

*Refined Metals Corp. v. NL Indus. Inc.,*
  937 F.3d 928 (7th Cir. 2019) ................................................... 28

*Robinson Knife Mfg. Co. v. CIR,*
    600 F.3d 121 (2d Cir. 2010) .................................................................... 35

*Russello v. United States,*
    464 U.S. 16 (1983) .................................................................... 22, 25, 27

*Sandoz Inc. v. Amgen Inc.,*
    582 U.S. 1 (2017) .................................................................... 27

*SEC v. Chenery Corp. (Chenery I),*
    318 U.S. 80 (1943) .................................................................... 19, 34

*Smart Oil, LLC v. DW Mazel, LLC,*
    970 F.3d 856 (7th Cir. 2020) .................................................................... 37

*Smith v. Comm'r of Soc. Sec.,*
    482 F.3d 873 (6th Cir. 2007) .................................................................... 26

*In re Southwest Airlines Voucher Litig.,*
    799 F.3d 701 (7th Cir. 2015) .................................................................... 31

*Teva Pharms. USA, Inc. v. FDA,*
    514 F. Supp. 3d 66 (D.D.C. 2020) .................................................................... 21, 36

*In re Trendsetter HR L.L.C.,*
    949 F.3d 905 (5th Cir. 2020) .................................................................... 24

*Turner-El v. Illinois Bd. of Educ.,*
    No. 93-cv-4918, 1996 WL 480341 (N.D. Ill. Aug. 21, 1996) .................................................................... 24

*United States v. Boender,*
    649 F.3d 650 (7th Cir. 2011) .................................................................... 23

*United States v. Gonzales,*
    520 U.S. 1 (1997) .................................................................... 23, 24

*United States v. Uriarte,*
    975 F.3d 596 (7th Cir. 2020) .................................................................... 38, 42

**Statutes**

5 U.S.C.
    § 706(2)(A) .................................................................... 19

18 U.S.C.
    § 924(c) ..................................................................................................... 24
    § 1963(a)(1) ............................................................................................. 27
    § 1963(a)(2) ............................................................................................. 27

21 U.S.C.
    § 355(d) ..................................................................................................... 39
    § 360bbb-2 ................................................................................................. 7
    § 360bbb-2(a) ........................................................................................... 11
    § 360bbb-2(b) ........................................................... 4, 11, 18, 37, 38, 41
    § 360bbb-2(c) ............................................ 5, 6, 11, 18, 19, 38, 39, 41, 42

33 U.S.C.
    § 1311(b)(1)(A) ........................................................................................ 25
    § 1311(b)(1)(B) ........................................................................................ 25
    § 1311(b)(1)(C) ........................................................................................ 25

42 U.S.C.
    § 262 ....................................................................................................... 8, 9
    § 262(i)(1) .............................................................................................. 4, 5, 9
    § 262(a) ..................................................................................................... 39
    § 262(a)(1)(A) ............................................................................................. 9
    § 262(l)(8)(A) ........................................................................................... 27
    § 262(l)(8)(B) ........................................................................................... 27

Pub. L. No. 116-94, Div. N, Title I, § 605, 133 Stat. 3127 (2019) ........................................... 31

## Regulations

21 C.F.R.
    § 3.7 ......................................................................................................... 11
    § 314.50 .................................................................................................... 39
    § 600.3 ........................................................................................................ 8
    § 600.3(h)(5)(ii) ....................................................................................... 28
    § 600.3(h)(6) ............................... 4, 5, 6, 9, 10, 13, 14, 18, 20, 22, 24, 28, 31, 32, 33, 35, 36
    § 601.2 ...................................................................................................... 39

85 Fed. Reg. 10,057, 10,059 (Feb. 21, 2020) .............................................................. 10

## Other Authorities

*Analogous*, Merriam-Webster Dictionary, https://www.merriam-webster.
    com/dictionary/analogous ..................................................................... 16

Antonin Ginguay & Luc A. Cynober, *Amino Acids*, *in* Encyclopedia of
    Biological Chemistry (3d Ed. 2021) ................................................. 30, 32

FDA Mem. in Support of Cross-Mot. for Summ. J., *Ipsen Biopharmaceuticals, Inc. v. Becerra*, No. 20-cv-2437 (D.D.C. Nov. 20, 2020), 2020 WL 13280713 ........................................................................ 24

FDA, Memo to File, *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Doc. 46 .................................................................................. 10

*Lilly's Triple Agonist, Retatrutide, Delivered Weight Loss of up to an Average of 71.2 lbs Along with Substantial Relief from Osteoarthritis Pain in First Successful Phase 3 Trial*, Eli Lilly & Company (Dec. 11, 2025), https://investor.lilly.com/news-releases/news-release-details/lillys-triple-agonist-retatrutide-delivered-weight-loss-average ................................ 12

Michael D. Larrañaga et al., *Hawley's Condensed Chemical Dictionary* 64 (16th ed. 2016) ........................................................................................ 10

Reply Br. for Pet., *City and County of San Francisco v. EPA*, No. 23-753, 2024 WL 4360488 (Sept. 25, 2024) ........................................................ 25

Roger L. Lundblad, *Biochemistry and Molecular Biology Compendium* 175 (2019) ............................................................................................ 21

Sogroya Prescribing Information § 11 (April 2023), https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/761156s005lbl.pdf ........................................................................................................ 21

Tresiba Prescribing Information § 11 (July 2022), https://www.novo-pi.com/tresiba.pdf .................................................................................... 32

U.S. Br., *City and County of San Francisco v. EPA*, No. 23-753, 2024 WL 3988543 (Aug. 26, 2024) ........................................................................ 25

*Webster's Third New Int'l Dictionary* (1981) ................................................ 24

**JURISDICTIONAL STATEMENT**

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1346, and 1361, and 5 U.S.C. §§ 701-06 because Plaintiff-Appellant Eli Lilly & Company challenged a final agency action by the Food and Drug Administration (FDA) denying Lilly's request to designate retatrutide, a potential medicine that Lilly is studying in clinical trials, as a biological product.

This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). On December 16, 2025, the district court entered final judgment vacating FDA's designation decision and denying Lilly's request for an injunction requiring FDA to designate retatrutide as a biological product. ShA.18-19. The district court's final judgment remanded one issue back to the agency and resolved the other issue against Lilly. ShA.18-19. Both parties recognized that this judgment would be "appealable." A.290 (joint position statement). Lilly timely noticed its appeal on February 12, 2026. A.295; *see* Fed. R. App. P. 4(a)(1)(B).

This Court has jurisdiction under 28 U.S.C. § 1291 because Lilly appeals from the final judgment of the district court. The district court's judgment is "final," even though one issue was remanded to FDA, because the "remand ordered by the district judge is one that might well conclude without a return to court." *Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735, 738 (7th Cir. 2008); *see Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 979 (7th Cir. 1999) (recognizing "administrative remands" of this sort are "generally appealable"). For example, if FDA sides with Lilly on remand, then neither party would return to court, and the issues decided by the district court "might never be open to appellate review." *Rush*, 535 F.3d at 738. Both the Supreme Court and this Court have held that, under these circumstances, a district court's order is final—even

1

if the agency is "unable to obtain review after its own action"—because "any decision final from the agency's perspective also is final from the private litigant's." *Id.* (citing *Forney v. Apfel*, 524 U.S. 266 (1998)).

This Court independently has jurisdiction under 28 U.S.C. § 1292(a)(1) because the district court's judgment was an order "refusing" Lilly's requested injunctive relief. *See Forney*, 524 U.S. at 271 ("[A] party is 'aggrieved' and ordinarily can appeal a decision 'granting in part and denying in part the remedy requested.'") (quoting *United States v. Jose*, 519 U.S. 54, 56 (1996) (per curiam)). Here, Lilly sought an injunction requiring FDA to designate retatrutide as a biological product. *See* A.10; D. Ct. Dkt. 26, at 30. The district court's judgment denied Lilly that relief. Thus, this Court has jurisdiction under Section 1292(a)(1).

## ISSUES PRESENTED

Under 21 U.S.C. § 360bbb-2, the sponsor of an investigational product may submit to FDA a request "respecting the classification of the product as a drug[ or] biological product." *Id.* § 360bbb-2(a). "Not later than 60 days after the receipt of the request," FDA "shall determine the classification of the product." *Id.* § 360bbb-2(b). If the agency fails to do so, "the recommendation made by the [sponsor] shall be considered to be a final determination by the [agency] of such classification of the product." *Id.* § 360bbb-2(c).

Plaintiff-Appellant Eli Lilly and Company submitted a request to designate retatrutide, a potential medicine that Lilly is studying in clinical trials, as a biological product. Lilly argued that retatrutide is a biological product because it satisfies FDA's regulatory definition of a "protein." 21 C.F.R. § 600.3(h)(6). Lilly also argued that, at

minimum, retatrutide is "analogous" to a protein. 42 U.S.C. § 262(i)(1). FDA rejected both arguments. The district court agreed with FDA that retatrutide is not a protein, but with Lilly that FDA's "analogous" ruling was contrary to law. The court remanded to the agency for a further determination on the "analogous" issue.

The following issues are presented for review:

1.      Whether Lilly's product retatrutide, which is composed of 41 amino acids, satisfies a regulatory requirement that a "protein" must be "greater than 40 amino acids in size," where size is "based on the total number of amino acids." 21 C.F.R. § 600.3(h)(6).

2.      Whether the district court erred in remanding to the agency despite the mandatory 60-day deadline for FDA designation decisions, 21 U.S.C. § 360bbb-2(b), and the automatic take-effect provision, *id.* § 360bbb-2(c), where the 60-day deadline had long expired before the court vacated the agency's decision.

3.      Whether this Court should order FDA to treat Lilly's request for designation has having been granted, given that more than 60 days have passed since its designation decision was vacated, and the agency still has not issued any decision.

**INTRODUCTION**

Under regulations issued by the Food and Drug Administration (FDA), a "protein" must be "greater than 40 amino acids," based on a count of the "total number of amino acids" that it contains. 21 C.F.R. § 600.3(h)(6). The application of this text is straightforward here. Retatrutide, an investigational product developed by Eli Lilly and Company to treat obesity and related health conditions, has 41 amino acids. Retatrutide is therefore a protein because its total number of amino acids is "greater than 40." FDA reached a contrary decision only by ignoring the text of its own regulations. This Court should reverse.

Federal law channels products designed to prevent or treat disease into different approval pathways depending on whether the product is a "drug" or a "biological product." Under the Public Health Service Act, FDA has authority to approve a "biological product," a term that in relevant part encompasses all "protein[s]" and products "analogous" to proteins that are "applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). The distinction between drugs and biological products carries importance for the developers of new products and for the patients who will use them. Among other things, applications for drugs and biological products may involve different application processes and product labeling, and a product's sponsor thus must know well in advance which regulatory regime will govern its application.

To ensure that designation determinations are made promptly—reducing burdens on manufacturers and allowing patients to access new medicines as soon as possible—Congress imposed a mandatory deadline: FDA "shall" issue a decision "[n]ot later than 60 days after the receipt of the request" for designation. 21 U.S.C. § 360bbb-2(b). If the

4

agency fails to do so, then the requested designation "shall be considered to be a final determination" of the "classification of the product." *Id.* § 360bbb-2(c).

This case concerns FDA's determination that retatrutide is a drug and not a biological product. By statute, a "biological product" includes all "protein[s]" that are "applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). By regulation, a "protein" is defined based on the "total number of amino acids" it contains: If the "total number of amino acids" is "greater than 40 amino acids," then the product is a protein so long as it satisfies other regulatory requirements not in dispute here. 21 C.F.R. § 600.3(h)(6). Retatrutide is composed of 41 amino acids—a number plainly "greater than 40." Retatrutide is therefore a protein.

FDA denied Lilly's request to designate retatrutide as a biological product. The agency reasoned that only 40 of retatrutide's 41 amino acids count toward the "total number of amino acids" because only 40 of retatrutide's amino acids are *alpha* amino acids, which is a particular subtype of amino acid. On that ground—the only one that FDA identified in its decision—the agency concluded that retatrutide was not a protein. And because retatrutide does not have 41 *alpha* amino acids, FDA also concluded that retatrutide could not be "analogous" to a protein, even though that statutory category provides a wholly separate basis for designating biological products. 42 U.S.C. § 262(i)(1).

The district court sided with FDA on the "protein" issue but rejected the agency's reasoning on the "analogous" issue, which it remanded to FDA for reconsideration. In so ruling, the court erred for three independent reasons.

5

First, retatrutide is a "protein" under FDA's regulatory definition of that term. Because retatrutide has 41 amino acids, it is "greater than 40 amino acids in size," 21 C.F.R. § 600.3(h)(6), and thus satisfies the protein definition's size requirement. The definition's text is clear, and longstanding interpretative principles forbid FDA's attempt to read into the size requirement an implicit rule that only *alpha* amino acids count. Nor has FDA disputed that retatrutide satisfies all the other elements of the protein definition: It is an "alpha amino acid polymer"; it has a "specific, defined sequence"; and its "amino acid chains . . . are associated with each other in a manner that occurs in nature." *Id.*

Second, FDA should not get a do-over on the "analogous" issue, since the statute's mandatory deadline passed long ago. Even if retatrutide were not a protein, the district court correctly determined that FDA erred in rejecting Lilly's argument that retatrutide is at least "analogous" to a protein, and it vacated the agency's designation decision. At that point, no valid agency decision existed, and the statute's mandatory 60-day deadline and automatic take-effect provision foreclosed remand for an untimely agency do-over.

Third, even if the vacatur merely reset the 60-day clock, more than *three months* have now passed since the remand order without any further proceedings or decisions from the agency. At the very least, FDA was required to "provide [a designation decision] within the 60-day period" following vacatur, but it failed to do so. 21 U.S.C. § 360bbb-2(c). Lilly's requested designation should therefore become effective by operation of law.

This Court should reverse the district court's decision on whether retatrutide is a protein, vacate its order remanding to the agency, and remand this case back to the district court with instructions to order FDA to designate retatrutide as a biological product.

**STATUTES AND REGULATIONS**

1.      Under 21 U.S.C. § 360bbb-2, FDA must determine the classification of a product for which classification is requested "[n]ot later than 60 days after the receipt of the request," and if it fails to do so, the requested classification "shall be considered to be a final determination by the Secretary of such classification of the product":

**(a) Request**
A person who submits an application or submission (including a petition, notification, and any other similar form of request) under this chapter for a product, may submit a request to the Secretary respecting the classification of the product as a drug, biological product, device, or a combination product subject to section 353(g) of this title or respecting the component of the Food and Drug Administration that will regulate the product. In submitting the request, the person shall recommend a classification for the product, or a component to regulate the product, as appropriate.

**(b) Statement**
Not later than 60 days after the receipt of the request described in subsection (a), the Secretary shall determine the classification of the product under subsection (a), or the component of the Food and Drug Administration that will regulate the product, and shall provide to the person a written statement that identifies such classification or such component, and the reasons for such determination. The Secretary may not modify such statement except with the written consent of the person, or for public health reasons based on scientific evidence.

**(c) Inaction of Secretary**
If the Secretary does not provide the statement within the 60-day period described in subsection (b), the recommendation made by the person under subsection (a) shall be considered to be a final determination by the Secretary of such classification of the product, or the component of the Food and Drug Administration that will regulate the product, as applicable, and may not be modified by the Secretary except with the written consent of the person, or for public health reasons based on scientific evidence.

**2.**    Under 42 U.S.C. § 262, a "biological product" includes a "protein" and any product "analogous" to a "protein":

**(i) "Biological Product" Defined**
In this section:
> **(1)** The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

**3.**    Under 21 C.F.R. § 600.3, a "protein" must be "greater than 40 amino acids in size":

> **(h)** *Biological product* means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

> **(6)** A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

8

**STATEMENT OF THE CASE**

**A.     The FDCA Requires Prompt Determinations That "Protein[s]" and "Analogous Product[s]" Are Biological Products**

**1.**     Under the Public Health Service Act, a person who introduces "any biological product" into interstate commerce must have a "biologics license." 42 U.S.C. § 262(a)(1)(A). Congress has empowered the Secretary of Health and Human Services to oversee biologics licensing. *Id.* § 262. The Secretary relies on FDA to implement the licensing scheme.

Congress has defined "biological product" to include "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, *protein, or analogous product*" that is "applicable to the prevention, treatment, or cure of a disease or condition of human beings." *Id.* § 262(i)(1) (emphasis added). The statute does not further define "protein" or "analogous product." Nor does the statute specifically direct the Secretary to promulgate further definitions of those terms. Their meaning is accordingly a question of statutory interpretation for the courts. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024); *accord id.* at 452, 456, 460 (Kagan, J., dissenting) (identifying, as a question that courts must resolve, the definition of "'biological products,' including 'proteins'") (cleaned up).

Under FDA regulations, "[a] protein is any [1] *alpha amino acid polymer* with [2] a *specific, defined sequence* that [3] is *greater than 40 amino acids in size*." 21 C.F.R. § 600.3(h)(6) (emphases added). In adopting that definition, FDA acknowledged that there is no "clear scientific consensus" on the meaning of "protein," and the agency explained that it adopted this definition in substantial part for policy reasons: to establish, for this one category of biological products enumerated in the statute, a "bright-line rule that provides

9

regulatory clarity," that "facilitates the implementation" of the statute, and that promotes the "efficient use of time and resources by both FDA and applicants." 85 Fed. Reg. 10,057, 10,059 (Feb. 21, 2020).

FDA regulations do not further define "alpha amino acid polymer," "amino acid," or "alpha amino acid." The parties agree that a "polymer" is a large molecule made up of smaller units, such as amino acids, and that an "alpha amino acid polymer" need not contain only alpha amino acids. *See* A.266. An "amino acid" is a molecule that has both an amino group and a carboxylic acid group. *See* Michael D. Larrañaga et al., *Hawley's Condensed Chemical Dictionary* 64 (16th ed. 2016). And alpha amino acids are a subtype of amino acid in which those two functional groups are linked together in a particular way—namely, they "have the carboxyl group [of the carboxylic acid] linked to the alpha carbon of their carbon chain." FDA, Memo to File, *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Doc. 46, at FDA0292 n.3; *see* A.264 ("If there are any additional carbons between the amino group and carboxy group, it is not an alpha amino acid.").

FDA's regulations do provide express instructions for determining whether an amino acid polymer "is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). "When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature," the regulations provide that "the size of the amino acid polymer for purposes of [the protein definition] will be based on *the total number of amino acids* in those chains, and will not be limited to the number of amino acids in a contiguous sequence." *Id.* (emphasis added).

**2.**    Section 563 of the Federal Food, Drug, and Cosmetic Act (FDCA) allows a person to "submit a request to the Secretary respecting the classification of [a] product," including a request that the product be classified as a drug or biological product. 21 U.S.C. § 360bbb-2(a). FDA's regulations refer to this type of request as a "request for designation." 21 C.F.R. § 3.7.

The FDCA imposes a strict and mandatory deadline for the agency's response: "Not later than 60 days after the receipt" of a request for designation, the agency "shall determine the classification of the product" and must issue a "written statement that identifies such classification." 21 U.S.C. § 360bbb-2(b). If FDA "does not provide" a letter of designation by the 60-day statutory deadline, then "the recommendation made by the person" requesting classification "shall be considered to be a final determination" of the product's classification. *Id.* § 360bbb-2(c). A final determination of a product's classification "may not be modified" except with the requester's "written consent," or else "for public health reasons based on scientific evidence." *Id.*

**B.    Lilly Develops Retatrutide to Treat Obesity, Diabetes, and Other Conditions**

Through years of study, including ongoing clinical testing, Lilly has developed retatrutide to help adults manage obesity and associated health concerns, including type 2 diabetes. A.241-43. Mirroring the function of other proteins that occur natively in humans, retatrutide operates as an agonist of three hormone receptors within the body, meaning that it binds to and activates those receptors. A.238; *see* A.250. By doing so, retatrutide induces metabolic benefits, including enhancing insulin secretion, modulating energy consumption, and facilitating fat utilization. A.241. This novel three-receptor (or tri-agonist)

11

approach allows retatrutide, among other things, to stimulate substantial weight loss. A.242-43.

Retatrutide has undergone numerous tests to validate its safety and efficacy. *See* A.242-43. Phase 1 and Phase 2 clinical studies have demonstrated that treatment with retatrutide is associated with significant reductions in body weight, daily mean glucose levels, and glycated hemoglobin, as well as improvements in other cardiometabolic measures. A.243. Phase 3 clinical studies are ongoing and expected to complete in 2026. A.243; *see Lilly's Triple Agonist, Retatrutide, Delivered Weight Loss of up to an Average of 71.2 lbs Along with Substantial Relief from Osteoarthritis Pain in First Successful Phase 3 Trial*, Eli Lilly & Company (Dec. 11, 2025), https://investor.lilly.com/news-releases /news-release-details/lillys-triple-agonist-retatrutide-delivered-weight-loss-average.  Lilly has proposed retatrutide's use for chronic weight management, obstructive sleep apnea, osteoarthritis, and type 2 diabetes. A.241.

Like many other proteins, retatrutide is a polymer composed of an amino acid backbone and an associated amino acid chain. Its backbone comprises a chain of 39 alpha amino acids linked together by peptide bonds. A.238-39. The backbone is connected to a second, associated chain composed of two more amino acids: gamma-glutamate, which is an alpha amino acid; and 8-amino-3,6-dioxaoctanoic acid (ADO), which is a non-alpha amino acid. A.238-39; *see* A.246-47. Thus, retatrutide's total number of amino acids is 41. A.246-47; *see* A.264

**C.    FDA Denies Lilly's Request to Designate Retatrutide as a Biological Product**

On November 9, 2023, Lilly submitted to FDA a request for designation seeking classification of retatrutide as a biological product. A.208. Following discussions in which the agency requested additional information, Lilly submitted a new superseding request for designation on January 19, 2024. *See* A.225-36 (FDA "Not Filed" letter and response); A.237-51 (superseding request for designation).

On March 18, 2024, FDA issued a letter of designation denying Lilly's request. A.261-69. The agency "disagree[d] with [Lilly's] recommendation that retatrutide should be classified as a biological product" and instead "determined that [the] product is a drug." A.269.

According to FDA, retatrutide does not qualify as a protein because "it is not composed of more than 40 alpha amino acids." A.264. Although the agency did not dispute that retatrutide has 41 total amino acids, it took the position that "only alpha amino acids are relevant to determining whether something is a protein." A.265. While FDA did not dispute that ADO is an amino acid—indeed, one larger and more complex than typical alpha amino acids—the agency stated that it "is not an *alpha* amino acid because it does not contain an amino group and a carboxylic acid group separated by a single carbon." A.265. As a result, "ADO [wa]s not counted" toward the total, A.265, and thus, in FDA's view, retatrutide was not "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6).

FDA acknowledged that "the definition of protein in 21 CFR 600.3 does not repeat the 'alpha' modifier each time the definition uses the term amino acid." A.265. But the agency nevertheless asserted that "doing so was not necessary given that 'alpha amino acid

polymer' was used at the beginning of the definition." A.265. The agency further asserted that its reading was supported by "common scientific knowledge," a claim the agency supported with a footnote citing generally to a single source—an entry in a biochemistry encyclopedia that discusses the general role of alpha amino acids in various biological processes, but does not address the number of alpha amino acids necessary for a protein or the status of non-alpha amino acids. A.265 & n.17.

In reaching its decision, FDA "assume[d]" that the other components of the protein definition had been met. Thus, the agency "assume[d] (without conceding) that retatrutide has a specific defined sequence," it "assume[d] that ADO is an amino acid," and it "assume[d], without deciding, that gamma glutamate is an alpha amino acid and that the associated chain composed of ADO and gamma glutamate is associated with the main 39-alpha amino acid chain in a manner that occurs in nature." A.264-65. The agency's decision included no analysis or evidence contrary to these assumptions.

FDA next concluded that retatrutide was not "analogous to a protein" because it did not satisfy "the bright line principle established by the rule." A.268. In other words, because retatrutide did not satisfy FDA's regulatory definition of "protein" in 21 C.F.R. § 600.3(h)(6), the agency did not consider it to be "analogous" to a protein either. According to the agency, treating retatrutide as "analogous" to a protein would "effectively include alpha amino acid polymers with fewer than 41 alpha amino acids within the scope of a rule that was intended to exclude them," thereby "defeat[ing] the purpose of the bright line rule because FDA would frequently have to evaluate on a case-by-case basis the features of a particular molecule to determine if it is analogous to a protein." A.268. The agency further

14

stated, without citing any source, that "being greater than 40 *alpha* amino acids is a fundamental, defining property of a protein," such that "retatrutide cannot be analogous to a protein because it does not share this fundamental defining property." A.269.

### D.  The District Court Finds That FDA's Decision Was Contrary to Law, But Remands to the Agency Without Acknowledging the Statutory Deadline

Lilly brought suit challenging FDA's designation decision under the Administrative Procedure Act. Following briefing and oral argument, the district court issued a decision granting summary judgment in part to Lilly and in part to the agency. ShA.16. The court then entered a final judgment vacating FDA's designation decision and remanding to the agency instead of awarding Lilly the injunctive relief it sought. ShA.18-19; *see* A.10; D. Ct. Dkt. 26, at 30.

First, the district court sided with FDA on whether retatrutide was a "protein" under the agency's regulatory definition. ShA.8-12. At the outset, although FDA's briefing never sought deference to its interpretation of the regulation under *Auer v. Robbins*, 519 U.S. 452 (1997), or *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019), the court identified "*Kisor/Auer* deference" as "the appropriate framework for review." ShA.8 (quotation marks omitted).

In construing FDA's regulatory definition of "protein," the district court recognized that the definition *omits* the word "alpha" in its size requirement ("greater than 40 amino acids in size"), while *including* that same qualifier in other parts of the definition ("any alpha amino acid polymer"). And the court acknowledged that "courts usually presume that drafters act intentionally by using particular language in one part of a statute or regulation but omitting in another," an inference that is strongest where, as here, "the disparate

15

language appears in the 'same sentence.'" ShA.10 (quoting *DHS v. MacLean*, 574 U.S. 383, 392 (2015)).

Nonetheless, the district court drew precisely the opposite inference from the omission of "alpha" from the size requirement. According to the court, "the most natural reading of 'alpha amino acid polymer' requires analyzing that phrase in conjunction with, rather than in isolation from, the term 'amino acid' each time it appears within the same regulatory definition." ShA.10-11. Thus, because "[t]he agency made the deliberate choice to narrow the type of polymer" at the beginning of the protein definition, the court reasoned, the agency "by implication" also limited "the type of amino acid[] relevant for determining whether a product is a 'protein.'" ShA.10. On that ground, the court concluded that "the regulation unambiguously requires that proteins contain at least forty-one alpha amino acids." ShA.12.

Next, regarding "analogous" products, the district court determined that "the agency's decision that retatrutide is not at least analogous to a protein was not in accordance with the law." ShA.15. "To be 'analogous,'" the court explained, "a product must be 'similar or comparable to something else either in general or in some specific detail.'" ShA.13 (quoting *Analogous*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/analogous). Under that definition, the agency's bright-line rule—disqualifying as an "analogous" product anything that fails to satisfy every element of the regulatory protein definition—"flouts the statutory text and sidesteps congressional intent." ShA.15. That is so, the court explained, because the agency's interpretation

"effectively reads 'analogous product' out of the statute," requiring a product to *be* a protein in order to be *analogous* to one. ShA.15.

After determining that FDA's analogous-product decision was contrary to law, however, the district court concluded that "remand [wa]s appropriate" for the agency to "revisit its determination that retatrutide is not at least 'analogous' to a protein." ShA.15-16. On remand, the court said, FDA could "reach the same conclusion" on a new ground— that is, on some new basis that the agency has not yet identified. ShA.16. In so concluding, the court did not acknowledge or address the statutory deadline for designation decisions, discussed at length in Lilly's briefing, which makes no allowance for agency do-overs after an adverse judicial ruling.

After issuing its order on the parties' cross-motions for summary judgment, the district court solicited the parties' positions on appropriate next steps. In response, the parties filed a joint position statement requesting that "the Court should proceed to enter a final and appealable judgment," consistent with the summary judgment order. A.290. Lilly also requested that the district court order FDA to act expeditiously on remand in light of the long-expired statutory deadline. The court entered its final judgment December 16, 2025, and Lilly timely noticed its appeal. *See* ShA.18-19; A.295.

## SUMMARY OF ARGUMENT

Congress requires FDA to promptly determine whether new products are "drugs" or "biological products." Here, FDA rejected Lilly's request to designate retatrutide as a biological product, on the ground that it is neither a "protein" nor "analogous" to a protein. For three independent reasons, the district court erred in refusing Lilly's request to order that FDA designate retatrutide as a biological product.

17

*First*, retatrutide is a protein under FDA's own regulatory definition. In relevant part, FDA regulations require a protein to be "greater than 40 *amino acids* in size," where size is measured by counting the "total number of amino acids." 21 C.F.R. § 600.3(h)(6). Retatrutide has 41 total amino acids, which is plainly "greater than 40 amino acids." FDA denied Lilly's request on the ground that retatrutide does not have more than 40 *alpha* amino acids. But the definition does not require a protein to have "greater than 40 *alpha* amino acids," and the agency erred by reading such a limitation into the text. Indeed, the opposite inference is required. A different part of the protein definition expressly requires that a product be an "*alpha* amino acid polymer," *id.* (emphasis added)—a requirement that both parties agree retatrutide meets—but the definition's size requirement omits any such "alpha" limitation. Accordingly, blackletter interpretive principles mandate the conclusion that *all* amino acids count, not only alpha amino acids.

*Second*, the district court erred in remanding to the agency so it could reconsider the analogous-products issue. That remand order conflicted with the FDCA's mandatory statutory deadline, under which "the recommendation made by" a sponsor in a request for designation "shall be considered to be a final determination by the Secretary" if the agency has not issued a designation decision "[n]ot later than 60 days after" the request is received. 21 U.S.C. § 360bbb-2(b), (c). Here, when the court vacated FDA's unlawful designation decision for retatrutide, there was no longer any valid designation decision by the agency. The statute accordingly required, by operation of law, the designation of retatrutide as a biological product—not a do-over.

18

***Third***, even if the vacatur merely reset the 60-day clock, it has now been more than *three months* since the remand order, and the agency *still* has not issued a designation decision or even initiated further proceedings. At the very least, the agency was required to "provide [a designation decision] within the 60-day period" following vacatur, but it failed to do so. *Id.* § 360bbb-2(c). This Court should put an end to the agency's unlawful delay. Lilly is entitled to finality on its designation decision, just as the FDCA prescribes.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment de novo." *Nat'l Wildlife Fed'n v. Army Corps of Eng'rs*, 75 F.4th 743, 748 (7th Cir. 2023). Under the Administrative Procedure Act, the Court must hold unlawful and set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision that does not "abide by its own regulations" must be set aside under that standard. *Fort Stewart Sch. v. FLRA*, 495 U.S. 641, 654 (1990). The Court may sustain an agency's decision only on the grounds that the agency offered at the time that decision was made. *SEC v. Chenery Corp. (Chenery I)*, 318 U.S. 80, 93-94 (1943).

Determining what falls within the statutory definition of a "biological product" is an interpretative question that must ultimately be resolved by the courts, rather than by FDA. *See Loper Bright*, 603 U.S. at 394; *accord id.* at 452 (Kagan, J., dissenting) (identifying this specific question as one that, under the majority's opinion, courts must decide). "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 413 (majority opinion). "Under the APA, it thus

19

'remains the responsibility of the court to decide whether the law means what the agency says.'" *Id.* at 392 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)). In performing that task, moreover, the Court must employ "traditional tools of statutory construction" rather than deferring to an agency's "policy preferences." *Id.* at 403.

## ARGUMENT

The district court erred in concluding that retatrutide is not a protein and in remanding to FDA rather than ordering the agency to designate retatrutide as a biological product, as the FDCA commands.

## I.    RETATRUTIDE IS A PROTEIN AND THUS A BIOLOGICAL PRODUCT

Retatrutide is a protein under FDA's own regulatory definition. The grounds that the agency asserted for its contrary conclusion conflict with the regulatory text and are unpersuasive on their own terms. This Court should reverse the district court's decision and remand with instructions to order the agency to designate retatrutide as a biological product.

### A.    Retatrutide Is a Protein Under the Protein Definition's Plain Text Because it is "Greater Than 40 Amino Acids in Size"

1.    Under FDA's regulations, a product is a protein if it: [1] is an "alpha amino acid polymer," [2] has "a specific, defined sequence," and [3] "is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). When determining "the size of the amino acid polymer," the regulation requires counting "the total number of amino acids" across "two or more amino acid chains in [the] amino acid polymer" if the chains are "associated with each other in a manner that occurs in nature." *Id.* Retatrutide satisfies each of those criteria.

***First***, retatrutide is an "alpha amino acid polymer" because it is a polymer that is composed primarily of alpha amino acids. A.247; *see* A.264-65. Nothing in FDA's regulations requires an alpha amino acid polymer to be composed *solely* of alpha amino acids. FDA has never contended otherwise, nor has it argued that retatrutide is not an alpha amino acid polymer. To the contrary, FDA has previously approved biologics license applications for products composed of a mix of alpha and non-alpha amino acids. *See* Sogroya Prescribing Information § 11 (April 2023), available at https://www.accessdata.fda.gov/drugsatfda_docs /label/2023/761156s005lbl.pdf; *see also* A.266 (agreeing that Sogroya's inclusion of additional ADO units, which are not alpha amino acids, "d[id] not change that Sogroya is a protein").

***Second***, retatrutide has a "specific, defined sequence" because it is synthesized according to "a pre-defined template" that results in an "identical sequence across batches." *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106 (D.D.C. 2020); *see* A.246. FDA has never argued otherwise. *See* A.265.

***Third***, and most relevant here, retatrutide has "greater than 40 amino acids," all of which are "associated with each other in a manner that occurs in nature." A.246 (quotation marks omitted); *see* A.264. Retatrutide's backbone comprises 39 amino acids, and its associated chain contains two more. A.238. The chain is "associated" with the backbone because they connect via an "isopeptide bond," which is "an amide bond between a carboxyl group of one amino acid and an amino group of another amino acid"—a type of bond that commonly occurs in nature. *See* Roger L. Lundblad, *Biochemistry and Molecular Biology Compendium* 175 (2019). Thus, the "total number of amino acids in [retatrutide's] chains"

is 41, which is "greater than 40." 21 C.F.R. § 600.3(h)(6). Again, FDA has never contested retatrutide's total number of amino acids.

2.    The key dispute here is whether all retatrutide's amino acids count in determining whether it is "greater than 40 amino acids in size" (as Lilly argues) or whether only *alpha* amino acids count (as FDA argues). *Id.* The text of FDA's regulation answers that question: "When two or more amino acid chains" are "associated with each other in a manner that occurs in nature," as retatrutide's are, the count will be determined by "based on the total number of amino acids in those chains." *Id.* Neither that counting instruction ("total number of amino acids") nor the size requirement ("greater than 40 amino acids") turns on the presence of *alpha* amino acids. Both require counting *all* retatrutide's amino acids.

The omission of "alpha" in the counting instruction and the size requirement is significant because the first part of the protein definition—the "alpha amino acid polymer" requirement—*does* expressly turn on the presence of *alpha* amino acids. *Id*. Under the so-called *Russello* presumption, "[w]here [the drafter] includes particular language in one section of [a law] but omits it in another section of the same [law], it is generally presumed that [the drafter] acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted); *see Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 636 (7th Cir. 2020) (applying the *Russello* presumption to the interpretation of a regulation). This interpretive canon, rooted in the principle that courts "must give effect to, not nullify, [the drafter's] choice to include limiting language in some provisions but not others," is invoked routinely. G*allardo v. Marstiller*, 596 U.S. 420, 431

22

(2022); *see, e.g.*, *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) (relying on *Russello* presumption); *Carcieri v. Salazar*, 555 U.S. 379, 389-90 (2009) (same); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (same). Here, the fact that FDA included the modifier "alpha" in *some* parts of the protein definition but not in *others* must be understood as an intentional choice, not as an invitation to read the modifier into other elements of the protein definition.

Moreover, "[t]he interpretive canon that [a drafter] acts intentionally when it omits language included elsewhere applies with particular force" where the differing language appears "in close proximity," and especially where—as here—it appears "in the same sentence." *DHS v. MacLean*, 574 U.S. 383, 392 (2015). As the Supreme Court and this Court have repeatedly explained, the *Russello* presumption is strongest where the omission appears in nearby text. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (finding it "significant" that a modifier was included for one phrase, but "no similar restriction modifies the phrase" that "appears only two sentences later"); *McNutt v. Bd. of Trustees of Univ. of Ill.*, 141 F.3d 706, 709 (7th Cir. 1998) ("The omission of a similarly specific reference in the very next statutory section therefore assumes special significance."); *see also United States v. Boender*, 649 F.3d 650, 660-61 (7th Cir. 2011) ("the Supreme Court has found that the 'negative implications raised by disparate provisions are strongest'" where the relevant language was adopted together) (quoting *Lindh v. Murphy*, 521 U.S. 320, 330 (1997)).

*Gonzales* is particularly instructive. There, the Supreme Court considered whether a provision that prohibited certain federal sentences from running "concurrently with *any* other term of imprisonment" applied to state-imposed sentences. 520 U.S. at 2-3 (quoting

23

18 U.S.C. § 924(c)) (emphasis added). The Court noted that the first sentence of the same subsection also used the word "any," but it did so in a manner "expressly limited . . . to only federal crimes." *Id.* at 5. The Court accordingly found it "significant that no similar restriction modifies the phrase 'any other term of imprisonment,' which appears only two sentences later and is at issue in this case." *Id.* (citing *Russello*). Here, the regulation's failure to modify "amino acid" with "alpha" the second time it appears is even more significant, because the omission comes later "in the same sentence." *MacLean*, 574 U.S. at 392.

This reading is further reinforced by the regulation's separate instruction that for polymers like retatrutide that include associated chains, "the size of the amino acid polymer for purposes of [the protein definition] will be based on the *total number of amino acids* in those chains." 21 C.F.R. § 600.3(h)(6) (emphasis added). "Total" encompasses the "entire quantity" of amino acids. *Conway v. O'Malley*, 96 F.4th 1275, 1279 n.2 (9th Cir. 2024) (quoting *Webster's Third New Int'l Dictionary*, 2414 (1981)); *see* FDA Mem. in Support of Cross-Mot. for Summ. J. at 17, 25, 38, *Ipsen Biopharmaceuticals, Inc. v. Becerra*, No. 20-cv-2437 (D.D.C. Nov. 20, 2020), 2020 WL 13280713 (discussing requirement that a protein's associated chains must "total more than 40 amino acids," without suggesting that only alpha amino acids count). Consistent with that definition, courts hold that the "plain and ordinary meaning" of the word "total" refers "unambiguously" to the entire set of the objects that it modifies. *In re Trendsetter HR L.L.C.*, 949 F.3d 905, 913 (5th Cir. 2020); *see, e.g.*, *Turner-El v. Illinois Bd. of Educ.*, No. 93-cv-4918, 1996 WL 480341, at *2 (N.D. Ill. Aug. 21, 1996) ("[t]en pages in total" includes all pages, not only a subset of pages); *Abt v. Mazda Am.*

24

*Credit*, 25 F. Supp. 2d 860, 865 (N.D. Ill. 1998) ("total of other charges" includes all other charges, not only a subset of charges). Here, the regulation's reference to "the total number of amino acids," rather than to "the total number of *alpha* amino acids," reinforces the *Russello* presumption.

**3.**     To resist this straightforward application of *Russello*, FDA argued below that the agency simply "found it '[un]necessary' to 'repeat the "alpha" modifier each time [it] uses the term amino acid.'" D. Ct. Dkt. 31, at 12 (alterations in original) (quoting A.265). But just last Term, the Supreme Court rejected an argument exactly like the one FDA advances here. In *City and County of San Francisco*, the Court considered a statute that initially referred to "effluent limitations," 33 U.S.C. § 1311(b)(1)(A)-(B), but then referred in the following provision to "any more stringent limitation," *id.* § 1311(b)(1)(C). Noting the absence of "effluent" from the latter provision, the Solicitor General argued that "Congress's use of different language" in the two provisions "seem[s] quite deliberate." U.S. Br. at 23, No. 23-753, 2024 WL 3988543 (Aug. 26, 2024) (citing *Russello*, 464 U.S. at 23) (quotation marks omitted). Echoing the argument that FDA made in the district court here, San Francisco countered that the presumption was inapplicable because Congress had merely "used 'limitations' as a *shorthand* for 'effluent limitations.'" Reply Br. for Pet. at 8, No. 23-753, 2024 WL 4360488 (Sept. 25, 2024) (emphasis added); *compare* D. Ct. Dkt. 31, at 14 (FDA arguing that "the unmodified term 'amino acids'" was used "as 'shorthand' for 'alpha amino acids'").

In language that could have been written for this case—and is dispositive here—the Supreme Court rejected San Francisco's argument and agreed with the Solicitor General:

> "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). We have invoked this canon time and time again. *See, e.g.*, *Gallardo v. Marstiller*, 596 U.S. 420, 429-30 (2022); *Salinas v. Railroad Retirement Bd.*, 592 U.S. 188, 196 (2021); *Azar v. Allina Health Services*, 587 U.S. 566, 576-77 (2019). And it is fatal to San Francisco's argument here. Sections 1311(b)(1)(A) and (B) refer to "effluent limitations," but the very next provision, § 1311(b)(1)(C), refers instead to "any more stringent limitation." We cannot believe that Congress omitted the term "effluent" from § 1311(b)(1)(C) simply because it wanted to save ink or assumed that regulators and interested parties would understand that the omission of the term was inconsequential.

604 U.S. at 344 (brackets omitted). The *Russello* presumption is similarly "fatal" to FDA's argument here. *See, e.g.*, *Mlsna*, 975 F.3d at 636 (applying *Russello* presumption to interpretation of regulation); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("When an agency includes a requirement in only one section of a regulation, we presume the exclusion from the remainder of the regulation to be intentional.").

The district court similarly drew the opposite inference from the one that *Russello* and its progeny require. The court said that the phrase "alpha amino acid polymer" must be read "in conjunction with, rather than in isolation from, the term 'amino acid' each time it appears within the same regulatory definition." ShA.10-11. The court thus assumed that the inclusion of the word "alpha" in the phrase "*alpha* amino acid polymer" required reading the phrase "greater than 40 amino acids in size" as incorporating that same limitation implicitly. But extensive Supreme Court precedent mandates the opposite assumption: Where text includes limiting language in one place but omits it in another, courts "normally understand that difference in language to convey a difference in meaning."

26

*Bittner v. United States*, 598 U.S. 85, 94 (2023). The district court's contrary interpretation, like FDA's designation decision, "defies this traditional rule of [textual] construction." *Id.*

The district court also erred in attempting to distinguish the long line of cases applying *Russello*. Unlike here, the court said, the relevant language in those cases "could be analyzed in isolation because at least one phrase had a consistent meaning throughout the statute." ShA.10. That is neither a correct characterization of the Supreme Court's *Russello* precedents nor of the regulatory language at issue here.

Nothing in *Russello*, or the numerous cases applying it, requires that language be used repeatedly throughout a statute before the presumption can apply. For example, in *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1 (2017), the Supreme Court applied the *Russello* presumption where only two timing provisions were at issue—one of which expressly required taking action before certain pharmaceutical products were marketed, 42 U.S.C. § 262(l)(8)(B), and one of which did not, *id.* § 262(l)(8)(A). *See Sandoz*, 582 U.S. at 20. Similarly, the forfeiture provisions at issue in *Russello* itself used the phrase "any interest" only twice—once limited to "any interest" in an "enterprise," 18 U.S.C. § 1963(a)(1), and once without any such textual limitation, *id.* § 1963(a)(2). *See Russello*, 464 U.S. at 23.

To be sure, the *Russello* Court also observed that "[s]imilar less expansive language" appeared in other statutory sections. 464 U.S. at 23. But the Court's holding did not rest on that fact. Instead, the Court explained that when "differing language" is used in two places, the presumption is that it does not carry "the same meaning in each." *Id.* This Court has likewise repeatedly relied on the *Russello* presumption in cases where the differing language appeared in the relevant provisions only once. *See, e.g., Consolidation Coal Co. v.*

*Dir., Off. of Workers' Comp. Programs*, 129 F.4th 409, 414 (7th Cir. 2025) (statute's use of "chronic" to limit covered lung conditions in one statutory provision reflected that no such limit applied in a different provision that omitted it); *Refined Metals Corp. v. NL Indus. Inc.*, 937 F.3d 928, 932 (7th Cir. 2019) (limiting language included in one of two provisions authorizing contribution actions reflected that no such limit applied in provision that omitted it).

In any case, the district court was simply wrong that the relevant language here was not "used repeatedly throughout the regulation." ShA.10. The regulatory protein definition uses the phrase "amino acid" three times without the "alpha" qualifier. A protein must be "greater than 40 *amino acids* in size"; and when two or more amino acid chains are associated, the product's size for purposes of that requirement "will be based on the *total number of amino acids* in those chains, and will not be limited to the *number of amino acids* in a contiguous sequence." 21 C.F.R. § 600.3(h)(6) (emphases added). A neighboring definition, moreover, also makes reference to "an amino acid"—again without qualification. *Id.* § 600.3(h)(5)(ii) (definition of product analogous to a therapeutic serum). Thus, the relevant language *does* appear repeatedly in the regulation. Yet the qualifying word "alpha" appears *only* when describing the type of amino acid polymer a protein must be: an "alpha amino acid polymer." *Id.* § 600.3(h)(6). Longstanding precedent accordingly requires giving effect to that difference in language.

Finally, the district court's reasoning fails on its own terms: Reading the phrase "'alpha amino acid polymer' . . . in conjunction with, rather than in isolation from, the term 'amino acid'" supports counting *both* alpha *and* non-alpha amino acids towards the size

requirement. ShA.10-11. As noted, FDA has never disputed that retatrutide is an "alpha amino acid polymer," notwithstanding its inclusion of a single non-alpha amino acid, because it is primarily composed of alpha amino acids; alpha-amino-acid homogeneity is not required. Even if the same limitation could implicitly be read into the size requirement of more "than 40 amino acids," therefore, that requirement should *also* be satisfied by a product that consists primarily of alpha amino acids. There is no reason to treat the "alpha" limitation as being *more* stringent in the size requirement (where it *does not* appear) than in the "alpha amino acid polymer" requirement (where it *does* appear). And, because of *Russello*, there is every reason to draw the opposite inference.

### B. The Remaining Grounds for Counting Only Alpha Amino Acids Are Unsound and Conflict with the Regulatory Text

None of the remaining grounds offered by the district court or agency for reading an "alpha" limitation into the protein definition's size requirement justify departure from the protein definition's clear text.

1. Below, FDA principally asserted that because the phrase "'alpha amino acid polymer' was used at the beginning of the definition," it was "not necessary" to "repeat the 'alpha' modifier each time the definition uses the term amino acid." A.265. But as noted, traditional tools of interpretation mandate precisely the opposite inference: "Where [the drafter] includes particular language in one section of [a law] but omits it in another section of the same [law], it is presumed that [the drafter] intended to exclude the language, and the language *will not be implied where it has been excluded*." *Gendron v. United States*, 154 F.3d 672, 674 (7th Cir. 1998) (emphasis added); *see, e.g.*, *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009).

29

FDA also relied on supposed "common scientific knowledge that alpha amino acids are the only relevant amino acids for determining whether something is a protein." A.265. That is because, the agency explained, "[a]lthough more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20 alpha amino acids." A.264-65. For that reason, the agency concluded, its position that "only alpha amino acids are relevant to determining whether something is a protein . . . is consistent with commonly understood scientific principles." A.265. But FDA may not "simply assert[]" that its view of common knowledge is correct; that sort of "[a]ssertion and reassertion, without more, is not the reasoned decisionmaking required of an administrative body." *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1499 (D.C. Cir. 1989); *cf. Commodity Carriers, Inc. v. Fed. Motor Carrier Safety Admin.*, 434 F.3d 604, 608 n.8 (D.C. Cir. 2006) ("reference to common knowledge does not in and of itself make it so absent evidence of such knowledge") (citation and quotation marks omitted).

In any event, even if this sort of post-hoc "everybody knows" reasoning were valid, it provides no basis to override the unambiguous regulatory text.

First, the agency's appeal to "commonly understood scientific principles," A.265, fails on its own terms. The single source that FDA cited in support of this supposed common understanding, *see* Antonin Ginguay & Luc A. Cynober, *Amino Acids*, *in* Encyclopedia of Biological Chemistry (3d Ed. 2021), provides no support for the agency's position. It is an entry in a biochemistry encyclopedia, which merely discusses the general role that alpha amino acids play in various biological processes—without addressing the definition of a protein *at all*. And FDA's source certainly does not say (or even suggest) that "alpha amino

30

acids are the only relevant amino acids for determining whether something is a protein." A.265.

Second, FDA's argument is internally inconsistent and would render the word "alpha" in the protein definition superfluous. The definition specifies that a protein is an "*alpha* amino acid polymer." 21 C.F.R. § 600.3(h)(6) (emphasis added). If the agency were correct that "alpha amino acids are the only relevant amino acids" for proteins as a matter of "common scientific knowledge," A.265, then specifying the "alpha" at the beginning of the definition would have been unnecessary. Indeed, under the agency's reasoning, it is hard to see what work the word "alpha" does in the regulation at all. *See In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 710 (7th Cir. 2015) (describing "the canon against surplusage" as a "basic tool in statutory interpretation").

Third, nothing supports FDA's attempt to limit the protein definition based on the type of amino acids present in "proteins of humans." A.264. Neither that phrase nor the concept appears anywhere in the relevant statutory or regulatory text. In fact, such a limitation would contradict Congress's decision to amend the statutory definition of protein to *remove* the prior exclusion for "chemically synthesized polypeptides" (*i.e.*, non-naturally synthesized proteins), Pub. L. No. 116-94, Div. N, Tit. I, § 605, 133 Stat. 3127 (2019). This decision confirms that the term "protein" includes proteins that do not naturally occur in humans. Indeed, FDA has approved numerous non-naturally occurring proteins as biological products, such as Enbrel® (etanercept) and Orencia® (abatacept). In light of that fact—and Congress's deliberate choice to include chemically synthesized proteins in the

31

definition of a biological product—it makes scant sense to construe the protein definition as referring solely to the type of amino acids used in human protein synthesis.

FDA's attempt to define "protein" in terms of human biosynthesis is also "internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018). For example, FDA's regulatory definition of protein includes polymers composed of *any* alpha amino acids—even those that *do not* naturally occur in humans. *See* 21 C.F.R. § 600.3(h)(6); *see, e.g.*, Tresiba Prescribing Information § 11 (July 2022), available at https://www.novo-pi.com /tresiba.pdf. FDA has articulated no justification for *excluding* non-alpha amino acids on the ground that they are not involved in human protein synthesis, while *including* alpha amino acids that are similarly not involved in human protein synthesis.

FDA's reliance on the type of amino acids present in "proteins of humans" is also underinclusive, because it would exclude at least one of the 20 common amino acids involved in human protein biosynthesis. According to FDA, one of retatrutide's amino acids (ADO) is not an "alpha amino acid" because it does not "contain an amino group and a carboxylic acid group separated by a single carbon." A.265. But proline—a common amino acid used in natural human protein synthesis—*also* fails to meet this strict definition, and so the agency's reading of the protein definition would exclude proline. *See* Antonin Ginguay & Luc A. Cynober, *Amino Acids*, in Encyclopedia of Biological Chemistry at 2 (3d Ed. 2021) (proline's "–NH$_2$ group is part of a heterocycle," such that it lacks a standard amino group). FDA's focus on amino acids used to synthesize human proteins thus does not support its categorical exclusion of non-alpha amino acids.

In sum, the agency's reasoning cannot justify departure from the straightforward result mandated by the regulation's text: Because retatrutide has more than 40 amino acids, it is "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6).

2.    The district court's additional reasons for adopting FDA's interpretation of the "protein" definition similarly provide no basis for departing from the regulatory text.

At the outset, the district court based its decision on a fundamental misunderstanding of the issue in dispute. In FDA's designation decision, the agency concluded that retatrutide failed to qualify as a protein on one ground only: that "retatrutide is not greater than 40 alpha amino acids in size." A.265. But FDA did not dispute—and has *never* disputed—that retatrutide is an "alpha amino acid polymer." Indeed, the agency has repeatedly acknowledged that alpha amino acid polymers *can* contain both alpha and non-alpha amino acids, consistent with the agency's prior determinations that products containing both were proteins. *See* A.256, 265; *see also* A.288 ("THE COURT: So, counsel, is it the FDA's position that all proteins contain only alpha amino acids? MR. CRANE-HIRSCH: No, not at all.").

Yet the district court based its decision on the opposite understanding: "Basic grammar dictates that 'alpha amino acid polymer' means a polymer made up of alpha amino acids." ShA.10. On that ground, the court said, the agency had appropriately limited "the type of amino-acid[] relevant for determining whether a product is a 'protein.'" ShA.10. "Otherwise," the court concluded, "the 'alpha' modifier does no work, and the term becomes superfluous." ShA.10. That reasoning was flawed in multiple respects.

For one thing, FDA's "action must be measured by what the [agency] did, not by what it might have done." *Chenery I*, 318 U.S. at 93-94. FDA *did not* say that "'alpha amino acid polymer' means a polymer made up of alpha amino acids." ShA.10. Indeed, the agency repeatedly said the opposite. A.288 ("No, not at all."). The court should not have upheld the agency's decision on a theory that the agency itself expressly disclaimed.

More fundamentally, the district court was wrong that "the 'alpha' modifier . . . becomes superfluous" unless an alpha amino acid polymer is composed solely of "alpha amino acids." ShA.10. The modifier in "*alpha* amino acid polymer" indicates that the relevant polymer contains alpha amino acids. A.247. Without the modifier, the protein definition could be satisfied by products that contain *no* alpha amino acids. But it does not follow that the modifier means that *only* alpha amino acids are relevant, much less that only alpha amino acids count toward the size requirement. Consistent with that understanding, FDA has approved as proteins products that contain both alpha and non-alpha amino acids. A.247.

Finally, the district court's logical leap fails on its own terms: Basic grammar *does not* "dictate[] that 'alpha amino acid polymer'" is a polymer made up solely of alpha amino acids, nor that only alpha amino acids would be relevant for determining such a polymer's size. For example, no one would contend that a "chocolate cake" must have no ingredients except chocolate. And if someone asked for a "chocolate layer cake more than five layers tall," no baker would think that only chocolate layers could count towards the size requirement. The same is true for the agency's protein definition. When one starts from the premise—as the agency agrees—that alpha amino acid polymers *can* contain non-alpha

amino acids, nothing in the regulatory definition suggests that *only* alpha amino acids count for determining whether a product is "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6).

3. FDA's interpretation cannot be saved by the fact that courts have sometimes "deferred to agencies' reasonable readings of genuinely ambiguous regulations." *Kisor v. Wilkie*, 588 U.S. 558, 563 (2019). As a threshold matter, "*Kisor/Auer* deference," as the district court called it, cannot be reconciled with *Loper Bright*'s insistence "that questions of law [a]re for courts to decide, exercising independent judgment." 603 U.S. at 387.

In any event, *Kisor* deference is categorically inapplicable where the agency "does not invoke the doctrine." *Ortiz v. McDonough*, 6 F.4th 1267, 1275 (Fed. Cir. 2021); *see id.* (citing cases); *Robinson Knife Mfg. Co. v. CIR*, 600 F.3d 121, 134 n.11 (2d Cir. 2010) ("[T]he Commissioner has not argued *Auer* deference, so any such argument is forfeited."); *see also Neumann's Pharmacy, L.L.C. v. DEA*, 167 F.4th 320, 328 n.22 (5th Cir. 2026) (declining "to consider whether [*Kisor*] deference might otherwise apply" because "[t]he DEA d[id] not invoke [such] deference"). In its briefing below, FDA declined to argue that the district court should defer to its interpretation of the regulation under *Kisor*. *See* D. Ct. Dkt. 31; D. Ct. Dkt. 34. That forfeiture is fatal to any potential invocation of *Kisor* now to support FDA's reading of its regulation.

But even if FDA *had* sought *Kisor* deference, the agency's interpretation here *still* would not be entitled to it. "First and foremost, a court should not afford . . . deference unless the regulation is genuinely ambiguous." *Kisor*, 588 U.S. at 574. As discussed above, the regulation's plain text and "all the 'traditional tools' of construction" unambiguously

foreclose the agency's reading that only *alpha* amino acids count toward the "greater than 40" size requirement. *Id.* at 575. FDA's position here is also a "new interpretation," *id.* at 579, which the agency debuted for the first time to defend the result in this case, rather than an "authoritative" and generally applicable statement of agency policy, *id.* at 577. Indeed, in *other* cases, FDA has asserted that a "specific, defined sequence"—*not* the number of alpha amino acids—was the "critical" factor for distinguishing proteins. *Teva Pharms.*, 514 F. Supp. 3d at 113. Nor does interpreting the regulatory definition's size requirement implicate FDA's "substantive expertise." *Kisor*, 588 U.S. at 577. The issue thus "'fall[s] more naturally into a judge's bailiwick' than an agency's." *Loper Bright*, 603 U.S. at 401 (quoting *Kisor*, 588 U.S. at 578).

### C.      Because Retatrutide Is a Protein, No Remand to FDA Is Warranted

Under the proper interpretation of the regulatory text, retatrutide satisfies the only disputed requirement of the protein definition: the size requirement. If all of retatrutide's amino acids count toward the size requirement then there is no dispute that retatrutide is "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). From there, no remand to the agency is necessary because there is nothing left for the agency to decide. *Am. Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157, 1163 (D.C. Cir. 1994) ("A remand is unnecessary where, as here, the outcome of a new administrative proceeding is preordained."); *cf. Baez-Sanchez v. Barr*, 947 F.3d 1033, 1036-37 (7th Cir. 2020) (administrative remands are "designed to afford the agency an opportunity to have its say on an issue" that "could be entitled to judicial deference"). Accordingly, the Court should reverse the decision below

36

on the "protein" definition, and it should remand with instructions to order FDA to designate retatrutide as a biological product.

## II.     THE DISTRICT COURT INDEPENDENTLY ERRED IN REMANDING TO THE AGENCY

Even apart from the district court's erroneous conclusion that retatrutide is not a protein, the court erred in remanding to the agency rather than entering the injunction that Lilly sought. Under the FDCA, Congress adopted a mandatory 60-day deadline for designation decisions, and it specified that the agency's failure to act within that timeline automatically results in the sponsor's recommendation taking effect. These requirements are designed to provide certainty to manufacturers and ensure that new medications become available to patients promptly. It has now been more than *two years* since Lilly submitted its request for designation, and more than *three months* since the district court's order vacating the agency's decision. Yet the agency *still* has not issued a lawful designation decision for retatrutide. Thus, the statutory deadline has long since expired, regardless of whether (1) the deadline began to run from the date of Lilly's request for designation, or (2) the district court's vacatur order reset the 60-day clock. Either way, the result is the same: Lilly's recommendation has taken effect by operation of law, and FDA must now designate retatrutide as a biological product.

A.     Recognizing the need for prompt designation decisions, the FDCA provides clear instructions: "Not later than 60 days after the receipt of [a] request" for designation, the agency "shall determine the classification of the product." 21 U.S.C. § 360bbb-2(b). In using the word "shall," Congress made the 60-day deadline mandatory and non-extendable. *See Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 865 (7th Cir. 2020) ("This court (like

others) has consistently interpreted 'shall' as mandatory language."). The statute further specifies—again using "shall"—that the agency's failure to comply with the deadline *automatically* results in acceptance of the requested classification: "If the [agency] does not provide" a designation decision "within the 60-day period," then "the recommendation made by the [sponsor] shall be considered to be a final determination by the [agency] of such classification of the product." 21 U.S.C. § 360bbb-2(c). And once that happens, the classification "may not be modified by the [agency] except with the written consent of the person, or for public health reasons based on scientific evidence." *Id.*

Those mandatory instructions require treating Lilly's request for designation of retatrutide as having been granted. When the district court "vacated" FDA's designation decision, it had the effect of "rendering [that decision] a nullity." *United States v. Uriarte*, 975 F.3d 596, 601 (7th Cir. 2020); *see id.* ("Vacatur 'wipe[s] the slate clean.'") (alteration in original) (quoting *Pepper v. United States*, 562 U.S. 476, 508 (2011)). As a consequence, the ruling restored the status quo as it existed before the agency issued its unlawful decision—including the statutory deadline. And, when the district court ruled, that 60-day deadline had long since elapsed without FDA "determin[ing] the classification of the product" through any valid agency action. 21 U.S.C. § 360bbb-2(b). Accordingly, "the recommendation made by [Lilly] shall be considered to be a final determination" of retatrutide's status as a biological product. *Id.* § 360bbb-2(c).

No statutory provision excuses or tolls the deadline in the event that a court sets the agency's decision aside. Nor does the statute authorize the agency to make a second, untimely attempt to identify alternative grounds to reject Lilly's request. Instead, Lilly's

38

request that retatrutide be designated as a biological product goes into effect by operation of law: "the recommendation made by the person [requesting designation] shall be considered to be a final determination by the Secretary of such classification of the product, . . . and may not be modified by the [agency]," absent exceptional circumstances not present here. *Id.* § 360bbb-2(c). The district court's order remanding to the agency, rather than ordering FDA to designate retatrutide as a biological product as the statute requires, was erroneous.

Reading the FDCA, consistent with its text, as prohibiting endless remands and piecemeal agency decisions aligns with the statute's structure and purpose. Congress's decision to impose a mandatory deadline, and to deem the agency's failure to timely act as acceptance of the requested classification, reflects the significant burdens that delay imposes on the development of new medicines. Marketing applications for drugs and biological products have different statutory and regulatory requirements. *Compare* 42 U.S.C. § 262(a) (licensure standards for biologics license applications), *and* 21 C.F.R. § 601.2 (procedures and content requirements for biologics license applications), *with* 21 U.S.C. § 355(d) (approval standards for new drug applications), *and* 21 C.F.R. § 314.50 (content requirements and procedures for new drug applications). A product's sponsor must accordingly know the type of application that it will be required to file far in advance of submission in order to begin its preparations. Delays in classification carry significant costs for manufacturers and can unnecessarily keep groundbreaking medicines out of patients' hands.

39

Affording FDA another opportunity to develop other grounds to justify its result would also create perverse incentives. The agency would be encouraged to hold potential arguments in reserve, so that the agency could deploy them on remand in the event of an unfavorable judicial decision. That sort of piecemeal process would turn the statutory deadline on its head—thwarting the statute's design, costing sponsors significant resources, and depriving the public of prompt access to new medicines.

Indeed, FDA's briefing below makes clear that remand here invites precisely this sort of *seriatim* litigation. In its decision, the agency identified only a single ground for denying retatrutide's designation as a biological product: namely, that "retatrutide is not greater than 40 alpha amino acids in size," A.265; *see* A.268-69. But in litigation, the agency asserted that there were still "multiple scientific issues" it had yet to decide. D. Ct. Dkt. 31, at 30. FDA's designation decision, the agency claimed, "'assumed' four issues for its analysis 'without conceding' them: that retatrutide has a specific, defined sequence; that its primary 39-amino-acid chain is associated 'in a manner that occurs in nature' with its second chain of gamma glutamate and ADO; that gamma glutamate is an alpha amino acid; and that ADO is an amino acid." *Id.* at 7 (quoting A.264) (brackets omitted).

The agency has thus claimed the right to reject retatrutide on the basis of those four supposedly unconceded issues, in addition to the issue currently on remand. If the agency elects to decide only one issue per remand, as it did in its now-vacated initial designation decision, the parties could be in for at least *five more* trips to this Court. Under the agency's theory, moreover, nothing prevents it from inventing *even more* grounds for rejection in future designation decisions. The result would be to draw out indefinitely a classification

40

determination that Congress said "shall" be resolved—by operation of law, if not by the agency—within 60 days.

That cannot be right. Congress's instructions, as well as principles of basic fairness and judicial economy, preclude allowing the agency to parcel out its decision-making issue-by-issue. Since the agency failed to make a valid decision "[n]ot later than 60 days after the receipt of [Lilly's] request" for designation, "the recommendation made by [Lilly] shall be considered to be a final determination." 21 U.S.C. § 360bbb-2(b), (c). This Court should vacate the district court's judgment remanding to FDA and should instead order the agency to designate retatrutide as a biological product.

**B.** Even if vacatur of FDA's unlawful designation decision did not render the agency's decision-making untimely at the moment of vacatur, and instead merely *reset* the FDCA's mandatory 60-day clock, the agency has blown past that deadline too. More than *three months* have elapsed since the district court's final judgment remanding to the agency. *See* ShA.18-19. And yet the agency *still* has not issued a new designation decision on remand. To be clear, the best reading of the statute is that the agency gets *no* additional bites at the apple once the statutory deadline has lapsed; FDA may not issue piecemeal decisions and then run out a new 60-day clock every time a court sets one of those unlawful decisions aside. But at the very least, the agency must "provide [a designation decision] within the 60-day period" following vacatur. 21 U.S.C. § 360bbb-2(c). Since it has indisputably failed to do so here, Lilly's recommendation was accepted by operation of law, and FDA should accordingly be ordered to designate retatrutide as a biological product.

41

As the D.C. Circuit has explained, there is "no reason" that an agency "should be permitted to evade [a] statutory deadline [by seeking a] remand." *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1176 (D.C. Cir. 2020). Allowing FDA to do so here would render the statute's required remedy effectively meaningless. FDA could avoid its obligation to timely determine a product's classification—and the attendant consequences prescribed by statute—merely by issuing a perfunctory denial incapable of withstanding judicial review. Then, when that perfunctory denial is set aside in litigation, the agency would have an unlimited amount of time to reach a new decision.

Notably, FDA seems to have endorsed that concept below, arguing that it need not be directed to "'act expeditiously' on remand." A.292. Its position appears to be that once it issues *any* designation decision—no matter how incomplete or unlawful—*no* statutory time limit requires it to take action, even if a judicial decree has "render[ed] [its decision] a nullity." *Uriarte*, 975 F.3d at 601. Needless to say, if that view were adopted, it would undermine the mandatory system of prompt product-classification that Congress created. And it would directly conflict with the statute's prescription that, absent a designation decision within 60 days, "the recommendation made by the person [requesting designation] shall be considered to be a final determination" of the product's classification. 21 U.S.C. § 360bbb-2(c).

## CONCLUSION

The Court should reverse the district court's judgment insofar as it upheld FDA's "protein" determination, vacate the district court's remand order, and remand with instructions to order FDA to designate retatrutide as a biological product.

42

Dated: March 30, 2026                    Respectfully submitted,

                                         *s/ Allon Kedem*
                                         Allon Kedem
                                         ARNOLD & PORTER KAYE SCHOLER LLP
                                         601 Massachusetts Ave., N.W.
                                         Washington, DC 20001
                                         (202) 942-5000
                                         allon.kedem@arnoldporter.com

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Circuit Rule 32(c). The brief contains 11,884 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 365 (2016) in Century Expanded BT 12-point font.

*s/ Allon Kedem*
Allon Kedem

## CERTIFICATE OF FILING AND SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I hereby certify that on March 30, 2026, I electronically filed the foregoing Brief of Appellant via ECF, and service was accomplished on counsel of record by that means.

s/ *Allon Kedem*
Allon Kedem

**SHORT APPENDIX**

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

I hereby certify that the Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

s/ *Allon Kedem*
Allon Kedem

**SHORT APPENDIX**

**TABLE OF CONTENTS**

Amended Order on Cross-Motions for Summary Judgment, Dkt. 48 (Oct. 3, 2025).....ShA.1

Order and Final Judgment, Dkt. 54 (Dec. 16, 2025)........................................................ShA.18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ELI LILLY AND COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:24-cv-01503-TWP-KMB |
| | ) |
| ROBERT KENNEDY, JR. in his official capacity, | ) |
| U.S. DEPARTMENT OF HEALTH AND | ) |
| HUMAN SERVICES, | ) |
| MARTIN MAKARY in his official capacity, | ) |
| FOOD AND DRUG ADMINISTRATION, | ) |
| | ) |
| Defendants. | ) |

**AMENDED[1] ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff

Eli Lilly and Company ("Lilly") (Filing No. 25) and Defendants Robert F. Kennedy, Jr., Mark A.

Makary, Food and Drug Administration ("FDA"), and U.S. Department of Health and Human

Services ("HHS") (collectively, "Defendants") (Filing No. 30).  Lilly initiated this action under the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706, after FDA denied Lilly's request to

designate its product, "retatrutide," as a biological product.  (Filing No. 1).  For the reasons stated

below, Lilly's Motion is **granted in part** and **denied in part**, and Defendants' Motion is **granted

in part** and **denied in part**.

**I.      BACKGROUND**

A. **Statutory and Regulatory Background**

The FDA is an administrative agency within the U.S. Department of Health and Human

Services ("HHS") that regulates food and drug products under several statutes.  One such statute,

---

[1] To clarify what the Court has decided, Amendments include the second paragraph on page 7, second full paragraph
on page 12, first sentence in the last paragraph on page 15, and the conclusion on page 16.

the Public Health Service Act ("PHSA"), prohibits the sale of "biological products" without a biologics license issued by the FDA. 42 U.S.C. § 262(a).[2] As originally enacted, the PHSA excluded proteins from the definition of "biological products." In 2009, however, Congress amended the statutory definition of "biological product" to include a "protein (except any chemically synthesized polypeptide), or analogous product … applicable to the prevention, treatment, or cure of a disease or condition in human beings." 42 U.S.C. § 262(i)(1) (2009).

After the 2009 amendment, FDA issued a memorandum interpreting the category of "protein (except any chemically synthesized polypeptide)" in the amended definition of "biological product." (Filing No. 35 at 4).[3] The FDA determined that the term "protein" means "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size." *Id.* The term "chemically synthesized polypeptide" means "any alpha amino acid polymer that is: (a) made entirely by chemical synthesis; and (b) less than 100 amino acids in size." *Id.* In addition, FDA opined that "[a]ll amino acids that are constituents of proteins are alpha amino acids because they have the carboxyl group linked to the alpha carbon of their carbon chain." *Id.* at 4 & n.3

In 2019, Congress again amended the PHSA to remove the parenthetical "(except any chemically synthesized polypeptide)," but did not otherwise define "protein" or "analogous product." *See* Pub. L. 116-94, Div. N, Title I, § 605, Dec. 20, 2019; 42 U.S.C. § 262(i)(1) (2019). As a result, FDA promulgated a final rule defining "protein" as follows:

> "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer … will be based on the total number of amino acids in

---

[2] To facilitate the approval of biologics licenses, the PHSA provides that "[t]he Secretary [of HHS] shall establish, by regulation, requirements for the approval, suspension, and revocation of biologics licenses." *Id.* § 262(a)(2)(A).

[3] As with all citations to the judicial record, citations to the Administrative Record (Filing No. 35) refer to the page number assigned by CM/ECF found at the top of the page in blue font.

those chains, and will not be limited to the number of amino acids in a contiguous sequence."

21 C.F.R. § 600.3(h)(6).  In developing the final rule, FDA explained that "despite the lack of precise, agreed-upon definitions, most, if not all, sources agree" that "protein … refer[s] to amino acid polymers (also referred to as 'amino acid chains') made up of alpha amino acids that are linked by peptide bonds."  (Filing No. 35 at 192).

The Federal Food, Drug, and Cosmetic Act provides further guidelines for requesting and approving biologics licenses.  21 U.S.C. § 360bbb-2.  A company seeking FDA approval to market a new product may submit a "request for designation" asking the agency to classify its product as a drug or biological product.  *Id.* § 360bbb-2(a).  After receiving the request, the agency must determine the classification of a product and provide a written statement to that effect within sixty (60) days after receipt of the designation request.  *Id.* § 360bbb-2(b).  If the Secretary fails to provide a statement within the sixty-day period, then the recommendation of the product's sponsor will be considered the final determination of the product's classification.  *Id.* § 360bbb-2(c).

B. **Lilly's Request for Designation**

Plaintiff Lilly is the sponsor of "retatrutide," a product developed to treat obesity, obstructive sleep apnea, knee osteoarthritis, and type 2 diabetes.  (Filing No. 35 at 231).  On November 9, 2023, Lilly submitted an initial Request for Designation seeking to classify retatrutide as a biological product.  *See id.* at 227.  FDA requested additional information from Lilly, and the company submitted a superseding request on January 29, 2024.  *Id.*

Lilly's Request for Designation describes retatrutide's unique chemical, physical, or biological composition as follows:

> Retatrutide is an alpha amino acid polymer that contains a specific, defined sequence of 41 amino acids cumulatively, comprising a backbone of 39 alpha amino acids and a second (associated) chain of one residue each of gamma-glutamate and

8-amino-3,6-dioxaoctanoic acid (ADO). The associated chain of two amino acids is covalently bound to the backbone of 39 amino acids through an amide bond between the epsilon-amino group of a lysine residue and the carboxyl group of ADO.

*Id.* at 228. Lilly further explains that "ADO has additional carbons (and oxygens) between the amino group and the carboxyl group … and it is more complex than many alpha amino acids that meet the definition in the FDA memo." *Id.* at 230. Accordingly, Lilly argued that retatrutide met the regulatory definition of "protein" because (1) it has a "specific, defined sequence"; (2) its chains "are associated with each other in a manner that occurs in nature"; and (3) it is an "alpha amino acid polymer that is greater than 40 amino acids in size." *Id.* at 236. With respect to the third requirement, Lilly argued that "FDA should count all amino acids in retatrutide, including non-alpha amino acids, if any, in assessing protein status." *Id.* at 235.

On March 18, 2024, FDA responded in a "letter of designation" classifying retatrutide as a drug rather than a biological product. *Id.* at 251. FDA determined that retatrutide is not a biological product because it does not meet the regulatory definition for "protein." *Id.* In the agency's view, retatrutide is not a protein "because it is not an alpha amino acid polymer with a specific defined sequence greater than 40 amino acids in size." *Id.* at 254. At most, says FDA, retatrutide contains 40 alpha amino acids and 1 non-alpha amino acid. *See id.* Because proteins must have more than 40 *alpha* amino acids, retatrutide does not count. *Id.* at 254.

To support its conclusion, FDA first explained "it is common scientific knowledge that proteins are composed of alpha amino acids." *Id.* The agency reasoned that "textbooks describe that alpha amino acids are the building blocks for all proteins found in nature" and "[a]lthough more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20 alpha amino acids." *Id.* at 254–55. Second, FDA reasoned that "the reference to 'alpha amino acid polymer' at the beginning of the definition makes clear that only alpha amino acids are

4

ShA.4                    ShA.4                    ShA.4

relevant to determining whether something is a protein, which is consistent with commonly understood scientific principles." *Id.* at 255.

FDA also concluded that retatrutide is not "analogous to a protein" because "being greater than 40 *alpha* amino acids is a fundamental, defining property of a protein, which retatrutide does not have." *Id.* at 259. According to the agency, "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule." *Id.* at 258. Adopting Lilly's argument, FDA argued, would "defeat the purpose of the bright line rule because FDA would frequently have to evaluate on a case-by-case basis the features of a particular molecule to determine if it is analogous to a protein." *Id.*

C. **Procedural Background**

Lilly filed its complaint for declaratory and injunctive relief on September 3, 2024. (Filing No. 1). Lilly challenges FDA's refusal to designate retatrutide as a protein as exceeding the agency's statutory authority, violative of the agency's regulations, and arbitrary and capricious. *Id.* at 26–27. Lilly requests that the Court (1) declare that Defendants' denial of Plaintiff's request for designation of retatrutide as a biological product is arbitrary, capricious, an abuse of discretion, and unlawful under the APA; (2) enter an injunction requiring Defendants to designate retatrutide as a biological product; and (3) award Plaintiff reasonable attorneys' fees and costs. *Id.* at 28.

Lilly moved for summary judgment on January 28, 2025. (Filing No. 25). The Defendants cross-moved for summary judgment on March 18, 2025. (Filing No. 30). The parties then filed a sealed joint appendix comprised of the administrative record and documents in support of the motions. (Filing No. 35). On August 7, 2025 the Court heard oral argument on the parties cross-motions. The motions are now ripe for the Court's decision.

5

ShA.5                              ShA.5                              ShA.5

## II.    LEGAL STANDARD

In the normal course, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In cases arising under the APA, however, the summary judgment standard in Rule 56 does not apply.  *RJMC Farms, LLC v. Vilsack*, 661 F. Supp. 3d 826, 832 (S.D. Ind. 2023) (citations omitted).  In APA cases, "summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record."  *Id.* (quoting *Heather S. by Kathy S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) (quotation marks omitted)).  "Put differently, the facts have already been determined by the agency, which means the entire case on review is a question of law."  *Id.* (citation and quotation marks omitted).

Under the APA, the ultimate question is whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with the law, or in excess of the agency's statutory authority.  5 U.S.C. §§ 706(2)(A), (C).  The "arbitrary and capricious" standard is "narrow, and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and quotation marks omitted).  An agency's decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  The decision may also be arbitrary and capricious if the agency "contravene[s] its own regulations."  *Cox v. Benson*, 548 F.2d 186, 189 (7th Cir. 1977).

6

While the APA "marks the full extent of judicial authority to review executive agency action for procedural correctness, it creates varying, but overlapping, standards of review depending on the issue." *RJMC Farms*, 661 F. Supp. 3d at 832 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) and citing *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)).  Here, as in *RJMC Farms*, the standard differs for each issue and is discussed in each respective section.

### III.   DISCUSSION

In its Complaint for declaratory relief, Lilly asserts three claims: (1) Violation of the Administrative Procedure Act (Declaratory/Injunctive Relief – FDA's Refusal to Designate Retatrutide as a Biological Product Exceeds the Agency's Statutory Authority); (2) Violation of the Administrative Procedure Act (Declaratory/Injunctive Relief – FDA's Refusal to Designate Retatrutide as a Biological Product Violates the Agency's Own Regulations); (3) Violation of the Administrative Procedure Act (Declaratory/Injunctive Relief – FDA's Refusal to Designate Retatrutide as a Biological Product is Arbitrary, Capricious, and an Abuse of Discretion). (Filing No. 1 at 26-28). In their cross-motions for summary judgment, the parties do not squarely address Lilly's first claim for relief, consequently, this Order addresses only claims two and three.

Lilly argues that FDA acted arbitrarily and capriciously by failing to designate retatrutide as a protein or at least analogous to a protein, contravening its own regulations and congressional intent.  Lilly asks the Court to set aside FDA's designation decision and enter an injunction requiring FDA to designate retatrutide as a biological product without remanding to the agency for further review.  (Filing No. 26 at 17).  Conversely, FDA argues that it reasonably determined retatrutide is neither a protein nor analogous to a protein, and its decision is supported by the regulatory text, context, and history, as well as the agency's scientific reasoning.  Should the Court

side with Lilly, however, FDA contends vacatur and remand is the only appropriate remedy. (Filing No. 31). The Court will address each argument in turn.

### A.  Designation as a Protein

In arguing that FDA acted arbitrarily and capriciously by failing to designate retatrutide as a protein, Lilly first challenges FDA's interpretation of the regulatory definition of "protein." In reviewing an agency's interpretation of its own regulations, "the appropriate framework for review" is *Kisor/Auer* deference. *See RJMC Farms*, 661 F. Supp. 3d at 833 (citing *Auer v. Robbins*, 519 U.S. 452, 117 (1997)). *Kisor/Auer* deference proceeds in three steps. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). First, the Court must determine if the regulation is "genuinely ambiguous" by "exhaust[ing] all the 'traditional tools' of construction," including the "text, structure, history, and purpose" of the regulation. *Id.* at 574. Second, if "genuine ambiguity remains," then the Court must determine whether the agency's interpretation is "reasonable." *Id.* Third, "the character and context of the agency interpretation" must entitle it to "controlling weight." *Id.* at 577–79. Because the Court finds the regulation unambiguously forecloses Lilly's reading, it is not necessary to address steps two and three.

### 1.  Step One: Ambiguity

As required, the Court begins with the text of the regulation. *See City & Cnty. of San Francisco v. Env't Prot. Agency*, 604 U.S. 334, 346 (2025). "The court can declare a regulation ambiguous only when more than one interpretation is plausible and the text alone does not permit a more definitive reading after its deploying traditional interpretive tools." *RJMC Farms*, 661 F. Supp. 3d at 833 (quoting *Exelon Generation Co., LLC v. Loc. 15, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012)).

Recall that a "protein" is "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size."  21 C.F.R. § 600.3(h)(6).  Furthermore, "[w]hen two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer … will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence." *Id.*

Lilly contends that the plain text unambiguously forecloses a reading requiring proteins to consist of more than forty *alpha* amino acids because the regulation fails to modify "amino acid" with "alpha" each time it appears.  (Filing No. 26 at 17–21).  "[W]here the drafter includes particular language in one section of a law but omits it in another section of the same law, it is generally presumed that the drafter acts intentionally and purposely in the disparate inclusion or exclusion."  *Id.* at 19 (cleaned up) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)).  In addition, because "the size of the amino acid polymer … will be based on the *total* number of amino acids in those chains," 21 C.F.R. § 600.3(h)(6) (emphasis added), both alpha and non-alpha amino acids count towards the greater-than-forty requirement.  (Filing No. 26 at 20).

Defendants contend, by contrast, that the text unambiguously requires proteins to contain greater than forty *alpha* amino acids because the introductory word, "alpha," implicitly modifies the terms that follow.  (Filing No. 31 at 17).  "Whether a speaker intends for a listener to distribute words implicitly depends on the context and the relevant background understandings of the parties."  *Id.* (cleaned up) (citing *Pulsifer v. United States*, 601 U.S. 124, 134 (2024)).  Here, the relevant background is that of scientists who understand that "in most contexts, the term 'amino acids' refers to the alpha amino acids."  *Id.* at 18.

9

As an initial matter, neither the PHSA nor FDA regulations define "amino acid," "alpha amino acid," or "alpha amino acid polymer." And neither "alpha amino acid" nor "alpha amino acid polymer" appear elsewhere in the regulation. Thus, the phrase "alpha amino acid polymer" must be considered in context, particularly in conjunction with the words around it. Basic grammar dictates that "alpha amino acid polymer" means a polymer made up of alpha amino acids. Therefore, the most natural reading of "alpha amino acid polymer … that is more than 40 amino acids" is a polymer with more than forty *alpha* amino acids. Otherwise, the "alpha" modifier does no work, and the term becomes superfluous.

To Lilly's credit, courts usually presume that drafters act intentionally by using particular language in one part of a statute or regulation but omitting in another. *See City & Cnty. of San Francisco*, 604 U.S. at 344. So too, when the disparate language appears in the "same sentence." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015). But even where disparate terms appear in the same sentence, the court analyzes the unqualified term by reference to a qualified term that appears elsewhere throughout the statute. *See id.* at 391. In *MacLean*, for instance, the so-called *Russello* presumption applied "with particular force" because Congress used "law" and "law, rule, or regulation" in close proximity, and because Congress used the phrase "law, rule, or regulation" repeatedly throughout the statute. *Id.* at 392. The phrases could be analyzed in isolation because at least one phrase had a consistent meaning throughout the statute.

Here, by contrast, the phrase "alpha amino acid polymer" is neither defined nor used repeatedly throughout the regulation, so the Court cannot analyze it in isolation. The agency made the deliberate choice to narrow the type of polymer—and by implication, the type of amino acid––relevant for determining whether a product is a "protein." Therefore, the most natural reading of

"alpha amino acid polymer" requires analyzing that phrase in conjunction with, rather than in isolation from, the term "amino acid" each time it appears within the same regulatory definition.

Other contextual and historical clues support this reading. Here, Defendants contend that it is "common knowledge" in the field of biochemistry that "amino acid" almost always means "alpha amino acid." (Filing No. 31 at 18 (citing Filing No. 35 at 265)). Scientific texts confirm this understanding, which further define "alpha amino acids" as "organic molecules" that are the "building blocks of proteins." (Filing No. 35 at 265, 268 (S. Maloy, *Amino Acids, Brenner's Encyclopedia of Genetics* (2d Ed. 2013); Antonin Ginguay & Luc A. Cynober, *Amino Acids, Encyclopedia of Biological Chemistry* (3d Ed. 2021)). From that premise, FDA has opined that "[a]ll amino acids that are constituents of proteins are alpha amino acids[.]" (Filing No. 35 at 4 (citing Jeremy M. Berg, John L. Tymoczko, & Lubert Stryer, *Biochemistry* 27 (6th Ed. 2007)). Indeed, Lilly itself suggested that FDA define "protein" by reference to its "[alpha] amino acids" following FDA's interpretation of the 2009 amendment to the PHSA. (*See* Filing No. 35 at 51).

Lilly insists that because Congress amended the PHSA to remove the parenthetical "(except chemically synthesized polypeptides)," it meant to include proteins that are not naturally occurring. (Filing No. 33 at 17). Fair enough, but even "chemically synthesized polypeptides" are defined, in part, by the presence of an "alpha amino acid polymer." (*See* Filing No. 35 at 4, 38). As FDA rightly points out, striking the parenthetical merely "broadened the ways in which a protein under the PHSA can be *made*"—it did not alter the fundamental character of proteins themselves. (Filing No. 34 at 10; *see also* (Filing No. 35 at 38 (defining "chemically synthesized polypeptides" as "any alpha amino acid polymer that is "*made entirely by chemical synthesis*" and "is less than 100 amino acids in size.")). Thus, even if Congress intended to include non-naturally occurring proteins in

11

ShA.11    ShA.11    ShA.11

its definition of "biological product," that does not foreclose FDA's interpretation requiring proteins to contain at least forty *alpha* amino acids.

Still, Lilly counters that just because proteins must be "applicable to the prevention, treatment, or cure of a disease or condition of human beings," 42 U.S.C. § 262(i)(1), does not mean that a protein must itself be limited to those in human beings. (Filing No. 33 at 17). That's true, but this argument overstates FDA's position. Yes, the agency was particularly concerned with human proteins given that the regulation is meant to define a category of biological products intended for the treatment of "human beings." But as the Court understands it, FDA has not taken the position that *only* proteins found in human beings are biological products. Instead, "[t]he definition was … based on proteins in nature, especially"—but not exclusively—"those in humans." (Filing No. 31 at 19).

At bottom, the regulation unambiguously requires that proteins contain at least forty-one alpha amino acids. Because retatrutide contains forty alpha amino acids at most, the agency did not violate its own regulations and its decision not to designate retatrutide as a protein was not arbitrary and capricious.

## A. Analogous to a Protein

Alternatively, Lilly argues that even if retatrutide does not meet the regulatory definition for "protein," it is at least "analogous" to a protein. (Filing No. 26 at 26). As noted above, the PHSA defines "biological product" to include a "protein, *or analogous product* … applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i)(1). As the U.S. Supreme Court recently held in *Loper Bright Enterprises v. Raimondo*, "courts must exercise independent judgment in determining the meaning of statutory provisions." 603 U.S. 369, 394 (2024). However, an agency's interpretation of a statute "may be especially

informative to the extent it rests on factual premises within the agency's expertise." *Id.* at 402

(citing *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 98, n. 8 (1983)).

The FDA has not promulgated a rule defining "analogous product." Instead, it takes the

general position that "it would not be appropriate for the statutory term 'analogous product' to be

interpreted in a way that would include products that are specifically excluded by the final rule

defining 'protein.'" (Filing No. 31 at 29). Adopting Lilly's argument that retatrutide is analogous

to a protein, FDA says, "would undo the bright line principle established by the rule, and effectively

include alpha amino acid polymers with fewer than 41 alpha amino acids within the scope of a rule

that was intended to exclude them." (Filing No. 35 at 258). With respect to retatrutide, specifically,

FDA found it cannot be analogous to a protein because it does not share the "fundamental defining

property" of being greater than forty alpha amino acids in size. *Id.* at 259.

Lilly challenges FDA's conclusion on several grounds. First, Lilly argues that retatrutide

is "analogous" to a protein because it shares nearly every defining feature with proteins: it contains

forty-one total amino acids in a specific, defined sequence, and it shares key structural and

functional characteristics of proteins. (Filing No. 26 at 26–27). In response, Defendants contend

that while retatrutide may share certain characteristics with proteins, it is dissimilar to proteins in

the most fundamental way, and therefore, cannot be "analogous" to a protein. (Filing No. 31 at

30).

The meaning of "analogous" is a question of law for the court to decide. *Loper Bright*, 603

U.S. at 391–92. To be "analogous," a product must be "similar or comparable to something else

either in general or in some specific detail." Merriam-Webster Dictionary, https://www.merriam-

webster.com/dictionary/analogous (last visited Sept. 26, 2025). However, courts have determined

that whether a product is "similar or comparable to" a protein in the relevant respects is an issue

of scientific fact best left to the FDA. *See Teva Pharm. USA, Inc. v. United States Food & Drug Admin.*, 514 F. Supp. 3d 66, 116 (2020). Even in the wake of *Loper Bright*, courts are permitted to leave those niche factual questions for the agency to decide. *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1512 (2025) ("The agency is better equipped to assess what facts are relevant to the agency's own decision than a court is.").

Here, FDA determined that retatrutide cannot be analogous to a protein because it does not share the "fundamental defining property" of being greater than forty alpha amino acids in size. Lilly argues that FDA took a different position in *Teva Pharmaceuticals*—namely, that the "fundamental defining property" is having "a specific, defined sequence." (Filing No. 26 at 31). For that reason, Lilly insists the agency's decision that retatrutide is not at least "analogous" to a protein was arbitrary and capricious. *Id.*

Lilly has a point. Because FDA previously took the position that the defining feature of analogous protein products is their specific, defined sequence, it cannot change course without providing "a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* at 222.

FDA reasons that unlike retatrutide, the product at issue in *Teva Pharmaceuticals* lacked a specific, defined sequence. (Filing No. 31 at 32). That distinction is relevant presumably because products that would be excluded from the definition of "protein"—either because they lack a specific, defined sequence *or* more than forty alpha amino acids—cannot be "analogous" to a protein. According to FDA, a more straightforward approach would undermine the "bright line

14

ShA.14                    ShA.14                    ShA.14

rule" the agency intended when it promulgated the regulatory definition of "protein." (*See* Filing No. 35 at 258).

FDA's "bright line" approach flouts the statutory text and sidesteps congressional intent. To be "analogous" means a product does not fit perfectly into one category or another. By definition, then, "analogous products" need not fit into a "bright line" rule for any category of biological products. By requiring "analogous" products to meet each and every requirement for a "protein," FDA effectively reads "analogous product" out of the statute.

FDA resists this conclusion on the ground that it has already identified at least one product that it considers analogous to a protein. (Filing No. 31 at 30). But even that product swallows the rule because it would be considered a "protein" under the regulatory definition. After *Loper Bright*, it is the Court's job to determine what the statute means, and FDA's "bright line" approach does not fit the bill.

While the FDA may have a degree of flexibility in determining the threshold for scientific similarity, *see Seven County*, 145 S. Ct. at 1512, that threshold must be clearly defined and consistently applied. Any other approach would inject confusion and result in "piecemeal litigation" concerning whether and which products are "analogous" to proteins. *See Kisor*, 588 U.S. at 572 (noting "Congress's frequent preference for resolving interpretive issues by uniform administrative decision, rather than piecemeal litigation.") (quotation marks and citation omitted).

Because the agency's decision that retatrutide is not at least analogous to a protein was not in accordance with the law, it was arbitrary and capricious and must be set aside. *See* 5 U.S.C. § 706(2)(A). However, remand is appropriate for the agency to identify, in a uniform fashion, the fundamental defining feature of "analogous" proteins. *See Fed. Power Comm'n v. Transcont'l Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) ("If the decision of the agency 'is not sustainable on the

administrative record made, then the … decision must be vacated and the matter remanded … for further consideration.") (citation omitted).  Contrary to Lilly's contention, there is a "meaningful possibility that the agency could lawfully reach the same conclusion" if it determines the over-forty-requirement is the critical defining feature of analogous proteins.  Once FDA decides, it must revisit its determination that retatrutide is not at least "analogous" to a protein.

### IV.   CONCLUSION

For the reasons explained above, Plaintiff's Motion for Summary Judgment (Filing No. 25) is **GRANTED IN PART** and **DENIED IN PART.**  The Motion is **granted** on the claim that FDA's justifications for failing to designate retatrutide as an "analogous product" were arbitrary and capricious.  The Motion is **denied** on the claim that FDA's refusal to designate retatrutide as a protein, and hence as a biological product, violates the agency's own regulations.

Defendants' Cross Motion for Summary Judgment (Filing No. 30) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **granted** on the claim that FDA's refusal to designate retatrutide as a protein, and hence as a biological product, violates the agency's own regulations.  The Motion is **denied** on the claim that FDA's justifications for failing to designate retatrutide as an "analogous product" were arbitrary and capricious.

Having found the FDA's decision not to designate retatrutide as a biological product on the "analogous products" pathway to be arbitrary and capricious, the Court hereby **VACATES** that portion of the agency's decision and **REMANDS** it to the agency for further consideration consistent with this order.  In a separate Order, the Court will direct the parties to issue position statements as to how it should proceed with respect to the unresolved claim that FDA's refusal to designate retatrutide as a biological product exceeds the agency's statutory authority (Lilly's "First Claim for Relief") (*see* Filing No. 1 at 26).

16

**SO ORDERED**.

Date:   October 3, 2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
jcacioppo@taftlaw.com

Daniel Kadane Crane-Hirsch
U.S. JUSTICE DEPT.
daniel.crane-hirsch@usdoj.gov

Jeffrey L. Handwerker
Arnold & Porter LLP
jeffrey.handwerker@arnoldporter.com

Allon Kedem
Arnold & Porter Kaye Scholer LLP
Allon.Kedem@arnoldporter.com

Donald Eugene Morgan
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
dmorgan@taftlaw.com

Daniel Reuben Yablon
Arnold & Porter Kaye Scholer LLP
daniel.yablon@arnoldporter.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| ELI LILLY AND COMPANY,<br><br>        *Plaintiff*,<br><br>    v.<br><br>ROBERT F. KENNEDY JR., in his official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>and<br><br>MARTIN MAKARY, in his official capacity, and FOOD AND DRUG ADMINISTRATION,<br><br>        *Defendants*. | Case No. 24-cv-1503-TWP-KMB |

**ORDER AND FINAL JUDGMENT**

The Court, having made its Entry directing the entry of final judgment, now enters

**FINAL JUDGMENT**.

For the reasons explained in the Court's Amended Order on Cross-Motions for Summary

Judgment (Filing No. 48), it is hereby ORDERED that Plaintiff's Motion for Summary Judgment

(Filing No. 25) is **GRANTED IN PART** and **DENIED IN PART**, and that Defendants' Cross

Motion for Summary Judgment (Filing No. 30) is **GRANTED IN PART** and **DENIED IN**

**PART**.

Consistent with the Court's Amended Order on Cross-Motions for Summary Judgment, the Court hereby **VACATES** the agency's designation decision and **REMANDS** to the agency for further proceedings on Plaintiff's "analogous" products claim.

This Order and Final Judgment constitutes a final judgment of the Court within the meaning of Rule 58(a) of the Federal Rules of Civil Procedure.

Date: 12/16/2025

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Kristine L. Seufert, Clerk

BY: _____
Deputy Clerk, U.S. District Court

Service will be made electronically on all
ECF-registered counsel of record via
email generated by the court's ECF
system.