**No. 26-1301**

# In the United States Court of Appeals for the Seventh Circuit

––––––––––––––––––––––––––––––

ELI LILLY AND COMPANY,

*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY JR., ET AL,

*Defendants-Appellees.*

––––––––––––––––––––––––––––––

On Appeal from the United States District Court
for the Southern District of Indiana
No. 24-cv-1503 (Hon. Tanya Walton Pratt)

––––––––––––––––––––––––––––––

**APPENDIX: VOLUME I OF II (A.0001-A.0297)**

––––––––––––––––––––––––––––––

Allon Kedem
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for Eli Lilly and Company*

March 30, 2026

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30

I hereby certify that the Appendix herein includes all of the materials required by Circuit Rule 30(a) and (b).

s/ *Allon Kedem*
Allon Kedem

# TABLE OF CONTENTS

Certificate of Compliance with Circuit Rule 30 ................................................................. i

## Volume I of II (A.0001-A.0297)

District Court Docket Sheet ........................................................................... A.0001

Excerpt of Complaint, Dkt. 1 (Sept. 3, 2024) ................................................ A.0009

Redacted Joint Appendix, Dkt. 38 (Apr. 30, 2025) ....................................... A.0011

Excerpt of Oral Argument Transcript from August 7, 2025 [pp. 1, 21-23],
    Dkt. 45 (Aug. 14, 2025) ............................................................................ A.0286

Joint Position Statement, Dkt. 53 (Dec. 15, 2025) ........................................ A.0290

Notice of Appeal, Dkt. 55 (Feb. 12, 2026) .................................................... A.0295

## Volume II of II (A.0298-A.0574)
### FILED UNDER SEAL

Order on Plaintiff's Motion to Seal, Dkt. 40 (May 13, 2025) ........................ A.0298

Sealed Joint Appendix, Dkt. 35 (Apr. 30, 2025) ........................................... A.0300

# U.S. District Court
## Southern District of Indiana (Indianapolis)
## CIVIL DOCKET FOR CASE #: 1:24-cv-01503-TWP-KMB

ELI LILLY AND COMPANY v. KENNEDY et al
Assigned to: District Judge Tanya Walton Pratt
Referred to: Magistrate Judge Kellie M. Barr
Case in other court: 7th Circuit, 26-01301
Cause: 05:551 Administrative Procedure Act

Date Filed: 09/03/2024
Date Terminated: 12/16/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**ELI LILLY AND COMPANY**

represented by **Allon Kedem**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
202-942-6234
Email: Allon.Kedem@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Reuben Yablon**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington D.C., DC 20001-3743
202-942-5009
Email: daniel.yablon@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald Eugene Morgan**
TAFT STETTINIUS & HOLLISTER LLP
(Indianapolis)
One Indiana Square
Suite 3500
Indianapolis, IN 46204
(317) 713-4432
Fax: (317) 713-3699
Email: dmorgan@taftlaw.com
*ATTORNEY TO BE NOTICED*

**Jayna Morse Cacioppo**
TAFT STETTINIUS & HOLLISTER LLP
(Indianapolis)
One Indiana Square
Suite 3500
Indianapolis, IN 46204
317-713-3582
Fax: 317-713-3699
Email: jcacioppo@taftlaw.com

A.0001                    A.0001                    A.0001

*ATTORNEY TO BE NOTICED*

**Jeffrey L. Handwerker**
Arnold & Porter LLP
601 Massachusetts Ave. NW
Washington, DC 20001
202-942-5000
Email:
jeffrey.handwerker@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **ROBERT KENNEDY, JR.**<br>*in his official capacity* | represented by | **Daniel Kadane Crane-Hirsch**<br>U.S. JUSTICE DEPT.<br>PO Box 386<br>Washington, DC 20044-0386<br>Email: daniel.crane-hirsch@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** | represented by | **Daniel Kadane Crane-Hirsch**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **MARTIN MAKARY**<br>*in his official capacity* | represented by | **Daniel Kadane Crane-Hirsch**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **FOOD AND DRUG ADMINISTRATION** | represented by | **Daniel Kadane Crane-Hirsch**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 09/03/2024 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS), filed by ELI LILLY AND COMPANY. (Filing fee $405, receipt number AINSDC-8318019) (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons)(Cacioppo, Jayna) (Entered: 09/03/2024) |
| 09/03/2024 | 2 | NOTICE of Appearance by Jayna Morse Cacioppo on behalf of Plaintiff ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 09/03/2024) |
| 09/03/2024 | 3 | Rule 7.1 Disclosure Statement by ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 09/03/2024) |
| 09/03/2024 | 4 | NOTICE of Appearance by Donald Eugene Morgan on behalf of Plaintiff ELI LILLY AND COMPANY. (Morgan, Donald) (Entered: 09/03/2024) |

A.0002                    A.0002                    A.0002

| | | |
|---|---|---|
| 09/03/2024 | 5 | MOTION for Attorney(s) Jeffrey L. Handwerker to Appear pro hac vice (Filing fee $100, receipt number AINSDC-8318404), filed by Plaintiff ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Cacioppo, Jayna) (Entered: 09/03/2024) |
| 09/03/2024 | 6 | MOTION for Attorney(s) Allon Kedem to Appear pro hac vice (Filing fee $100, receipt number AINSDC-8318423), filed by Plaintiff ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Cacioppo, Jayna) (Entered: 09/03/2024) |
| 09/03/2024 | 7 | MOTION for Attorney(s) Daniel Yablon to Appear pro hac vice (Filing fee $100, receipt number AINSDC-8318429), filed by Plaintiff ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order Order Granting Motion to Appear Pro Hac Vice)(Cacioppo, Jayna) (Entered: 09/03/2024) |
| 09/03/2024 | 8 | Summons Issued as to USA - XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (DJH) (Entered: 09/03/2024) |
| 09/03/2024 | 9 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (DJH) (Entered: 09/03/2024) |
| 09/03/2024 | 10 | Notice to File Rule 7.1 Disclosure Statement. (RAGS) (DJH) (Entered: 09/03/2024) |
| 09/05/2024 | 11 | ORDER OF CASE REASSIGNMENT - The Court, sua sponte, now orders this case randomly reassigned due to the requirements of workload pursuant to S.D. Ind. L.R. 40-1(f). The Clerk is directed to randomly reassign the case to another district judge. No magistrate judge reassignment shall occur. Signed by District Judge Jane Magnus-Stinson on 9/5/2024. (JSR) (Entered: 09/05/2024) |
| 09/05/2024 | 12 | NOTICE of Reassignment of Case to Judge Tanya Walton Pratt. District Judge Jane Magnus-Stinson is no longer assigned to this case. Please include the new case number, **1:24-cv-01503-TWP-MG**, on all future filings in this matter. (CCG) (Entered: 09/05/2024) |
| 09/05/2024 | 13 | ORDER OF RECUSAL. Clerk is directed to randomly reassign case and notify parties of newly assigned Judge. Signed by Magistrate Judge Mario Garcia on 9/5/24. (NAD) (Entered: 09/05/2024) |
| 09/05/2024 | 14 | NOTICE of Reassignment of Case to Magistrate Judge Kellie M. Barr. Magistrate Judge Mario Garcia is no longer assigned to this case. Please include the new case number, **1:24-cv-01503-TWP-KMB**, on all future filings in this matter. (CCG) (Entered: 09/05/2024) |
| 09/06/2024 | 15 | ORDER - granting 7 Motion to Appear pro hac vice. Attorney Daniel Yablon for ELI LILLY AND COMPANY added. (See Order.) Signed by Magistrate Judge Kellie M. Barr on 9/6/2024. Copy to Daniel Yablon via US mail. (JSR) (Entered: 09/06/2024) |
| 09/06/2024 | 16 | ORDER granting 5 Motion to Appear pro hac vice. Attorney Jeffrey L. Handwerker for ELI LILLY AND COMPANY added. Signed by Magistrate Judge Kellie M. Barr on 9/6/2024 (Copy mailed to Attorney Handwerker). (LBT) (Entered: 09/06/2024) |
| 09/06/2024 | 17 | ORDER granting 6 Motion to Appear pro hac vice. Attorney Allon Kedem for ELI LILLY AND COMPANY added. Signed by Magistrate Judge Kellie M. Barr on 9/6/2024 (Copy mailed to Attorney Kedem). (LBT) Modified on 9/6/2024 (LBT). (Entered: 09/06/2024) |
| 09/24/2024 | 18 | NOTICE *of Service on Defendants*, filed by Plaintiff ELI LILLY AND COMPANY (Attachments: # 1 Exhibit A - Proof of Delivery) (Cacioppo, Jayna) (Entered: |

| | | |
|---|---|---|
| 10/15/2024 | 19 | NOTICE *of Service*, filed by Plaintiff ELI LILLY AND COMPANY (Attachments: # 1 Exhibit A - Proof of Delivery) (Cacioppo, Jayna) (Entered: 10/15/2024) |
| 11/13/2024 | 20 | NOTICE of Appearance by Scott P. Kennedy on behalf of Defendants XAVIER BECERRA, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION. (Kennedy, Scott) (Entered: 11/13/2024) |
| 11/22/2024 | 21 | Joint MOTION *to Set Briefing Schedule and Other Relief*, filed by Plaintiff ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order)(Cacioppo, Jayna) (Entered: 11/22/2024) |
| 11/26/2024 | 22 | ORDER granting 21 Joint Motion to Set Briefing Schedule and Other Relief. Defendants shall produce the Administrative Record and file a certified index to the Administrative Record no later than December 3, 2024. Plaintiff shall file its motion for summary judgment no later than January 28, 2025. Because this is a case seeking declaratory and injunctive relief under the Administrative Procedure Act, it is further ORDERED that Defendants' obligation to answer Plaintiff's complaint is STAYED pending the Court's ruling on the cross-motions for summary judgment. See Order for additional details. Signed by Magistrate Judge Kellie M. Barr on 11/26/2024. (LBT) (Entered: 11/26/2024) |
| 11/26/2024 | 23 | ORDER REGARDING DISCOVERY DISPUTES. See Order for details. Signed by Magistrate Judge Kellie M. Barr on 11/26/2024.(LBT) (Entered: 11/26/2024) |
| 12/03/2024 | 24 | NOTICE of Filing *of Certified Index to the Administrative Record* by XAVIER BECERRA, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION (Kennedy, Scott) (Entered: 12/03/2024) |
| 01/28/2025 | 25 | MOTION for Summary Judgment , filed by Plaintiff ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 01/28/2025) |
| 01/28/2025 | 26 | BRIEF/MEMORANDUM in Support re 25 MOTION for Summary Judgment , filed by Plaintiff ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 01/28/2025) |
| 03/10/2025 | 27 | Consent MOTION to Extend Deadlines *and Amend Briefing Schedule*, filed by Defendants XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Attachments: # 1 Text of Proposed Order)(Kennedy, Scott) (Entered: 03/10/2025) |
| 03/13/2025 | 28 | ORDER - The Court, having reviewed Defendants' Consent Motion for Extension of Time and Amendment to Briefing Schedule (ECF NO. 27 ), hereby GRANTS the motion for good cause shown and ORDERS that the schedule established in this Court's November 26, 2024 Order (ECF No. 22 ) shall be amended as follows: SEE ORDER. Signed by Magistrate Judge Kellie M. Barr on 3/13/2025. (AAS) (Entered: 03/13/2025) |
| 03/18/2025 | 29 | NOTICE of Filing *of Revised Certified Index to the Administrative Record* by XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Kennedy, Scott) (Entered: 03/18/2025) |
| 03/18/2025 | 30 | Cross MOTION for Summary Judgment , filed by Defendants XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Kennedy, Scott) (Entered: 03/18/2025) |

| 03/18/2025 | 31 | BRIEF/MEMORANDUM in Support re 30 Cross MOTION for Summary Judgment *and Opposition to Plaintiff's Motion for Summary Judgment*, filed by Defendants XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Kennedy, Scott) (Entered: 03/18/2025) |
|---|---|---|
| 03/18/2025 | 32 | RESPONSE in Opposition re 25 MOTION for Summary Judgment *and Memorandum in Support of Cross Motion for Summary Judgment*, filed by Defendants XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Kennedy, Scott) (Entered: 03/18/2025) |
| 04/08/2025 | 33 | REPLY in Support of Motion re 25 MOTION for Summary Judgment *and in Opposition to 30 Defendants' Cross-Motion for Summary Judgment*, filed by Plaintiff ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 04/08/2025) |
| 04/29/2025 | 34 | REPLY in Support of Motion re 30 Cross MOTION for Summary Judgment , filed by Defendants XAVIER BECERRA, ROBERT CALIFF, FOOD AND DRUG ADMINISTRATION, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Kennedy, Scott) (Entered: 04/29/2025) |
| 04/30/2025 | 35 | SEALED *Joint Appendix*, filed by Plaintiff ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 04/30/2025) |
| 04/30/2025 | 36 | Unopposed MOTION to Maintain Document Under Seal 35 SEALED Document (Case Participants - doc) *Joint Appendix*, filed by Plaintiff ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order)(Cacioppo, Jayna) (Entered: 04/30/2025) |
| 04/30/2025 | 37 | BRIEF/MEMORANDUM in Support re 36 Unopposed MOTION to Maintain Document Under Seal 35 SEALED Document (Case Participants - doc) *Joint Appendix* , filed by Plaintiff ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 04/30/2025) |
| 04/30/2025 | 38 | REDACTION to 35 SEALED Document (Case Participants - doc) *Joint Appendix* by ELI LILLY AND COMPANY. (Cacioppo, Jayna) (Entered: 04/30/2025) |
| 05/09/2025 | 39 | NOTICE of Substitution of Appearance by Daniel Kadane Crane-Hirsch replacing *Scott P. Kennedy* on behalf of All Defendants (Crane-Hirsch, Daniel) (Entered: 05/09/2025) |
| 05/13/2025 | 40 | ORDER ON PLAINTIFF'S MOTION TO SEAL: Pending before the Court is Plaintiff Eli Lilly and Company's Unopposed Motion to Maintain Document Under Seal. [Dkt. 36 .] Plaintiff asks the Court to maintain certain documents it filed under seal because they contain trade secrets. Plaintiff has also filed minimally redacted versions of these documents that will remain unsealed. For the reasons discussed below, the Court finds this Motion should be GRANTED. See Order. Signed by Magistrate Judge Kellie M. Barr on 5/13/2025. (LF) (Entered: 05/13/2025) |
| 05/14/2025 | 41 | MARGINAL ENTRY, re 39 Notice of Substitution of Appearance, Acknowledged. Signed by Judge Tanya Walton Pratt on 5/14/2025.(LF) (Entered: 05/14/2025) |
| 07/16/2025 | 42 | MOTION *Request for Oral Argument on Cross-Motions for Summary Judgment*, filed by Plaintiff ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order) (Cacioppo, Jayna) (Entered: 07/16/2025) |
| 07/22/2025 | 43 | ORDER granting 42 Motion for Oral Argument on Cross-Motions for Summary Judgment - An Oral Argument Hearing is set for 8/7/2025 at 10:00 AM in room #344, United States Courthouse, 46 E. Ohio Street, Indianapolis, Indiana before District Judge |

A.0005                          A.0005                          A.0005

| | | Tanya Walton Pratt. (See Order.) Signed by District Judge Tanya Walton Pratt on 7/22/2025. (JSR) (Entered: 07/23/2025) |
|---|---|---|
| 08/07/2025 | 44 | MINUTE ENTRY for proceedings held before District Judge Tanya Walton Pratt on 8/7/2025: Plaintiff appeared by counsel Allon Kedem and Donald Morgan. Defendants appeared by counsel Daniel Crane-Hirsch. The parties appeared for oral argument on Plaintiff's Motion for Summary Judgment (Filing No. 25 ) and Defendants' Cross Motion for Summary Judgment (Filing No. 30 ) at the Indianapolis Courthouse. Argument heard. The motions were taken under advisement and the Court will issue a ruling in due course. Signed by District Judge Tanya Walton Pratt. (Court Reporter David Moxley.)(SMH) (Entered: 08/07/2025) |
| 08/14/2025 | 45 | TRANSCRIPT of Oral Argument held on 08/07/2025 before District Judge Tanya Walton Pratt. (45 pages.) Court Reporter/Transcriber: David Moxley (Email: dmoxley@outlook.com). Please review Local Rule 80-2 for more information on redaction procedures. Redaction Statement due 9/4/2025. Release of Transcript Restriction set for 11/12/2025. (Moxley, David) Released on 11/12/2025 (JSR). (Entered: 08/14/2025) |
| 08/14/2025 | 46 | NOTICE of FILING of OFFICIAL TRANSCRIPT of Oral Argument held before District Judge Tanya Walton Pratt on 08/07/2025 (Moxley, David) (Entered: 08/14/2025) |
| 09/30/2025 | 47 | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT - Plaintiff's Motion for Summary Judgment (Filing No. 25 ) is GRANTED IN PART and DENIED IN PART. The Motion is granted with respect to FDA's decision not to designate retatrutide as "analogous" to a protein and denied with respect to the decision that retatrutide is not a "protein" under the regulatory definition. Defendant's Cross Motion for Summary Judgment (Filing No. 30 ) is similarly GRANTED IN PART and DENIED IN PART. That motion is granted with respect to FDA's decision that retatrutide is not a "protein" and denied with respect to the decision not to designate retatrutide as "analogous" to a protein. The FDA's decision that retatrutide is not at least "analogous" to a protein is VACATED and REMANDED to the agency for further consideration. (See Order.) Signed by District Judge Tanya Walton Pratt on 9/30/2025. (JSR) (Entered: 09/30/2025) |
| 10/03/2025 | 48 | AMENDED ORDER - ON CROSS-MOTIONS FOR SUMMARY JUDGMENT; Plaintiff's Motion for Summary Judgment (Filing No. 25 ) is GRANTED IN PART and DENIED IN PART. The Motion is granted on the claim that FDA's justifications for failing to designate retatrutide as an "analogous product" were arbitrary and capricious. The Motion is denied on the claim that FDA's refusal to designate retatrutide as a protein, and hence as a biological product, violates the agency's own regulations. Defendants' Cross Motion for Summary Judgment (Filing No. 30 ) is GRANTED IN PART and DENIED IN PART. The Motion is granted on the claim that FDA's refusal to designate retatrutide as a protein, and hence as a biological product, violates the agency's own regulations. The Motion is denied on the claim that FDA's justifications for failing to designate retatrutide as an "analogous product" were arbitrary and capricious. Having found the FDA's decision not to designate retatrutide as a biological product on the "analogous products" pathway to be arbitrary and capricious, the Court hereby VACATES that portion of the agency's decision and REMANDS it to the agency for further consideration consistent with this order. *** SEE ORDER ***. Signed by District Judge Tanya Walton Pratt on 10/3/2025.(CKM) (Entered: 10/03/2025) |
| 10/03/2025 | 49 | ORDER - REQUESTING POSITION STATEMENTS; On September 30, 2025, the Court entered summary judgment in favor of Defendants Robert Kennedy, Jr., U.S. Department of Health and Human Services, Martin Makary, and Food and Drug Administration on the claim that FDA's refusal to designate retatrutide as a protein, and hence as a biological product, violated the agency's own regulations (Lilly's "Second |

Claim for Relief") (see Filing No. 1 at 26-27). The Court entered summary judgment in favor of Plaintiff Eli Lilly and Company on the claim that FDA's justifications for failing to designate retatrutide as an "analogous product" were arbitrary and capricious (Lilly's "Third Claim for Relief") (see Filing No. 1 at 27). Accordingly, the Court set aside FDA's "analogous product" determination and remanded that decision to the agency for further consideration. The Court's order does not resolve all of Plaintiff's claims in the Complaint (Filing No. 1). Therefore, by no later than Friday, October 24, 2025 the parties shall submit their positions statements on how the Court should proceed with respect to the unresolved claim that FDA'srefusal to designate retatrutide as a biological product exceeds the agency's statutory authority (Lilly's "First Claim for Relief") (see Filing No. 1 at 26). Signed by District Judge Tanya Walton Pratt on 10/3/25. (CKM) (Entered: 10/03/2025)

| Date | No. | Description |
|---|---|---|
| 10/09/2025 | 50 | Unopposed MOTION to Stay *Parties' Statements of Position*, filed by Defendants FOOD AND DRUG ADMINISTRATION, ROBERT KENNEDY, JR., MARTIN MAKARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES. (Attachments: # 1 Text of Proposed Order)(Crane-Hirsch, Daniel) (Entered: 10/09/2025) |
| 10/10/2025 | 51 | SCHEDULING ORDER - Upon consideration of Defendants' unopposed motion for stay (ECF No. 50 ), and the entire record in this matter, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that: (See Order.) Signed by District Judge Tanya Walton Pratt on 10/10/2025. (JSR) (Entered: 10/10/2025) |
| 11/24/2025 | 52 | ORDER REQUESTING POSITION STATEMENTS - The Court orders that the stay in this case is lifted. Parties are ordered to submit position statements on or before December 15, 2025. SEE ORDER. Signed by District Judge Tanya Walton Pratt on 11/24/2025.(JRB) (Entered: 11/25/2025) |
| 12/15/2025 | 53 | Statement *Joint Position* by ELI LILLY AND COMPANY. (Attachments: # 1 Text of Proposed Order)(Cacioppo, Jayna) (Entered: 12/15/2025) |
| 12/16/2025 | 54 | ORDER AND FINAL JUDGMENT - The Court, having made its Entry directing the entry of final judgment, now enters FINAL JUDGMENT. For the reasons explained in the Court's Amended Order on Cross-Motions for Summary Judgment (Filing No. 48 ), it is hereby ORDERED that Plaintiff's Motion for Summary Judgment (Filing No. 25 ) is GRANTED IN PART and DENIED IN PART, and that Defendants' Cross Motion for Summary Judgment (Filing No. 30 ) is GRANTED IN PART and DENIED IN PART. Consistent with the Court's Amended Order on Cross-Motions for Summary Judgment, the Court hereby VACATES the agency's designation decision and REMANDS to the agency for further proceedings on Plaintiff's "analogous" products claim. This Order and Final Judgment constitutes a final judgment of the Court within the meaning of Rule 58(a) of the Federal Rules of Civil Procedure. Signed by District Judge Tanya Walton Pratt on 12/16/2025.(JRB) (Entered: 12/17/2025) |
| 02/12/2026 | 55 | NOTICE OF APPEAL as to 54 Closed Judgment, filed by Plaintiff ELI LILLY AND COMPANY. (Filing fee $605, receipt number AINSDC-9116224) (Cacioppo, Jayna) (Entered: 02/12/2026) |
| 02/12/2026 | 56 | DOCKETING STATEMENT by ELI LILLY AND COMPANY re 55 Notice of Appeal (Cacioppo, Jayna) (Entered: 02/12/2026) |
| 02/17/2026 | 57 | PARTIES' SHORT RECORD re 55 Notice of Appeal - **Instructions for Attorneys/Parties attached.** (KAA) (Entered: 02/17/2026) |
| 02/17/2026 | 58 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 55 Notice of Appeal. **- for Court of Appeals Use Only.** (KAA) (Entered: 02/17/2026) |

| 02/17/2026 | 59 | USCA Case Number 26-1301 for 55 Notice of Appeal filed by ELI LILLY AND COMPANY. (KAA) (Entered: 02/17/2026) |
|---|---|---|
| 03/03/2026 | 60 | SEVENTH CIRCUIT TRANSCRIPT INFORMATION SHEET by ELI LILLY AND COMPANY for proceedings held on 08/07/2025 before Judge Tanya Walton Pratt, re 55 Notice of Appeal (Cacioppo, Jayna) (Entered: 03/03/2026) |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| ELI LILLY AND COMPANY,<br>    Lilly Corporate Center<br>    Indianapolis, IN 46285,<br><br>                    *Plaintiff*,<br><br>        v.<br><br>XAVIER BECERRA, in his official capacity, and<br>U.S. DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES,<br>    200 Independence Avenue, S.W.<br>    Washington, DC 20201,<br><br>and<br><br>ROBERT CALIFF, in his official capacity, and<br>FOOD AND DRUG ADMINISTRATION,<br>    10903 New Hampshire Avenue,<br>    Silver Spring, MD 20993,<br><br>                    *Defendants*. | Case No. 1:24-cv-01503 |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

107.   FDA's denial of Lilly's request for designation of retatrutide as a biological product must accordingly be set aside.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiff Eli Lilly requests a judgment in its favor against Defendants as follows:

1.   Declare that Defendants' denial of Plaintiff's request for designation of retatrutide as a biological product is arbitrary and capricious, an abuse of discretion, and unlawful under the APA and the applicable governing statutes;

2.   Enter an injunction requiring Defendants to designate retatrutide as a biological product;

3.   Award Plaintiff reasonable attorneys' fees and costs; and

4.   Grant such other and further relief as the Court may deem appropriate.

Dated: September 3, 2024                    Respectfully submitted,

/s/ *Jayna M. Cacioppo*
Jayna M. Cacioppo, Attorney No. 25514-49
Donald Morgan, Attorney No. 30776-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Ph. No. (317) 713-3500
Fax No. (317) 713-3699

A.0010                    A.0010                    A.0010

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| ELI LILLY AND COMPANY, | |
| *Plaintiff*, | |
| v. | |
| ROBERT F. KENNEDY JR., in his official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | Case No. 1:24-cv-1503-TWP-KMB |
| and | |
| MARTIN MAKARY, in his official capacity, and FOOD AND DRUG ADMINISTRATION, | |
| *Defendants*. | |

**<u>REDACTED JOINT APPENDIX</u>**

Jayna M. Cacioppo, Attorney No. 25514-49
Donald Morgan, Attorney No. 30776-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Ph. No. (317) 713-3500

Allon Kedem (pro hac vice)
Jeffrey L. Handwerker (pro hac vice)
Daniel Yablon (pro hac vice)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for Plaintiff Eli Lilly and Company*

SCOTT P. KENNEDY
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
P.O. Box 386
Washington, D.C. 20044-0386
(202) 305-1837
Scott.P.Kennedy@usdoj.gov

*Counsel for Defendants*

**TABLE OF CONTENTS**

FDA Protein Definition Memorandum
  (Aug. 1, 2011) ................................................................................................... 790-808

FDA Draft Biologics Guidance
  (Feb. 15, 2012) .................................................................................................. 811-828

Pfizer Public Comments
  (May 25, 2012) .................................................................................................. 829-837

Eli Lilly Public Comments
  (Oct. 9, 2014) .................................................................................................. 1317-1328

FDA Biologics Guidance
  (Apr. 30, 2015) ................................................................................................ 1334-1352

Eli Lilly Citizen Petition
  (Aug. 18, 2016) ............................................................................................... 1369-1405

Proposed Biological Product Rule
  (Dec. 12, 2018) ............................................................................................... 1609-1681

Final Biological Product Rule
  (Feb. 21, 2020) ............................................................................................... 1809-1815

Eli Lilly First Request for Designation (Redacted)
  (Nov. 9, 2023) ................................................................................................. 1875-1888

FDA Not-Filed Letter
  (Nov. 17, 2023) ............................................................................................... 1889-1891

Eli Lilly Response to FDA Not-Filed Letter
  (Dec. 1, 2023) ................................................................................................. 1892-1903

Eli Lilly Superseding Request for Designation (Redacted)
  (Jan. 19, 2024) ................................................................................................ 1904-1918

FDA Review Memorandum (Redacted)
  (Mar. 18, 2024) ............................................................................................... 1919-1927

FDA Decision on Request for Designation (Redacted)
  (Mar. 18, 2024) ............................................................................................... 1928-1936

*Amino Acids.* Handbook of Hormones (2d ed. 2021) ...................................... 1937-1941

*Amino Acids.* Brenner's Encyclopedia of Genetics (2d ed. 2013) ................... 1942-1944

*Amino Acids.* Encyclopedia of Biological Chemistry (3d ed. 2021) .............. 1945-1952

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2025, the foregoing joint appendix was served via ECF

to all counsel of record.


/ s/  Jayna M. Cacioppo
Jayna M. Cacioppo, Attorney No. 25514-49
Donald Morgan, Attorney No. 30776-49
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Ph. No. (317) 713-3500
Fax No. (317) 713-3699

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                   Public Health Service

# Memorandum

| | |
|---|---|
| **Date** | • August 1, 2011 |
| **From** | Director, Center for Drug Evaluation and Research<br>Director, Center for Biologics Evaluation and Research |
| **Subject** | Interpreting the category "protein (except any chemically synthesized polypeptide)" in the revised definition of biological product |
| **To** | File |

## Summary

This document describes FDA's approach, scientific and regulatory deliberations, and conclusions underlying its interpretation of the category of "protein (except any chemically synthesized polypeptide),"[1] in the amended definition of "biological product" in the Public Health Service Act (PHS Act).[2] The Biologics Price Competition and Innovation Act of 2009 (BPCI Act) amended the definition of "biological product" to include a "protein (except any chemically synthesized polypeptide)."

In short, in implementing the BPCI Act. FDA has determined that the following definitions apply:

- The term "protein" means any alpha[3] amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size.
- The term "chemically synthesized polypeptide" means any alpha amino acid polymer that is (a) made entirely by chemical synthesis: and (b) less than 100 amino acids in size.

The rationale for this interpretation is as follows. Congress intended to include certain molecules within the definition of "biological product" that had not previously been regulated under the PHS Act, i.e., proteins as referenced by the BPCI Act.[4] This is reflected in the transition

---

[1] Hereinafter "protein definition."

[2] Section 351(i) of the PHS Act [42 U.S.C. § 262(i)], as amended, defines "biological product" as:
a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

[3] All amino acids that are constituents of proteins are alpha amino acids because they have the carboxyl group linked to the alpha carbon of their carbon chain. Jeremy M. Berg, John L. Tymoczko, & Lubert Stryer, *Biochemistry* 27 (6th Ed. 2007).

[4] FDA currently regulates many proteins under the PHS Act that fall under another category in the definition of "biological product" (such as blood clotting factors). Other proteins (such as insulin and human growth hormone) have historically been regulated as drugs under the FD&C Act. With the BPCI Act, all proteins (except any chemically synthesized polypeptide) are within the scope of the "biological product" definition.

FDA000790
A.0014                    A.0014                    A.0014

provisions described in section 7002(e) of the BPCI Act for certain products previously approved under section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act). Congress did not provide definitions for "protein," "chemically synthesized," or "polypeptide." It is well established that "when terms used in a statute are undefined, we give them their ordinary meaning"[5] "[i]n the absence of persuasive reasons to the contrary."[6] In this case, however, due to considerable variability in how scientific sources define these terms, it is difficult to determine their "ordinary meaning." Therefore, FDA has applied its scientific expertise to the ambiguous statutory language and developed an interpretation of these terms based on relevant scientific, regulatory, and legal considerations. The process for developing this interpretation involved the creation of a cross-center, multi-disciplinary "protein definition working group" that conducted an extensive analysis of potential approaches that the agency could take. The result is a scientifically reasonable, bright-line rule that provides regulatory clarity and facilitates the implementation of the BPCI Act.

Under the agency's interpretation, the term "protein" in the amended definition of "biological product" does not include peptides. In general, most scientific sources describe the term "protein" as excluding "peptides" (i.e., amino acid polymers ("chains") that are generally shorter and simpler than proteins). Thus, to the extent that there is a generally accepted meaning of "protein," peptides are outside the scope of the term.

Moreover, one of the purposes of the BPCI Act is to establish a new abbreviated approval pathway for licensure of a biological product as "interchangeable" with a reference product. Prior to the enactment of the BPCI Act, no abbreviated approval pathway existed for products licensed under the PHS Act. Section 505(j) of the FD&C Act provides an abbreviated approval pathway for products shown to have, among other things, the "same" active ingredient as a reference listed drug. Historically, use of the 505(j) pathway has not been appropriate for approval of interchangeable versions of large, complex molecules because of the challenges involved in demonstrating that two large, complex molecules have the same active ingredient, as required under section 505(j). In contrast, for smaller, less complex molecules, such as peptides,[7] which are more easily characterized, the section 505(j) pathway is adequate because a sponsor may be able to demonstrate that two products have the same active ingredient.

Accordingly, it is reasonable to infer that, when it established an abbreviated approval pathway that includes interchangeability for "proteins" and other biological products under the PHS Act, Congress intended to provide an abbreviated pathway that was better suited for complex molecules. Congress, however, did not intend to remove smaller, easier-to-characterize products (e.g., small, simple amino acid chains such as peptides) from the scope of products that are effectively regulated under section 505 of the FD&C Act.

Finally, continuing to regulate peptides as drug products under the FD&C Act may promote medical innovation because it makes available the abbreviated approval pathways under sections 505(b)(2) and 505(j)(2)(C) of the FD&C Act for peptides that differ in certain ways from a

---

[5] *Asgrow Seed Co. v. Winterboer*, 513 U. S. 179, 187 (1995).
[6] *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 465 (1968).
[7] This discussion does not encompass peptide vaccines which have been and will continue to be regulated as biological products because they fit within the biological product definition as vaccines.

previously approved drug product, but for which it is scientifically appropriate to rely, in part, on FDA's finding of safety and/or effectiveness for a previously approved product or published literature to support approval.[8]

To define "protein" within the meaning of the BPCI Act, FDA has selected a size-based cutoff for distinguishing peptides from "proteins" that is well-supported by scientific sources. Specifically, for purposes of the BPCI Act, the agency has determined that the category "protein (except any chemically synthesized polypeptide)" should be interpreted to mean any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size.[9] This threshold, based on a single, well-defined criterion, supplies a clear, bright-line rule.

### Background and Analysis

The BPCI Act expanded the definition of a "biological product" in the PHS Act[10] by introducing the term "protein (except any chemically synthesized polypeptide)."[11] "Protein," "chemically synthesized," and "polypeptide" are not defined in BPCI Act, the PHS Act, or the FD&C Act. In addition, "peptide," a related term central to the scientific definition of a protein, does not appear in any of these statutes. At the same time, there is no universally accepted scientific definition for "protein," "polypeptide," or "peptide." Therefore, the scope of the newly expanded definition of "biological product" is facially unclear. Because none of the relevant texts – statutory or scientific – leads to a consistent definition for these terms, it is not obvious, based on textual analysis alone, which set of molecules Congress meant to bring under the definition of a "biological product" through the BPCI Act. This ambiguity requires the agency to analyze the current scientific thinking with respect to the meanings of these terms in order to identify areas where a consensus exists that can inform the agency's interpretation of these terms. Where there is no agreement, FDA, guided by its scientific expertise, will exercise its discretion to arrive at a definition that makes both scientific and regulatory sense.

### 1. Lack of a scientific consensus

#### a. Scientific definitions

The scientific literature[12] contains multiple definitions for the terms "peptide," "protein" and "polypeptide." A non-exhaustive sampling, below, demonstrates the heterogeneity of such definitions.

---

[8] The BPCI Act lacks similar abbreviated approval pathways for follow-on biological products.

[9] As a necessary corollary, the agency has also determined that a peptide product should not be considered "analogous" to a "protein" under the biological product definition. As discussed in this memorandum, Congress, in amending the biological product definition by adding "protein (except any chemically synthesized polypeptide)," likely did not intend to bring peptides into the scope of the amended definition.

[10] *Supra* note 2.

[11] BPCI Act §§ 7002(b)(1) & (b)(2).

[12] Non-scientific references are not particularly helpful in defining these terms. *E.g.*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 938 (10th Ed. 1996) ("Protein: any of numerous naturally occurring extremely complex substances that consist of amino-acid residues joined by peptide bonds."); *id.* at 903 ("Polypeptide: a

### i. Dictionary definitions

**Protein:**

- "A complex, high polymer containing carbon, hydrogen, oxygen, nitrogen, and usually sulfur, and composed of chains of amino acids connected by peptide linkages . . . ."[13]
- "Protein molecules consist of one or several long chains (polypeptides) of amino acids linked in a characteristic sequence."[14]
- "A high molecular weight polypeptide of L-amino acids that is synthesized by living cells. Proteins are biopolymers with a wide range of molecular weights, structural complexity, and functional properties."[15]
- "Any of a large class of complex organic chemical compounds that . . . consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures."[16]

**Polypeptide:**

- "The class of compounds composed of acid units chemically bound together with amide linkages (-CO·NH-) with elimination of water. A polypeptide is thus a polymer of amino acids. The chain of amino acids (less than 100) are linked by peptide bonds."[17]
- "A peptide comprising 20 or more amino acids. Polypeptides that constitute proteins usually contain 100–300 amino acids."[18]
- "The term [polypeptide] is most often used for proteins, which can consist of one or more polypeptide chains, but can also be used more generally for all amino acid polymers including peptides, polyamino acids, and chemically synthesized polymers of amino acids."[19]
- "A linear polymer of more than 10 amino acids that are linked by means of peptide bonds."[20]
- "A peptide, such as a small protein, containing many molecules of amino acids, typically between 10 and 100."[21]
- "A peptide which on hydrolysis yields more than two amino acids . . . . See peptide."[22]

---

molecular chain of amino acids.").

[13] HAWLEY'S CONDENSED CHEMICAL DICTIONARY 1053 (15th Ed. 2007).
[14] DICTIONARY OF SCIENCE 666 (6th Ed. 2010).
[15] DICTIONARY OF BIOCHEMISTRY AND MOLECULAR BIOLOGY 374 (2d Ed. 1989).
[16] AMERICAN HERITAGE SCIENTIFIC DICTIONARY 507 (2008), *available at*
http://science.yourdictionary.com/protein.
[17] HAWLEY'S, *supra* note 13, at 1017.
[18] SCIENCE, *supra* note 14, at 650.
[19] ENCYCLOPEDIA OF MOLECULAR BIOLOGY 1919 (1994).
[20] BIOCHEMISTRY, *supra* note 15, at 387.
[21] AMERICAN HERITAGE, *supra* note 16, at 497, *available at* http://science.yourdictionary.com/polypeptide.
[22] DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1331 (28th Ed. 1994).

FDA000793
A.0017    A.0017    A.0017

**Peptide**:

- "See polypeptide."[23]
- "Any of a group of organic compounds comprising two or more amino acids linked by peptide bonds. . . . Polypeptides contain more than 20 and usually 100–300."[24]
- "A chemical compound that is composed of a chain of two or more amino acids and is usually smaller than a protein."[25]
- "Any member of a class of compounds of low molecular weight which yield two or more amino acids on hydrolysis. . . . Peptides form the constituent parts of proteins."[26]
- "Peptides . . . are oligomers in which the repeating units are amino acids. Peptides have a defined sequence of amino acids that are linked together by formation of peptide bonds. In contrast to polypeptides and proteins, peptides consist of a small number of amino acids. The distinction between a peptide and a polypeptide is somewhat arbitrary, but generally a peptide has between 2 and 50 amino acid residues. . . . Most peptides are unstructured, described as having a random coil conformation, but others have highly ordered secondary and tertiary structure similar to that observed in larger proteins."[27]

### ii. Textbook definitions

- "Most natural polypeptide chains contain between 50 and 2000 amino acid residues and are commonly referred to as proteins. Peptides made of small numbers of amino acids are called oligopeptides or simply peptides."[28]
- "Proteins are molecules that consist of one or more polypeptide chains. These polypeptides range in length from ~40 to over 4000 amino acid residues."[29]
- "Proteins consist of one or more linear polymers called polypeptides . . . a minimum of 40 residues seems to be required for a polypeptide to adopt a stable three-dimensional structure in water."[30]
- "Many terms are used to denote the chains formed by the polymerization of amino acids. A short chain of amino acids linked by peptide bonds and having a defined sequence is called an oligopeptide, or just peptide; longer chains are referred to as polypeptides. Peptides generally contain fewer than 20-30 amino acid residues, whereas polypeptides are often 200-500 residues long."[31]
- "A protein molecule is made from a long chain of these amino acids, each linked to its neighbor through a covalent peptide bond. Proteins are therefore also known as polypeptides. Each type of protein has a unique sequence of amino acids . . . Proteins

---

[23] HAWLEY'S, *supra* note 13, at 957.

[24] SCIENCE, *supra* note 14, at 608.

[25] AMERICAN HERITAGE, *supra* note 16, at 468, *available at* http://science.yourdictionary.com/peptide.

[26] DORLAND'S, *supra* note 22, at 1254.

[27] MOLECULAR BIOLOGY, *supra* note 19, at 1788-89.

[28] *Biochemistry*, *supra* note 3, at 35.

[29] Donald Voet & Judith G. Voet, *Biochemistry* 62 (3d. Ed. 2004).

[30] Thomas D. Pollard & William C. Earnshaw, *Cell Biology* 21 (1st Ed. 2002).

[31] Harvey Lodish, et al., *Molecular Cell Biology* 66 (6th Ed. 2007).

come in a wide variety of shapes, and they are generally between 50 and 2000 amino acids long."[32]

### b. Areas of scientific agreement

As the examples above demonstrate, scientific sources disagree over many aspects of the definitions of these terms. At the same time, despite the lack of an agreed-upon precise overall definition for "protein," "peptide," and "polypeptide," most, if not all, sources agree about some facets of the meanings of these terms. These areas of agreement may be summarized as follows:

- All of the terms (protein, peptide, polypeptide) refer to amino acid polymers ("chains") made up of alpha amino acids linked by peptide bonds.
- "Protein" refers to chains containing a specific, defined sequence of amino acids, generally provided by the DNA sequence of a corresponding gene.[33]
- "Peptide" is a term distinct from "protein." "Peptide" generally refers to smaller, simpler chains of amino acids, while "protein" generally refers to longer, more complex chains.

Taking these areas of agreement as a baseline, the generally accepted meanings, to the extent they can be determined, of "protein," "polypeptide," and "peptide" appear to include the following:

- All three terms refer to amino acid polymers.
- Proteins are long, complex polymers of alpha amino acids.
- Each protein has a specific, defined sequence.
- Peptides are not proteins.

### c. The limitations of the generally accepted meanings of "protein," "polypeptide," and "peptide"

Scientific consensus provides a valid starting point, but falls short of supplying a clear protein definition by itself. The ambiguity arises from two major shortcomings of the literature.

The first is the lack of a precise defining line between proteins and peptides. Beyond agreeing on the fact that peptides are generally shorter, simpler, and less ordered, sources do not agree on a specific criterion or criteria that distinguish peptides from proteins.

The second is that, while scientific sources agree that "polypeptide" refers to amino acid polymers, there does not seem to be any further scientific agreement over its meaning. In fact,

---

[32] Bruce Alberts, et al., *Molecular Biology of the Cell* 129, 135 (4th Ed. 2002).

[33] *E.g.*, Basic Genetics *in Current Medical Diagnosis & Treatment* Ch. 2e (Stephen J. McPhee & Maxine A. Papadakis, Eds. 2011) *available at* http://www.accessmedicine.com/content.aspx?aID=774551 ("[E]ach of the 20,000–25,000 human genes is [expressed in] the cytoplasm, where [their] genetic information is translated into proteins, which perform the functions that ultimately determine phenotype."); MOLECULAR BIOLOGY, *supra* note 19, 2037 ("Unlike synthetic polymers, the arrangement of amino acid residues in the primary structure of a protein is not random, but is precisely determined by the genetic information stored in the chromosomal DNA or RNA.").

A.0019                    A.0019                    A.0019

FDA000795

"polypeptide" can have several, widely different meanings.[34] In one sense, it may refer to all amino acid chains, which would make "protein" and "peptide" subsets of the term.[35] Under other interpretations, "polypeptide" could take on narrower meanings.[36] Some sources equate "polypeptide" with "protein,"[37] while a few equate it with "peptide."[38]

As a result, the generally accepted meanings of all three terms overlap in scope to varying degrees. In other words, it does not appear to be possible to apply any of the generally accepted meanings of "protein," polypeptide," or "peptide" with sufficient precision such that each refers to a specific, exclusive set of molecules. The lack of scientific certainty over the definitions of these terms implies that there may be some molecules to which more than one term could apply. Therefore, FDA has chosen to adopt an approach that attempts to minimize the ambiguity due to the vagueness and overlap inherent in the terms such that the resulting interpretation of protein definition leads to optimal clarity.

At a minimum, the agency's interpretation should address the following in order to provide an optimal amount of clarity:

- A definition of "protein" that excludes peptides using clear parameters.
- A definition of "polypeptide."
- A definition of "chemically synthesized."

## 2. Protein vs. Peptide

### a. Justification

FDA's conclusion that "protein" does not encompass simpler, shorter amino acid chains, i.e., peptides, within the meaning of the BPCI Act rests on three independent bases.

First, a majority of scientific sources agree that peptides are distinct from proteins, mostly based on their shorter size,[39] thus the generally accepted meaning of the term "protein" appears to exclude peptides.

Second, proteins are longer and more complex than peptides, which means that they are generally more difficult to identify and fully characterize in theory as well as in practice. It follows that, in general, it would be more difficult for protein products to meet the standard that requires a demonstration of "sameness" of the active ingredient of a generic drug product to the

---

[34] *See supra* note 19.

[35] *See id. See also supra* notes 21 & 22.

[36] *See supra* notes 19, 20 & 22.

[37] *See, e.g., supra* note 17.

[38] *See supra* notes 22 & 23.

[39] *See supra* note 25 ("[Peptide] is usually smaller than a protein."); *supra* note 26 ("Peptides form the constituent parts of proteins."); *supra* note 27 ("In contrast to . . . proteins, peptides consist of a small number of amino acids."); *supra* note 31 ("A short chain of amino acids linked by peptide bonds and having a defined sequence is called [a] . . . peptide.").

active ingredient of a reference listed drug product.[40] For example, FDA has already approved several peptide products under an abbreviated new drug application ("ANDA"). FDA also has approved menotropins (containing follicle stimulating hormone and luteinizing hormone, which are complex proteins) under an ANDA.[41] The product was never marketed.

Thus, because the abbreviated approval pathway under section 505(j) of the FD&C Act is less accessible for large, complex molecules, it follows that the BPCI Act's purpose includes establishing a new abbreviated approval pathway with statutory criteria better suited to a determination of interchangeability for such products. By similar reasoning, Congress could reasonably have intended to allow for the continuing regulation of short, simple amino acids (i.e., peptides) under the abbreviated approval pathways under sections 505(b)(2) and 505(j)(2)(C) of the FD&C Act, which allow for the development of improved versions of these molecules.

Finally, interpreting the protein definition to include "peptide" within the meanings of "protein" and "polypeptide" would result in chemically synthesized peptides being subject to regulation as drugs while biologically derived versions[42] of the same molecules would be regulated as biological products. This would increase regulatory ambiguity by subjecting almost-identical versions of short, simple molecules to different approval pathways and different exclusivity regimes. It would mean that sponsors would have an incentive to concentrate their resources and make product development decisions based on regulatory, not on scientific grounds, which the agency does not consider to be a desirable outcome.

### b. Various approaches to distinguish peptides from proteins

No existing bright-line rule sharply distinguishes peptides from proteins. In general, scientific sources agree that peptides are shorter chains which perform fewer functions, are less ordered, generally lacking higher order structure that is intrinsic to their function, and do not generally exhibit many post-translational modifications. Comments received by FDA to the public docket generally agree that the term "protein" does not include peptides and that peptides can be distinguished from proteins based on the characteristics listed above.[43] In sum, criteria for distinguishing peptides from proteins include size, structure, function, and the presence of post-translational modifications.

### i. Size
As noted above, there is no single, agreed-upon number of amino acids in the literature above which a particular amino acid chain ceases to be recognized as a peptide and becomes a protein.

---

[40] Sections 505(j)(2)(A) & (j)(2)(A)(ii)(I)(i) of the FD&C Act state that "[a]n abbreviated application for a new drug shall contain . . . information to show that the active ingredient of the new drug is the same as that of the listed drug." FDA regulations also state that "[f]or determining the suitability of an abbreviated new drug application, the term 'same as' means identical in active ingredient(s) . . . ." 21 C.F.R. § 314.92(a)(1).

[41] This approval was the subject of litigation in the D.C. Circuit. *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313 (1998). *Serono* stands for the proposition that FDA has broad discretion in deciding whether two active ingredients are the same for purposes of approving a generic drug under section 505(j). Nevertheless, the agency has approved only one complex protein through the 505(j) pathway.

[42] For the purposes of this document, "biologically derived" includes recombinant products.

[43] *See* FDA, *Approval Pathway for Biosimilar and Interchangeable Biological Products*, Docket FDA-2010-N-0477 *passim, available at* http://www.regulations.gov/#!docketDetail;D=FDA-2010-N-0477.

FDA000797

The list of definitions in Section 1.a reflects cutoff numbers ranging from ten to 100 amino acids. In addition, many sources that refer to a specific number specify that the number is an approximation.[44] Therefore, one can argue that there is considerable overlap between proteins and peptides in this size range. In other words, for any size cut-off of approximately 30 amino acids or greater, there may be amino acid polymers smaller than the cut-off number that could otherwise be considered small proteins based on some other criterion, such as the presence of higher order structure.[45] Similarly, for any size cut-off under 100 amino acids, there may be amino acid polymers of less than 100 amino acids in size that could be considered large peptides rather than proteins based on some other criterion.

### ii. Function

Some proteins carry out functions that uniquely identify them as proteins (e.g., enzymatic catalysis, molecular transport). At the same time, other proteins carry out functions that are identical to those carried out by peptides (e.g., reversible binding and signaling). Therefore, when used as a criterion to distinguish peptides, function can only determine which molecules are unambiguously proteins. At the same time, a molecule that would indisputably be classified as a protein under some other criterion (e.g., size) may not be so classified under an approach based solely on function if that molecule only carries out functions common to both peptides and proteins. For example, if FDA adopts an approach that ultimately depends solely on function to distinguish peptides, human growth hormone (HGH), a signaling molecule composed of 191 amino acids, would not be considered unambiguously a protein because it performs a function also performed by peptides. But HGH is large enough to be considered a protein under an approach that employs any of the size cut-offs discussed in the literature, which illustrates the limitations of function as a distinguishing criterion.

### iii. Structure

While peptides are, in general, less ordered than proteins, the presence of higher order three-dimensional structure is not a reliable criterion to clearly distinguish peptides because of the difficulty in determining the amount or type of structure that is sufficient to unambiguously classify a molecule as a protein. For example, synthetic peptides as short as 16 amino acids may exhibit a simple alpha helical structure.[46] Conantokin-T, a naturally-occurring peptide of 21 amino acids, exhibits significant helical structure in aqueous solution.[47] In addition, some peptides that are unordered in solution may assume a more ordered structure upon binding to their targets.[48] Therefore, clarity is not furthered by including structure considerations in an approach that aims to distinguish peptides from proteins.

### iv. Post-translational modifications

While post-translational modifications are more commonly observed in proteins, some post-translational modifications such as phosphorylation can also occur naturally in peptides. Many of

---

[44] *E.g., supra* notes 29, 31 & 32.

[45] *E.g.,* Conantokin-T, a 21 amino-acid peptide. See the discussion in Section 2.b.iii, *infra.*

[46] Susan Marqusee & Robert L. Baldwin, *Helix stabilization by Glu⁻⁻⁻Lys⁺ salt bridges in short peptides of* de novo *design,* 84 Procs. Nat'l Acad. Sci. 8898 (1987).

[47] Niels Skjærbæk, et al., *Determination of the Solution Structures of Conantokin-G and Conantokin-T by CD and NMR Spectroscopy,* 272 J. Biol. Chem. 2291 (1997).

[48] *E.g.,* Nathan T. Wright, *Solution structure of S100A1 bound to the CapZ peptide (TRTK12),* 386 J. Mol. Biol. 1265 (2009) (Describing how a 12 amino acid peptide forms an amphipathic helix upon binding).

the smaller molecules (e.g., calcitonin, a 32 amino acid polymer) contain at least one disulfide bond. Additional post-translational modifications, e.g., PEGylation, can be introduced artificially into both proteins and peptides with equal ease. Therefore, a molecule's post-translational modification status is not a very useful measure with which to distinguish peptides from proteins.

### c. Agency goals and options

The agency's goals in establishing the regulatory definition of protein for purposes of the BPCI Act are to provide regulatory clarity and to facilitate implementation of the legislation consistent with Congressional intent. The agency engaged in an extensive deliberative process that involved the identification and analysis of numerous scientific definitions. The options and our conclusions are discussed below.

Because peptides and proteins appear to overlap over a certain size range, as a scientific matter, the most accurate means of distinguishing peptides from proteins would be to analyze each molecule within that size range on a case-by-case basis, taking into account size, function, structure and post-translational modifications. This individual, multi-factor analysis has three principal drawbacks that preclude it from being a viable regulatory option.

First, it is likely to lead to post-determination challenges from competitors, possibly transforming each determination into a long-term proceeding and likely consuming finite agency resources. It is also likely that sponsors or challengers who are unsatisfied with FDA's determination will seek recourse in the courts, thus extending the period of uncertainty. Such an outcome is undesirable from a regulatory efficiency standpoint. In contrast, a bright line rule would help expedite decision making, ensure consistency, and ensure that agency decision making is not arbitrary.

Second, it is possible that even a multi-factor analysis ultimately would be insufficient to classify a molecule as either a peptide or protein in a conclusive manner. Questions such as what types of secondary and tertiary structure qualify to make an amino acid chain a protein, or how many and what types of post-translational modifications must a protein possess, as well as countless similar questions, are likely to arise.

Finally, if FDA were to modify its criteria in response to challenges that arise in the course of an individual determination, this could have repercussions on other parties who may have committed to certain product development and investment decisions based on FDA's approach to previous products.

Therefore, it is vastly preferable to constrain the determination of which molecules are proteins by employing a few (or even a single) of the criteria described above. The protein definition working group considered the following factors in developing potential options for the Center Directors to consider:

- Using scientifically sound criteria.
- Providing a bright-line rule that is as clear and feasible to implement as possible.

FDA000799
A.0023

- To the extent possible, keeping related molecules under the same regulatory framework.
- Minimizing the legal vulnerability of the resulting definition.

Ultimately, the protein definition working group presented three potential options for consideration by the agency. Each option provided a means of defining "protein" to exclude peptides. For the reasons described above, FDA did not consider all possible means of distinguishing peptides. If a potential option did not present a clear distinguishing line, based on criteria with solid support in the literature, it was discarded. Accordingly, it was decided to model each possible option around a size cut-off despite the fact that there is no universal scientific agreement on the location of a size cut-off dividing peptides and proteins. Size is a reasonable criterion because most sources distinguish peptides from proteins based on the length of the amino acid chain. Moreover, none of the other criteria are conducive to creating a bright-line rule by themselves.

Two of the options also incorporated function as a means of narrowly and unambiguously determining whether a molecule is a protein, but they did so only in a size range over which there was no clear peptide/protein distinction based on size. Structure and post-translational modifications were found not suitable because these criteria did not appear to be useful in clearly differentiating between proteins and peptides.

## Option I.

This approach presents a single size cut-off at 50 amino acids. The cutoff is supported by several scientific sources.[49] Molecules below the cut-off are generally peptides, and those above are generally proteins. At the same time, recognizing the uncertainty inherent in using a single cut-off, molecules within ten amino acids of the cut-off would be subjected to a set of rules that have the effect of classifying as proteins only those molecules that are unambiguously proteins based on their function.

"Protein" under Option I would be defined as follows:

> Any chain consisting of a total of 50 or more amino acids is generally a protein.
> Any such molecule consisting of a total of 49 or fewer amino acids is generally a peptide.

In light of the inherent uncertainty in the exact location of the dividing line between peptides and proteins, FDA would apply the algorithm described below to categorize molecules within ten amino acids of the 50 amino acid cutoff (i.e., molecules consisting of 40 to 60 amino acids). This would mean, for example, that some molecules greater than 50 amino acids in size may be classified as peptides. All molecules within the range of uncertainty (i.e., molecules containing between 40 and 60 amino acids) would be subject to the following additional rules:

---

[49] *See supra* notes 28 & 32.

FDA000800
A.0024

a) a chain that displays a function that unambiguously identifies it as a protein[50] is
a protein,
b) otherwise, a chain is a protein if it is within a few amino acids of the higher end
of the size range and is related in sequence and function to another chain that is
larger than 60 amino acids in size,
c) otherwise, it is a peptide.

This option provides a bright-line rule for almost all molecules, except for those in the 40-60
amino acid range. The range of uncertainty between those two points is narrow, and currently
contains only two approved products, insulin and aprotinin. In practical terms, this rule means
that almost any chain under 60 amino acids in size will be treated as a peptide. The exception
would be molecules of at least 40 amino acids that function unambiguously as a protein.

## Option II.

Rather than a single size cutoff, this option would involve applying an algorithm based on
generally accepted limits[51] to isolate the size ranges over which there is general scientific
agreement about whether a molecule is a peptide or a protein. Under this option, molecules of 40
amino acids or less in size would be considered peptides,[52] and those of 100 amino acids or more
in size would be considered proteins.[53] Molecules within the range of uncertainty would be
classified as proteins only if they display an unambiguous protein function or if they are not
composed entirely of peptide-sized fragments (i.e., fragments of 40 amino acids or less in size).

The algorithm is as follows:

1. Any chain consisting of a total of 100 or more amino acids is a protein.
2. Any chain consisting of a total of 40 or fewer amino acids is a peptide.
3. Any chain not fitting the criteria above is a protein if, and only if, it is
unambiguously a protein such that:
a. it displays a function that unambiguously identifies it as a protein (as in
Option I), or

---

[50] As used in this algorithm, "unambiguously identifies it as a protein" would mean that the molecule carries out one
or more of the following classic functions of a protein.
a. Provides structural support to cellular macrostructures
b. Catalyzes a biochemical reaction
c. Transports other molecules
d. Aids in the folding of other proteins
**Note.** Functions such as binding and signaling are functions intrinsic to both proteins and peptides and may not be
used to unambiguously distinguish between the two.
**Note.** The molecule must carry out its function directly and not, for example, via allosteric regulation (by inducing a
conformational change in another biomolecule). The molecule may carry out this function either independently or in
complex with other proteins.
[51] A significant majority of scientific sources agree with these criteria.
[52] Several sources support the notion that molecules under 40 amino acids are peptides. *See, e.g., supra* notes 29 &
30. In addition, the agency regulations recognize the proposition that molecules of up to 40 amino acids are peptides.
*See* 21 C.F.R. § 601.2(c)(1).
[53] *See supra* notes 18, 21 & 24.

FDA000801

b. if it contains at least one contiguous chain of 41 or more amino acids. In other words, the molecule must not be composed of peptide-sized fragments.

This option relies almost wholly on generally accepted propositions. It also provides a bright-line rule for all amino acid chains except for those in the zone of uncertainty (i.e., those between 40 and 100 amino acids in size). It presents a greater zone of uncertainty than the one presented in Option I, but this reflects the lack of clear lines in this size range, representing the actual overlap between proteins and peptides. Moreover, despite the increase in the size of the zone of uncertainty, the number of current products affected does not increase significantly. There are only a total of five approved products within the range of 41 to 99 amino acids.[54] The determination of whether these products are proteins is no more difficult that it would be under Option I.

## Option III.

This approach would subject all amino acid polymers with a specific, defined sequence to a single size cut-off (which would be based on the scientific literature) and categorize them as proteins or peptides without further analysis. This option would provide a very bright line and provide certainty to sponsors seeking to define the appropriate regulatory pathway for their product candidates.

"Protein" under Option III would be defined as follows:

Any chain consisting of a total of at least 41 amino acids is a protein. Any such molecule consisting of 40 or fewer amino acids is a peptide.

As noted above, an important advantage of this option is that it would maximize regulatory certainty. A potential disadvantage is that, depending on the number picked for the size cut-off, some smaller, biologically derived molecules currently regulated as drugs could become subject to regulation as biological products under the PHS Act, while their chemically-synthesized counterparts would remain drugs approved under the FD&C Act.

### e. The agency's decision

After careful consideration of the background and analysis of the possibilities embodied in the three options presented, FDA selected Option III with a 40 amino acid cutoff. Therefore, FDA has determined that the term "protein," under the BPCI Act, means:

Any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size.

This option promotes the key goal of interpreting the ambiguous statutory language in a way that maximizes clarity and provides the agency with an easily implementable standard. One of the objections to Options I and II was that each was likely to invite a case-by-case analysis of every

---

[54] These products are: insulin, aprotinin, hirudin, IGF-1 and IGF-2.

FDA000802
A.0026

product to determine whether it was a protein in the range where size alone was not a determinant. Based on FDA's regulatory expertise, including its experience with antibiotics, where the agency's determination of what constituted an antibiotic was repeatedly challenged, as well as the considerations outlined in Section 2.c, any rule that invites a case-by-case analysis in classifying products will result in large transaction costs both before, during, and after a classification decision has been made, may lead to inconsistent decision-making between different Centers, and will result in uncertainty for regulated industry which may negatively impact product development. For these reasons, such rules should be avoided if reasonable alternatives exist. Options I and II could lead to repeated challenges to the agency's determination of what constitutes "function that unambiguously identifies a product as a protein." The 40 amino acid cut-off was chosen because it has significant support in the literature, and is consistent with an existing agency regulation that recognizes that peptides may be composed of up to 40 amino acids. Thus, Option III was found to be superior to the others.

In making this decision, the agency recognizes that any regulatory definition that determines the scope of molecules that are within the "protein" category will result in some outcomes that may be contested on scientific grounds. For example, under the currently selected cut-off, there may be molecules smaller than 41 amino acids that could be considered proteins under a different criterion, such as structure. But the same would apply even if the cut-off were set at 30, or even 20 amino acids.[55] The downside of attempting to eliminate such incongruities by lowering the threshold would be that only a size cut-off of approximately ten amino acids would guarantee that no smaller molecule could possibly be considered a protein under some other scientific criterion. Although a few sources seem to support a cut-off at around ten amino acids,[56] the disadvantage of such a low size cut-off is that it classifies as proteins many molecules that would not otherwise be classified as proteins based on any other criteria. In other words, the trade-off for insuring that no small protein is ever classified as a peptide would be the classification of many peptides larger than the cut-off as proteins. For reasons discussed in Section 2.a, easily characterizable, short amino acid chains should not be classified as "proteins" for the purposes of the BPCI Act.

There are several benefits to Option III with a size cut-off at 40 amino acids. First, it provides a clearer, more predictable standard than the alternative definitions. Second, the approach is supported by the scientific literature, as well as being consistent with existing agency regulations. It also provides maximum regulatory clarity that should greatly aid industry in its product development decisions and minimizes the need for extensive case-by-case analysis. FDA believes that the benefits of this approach far outweigh any deficiencies it may have in potentially classifying some molecules differently than an approach based on another set of criteria.

## 3. The parenthetical exclusion

The parenthetical provides that the term "protein" does not include "any chemically synthesized polypeptide." Thus, FDA needs to determine which molecules, if any, that would otherwise fall

---

[55] *See supra* notes 46-48.

[56] *See, e.g.*, supra note 20.

     FDA000803

within the scope of "protein" are excluded by the exception for chemically synthesized polypeptides. The challenge lies in the fact that the terms "polypeptide" and "chemically synthesized" are undefined; and "polypeptide" does not have a generally accepted meaning.

### a. Lack of a consensus

As noted in Section 1.c, different scientific sources ascribe different meanings to "polypeptide." A number of sources seem to use the term to describe all, or almost all, amino acid chains. Others consider "polypeptide" to apply to a more limited set of molecules, but differ as to which set of molecules the definition applies. Yet others use the term interchangeably with "protein." Since a consensus definition of "polypeptide" does not appear to exist, FDA needs to interpret the term such that it fits within the statutory language and makes regulatory sense.

### b. Unworkable definitions of "polypeptide"

#### i. *"Polypeptide" refers to all amino acid chains, or it refers to all proteins*

Some scientific sources use the term "polypeptide" to generally include all amino acid chains.[57] Others seem to use it synonymously with "protein."[58] These definitions do not accord with the statutory text. The textual context implies that the exception for chemically synthesized polypeptides applies to a subset of the molecules that would otherwise fall within the "protein" term. In the first case, it seems incongruous for Congress to use a term that means all amino acid polymers to exclude chemically synthesized amino acid polymers from "protein," which itself refers to a smaller subset of all amino acid polymers.[59] In the second case, it seems that if Congress wished to exclude all chemically synthesized proteins from the definition of biological product, it would have used "protein" in the parenthetical instead of "polypeptide."

Scientifically, this approach presents a different problem. Even though chemical synthesis of amino acid polymers with a defined sequence has been historically restricted to shorter peptide chains, modern chemical ligation methods are rapidly pushing these limits upwards.[60] Recently, using such methods, researchers reportedly have synthesized lysozyme, a 130 amino acid protein, "in good yield and excellent purity."[61] With respect to the definition of biological product, the implications of these advances is that if "polypeptide" were co-extensive with "protein," all proteins, including those that are very long, complex and/or highly post-translationally modified, would be regulated as drugs if they were chemically synthesized, while their biologically derived counterparts would be regulated as biological products.[62] In light of the

---

[57] *E.g.*, *supra* notes 19 & 22.

[58] *E.g.*, *supra* notes 19 & 29.

[59] Based on our extensive review of the literature, there does not seem to be support for the view that "protein" refers to all amino acid polymers regardless of size or other considerations.

[60] *See, e.g.*, Stephen B.H. Kent, *Total Chemical Synthesis of Proteins*, 38 CHEM. SOC. REV. 338 (2009).

[61] Thomas Durek, Vladimir Yu. Torbeev & Stephen B.H. Kent, *Convergent chemical synthesis and high-resolution x-ray structure of human lysozyme*, 104 PROCS. NAT'L ACAD. SCI. 4846, 4846 (2007).

[62] FDA does not interpret the parenthetical to mean that both the chemically synthesized version and the biologically derived versions of a molecule are excepted from the definition of biological product once a chemically synthesized version of that molecule has been marketed. This would, in addition to causing difficulties with respect to determination and application of exclusivity, raise the same sort of scientific and regulatory problems that currently exist with the regulation of large, complex proteins under the FD&C Act, as discussed in Section 2.a.

FDA000804

fact that these new methods of chemical synthesis are novel and untried, there seems to be no basis in the legislative history of the BPCI Act to support a finding of Congressional intent to regulate all chemically synthesized proteins, including very large and complex molecules, as drugs under the FD&C Act.

In addition, adopting a broad interpretation of "polypeptide" would have the effect of causing regulatory confusion over the entire set of molecules defined by "protein" due to almost identical compounds being subject to different approval schemes, follow-on pathways, and exclusivity regimes. This result would hinder product development by increasing regulatory uncertainty regarding such products. Finally, it would instigate a perverse incentive that could channel product development decisions in a sub-optimal manner, driven solely by reference to regulatory outcomes rather than scientific considerations. For these reasons, FDA will not interpret "polypeptide" to refer to all amino acid chains or to all proteins.

### ii. "Polypeptide" refers to peptides

A minority of scientific sources use the term "polypeptide" to mean "peptide."[63] This definition was rejected because its logical conclusion is contrary to the weight of established scientific opinion that considers peptides to be distinct from proteins. If "polypeptide" were synonymous with "peptide," the only way to interpret the statutory construct that Congress used (which requires "polypeptide" to either be included in or itself include the term "protein,") would be to assume that "peptide" was included in the term "protein." This does not comport with the majority scientific view. For the reasons discussed in Sections 2.a and 3.b.i, above, we do not believe this was Congress's intent, nor do we believe it would be a desirable outcome, given that it would subject all peptides, no matter how small, to two different regulatory regimes based on their mode of synthesis.

### c. The agency's decision

For the reasons discussed above, we infer that Congress intended for the parenthetical exclusion to apply only to relatively short, less complex amino acid polymers. This is based on the textual context (Congress would not have used a term with coextensive or larger scope to exclude a subset of proteins) and historical limits on the methods of chemical synthesis. Accordingly, the agency interprets the statutory term "polypeptide" to include only amino acid polymers consisting of less than 100 amino acids in size. This interpretation is supported by the scientific literature.[64] Under this approach, chemically synthesized versions of amino acid polymers from 41 to 99 amino acids in size will be regulated as drugs (unless such products otherwise meet the statutory definition of a "biological product") while biologically derived versions of such molecules will be subject to regulation as biological products. Molecules of 100 amino acids or larger are proteins that are not polypeptides and will be regulated as biological products regardless of their mode of synthesis. Given that we are interpreting "protein" to mean amino acid chains of over 40 amino acids with a specific, defined amino acid sequence, chemically synthesized polymers with random sequences (e.g., glatiramer) fall outside the definition of protein and therefore not subject to the parenthetical exclusion in the first place.[65]

---

[63] *Supra* notes 22 & 23.
[64] *Supra* notes 17 & 21.
[65] MOLECULAR BIOLOGY, *supra* note 33.

A significant advantage of this interpretation is that it minimizes the size range over which almost identical versions of the same molecule can be subject to different regulatory regimes. FDA's interpretation of the statutory term "polypeptide" is a reasonable approach given the statutory context which parenthetically describes a subset of proteins and the scientific literature.

### d. "Chemically synthesized"

The term "chemically synthesized" is also facially unclear in that it does not address how much chemical manipulation is sufficient to qualify a polypeptide as having been "chemically synthesized." As a starting point, complete synthesis of a molecule starting from constituent alpha amino acid subunits would qualify as chemical synthesis. Any other scenario would introduce considerable ambiguity. For example, would chemically ligating two recombinant peptides together be sufficient to call the resulting product "chemically synthesized?" Would a well-known biological molecule modified to include a specific site at which an artificial post-translational molecule may later be chemically introduced be considered as a "chemically synthesized" molecule?[66] Cell-free translation methods, where cellular translational machinery is used *in vitro* to manufacture amino acid polymers directed by externally supplied mRNA,[67] also would raise novel questions with respect to chemical synthesis.

Interpreting "chemically synthesized" to require the chemical synthesis of a molecule in its entirety (starting with constituent amino acid subunits) eliminates any ambiguity. This approach creates another bright-line rule that also comports with the notion that entirely chemically synthesized polypeptides can potentially meet the standards of identity applicable to the generic drug pathway under the FD&C Act.[68]

### 4. Conclusion

The protein definition adopted in this document represents the culmination of the agency's extensive consideration of the relevant scientific, policy, and legal considerations and the advantages and limitations of numerous potential regulatory definitions under the BPCI Act. Notwithstanding the BPCI Act's inexact terminology, FDA's interpretation of what constitutes a protein within the meaning of the amended definition of "biological product" establishes a regulatory framework that is scientifically sound, reduces ambiguity, and facilitates consistent implementation and decision making. By clarifying that peptides are excluded from the scope of "protein" and narrowly interpreting "polypeptide," the agency's interpretation subjects both simple, short amino acid polymers as well as large, complex amino acid polymers to a single regulatory regime regardless of their mode of manufacture. The result is an outcome in which all short, simple amino acid polymers (peptides) that do not otherwise meet the definition of

---

[66] Ho Cho, et al., *Optimized Clinical Performance of Growth Hormone with an Expanded Genetic Code*, Procs. Nat'l Acad. Sci. (May 16, 2011), *available at*
http://www.pnas.org/content/early/2011/05/09/1100387108.full.pdf+html.
[67] *See, e.g.*, Alexander S. Spirin, et al., *A Continuous Cell-Free Translation System Capable of Producing Polypeptides in High Yield*, 242 Science 1162 (1988).
[68] *See supra*, Section 2.a; *supra*, note 8 and associated text.

FDA000806
A.0030

"biological product" are regulated as drugs regardless of their method of manufacture, larger, more complex amino acid polymers are also regulated as drugs if chemically synthesized and less than 100 amino acids in size, and all other amino acid polymers with a specific, defined sequence are subject to regulation as biological products. The agency believes that this approach strikes the right balance between minimizing the inherent ambiguity of the statutory text, providing a workable standard, and employing scientifically sound criteria.

Janet Woodcock, MD
Director, Center for Drug Evaluation and Research

Karen Midthun, MD
Director, Center for Biologics Evaluation and Research

FDA000807
A.0031

Drafted:  M Unlu 6/1/2011
R/D:   S Kozlowski 6/17/2011
       L Christl 6/17/2011
       J Barr Weiner 6/17/2011
       Janice Weiner 6/24/2011
       S Benton 6/26/2011
       CDER-ORP-DEsposito 7/6/2011
       M.Unlu 7/15/2011
       K. Midthun 7/28/2011

FDA000808

# Guidance for Industry

## Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

### *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance.  Submit comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD  20852.  All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document contact (CDER) Sandra Benton at 301-796-2500 or (CBER) Office of Communication, Outreach and Development at 1-800-835-4709 or 301-827-1800.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**February 2012**
**Biosimilarity**

FDA000811
A.0033                    A.0033                    A.0033

# Guidance for Industry

## Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

*Additional copies are available from:*
*Office of Training and Communication*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD  20857*
*(Tel) 301-827-4573*

*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*
*and/or*
*Office of Communication, Outreach and Development, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/default.htm*
*(Tel) 800-835-4709 or 301-827-1800*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**February 2012**
**Biosimilarity**

FDA000812

A.0034                        A.0034                        A.0034

**TABLE OF CONTENTS**

**INTRODUCTION** .................................................................................................................... 1

**BACKGROUND** .................................................................................................................... 2

**QUESTIONS AND ANSWERS** ............................................................................................ 4

   I.    BIOSIMILARITY OR INTERCHANGEABILITY ......................................................... 4

   II.   PROVISIONS RELATED TO REQUIREMENT TO SUBMIT A BLA FOR A
       "BIOLOGICAL PRODUCT" ........................................................................................... 12

   III.  EXCLUSIVITY ................................................................................................................ 15

FDA000813

A.0035                                   A.0035                                   A.0035

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

# Guidance[1]

# Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

This draft guidance, when finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic.  It does not create or confer any rights for or on any person and does not operate to bind FDA or the public.  You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations.  If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance.  If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

## INTRODUCTION

This guidance provides answers to common questions from sponsors interested in developing proposed biosimilar products, biologics license application (BLA) holders, and other interested parties regarding FDA's interpretation of the Biologics Price Competition and Innovation Act of 2009 (BPCI Act).  The questions and answers (Q&As) are grouped below in the following categories:

- Biosimilarity or Interchangeability
- Provisions Related to Requirement to Submit a BLA for a "Biological Product"
- Exclusivity

The BPCI Act amends the Public Health Service Act (PHS Act) and other statutes to create an abbreviated licensure pathway in section 351(k) of the PHS Act for biological products shown to be biosimilar to, or interchangeable with, an FDA-licensed biological reference product (see sections 7001 through 7003 of the Patient Protection and Affordable Care Act (Pub. L. 111–148) (Affordable Care Act)).  On November 2 and 3, 2010, FDA held a public hearing and established a public docket to obtain input on specific issues and challenges associated with the implementation of the BPCI Act (see Docket No. FDA-2010-N-0477).  This guidance describes FDA's current interpretation of certain statutory requirements added by the BPCI Act and reflects consideration of the comments concerning those requirements that were submitted to the public docket.

---

[1] This guidance has been prepared by the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) at the Food and Drug Administration (FDA or the Agency).

Guidance documents are available on the CDER guidance page at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.  We update guidances periodically.  To make sure you have the most recent version of a guidance, check the CDER guidance page.

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

This guidance is one in a series of guidances that FDA is developing to implement the BPCI Act. The guidances address a broad range of issues, including:

- Quality Considerations in Demonstrating Biosimilarity to a Reference Protein Product

- Scientific Considerations in Demonstrating Biosimilarity to a Reference Product

- Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

When applicable, references to information in these guidances are included in this Q&A guidance.

The Q&A format is intended to promote transparency and facilitate development programs for proposed biosimilar products by addressing questions that may arise in the early stages of development.  In addition, these Q&As respond to questions the Agency has received from prospective BLA and new drug application (NDA) applicants regarding the appropriate statutory authority under which certain products will be regulated.  FDA intends to update this guidance to include additional Q&As as appropriate.[2]

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

**BACKGROUND**

The BPCI Act was enacted as part of the Affordable Care Act on March 23, 2010.  The BPCI Act creates an abbreviated licensure pathway for biological products shown to be biosimilar to, or interchangeable with, an FDA-licensed biological reference product.  The objectives of the BPCI Act are conceptually similar to those of the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) (commonly referred to as the "Hatch-Waxman Act"), which established abbreviated pathways for the approval of drug products under the Federal Food, Drug, and Cosmetic Act (FD&C Act).[3]  The implementation of an abbreviated licensure pathway for biological products can present challenges given the scientific and technical complexities that may be associated with the larger and typically more complex structure of biological products, as well as the processes by which such products are manufactured.  Most biological products are produced in a living system such as a microorganism, or plant or animal cells, whereas small molecule drugs are typically manufactured through chemical synthesis.

---

[2] The process by which FDA is requesting public comment on proposed Q&As and issuing new Q&As is described in the accompanying FEDERAL REGISTER notice.

[3] See section 505(b)(2) and 505(j) of the FD&C Act (21 U.S.C. 355(b)(2) and 355(j)).

FDA000815

A.0037                            A.0037                            A.0037

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

Section 351(k) of the PHS Act (42 U.S.C. 262(k)), added by the BPCI Act, sets forth the requirements for an application for a proposed biosimilar product and an application or a supplement for a proposed interchangeable product. Section 351(i) defines *biosimilarity* to mean "that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components" and that "there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product" (see section 351(i)(2) of the PHS Act). A 351(k) application must contain, among other things, information demonstrating that the biological product is biosimilar to a reference product based upon data derived from analytical studies, animal studies, and a clinical study or studies, unless FDA determines, in its discretion, that certain studies are unnecessary in a 351(k) application (see section 351(k)(2) of the PHS Act). To meet the higher standard of "interchangeability," an applicant must provide sufficient information to demonstrate biosimilarity, and also to demonstrate that the biological product can be expected to produce the same clinical result as the reference product in any given patient and, if the biological product is administered more than once to an individual, the risk in terms of safety or diminished efficacy of alternating or switching between the use of the biological product and the reference product is not greater than the risk of using the reference product without such alternation or switch (see section 351(k)(4) of the PHS Act). Interchangeable products may be substituted for the reference product without the intervention of the prescribing healthcare provider (see section 351(i)(3) of the PHS Act).

The BPCI Act also includes, among other provisions:

- A 12-year exclusivity period from the date of first licensure of the reference product, during which approval of a 351(k) application referencing that product may not be made effective (see section 351(k)(7) of the PHS Act);
- A 4-year exclusivity period from the date of first licensure of the reference product, during which a 351(k) application referencing that product may not be submitted (see section 351(k)(7) of the PHS Act);
- An exclusivity period for the first biological product determined to be interchangeable with the reference product for any condition of use, during which a second or subsequent biological product may not be determined interchangeable with that reference product (see section 351(k)(6) of the PHS Act);
- An exclusivity period for certain biological products for which pediatric studies are conducted in accordance with a written request (see section 351(m) of the PHS Act);
- A transition provision for biological products that have been or will be approved under section 505 of the FD&C Act (21 U.S.C. 355) before March 23, 2020 (see section 7002(e) of the Affordable Care Act); and
- A provision stating that a 351(k) application for a biosimilar product contains a "new active ingredient" for purposes of the Pediatric Research Equity Act (PREA) (see section 505B(n) of the FD&C Act).

The BPCI Act also establishes procedures for identifying and resolving patent disputes involving applications submitted under section 351(k) of the PHS Act.

FDA000816

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

## QUESTIONS AND ANSWERS

### I.   BIOSIMILARITY OR INTERCHANGEABILITY

*Q. I.1.   Whom should a sponsor contact with questions about its biosimilar development program?*

A. I.1.   (Proposed Answer):  If the reference product for a proposed biosimilar product is regulated by the Center for Drug Evaluation and Research (CDER), contact the Biosimilars Program Staff in CDER's Office of New Drugs at 301-796-0700.

If the reference product for a proposed biosimilar product is regulated by the Center for Biologics Evaluation and Research (CBER), contact the Office of Communication, Outreach and Development (OCOD) at 800-835-4709 or 301-827-1800 or by email to ocod@fda.hhs.gov.

For general questions related to FDA's implementation of the BPCI Act, contact Sandra Benton in CDER's Office of Medical Policy at 301-796-2500.

*Q. I.2.   When should a sponsor request an initial meeting with FDA and what data and information should a sponsor provide to FDA as background for a proposed biosimilar development program?*

A. I.2.   (Proposed Answer):  FDA recommends that sponsors of proposed biosimilar products request an initial meeting with FDA at such time as the sponsor can provide a proposed plan for its biosimilar development program, manufacturing process information (including planned methodology and assay validation), and preliminary comparative analytical data with the reference product.

Comparative analytical data provide the foundation for a biosimilar development program and can influence decisions about the type and amount of animal and clinical data needed.  Such data should be available early in development and allow for a more detailed discussion with the Agency.  FDA will best be able to provide meaningful input on the extent and scope of animal and clinical studies for a proposed biosimilar development program once the Agency has considered the comparative analytical data.

*Q. I.3.   Can a proposed biosimilar product have a different formulation than the reference product?*

A. I.3.   (Proposed Answer):  Yes, differences between the formulation of a proposed product and the reference product may be acceptable.  A 351(k) application must contain information demonstrating that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive

4

FDA000817
A.0039                              A.0039                              A.0039

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

components.  In addition, an applicant would need to demonstrate that there are no clinically meaningful differences between the biological product and the reference product in terms of safety, purity, and potency.  It may be possible, for example, for a proposed product formulated without human serum albumin to demonstrate biosimilarity to a reference product formulated with human serum albumin.  For more information about FDA's current thinking on the interpretation of the statutory standard for biosimilarity, see FDA's draft guidances for industry on *Quality Considerations in Demonstrating Biosimilarity to a Reference Protein Product* and *Scientific Considerations in Demonstrating Biosimilarity to a Reference Product.*

**Q. I.4.**   ***Can a proposed biosimilar product have a delivery device or container closure system that is different from its reference product?***

A. I.4.    (Proposed Answer):  Yes, some design differences in the delivery device or container closure system used with the proposed biosimilar product may be acceptable.  It may be possible, for example, for an applicant to obtain licensure of a proposed biosimilar product in a pre-filled syringe or in an auto-injector device (which are considered the same "injectable" dosage form), even if the reference product is licensed in a vial presentation, provided that the proposed product meets the statutory standard for biosimilarity and adequate performance data for the delivery device or container closure system are provided.  For a proposed biosimilar product in a different delivery device or container closure system, the presentation must be shown to be compatible for use with the final formulation of the biological product through appropriate studies, including, for example, extractable/leachable studies and stability studies.  Also, for certain design differences in the delivery device or container closure system, performance testing and a human factors study may be needed.

However, a prospective biosimilar applicant will not be able to obtain licensure under section 351(k) for its product when a design difference in the delivery device or container closure system results in:
- a clinically meaningful difference between the proposed product and the reference product in terms of safety, purity, and potency;
- a different route of administration or dosage form; or
- a condition of use for which the reference product has not been previously approved;

or otherwise does not meet the standard for biosimilarity.

Additional considerations apply for a proposed interchangeable product.  For example, in reviewing an application for a proposed interchangeable product, FDA may consider whether the differences from the reference product significantly alter critical design attributes, product performance, or operating principles, or would require additional instruction to healthcare providers or patients, for patients to be safely alternated or switched between the reference

FDA000818

A.0040              A.0040              A.0040

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

product and one or more interchangeable products without the intervention of the prescribing healthcare provider.  Additional performance data about the delivery device may also be necessary.

A proposed biosimilar product in a delivery device will be considered a combination product and may, in some instances, require a separate application for the device.

**Q. I.5.**    *Can an applicant obtain licensure of a proposed biosimilar product for fewer than all routes of administration for which an injectable reference product is licensed?*

A. I.5.    (Proposed Answer):  Yes, an applicant may obtain licensure of a proposed biosimilar product for fewer than all routes of administration for which an injectable reference product is licensed.  An applicant must demonstrate that there are no clinically meaningful differences between the proposed biosimilar product and the reference product in terms of safety, purity, and potency.  This may include providing information from one or more studies using a route of administration for which licensure is not requested (e.g., a study using subcutaneous administration may provide a more sensitive comparative assessment of immunogenicity of the reference product and a proposed biosimilar product, even though licensure of the proposed biosimilar product is requested only for the intravenous route of administration).

**Q. I.6.**    *Can an applicant obtain licensure of a proposed biosimilar product for fewer than all presentations (e.g., strengths or delivery device or container closure systems) for which a reference product is licensed?*

A. I.6.    (Proposed Answer):  Yes, an applicant is not required to obtain licensure for all presentations for which the reference product is licensed.  However, if an applicant seeks licensure for a particular indication or other condition of use for which the reference product is licensed and that indication or condition of use corresponds to a certain presentation of the reference product, the applicant may need to seek licensure for that particular presentation (see also responses to Q. I.4 and Q. I.5).

**Q. I.7.**    *Can an applicant obtain licensure of a proposed biosimilar product for fewer than all conditions of use for which the reference product is licensed?*

A. I.7.    (Proposed Answer):  Yes, a biosimilar applicant generally may obtain licensure for fewer than all conditions of use for which the reference product is licensed.  The 351(k) application must include information demonstrating that the condition or conditions of use prescribed, recommended, or suggested in the proposed labeling submitted for the proposed biosimilar product have been previously

FDA000819

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

approved for the reference product (see section 351(k)(2)(A)(i)(III) of the PHS Act).

**Q. I.8.** ***Can a sponsor use comparative animal or clinical data with a non-U.S.-licensed product to support a demonstration that the proposed product is biosimilar to the reference product?***

A. I.8.    (Proposed Answer):  Yes, a sponsor may use a non-U.S.-licensed comparator product in certain studies to support a demonstration that the proposed biological product is biosimilar to the U.S.-licensed reference product.  However, as a scientific matter, analytical studies and at least one clinical pharmacokinetic (PK) study and, if appropriate, at least one pharmacodynamic (PD) study, intended to support a demonstration of biosimilarity must include an adequate comparison of the proposed biosimilar product directly with the U.S.-licensed reference product.  We note, however, that for certain complex biological products, a modified approach may be needed.

If a sponsor seeks to use data from an animal study or a clinical study comparing its proposed biosimilar product to a non-U.S.-licensed product to address, in part, the requirements under section 351(k)(2)(A) of the PHS Act, the sponsor should provide adequate data or information to scientifically justify the relevance of these comparative data to an assessment of biosimilarity and to establish an acceptable bridge to the U.S.-licensed reference product.  The type of bridging data needed likely would include a clinical PK and/or PD study conducted with the U.S.-licensed reference product.

Issues that a sponsor may need to address to use a non-U.S.-licensed comparator product in a biosimilar development program include, but are not limited to, the following:

- the relevance of the design of the clinical program to support a demonstration of biosimilarity to the U.S.-licensed reference product for the condition(s) of use and patient population(s) for which licensure is sought;

- the relationship between the license holder for the non-U.S.-licensed product and BLA holder for the U.S.-licensed reference product, including whether the non-U.S.-licensed product, and/or any components thereof, are manufactured in the same facility(ies) as the U.S.-licensed reference product during the relevant time period;

- whether the non-U.S.-licensed product was manufactured in a facility(ies) licensed and inspected by a regulatory authority that has similar scientific and regulatory standards as FDA (e.g., International Conference on Harmonisation (ICH) countries);

FDA000820
A.0042                                   A.0042                                   A.0042

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

- whether the non-U.S.-licensed product was licensed by a regulatory authority that has similar scientific and regulatory standards as FDA (e.g., ICH countries) and the duration and extent to which the product has been marketed; and

- the scientific bridge between the non-U.S.-licensed product and the U.S.-licensed reference product, including comparative physico-chemical characterization, bioassays/functional assays, and comparative clinical and/or nonclinical PK and/or PD data, as appropriate, and data to address any differences in formulation or primary packaging.

A sponsor also should address any other factors that may affect the relevance of comparative data with the non-U.S.-licensed product to an assessment of biosimilarity with the U.S.-licensed reference product.

A sponsor may submit publicly available information regarding the non-U.S.-licensed product to justify the extent of comparative data needed to establish a bridge to the U.S.-licensed reference product. Sponsors are encouraged to discuss with FDA during the development program the adequacy of the scientific justification and bridge to the U.S.-licensed reference product. A final decision about the adequacy of this scientific justification and bridge will be made by FDA during review of the 351(k) application.

At this time, as a scientific matter, it is unlikely that clinical comparisons with a non-U.S.-licensed product would be an adequate basis to support the additional criteria required for a determination of interchangeability with the U.S.-licensed reference product.

**Q. I.9.** ***Is a clinical study to assess the potential of the biological product to delay cardiac repolarization (a QT/QTc study) or a drug-drug interaction study generally needed for licensure of a proposed biosimilar product?***

A. I.9.   (Proposed Answer): No. In general, a proposed biosimilar product may rely upon the reference product's clinical evaluation of QT/QTc interval prolongation and proarrhythmic potential and drug-drug interactions.

**Q. I.10.** ***How long should sponsors retain reserve samples of the biological products used in comparative clinical PK and/or PD studies intended to support a 351(k) application?***

A. I.10.   (Proposed Answer): The requirements in 21 CFR 320.38 and 320.63 for retention of reserve samples of the products used in bioavailability and bioequivalence studies apply to applications submitted under section 505 of the FD&C Act. However, FDA recommends that the sponsor of a proposed biosimilar product retain reserve samples in the same manner and for the same time period (at least 5

FDA000821

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

years) as described in 21 CFR 320.38 and 320.63 following a comparative clinical PK or PD study of the reference product and the proposed biosimilar product (or other clinical study in which PK or PD samples are collected) that is intended to support a submission under section 351(k) of the PHS Act. Retention of samples used in a comparative clinical PK or PD study or other clinical study in which PK or PD samples are collected would serve the same purpose described in the Final Rule for the cited regulations (58 FR 25918, April 28, 1993). Specifically, reserve samples establish the identity of the products tested in the actual study, allow for confirmation of the validity and reliability of the results of the study, and facilitate investigation of further follow-up questions that arise after the studies are completed.

***Q. I.11.*** ***Can an applicant extrapolate clinical data intended to support a demonstration of biosimilarity in one condition of use to support licensure of the proposed biosimilar product in one or more additional conditions of use for which the reference product is licensed?***

A. I.11.    (Proposed Answer): Yes. If the proposed product meets the statutory requirements for licensure as a biosimilar product under section 351(k) of the PHS Act based on, among other things, data derived from a clinical study sufficient to demonstrate safety, purity, and potency in an appropriate condition of use, the potential exists for the biosimilar product to be licensed for one or more additional conditions of use for which the reference product is licensed. However, the applicant would need to provide sufficient scientific justification for extrapolating clinical data to support a determination of biosimilarity for each condition of use for which licensure is sought.

9

FDA000822

A.0044    A.0044    A.0044

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

Such scientific justification for extrapolation should address, for example, the following issues for the tested and extrapolated conditions of use:

- the mechanism(s) of action in each condition of use for which licensure is sought; this may include:
  - o the target/receptor(s) for each relevant activity/function of the product;
  - o the binding, dose/concentration response and pattern of molecular signaling upon engagement of target/receptors;
  - o the relationships between product structure and target/receptor interactions;
  - o the location and expression of the target/receptor(s);
- the PK and bio-distribution of the product in different patient populations (relevant PD measures also may provide important information on the mechanism of action);
- differences in expected toxicities in each condition of use and patient population (including whether expected toxicities are related to the pharmacological activity of the product or to "off-target" activities); and
- any other factor that may affect the safety or efficacy of the product in each condition of use and patient population for which licensure is sought.

**Q. I.12.    *How can an applicant demonstrate that its proposed injectable biosimilar product has the same "strength" as the reference product?***

A. I.12.    (Proposed Answer):  Under section 351(k)(2)(A)(i)(IV) of the PHS Act, an applicant must demonstrate that the "strength" of the proposed biosimilar product is the same as that of the reference product.  As a scientific matter, there may be a need to take into account different factors and approaches in determining the "strength" of different types of biological products.

In general, we expect injectable biological products to have both the same total content of drug substance (in mass or units of activity in a container closure) and the same concentration of drug substance (in mass or units of activity per unit volume) as the reference product to have the same "strength" under section 351(k)(2)(A)(i)(IV) of the PHS Act.  We note, however, that for certain complex biological products, a modified approach may be needed.

The total content of drug substance generally should be expressed using the same measure as the reference product.  For example, if the strength of the reference product is expressed as milligrams (mg) per total volume in a container closure, for example mg/5 milliliters (mL), the proposed biosimilar product generally should also describe its strength in mg/5 mL, rather than units per 5 mL.  If the total content of drug substance is expressed in units of activity (e.g., international units (IU) or units per total volume in a container closure), the units of the proposed biosimilar product should be the same as the reference product.

FDA000823

A.0045                                A.0045                                A.0045

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

The concentration of the drug substance (in mass or units of activity per unit volume) generally should be expressed using the same measure as the reference product. The extinction coefficient used to calculate the concentration of a protein drug substance should be determined experimentally, and a justification for the experimental method should be provided. If the proposed biosimilar product is a dry solid (e.g., lyophilized) from which a constituted or reconstituted solution is prepared, then the 351(k) application should contain information demonstrating that the concentration of the proposed biosimilar product, when constituted or reconstituted, is the same as that of the reference product.

The requirement for a 351(k) application to contain information demonstrating that the proposed product and the reference product have the same "strength" applies to both biosimilar products and interchangeable products.

**Q. I.13.** **What constitutes "publicly-available information" regarding FDA's previous determination that the reference product is safe, pure, and potent to include in a 351(k) application?**

A. I.13.    (Proposed Answer): "Publicly-available information" in this context generally includes the types of information found in the "action package" for a BLA (see section 505(l)(2)(C) of the FD&C Act). However, FDA notes that submission of publicly available information composed of less than the action package for the reference product BLA will generally not be considered a bar to submission or approval of an acceptable 351(k) application.

FDA intends to post on the Agency's Web site publicly available information regarding FDA's previous determination that certain biological products are safe, pure, and potent in order to facilitate biosimilar development programs and submission of 351(k) applications. We note, however, that the publicly available information posted by FDA in this context does not necessarily include all of the information that would otherwise be disclosable in response to a Freedom of Information Act request.

**Q. I.14.** **Can an applicant obtain a determination of interchangeability between its proposed product and the reference product in an original 351(k) application?**

A. I.14.    (Proposed Answer): Yes. Under the BPCI Act, FDA can make a determination of interchangeability in a 351(k) application or any supplement to a 351(k) application. An interchangeable product must be shown to be biosimilar to the reference product and meet the other standards described in section 351(k)(4) of the PHS Act. At this time, it would be difficult as a scientific matter for a prospective biosimilar applicant to establish interchangeability in an original 351(k) application given the statutory standard for interchangeability and the sequential nature of that assessment. FDA is continuing to consider the type of

11

A.0046    A.0046    A.0046

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

information sufficient to enable FDA to determine that a biological product is interchangeable with the reference product.

**Q. I.15.  *Is a pediatric assessment under the Pediatric Research Equity Act (PREA) required for a proposed biosimilar product?***

A. I.15.  (Proposed Answer):  Under the Pediatric Research Equity Act (PREA) (section 505B of the FD&C Act), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain a pediatric assessment to support dosing, safety, and effectiveness of the product for the claimed indication unless this requirement is waived, deferred, or inapplicable.

Section 505B(n) of the FD&C Act, added by section 7002(d)(2) of the Affordable Care Act, provides that a biosimilar product that has not been determined to be interchangeable with the reference product is considered to have a "new active ingredient" for purposes of PREA, and a pediatric assessment is required unless waived or deferred.  An interchangeable product is not considered to have a "new active ingredient" for purposes of PREA.  If a biological product is determined to be interchangeable with the reference product, a pediatric assessment of the interchangeable product is not required.

FDA encourages prospective biosimilar applicants to submit plans for pediatric studies during the investigational new drug (IND) stage of product development. See also the guidance for industry, *How to Comply with the Pediatric Research Equity Act* (http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/Development Resources/UCM077855.pdf)

**II.    PROVISIONS RELATED TO REQUIREMENT TO SUBMIT A BLA FOR A "BIOLOGICAL PRODUCT"**

**Q. II.1.  *How does FDA interpret the category of "protein (except any chemically synthesized polypeptide)" in the amended definition of "biological product" in section 351(i)(1) of the PHS Act?***

A. II.1.  (Proposed Answer):  The BPCI Act amends the definition of "biological product" in section 351(i) of the PHS Act to include a "protein (except any chemically synthesized polypeptide)" and provides that an application for a biological product must be submitted under section 351 of the PHS Act, subject to certain exceptions during the 10-year transition period ending on March 23, 2020, described in section 7002(e) of the Affordable Care Act.

FDA000825

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

FDA has developed the following regulatory definitions of "protein" and "chemically synthesized polypeptide" to implement the amended definition of "biological product" and provide clarity to prospective applicants regarding the statutory authority under which products will be regulated.

***Protein —*** The term "protein" means any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size.

Compounds greater than 40 amino acids in size will be scrutinized to determine whether they are related to a natural peptide of shorter length and, if so, whether the additional amino acids raise any concerns about the risk/benefit profile of the product.

***Chemically synthesized polypeptide —*** The term "chemically synthesized polypeptide" means any alpha amino acid polymer that (1) is made entirely by chemical synthesis; and (2) is less than 100 amino acids in size.

A chemically synthesized polypeptide, as defined, is not a "biological product" and will be regulated as a drug under the FD&C Act unless the polypeptide otherwise meets the statutory definition of a "biological product."

Chemically synthesized compounds greater than 99 amino acids in size will be scrutinized to determine whether they are related to a natural peptide of shorter length and, if so, whether the additional amino acids raise any concerns about the risk/benefit profile of the product.

FDA's interpretation of these statutory terms is informed by several factors, including the following. The scientific literature describes a "protein" as a defined sequence of alpha amino acid polymers linked by peptide bonds, and generally excludes "peptides" from the category of "protein." A "peptide" generally refers to polymers that are smaller, perform fewer functions, contain less three-dimensional structure, are less likely to be post-translationally modified, and thus are generally characterized more easily than proteins. Consistent with the scientific literature, FDA has decided that the term "protein" in the statutory definition of biological product does not include peptides. To enhance regulatory clarity and minimize administrative complexity, FDA has decided to distinguish proteins from peptides based solely on size (i.e., number of amino acids).

Although scientific references do not agree on the criteria that distinguish proteins from peptides, including the exact size at which a chain of amino acids becomes a protein, several references support a threshold of 40 amino acids as defining the upper size boundary of a peptide. Accordingly, FDA considers any polymer composed of 40 or fewer amino acids to be a peptide and not a protein. Therefore, unless a peptide otherwise meets the statutory definition of a

13

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

"biological product" (e.g., a peptide vaccine), it will be regulated as a drug under the FD&C Act.

The statutory category of "protein" parenthetically excludes "any chemically synthesized polypeptide." There are several definitions of "polypeptide" in the scientific literature. Some are broad (e.g., polypeptide means any amino acid polymer), while others are more narrow (e.g., polypeptide means any amino acid polymer composed of fewer than 100 amino acids). FDA believes that a narrow definition of polypeptide is most appropriate in this context because, among other reasons, this avoids describing an exception to the category of protein using a term that relates to a larger category of molecules. Therefore, FDA interprets the statutory exclusion for "chemically synthesized polypeptide" to mean any molecule that is made entirely by chemical synthesis and that is composed of up to 99 amino acids. Such molecules will be regulated as drugs under the FD&C Act, unless the chemically synthesized polypeptide otherwise meets the statutory definition of a "biological product."

There may be additional considerations for proposed products that are combination products or meet the statutory definition of both a "device" and a "biological product." We encourage prospective sponsors to contact FDA for further information on a product-specific basis.

**Q. II.2. *How is "product class" defined for purposes of determining whether an application for a biological product may be submitted under section 505 of the FD&C Act during the transition period?***

A. II.2. (Proposed Answer): For purposes of section 7002(e)(2) of the Affordable Care Act, a proposed biological product will be considered to be in the same "product class" as a protein product previously approved under section 505 of the FD&C Act on or before March 23, 2010, if both products are homologous to the same gene-coded sequence (e.g., the INS gene for insulin and insulin glargine) with allowance for additional novel flanking sequences (including sequences from other genes). Products with discrete changes in gene-coded sequence or discrete changes in post-translational modifications may be in the same product class as the previously approved product even if the result may be a change in product pharmacokinetics.

For naturally derived protein products that do not have identified sequences linked to specific genes and that were approved under section 505 of the FD&C Act on or before March 23, 2010, a proposed biological product is in the same product class as the naturally derived protein product if both products share a primary biological activity (e.g., the 4-number Enzyme Commission code for enzyme activity).

FDA000827

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

However, for any protein product (whether naturally derived or otherwise), if the difference between the proposed product and the protein product previously approved under section 505 of the FD&C Act alters a biological target or effect, the products are not in the same product class for purposes of section 7002(e)(2) of the Affordable Care Act.


## III. EXCLUSIVITY

**Q. III.1.** ***Can an applicant include in its 351(a) BLA submission a request for reference product exclusivity under section 351(k)(7) of the PHS Act?***

A. III.1.  (Proposed Answer):  Yes.  FDA is continuing to review the reference product exclusivity provisions of section 351(k)(7) of the PHS Act and has requested public comment on factors to consider in FDA's interpretation of certain statutory provisions (see Docket No. FDA-2010-N-0477).  An applicant may include in its BLA submission a request for reference product exclusivity under section 351(k)(7) of the PHS Act, and FDA will consider the applicant's assertions regarding the eligibility of its proposed product for exclusivity.  At this time, FDA suggests that an applicant's request for reference product exclusivity specifically describe how the proposed product meets the statutory requirements in section 351(k)(7) of the PHS Act, and include adequate data and information to support the request.

**Q. III.2.** ***How can a prospective biosimilar applicant determine whether there is unexpired orphan exclusivity for an indication for which the reference product is licensed?***

A. III.2.  (Proposed Answer):  A searchable database for Orphan Designated and/or Approved Products and indications is available on FDA's Web site, and is updated on a monthly basis (see http://www.accessdata.fda.gov/scripts/opdlisting/oopd/index.cfm).  FDA will not approve a subsequent application for the "same drug" for the same indication during the 7-year period of orphan exclusivity, except as otherwise provided in the FD&C Act and 21 CFR part 316.

FDA000828

A.0050                              A.0050                              A.0050

April 16, 2012

**By Electronic Submission**

Docket No. FDA-2011-D-0602
Division of Dockets Management (HFA-305)
Food and Drug Administration
5630 Fishers Lane, rm. 1061
Rockville, MD 20852

**COMMENTS OF PFIZER INC ON DRAFT BIOSIMILAR GUIDANCE:
QUALITY CONSIDERATIONS IN DEMONSTRATING BIOSIMILARITY TO
REFERENCE PROTEIN PRODUCT**

Pfizer Inc (Pfizer) submits these comments to the Food and Drug Administration ("FDA" or "Agency") on the Draft Guidance for Industry: *Quality Considerations in Demonstrating Biosimilarity to Reference Product*. ("Draft Guidance). [1] Pfizer also supports, in large part, the comments submitted by the Pharmaceutical Research and Manufacturers of America (PhRMA) and the Biotechnology Industry Organization (BIO).

As a manufacturer of innovator biologic products that intends to pursue development of follow-on biologics, Pfizer sincerely appreciates the Agency's proactive approach as it begins to resolve the many issues and challenges associated with its implementation of the Biologics Price Competition and Innovation Act of 2009 ("BPCI Act")[2]. We look forward to continuing opportunities to provide input as the Agency implements its authorities over biosimilars and interchangeable biosimilars.

Towards that end, Pfizer has also registered to present testimony at the upcoming public hearing to take place May 11, 2012.[3] These comments are intended to support and supplement that testimony.

## I. GENERAL COMMENTS RELATED TO THE PROPOSED TEXT OF THE DRAFT GUIDANCE

### A. Section IV: Definitions (Lines 197-201)

General Comments and Introduction

Pursuant to the BPCI Act, the definition of "biological product" now includes proteins with the exception of "any chemically synthesized polypeptide."[4] However, as the Agency has previously noted, there is currently no scientific consensus as to the differential definitions of proteins, polypeptides, and peptides.[5] The Agency has thus developed a proposed regulatory definition of 'protein' and "chemically synthesized polypeptide." Specifically, FDA has proposed the following definitions:

---

[1] These comments are submitted pursuant to the Federal Register notice announcing the Draft Guidance.. 77 Fed. Reg. 8883 (Feb 15, 2012). These comments focuses on a number of high-level concepts and issues; a chart offering specific recommendations for and suggested edits to the Draft Guidance text is appended below.
[2] Pub. L. No. 111-148, § 7002(a)(2), 124 Stat. 804 (2010).
[3] 77 Fed. Reg. 12853 (Mar 2, 2012).
[4] BPCIA § 7002(b)(1), 124 Stat. 814 (amending section 351(i) of the Public Health Services Act by "inserting 'protein (except any chemically synthesized polypedtide)" in the definition of "biological product.").
[5] 75 Fed. Reg. 61497, 61499 (Oct. 5, 2010).

FDA000829
A.0051                                   A.0051                                   A.0051

*Protein* means any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size.

*Chemically synthesized polypeptide* means any alpha amino acid polymer that is (a) made entirely by chemical synthesis, and (b) is less than 100 amino acids in size. (Draft Guidance at page 5, lines 197-202).

Pfizer appreciates why the Agency has proposed a categorical ("bright line") approach. However, Pfizer is concerned that the definition of "protein" proposed in the Draft Guidance is overly-restrictive, in that it is based solely on sequence size, i.e., greater than 40 amino acids in size.

Pfizer agrees that generally, and as the Agency has proposed, polypeptides small enough to be practically synthesized chemically would be structurally simple, and there would be a scientific basis to consider them as "peptides." Accordingly, in many cases the proposed definition of "protein" may be reasonable as a starting point. However, size should not be the only determinant. Rather, Pfizer considers the primary characteristic for distinguishing between a "protein" and a "chemically synthesized peptide" should be based on structural and synthetic complexity. Pfizer is concerned that FDA's proposed definition does not take into account the additional structural, functional, or synthetic complexity that is presented by some polypeptides that are less than 41 amino acids in length. Pfizer therefore suggests the Agency amend its definition to reflect that sub-41 amino acid polypeptides that must be, or are most practically, synthesized by biological means raise many of the same issues as larger biological products and therefore could be considered to be "proteins."

Pfizer expands on its logic in the next two sections.

What is the Best Regulatory Science Definition for a "Protein"?

Pfizer believes that in crafting any regulations that would define these terms, FDA must remain mindful of the basic construct underlying the new statutory pathway for follow-on biologics as well as the basic intent of historically treating many proteins under paradigms that differ from those applied to small molecules. Underlying both of these is the recognition that complex, heterogeneous biological structures made in biological systems are 'different' from a regulatory science perspective than smaller, homogeneous structures.

More specifically, regarding the definition to be applied to the term "protein," Pfizer notes that the definition often includes products that that have higher-order structure (such as secondary, tertiary, and quaternary structure) or the complex post-translational modifications produced in biological production systems. Further, and in contrast to substances generally referred to as "peptides," most proteins above a certain molecular weight will not fold properly if synthesized outside of a biological system, cannot be purified by chemical means or sterilized with heat without suffering irreversible changes to the higher-order structure, and have complicated stability and impurity profiles.

In contrast, *generally* (with the exceptions illustrated below) polypeptides small enough to be practically synthesized chemically would be structurally simple, and there would be a scientific basis to handle them as non-biological products. For example, such substances are not as structurally complex as proteins, do not have the very complex stability features that larger structures do, and can be purified and sterilized by means similar to small molecules.

FDA000830

More specifically, such products often lack complicated structural features such as complex secondary and tertiary structural elements and complex post-translational modifications (e.g., glycosylation, post-translationally modified amino acids).

However, and importantly, there are exceptions to this general set of characteristics that bear some careful thought, lest products more suited to regulatory science treatment as biological products are forced into a different pathway.

Should Sub-41 Amino Acid Structures Sometimes be Considered "Proteins"?

Pfizer believes the answer to this question is sometimes "yes." This determination must be made on a case-by-case basis.

Some naturally occurring poplypeptides that are shorter than 41 amino acids raise substantial structural and synthetic complexities. These examples are relevant to drug development because from a pharmaco-biological perspective, one can assume that a range of currently known, highly biological potent natural polypeptides could be modified into active drug substances. Pfizer has considered the feasibility of chemical synthesis and structural complexity for a range of these for the purposes of illustration.

Selected examples follow; however, this list is partial:

1. Nisin is a structurally complicated antibacterial peptide with less than 41 amino acids currently approved as a food preservative. It contains the unusual amino acids lanthionine methyllanthionine, didehydroalanine, and didehydroaminobutyric acid, all of which are produced biologically by substantial enzymatically-catalyzed posttranslational modification of the precursor peptide, in which a precursor 57 amino acid ribosomally synthesized polypeptide is converted to the final peptide. The unusual amino acids originate from serine and threonine, and the enzyme-catalysed addition of cysteine residues to the didehydro amino acids, resulting in the multiple thioether bridges. Nisin is current produced by fermentation using a bacterium and, given its synthetic complexity, this is likely to be the only route feasible. Clearly this product, based on its structural and synthetic complexity, raises regulatory science issues more in common with "proteins" than with chemically synthesized peptides.

2. There are a number of peptides that have a high density of cystcine residues and complex disulfide bridges (ziconotide and linaclotide). These are currently manufactured by synthetic methods. However, to produce versions of these at the large scale often required for a global pharmaceutical product might require more cost effective recombinant production methods, and such methods may support treating these as biological products.

3. There are a number of polypeptides with aggregation/hydrophobicity issues, such as enfuvirtide. For these, chemical synthetic methods are possible, but complex and expensive. For example, enfuvirtide, a 36 amino acid peptide, is synthesized by fragment condensation in 106 steps, and it takes about 45,000 kg of raw material to make 1 kg of active pharmaceutical ingredient. Recombinant methods have been proven useful in certain cases to circumvent aggregation during synthesis of hydrophobic peptides, and we cannot exclude that they will be used in the future.

Further, the increased emphasis on the use of "Green Chemistry" principles to develop manufacturing processes to reduce or eliminate negative environmental impacts should be

FDA000831
A.0053                         A.0053                         A.0053

considered.  In contrast to the synthetic processes, recombinant approaches for polypeptide manufacture are likely to use feedstocks and reagents that are less hazardous to human health and the environment, demonstrate high atom economy, produce less hazardous waste streams, and thus are more in line with the drive to promote "Green Chemistry" practices.  An incentive to undertake investment in developing recombinant routes as an alternative to synthetic approaches may therefore make public policy sense.

Pfizer does not currently have an adequate basis for proposing that the proposed "bright line" of 40/41 amino acids is not appropriate for products that do not raise special structural or synthetic issues, but if there is an adequate basis for a different length we would support this.

Given the above considerations, Pfizer recommends the Agency amend the definition of a "protein" in the final guidance to apply to any alpha amino acid polymer with a sequence that is greater than *XX* amino acids in size *as well as those XX-1 or less in size if justified by structural and synthetic complexity.* Pfizer believes that the language above may provide some relevant parameters to consider in defining the dividing line between a "protein" and a "chemically synthesized peptide."

Borderline Products

The guidance in its current state does not account for products that may be on the scientific "borderline" between "peptide" and "protein" products; among these are those examples cited above, at well as products that include non-alpha amino acid residues and other structural complexities.

Pfizer encourages FDA to consider whether, in the long term, it will be advantageous for FDA to amend its regulations governing review assignment  and its Request for Designation process  to permit an applicant to request clarification of the appropriate regulatory authority for approval for such borderline products.

**B.  Section VI: Factors for Consideration in Assessing Whether Products are Hhighly Similar**

Section A. Expression System (line 364-384)

The Agency states that differences between the chosen expression should be carefully considered and that changes in the expression system and host cell will significantly affect the types of process- and product-related substances and impurities.  Pfizer agrees that changes to expression system and host cell should be managed carefully, but recommends that this text be amended to clarify that changes in expression system and host cell may affect product attributes and that such changes should be assessed within the context of demonstrating similarity.  Pfizer recommends the Agency continue to apply high-level guidance for the philosophy and expectations that exist in the circumstance that changes to the expression system are introduced,  to ensure the guidance remains applicable to a wide range of products and product categories, and believes that specific implications and expectations should be addressed on a case-by-case basis with individual Sponsors.

FDA000832
A.0054                    A.0054                    A.0054

Section I. Stability (line 584-596)

The role of the biosimilar stability program is two-fold: providing appropriate data to support the proposed expiry dating of the biosimilar and providing data demonstrating acceptable similarity to the reference product. Limitations exist with regard the reference product information during shelf-life, given that the reference product will be available at a range of expiry dates, unlikely to reflect time zero. The aim of the stability study in the case of biosimilars is not to re-demonstrate the shelf-life of the reference product. Rather, the goal is primarily to demonstrate an acceptable profile of the biosimilar throughout the proposed shelf-life. Within the demonstration of an acceptable stability profile for the biosimilar there is a need to reflect the similarity to the reference product, but given the known constraints and limitations, a side-by-side comparable stability program would be impractical and not relevant.

Pfizer recommends the Agency amend the text to clarify that the stability expectations include those applicable to the development of any new product, which may result in the proposed dating period of the biosimilar being different from that of the reference product. As it is not practical to obtain reference product at time of manufacture (representative of time zero), Pfizer believes that the biosimilar developer should be directed to obtain reference product and through the use of appropriate studies, such as accelerated or forced degradation, should generate an understanding of the reference product stability profile, including degradation pathways, against which biosimilar similarity could be considered.

## II. GENERAL COMMENTS RELATED TO THE PROPOSED TEXT OF THE DRAFT GUIDANCE

| Line Nos. | Comment and Rationale | Proposed change (if applicable) |
|---|---|---|
| 38-40 | The Draft Guidance indicates that 351(k) pathway applies to all biological products, which therefore indicates all biological products could be the subject of biosimilars development. | Pfizer recommends the Agency include additional text to acknowledge that complex biological products may require specific consideration that is not addressed within this general guidance and should be subject to individual consultation (aligned to text in line 164-165). |
| 222-224 | The Draft Guidance states: "*Advances in manufacturing science and production methods may enhance thelikelihood that a product will be highly similar to another product by better targeting the originalproduct's physiochemical and functional properties.*"<br><br>Advances in manufacturing science and production methods are unlikely, in isolation, to enhance the likelihood of developing a highly similar product. It is more the combination of the application of state-of-art analytical assessment guiding manufacturing methods that will result in highly similar products. | Pfizer suggests the Agency amend this sentence to reflect that the state-of-the-art analytical assessment applied to manufacturing methods is most likely to result in the development of a highly similar product. |
| 227-229 | The Draft Guidance states: "*The rationale for the analytical similarity assessment should be clearly described with consideration for the known quality attributes and performance characteristics of the* | Pfizer suggests the Agency amend the sentence to reflect that known quality attributes can be utilized to shape biosimilar development and justify |

FDA000833

A.0055    A.0055    A.0055

| Line Nos. | Comment and Rationale | Proposed change (if applicable) |
|---|---|---|
| | *specific reference product."*<br><br>The known quality attributes of the reference product and performance characteristics may vary considerably between reference products. Biosimilar developers should be encouraged to include within their submission the known quality attributes and performance characteristics available from valid publication materials and where appropriate utilize this information to drive development decisions for the biosimilar. | certain development decisions. |
| 247-249 | *"In addition to the typically low level of replication errors in the DNA encoding the protein sequence and amino acid misincorporation that occurs during translation..."* | Pfizer queries if this language implies that low levels of amino acid misincorporation would be acceptable. |
| 269-274 | Advances in analytical techniques suggests that the inclusion of specific methodology within the guidance would be misleading and drive the need for the guidance to be updated on a regular basis. The guidance document has been written to be applicable to a wide range of product categories and the inclusion of specific methods within a general guidance document creates confusion. Pfizer believes an outline of the philosophy and general expectations should remain the focus of the guidance text and that specific methods would be better discussed on an individual submission basis. | Pfizer suggests the document be amended to remove reference to specific methods, such as X-ray crystallography and NMR and focus on the overarching principles that should be applied. |
| 281-283 | The draft guidance states: *"The body of knowledge that emerges will serve to support product quality during development, at approval, and over the postapproval life of the product."*<br><br>It should be acknowledged that the body of knowledge gained to support the product during development, at approval and post approval, also includes a body of knowledge obtained for the reference product. This body of knowledge can also function as a valuable source of information throughout the biosimilar lifecycle. | While continued demonstration of similarity to the reference product should not be an expectation after licensure, all data generated during development of the biosimilar could be a relevant data source (both on the biosimilar and the reference product). Pfizer recommends the Agency include text that acknowledges that a body of data will also be generated on the reference product, which may be a valuable source of information throughout the product lifecycle. |
| 294-295, 300 | Pfizer believes the acceptance criteria should consider all representative data, across development, manufacturing consistency, stability studies, as well as data obtained from lots used in nonclinical and clinical studies, in accordance with the philosophy outlines within ICH Q6B. | Pfizer suggests that the Agency include reference to the fact that acceptance criteria should be based on all relevant information, including representative lots generated during development, manufacturing consistency as well as data from lots supplied during nonclinical and clinical studies and data from stability studies (ICH Q6B). |
| 314 | The meaning of the term "meaningful fingerprint-like analysis algorithm" is unclear. | Pfizer suggests that the term "meaningful fingerprint-like analysis algorithm" should either be defined or the term should be removed, to prevent confusion. |
| 315-317 | The Draft Guidance states: *"Advances in manufacturing science and Quality-by-Design* | Pfizer suggests the Agency modify the wording to reflect that "Advances in manufacturing science and |

FDA000834

A.0056                    A.0056                    A.0056

| Line Nos. | Comment and Rationale | Proposed change (if applicable) |
|---|---|---|
| | *approaches...*"<br><br>The inclusion of reference to Quality-by-Design (QbD) approaches, should be qualified to clarify Agency expectations for the role of QbD with biosimilars, which is assumed to reflect the benefit that can be obtained from process understanding. The current text infers a single product process, but does not specifically acknowledge that this would consist of many unit operations. | Quality-by-Design approaches, with regard to opportunities for developing process understanding" ..., may facilitate production operations that can better match a reference product's attributes". |
| 326-327 | The Draft Guidance states: "*The potential effect of the differences on safety, purity, and potency should be addressed and supported by appropriate data.*"<br><br>Data available from valid publications and previously manufacturing experience can also represent important sources of knowledge in understanding any observed differences. | Pfizer suggests the Agency include reference to applicable data sources, such as publications and previous experience (manufacturing / development). |
| 333-334 | The Draft Guidance makes mention of availability of a relevant drug substance derived from the reference product. Although the reference product is available in final drug product form, drug substance of the reference product will not be available to the biosimilar developer. Accordingly, Pfizer is concerned that the reference to drug substance from the reference product in the Draft Guidance may be inaccurate. However, the lack of drug substance access will not hinder the analytical similarity assessment, in the instance that drug product can be adequately characterized, without analytical method interference. | Pfizer recommends removing the reference to the reference product drug substance. |
| 353 | The current guidance document requests that a biosimilar developer should clarify changes made with regard formulation and primary packaging. Such information on the licensed product is not always fully available to the developer of a biosimilar and therefore the justification of differences to the licensed product can not in all cases be made. | Pfizer suggests that the guidance acknowleged that formulation and primary packaging details may not be publically available. As such justification of the biosimilar formulation and primary container closure should assess the publically available information of the reference product and also take into consideration current knowledge and expectations. Information available from prior manufacturing experience and prior knowledge obtained during the development of other (related) products should be considered as relevant. It should be acknowledged that parameters that are clinically relevant should be the primary focus of consideration. |
| 385-397 | The Agency recommends Quality-by-Design approaches be considered during biosimilar development. Pfizer believes that reference to a broad term could be misinterpreted. | Pfizer suggests that the text should be clarified to reflect that the principals outlined within ICH Q8, ICH Q9, and ICH Q11 should be applied during the development of a biosimilar product. |
| 424- | Advances in analytical techniques and progress of | Pfizer suggests the Agency remove |

FDA000835

A.0057    A.0057    A.0057

| Line Nos. | Comment and Rationale | Proposed change (if applicable) |
|---|---|---|
| 425 | what is considered state-of-the-art suggests that the inclusion of specific methodology would be misleading and drive the need for guidance to be updated on a regular basis. Specific methods identified within the guidance should be removed. The philosophy and generally accepted approach should remain the focus of the guidance text. Specific methods are better discussed on an individual submission basis. | reference to specific analytical techniques. |
| 456-459 | The Draft Guidance states: "If a reference product exhibits multiple functional activities, manufacturers should perform a set of relevant assays designed to evaluate the range of activities."<br><br>Pfizer believes that clarification should be provided that there is no expectation for the biosimilar developer to re-prove the reference product mechanism(s) of action or to conduct excessive functional activities, with little clinical relevance. | Pfizer suggests the Agency clarify expectations for functional activities to be thorough but not exhaustive, and that the focus should be on mechanism(s) of action and clinical relevance, to provide meaningful information. |
| 492-493 | It may not be possible to assess process-related impurities in the reference product, in the absence of knowledge of manufacturing specifics. The assessment of process-related impurities plays a limited role in the similarity assessment, because of the differences in the manufacturing process. Process-related impurities should be considered outside the similarity assessment and should be considered in the context of current expectations and processing capabilities. | Pfizer suggests the Agency remove the reference to process-related impurities from the sentence. |
| 503-505 | The guidance should confirm that process-related impurities do not require an assessment of similarity to the reference product, as advances in manufacturing methods are likely to result in lower levels than those present in the reference product. | Pfizer suggests the Agency add a sentence to reflect process-related impurities are not necessarily always part of the of the similarity assessment. |
| 523 | Acknowledgement should be made that the biosimilar developer operates within the constraints of the commercial availability of the reference product and that while the intention maybe to obtain material that reflects the expiry period of the reference product, market availability will ultimately dictate the reference product lots obtained. The biosimilar manufacturer should be encouraged to develop strategies aimed at obtaining appropriate reference product lots that represent an adequate number and reflection of product variability. | Pfizer suggests the Agency acknowledge that the similarity assessment is dependent on the availability of the reference product. Include sentence that acknowledges the limitations that may exist in obtaining adequate reference product, within a specific time frame and that this may influence the time frame in which the similarity assessment may progress. |
| 523-533 | The demonstration of analytical similarity conducted between the biosimilar product and the reference product should include all relevant batches / lots, particularly key material generated during development, as well as used to support nonclinical and clinical studies. All relevant and representative lots should be considered. | Pfizer suggests the Agency include the recommendation to use a cross section of relevant drug substance and drug product lots, from development, nonclinical and clinical studies, reflecting representative and relevant information, within the similarity assessment. |
| 526 | As the biosimilar is being developed to match the | Pfizer suggests removing reference to dose-finding clinical studies. The |

FDA000836

A.0058                    A.0058                    A.0058

| Line Nos. | Comment and Rationale | Proposed change (if applicable) |
|---|---|---|
| | reference product, hence match the registered labelling, the reference to dose-finding clinical studies would seem to be unnecessary. | objective of biosimilar product development is to establish that the safety and efficacy of the biosimilar product is not different in a clinically meaningful way from the reference product. The objective is not to establish that the product has an acceptable risk:benefit balance to support approval, or that the dose and regimen are optimal; this has already been established by the reference product. Given this, Pfizer believes it would be unethical to conduct clinical trials using a dose for which the reference product is not approved. |
| 537-539 | Pfizer requests clarification that extraction of drug substance from the reference product should be considered if constraints in analytical assessment at the drug product level exist and that only under these circumstances should the extraction procedure and analysis be required. | Pfizer recommends the Agency include clarification that extraction of drug substance from the reference product should be considered if constraints in analytical assessment at the drug product level exist. |
| 544-546 | Guidance is provided to conduct an analytical assessment with available reference standard(s). However, biosimilarity can only be established by a similarity assessment with the reference product. | Pfizer suggests that the Agency clarify that the similarity assessment provides the basis of the biosimilarity, and that the reference standard may provide useful additional information. |
| 521-556 | The role of the reference product during the development of the biosimilar is outlined without comment on the expectations for post licensure. Clarification should be provided as to expectations following approval of the biosimilar product. | Pfizer believes additional information should be included to clarify that the similarity assessment with the reference product is fulfilled following approval of the 351(k) license application. |

## III. CONCLUSION

Pfizer appreciates the opportunity to comment as FDA begins to work to implement its new authorities under the BPCI Act. We look forward to future opportunities to participate in the regulatory process relating to this important legislation. If you have any questions on these comments, please contact the undersigned at 484-865-3733 or at owen.fields@Pfizer.com.

Respectfully submitted,

F. Owen Fields, Ph.D.
Vice President, Worldwide Regulatory Strategy
Worldwide Research and Development
Pfizer, Inc

FDA000837
A.0059                                    A.0059                                    A.0059

*Lilly*

**Eli Lilly and Company**
Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000

www.lilly.com

October 9, 2014

Division of Dockets Management (HFA-305)
Food and Drug Administration
5630 Fishers Lane
Room 1061
Rockville, MD 20852

Re:    Docket No. FDA-2011-D-0611: Draft Guidance for Industry on Biosimilars:
Questions and Answers Regarding Implementation of the Biologics Price Competition
and Innovation Act of 2009, 77 Fed. Reg. 8885 (Feb. 15, 2012)

Dear Sir or Madam,

Eli Lilly and Company (Lilly) is pleased to submit these comments on FDA's interpretation of the statutory language "protein (except any chemically synthesized polypeptide)," which was added to the Public Health Service Act (PHSA), 42 U.S.C. § 262(i), by the Biologics Price Competition and Innovation Act of 2009 (BPCIA) and addressed in FDA's Draft Guidance, "Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009" (Feb. 2012) (Draft Guidance).[1]

Lilly is a leading innovation-driven company committed to developing a growing portfolio of first-in-class and best-in-class pharmaceutical products that help people live longer, healthier and more active lives. Lilly products treat patients with cancer, diabetes, depression, schizophrenia, osteoporosis and many other conditions.

The interpretation of the statutory term "protein" will help determine the fundamental classification of molecules as subject to the approval requirements of either the PHSA or the Food Drug and Cosmetic Act (FDCA), 21 U.S.C. § 355. The consequences of this classification are far-reaching, and include differences in data submission requirements under the respective Acts, applicability of the biosimilar pathway for subsequent versions of the approved product, and the scope of available regulatory exclusivity. See Table 1, attached. Therefore, it is critically important for this interpretation to be grounded in sound science.

---

[1] Lilly respectfully requests FDA's consideration of these comments pursuant to 21 C.F.R. § 10.115(g)(5) ("You can comment on any guidance document at any time . . . . FDA will revise guidance documents in response to your comments when appropriate.").

FDA001317
A.0060                                    A.0060                                    A.0060

Based on our review of the scientific literature, Lilly believes FDA should replace the definition of "protein" in the Draft Guidance with the following:

> A "protein" is a linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds.

With regard to the parenthetical phrase in this statutory language, "(excluding any chemically synthesized polypeptide)," the scientific literature discussed below shows that there is no precise number of amino acids at which a peptide becomes a "polypeptide." Rather, "polypeptide" is most commonly associated with an amino acid chain of sufficient length to form a protein. For purposes of this statute, therefore, the terms "polypeptide" and "protein" should be read synonymously. The exclusion of any "chemically synthesized polypeptide" from "protein" should be understood simply to exclude chemically synthesized proteins from the statutory definition of a biological product.[2]

The net result is that FDA should replace its interpretation of the full phrase "protein (excluding any chemically synthesized polypeptide)" with

> A linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds and manufactured by a process that utilizes a biological system.

The discussion below briefly reviews the relevant provisions of the BPCIA and the interpretation offered in the Draft Guidance, and then provides the scientific basis for the revisions to the Draft Guidance recommended by Lilly.

## I.    DEFINING A "PROTEIN" BASED ON THE NUMBER OF AMINO ACIDS LACKS SUPPORT IN THE SCIENTIFIC LITERATURE

### A.    FDA PROPOSES TO DEFINE "PROTEIN" BASED SOLELY ON THE NUMBER OF AMINO ACIDS

The BPCIA amended the definition of "biological product" in the PHSA, codified at 42 U.S.C. § 262(i), to include the phrase, "protein (except any chemically synthesized polypeptide)." BPCIA § 7002(b)(2); 42 U.S.C. § 262(i). The resulting definition of "biological product" is:

> [A] virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product, or arsphenamine or derivative of arsphenamine (or any other

---

[2] There is no legislative history of what Congress intended by the parenthetical "(excluding any chemically synthesized polypeptide)." However, a prior version of the legislation used the term "recombinant protein" instead of "protein (except any chemically synthesized polypeptide)," suggesting that Congress had contemplated that only proteins produced utilizing biological systems would be considered biological products. See Erika Lietzan et al., An Unofficial Legislative History of the Biologics Price Competition and Innovation Act of 2009, 65 Food and Drug Law Journal 672, 747 (2010).

FDA001318

trivalent organic arsenic compound), applicable to the prevention,
treatment, or cure of a disease or condition of human beings.

42 U.S.C. § 262(i) (emphasis added). The BPCIA does not explicitly define "protein (except any chemically synthesized polypeptide)," nor does the legislative history elucidate this language. Consequently, "to implement the amended definition of 'biological product' and provide clarity to prospective applicants regarding the statutory authority under which products will be regulated," FDA offers its own "regulatory definitions" in the Draft Guidance. See Draft Guidance at 13.

There, FDA states, "[t]he term 'protein' means any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size." Id. "[C]hemically synthesized polypeptide," in turn, is defined as "any alpha amino acid polymer that (1) is made entirely by chemical synthesis; and (2) is less than 100 amino acids in size." Id. The Draft Guidance states, further, that "[a] chemically synthesized polypeptide, as defined, is not a 'biological product' and will be regulated as a drug under the FDCA unless the polypeptide otherwise meets the statutory definition of a 'biological product.'" Id.

The following diagram depicts the definitions of "peptide," "polypeptide," and "protein" that FDA proposes in the Draft Guidance:

**<u>Figure 1</u>:  Interpretation of "…protein (except any chemically synthesized polypeptide)…" in the Draft Guidance**



As shown in Figure 1, FDA proposes to define amino acid polymers falling within the shaded regions as proteins, subject to regulation under the PHSA, while amino acid

polymers in the non-shaded regions would not be considered proteins and thereby would be regulated as drugs, subject to the FDCA. In support of its approach, FDA states that the "scientific literature describes a 'protein' as a defined sequence of alpha amino acid polymers linked by peptide bonds, and generally excludes 'peptides' from the category of 'protein.'" See Draft Guidance at 13. The Agency then introduces its interpretation of the term peptide, which it states:

> generally refers to polymers that are smaller, perform fewer functions, contain less three-dimensional structure, are less likely to be post-translationally modified, and thus are generally characterized more easily than proteins.

Id. Nonetheless, FDA acknowledges that:

> scientific references do not agree on the criteria that distinguish proteins from peptides, including the exact size at which a chain of amino acids becomes a protein.

Id. Despite recognizing the lack of agreement on size, and the multi-factorial nature of the issue, the Draft Guidance goes on to state that, to "enhance regulatory clarity and minimize administrative complexity, FDA has decided to distinguish proteins from peptides based solely on size (i.e., number of amino acids)." Id. Thus, the Draft Guidance concludes that, "unless a peptide otherwise meets the statutory definition of a 'biological product' (e.g., a peptide vaccine), it will be regulated as a drug under the FD&C Act." Id. at 13-14.

The Agency takes a similar approach in its definition of the statutory exclusion, "except any chemically synthesized polypeptide":

> There are several definitions of 'polypeptide' in the scientific literature. Some are broad (e.g., polypeptide means any amino acid polymer), while others are more narrow (e.g., polypeptide means any amino acid polymer composed of fewer than 100 amino acids). FDA believes that a narrow definition of polypeptide is most appropriate in this context because, among other reasons, this avoids describing an exception to the category of protein using a term that relates to a larger category of molecules.

Id. at 14. The Draft Guidance then declares that the statutory exclusion for "any chemically synthesized polypeptide" will apply "to any molecule that is made entirely by chemical synthesis and that is composed of up to 99 amino acids." Id.

Lilly appreciates FDA's intent to adopt a simple and administratively convenient interpretation of the statutory language. However, the definition offered in the Draft Guidance, if finalized, would create arbitrary distinctions among similar molecules of slightly different sizes, and would exclude molecules with 40 or less amino acids that—based on the weight of scientific literature—meet the definition of a protein.

B.    **EXCLUDING ALL MOLECULES WITH 40 OR LESS AMINO ACIDS FROM CLASSIFICATION AS A "PROTEIN" IS NOT SUPPORTED BY THE WEIGHT OF SCIENTIFIC LITERATURE**

The Draft Guidance justifies exclusion of molecules with 40 or less amino acids from the category of "proteins" by stating that the definition of a "protein" excludes "peptides," and then selecting 40 amino acids as the upper boundary for a peptide. However, a review of the literature regarding these terms demonstrates that this approach is inconsistent with the weight of scientific opinion.

The term "peptide" describes a molecule consisting of two or more amino acids held together with peptide bonds, which is structurally analogous to a protein but smaller in size.[3] However, not all scientific references describe the relation of peptides to proteins in a consistent manner. Some references describe a simple dichotomy between the two terms, in which an amino acid polymer is a peptide up to a certain length of amino acids, at which point it becomes a protein.[4] More often, the base term "peptide" is used to describe any and all amino acid polymers with peptide bonds, and the full term is expanded when the intent is to refer more specifically to the number of amino acids, with examples as follows:

| | |
|---|---|
| Dipeptide | 2 Amino Acids |
| Tripeptide | 3 Amino Acids |
| Tetrapeptide | 4 Amino Acids[5] |

The above pattern continues but with terms that more broadly describe the number of amino acids with peptide bonds:

> At some point, scientists stop counting the number of amino acids and simply use the word **oligopeptide** to designate a few amino acids held together by peptide bonds. . . . At yet another somewhat arbitrary point (typically 10 amino acids or more), the structure is called a **polypeptide**. . . .When discussing proteins,

---

[3] See L.G. Wade, Organic Chemistry 1171, (8th ed. 2012); H. Lodish et al., Molecular Cell Biology 61 (5th ed. 2004).

[4] See Carl Burtis et al., Tietz Textbook of Clinical Chemistry and Molecular Diagnostics Ch. 21 (5th ed. 2012) ("Short peptides are identified by the number of constituent amino acids, such as dipeptide, tripeptide, tetrapeptide, or pentapeptide. When peptides reach sufficient length to have a defined globular structure—about 50 or more residues—polypeptides begin to be referred to as proteins.").

[5] See L.G. Wade, Organic Chemistry 1171, (8th ed. 2012) ("The product is an amide called a dipeptide because it consists of two amino acids."); Trudy McKee & James McKee, Biochemistry: The Molecular Basis of Life § 5.1. (5th ed. 2011) ("As amino acids are added and the chain lengthens, the prefix reflects the number of residues: a tripeptide contains three amino acid residues, a tetrapeptide four, and so on."); G.C. Barrett & D.T. Elmore, Amino Acids and Peptides 2 (1998).

the term polypeptide is most appropriate, because most proteins contain more than 20 amino acids. . . . [6]

There are three important principles in this passage relevant to the definitions in the Draft Guidance.  First, terms such as dipeptide, tri-peptide and polypeptide are used to distinguish among the number of amino acids in the polymer.  "Protein" is not part of this continuum of terms that refer only to the length of the amino acid chain.  While the length of the amino acid chain in a "protein" is most often associated with the term "polypeptide," this does not mean that proteins are defined simply by size, as is proposed in the Draft Guidance.

Second, "poly," when appended to "peptide," literally means many peptides.  It is a general term intended to avoid conveying a specific number, other than being associated with relatively more amino acids than the small peptides for which the number of peptides is usually specified (e.g., "di," "tri").  For this reason, Plopper and others recognize that any attempt to define an exact number at which a dipeptide, tri-peptide or tetra-peptide becomes a polypeptide is "somewhat arbitrary."[7]  This exercise demonstrates that using a specific number of amino acids as the basis for a fundamentally different treatment of molecules under the law is inappropriate.

A third important takeaway is the example provided by this passage of the number of amino acids that are considered "typical" for those who venture to assign such a number.  Plopper uses 10 amino acids as the lower boundary for a polypeptide, and other authorities likewise differ with FDA on this point.[8]  Even if size were the appropriate criterion for determining what is a protein, literature that defines a polypeptide as falling within a set range of amino acids establishes ranges different from the 40-100 range proposed by FDA—further exhibiting the arbitrary nature of the Agency's draft definition.[9]

FDA's interpretation of the language "protein (except chemically synthesized polypeptides)" lacks any significant support in the literature reviewed by Lilly.  To the contrary, Lilly's review found almost universal agreement that there is no precise number of amino acids that defines a protein.

---

[6] George Plopper, Principles of Cell Biology 85 (2013). See also G.C. Barrett & D.T. Elmore, Amino Acids and Peptides 2 (1998) (observing that there is no precise numeric dividing line determining when a peptide becomes a polypeptide or a protein).

[7] George Plopper, Principles of Cell Biology 85 (2013). While not explicitly stating that the dividing line is arbitrary, other references do not assign a specific numeric cut-off point differentiating between peptides and polypeptides.  See, e.g., H. Lodish et al., Molecular Cell Biology § 3.1 (4th ed. 2000) (observing only that peptides "generally contain fewer than 20-30 amino acids" (emphasis added)); Carl Burtis et al., Tietz Textbook of Clinical Chemistry and Molecular Diagnostics Ch. 21 (5th ed. 2012); L.G. Wade, Organic Chemistry 1171, (8th ed. 2012) (noting only that a polypeptide contains "many amino acid residues" (emphasis added)).

[8] See, e.g., Carl Burtis et al., Fundamentals of Clinical Chemistry 286 (6th ed. 2008) (defining a polypeptide as "[a] chain of amino acids containing approximately 6 to 30 residues").

[9] See id.; George Plopper, Principles of Cell Biology 85 (2013) (noting that most sources identify polypeptides as having 10 or more amino acids).

FDA001322

C.   **THE DRAFT GUIDANCE APPEARS TO BE INCONSISTENT WITH EXISTING FDA REGULATION ON THIS POINT**

The Draft Guidance also appears to be inconsistent with FDA's existing regulation, 21 C.F.R. § 601.2, which identifies products subject to reduced biological product licensure requirements under 42 U.S.C. § 262(i). According to the regulation, products eligible for such treatment include "therapeutic DNA-derived product[s]" _regardless_ of numbers of amino acid residues as well as chemically synthesized products of 40 or fewer amino acids:

> To obtain marketing approval for a biological product subject to licensure which is a therapeutic DNA plasmid product, therapeutic synthetic peptide product of 40 or fewer amino acids, monoclonal antibody for in vivo use, or therapeutic recombinant DNA-derived product, an applicant shall submit a biologics license application in accordance with paragraph (a) of this section except that the following sections in part 600 through 680 of this chapter shall not be applicable to such products: 600.10(b) and (c), 600.11, 600.12, 600.13, 610.11, 610.53, and 610.62 of this chapter.

21 C.F.R. § 601.2(c)(1) (emphasis added). FDA states in the rulemaking that the list of products was intended to represent those "well-characterized biotechnology products" that could be subject to a less onerous licensing pathway under the PHSA. See 61 Fed. Reg. 24227, 24228 (May 14, 1996).

The net result of this regulation is that both therapeutic recombinant DNA-derived amino acid polymers and chemically synthesized polymers of 40-amino acids or less are currently regarded as biological products under 21 C.F.R. § 601.2. The Draft Guidance is inconsistent with this approach.

II.   **A "PROTEIN" SHOULD BE DEFINED USING A CONSENSUS DEFINITION FROM THE SCIENTIFIC LITERATURE**

A.   **A BROADER DEFINITION OF A PROTEIN HAS WIDE SUPPORT IN THE SCIENTIFIC LITERATURE**

As Section I makes clear, a narrow definition of protein that excludes some polymers based on the number of amino acids is inappropriate. The consensus of scientific opinion is that the terms "protein" and "polypeptide" are used synonymously,[10] whereas the comparison of a "protein" to a "peptide" can only be done on a _relative_ basis, such that peptides are relatively smaller, less structurally complex, and less capable of performing cellular functions than are "proteins."[11]

---

[10] See, e.g., Eberhard Passarge, Genetics 40 (3d ed. 2007); B. Alberts et al., Molecular Biology of the Cell (4th ed. 2002) ("Proteins are therefore also known as polypeptides."); Trudy McKee & James McKee, Biochemistry: The Molecular Basis of Life § 5.1. (5th ed. 2011).

[11] FDA has adopted the same position. See Draft Guidance at 13.

FDA001323

Without objective criteria to consistently distinguish a protein from a peptide, the Agency should not introduce this distinction into the definition of a protein.[12]  Rather, FDA should adopt the consensus definition from the literature of a protein as a linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds.  Given that the statute parenthetically excludes polypeptides made by chemical synthesis, the definition would be further restricted to only products manufactured by a process that utilizes a biological system.  Additional protein traits of the molecule (e.g., cellular functions performed) would necessarily be demonstrated as part of the Biologics License Application (BLA) submission under the PHSA.

This approach would have an added benefit of harmonizing FDA's classification of "drugs" versus "biological products" with regulators in other major markets worldwide.[13]  Conversely, if FDA were to follow through with the definition proposed in the Draft Guidance, the U.S. would become the only major market of which we are aware that excludes some biologically-produced therapeutic amino acid polymers from the definition of a biological product.  The definition Lilly proposes herein would greatly help to facilitate consistent discussions and submissions in multiple countries by sponsor companies.

Lilly recognizes that this broader definition does not explicitly incorporate other properties widely recognized as traits of proteins.  Such properties include, among others, the adoption of higher order structures, a potential for binding to molecular targets and the performance of cellular functions.  Lilly believes that any attempt to incorporate such traits *a priori* into a generic definition of a protein would result in an academic debate as to which factors are essential for classification as a protein and to what degree.  Moreover, classifying amino acid polymers based on structural and functional traits would be a difficult scientific process at any stage of development, let alone at a time well before submission of a marketing application, which is when this decision must be made.  Lilly has thus concluded that the further assessment of structure and biological function of proteins should be reserved for the review of the marketing application and has not tried to incorporate such traits into the definition of "protein."

---

[12] The term peptide does not appear in the BPCIA.  As noted, FDA introduced the term in the Draft Guidance to find a way to exclude simple polymers from regulation under the PHSA and for the sake of administrative efficiency.

[13] For example, the European Medicines Agency (EMA) defines biological products in terms of the process by which they are made and there is no amino acid numeric requirement: "MEDICINAL PRODUCTS TO BE AUTHORISED BY THE COMMUNITY [include] 1. Medicinal products developed by means of one of the following biotechnological processes: — recombinant DNA technology, — controlled expression of genes coding for biologically active proteins in prokaryotes and eukaryotes including transformed mammalian cells, — hybridoma and monoclonal antibody methods." Council Regulation 726/2004, Annex, 2004 O.J. (L. 136) (EC).  Similarly, Canada's Food and Drug Act lists, as an example of a biologic, "[d]rugs obtained by recombinant DNA procedures," without any amino acid numeric requirement. See Food and Drugs Act, R.S.C., 1985, Schedule D.  Japan's Pharmaceutical Affairs Law defines a biologic product as "products including ingredients derived from human or biological (excluding plants) source materials (such as cell, tissue, blood, etc.) which should be subject to particular attention from the public health point of view." See Pharmaceutical Affairs Law, Law No. 145 of 1960, art.2, para. 9 (Japan). The law does not specify a numeric amino acid requirement for biological products.

## B.  AMINO ACID POLYMERS MANUFACTURED BY PROCESSES THAT UTILIZE BIOLOGICAL SYSTEMS RAISE COMMON ISSUES

FDA's interpretation of "protein" should take into account a key purpose of this definition, which is to determine whether a particular product will be regulated under the PHSA or the FDCA. In this regard, it is important to note that protein complexity arises in part from method of production. Those products manufactured by processes that utilize biological systems inherently implicate issues that are better addressed by the biological products regulation under the PHSA.

It is well-recognized scientifically that amino acid polymers manufactured by or from a biological system raise unique manufacturing, processing, quality, and safety issues, regardless of the specific number of amino acids contained in each. These issues arise out of the inherent variability of production utilizing a biological system. These biological production systems may include living cells as the site of manufacture, biological source material, or unique cell banks. Any variation in the host biological material, cell culture, processing steps, or impurities in such material can result in conformational changes that may, in turn, result in immunogenic responses and different physiological function.[14] In addition, it is well-recognized that post-production purification, glycosylation, and translational steps in amino acid polymers can also have significant impacts for safety and functionality.[15]

These complexities apply to short amino acid polymers as well as to larger polymers containing more amino acids.[16] Biologically produced amino acid polymers raise common issues, whether those polymers are categorized as proteins, peptides or polypeptides, based on numbers of amino acids. These complexities are greater, generally, than those raised by chemically synthesized amino acid polymers of similar size. One expert summarizes these distinctions as follows:

> [u]nlike drugs, many structural-, functional-, safety- and efficacy-related characteristics of biopharmaceutical active agents, beyond primary structure (e.g., amino acid sequence), are highly dependent on their methods of manufacture . . . . This includes three-dimensional conformation, the size and folding of polymeric chains, formation of multimers or complexes of chains, variable oxidation states, self-aggregation of molecules, intra- and inter-chain disulfide linkages, amidation, attachment of variable polysaccharide side chains (glycosylation) and other post-translational modifications.

---

[14] See, e.g., Kevin Brady & Rob Webster, Disposition of Biologics, 63 Advances in Pharmacology 257 (2012).

[15] Anurag S. Rathore, Follow-on Protein Products: Scientific Issues, Developments and Challenges, 27 Cell 698, 700 (2009). See also Gary Walsh, Post-translational Modifications of Protein Biopharmaceuticals, 15 Drug Discovery Today 773 (2010); Huub Schellekens, When Biotech Proteins Go Off-patent, 22 Science Direct 406 (2004).

[16] James Samanen, Similarities and differences in the discovery and use of biopharmaceuticals and small-molecule chemotherapeutics, in Introduction to Biological and Small Molecule Drug Research and Development: Theory and Case Studies (T. Laird ed. 2013).

Most biopharmaceuticals, <u>including seemingly simple well-characterized and specified recombinant proteins</u>, involve considerable (micro)heterogeneity, with the active agent actually a complex mixture of molecular sub-species with a range of variations in structural aspects (e.g., due to amino acid substitutions, twists and turns in chain structures, intra- and inter-chain linkages, side-chain modifications and aggregation).[17]

Thus, biologically produced 39-amino acid polymers can raise similar manufacturing, process and quality concerns as 40-amino acid, or longer, polymers. There is no reason for such polymers to be regulated differently.

FDA has, in fact, already recognized the additional complexities raised by amino acid polymers manufactured by processes that utilize biological systems. Toward this end, the Agency has adopted International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH) guidelines that outline controls for manufacturing changes, acceptance criteria, and stability testing. The purpose of these guidelines is to minimize risks for "biotechnology/biological products." These guidelines, implemented by FDA as guidances, apply without numeric amino acid requirements to all "[p]roteins and polypeptides . . . produced from recombinant or non-recombinant cell-culture expression systems" and address issues such as manufacturing changes, acceptance criteria, and stability testing.[18]

Further, FDA acknowledges the similarity of issues raised by both large and small amino acid polymers. Thus, the Final Guidance entitled, "Immunogenicity Assessment for Therapeutic Protein Products," explicitly states that the potential for "immune responses to or adverse immunologically related responses" may apply not only to therapeutic "proteins," as defined in the Draft Guidance, but also to "related products and biological entities, for example, peptides."[19] This recognition by FDA provides further weight against *de facto* exclusion of small amino acid polymers manufactured by processes that utilize biological systems from regulation as biological products. Instead, where small amino acid polymers share common features with larger amino acid polymers, they too should be regulated as biological products.

FDA's interpretation of the statutory language "protein (except any chemically synthesized polypeptide)" added to 42 U.S.C. § 262(i) should reflect the well-accepted scientific definition of protein and should acknowledge the unique factors raised by amino acid polymers manufactured by processes utilizing biological systems. Lilly's proposed interpretation of the language is scientifically accurate and will result in consistent regulation of amino acid polymers that raise potential manufacturing, processing, quality, or safety issues. The interpretation is

---

[17] Ronald A. Rader, <u>(Re)defining Biopharmaceutical</u>, 26 Nature 743, 745 (2008) (emphasis added).
[18] <u>See</u>, <u>e.g.</u>, FDA, Guidance for Industry: Q5E Comparability of Biotechnological/Biological Products Subject to Changes in Their Manufacturing Process (Jun. 2005); FDA, Guidance for Industry: Q6B Specifications: Test Procedures and Acceptance Criteria for Biotechnological/Biological Products (Aug. 1999); FDA, Guideline for Industry: Quality of Biotechnological Products: Stability Testing of Biotechnological/Biological Products (Jul. 1996). The guidances address measures that manufacturers should take in order to ensure safety of biotechnology/biological products.

[19] <u>See</u> FDA, Guidance for Industry: Immunogenicity Assessment for Therapeutic Protein Products 2 (Aug. 2014).

FDA001326

also consistent with FDA's existing regulation at 21 C.F.R. § 601.2, and the classification of biological products in major markets worldwide.

## III.    CONCLUSION

FDA's interpretation of the language, "protein (except any chemically synthesized polypeptide)," informs all of its draft guidances on implementation of the BPCIA, as well as ongoing policymaking for biological products regulated under the PHSA. It is imperative that these policies rest on sound science. For this reason, FDA should revise the interpretation of the statutory language offered in the Draft Guidance to accurately reflect the scientific definition of protein and the commonalities of manufacturing amino acid polymers by processes that utilize biological systems.

Lilly very much appreciates FDA's consideration of these comments. If the Agency would like to discuss this matter with us, please contact Dr. Bruce Mitlak at 317-277-6546 or Mr. David Ceryak at 317-277-7263.

Sincerely,

Eli Lilly & Company

By: _____
Bruce H. Mitlak, M.D.
Distinguished Medical Fellow

cc: David V. Ceryak, J.D.

Table 1: Differences in Exclusivity for Peptides, Polypeptides and Proteins Pursuant to
FDA Draft Guidance

| Proposed FDA Category | Method of Production | Statutory Approval Authority | Potential Exclusivity Upon Approval |
|---|---|---|---|
| Peptide (1-40 amino acids) | Biological System | 21 U.S.C. § 355 (FDCA) | 5 years |
| Peptide or Polypeptide (1-99 amino acids) | Chemically Synthesized | 21 U.S.C. § 355 (FDCA) | 5 years |
| Polypeptide (41-99 amino acids) | Biological System | 42 U.S.C. § 262 (PHSA) | 12 years |
| Protein (>99 amino acids) | Biological System or Chemically Synthesized | 42 U.S.C. § 262 (PHSA) | 12 years |

FDA001328

# Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2015**
**Biosimilarity**

FDA001334

# Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

# Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*


*and/or*

*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave., Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone: 800-835-4709 or 240-402-7800*
*Email: ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*


**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2015**
**Biosimilarity**

FDA001335

A.0073                          A.0073                          A.0073

*Contains Nonbinding Recommendations*

**TABLE OF CONTENTS**

**INTRODUCTION**......................................................................................................................... **1**

**BACKGROUND** ........................................................................................................................... **3**

**QUESTIONS AND ANSWERS**................................................................................................... **5**

   I.    BIOSIMILARITY OR INTERCHANGEABILITY............................................................. 5

   II.   PROVISIONS RELATED TO REQUIREMENT TO SUBMIT A BLA FOR A
       "BIOLOGICAL PRODUCT"............................................................................................ 13

   III.  EXCLUSIVITY ................................................................................................................ 16

FDA001336

A.0074                              A.0074                              A.0074

*Contains Nonbinding Recommendations*

# Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009 Guidance for Industry[1]

<div style="border:1px solid black; padding:10px">

This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic.  It does not create any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations.  To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

</div>

## INTRODUCTION

This guidance provides answers to common questions from sponsors interested in developing proposed biosimilar products, biologics license application (BLA) holders, and other interested parties regarding FDA's interpretation of the Biologics Price Competition and Innovation Act of 2009 (BPCI Act).  The questions and answers (Q&As) are grouped below in the following categories:

- Biosimilarity or Interchangeability
- Provisions Related to Requirement to Submit a BLA for a "Biological Product"
- Exclusivity

The BPCI Act amends the Public Health Service Act (PHS Act) and other statutes to create an abbreviated licensure pathway in section 351(k) of the PHS Act for biological products shown to be biosimilar to, or interchangeable with, an FDA-licensed biological reference product (see sections 7001 through 7003 of the Patient Protection and Affordable Care Act (Pub. L. 111–148) (Affordable Care Act)).  On November 2 and 3, 2010, FDA held a public hearing and established a public docket to obtain input on specific issues and challenges associated with the implementation of the BPCI Act (see Docket No. FDA-2010-N-0477).  This guidance describes FDA's current interpretation of certain statutory requirements added by the BPCI Act and reflects consideration of the comments concerning those requirements that were submitted to the public docket.

---

[1] This guidance has been prepared by the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) at the Food and Drug Administration (FDA or the Agency).

Guidance documents are available on the CDER guidance page at
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm and on the CBER guidance page at
http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/default.htm.  We update guidances periodically.  To make sure you have the most recent version of a guidance, check the CDER or CBER guidance page.

FDA001337
A.0075

*Contains Nonbinding Recommendations*

This guidance is one in a series of guidances that FDA is developing to implement the BPCI Act. The guidances address a broad range of issues, including:

- Quality Considerations in Demonstrating Biosimilarity of a Therapeutic Protein Product to a Reference Product

- Scientific Considerations in Demonstrating Biosimilarity to a Reference Product

- Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009

- Formal Meetings Between the FDA and Biosimilar Biological Product Sponsors or Applicants

When applicable, references to information in these guidances are included in this Q&A guidance.

The Q&A format is intended to promote transparency and facilitate development programs for proposed biosimilar products by addressing questions that may arise in the early stages of development.  In addition, these Q&As respond to questions the Agency has received from prospective BLA and new drug application (NDA) applicants regarding the appropriate statutory authority under which certain products will be regulated.  FDA intends to update this guidance to include additional Q&As as appropriate.[2]  Table 1 describes the status of the draft guidance Q&As that will be provided in Revision 1 to the draft guidance on *Biosimilars:  Additional Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009* and final guidance Q&As that are included in this guidance.  FDA has maintained the original numbering of the Q&As used in the February 2012 draft guidance.  Q&As that have not yet been finalized will appear in Revision 1 to the draft guidance, and the omission of these Q&As from the final guidance is marked by several asterisks between nonconsecutively numbered Q&As.

---

[2] The process by which FDA is requesting public comment on proposed Q&As and issuing new Q&As is described in the accompanying FEDERAL REGISTER notice.

FDA001338
A.0076                              A.0076                              A.0076

*Contains Nonbinding Recommendations*

Table 1.  Status of Draft Guidance Q&As for Comment and Final Guidance Q&As

| Q&A Category | Q&A Numbers | Publication Date of Draft Guidance Q&As for Comment | Comment Period | Publication Date of Final Guidance Q&As |
|---|---|---|---|---|
| Part I. Biosimilarity or Interchangeability | I.1—I.8 I.11—I.12 I.15 | 2/15/12 | 2/15/12-4/16/12 | April 2015 |
| | I.13—I.14 | 2/15/12 | 2/15/12-4/16/12 | |
| | I.9—I.10 (revised) | (forthcoming) | (forthcoming) | |
| Part II. Provisions Related To Requirement To Submit A BLA For A "Biological Product" | II.1—II.2 | 2/15/12 | 2/15/12-4/16/12 | April 2015 |
| Part III. Exclusivity | III.1 (revised) | (forthcoming) | (forthcoming) | |
| | III.2 | 2/15/12 | 2/15/12-4/16/12 | April 2015 |

In general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word *should* in Agency guidances means that something is suggested or recommended, but not required.

## BACKGROUND

The BPCI Act was enacted as part of the Affordable Care Act on March 23, 2010.  The BPCI Act creates an abbreviated licensure pathway for biological products shown to be biosimilar to, or interchangeable with, an FDA-licensed biological reference product.  The objectives of the BPCI Act are conceptually similar to those of the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) (commonly referred to as the "Hatch-Waxman Act"), which established abbreviated pathways for the approval of drug products under the Federal Food, Drug, and Cosmetic Act (FD&C Act).[3]  The implementation of an abbreviated licensure pathway for biological products can present challenges given the scientific and technical complexities that may be associated with the larger and typically more complex structure of biological products, as well as the processes by which such products are manufactured.  Most biological products are produced in a living system such as a microorganism, or plant or animal cells, whereas small molecule drugs are typically manufactured through chemical synthesis.

Section 351(k) of the PHS Act (42 U.S.C. 262(k)), added by the BPCI Act, sets forth the requirements for an application for a proposed biosimilar product and an application or a supplement for a proposed interchangeable product.  Section 351(i) defines *biosimilarity* to mean "that the biological product is highly similar to the reference product notwithstanding minor

---

[3] See section 505(b)(2) and 505(j) of the FD&C Act (21 U.S.C. 355(b)(2) and 355(j)).

FDA001339
A.0077                         A.0077                         A.0077

*Contains Nonbinding Recommendations*

differences in clinically inactive components" and that "there are no clinically meaningful differences between the biological product and the reference product in terms of the safety, purity, and potency of the product" (see section 351(i)(2) of the PHS Act). A 351(k) application must contain, among other things, information demonstrating that the biological product is biosimilar to a reference product based upon data derived from analytical studies, animal studies, and a clinical study or studies, unless FDA determines, in its discretion, that certain studies are unnecessary in a 351(k) application (see section 351(k)(2) of the PHS Act). To meet the additional standard of "interchangeability," an applicant must provide sufficient information to demonstrate biosimilarity, and also to demonstrate that the biological product can be expected to produce the same clinical result as the reference product in any given patient and, if the biological product is administered more than once to an individual, the risk in terms of safety or diminished efficacy of alternating or switching between the use of the biological product and the reference product is not greater than the risk of using the reference product without such alternation or switch (see section 351(k)(4) of the PHS Act). Interchangeable products may be substituted for the reference product without the intervention of the prescribing healthcare provider (see section 351(i)(3) of the PHS Act).

The BPCI Act also includes, among other provisions:
- A 12-year exclusivity period from the date of first licensure of the reference product, during which approval of a 351(k) application referencing that product may not be made effective (see section 351(k)(7) of the PHS Act);
- A 4-year exclusivity period from the date of first licensure of the reference product, during which a 351(k) application referencing that product may not be submitted (see section 351(k)(7) of the PHS Act);
- An exclusivity period for the first biological product determined to be interchangeable with the reference product for any condition of use, during which a second or subsequent biological product may not be determined interchangeable with that reference product (see section 351(k)(6) of the PHS Act);
- An exclusivity period for certain biological products for which pediatric studies are conducted in accordance with a written request (see section 351(m) of the PHS Act);
- A transition provision for biological products that have been or will be approved under section 505 of the FD&C Act (21 U.S.C. 355) before March 23, 2020 (see section 7002(e) of the Affordable Care Act); and
- A provision stating that a 351(k) application for a biosimilar product contains a "new active ingredient" for purposes of the Pediatric Research Equity Act (PREA) (see section 505B(n) of the FD&C Act).

The BPCI Act also establishes procedures for identifying and resolving patent disputes involving applications submitted under section 351(k) of the PHS Act.

4

FDA001340

*Contains Nonbinding Recommendations*

**QUESTIONS AND ANSWERS**

## I.    BIOSIMILARITY OR INTERCHANGEABILITY

**Q. I.1.    *Whom should a sponsor contact with questions about its proposed biosimilar development program?***

A. I.1.    If the reference product for a proposed biosimilar product is regulated by the Center for Drug Evaluation and Research (CDER), contact the Therapeutic Biologics and Biosimilars Team (TBBT) in CDER's Office of New Drugs at 301-796-0700.

If the reference product for a proposed biosimilar product is regulated by the Center for Biologics Evaluation and Research (CBER), contact the Office of Communication, Outreach and Development (OCOD) at 800-835-4709 or 240-402-7800 or by email to ocod@fda.hhs.gov.

For general questions related to FDA's implementation of the BPCI Act, contact Sandra Benton in CDER's Office of Medical Policy at 301-796-2500.

**Q. I.2.    *When should a sponsor request a meeting with FDA to discuss their proposed biosimilar development program, and what data and information should a sponsor provide to FDA as background for this meeting?***

A. I.2.     Sponsors can request meetings at any time point in their development program. FDA recommends that sponsors refer to the draft guidance for industry titled *Formal Meetings Between the FDA and Biosimilar Biological Product Sponsors or Applicants* to determine the most appropriate meeting type to request.  This draft guidance describes the different meeting types intended to facilitate biosimilar development programs in accordance with the Biosimilar User Fee Act of 2012 (BsUFA) and the criteria/data needed to support the request.  The type of meeting granted will depend on the stage of product development and whether the information submitted in the meeting package meets the criteria for the type of meeting.

See FDA's draft guidance for industry on *Formal Meetings Between the FDA and Biosimilar Biological Product Sponsors or Applicants*. http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM345649.pdf

See FDA's BsUFA website http://www.fda.gov/ForIndustry/UserFees/BiosimilarUserFeeActBsUFA/default.htm

FDA001341

*Contains Nonbinding Recommendations*

**Q. I.3.** ***Can a proposed biosimilar product have a different formulation than the reference product?***

A. I.3.    Yes, differences between the formulation of a proposed product and the reference product may be acceptable.  A 351(k) application must contain information demonstrating that the biological product is highly similar to the reference product notwithstanding minor differences in clinically inactive components.  In addition, an applicant would need to demonstrate that there are no clinically meaningful differences between the biological product and the reference product in terms of safety, purity, and potency.  It may be possible, for example, for a proposed product formulated without human serum albumin to demonstrate biosimilarity to a reference product formulated with human serum albumin.  For more information about FDA's current thinking on the interpretation of the statutory standard for biosimilarity, see FDA's draft guidances for industry on *Quality Considerations in Demonstrating Biosimilarity of a Therapeutic Protein Product to a Reference Product* and *Scientific Considerations in Demonstrating Biosimilarity to a Reference Product.*

**Q. I.4.** ***Can a proposed biosimilar product have a delivery device or container closure system that is different from its reference product?***

A. I.4.    Yes, some design differences in the delivery device or container closure system used with the proposed biosimilar product may be acceptable.  It may be possible, for example, for an applicant to obtain licensure of a proposed biosimilar product in a pre-filled syringe or in an auto-injector device (which are considered the same dosage form), even if the reference product is licensed in a vial presentation, provided that the proposed product meets the statutory standard for biosimilarity and adequate performance data for the delivery device or container closure system are provided.  For a proposed biosimilar product in a different delivery device or container closure system, the presentation must be shown to be compatible for use with the final formulation of the biological product through appropriate studies, including, for example, extractable/leachable studies and stability studies.  Also, for design differences in the delivery device or container closure system, performance testing and a human factors study may be needed.

However, a prospective biosimilar applicant will not be able to obtain licensure under section 351(k) for its product when a design difference in the delivery device or container closure system results in any of the following:
- A clinically meaningful difference between the proposed product and the reference product in terms of safety, purity, and potency;
- A different route of administration or dosage form; or
- A condition of use (e.g., indication, dosing regimen) for which the reference product has not been previously approved;

or otherwise does not meet the standard for biosimilarity.

FDA001342

A.0080                          A.0080                          A.0080

*Contains Nonbinding Recommendations*

Additional considerations apply for a proposed interchangeable product.  For example, in reviewing an application for a proposed interchangeable product, FDA may consider whether the differences from the reference product significantly alter critical design attributes, product performance, or operating principles, or would require additional instruction to healthcare providers or patients, for patients to be safely alternated or switched between the reference product and one or more interchangeable products without the intervention of the prescribing healthcare provider.  Additional performance data about the delivery device may also be necessary.

A proposed biosimilar product in a delivery device will be considered a combination product and may, in some instances, require a separate application for the device.

**Q. I.5.**    ***Can an applicant obtain licensure of a proposed biosimilar product for fewer than all routes of administration for which an injectable reference product is licensed?***

A. I.5.    Yes, an applicant may obtain licensure of a proposed biosimilar product for fewer than all routes of administration for which an injectable reference product is licensed.  An applicant must demonstrate that there are no clinically meaningful differences between the proposed biosimilar product and the reference product in terms of safety, purity, and potency.  In a limited number of circumstances, this may include providing information from one or more studies using a route of administration for which licensure is not requested (e.g., a study using subcutaneous administration may provide a more sensitive comparative assessment of immunogenicity of the reference product and a proposed biosimilar product, even though licensure of the proposed biosimilar product is requested only for the intravenous route of administration).

**Q. I.6.**    ***Can an applicant obtain licensure of a proposed biosimilar product for fewer than all presentations (e.g., strengths or delivery device or container closure systems) for which a reference product is licensed?***

A. I.6.    Yes, an applicant is not required to obtain licensure for all presentations for which the reference product is licensed.  However, if an applicant seeks licensure for a particular indication or other condition of use for which the reference product is licensed and that indication or condition of use corresponds to a certain presentation of the reference product, the applicant may need to seek licensure for that particular presentation (see also questions and answers I.4 and I.5).

**Q. I.7.**    ***Can an applicant obtain licensure of a proposed biosimilar product for fewer than all conditions of use for which the reference product is licensed?***

7

*Contains Nonbinding Recommendations*

A. I.7.    Yes, a biosimilar applicant generally may obtain licensure for fewer than all conditions of use for which the reference product is licensed.  The 351(k) application must include information demonstrating that the condition or conditions of use prescribed, recommended, or suggested in the proposed labeling submitted for the proposed biosimilar product have been previously approved for the reference product (see section 351(k)(2)(A)(i)(III) of the PHS Act).

**Q. I.8.    *Can a sponsor use comparative animal or clinical data with a non-U.S.-licensed product to support a demonstration that the proposed product is biosimilar to the reference product?***

A. I.8.    Yes, a sponsor may use a non-U.S.-licensed comparator product in certain studies to support a demonstration that the proposed biological product is biosimilar to the U.S.-licensed reference product.  However, as a scientific matter, analytical studies and at least one clinical pharmacokinetic (PK) study and, if appropriate, at least one pharmacodynamic (PD) study, intended to support a demonstration of biosimilarity must include an adequate comparison of the proposed biosimilar product directly with the U.S.-licensed reference product unless it can be scientifically justified that such a study is not needed.

If a sponsor seeks to use data from an animal study or a clinical study comparing its proposed biosimilar product to a non-U.S.-licensed product to address, in part, the requirements under section 351(k)(2)(A) of the PHS Act, the sponsor should provide adequate data or information to scientifically justify the relevance of these comparative data to an assessment of biosimilarity and establish an acceptable bridge to the U.S.-licensed reference product. As a scientific matter, the type of bridging data needed will always include data from analytical studies (e.g., structural and functional data) that directly compare all three products (i.e., the proposed biosimilar product, the U.S.-licensed reference product, and the non-U.S.-licensed comparator product), and is likely to also include bridging clinical PK and/or PD study data for all three products.  All three pairwise comparisons should meet the pre-specified acceptance criteria for analytical and PK and/or PD similarity.  The acceptability of such approach will be evaluated on a case-by-case basis, and should be discussed in advance with the Agency.  For certain complex biological products, a modified approach may be needed.  A final determination about the adequacy of the scientific justification and bridge will be made during the review of the application.

Issues that a sponsor may need to address to use a non-U.S.-licensed comparator product in a biosimilar development program include, but are not limited to, the following:

- The relevance of the design of the clinical program to support a demonstration of biosimilarity to the U.S.-licensed reference product for the condition(s) of use and patient population(s) for which licensure is sought;

8

FDA001344

A.0082    A.0082    A.0082

*Contains Nonbinding Recommendations*

- The relationship between the license holder for the non-U.S.-licensed comparator product and BLA holder for the U.S.-licensed reference product;

- Whether the non-U.S.-licensed comparator product was manufactured in a facility(ies) licensed and inspected by a regulatory authority that has similar scientific and regulatory standards as FDA (e.g., International Conference on Harmonisation (ICH) countries);

- Whether the non-U.S.-licensed comparator product was licensed by a regulatory authority that has similar scientific and regulatory standards as FDA (e.g., ICH countries) and the duration and extent to which the product has been marketed; and

- The scientific bridge between the non-U.S.-licensed comparator product and the U.S.-licensed reference product, including comparative physicochemical characterization, biological assays/functional assays, degradation profiles under stressed conditions, and comparative clinical PK and, when appropriate, PD data, to address the impact of any differences in formulation or primary packaging on product performance.

A sponsor also should address any other factors that may affect the relevance of comparative data with the non-U.S.-licensed comparator product to an assessment of biosimilarity with the U.S.-licensed reference product.

A sponsor may submit publicly available information regarding the non-U.S.-licensed comparator product to justify the extent of comparative data needed to establish a bridge to the U.S.-licensed reference product. The complexity of the products, particularly with respect to higher order structure, post-translational modifications (e.g., glycosylation) and the degree of heterogeneity associated with the product may impact the considerations for the scientific justification regarding the extent of bridging data. Additional factors that FDA may consider regarding the extent of bridging data include, but are not limited to, the following:

- Whether the formulation, dosage form, and strength of the U.S.-licensed reference product and non-U.S.-licensed comparator products are the same;
- The route of administration of the U.S.-licensed reference product and non-U.S.-licensed comparator products;
- The design of the physicochemical and biological/functional assessments and the use of multiple orthogonal methods with adequate sensitivity to detect differences among the products;
- The scientific justification for the selection of the non-U.S.-licensed comparator lots used to establish the scientific bridge and how the selected lots relate to the material used in the nonclinical and clinical studies. The scientific bridge should include a sufficient number of lots of non-U.S.-

9

FDA001345

A.0083                          A.0083                          A.0083

*Contains Nonbinding Recommendations*

licensed comparator product to adequately capture the variability in product quality attributes. When possible, the non-U.S.-licensed comparator lots used in the nonclinical or clinical studies should be included in the assessment performed to establish the analytical bridge.

Sponsors are encouraged to discuss with FDA during the development program the adequacy of the scientific justification and bridge to the U.S.-licensed reference product. A final decision about the adequacy of this scientific justification and bridge will be made by FDA during review of the 351(k) application.

At this time, as a scientific matter, it is unlikely that clinical comparisons with a non-U.S.-licensed product would be an adequate basis to support the additional criteria required for a determination of interchangeability with the U.S.-licensed reference product.

*\* \* \* \* \**

**Q. I.11.** *Can an applicant extrapolate clinical data intended to support a demonstration of biosimilarity in one condition of use to support licensure of the proposed biosimilar product in one or more additional conditions of use for which the reference product is licensed?*

A. I.11.  Yes. If the proposed product meets the statutory requirements for licensure as a biosimilar product under section 351(k) of the PHS Act based on, among other things, data derived from a clinical study or studies sufficient to demonstrate safety, purity, and potency in an appropriate condition of use, the applicant may seek licensure for one or more additional conditions of use for which the reference product is licensed. However, the applicant would need to provide sufficient scientific justification for extrapolating clinical data to support a determination of biosimilarity for each condition of use for which licensure is sought.

FDA001346

A.0084                    A.0084                    A.0084

*Contains Nonbinding Recommendations*

Such scientific justification for extrapolation should address, for example, the following issues for the tested and extrapolated conditions of use:

- The mechanism(s) of action in each condition of use for which licensure is sought; this may include:
  - the target/receptor(s) for each relevant activity/function of the product;
  - the binding, dose/concentration response and pattern of molecular signaling upon engagement of target/receptor(s);
  - the relationships between product structure and target/receptor interactions;
  - the location and expression of the target/receptor(s);
- The PK and bio-distribution of the product in different patient populations (relevant PD measures also may provide important information on the mechanism of action);
- The immunogenicity of the product in different patient populations;
- Differences in expected toxicities in each condition of use and patient population (including whether expected toxicities are related to the pharmacological activity of the product or to "off-target" activities); and
- Any other factor that may affect the safety or efficacy of the product in each condition of use and patient population for which licensure is sought.

Differences between conditions of use with respect to the factors described above do not necessarily preclude extrapolation. A scientific justification should address these differences in the context of the totality of the evidence supporting a demonstration of biosimilarity.

In choosing which condition of use to study that would permit subsequent extrapolation of clinical data to other conditions of use, FDA recommends that a sponsor consider choosing a condition of use that would be adequately sensitive to detect clinically meaningful differences between the two products.

The sponsor of a proposed product may obtain licensure only for a condition of use that has been previously licensed for the reference product. If a reference product has a condition of use that was licensed under section 506(c) of the FD&C Act and 21 CFR part 601, subpart E (accelerated approval), and the reference product's clinical benefit in this condition of use has not yet been verified in postmarketing trials, the proposed product sponsor should consider studying another condition of use for which the reference product is licensed to avoid potential complications in the event that postmarketing trials fail to verify the clinical benefit of the reference product for the condition of use.

**Q. I.12.** ***How can an applicant demonstrate that its proposed injectable biosimilar product has the same "strength" as the reference product?***

11

*Contains Nonbinding Recommendations*

A. I.12.   Under section 351(k)(2)(A)(i)(IV) of the PHS Act, an applicant must demonstrate that the "strength" of the proposed biosimilar product is the same as that of the reference product.  As a scientific matter, there may be a need to take into account different factors and approaches in determining the "strength" of different types of biological products.

In general, we expect injectable biological products to have both the same total content of drug substance (in mass or units of activity in a container closure) and the same concentration of drug substance (in mass or units of activity per unit volume) as the reference product to have the same "strength" under section 351(k)(2)(A)(i)(IV) of the PHS Act.  We note, however, that for certain complex biological products, a modified approach may be needed.

The total content of drug substance generally should be expressed using the same measure as the reference product.  For example, if the strength of the reference product is expressed as milligrams (mg) per total volume in a container closure, for example mg/5 milliliters (mL), the proposed biosimilar product generally should also describe its strength in mg/5 mL, rather than units per 5 mL.  If the total content of drug substance is expressed in units of activity (e.g., international units (IU) or units per total volume in a container closure), the units of the proposed biosimilar product should be the same as the reference product.

The concentration of the drug substance (in mass or units of activity per unit volume) generally should be expressed using the same measure as the reference product.  The extinction coefficient used to calculate the concentration of a protein drug substance should be determined experimentally, and a justification for the experimental method should be provided.  If the proposed biosimilar product is a dry solid (e.g., lyophilized) from which a constituted or reconstituted solution is prepared, then the 351(k) application should contain information demonstrating that the concentration of the proposed biosimilar product, when constituted or reconstituted, is the same as that of the reference product.

The requirement for a 351(k) application to contain information demonstrating that the proposed product and the reference product have the same "strength" applies to both biosimilar products and interchangeable products.

* * * * *

Q. I.15.   *Is a pediatric assessment under the Pediatric Research Equity Act (PREA) required for a proposed biosimilar product?*

A. I.15.   Under the Pediatric Research Equity Act (PREA) (section 505B of the FD&C Act), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain a pediatric assessment to support dosing, safety, and effectiveness of the

12

FDA001348

A.0086                           A.0086                           A.0086

*Contains Nonbinding Recommendations*

product for the claimed indication unless this requirement is waived, deferred, or inapplicable.

Section 505B(n) of the FD&C Act, added by section 7002(d)(2) of the Affordable Care Act, provides that a biosimilar product that has not been determined to be interchangeable with the reference product is considered to have a "new active ingredient" for purposes of PREA, and a pediatric assessment is required unless waived or deferred. Under the statute, an interchangeable product is not considered to have a "new active ingredient" for purposes of PREA. Therefore, if a biological product is determined to be interchangeable with the reference product, PREA would not be triggered and a pediatric assessment of the interchangeable product would not be required. However, if an applicant first seeks licensure of its proposed product as a non-interchangeable biosimilar product and intends to subsequently seek licensure of the product as interchangeable, the applicant still must address PREA requirements when it seeks initial licensure as a non-interchangeable biosimilar product.

FDA encourages prospective biosimilar applicants to submit plans for pediatric studies as early as practicable during product development. If there is no active IND for the proposed product and the sponsor intends to conduct a comparative clinical study as part of its development program, the initial pediatric study plan (PSP) should be submitted as a pre-IND submission. In this scenario, FDA encourages the sponsor to meet with FDA before submission of the initial PSP to discuss the details of the planned development program. It is expected that the sponsor will submit the initial PSP before initiating any comparative clinical study in its biosimilar development program. For more information see draft question and answer I.17 in FDA's draft guidance for industry (revision 1) on *Biosimilars: Additional Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009*, which, when finalized, will represent the Agency's current thinking on this topic. See also the draft guidance for industry, *Pediatric Study Plans: Content of and Process for Submitting Initial Pediatric Study Plans and Amended Pediatric Study Plans* (http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm360507.pdf)

## II.    PROVISIONS RELATED TO REQUIREMENT TO SUBMIT A BLA FOR A "BIOLOGICAL PRODUCT"

**Q. II.1.    *How does FDA interpret the category of "protein (except any chemically synthesized polypeptide)" in the amended definition of "biological product" in section 351(i)(1) of the PHS Act?***

A. II.1.    The BPCI Act amends the definition of "biological product" in section 351(i) of the PHS Act to include a "protein (except any chemically synthesized

13

FDA001349

A.0087                    A.0087                    A.0087

*Contains Nonbinding Recommendations*

polypeptide)" and provides that an application for a biological product must be submitted under section 351 of the PHS Act, subject to certain exceptions during the 10-year transition period ending on March 23, 2020, described in section 7002(e) of the Affordable Care Act.

FDA has developed the following regulatory definitions of "protein" and "chemically synthesized polypeptide" to implement the amended definition of "biological product" and provide clarity to prospective applicants regarding the statutory authority under which products will be regulated.

***Protein*** — The term "protein" means any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size.

For purposes of this definition, the size of the molecule is based on the total number of amino acids and is not limited to the number of amino acids in a contiguous sequence. However, compounds greater than 40 amino acids in size will be scrutinized to determine whether they are related to a natural peptide of shorter length and, if so, whether the additional amino acids raise any concerns about the risk/benefit profile of the product.

***Chemically synthesized polypeptide*** — The term "chemically synthesized polypeptide" means any alpha amino acid polymer that (1) is made entirely by chemical synthesis; and (2) is less than 100 amino acids in size.

A chemically synthesized polypeptide, as defined, is not a "biological product" and will be regulated as a drug under the FD&C Act unless the polypeptide otherwise meets the statutory definition of a "biological product."

For purposes of this definition, the size of the molecule is based on the total number of amino acids and is not limited to the number of amino acids in a contiguous sequence. However, chemically synthesized compounds greater than 99 amino acids in size will be scrutinized to determine whether they are related to a natural peptide of shorter length and, if so, whether the additional amino acids raise any concerns about the risk/benefit profile of the product.

FDA's interpretation of these statutory terms is informed by several factors, including the following. The scientific literature describes a "protein" as a defined sequence of alpha amino acid polymers linked by peptide bonds, and generally excludes "peptides" from the category of "protein." A "peptide" generally refers to polymers that are smaller, perform fewer functions, contain less three-dimensional structure, are less likely to be post-translationally modified, and thus are generally characterized more easily than proteins. Consistent with the scientific literature, FDA has decided that the term "protein" in the statutory definition of biological product does not include peptides. To enhance regulatory clarity and minimize administrative complexity, FDA has

14

*Contains Nonbinding Recommendations*

decided to distinguish proteins from peptides based solely on size (i.e., number of amino acids).

In the absence of clear scientific consensus on the criteria that distinguish proteins from peptides, including the exact size at which a chain(s) of amino acids becomes a protein, FDA reviewed the pertinent literature and concluded that a threshold of 40 amino acids is appropriate for defining the upper size boundary of a peptide. Accordingly, FDA considers any polymer composed of 40 or fewer amino acids to be a peptide and not a protein. Therefore, unless a peptide otherwise meets the statutory definition of a "biological product" (e.g., a peptide vaccine), it will be regulated as a drug under the FD&C Act.

The statutory category of "protein" parenthetically excludes "any chemically synthesized polypeptide." There are several definitions of "polypeptide" in the scientific literature. Some are broad (e.g., polypeptide means any amino acid polymer), while others are more narrow (e.g., polypeptide means any amino acid polymer composed of fewer than 100 amino acids). FDA believes that a narrow definition of polypeptide is most appropriate in this context because, among other reasons, this avoids describing an exception to the category of protein using a term that relates to a larger category of molecules. Therefore, FDA interprets the statutory exclusion for "chemically synthesized polypeptide" to mean any molecule that is made entirely by chemical synthesis and that is composed of up to 99 amino acids. Such molecules will be regulated as drugs under the FD&C Act, unless the chemically synthesized polypeptide otherwise meets the statutory definition of a "biological product."

There may be additional considerations for proposed products that are combination products or meet the statutory definition of both a "device" and a "biological product." We encourage prospective sponsors to contact FDA for further information on a product-specific basis.

**Q. II.2.**    *How is "product class" defined for purposes of determining whether an application for a biological product may be submitted under section 505 of the FD&C Act during the transition period?*

A. II.2.    For purposes of section 7002(e)(2) of the Affordable Care Act, a proposed biological product will be considered to be in the same "product class" as a protein product previously approved under section 505 of the FD&C Act on or before March 23, 2010, if both products are homologous to the same gene-coded sequence (e.g., the INS gene for insulin and insulin glargine) with allowance for additional novel flanking sequences (including sequences from other genes). Products with discrete changes in gene-coded sequence or discrete changes in post-translational modifications may be in the same product class as the previously approved product even if the result may be a change in product pharmacokinetics.

15

*Contains Nonbinding Recommendations*

For naturally derived protein products that do not have identified sequences linked to specific genes and that were approved under section 505 of the FD&C Act on or before March 23, 2010, a proposed biological product is in the same product class as the naturally derived protein product if both products share a primary biological activity (e.g., the 4-number Enzyme Commission code for enzyme activity).

However, for any protein product (whether naturally derived or otherwise), if the difference between the proposed product and the protein product previously approved under section 505 of the FD&C Act alters a biological target or effect, the products are not in the same product class for purposes of section 7002(e)(2) of the Affordable Care Act.

## III.  EXCLUSIVITY

\* \* \* \* \*

***Q. III.2.   How can a prospective biosimilar applicant determine whether there is unexpired orphan exclusivity for an indication for which the reference product is licensed?***

A. III.2.   A searchable database for Orphan Designated and/or Approved Products and indications is available on FDA's Web site, and is updated on a monthly basis (see http://www.accessdata.fda.gov/scripts/opdlisting/oopd/index.cfm).  FDA will not approve a subsequent application for the "same drug" for the same indication during the 7-year period of orphan exclusivity, except as otherwise provided in the FD&C Act and 21 CFR part 316.

FDA001352

A.0090                           A.0090                           A.0090

*Lilly*

**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

August 18, 2016

Division of Dockets Management (HFA-305)
Food and Drug Administration
Department of Health and Human Services
5630 Fishers Lane, Room 1061
Rockville, Maryland 20852

## CITIZEN PETITION

Eli Lilly and Company (Lilly) respectfully submits this petition under section 505 of the Federal Food, Drug, and Cosmetic Act (FDCA), section 351 of the Public Health Service Act (PHSA), and their implementing regulations to request that the Commissioner of Food and Drugs take the actions set forth below in Section A with respect to: (1) any abbreviated new drug application (ANDA), section 505(b)(2) application, or future biosimilar application that cites Forteo® (teriparatide [rDNA origin] injection) (new drug application (NDA) 021318) as the reference listed drug (RLD) or reference product, including ANDA No. 208569 submitted by Teva Pharmaceuticals USA Inc. (Teva); (2) revising the Agency's interpretation of the phrase "biological product" and, in particular, the phrases "protein (except any chemically synthesized polypeptide)" and "analogous product"; and (3) confirming that, as of March 23, 2020, the NDA for Forteo will be deemed a biologics license application (BLA) under the PHSA.

### A. ACTIONS REQUESTED

To promote the public health interest in ensuring safe and effective follow-on teriparatide injections, Lilly requests that the Food and Drug Administration (FDA or the Agency) take the following actions:

1. Refuse to approve any ANDA that cites Forteo as the RLD, including ANDA No. 208569 submitted by Teva;

2. Require that any section 505(b)(2) application or future biosimilar application citing Forteo as the RLD or reference product demonstrate that the proposed follow-on product is highly similar to, and has no clinically meaningful differences from, Forteo in terms of safety and effectiveness based on data derived from the analytical studies, bioassay, comparative clinical immunogenicity testing, comparative clinical pharmacokinetic (PK) and pharmacodynamic (PD) studies, and other studies described in Section IV below;

3. Determine that a follow-on teriparatide product may not be deemed therapeutically equivalent to Forteo, or alternatively, if FDA determines that therapeutic equivalence determinations with respect to Forteo are scientifically feasible, refrain from issuing

FDA001369

A.0091                     A.0091                     A.0091

such a therapeutic equivalence determination unless the applicant provides the clinical switching and alternating data described in Section V.B;

4. Initiate notice and comment rulemaking to revise the regulatory definition of "biological product" in 21 C.F.R. § 600.3(h)[1] to align with the statutory definition in the PHSA and scientific understanding of the term "protein," including by defining the phrase "protein (except any chemically synthesized polypeptide)" as "[a] linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds and manufactured by a process that utilizes a biological system" or, alternatively, regard Forteo and other amino acid polymers meeting our proposed definition but having 40 or fewer amino acids as "analogous products" and thus within the "biological product" definition; and

5. Upon March 23, 2020, deem the NDA for Forteo to be a BLA for regulatory approval purposes and require follow-on applications to proceed under section 351(k) of the PHSA at that time.

## B. STATEMENT OF GROUNDS

## I. Executive Summary Of Grounds

Forteo's active ingredient, teriparatide, is a recombinantly-derived amino acid polymer with 34 amino acids. Due to Forteo's complexity and method of manufacture, the ANDA approval pathway is inappropriate for applicants that seek approval of a follow-on teriparatide product. Regardless of whether the follow-on product is synthetically-derived, recombinantly-derived, or a salt form of teriparatide, an ANDA is inappropriate because sameness of active ingredient cannot be shown—a requirement for follow-on products seeking approval under section 505(j).[2] Approval under the ANDA pathway also is foreclosed because clinical testing will be necessary to establish the safety and effectiveness of a proposed follow-on teriparatide product, which precludes the availability of the ANDA pathway.[3] In particular, clinical testing is necessary to demonstrate that a proposed follow-on product does not present increased immunogenicity risk and has similar PK and PD profiles compared to Forteo. Given these considerations, a follow-on teriparatide application should seek approval under section 505(b)(2), not section 505(j), of the FDCA. FDA has never approved an ANDA referencing a

---

[1] Lilly has provided the exact wording of the existing regulation subject to this request in Exhibit 1, per 21 C.F.R. § 10.30(b)(3). The proposed amendments requested are described in Action Requested number 4 and Section VI of this petition.

[2] FDCA § 505(j)(2)(A)(ii)(I). FDA regulations define "active ingredient" to mean "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect." 21 C.F.R. § 210.3(b)(7). Similarly, "drug substance" is defined as "an active ingredient that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease or to affect the structure or any function of the human body, but does not include intermediates use in the synthesis of such ingredient." *Id.* § 314.3(b).

[3] *See* FDCA § 505(j)(2)(A). *See also id.* § 505(j)(2)(C)(i).

2

recombinantly-derived product, and these facts do not justify departure from the Agency's precedent.

When determining whether a follow-on teriparatide product has been shown to be sufficiently similar to Forteo to justify approval under section 505(b)(2), FDA should adopt scientific requirements that align with biosimilarity principles. In light of Forteo's complexity and method of manufacture, the principles of biosimilarity are well-suited to guide the Agency in assessing the similarity between a proposed follow-on teriparatide product and Forteo, and to ensure that a proposed follow-on product has no clinically meaningful differences from Forteo in term of safety or effectiveness. Indeed, the Agency has noted that the scientific considerations for demonstrating biosimilarity may be applicable to biological products seeking approval under section 505(b)(2).[4] Among other requirements, FDA should require follow-on teriparatide applicants to undertake a stepwise testing approach that includes the comparative structural and functional analyses, comparative clinical immunogenicity study, and clinical PK and PD testing described in Section IV.

FDA also should not determine that a follow-on teriparatide product is therapeutically equivalent to, i.e., substitutable for, Forteo. Because a follow-on teriparatide product cannot be shown to have the same active ingredient as Forteo with current analytical techniques, it also cannot be shown to be pharmaceutically equivalent to Forteo—a prerequisite for a therapeutic equivalence determination.[5] Therefore, Lilly requests that FDA conclude it cannot issue an "A" rating to a follow-on product referencing Forteo. Alternatively, even if FDA concludes that a follow-on applicant could establish *pharmaceutical* equivalence to Forteo, this would not be enough to assure that the follow-on product "can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product,"[6] as is required for a *therapeutic* equivalence determination. Instead, due to potential immunogenicity risks from switching and alternating between amino acid polymers, clinical studies demonstrating no increased risk in terms of safety or diminished efficacy from switching and alternating between Forteo and the follow-on product would be necessary to make this showing. In other words, as a scientific matter, FDA should use the criteria for establishing "interchangeability" of biosimilars, as described in section 351(k)(4) of the PHSA, in determining whether a follow-on teriparatide product is therapeutically equivalent to Forteo.

Finally, FDA should conduct notice and comment rulemaking to revise its interpretation of "biological product" in section 351(i)(1) of the PHSA to align with that statute and scientific understanding of the term "protein." FDA's purported interpretation of "protein"—which, following enactment of the Biologics Price Competition and Innovation Act (BPCIA), is now included in the statutory definition of "biological product"—in agency guidance[7] must be abandoned, as it conflicts with the PHSA and FDA's regulations and is arbitrary and capricious.

---

[4] *See* FDA, Guidance for Industry, Scientific Considerations in Demonstrating Biosimilarity to a Reference Product, at 3 (Apr. 2015) (Scientific Considerations Guidance).

[5] FDA, *Approved Drug Products with Therapeutic Equivalence Evaluations*, at vii (36th ed. 2016) (*Orange Book*).

[6] *Id.*, at vii-viii.

[7] FDA, Guidance for Industry, Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009, at 13-15 (Apr. 2015) (Biosimilars Q&A Guidance).

FDA001371

A.0093                    A.0093                    A.0093

Instead, FDA should promulgate a rule that defines the statutory phrase "protein (except any chemically synthesized polypeptide)" to mean: "A linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds and manufactured by a process that utilizes a biological system." Even if the Agency retains its current interpretation of "protein," however, the PHSA is clear that products "analogous" to proteins—which would certainly include recombinantly-derived amino acid polymer products like teriparatide—constitute biological products.[8] Consequently, the Forteo NDA should be deemed a BLA under section 351(a) of the PHSA on March 23, 2020.[9] Thereafter, follow-on applications referencing Forteo should proceed through the biosimilar pathway in section 351(k) of the PHSA.

## II.   Background

### A.   Forteo®

Forteo is a recombinant analog of human parathyroid hormone (PTH). The active ingredient in Forteo, teriparatide, is manufactured using a strain of *Escherichia coli* modified by recombinant DNA technology.[10] Teriparatide has an identical sequence to the first 34 amino acids of the 84-amino acid PTH, the biologically active region of the endogenous hormone (see Figure 1).[11]

**Figure 1.  Amino Acid Sequence of Teriparatide**



In addition to its primary amino acid sequence, teriparatide has a distinct higher-order structure, consisting of 33% alpha helical and 32% beta-sheet content, that resides primarily on the N-terminal region of the amino acid sequence.[12]

---

[8] *See* PHSA § 351(i)(1) (defining "biological product" to mean "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), *or analogous product*," among other things) (emphasis added).

[9] *See* BPCIA, Pub. L. No. 111-148 § 7002(e)(4),124 Stat. 119, 817 (2010).

[10] Forteo Prescribing Information, Description (Section 11).

[11] *Id.*

[12] *See* Torosantucci et al., *Oxidation of Therapeutic Proteins and Peptides: Structural and Biological Consequences*, 31 PHARM. RES. 541, 549 (2014) (Exhibit 2). *See also* Klaus et al., *Investigation of the Solution Structure of the Human Parathyroid Hormone Fragment (1-34) by [1]H NMR Spectroscopy,*

4

Forteo is indicated for treatment of postmenopausal women with osteoporosis at high risk for fracture, increase of bone mass in men with primary or hypogonadal osteoporosis at high risk for fracture, and treatment of men and women with osteoporosis associated with sustained systemic glucocorticoid therapy at high risk for fracture.[13]  Forteo is provided in a multi-dose prefilled delivery device (pen) for subcutaneous injection and labeled for administration into the thigh or abdominal wall.[14]  The inactive ingredients in Forteo are glacial acetic acid, sodium acetate (anhydrous), mannitol, metacresol, and water for injection, as well as hydrochloric acid solution 10% and/or sodium hydroxide solution 10% as necessary to adjust the product to pH 4.[15]

In Forteo, teriparatide is in free base, not salt, form.[16]  During its manufacture, the drug substance is solvent-exchanged into an acetate buffer and subsequently lyophilized.  As a result, teriparatide contains a small amount of residual acetate.  Teriparatide is evaluated for any residual acetate, and the regulatory acceptance specification for acetate in Forteo is not more than 5.0%. This is also the acetate content acceptance criterion set forth in the current United States Pharmacopeia (USP) monograph for Teriparatide.[17]

### B.    USP Monograph For Teriparatide

The USP monograph for teriparatide identifies the drug substance as having a molecular formula of $C_{181}H_{291}N_{55}O_{51}S_2$ and a molecular weight of 4117.72 Daltons.[18]  The monograph defines the substance further as:

> a single-chain peptide containing 34 amino acids identical to the 34 N-terminal amino acids of human parathyroid hormone. Teriparatide is produced by a method based on recombinant DNA (rDNA) technology. . . .  It contains NLT 95.0% and NMT 105.0% of teriparatide ($C_{181}H_{291}N_{55}O_{51}S_2$), calculated on the anhydrous, acetic acid-free, chloride-free basis.[19]

---

*Distance Geometry, and Molecular Dynamics Calculations*, 30 BIOCHEMISTRY 6936 (1991) (Exhibit 3); Marx et al., Structure of Human Parathyroid Hormone 1-37 in Solution, 270 J. BIOL. CHEM. 15194 (1995) (Exhibit 4).

[13] Forteo Prescribing Information, Indications and Usage (Section 1).

[14] *Id.*, Dosage Form and Strengths (Section 3) & Administration (Section 2.4).

[15] *Id.*, Description (Section 11).

[16] Indeed, the United States Pharmacopeia determined that the monograph title for the drug substance should be "Teriparatide" instead of "Teriparatide Acetate."  USP, Commentary, USP 39-NF 34 (Nov. 2, 2015), at 63 (Exhibit 5); *see also* FDA, Guidance for Industry, Naming of Drug Products Containing Salt Drug Substances, at lines 49-51, 174-78 (June 2015) (explaining that the USP monograph titles for drug substances (i.e., active ingredients) will include the salt name) (Salt Naming Guidance).

[17] USP MONOGRAPH, Teriparatide, at 6060 (39th ed., Aug. 1, 2016) (Exhibit 6).

[18] *Id.*, at 6058.

[19] *Id.*  The current USP monograph provides that "Teriparatide is available as an acetate salt form, which is a white to almost white powder."  *Id.*  The monograph is in the process of being corrected with a scheduled publication date of September 1, 2016, and USP has confirmed that this phrase will be

5

The monograph provides acceptance criteria for other components (such as acetate residue, described above) and product-related impurities.

The USP monograph for teriparatide is limited to recombinant teriparatide. As noted, the monograph defines teriparatide as "produced by a method based on recombinant DNA (rDNA) technology."[20] Moreover, when a commenter requested that the monograph also refer to synthetic teriparatide, USP rejected the comment.[21] Similarly, USP: (1) refused to exempt synthetic teriparatide from the requirement for chloride content—which was suggested because trifluoroacetic acid, not chloride, is "involved in the synthetic process of teriparatide acetate, which is produced as acetate salt"; and (2) refused to add a "different basis of assay calculation for synthetic teriparatide"—which was suggested because the "production of synthetic teriparatide does not involve chloride at any stage therefore the calculation of assay for synthetic teriparatide is on an anhydrous, acetic acid free basis."[22] Therefore, the USP monograph encompasses only recombinant, not synthetic, teriparatide.

### C.   Teva's Paragraph IV Notice Letter And Proposed Product

Teva sent Lilly a notice of Paragraph IV certification and memorandum (collectively, Notice Letter) dated February 3, 2016. The Notice Letter indicates that Teva filed a section 505(j) application referencing Forteo, provides notice of Teva's Paragraph IV certifications with respect to the patents listed in the *Orange Book* for Forteo,[23] and explains the basis for Teva's belief that the manufacture, use, or sale of Teva's proposed product would not infringe these patents.

The Notice Letter claims that Teva's proposed product will not infringe the *Orange Book*-listed patents for Forteo because Teva's proposed product, among other things: (1) "does not contain 2.5 mg m-cresol, 50 mg mannitol, 0.52 mg acetic acid and 0.12 mg sodium acetate, or equivalents thereof";[24] and (2) "will not be prepared by 'combining human PTH (1-34) at a concentration of 100 μg/ml to 500 μg/ml' with the other excipients [plyol stabilizing agent, a buffering system to maintain the pH range of the solution from greater than 3 to 6, and a parenterally acceptable preservative] or an equivalent thereof."[25] Because Teva's proposed

---

changed to read: "Teriparatide is a white to almost white powder." Regardless, the current language does not indicate that Forteo is a salt, as evidenced by the USP's decision to title the monograph "Teriparatide." *See supra* note 16.

[20] USP MONOGRAPH, Teriparatide, at 6058 (39th ed., Aug. 1, 2016).

[21] *See* USP, Commentary, USP 39-NF 34 (Nov. 2, 2015), at 63 (explaining that "[t]he only FDA approved product in the US is recombinantly produced Teriparatide"); *id.* (noting that the Expert Committee would not consider this revision without receiving supporting data).

[22] *Id.*, at 64-65.

[23] In connection with NDA 021318, FDA has listed the following patents: U.S. Patent Nos. 6,770,623; 6,977,077; 7,144,861; 7,163,684; 7,351,414; 7,517,334; and 7,550,434. *Orange Book*, ADA 206.

[24] Notice Letter, at 48 (Exhibit 7).

[25] *Id.*, at 59.

FDA001374

A.0096                          A.0096                          A.0096

product appears to be synthetically manufactured, Lilly believes that it is a salt form of teriparatide (i.e., salt bound).[26]

### D.    Legal And Regulatory Background

####    1.    Relevant Requirements For Approval Of An ANDA

An application is eligible for approval under section 505(j) of the FDCA if it "is a duplicate of a listed drug."[27]  Such an application must contain information to show that the active ingredient in the proposed generic drug product "is the same as that of the listed drug," and that the proposed product has the same strength as the listed drug, among other things.[28]  FDA's implementing regulations provide in relevant part that "same as" means "identical in active ingredient(s)."[29]  With respect to this requirement, FDA has stated that it "will consider an active ingredient to be the same as that of the reference listed drug if it meets the same standards for identity."[30]

In general, if a USP monograph exists for the drug substance, the standards for identity are those of the USP monograph.[31]  This generally refers to the definition at the beginning of the monograph, e.g., the chemical name, empirical formula, molecular structure, and description.[32]  In addition, if there is a change in an inactive ingredient so that the proposed generic product does not comply with an official compendium (e.g., the USP), FDA will consider the drug

---

[26] *See* FDA List of Drug Master Files Received by June 30, 2016, http://www.fda.gov/downloads/Drugs/DevelopmentApprovalProcess/FormsSubmissionRequirements/DrugMasterFilesDMFs/UCM370723.txt (listing Teva Pharmaceutical Industries Ltd. as holder of drug master file for "teriparatide acetate").

[27] FDA, Draft Guidance, Guidance for Industry, Applications Covered by Section 505(b)(2), at 6 (Oct. 1999) (505(b)(2) Draft Guidance).  *See also* 21 C.F.R. § 314.101(d)(9).

[28] FDCA § 505(j)(2)(A)(ii)(I)&(iii); *see also id.* § 505(j)(2)(C) (providing that a suitability petition is required of proposed changes in strength in an ANDA).  Even if a proposed follow-on teriparatide applicant could demonstrate sameness in active ingredient (which it currently cannot, as discussed below), as a scientific matter, the applicant would need to adhere to the World Health Organization (WHO) international standard for recombinant PTH (1-34) to accurately demonstrate sameness in strength.  B. Rafferty & R.E. Gaines-Das, Expert Committee on Biological Standardization, World Health Organization, WHO/BS/07.2063, WHO International Collaborative Study of the Proposed 1st International Standard for Parathyroid Hormone 1-34, Recombinant, Human, at 2 (2007), http://www.who.int/biologicals/expert_committee/BS2063%20parathyroid%20homone.pdf.  In the laboratories that participated in the international standard-setting study, "significant" differences were observed in measurements of mass units of recombinant PTH (1-34) across laboratories.  *Id.*, at 9.  The WHO standard therefore was developed to ensure accuracy of the measurement of mass units of recombinant PTH (1-34), and the stated strength of any follow-on product, whether synthetic or recombinant, should be confirmed pursuant to the WHO standard.

[29] 21 C.F.R. § 314.92(a)(1).

[30] 57 Fed. Reg. 17950, 17959 (Apr. 28, 1999).

[31] *Id.*

[32] FDA, Guidance for Industry, ANDAs: Pharmaceutical Solid Polymorphism, Chemistry, Manufacturing, and Controls Information, at 5 (July 2007) (Polymorphism ANDA Guidance).

FDA001375
A.0097                            A.0097                            A.0097

composition unsafe and refuse to approve the ANDA.[33]  The Agency also recommends that if the USP monograph includes a limit for a specified impurity, the acceptance criteria for the impurity in the ANDA be set no higher than this compendial limit.[34]  In some cases, FDA may "prescribe additional standards that are material to the ingredient's sameness" beyond those provided by the USP monograph.[35]

In addition to information showing that the active ingredient is the same as that in the listed drug, an ANDA must contain information to show that the proposed generic drug is bioequivalent to the RLD.[36]  A proposed drug is considered bioequivalent if "the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses."[37]  FDA's implementing regulations further provide that bioequivalence is "the absence of a significant difference in the rate and extent to which the active ingredient or active moiety . . . becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study."[38]  If clinical data on safety and effectiveness of the proposed generic drug are necessary, however, the ANDA approval pathway is not available to an applicant:  FDA "may not require that an abbreviated application contain information in addition to that required by clauses (i) through (viii) [of section 505(j)(2) of the FDCA]."[39]

<div align="center">2.   Requirements For Approval Of A 505(b)(2) Application</div>

In contrast, there is no "sameness" requirement for an application submitted under section 505(b)(2).[40]  Indeed, a drug subject to a section 505(b)(2) application must *not* be

---

[33] 21 C.F.R. § 314.127(a)(8)(ii)(A)(*1*).

[34] FDA, Guidance for Industry, ANDAs: Impurities in Drug Substances, at 3 (June 2009).

[35] 57 Fed. Reg. at 17959.  *See also* Polymorphism ANDA Guidance, at 5 ("FDA may prescribe additional standards that are material to the *sameness* of a drug substance.").

[36] FDCA § 505(j)(2)(A)(iv); 21 C.F.R. §§ 314.94(a)(7), 314.127(a)(6)(i).

[37] FDCA § 505(j)(8)(B)(i).

[38] 21 C.F.R. § 320.1(e).

[39] FDCA § 505(j)(2)(A).  *See also* 505(b)(2) Draft Guidance, at 3 ("An applicant should file a 505(b)(2) application if it is seeking approval of a change to an approved drug that would not be permitted under section 505(j), because approval will require the review of clinical data."); FDCA § 505(j)(2)(C)(i) (providing that, in the context of suitability petitions, an ANDA is not appropriate when "investigations must be conducted to show the safety and effectiveness of the drug or any of its active ingredients").

[40] Letter from Steven K. Galson, M.D., M.P.H., Director, CDER, to Kathleen M. Sanzo, Esq., Morgan, Lewis & Bockius, LLP, et al., Docket Nos. 2004P-0231/CP1 and SUP 1, 2003P-0176/CP1 and EMC1, 2004P-0171/CP1, and 2004N-0355, at 13 (May 30, 2006).  *See also* Letter from Janet Woodcock, M.D. Director, CDER, to Katherine M. Sanzo, Esq., and Lawrence S. Ganslaw, Esq., Morgan, Lewis & Bockius, LLP, et al., Docket Nos. 2001P-0323/CP1 & C5, 2002P-0447/CP1, and 2003P-0408/CP1, at 18 (Oct. 14, 2003) (noting "FDA's longstanding interpretation that products under 505(b)(2) applications, unlike those under ANDAs, need not be duplicates of the listed drugs referenced") (505(b)(2) Citizen Petition Response).

<div align="center">8</div>

identical to the previously approved drug—otherwise, it should be submitted in an ANDA.[41]
"[I]nstead of establishing sameness of active ingredients, a 505(b)(2) applicant must provide
evidence showing that the active ingredient of the proposed product is sufficiently similar to that
of the reference drug to permit reliance on [FDA's] finding of safety and effectiveness for the
listed drug to support approval."[42]  A 505(b)(2) application may be submitted when the applicant
has changed a previously approved drug product with respect to its active ingredient, among
other changes.[43]  In such a submission, an applicant must provide "[s]tudies necessary to
support the change or modification from the listed drug . . . ."[44]  FDA has explained that "[a]n
application for a drug product containing an active ingredient(s) derived from animal or botanical
sources or recombinant technology" may be pursued under section 505(b)(2).[45]

### III.    FDA Should Refuse to Approve Any ANDA Citing Forteo As The RLD.

An ANDA applicant cannot satisfy the statutory requirement for "sameness" of active
ingredient between its proposed product and Forteo, and clinical safety and effectiveness
testing is necessary to evaluate any proposed follow-on teriparatide drug product.  As a result,
the ANDA approval pathway is inappropriate for follow-on applications referencing Forteo, and
FDA should refuse to approve any ANDA that cites Forteo as the RLD, including Teva's ANDA
No. 208569.

#### A.    An ANDA Cannot Satisfy The Statutory Requirement For "Sameness" Of Active Ingredient.

As noted, to meet the statutory requirement for "sameness," the active ingredient in the
proposed product must be identical to, i.e., meet the same standards of identity as, the RLD.
Neither a synthetic follow-on product nor a recombinant follow-on product can be shown to meet
this requirement.  Nor can a follow-on product that is a salt of teriparatide meet the ANDA
requirement for sameness in active ingredient to Forteo.  As a result, both synthetic and
recombinant follow-on teriparatide products are not appropriate for approval under the ANDA
pathway.

---

[41] 505(b)(2) Draft Guidance, at 6.

[42] Letter from Janet Woodcock, M.D., Director, CDER, to David L. Rosen, B.S. Pharm., J.D., Foley &
Lardner, LLP, Docket No. FDA-2005-P-0367, at 20 (Nov. 17, 2008) (Miacalcin Citizen Petition Response).

[43] 505(b)(2) Draft Guidance, at 5.

[44] *Id.*, at 8.  *See also* 21 C.F.R. § 314.54(a) ("Any person seeking approval of a drug product that
represents a modification of a listed drug (e.g., a new indication or new dosage form) and for which
investigations, other than bioavailability or bioequivalence studies, are essential to the approval of the
changes may, except as provided in paragraph (b) of this section, submit a 505(b)(2) application.  This
application need contain only that information needed to support the modification(s) of the listed drug.").

[45] 505(b)(2) Draft Guidance, at 5.  *See also* FDA, Guidance for Industry, Quality Considerations in
Demonstrating Biosimilarity of a Therapeutic Protein Product to a Reference Product, at 4 (Apr. 2015)
(Quality Considerations Guidance) ("In October 1999, FDA issued the draft guidance for industry
*Applications Covered by Section 505(b)(2)*, which, among other things, states that FDA may accept an
application submitted through the approval pathway described by section 505(b)(2) of the [FDCA] for a
drug product containing an active ingredient(s) derived from natural sources or recombinant DNA
technology.  For example, FDA approved a 505(b)(2) application for a follow-on recombinant DNA-
derived human growth hormone product in May 2006.").

FDA001377
A.0099                    A.0099                    A.0099

1.      Neither A Synthetic Follow-On Product Nor A Recombinant Follow-On
         Product Can Meet The "Sameness" Requirement.

To determine sameness, the RLD must be adequately characterized and the active ingredient sufficiently defined.[46]  FDA has acknowledged that complex amino acid polymers generally cannot be fully characterized using current analytical techniques.[47]  They are large, intricate products, and their "specific conformations . . . can be critical to biological activity."[48]  Yet, as the Agency has noted, despite advances in analytical techniques, "current analytical methodology may not be able to detect all relevant structural and functional differences between two protein products."[49]  This is in stark contrast to small-molecule drugs, "whose structure can usually be completely defined and entirely reproduced[.]"[50]  FDA has also explained that excipients can thwart the ability to fully characterize a protein product, which is of significant concern because "even minor structural differences . . . can significantly affect a protein's safety and/or effectiveness[.]"[51]

Because Forteo is a recombinantly-derived amino acid polymer, it cannot be fully characterized, and a follow-on applicant cannot demonstrate "sameness" in active ingredient. As the Director of the Center for Drug Evaluation and Research (CDER) has observed, in contrast to small-molecule drugs and "the very simplest peptide products for which manufacturers may be able to demonstrate that they contain the same active ingredient as the innovator product and thus may be considered under [section] 505(j),"[52] follow-on versions "of approved protein products that are regulated as drugs would currently be considered for abbreviated applications under [section] 505(b)(2), as scientific techniques are not available to demonstrate sameness of these types of molecules."[53]  Similarly, in a citizen petition response,

---

[46] Letter from Janet Woodcock, M.D., Director, CDER, to Stuart J. Land et al., Arnold & Porter, and Nancy L. Buc, Buc & Beardsley, Docket No. 98P-0311/CP1, at 7  (Mar. 24, 1999) (Premarin Citizen Petition Response).

[47] Quality Considerations Guidance, at 6 ("Despite improvements in analytical techniques, current analytical methodology may not be able to detect or characterize all relevant structural and functional differences between the two protein products.").  *See also* Woodcock et. al., *The FDA's Assessment of Follow-On Protein Products: A Historical Perspective*, 6 NAT. REV. DRUG DISCOV. 437, 438 (2007) (Exhibit 8).

[48] Woodcock, *supra* note 47, at 438.

[49] Scientific Considerations Guidance, at 5.

[50] *Id.*

[51] *Id.*

[52] Although FDA has approved ANDAs for certain synthetic peptide products, *see* Letter from Janet Woodcock, M.D., Director, CDER, to Sarfaraz K. Niazi, Ph.D., Therapeutic Proteins, Inc., Docket No. 2009-P-0004, at 4 (Feb. 24, 2012) (Therapeutic Proteins Petition Response), most of these peptides are significantly smaller than Forteo and, in any case, they all referenced RLDs that were also synthetically made.  These include:  octreotide acetate (8 amino acids), desmopressin acetate (9 amino acids), leuprolide acetate (9 amino acids), oxytocin (9 amino acids), and calcitonin-salmon (32 amino acids).

[53] *Assessing the Impact of a Safe and Equitable Biosimilar Policy in the United States: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 110th Cong. 20, 42 (2007) (statement of Janet Woodcock, M.D., Deputy Commissioner and Chief Medical Officer, FDA), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-110hhrg40500/pdf/CHRG-110hhrg40500.pdf.  As noted in Section VI, below, Lilly believes that teriparatide is a "protein" as defined in the PHSA.  Even if it were properly

10

FDA001378

A.0100                              A.0100                              A.0100

FDA stated: "Because of the complexity of protein molecules and limitations of current analytical methods, it would be difficult for manufacturers of proposed protein products to demonstrate that the active ingredient in their proposed product is *identical* to the active ingredient in an already approved product."[54]  Indeed, approval of an ANDA referencing a recombinantly-derived RLD would be unprecedented:  to our knowledge, FDA has never approved an ANDA referencing a recombinantly-derived product.[55]

Instead, when faced with similar situations, the Agency has approved follow-on recombinant drugs under section 505(b)(2).  For example, FDA approved a 505(b)(2) application for GlucaGen® (glucagon [rDNA origin] for injection)—a 29-amino acid polymer produced by expression of recombinant DNA in a *Saccharomyces cerevisiae* vector with subsequent purification[56]—in 1998.[57]  Similarly, in 2005, FDA approved Fortical® (calcitonin-salmon [rDNA origin]) Nasal Spray—a 32-amino acid polymer manufactured using recombinant technology[58]—pursuant to a section 505(b)(2) application referencing Miacalcin, a synthetically-manufactured form of calcitonin-salmon.[59]  FDA later stated that it "would expect that the salmon calcitonin nasal spray product in a 505(b)(2) application would have differences from the [synthetic] RLD (e.g., *an active ingredient manufactured through recombinant technology*, a different impurity profile) that would make it inappropriate for review under an ANDA."[60]  This determination is an example of the Agency concluding that a recombinantly-derived active ingredient is not the same as a synthetically-derived active ingredient, and that the 505(b)(2) pathway is the appropriate pathway where one of the products is synthetically-derived (there, the RLD), and one is recombinantly-derived (there, the follow-on product).  The same principle applies to synthetically-derived follow-on teriparatide products, where the manufacturing processes for the products are equally discordant (a recombinantly-derived RLD and a synthetically-derived follow-on product).  Further, the Agency's practice with respect to follow-on

---

considered a polypeptide that is not a protein, however, the quoted testimony applies to teriparatide based on the definitions used therein.  *See id.*, at 25 ("For purposes of this discussion, I will use the term *protein products* to refer to certain biological products licensed under the PHS Act and to certain protein and peptide products approved under the FD&C Act.") (emphasis in original).

[54] Therapeutic Proteins Petition Response, at 4 (emphasis in original).

[55] *See Assessing the Impact of a Safe and Equitable Biosimilar Policy in the United States: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 110th Cong. 57 (2007) (statement of Janet Woodcock, M.D., Deputy Commissioner and Chief Medical Officer, FDA) ("We have not approved any proteins really under the (j) process, any recombinant proteins.").

[56] GlucaGen Prescribing Information, Description (Section 11).

[57] Letter from Solomon Sobel, M.D., Director, Division of Metabolic and Endocrine Drug Products, CDER, to Novo Nordisk Pharmaceuticals, Inc., Approval Letter for NDA 20-918 (June 22, 1998).

[58] Fortical Prescribing Information, Description (Section 11).

[59] *See* Letter from David G. Orloff, M.D., Director, Division of Metabolic and Endocrine Drug Products, CDER, to Unigene Laboratories, Inc., Approval Letter for NDA 21-406 (Aug. 12, 2005); Letter from Steven K. Galson, M.D., M.P.H., Acting Director, CDER, to Nancy L. Buc and Carmen M. Shepard, Buc & Beardsley, Docket No. 2004P-0015/CP-1, at 8 (Aug. 12, 2005).

[60] Miacalcin Citizen Petition Response, at 21 (emphasis added).

11

recombinant products has been consistent and establishes that a 505(b)(2) application, not a 505(j) application, is necessary.[61]

The rare instances where FDA has determined that a showing of active ingredient sameness could be made for complex products are readily distinguishable from the circumstances surrounding Forteo. In the cases of Lovenox® (enoxaparin sodium injection) and Copaxone® (glatiramer acetate injection), neither the RLD nor the follow-on product were recombinantly-derived. Lovenox is naturally-derived, and Copaxone is synthetically-derived. Also, the proposed generic products in both the Lovenox and Copaxone cases had *equivalent manufacturing processes* to their respective RLDs with respect to fundamental steps.[62] With respect to Lovenox, the Agency required ANDA applicants to show "[e]quivalence of heparin source material and mode of depolymerization" among other things.[63] As for Copaxone, FDA explained that to show sameness, "the active ingredient of a generic glatiramer acetate injection [must be] produced by an equivalent fundamental reaction scheme."[64] Here, however, Teva's proposed product uses a fundamentally different manufacturing process than that used for Forteo, synthetic versus recombinant respectively, and as detailed below, the manufacturing dissimilarity can result in significant differences in the safety and efficacy profiles of the respective products. Furthermore, it is unlikely that the manufacturer of a *recombinantly*-derived follow-on teriparatide would use an equivalent manufacturing process to Lilly.[65] In short, neither Lovenox nor Copaxone provides relevant precedent regarding a showing of sameness to a recombinant RLD.

FDA's practice of requiring section 505(b)(2) applications must continue for proposed teriparatide follow-on products based on considerations related to Forteo's higher-order structure. First, differences in the follow-on manufacturing process could alter the product's higher-order structure so that it differs from that of Forteo. Researchers have concluded that

---

[61] *See* Letter from Jean-Marc Guettier, MD, Director, Division of Metabolism and Endocrinology Products, CDER, to Eli Lilly and Company, Approval Letter NDA 205692 (Dec. 16, 2015) (approval of section 505(b)(2) application for Basaglar (insulin glargine injection) produced by recombinant DNA technology); Letter from Robert J. Meyer, M.D., Director, Office of Drug Evaluation II, CDER, to Sandoz Inc., Approval of NDA 21-426 (May 30, 2006) (approval of section 505(b)(2) application for Omnitrope (somatropin [rDNA origin])); Letter from Mark J. Goldberger, M.D., M.P.H., Director, Office of Antimicrobial Products, CDER, to Halozyme Therapeutics, Inc., Approval Letter for NDA 21-859 (Dec. 2, 2005) (approval of section 505(b)(2) application for Hylenex recombinant (hyaluronidase human injection)).

[62] *See* Letter from Douglas Throckmorton, M.D., Deputy Director, CDER, to Peter O. Safir & Scott L. Cunningham, Covington & Burling, Docket No. FDA-2003-P-0273, at 11, 13-16 (Jul. 23, 2010) (Lovenox Citizen Petition Response); Letter from Janet Woodcock, M.D., Director, CDER, to J. Michael Nicholas, Ph.D., Teva Pharmaceuticals, Docket No. FDA-2015-P-1050, at 22-23, 25-28 (Apr. 16, 2015) (Copaxone Citizen Petition Response).

[63] Lovenox Citizen Petition Response, at 11.

[64] Copaxone Citizen Petition Response, at 22. Similar factors differentiate this case from the Pergonal case, in which both the RLD and follow-on products were naturally-derived and the follow-on applicant used the same natural source material as the innovator. *See Serono v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

[65] Scientific Considerations Guidance, at 6 ("[T]he manufacturer of a proposed [biosimilar] product is likely to have a different manufacturing process (e.g., different cell line, raw materials, equipment, processes, process controls, and acceptance criteria) from that of the reference product and no direct knowledge of the manufacturing process for the reference product.")

12

FDA001380

A.0102                      A.0102                      A.0102

teriparatide's higher-order structure "seems to be essential for receptor binding," and that it protects key residues of teriparatide from problematic oxidation.[66]  For instance, oxidation of the Met 8 amino acid residue, which is located near the N-terminal region, may induce aggregation and fragmentation and result in "substantial change[s]" in the higher-order structure of the drug substance.[67]  Oxidation of Met 8 also results in the suppression of biological activity.[68]  While the higher-order structure of teriparatide protects Met 8 against oxidation, this structure may be disrupted by a different manufacturing process, such as a synthetically-derived process.  In addition, other aspects of the follow-on manufacturing process (e.g., production, purification) could lead to increased oxidative species.[69]  FDA has determined that a recombinant follow-on product would be subject to review and approval under the 505(b)(2) pathway, not the ANDA approval pathway, even where the RLD's drug substance did *not* exhibit significant higher-order structure in the RLD formulation.[70]  Because teriparatide *does* exhibit a distinct and significant higher-order structure, it is clear that a 505(j) application is inappropriate.

Finally, a synthetically-derived follow-on teriparatide product is not eligible for ANDA approval for two additional reasons.  First, the synthetic product would not meet the USP monograph for teriparatide.  An ANDA product must comply with the compendial standards for identity,[71] including the current USP monograph for teriparatide, which is limited to recombinantly-derived teriparatide.  As the Agency observed in the context of Duramed's section 505(b)(2) application for a proposed synthetic follow-on to naturally-derived Premarin, "any synthetic conjugated estrogens drug product will not be labeled 'USP' until such time as a drug monograph for synthetic conjugated estrogens is adopted.  The current USP drug monographs for conjugated estrogens do not apply to Duramed's synthetic conjugated estrogens drug product."[72]  In that case, Duramed was not required to show sameness of active ingredient, including compliance with the same standards of identity, because it pursued the section 505(b)(2) pathway.  An ANDA applicant, however, must do so.  That FDA may institute additional requirements to establish the sameness of the drug substance does not obviate the underlying requirement that the proposed ANDA product comply with the standards set forth in the monograph.  Because that requirement is not met by a synthetically-derived teriparatide, "sameness" cannot be established, and the 505(j) approval pathway is unavailable to the follow-on applicant.

Second, as a technical matter, a synthetically-derived follow-on teriparatide product cannot satisfy the same labeling requirement for ANDAs with respect to nonproprietary name,[73]

---

[66] Torosantucci, *supra* note 12, at 549.

[67] *Id.*

[68] *See id.  See also* Neugebauer et al., *Solution Structure and Adenylyl Cyclase Stimulating Activities of C-Terminal Truncated Human Parathyroid Hormone Analogues*, 34 BIOCHEMISTRY 8835 (1995) (Exhibit 9); Marx et al., *Structure-activity Relation of NH$_2$-terminal Human Parathyroid Hormone Fragments*, 273 J. BIOL. CHEM. 4308 (1998) (Exhibit 10); Pellegrini et al., *Addressing the Tertiary Structure of Human Parathyroid Hormone* (1-34), 273 J. BIOL. CHEM. 10420 (1998) (Exhibit 11).

[69] Torosantucci, *supra* note 12, at 541.

[70] Miacalcin Citizen Petition Response, at 9-10.

[71] 57 Fed. Reg. at 17959.

[72] Premarin Citizen Petition Response, at 8.

[73] *See* FDCA § 505(j)(2)(A)(v); 21 C.F.R. § 314.94(a)(8).

13

further solidifying that a 505(j) application is inappropriate for such a product. As the District of Columbia Circuit confirmed with respect to this requirement, "[t]he rule mandating inclusion of the established nonproprietary name on the label means that a generic drug must have the same nonproprietary name as the pioneer drug for the FDA to approve the generic drug through the ANDA process."[74] The established name for Forteo refers to its recombinant manufacture (i.e., teriparatide [rDNA origin] injection). Thus, a synthetically-derived follow-on teriparatide product cannot have the same established name as Forteo and therefore, cannot meet this same labeling requirement.[75] Indeed, in the Premarin case, the Agency determined that the nonproprietary name of a follow-on product derived from a different manufacturing process should reflect that distinction.[76] FDA explained it was "useful to make a clear distinction between synthetic and nonsynthetic drug products" and adopted "synthetic conjugated estrogens, A" as the nonproprietary name for Duramed's product.[77]

### 2. A Salt of Teriparatide Is Not The "Same As" Teriparatide In Active Ingredient.

FDA's longstanding position is that a salt and free base of the same active moiety are different active ingredients. The active moiety of a drug is the substance in the drug product that achieves the intended treatment effect,[78] and it can exist in different chemical forms, including salts and free bases. Since the 1970s, FDA has taken the position that pharmaceutically equivalent products are drug products that, among other things, contain "identical amounts of the identical active ingredient, i.e., the same salt or ester of the same therapeutic moiety, in the same dosage forms . . . ."[79] By contrast, the Agency has termed products that contain the identical therapeutic moiety but in a different salt form to be "pharmaceutical alternatives."[80] In short, FDA's view is that "each salt or ester of a therapeutic

---

[74] *Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 346 (D.C. Cir. 2006).

[75] FDA has recognized the importance of having distinguishable nonproprietary names for biological products to enhance pharmacovigilance practices and help with the traceability of adverse events that might emerge in the postmarket setting. *See, e.g.*, FDA, Draft Guidance for Industry: Nonproprietary Naming of Biological Products, at 6 (Aug. 2015).

[76] Premarin Citizen Petition Response, at 9.

[77] *Id.*

[78] 21 C.F.R. § 314.108(a) (defining "active moiety" to mean "the molecule or ion, excluding those appended portions of the molecule that cause the drug to be an ester, salt (including a salt with hydrogen or coordination bonds), or other noncovalent derivative (such as a complex, chelate, or clathrate) of the molecule, responsible for the physiological or pharmacological action of the drug substance").

[79] *Id.* § 320.1(c) (1977). *See also* 40 Fed. Reg. 26164, 26165 (June 20, 1975) (proposing that "pharmaceutical equivalents" means products "contain[ing] identical amounts of the identical active drug ingredient (i.e., the same salt or ester of the same therapeutic moiety) in the same dosage forms (but not necessarily containing the same inactive ingredients) and that meet the identical compendial or other standards . . . .").

[80] 21 C.F.R. § 320.1(d). *See also* 40 Fed. Reg. at 26165 (proposed rule).

14

agent is a unique active drug ingredient[,]"[81] and thus, a new salt of an approved active moiety is considered to have a different active ingredient.[82]

FDA's view is well-grounded in safety and efficacy principles. The Agency has observed that "apparent slight differences in drugs such as a salt . . . may produce very different effects[.]"[83] Specifically, FDA has acknowledged that a new salt of an active moiety may differ in pharmacokinetic characteristics, which in turn can affect the product's pharmacological and toxicological properties.[84] As researchers have shown, salts are not chemically equivalent to the free base forms, and these differences can translate into differences in the therapeutic effectiveness.[85] For example, "[a]ltering the chemical properties of a pharmaceutical active such as log P (partition coefficient), p$K_a$ (dissociation constant) and melting point by salt formation will influence the behaviour of the parent drug in the body through alterations in drug solubility, dissolution and stability."[86] Moreover, safety, and especially immunological effect, is influenced not only by the active ingredient but by the entire composition of the drug substance. This includes impurities and degradation products, both of which are subject to change when a different salt of the same active moiety is used.[87]

Teriparatide is not a salt but instead is in free base form. Although its manufacturing process results in the drug product containing acetate residue, the amount is minimal and must not exceed 5.0%.[88] Indeed, the active ingredient in a drug product is what is named in the "Description" section of the product's labeling and listed in the *Orange Book*.[89] For Forteo, this is listed simply as "teriparatide"—notably not "teriparatide acetate."[90]

In keeping with FDA's longstanding view that a salt and free base are different active ingredients, the "sameness" requirement cannot be met for a proposed product that contains a salt form of teriparatide as its active ingredient. Lilly believes that Teva's proposed product is

---

[81] 44 Fed. Reg. 2932, 2938 (Jan. 12, 1979).

[82] 505(b)(2) Citizen Petition Response, *supra* note 40, at 33.

[83] 37 Fed. Reg. 23185, 23185 (Oct. 31, 1972).

[84] 40 Fed. Reg. at 26167.

[85] Patel et al., *Pharmaceutical Salts: A Formulation Trick or a Clinical Conundrum?*, 16 Br. J. Cardiol. 281 (2009) (Exhibit 12).

[86] *Id.*

[87] *See, e.g.*, Verbeeck et al., *Generic Substitution: The Use of Medicinal Products Containing Different Salts and Implications for Safety and Efficacy*, 28 Eur J Pharm Sci 1, 2 (2006) ("[D]ifferent salt forms of a particular API can differ markedly in physicochemical properties, such as solubility, hygroscopicity, stability, flowability, etc. In addition, the presence of impurities associated either with the route of synthesis of that particular salt or resulting as a consequence of instability and the formation of degradation products, can impart toxicity and/or undesirable biological activity quite different from the drug's intended clinical use.") (Exhibit 13).

[88] Although the current USP monograph provides that "[t]eriparatide is available as an acetate salt form," there is no scientific basis for this statement, and USP is in the process of removing the phrase from the monograph. *See supra* note 19.

[89] Salt Naming Guidance, at 6.

[90] *See* Forteo Prescribing Information, Description (Section 11); *Orange Book*, at vii.

FDA001383

A.0105                    A.0105                    A.0105

just such a product, namely that it is an acetate salt form of teriparatide.  As FDA has made clear, a section 505(b)(2) application is appropriate when the applicant proposes "a change in an active ingredient *such as a different salt* . . . of an active ingredient in a listed drug containing the same active moiety."[91]  In sum, the generic approval pathway is unavailable to a follow-on applicant whose active ingredient is a salt form of teriparatide.

### B.    The ANDA Pathway Is Not Appropriate Due To The Need For Clinical Safety And Effectiveness Testing.

Where clinical data are necessary to show that the active ingredient in a proposed generic drug is the same as the active ingredient in the RLD or to establish the proposed product's safety or effectiveness, the application should proceed under section 505(b)(2), not section 505(j).[92]  For amino acid polymer products, the CDER Director has noted that clinical testing is largely unavoidable, which is why the 505(b)(2) pathway must be used by follow-on applicants:

> FDA is frequently asked how difficult or feasible it is to approve a copy of an existing protein using an abbreviated pathway such as 505(b)(2).  Simple proteins that can be extensively characterized by analytical and functional tests can often be shown to be very similar to an approved protein, and thus the manufacturer might not have to perform extensive clinical testing.  *However, the clinical tests needed, even for simple proteins, would still be more than what is ordinarily done for a small-molecule generic drug*.  In contrast, very complex proteins, especially those that are difficult to characterize functionally are more challenging.  Using today's science, it would not be possible by using analytical and functional tests alone to be sure that a complex follow-on product was very similar to an innovator product.  Therefore, more extensive clinical testing would probably be needed.[93]

Indeed, because follow-on products to a recombinantly-derived product are likely to have, among other differences, distinct impurity, aggregate, and leachate profiles from the RLD— differences that have potential clinical significance, especially with respect to immunogenicity— clinical testing is necessary to analyze the nature of these differences and their therapeutic impact.  In particular, it is virtually impossible to predict the immunogenicity of a synthetically-derived teriparatide product from information regarding Forteo, given the array of potential differences between a synthetic product and Forteo, and this unknown necessitates clinical testing to establish the synthetic product's immunogenic profile, among other things.  Due to the

---

[91] 505(b)(2) Draft Guidance, at 4-5.

[92] *See id.*, at 3; 21 C.F.R. § 314.54(a).

[93] *Assessing the Impact of a Safe and Equitable Biosimilar Policy in the United States: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 110th Cong. 20-21 (2007) (statement of Janet Woodcock, M.D., Deputy Commissioner and Chief Medical Officer, FDA) (emphasis added).  In her statement, Dr. Woodcock defined "protein" to include peptide products.  *See supra* text accompanying note 53.

FDA001384

A.0106                              A.0106                              A.0106

need for clinical safety and effectiveness testing, approval of a proposed follow-on teriparatide product under the generic pathway is not permitted.

> 1. A Proposed Follow-On Teriparatide Product Will Likely Have Different Impurity, Aggregate, And Leachate Profiles From Forteo.

Seemingly minor changes to the manufacturing process of an amino acid polymer can alter its properties in ways that change its safety and efficacy profiles. It is thus understandable that even where a synthetic follow-on product to a *synthetic* RLD has been proposed, FDA has called for the ANDA applicant to show comparable impurity, aggregate, and leachate profiles.[94] It follows, then, that comparable impurity, aggregate, and leachate profiles are also required where the proposed follow-on product or the RLD is recombinantly-derived.

Because amino acid polymers intrinsically exhibit microheterogeneities and process- and product-related impurities,[95] Lilly's manufacturing process is designed to carefully control the teriparatide drug substance. For example, Lilly has identified and controls for a range of potential impurities generated during the fermentation and purification steps of the recombinant manufacturing process, including Val-Arg recombinant teriparatide, dihydrofolate reductase fragment from positions 45-58, and methionyl sulfoxides. In addition, Lilly carefully monitors and controls impurities resulting from degradation pathways, such as oxidation and deamidation, and aggregation. The principle degradation pathways for Forteo have been identified and include the oxidation of methionine at certain specific positions and the deamidation of asparagine at positions 10, 16, and 33. As noted previously, Met 8 is important for biological activity and is protected against oxidation by teriparatide's higher-order structure.[96] Changes to the manufacturing process can significantly alter the higher-order structure of teriparatide and thereby increase oxidation.[97]

It is practically impossible for a synthetic follow-on product to have comparable impurity, aggregate, and leachate profiles to the recombinantly-derived Forteo, given the significant nature of the manufacturing change. Although a synthetic follow-on product would not have host cell proteins, it also would likely have new impurities—namely, fragments consisting of single amino acids and partial sequences from the teriparatide chain. These impurities result from the synthetic manufacturing process, which can entail adding amino acids to a chain one by one or creating two fragments and then fusing them together. In other words, the synthetic manufacturing process will result in insertions and deletions not present in the recombinantly-derived drug substance. Further, the synthetic method of manufacture could result in higher-order structure that is less protective of Met 8 or otherwise more likely to result in oxidative species during the product shelf life.

---

[94] Miacalcin Citizen Petition Response, at 15-16, 18.

[95] *See* FDA, Guidance for Industry, Q6B Specifications: Test Procedures and Acceptance Criteria for Biotechnological/Biological Products, at 3 (Aug. 1999).

[96] Torosantucci, *supra* note 12, at 549; Horiuchi, *Effects of Oxidation of Human Parathyroid Hormone on its Biological Activity*, 3 J. BONE & MINERAL RES. 353 (1988) (Exhibit 14). *See also supra* notes 66-68 and accompanying text.

[97] Torosantucci, *supra* note 12, at 549 ("[I]t cannot be emphasized enough that control of oxidation during production, purification, formulation, transportation, storage and use of therapeutic proteins and peptides is of utmost importance for their quality, safety and efficacy.").

FDA001385

A.0107                   A.0107                   A.0107

There are similar difficulties in establishing comparable profiles with respect to a recombinantly-derived follow-on teriparatide product. FDA has acknowledged that impurities are "considerably less predictable" in a recombinant product and thereby render the generic approval pathway unavailable to a recombinant follow-on product.[98] For example, the Agency has noted that follow-on recombinant salmon calcitonin "might have protein, DNA, lipopolysaccharide, and other impurities from the host cell expression system, the nature of which cannot be predicted a priori and which are not easily monitored or controlled."[99]    Parallel concerns exist for a recombinantly-derived follow-on version of Forteo. Leachables also could be different because of different residual solvents present in a follow-on teriparatide. As a result, it is expected that a proposed follow-on recombinant teriparatide product is likely to have a different impurity, aggregate, and leachate profile than Forteo.

> 2.    Differences In Impurity, Aggregate, And Leachate Profiles Have Potential Clinical Significance And Must Be Investigated Through Clinical Studies That Preclude Approval Under The ANDA Pathway.

Where an applicant cannot show comparable impurity, leachate and aggregate profiles between a proposed follow-on amino acid polymer and its RLD, FDA has explained that clinical studies, such as an immunogenicity study, may be necessary and would render the follow-on product ineligible for approval via an ANDA.[100] In particular, FDA has recognized in the past that differences in impurity profile stemming from differences between synthetic and recombinant methods of manufacture would preclude availability of the ANDA pathway.[101] This principle applies to proposed follow-on products to Forteo.

Impurities, aggregates, and leachates are often responsible for unwanted immunogenic reactions, including immune responses that reduce product efficacy, affect product pharmacokinetics, and/or give rise to serious safety problems. For example, peptide aggregates can elicit an immune response (e.g., creation of neutralizing antibodies) associated with adverse clinical effects (e.g., hypersensitivity responses, such as anaphylaxis; loss of clinical efficacy).[102] Leachates from the container closure system can enhance immunogenicity by chemically modifying the amino acid polymer or by having direct immune adjuvant activity.[103]

---

[98] Miacalcin Citizen Petition Response, at 11. *See also id.*, at 12 ("This difference between synthetic and recombinant salmon calcitonin regarding impurities is one of the reasons why . . . we would not at this time accept for review an ANDA seeking approval of a recombinant or naturally occurring salmon calcitonin product.").

[99] *Id.*, at 11.

[100] *See, e.g., id.*, at 15 ("If a generic product contains a peptide-related impurity at a significant level that is not observed in the RLD, the applicant might need to conduct a clinical study to show that the impurity does not affect immunogenicity. In such a case, the applicant would need to seek approval of a 505(b)(2) application rather than an ANDA . . . .").

[101] *Id.*, at 15-16, 18. *See id.*, at 12 ("This difference between synthetic and recombinant salmon calcitonin regarding impurities is one of the reasons why . . . we would not at this time accept for review an ANDA seeking approval of a recombinant or naturally occurring salmon calcitonin product.").

[102] *Id.*, at 11-12, 15-16.

[103] FDA, Guidance for Industry, Immunogenicity Assessment for Therapeutic Protein Products, at 2 (Aug. 2014) (Immunogenicity Guidance); *see also id.* ("Although this guidance focuses on therapeutic protein

18

In addition to being potentially toxic, peptide-related impurities can affect immunogenicity.[104] Therefore, FDA guidance provides that sponsors of therapeutic protein products and related products, such as peptides,[105] are to carefully evaluate and minimize aggregates, leachates, and impurities in their products, as these may trigger an immune response.[106]

In the case of teriparatide in particular, immunogenicity is a crucial issue to consider when evaluating proposed follow-on products.  Immunogenicity is important not only due to the potential for adverse events and lack of efficacy, but also because of the potential for cross-reactivity with native PTH.  Namely, a teriparatide product has the potential to trigger a neutralizing immunogenic response, which can result in hypoparathyroidism and symptomatic hypocalcaemia.[107]  As noted, PTH products also are prone to oxidation that can alter bioactivity,[108] rendering the species super-potent or sub-potent.[109]  Furthermore, assessment of the long-term immunogenicity of Forteo has been a focus of both Lilly and the Agency, given the increase in positive antibody results observed over time during Lilly's principal clinical study.[110]  Finally, follow-on teriparatide products present heightened immunogenicity concerns due to their route of administration and dosing regimen.  Products

---

products, the scientific principles may also apply to related products and biological entities, for example, peptides.").

[104] *See* Miacalcin Citizen Petition Response, at 15.  *See also id.*, at 12 ("[H]ost cell impurities might exert potent immunomodulatory effects that might affect the immunogenicity of salmon calcitonin.  Because the anti-salmon calcitonin antibodies produced are neutralizing in nature, these antibodies in turn may affect the clinical efficacy (e.g., bone resorption) of the salmon calcitonin. This . . . is one of the reasons why . . . we would not at this time accept for review an ANDA seeking approval of a recombinant or naturally occurring salmon calcitonin product.").

[105] Immunogenicity Guidance, at 2.

[106] *Id.*, at 15, 18, 19.

[107] *See* U.S. National Library of Medicine MedlinePlus, Hypoparathyroidism, http://www.nlm.nih.gov/medlineplus/ency/article/000385.htm (last visited Aug. 12, 2016).

[108] Torosantucci, *supra* note 12, at 549; Hocher et al., *Measuring Parathyroid Hormone (PTH) in Patients with Oxidative Stress - Do We Need a Fourth Generation Parathyroid Hormone Assay?*, 7 PLoS ONE e40242 (2012) (Exhibit 15).

[109] *See* Lee et al., *Scientific Consideration for Generic Synthetic Salmon Calcitonin Nasal Spray Products*, 13 AAPS J. 14, 17 (2011) ("[]peptide-related impurities[],such as oxidation . . . have the potential to adversely impact the immunogenicity, as well as the activity of the drug product.") (Exhibit 16).

[110] "In the 20 mcg group, a total of 15 (2.8%) patients had at least 1 positive antibody [test] during the study. . . .  One patient had a positive test at month 3 (80 BU and 90% inhibition), 10 had positive tests at month 12 (means: 432 BU and 70% inhibition), and 13 had positive tests at the study closeout visit (means: 1365 BU and 79% inhibition).  In the 40 mcg group, a total of 44 (8.0%) patients had at least 1 positive antibody test during the study. . . .  One patient had a positive test at month 3 (2590 BU and 94% inhibition), 26 had a positive tests at month 12 (means: 1234 BU and 74% inhibition), and 41 had positive tests at the study closeout visit (means: 1165 BU and 74% inhibition)."  Forteo Action Package, Medical Review, Medical Safety Review, Memorandum from Bruce V. Stadel, M.D., M.P.H., Medical Officer, CDER, at 100 (Sept. 7, 2001), http://www.accessdata.fda.gov/drugsatfda_docs/nda/2002/21-318_FORTEO_Medr_P6.pdf.

FDA001387

A.0109                                A.0109                                A.0109

administered by subcutaneous injection and products administered in low doses on an intermittent basis may be associated with relatively higher levels of immunogenic response.[111]

Clinical studies will be necessary to address the immunogenic impact of the differences in impurity, aggregate, and leachate profiles between Forteo and the proposed follow-on product, precluding the availability of the ANDA pathway.  Animal studies cannot assure that a proposed follow-on teriparatide product will not result in a different immune response from Forteo; as FDA has acknowledged, animal studies are not predictive of clinical immunogenicity.[112]  Consistent with the requirements of the FDCA, FDA cannot require ANDA applicants conduct clinical immunogenicity studies.[113]  Instead, the practical effect of such a requirement is that a follow-on applicant is foreclosed from seeking approval under section 505(j) and must instead submit an application under section 505(b)(2).  This approach is consistent with FDA precedent,  For instance, the Agency has explained that, "[i]f a generic product contains a peptide-related impurity at a significant level that is not observed in the RLD, the applicant might need to conduct a clinical study to show that the impurity does not affect immunogenicity.  In such a case, the applicant would need to seek approval of a 505(b)(2) application rather than an ANDA . . . ."[114]  The Agency has stated the same principle for clinical studies needed due to dissimilar aggregate and leachate profiles.[115]  Indeed where clinical studies are needed to ensure the safety of a proposed follow-on product, such as a clinical transfer study for a follow-on testosterone transdermal gel product,[116] FDA has insisted that the applicant follow the section 505(b)(2) pathway, not the ANDA pathway.

In the past, there have been narrow circumstances in which the Agency has asserted that immunogenicity studies are permissible under the ANDA pathway to confirm the proposed product's purity.[117]  But the product, a proposed generic version of Lovenox, and studies that

---

[111] *See* Immunogenicity Guidance, at 10.

[112] Scientific Considerations Guidance, at 13 ("Animal immunogenicity assessments are conducted to assist in the interpretation of the animal study results and generally do not predict potential immune responses to protein products in humans.")

[113] FDCA § 505(j)(2)(A).  *See also id.* § 505(j)(2)(C)(i).

[114] Miacalcin Citizen Petition Response, at 15.

[115] *Id.*, at 16, 18.

[116] Letter from Janet Woodcock, M.D., Director, CDER, to Anthony DelConte, M.D., Chief Medical Officer, Auxilium Pharmaceuticals, Inc., Docket No. FDA-2009-P-0123, at 4-7 (Aug. 26, 2009).

[117] *See, e.g.*, Lovenox Citizen Petition Response, at 42.  In a footnote to a memorandum filed in the Lovenox case, the government asserted that "FDA may rely not only on animal studies for ANDA approval, but also on human studies.  *See, e.g.*, 21 C.F.R. § 320.24(b)(4) (describing 'appropriately designed comparative clinical trials' as acceptable for establishing bioequivalence for certain types of ANDA products).  Such studies serve a limited purpose to compare properties of the generic and innovator products, and are *not* clinical studies to demonstrate safety and efficacy that are necessary to support approval of a new innovator drug under 21 U.S.C. § 355(b)."  *Sanofi-Aventis US LLC v. FDA*, No. 10-1255, at 24 n.11 (D.D.C. Aug. 4, 2010) (Defendants' Mem. in Opposition to Plaintiff's Motion for Temporary Restraining Order & Preliminary Injunction) (Lovenox Brief) (emphasis in original).  The bioequivalence studies described in this footnote are distinguishable from comparative clinical immunogenicity studies, as FDA has clear authority to require clinical bioequivalence testing under section 505(j)(2)(A)(iv).  *See also* FDCA § 505(j)(7)(A)(i)(III).  Therefore, in contrast to the situation with clinical immunogenicity data, the prohibition on FDA requiring an ANDA to contain information "*in addition*

20

FDA001388

A.0110                                A.0110                                A.0110

the Agency considered in that scenario were distinctly different from those at issue here. There, the RLD was a naturally-sourced mixture, and the generic drug had an equivalent manufacturing process in fundamental respects (i.e., equivalence of heparin source material and mode of depolymerization).[118] By contrast, Forteo is a recombinantly-derived RLD. Further, the proposed follow-on product is synthetically-derived, so the manufacturing process will have undergone a fundamental change. Even if the follow-on product were recombinantly-derived, the manufacturing processes are expected to be inequivalent, as discussed above. These factors necessitate a far more cautious and deliberate approach to demonstrating lack of enhanced immunogenicity. Moreover, in the Lovenox case, the relevant immunogenicity data came from animals;[119] they were not clinical (i.e., human) immunogenicity data, as would be necessary for a follow-on teriparatide product. If FDA were to allow *human* immunogenicity data to be submitted as part of an application under section 505(j), this would vitiate Congress's explicit direction that an ANDA applicant can submit no further information than that required under section 505(j)(2)(A). Indeed, FDA has noted that immunogenicity is relevant to both safety and efficacy,[120] and allowing an applicant to submit human safety and efficacy data would be tantamount to reading the prohibition on the submission of additional information out of the FDCA.

Finally, the ANDA pathway is doubly inappropriate for a follow-on product that differs from Forteo in excipients, given the need for clinical testing to evaluate these differences. As Teva's proposed product demonstrates, follow-on applicants may attempt to distinguish their products from Forteo based on the type or amount of excipient in the formulation.[121] But different excipients can aggregate with proteins, modify peptide conformations, or cause leaching of materials from the product's container closure system.[122] Furthermore, if the follow-on product formulation does not stabilize the active ingredient adequately, the product could contain physical degradants (including aggregates) and chemical degradants (including oxidized substances), particularly if the product is not stored or handled in optimal conditions.[123] In general, a proposed generic parenteral product must contain the same inactive ingredients in the same concentration as the RLD.[124] While an exception for changes to a preservative, buffer, or antioxidant are available, the applicant must establish that "the differences do not affect the safety or efficacy of the proposed drug product."[125] As discussed below in Section IV.B, comparative clinical PK/PD studies are needed to adequately assess the effect on safety

---

*to* that required by clauses (i) through (viii) [of section 505(j)(2) of the FDCA]" plainly does not apply to clinical bioequivalence data.

[118] Lovenox Citizen Petition Response, at 13.

[119] *See* Lovenox Brief, at 9 ("Sandoz conducted in vitro and animal assays to address impurities that could cause [an immunogenic] response, thereby demonstrating that its product was not any more immunogenic than Lovenox.").

[120] Immunogenicity Guidance, at 2.

[121] *See* Notice Letter, at 48 (claiming that Teva's proposed product "does not contain 2.5 mg m-cresol, 50 mg mannitol, 0.52 mg acetic acid and 0.12 mg sodium acetate, or equivalents thereof").

[122] Immunogenicity Guidance, at 19-20.

[123] Miacalcin Citizen Petition Response, at 16-17.

[124] 21 C.F.R. § 314.94(a)(9)(iii).

[125] *Id.*

FDA001389

and efficacy from a change in excipients, among other differences, and thus, the ANDA pathway is not appropriate for follow-on teriparatide products.[126]

### IV.   FDA Should Adopt Scientific Requirements For Follow-On Teriparatide Products That Accord With Biosimilarity Principles.

Due to Forteo's complexity and method of manufacture, the scientific requirements for follow-on teriparatide applications should align with those for biosimilar applications. Indeed, FDA has noted that the scientific considerations for demonstrating biosimilarity may be applicable to biological products submitted for approval under section 505(b)(2).[127] Specifically, FDA should require a follow-on teriparatide applicant to employ a stepwise testing approach to demonstrate sufficient similarity to Forteo. Required testing should include comparative structural analyses, a bioassay, a comparative clinical immunogenicity study, and comparative clinical PK and PD testing. Studies of a proposed follow-on product's comparative stability and impurity profile also are necessary. Only with such an approach can FDA ensure that a follow-on teriparatide product is highly similar to Forteo in structure and function and lacks any clinically meaningful differences in safety and efficacy.

### A.   A Follow-On Applicant Must Demonstrate Analytical and Functional Similarity to Forteo.

Under the stepwise approach, a sponsor of a follow-on teriparatide product that cites Forteo as the RLD should start with extensive structural and functional characterization before proceeding to comparative clinical studies that address remaining uncertainties about the similarity of the products. Each step should contribute to demonstrating the products are highly similar, and "[a]t each step, the sponsor should evaluate the extent to which there is residual uncertainty about the biosimilarity of the proposed product and identify next steps to try to address that uncertainty."[128]

First, to demonstrate analytical similarity, a follow-on teriparatide applicant should demonstrate that its proposed product has the same primary structure, i.e., amino acid sequence, as Forteo.[129] Even seemingly "minor" differences in the amino acid sequence can

---

[126] For example, the ANDA approval pathway was precluded for follow-on testosterone transdermal gel products having different penetration enhancers than their RLDs due to the need for clinical testing that assessed PK parameters for safety purposes. For these products, FDA required transfer studies, among others, to establish that a proposed product has the same safety profile as the RLD. *See, e.g.*, Letter from Janet Woodcock, M.D., Director, CDER, to Laura Grablutz, Auxilium Pharmaceuticals, Inc., Docket No. FDA-2013-P-0371, at 5, 10-13 (Feb. 9, 2015). Even though PK endpoints have been used for the transfer study, because the study is intended to establish the same safety profile as the RLD, FDA has rightly considered this clinical testing to be a "special safety study/clinical trial" and not a bioequivalence study. *See* Perrigo Israel Pharma Ltd. Testosterone Gel (NDA No. 203098), Medical Review, Clinical Review, Memorandum from Donald McNellis, M.D., Division of Reproductive and Urologic Products, at 35-42 (Jan. 29, 2013), http://www.accessdata.fda.gov/drugsatfda_docs/nda/2013/203098Orig1s000MedR.pdf.

[127] Scientific Considerations Guidance, at 3.

[128] *Id.*, at 7.

[129] *See id.*, at 9 ("It is expected that the expression construct for a proposed product will encode the same primary amino acid sequence as its reference product.").

FDA001390

A.0112                              A.0112                              A.0112

result in substantial differences in the safety and efficacy of the product.  This has been well-documented in the scientific literature for PTH products in particular:  when scientists substituted amino acids in teriparatide and shorter PTH analogs, differences in the products' receptor binding affinities, intracellular signaling activity, bioavailability, and stability were observed.[130]  A follow-on teriparatide product applicant should also fully address Forteo's higher-order structural characteristics to show that the proposed product is sufficiently similar to Forteo,[131] given the importance of the higher-order structure to biological activity as discussed above.  Indeed, FDA officials have noted that "[h]igher order structure is an important quality attribute of biosimilars that must be assessed by comparison to the reference licensed drug."[132]  State-of-the-art, high-resolution techniques, such as two-dimensional nuclear magnetic resonance spectroscopy, should be used to establish both comparability of higher-order structures and drug substance consistency.[133]  Complete structural characterization should be conducted in multiple representative lots.[134]

Second, a follow-on teriparatide applicant should identify and characterize the impurities, aggregates, and leachates in its product, as discussed in detail above, and show that the proposed product has highly similar profiles to Forteo with respect to each (or lower levels of each) throughout the product's shelf life.[135]  Process-related impurities will need to be addressed—particularly when there is a fundamental manufacturing change (i.e., the follow-on product is synthetically-derived)—as will impurities introduced by the formulation.  A complete characterization of the follow-on product's impurity profile will help ensure that the proposed product will neither exhibit problematic excipient-peptide interactions nor present new or increased immunogenicity concerns.

Third, a follow-on teriparatide applicant should conduct a robust comparative functional characterization.[136]  PTH functions by binding to the type I parathyroid hormone receptor, and the bound complex triggers several signaling pathways, including the cyclic AMP-dependent protein kinase A pathway.  This pathway is primarily responsible for teriparatide's efficacy.[137]  Thus, in order for a product to be considered highly similar to Forteo, a follow-on applicant should demonstrate through an appropriate bioassay that the proposed product has highly similar abilities to bind to the type I PTH receptor and to up-regulate cyclic AMP.

---

[130] Dong et al., *Engineering of Therapeutic Polypeptides Through Chemical Synthesis: Early Lessons from Human Parathyroid Hormone and Analogues*, 134 J. AM. CHEM. SOC. 15122 (2012) (Exhibit 17).

[131] *See* Scientific Considerations Guidance, at 9.

[132] *See* Ghasriani et al., Correspondence, *Precision and Robustness of 2D-NMR for Structure Assessment of Filgrastim Biosimilars*, 34 NATURE BIOTECH. 139, 139 (2016) (Exhibit 18).

[133] *Id.  See generally* Scientific Considerations Guidance, at 9 ("FDA expects that first, a sponsor will extensively characterize the proposed product and the reference product with state-of-the-art technology, because extensive characterization of both products serves as the foundation for a demonstration of biosimilarity.").

[134] *See* Scientific Considerations Guidance, at 10.

[135] *See id.*; Quality Considerations Guidance, at 13-14.

[136] Quality Considerations Guidance, at 12.

[137] Yang et al., *Contributions of Parathyroid Hormone (PTH)/PTH-Related Peptide Receptor Signaling Pathways to the Anabolic Effect of PTH on Bone*, 40 BONE 1453 (2007) (Exhibit 19).

23

**B.      A Follow-On Applicant Should Be Required To Conduct Comparative Clinical Immunogenicity And PK/PD Testing To Establish Its Proposed Product Does Not Exhibit Any Clinically Meaningful Difference In Safety Or Efficacy Compared To Forteo.**

The applicant should be required to conduct clinical immunogenicity testing and PK/PD studies to ensure the follow-on teriparatide product has highly similar safety and effectiveness to Forteo.

Because animal studies do not reliably predict immunogenic response in humans, applicants should conduct comparative clinical immunogenicity studies using appropriate assays, even if a proposed follow-on product is shown to be highly similar to Forteo from an analytical and functional perspective.  As discussed above, however, it is unlikely that a follow-on product to a recombinantly-derived RLD like Forteo will have a comparable impurity profile, and the potential for concerning immunogenicity is heightened for follow-on teriparatide products given the route of administration and dosing regimen.  Clinical immunogenicity studies will ensure that differences in impurity profile or other product features do not present new or increased immunogenicity risks.

The follow-on applicant should pre-specify unacceptable differences in incidence or severity of immune responses and provide a strong rationale for those criteria.[138]  The applicant also should demonstrate a comparably low level of immunogenic response to that shown for Forteo after 12 months of treatment.  In Lilly's principal clinical study, it was shown that antibodies cross-reacting with Forteo were detected in 3 percent of women, and there was no evidence of neutralizing antibodies.[139]  Furthermore, as the number of patients with positive antibody results increased with duration of exposure to Forteo, a follow-on applicant should undertake long-term immunogenicity studies to assure there is no adverse impact on patients over time from the follow-on product, just as Lilly is continuing to work with FDA to carefully evaluate the potential for an immunogenic response after long-term use of Forteo.  For the Agency to approve a follow-on teriparatide product with *no* clinical immunogenicity studies would be a reversal of opinion, as FDA has shown keen attention to this issue throughout Forteo's regulatory history.

To ensure that a proposed follow-on product has no clinically meaningful differences from Forteo in term of safety or effectiveness, a follow-on applicant should also be required to demonstrate that the proposed product has highly similar pharmacokinetics to Forteo through a comparative clinical PK study.[140]  Differences in the follow-on product's manufacturing process, impurities, or formulation could cause the proposed product to have a different PK profile than Forteo.  For example, differences in inactive ingredient concentrations or in preservative may

---

[138] Immunogenicity Guidance, at 8-9.

[139] Forteo Prescribing Information, Adverse Reactions, Clinical Trials Experience (Section 6.1).

[140] *See* Scientific Considerations Guidance, at 14.  While a biowaiver is available for a parenteral solution intended solely for administration by injection, such a waiver is available only if the proposed follow-on product contains the same active and inactive ingredients in the same concentrations as the RLD.  21 C.F.R. § 320.22(b)(1).  In the case of follow-on teriparatide applicants, a biowaiver is inappropriate because their products cannot be shown to have the same active ingredient as Forteo and, in some cases, could have different excipients or different excipient concentrations.

24

FDA001392

affect absorption—and these differences could be clinically significant.[141]  A highly similar PK profile is essential, because Forteo's clinical performance depends in part on the speed at which the patient's body breaks down the amino acid sequence.  The product's PK peak is also very short, which makes its effectiveness highly sensitive to the PK profile.  Consequently, if the follow-on product's PK profile differs from that of Forteo, the proposed product's effects on bone mineral density (BMD) and fractures, as well as its side effect profile, would likely be affected. Indeed, patch delivery of synthetic PTH (1-34) has been shown to have a shorter half-life than subcutaneous recombinant PTH (1-34)[142] and is associated with a markedly different PD response as measured by the bone formation marker PINP and bone resorption marker CTX.[143] By contrast, a transdermal system delivering synthetic hPTH (1-34) has shown a longer $C_{max}$ profile than subcutaneous recombinant PTH(1-34),[144] which similarly resulted in significant differences in the bone turnover markers PINP and CTX.[145]

For these reasons, to assure that a proposed follow-on teriparatide product has no clinically meaningful differences from Forteo in term of safety or effectiveness, a comparative clinical PK study is necessary to demonstrate that a follow-on product has a highly similar PK profile to Forteo.  Consistent with FDA's recommendation for development of PTH and related products (including analogs) for osteoporosis, the applicant should perform this study in patients rather than healthy volunteers.[146]  The applicant should develop an assay to measure PTH (1-34) and ensure that the assay does not cross-react with PTH (1-84) and should use mass spectrometry to show that the products undergo highly similar peptide breakdown in subjects over the clinically-relevant time period.

It is also necessary for a follow-on teriparatide applicant to demonstrate that the proposed product has highly similar PD effects to Forteo.  This assessment will confirm that any small differences in PK or other attributes do not cause the follow-on product to be less effective than Forteo.  For example, in the phase 3 study of *recombinant* human teriparatide dosed at 20 µg/day without co-administration of hormone replacement therapy, the median increase in spine BMD at 12 months was approximately 8%.[147]  By contrast, even though addition of hormone replacement therapy to teriparatide would be expected to result in a similar or greater

---

[141] *Orange Book*, at xiv.

[142] Cosman et al., *Effect of Transdermal Teriparatide Administration on Bone Mineral Density in Postmenopausal Women*, 95 J. CLIN. ENDOCRINOL. METAB. 151, 154 (2010) (Figure 2) (Exhibit 20).

[143] *Id.*, at 156 (Figure 4).

[144] *See* Shalom et al., *Repetitive Rapid Delivery of Pharmacologically-Active hPTH 1-34 Across Human Skin Without Injection*, Abstract SA 397, ASBMR 30th Annual Meeting (2008) (Exhibit 21).

[145] *See* Kenan et al., *Comparison of Transdermal and Subcutaneous Teriparatide Effect on Markers of Bone Turnover and Safety in Postmenopausal Women*, Abstract OC47, 47 BONE S49 (2010) (Exhibit 22).

[146] *See* FDA, Draft Guidance, Development of Parathyroid Hormone for the Prevention and Treatment of Osteoporosis (May 2000), at 2 ("Given the uncertain clinical relevance of the [findings of osteosarcoma risk] in rodents, and in an effort to improve the benefit to risk ratio of PTH, it is strongly recommended that participation in clinical studies be limited to adults with severe osteoporosis who have completed bone maturation.").

[147] Lilly, LY333334 (Teriparatide Injection) Briefing Document for the Endocrinologic and Metabolic Drugs Advisory Committee, vol. 1 (June 15, 2001), at 75 (Figure 6.3), http://www.fda.gov/ohrms/dockets/ac/01/briefing/3761b2_01_lilly.pdf.

FDA001393

A.0115          A.0115          A.0115

increase in spine BMD in certain circumstances,[148] researchers found in a study of *synthetic* PTH (1-34) dosed at a higher dose, 25 µg/day (lyophilized powder reconstituted with 1 mL 5% dextrose), and combined with daily hormone replacement therapy, that the median increase in spine BMD at 12 months was just 4.7%.[149]   Thus, a follow-on applicant should conduct a 12-month clinical study comparing the PD profiles of the proposed product and Forteo.  The study should be designed to show non-inferiority to Forteo and use a lumbar spine BMD endpoint. The study should be conducted in postmenopausal women with osteoporosis.

### C.      Other Testing Of A Follow-On Teriparatide Product Will Be Necessary.

A follow-on teriparatide applicant should conduct comparative tests to show that the stability of the proposed product is highly similar to that of Forteo.  These tests should include studies to establish the proposed product's degradation profiles under multiple stress conditions (e.g., high temperature, freeze thaw, light exposure, and agitation).[150]   The applicant also should conduct sufficient real time, real condition stability data to support the proposed product's shelf life.[151]

Furthermore, if a proposed follow-on teriparatide product contains different impurities than Forteo, the applicant should conduct additional pharmacological and toxicological studies to confirm that the proposed product does not have a different safety profile than Forteo.[152] Similarly, the applicant should support any different excipients from those in Forteo (or higher levels of excipients than in Forteo) with existing toxicology information or additional toxicity studies with the follow-on product formulation.[153]   Both direct toxicities and excipient interactions should be addressed.[154]

### V.      FDA Should Not Deem A Follow-On Teriparatide Product To Be Therapeutically Equivalent To Forteo Or, Alternatively, Should Require Clinical Switching And Alternating Studies To Support A Determination Of Therapeutic Equivalence To Forteo.

Under FDA's longstanding criteria, a drug and its RLD generally are therapeutically equivalent if they are:  (1) "pharmaceutical equivalents"; (2) bioequivalent; (3) "adequately labeled"; and (4) manufactured in accordance with current good manufacturing practice.[155]   The *Orange Book* also provides that "[d]rug products are considered to be therapeutic equivalents

---

[148] Cosman, *Combination Therapy for Osteoporosis: A Reappraisal*, BONEKEY REPORTS 3, Article No. 518 (2014) (Exhibit 23).

[149] Lindsay et al., *Randomised Controlled Study of Effect of Parathyroid Hormone on Vertebral-Bone Mass and Fracture Incidence Among Postmenopausal Women on Oestrogen with Osteoporosis*, 350 LANCET 550, 552 (1997) (Exhibit 24).

[150] Quality Considerations Guidance, at 16.

[151] *Id.*

[152] *Id.*, at 13.

[153] *Id.*, at 16.

[154] *Id.*

[155] *Orange Book*, at vii.

FDA001394
A.0116                    A.0116                    A.0116

only if they are pharmaceutical equivalents and if they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling."[156]

### A.    A Follow-On Applicant Cannot Establish Pharmaceutical Equivalence And Therefore, Therapeutic Equivalence.

In the current state of science, a follow-on teriparatide product cannot meet the therapeutic equivalence standard, because it cannot be shown to be pharmaceutically equivalent to Forteo.  Pharmaceutical equivalents are drug products "that contain . . . the identical active drug ingredient."[157]  Further, pharmaceutical equivalents "meet the identical compendial or other applicable standard of identity, strength, quality, and purity, including potency and, where applicable, content uniformity, disintegration times, and/or dissolution rates."[158]  As noted, due to the complexity of amino acid polymers, a follow-on teriparatide product cannot be shown to be identical in active ingredient to Forteo with current analytical techniques.  Further, a synthetic teriparatide product will not meet identical compendial standards, as explained above.  As a result, pharmaceutical equivalence cannot be established, and thus, FDA may not deem the follow-on product to be therapeutically equivalent to Forteo.[159]  Lilly thus requests that FDA confirm that it will not deem a follow-on teriparatide product to be therapeutically equivalent to Forteo.

---

[156] *Id.*

[157] 21 C.F.R. § 320.1(c).  *See also Orange Book*, at vii ("Drug products are considered pharmaceutical equivalents if they contain the same active ingredient(s)").

[158] 21 C.F.R. § 320.1(c).

[159] Relatedly, a determination of therapeutic equivalence also would be inappropriate for a follow-on teriparatide applicant who cannot establish equivalence between the device constituents of Forteo and the proposed follow-on product with respect to performance, operating principles, and critical design attributes.  *See, e.g.*, Letter from Janet Woodcock, M.D., Director, CDER, to Thomas K. Rogers, III, King Pharmaceuticals, Inc., Docket Nos. FDA-2007-P-0128 & FDA-2009-P-0040 (July 29, 2009), at 6, 10 (King Citizen Petitions Response); Letter from Janet Woodcock, M.D., Director, CDER, to J. Michael Nicholas, Ph.D., Teva Respiratory, LLC, Docket No. FDA-2013-P-0850 (Dec. 9, 2013), at 7.  Here, Teva claims a litany of dissimilarities between the device constituents of the proposed product and Forteo and asserts that "[t]hese are not insubstantial differences."  Notice Letter, at 58 (claiming the proposed product "will not include a device having a gear set shiftable proximally with a plunger element" among other differences).  Forteo's pen was optimized to meet the needs of its specific patient population—that is, patients at high risk for fracture who are elderly, frail, and might have impaired agility, manual dexterity, and cognitive skills—and changes to the device constituent could significantly affect the usability of the device and thus, the therapeutic profile of the product.  Furthermore, Forteo's labeling directs patients to receive healthcare provider training before using the delivery device.  *See* Forteo Prescribing Information, Medication Guide.  A follow-on applicant proposing an inequivalent device constituent that requires new training prior to use should be ineligible for a therapeutic equivalence determination.  *See* King Citizen Petitions Response, at 10-11 ("For products that require physician training before unsupervised patient use, differences in operation that require retraining prior to use are not expected to be acceptable in an ANDA.").

27

**B.   If FDA Determines That A Follow-On Applicant Can Establish Pharmaceutical Equivalence To Forteo, FDA Should Require The Requested Clinical Switching And Alternating Studies.**

Alternatively, if FDA decides that pharmaceutical equivalence to Forteo can be shown, the Agency should require clinical studies showing that there is no increased risk in terms of safety or diminished efficacy from alternating or switching between Forteo and the proposed follow-on product as compared to exclusive use of Forteo as a prerequisite to a therapeutic equivalence determination.

Pursuant to FDA's established therapeutic equivalence criteria, the follow-on teriparatide applicant would need to show that the proposed product can be expected to produce the same clinical effect and safety profile as Forteo when administered to patients under the labeled conditions to establish therapeutic equivalence.[160]   To satisfy this standard, FDA has acknowledged that more may be required of an applicant than a showing of bioequivalence and pharmaceutical equivalence.  Specifically, FDA has stated that products meeting the basic therapeutic equivalence criteria nonetheless may fail to obtain an "A" rating where the proposed product has "differences in packaging configurations, inactive ingredients, or other differences that have significant therapeutic implications or otherwise require additional clinical studies to establish safety and effectiveness."[161]   For example, oral contraceptives packaged in 21-day packages without placebos and those packaged in 28-day packages with 7 placebos are not therapeutically equivalent, even though they contain the same amount of the same active ingredient, same dosage form, strength, and route of administration.[162]

More is needed in the case of a proposed follow-on teriparatide product.  FDA officials have acknowledged that the potential for immunogenicity upon switching between proteins is a key safety and effectiveness issue for the substitutability of these products.  The current CDER Director explained that this switching might cause "additional harm because of unexpected immune responses . . . and cause untoward effects."[163]  Dr. Woodcock has also noted that "either . . . product could cause antibodies to the [other] product,"[164] so switching "might set up an immune response that wouldn't occur if [the patient] had just stayed on the same product all along."[165]  This type of immune reaction "could be very dangerous in some circumstances."[166]

---

[160] *Orange Book*, at vii.

[161] King Citizen Petitions Response, at 4.

[162] *Id.*

[163] *Biosimilars Implementation: A Progress Report from the FDA*: *Hearing Before the S. Comm. on Health, Education, Labor and Pensions*, 114th Cong. (2015) (statement of Janet Woodcock, M.D., Director, CDER, FDA) , *available at* http://www.help.senate.gov/hearings/biosimilar-implementation-a-progress-report-from-fda..

[164] *Safe and Affordable Biotech Drugs: The Need for a Generic Pathway: Hearing Before the H. Comm. on Oversight and Government Reform*, 110th Cong. 54 (2007) (statement of Janet Woodcock, M.D., Deputy Commissioner for Operations and Chief Medical Officer, FDA), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-110hhrg40874/pdf/CHRG-110hhrg40874.pdf.

[165] *Assessing the Impact of a Safe and Equitable Biosimilar Policy in the United States: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 110th Cong. 42 (2007) (statement of Janet Woodcock, M.D., Deputy Commissioner and Chief Medical Officer, FDA).

FDA001396

A.0118                    A.0118                    A.0118

Indeed, FDA has noted the unpredictability of immunogenicity consequences in patients who are administered these products.[167]  Immunogenicity reactions can not only inhibit the efficacy of the product, but also "cross-react[] to an endogenous protein counterpart, leading to loss of its physiological function."[168]

Thus, even if pharmaceutical equivalence to Forteo could somehow be established, immunogenicity concerns demand that a follow-on teriparatide applicant not be given a therapeutic equivalence rating without showing that there is no increased risk in terms of safety or diminished efficacy resulting from switching and alternating between Forteo and the proposed product as compared to exclusive use of Forteo.  In other words, Lilly believes that, as scientific matter, a follow-on applicant must satisfy the interchangeability criteria in section 351(k)(4) of the PHSA before receiving a therapeutic equivalence determination.  Accordingly, FDA should interpret the therapeutic equivalence criteria—and particularly the language stating that therapeutic equivalents "can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product"[169]—as necessitating that follow-on teriparatide applicants make the scientific showing described in section 351(k)(4) of the PHSA.  In particular, the follow-on applicant should show that the proposed product  "can be expected to produce the same clinical result as [Forteo] in any given patient" and that "the risk in terms of safety or diminished efficacy of alternating or switching between use of the [products] is not greater than the risk of using [Forteo] without such alternation or switch."[170] Given the current state of science, clinical switching and alternating studies will be required to make this showing.[171]

---

[166] *Id.*  Dr. Woodcock's comments referred to both biological products licensed under the PHSA and protein and peptide products approved under the FDCA.  *See supra* text accompanying note 53.

[167] Immunogenicity Guidance, at 3-4 (noting the risk of anaphylaxis and cytokine release syndrome).

[168] *Id.*, at 3 (describing the development of neutralizing antibodies that can target critical domains and block efficacy).

[169] *Orange Book*, at vii-viii.  *See also id.*, at vii & x (explaining that, to be therapeutically equivalent, a follow-on product must "be expected to have the same clinical effect and safety profile" as its RLD, including having "no difference in [its] potential for adverse effects" when administered in accordance with the labeling).

[170] PHSA § 351(k)(4).

[171] Transcript, FDA Media Briefing on the Biosimilars Draft Guidance Documents (Feb. 9, 2012) (statement of Rachel Sherman, Director, Office of Medical Policy, CDER), at 8, *available at* http://www.fda.gov/downloads/NewsEvents/Newsroom/MediaTranscripts/UCM293216.pdf ("[O]nce a product is deemed [b]iosimilar it is eligible for an interchangeability determination. That requires additional study, in fact clinical study, showing that going back and forth, switching back and forth, does not change either the efficacy or the safety profile"); *id.*, at 15 ("In other words if you were in this trial . . . first you'd get Compound A, then we'd switch you to B, then we'd switch you back to A and we might switch you again depending on our level of concern and profile perhaps in an animal model or what we know about the product"); *Safe and Affordable Biotech Drugs: The Need for a Generic Pathway: Hearing Before the H. Comm. on Oversight and Government Reform*, 110th Cong. 33 (2007) (statement of Janet Woodcock, M.D., Deputy Commissioner for Operations and Chief Medical Officer, FDA)  ("To establish that two protein products would be substitutable, the sponsor of a follow-on product would need to demonstrate through additional clinical data that repeated switches from the follow-on product to the referenced product (and vice versa) would have no negative effect on the safety and/or effectiveness of the products as a result of immunogenicity").

29

FDA001397

Application of the scientific approach described in section 351(k)(4) of the PHSA to the substitution of amino acid polymers under the FDCA is sound from a policy perspective, as it puts patient outcomes and safety at the forefront of the substitutability determination. To be sure, a determination of interchangeability under the PHSA functions in the same way as a therapeutic equivalence determination, permitting the follow-on product to be automatically substituted without physician intervention.[172] Furthermore, the requested approach is consistent with the fact that FDA has historically taken a cautious approach even to deliberate (physician-monitored) switching among innovative biological products (e.g., insulins).[173] In short, the standard for substitutability set forth in the PHSA captures the scientific showing needed to establish that switching and alternating between Forteo and follow-on teriparatide products will not have an adverse impact. Thus, in furtherance of FDA's mission of protecting public health, the Agency should require applicants for follow-on versions of Forteo under the FDCA to meet this scientific standard as a prerequisite to a therapeutic equivalence determination.

## VI.    FDA Should Conduct Rulemaking To Revise Its Interpretation Of "Biological Product," And The Forteo NDA Should Be Deemed A BLA On March 23, 2020.

Before enactment of the BPCIA, the Agency had approved some proteins pursuant to NDAs and some as biological products pursuant to BLAs. The BPCIA amended the statutory definition of "biological product" to explicitly include "protein (except any chemically synthesized polypeptide)."[174] Under the BPCIA, any applications for biological products, including proteins, must be submitted as BLAs under the PHSA, except during a ten-year transitional period where certain applications may still be submitted for approval as NDAs under the FDCA.[175] At the end of this transition period (i.e., March 23, 2020), the BPCIA provides that approved NDAs for biological products will be deemed to be licenses under the PHSA.[176]

---

[172] *Compare* PHSA § 351(i)(3) (an interchangeability determination means a biological product "may be substituted for the reference product without the intervention of the health care provider who prescribed the reference product") *with Orange Book*, at vii-viii (a therapeutic equivalence rating reflects FDA's determination that the products "can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product").

[173] *See, e.g.*, HUMULIN® N (human insulin [rDNA origin] isophane suspension) Prescribing Information, Section 5.2 (Feb. 2015) ("Changes in insulin strength, manufacturer, type, or method of administration may affect glycemic control and predispose to hypoglycemia . . . or hyperglycemia. These changes should be made cautiously and under close medical supervision and the frequency of blood glucose monitoring should be increased."); HUMALOG® (insulin lispro injection) Prescribing Information, Section 5.2 (May 2015) (same).

[174] BPCIA § 7002(b)(2), 124 Stat. at 814. As a result, the statutory definition of "biological product" is "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings." PHSA § 351(i)(1).

[175] BPCIA § 7002(e)(2), 124 Stat. at 817. During the transition period, an applicant may not file an NDA if there is a PHSA-licensed biological product that could serve as the reference product for the application if it were submitted under section 351(k). *Id.* § 7002(e)(3), 124 Stat. at 817.

[176] *Id.* § 7002(e)(2), 124 Stat. at 817.

30

Last year, FDA issued final guidance (the Biosimilars Q&A Guidance) purporting to interpret the statutory phrase "protein (except any chemically synthesized polypeptide)."[177]  The Agency interpreted "protein" to mean "any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size" and "chemically synthesized polypeptide" to mean "any alpha amino acid polymer that (1) is made entirely by chemical synthesis; and (2) is less than 100 amino acids in size."[178]  In adopting this interpretation, the Agency "decided that the term 'protein' . . . does not include peptides" and sought to differentiate proteins from peptides.[179]  The Agency conceded that it chose to pursue a bright-line distinction between proteins and peptides "based solely on size," in order "[t]o enhance regulatory clarity and minimize administrative complexity."[180]  As discussed below, FDA's interpretation is untenable, as it is contrary to the amended PHSA, diverges impermissibly from FDA's regulations, and is arbitrary and capricious, particularly in light of the Agency's licensure of Natpara® (parathyroid hormone) under the PHSA and its prior statements regarding peptides.[181]

Lilly requests that FDA revise its regulations through notice and comment rulemaking to reflect the revised statutory definition of "biological product."  The Agency should ensure that its regulatory definition recognizes that *both* proteins and products that are analogous to proteins are biological products.  FDA also should ensure that its definition of the phrase "protein (except any chemically synthesized polypeptide)" is consistent with the plain language of the PHSA and supported by sound science.  To this end, Lilly requests that FDA define the entire phrase to mean:

> **A linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds and manufactured by a process that utilizes a biological system.**

Even if FDA maintains its current interpretation of "protein," however, the PHSA is clear that products "analogous" to proteins are biological products.[182] Recombinantly-derived amino acid polymer products such as teriparatide fall within this category, as they share many attributes

---

[177] 80 Fed. Reg. 24259 (Apr. 30, 2015); Biosimilars Q&A Guidance, at 13-15.

[178] Biosimilars Q&A Guidance, at 14.

[179] *Id.  See also id.* (stating that "[t]he scientific literature . . . generally excludes 'peptides' from the category of 'protein.'").

[180] *Id.*, at 14-15.

[181] Indeed, FDA engaged in lawmaking when it decided to classify peptides and proteins as requiring NDAs or BLAs based solely on number of amino acids—a determination that should have been made through notice and comment rulemaking in the first place.  *See Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 495 (D.C. Cir. 2010) ("[W]hen an agency wants to state a principle 'in numerical terms,' . . . the agency is legislating and should act through rulemaking.") (quoting Henry J. Friendly, *Watchman, What of the Night?*, in Benchmarks 144-45 (1967)).  The fact that FDA adopted its regulatory definitions of other components of the "biological product" definition through rulemaking and published them in the Code of Federal Regulations underscores that the 40 amino acid cut-off is a legislative rule.  *See* 21 C.F.R. § 600.3(h) & (j) (defining "virus," "therapeutic serum," "toxin," "antitoxin," and products analogous to them as well as "trivalent organic arsenicals"); *United States v. Picciotto*, 875 F.2d 345, 348 (D.C. Cir. 1989) (that the agency previously pursued notice and comment rulemaking in a related setting was "persuasive" evidence that the rule at bar also was legislative).

[182] *See* PHSA § 351(i)(1).

FDA001399

A.0121                                    A.0121                                    A.0121

with amino acid polymers on the other side of the 40 amino acid cut-off.  Therefore, in the alternative, FDA should confirm that it considers Forteo and other amino acid polymers that are made using biological systems but have 40 or fewer amino acids as "analogous products" and within the PHSA's "biological product" definition.  In keeping with either of these approaches and the requirements of the BPCIA, upon the BPCIA's transition date, the NDA for Forteo should be deemed a BLA licensed under section 351(a) of the PHSA, and follow-on teriparatide applicants should be required to seek licensure under section 351(k) of the PHSA.

### A.   FDA Should Revise Its Regulations Through Rulemaking To Reflect The Revised Statutory Definition Of "Biological Product."

#### 1.   FDA's Purported Interpretation Of "Protein" Is Contrary To The Statute.

Statutory words and phrases cannot be interpreted in isolation,[183] yet that is what FDA has done with the term "protein."  Consequently, the Agency has overlooked crucial details that inform the proper interpretation of this term, thereby resulting in an interpretation that is inconsistent with the statutory language.

First, FDA ignores the parenthetical of "except any chemically synthesized polypeptide" as being relevant to the definition of "protein."  The parenthetical inherently acknowledges that polypeptides *are* proteins and carves out only chemically-synthesized polypeptides.  Once the parenthetical is correctly accounted for, it is clear that a bright-line, amino acid-based numerical threshold for protein status runs counter to the statutory language:  the animating distinction is the manufacturing method, not the molecular size of the amino acid polymer, and restrictions on the meaning of "protein" based on the latter are misplaced.

Second, FDA's interpretation does not account for the fact that the amended definition of "biological product" includes both "protein" and any "analogous product."[184]  FDA is familiar with the breadth of "analogous product," having relied on this language to regulate many therapeutic proteins as biological products.[185]  Thus, it seems straightforward that a recombinant hormone consisting of 34 amino acids (e.g., teriparatide) should be analogous to a recombinant hormone consisting of 51 amino acids (e.g., insulin).  Even more apparent is that teriparatide should be considered analogous to the recombinantly-derived Natpara®, which is the 84 amino acid PTH that has the same biologically active region as teriparatide (amino acids 1-34)[186] and is licensed

---

[183] *See*, *e.g.*, *United States v. Morton*, 467 U.S. 822, 828 (1984) ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole.").

[184] PHSA § 351(i)(1) (defining biological product to mean, among other things, "*protein (except any chemically synthesized polypeptide), or analogous product*") (emphasis added).

[185] *See*, *e.g.*, 48 Fed. Reg. 50795, 50795 (Nov. 3, 1983) ("A monoclonal antibody product is analogous to both an antitoxin and a therapeutic serum.  Therfore [*sic*], by definition, any monoclonal antibody product intended either for in vivo use or for in vitro testing of a licensed biological product is [a] biological product and is subject to the licensing provisions of the Public Health Service Act.").

[186] Natpara Prescribing Information, Description (Section 11).  *See also* Forteo Prescribing Information, Description (Section 11) (explaining the biologically active region of the 84-amino acid human PTH is amino acids 1-34).

FDA001400
A.0122                    A.0122                    A.0122

as a biological product under section 351(a) of the PHSA.[187]  A bright-line, amino acid-based numerical threshold for "protein" status does nothing but establish an arbitrary distinction that runs counter to the broad and nuanced statutory language chosen by Congress.[188]

### 2.   FDA's Definitional Approach Diverges From The Agency's Regulations.

FDA's interpretation is inconsistent with 21 C.F.R. § 601.2.  This regulation provides that an applicant shall submit a BLA (subject to certain reduced requirements) for "the following specified categories of biological products subject to licensure," which include "[t]herapeutic recombinant DNA-derived products."[189]  As Lilly noted in prior comments submitted to the Agency,[190] this regulation acknowledges that therapeutic recombinant DNA-derived amino acid polymers—regardless of the number of amino acid residues—are currently regarded as biological products.  Thus, the Biosimilars Q&A Guidance impermissibly diverged from FDA's binding regulation by classifying recombinant DNA-derived amino acid polymers of 40 or fewer amino acids as outside the definition of "biological product."

Moreover, contrary to FDA's claim that its interpretation is intended to "enhance regulatory clarity and minimize administrative complexity[,]"[191] FDA's interpretation has resulted in significant ambiguity and inconsistency.  The 40 amino acid threshold of the Biosimilars Q&A Guidance is inconsistent with both the statutory definition *and* the Agency's regulations.  Adding to this confusing landscape is the fact that FDA's regulation defining "biological product" has not been updated to reflect the definitional changes made by the BPCIA.  These regulations define "biological product," as well as "virus," "therapeutic serum," "toxin," "antitoxin," products "analogous" to them, and "trivalent organic arsenicals."[192]  The regulatory definition does not include proteins even though these products are now biological products, and it also does not address what products are "analogous" to proteins.  In sum, FDA's interpretation of "protein" not only is contrary to its regulations, but its adoption through guidance rather than rulemaking has resulted in a patchwork of inconsistent, confusing, and incomplete Agency statements on the meaning of "biological product."

---

[187] Letter from Curtis J. Rosebraugh, M.D., M.P.H., Director, Office of Drug Evaluation II, Office of New Drugs, CDER, to NPS Pharmaceuticals Inc., Approval Letter for BLA 125511 (Jan. 23, 2015).

[188] *See Time Warner Ent. Co. v. FCC*, 240 F.3d 1126, 1137 (D.C. Cir. 2001) ("[I]n drawing a numerical line an agency will ultimately indulge in some inescapable residue of arbitrariness.").

[189] 21 C.F.R. § 601.2(a); *see also id.* § 601.2(c).  Further, the regulation continues to state that "[t]herapeutic synthetic peptide products of 40 or fewer amino acids" are biological products subject to licensure.  *Id.* § 601.2(a)(2) & (c).

[190] Comments of Eli Lilly and Company, Docket No. FDA-2011-D-0611 (Oct. 9, 2014).

[191] Biosimilars Q&A Guidance, at 14-15.

[192] 21 C.F.R. § 600.3(h)(&(i).

FDA001401
A.0123                          A.0123                          A.0123

3.    FDA's Interpretation Is Arbitrary And Capricious.

For several reasons, the Agency's interpretation of "protein" is arbitrary and capricious in violation of the Administrative Procedure Act.[193]  Promulgating the requested regulation will address these deficiencies.

First, FDA has not adequately explained its decision to rely upon the 40 amino acid cutoff as the sole determinant of "protein" status.  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."[194]  In other words, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[195]  FDA has not done that here.  The Agency conceded that it chose to pursue a bright-line distinction between proteins and peptides "based solely on size," in order "[t]o enhance regulatory clarity and minimize administrative complexity," and not because that conclusion was compelled by science.[196]  Indeed, the Biosimilars Q&A Guidance acknowledges "the absence of clear scientific consensus on the criteria that distinguish proteins from peptides."[197]  The guidance states that FDA reviewed "pertinent literature" in support of its bright-line interpretation, but does not disclose the literature that was reviewed and deemed pertinent.[198]  Nor did the Agency offer a reasoned explanation as to why molecular size alone—to the exclusion of other relevant factors, such as molecular structure or method of manufacture— should control or why 40 amino acids is the appropriate line from a scientific perspective.  FDA's vague pronouncements do not discharge FDA's obligation to provide a reasoned explanation for its position.[199]  Instead, as in *Prevor v. FDA*, this is a case where "FDA failed to provide any details regarding its 'qualitative evaluation' or the 'scientific information' on which it based the . . . decision."[200]

---

[193] 5 U.S.C. § 706(2)(A).

[194] *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (citation omitted).

[195] *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

[196] Biosimilars Q&A Guidance, at 14.

[197] *Id.*, at 15; *see also* Transcript of Part 15 Public Hearing, FDA, Draft Guidances Relating to the Development of Biosimilar Products, 285:8-13 (May 11, 2012) ("[W]e all agree that searching this carefully, searching the scientific literature there is not one right answer") (statement of Rachel Sherman, M.D., M.P.H., Associate Director for Medical Policy, CDER; Presiding Officer).

[198] Biosimilars Q&A Guidance, at 15.

[199] *See, e.g.*, *Time Warner*, 240 F.3d at 1137 ("[To] pass even the arbitrary and capricious standard, the agency must at least reveal a rational connection between the facts found and the choice made. . . . Yet it appears to provide nothing but the conclusion that 'we believe a 40% limit is appropriate to balance the goals.'  What are the conditions that make 50% too high and 30% too low? How great is the risk presented by current market conditions? These questions are left unanswered by the Commission's discussion." (internal citations and quotation marks omitted)).

[200] *Prevor v. FDA*, 895 F. Supp. 2d 90, 97 (D.D.C. 2012) (vacating FDA's classification of a product as a drug-device combination product with a primary mode of action due to failure to provide reasoned explanation for the classification).

34

FDA001402
A.0124                          A.0124                          A.0124

In addition, FDA's interpretation is inconsistent with prior statements of FDA officials and the regulation identified above, underscoring its arbitrariness. Just as 21 C.F.R. § 601.2 provides that recombinant DNA-derived products are biological products, FDA officials have acknowledged that peptides are a type of protein as a scientific matter.[201] The Agency's recent efforts to cabin the definition of "protein" to amino acid polymers of only a certain molecular size run counter to these past pronouncements, not to mention the weight of the scientific literature.[202] "It is well-established that an agency may not depart from 'established precedent without announcing a principled reason for such a reversal.'"[203] FDA's professed goal of minimizing administrative complexity is not a principled reason for insisting on an arbitrary 40 amino acid threshold, and the Agency's interpretation is arbitrary and capricious on this ground as well.

Finally, FDA has approved under different statutes different versions of the same hormone that fall on opposite sides of the 40 amino acid line. In 2002, the Agency approved Forteo, which is an amino acid polymer having the same biologically-active 34 amino acids as PTH, under the NDA approval pathway. In 2015, however, FDA licensed Natpara® (parathyroid hormone) under section 351(a) of the PHSA.[204] Even though the two products are both recombinant versions of the same natural hormone and have the same biologically-active 34 amino acids, they currently are approved under different statutes. If FDA's interpretation stands, it will continue this discordant practice, which is precisely the sort of arbitrary result that Congress intended to prevent by amending the biological product definition as part of the BPCIA. Indeed, FDA's interpretation cannot stand, as the disparate treatment of products that are "identical in all material respects" for product jurisdiction purposes is "the essence of the meaning of arbitrary and capricious."[205]

### B.    The Forteo NDA Should Be Deemed A BLA, And A Follow-On Teriparatide Product Should Follow The Biosimilar Pathway As Of The Transition Date.

As discussed above, FDA should abandon its current interpretation of the statutory phrase "protein (except any chemically synthesized polypeptide)" and, through notice and comment rulemaking, promulgate a rule that defines the phrase to mean: "A linear polymer of α-amino acids with a specific defined sequence joined together by peptide bonds and manufactured by a process that utilizes a biological system." This is the consensus definition from the scientific literature, and it is consistent with the statutory exclusion of polypeptides made by chemical synthesis. Even if FDA retains its current interpretation, however, the PHSA defines "biological product" in relevant part as a "protein (except any chemically synthesized polypeptide), *or analogous product*."[206] Thus, under the plain language of the statute, it is clear

---

[201] *See, e.g.*, Woodcock, *supra* note 47, at 438 ("Peptides represent the simplest subset of proteins. Throughout this document, we use the term 'proteins' to refer to all forms of proteins, including peptides, unless otherwise specified.").

[202] *See* Comments of Eli Lilly and Company, Docket No. FDA-2011-D-0611 (Oct. 9, 2014).

[203] *Fertilizer Inst. v. Browner*, 163 F.3d 774, 778 (3d Cir. 1998) (quoting *Donovan v. Adams Steel Erection, Inc.*, 766 F.2d 804, 807 (3d Cir. 1985)).

[204] Letter from Curtis J. Rosebraugh, M.D., M.P.H., Director, Office of Drug Evaluation II, Office of New Drugs, CDER, to NPS Pharmaceuticals Inc., Approval Letter for BLA 125511 (Jan. 23, 2015).

[205] *Bracco Diagnostics, Inc. v. Shalala,* 963 F. Supp. 20, 24, 27-28 (D.D.C. 1997).

[206] *See* PHSA § 351(i)(1) (emphasis added).

FDA001403

that "biological product" includes products analogous to proteins—such as amino acid polymer products like teriparatide—and FDA should acknowledge that the PHSA compels this result.

With the correct understanding in place, the Forteo NDA should be deemed a BLA on March 23, 2020.[207]  As a 505(b)(1) application, the Forteo NDA contained a full data package, and thus, it should be deemed licensed under section 351(a) of the PHSA.  Although Teva's proposed follow-on teriparatide product arguably would be a "chemically synthesized polypeptide"—which is not considered a biological product under the PHSA's definition—this is of no moment as the approval pathway for a follow-on product is dictated by the approval pathway of the RLD.[208]  Furthermore, with Forteo licensed as a reference product, as of the transition date, any proposed follow-on teriparatide product must be submitted under section 351(k) of the PHSA.[209]  Upon this transition, FDA should continue to apply the scientific requirements described in Section IV to proposed biosimilars of Forteo.

### C.  ENVIRONMENTAL IMPACT

The actions requested herein are subject to a categorical exclusion under 21 C.F.R. § 25.31(a).

### D.  ECONOMIC IMPACT

An economic impact statement will be submitted at the request of the Commissioner per 21 C.F.R. § 10.30(b).

---

[207] *See* BPCIA § 7002(e)(4), 124 Stat. at 817.

[208] Therapeutic Proteins Petition Response, at 4 ("[T]he availability of an abbreviated approval pathway for a protein or peptide product that seeks to rely, to some extent, upon a previously approved product is governed by the statutory authority under which the previous product was approved or licensed as well as by scientific considerations.").

[209] *See id.*

36

FDA001404

A.0126                                A.0126                                A.0126

Case: 26-1301          Document: 13          Filed: 04/01/2026          Pages: 301

## E. CERTIFICATION

Pursuant to section 505(q)(1)(H) of the FDCA: I certify that, to my best knowledge and belief: (a) this petition includes all information and views upon which the petition relies; (b) this petition includes representative data and/or information known to the petitioner which are unfavorable to the petition; and (c) I have taken reasonable steps to ensure that any representative data and/or information which are unfavorable to the petition were disclosed to me. I further certify that the information upon which I have based the action requested herein first became known to the party on whose behalf this petition is submitted on or about the following date: February 8, 2016 (information that an ANDA had been submitted); and April 2015 (availability of final Biosimilars Q&A Guidance). If I received or expect to receive payments, including cash and other forms of consideration, to file this information or its contents, I received or expect to receive those payments from the following persons or organizations: my employer, Eli Lilly and Company. I verify under penalty of perjury that the foregoing is true and correct as of the date of the submission of this petition.

Pursuant to 21 C.F.R. § 10.30(b): The undersigned certifies that, to the best knowledge and belief of the undersigned, this petition includes all information and views on which the petition relies, and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

Respectfully submitted,

Robert Conley, M.D.
Global Development Leader/Distinguished Scholar
Eli Lilly and Company
Lilly Corporate Center
Indianapolis, IN 46285
(317) 655-3518
conley_robert@lilly.com

FDA001405

A.0127          A.0127          A.0127

Certificate Expiration Date: May 31, 2020.

Model Number: HI–STORM 100.

\* \* \* \* \*

Dated at Rockville, Maryland, this 29th day of November 2018.

For the Nuclear Regulatory Commission.

**Margaret M. Doane,**

*Executive Director for Operations.*

[FR Doc. 2018–26878 Filed 12–11–18; 8:45 am]

**BILLING CODE 7590–01–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 93**

**RIN 2120–AK39**

**Notification of Replacement Public Meeting on Requirement for Helicopters To Use the New York North Shore Helicopter Route**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notification of public meeting.

**SUMMARY:** Due to inclement weather on November 15, 2018, the FAA announces a replacement public meeting to solicit feedback concerning the New York North Shore Helicopter Rule (''the Rule''). This meeting is being held pursuant to Section 182 of the FAA Reauthorization Act of 2018. The Rule requires civil helicopter pilots operating under Visual Flight Rules (VFR), whose route of flight takes them over the north shore of Long Island between the Visual Point Lloyd Harbor (VPLYD) waypoint and Orient Point (VPOLT), to use the North Shore Helicopter Route.

**DATES:** The public meeting will be held on Thursday, December 13, 2018.

**ADDRESSES:** The public meeting will be held at Vaugh College, 8601 23rd Avenue, Flushing NY 11369. The meeting is 7:00 p.m.–9:00 p.m. EST.

**FOR FURTHER INFORMATION CONTACT:** Christopher Bailey, Office of Rulemaking, Federal Aviation Administration; telephone (202) 267–4158; email *Christopher.Bailey@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Purpose of the Public Meeting**

The purpose of the public meeting is for the FAA to obtain feedback relevant to the Rule at subpart H of part 93, which requires civil helicopter pilots operating under VFR, whose route of flight takes them over the north shore of Long Island between the VPLYD waypoint and VPOLT, to use the North Shore Helicopter Route. The FAA will consider comments made at the public meeting in its review of the Rule.

**Public Participation and Meeting Procedures**

The meeting will use a workshop format. FAA will have several stations covering a number of relevant aspects of the Rule. Each station will be staffed by an FAA representative who is able to answer questions regarding that subject. There will also be a station where the public can submit a written statement or have their oral comment transcribed. No formal presentations will be made.

Section 182 of the FAA Reauthorization Act of 2018 also calls for a written comment period on the North Shore Helicopter Rule. See docket number FAA–2018–0954 to submit written comments.

Sign and oral interpretation can be made available at the meeting, as well as an assistive listening device, if requested 3 calendar days before the meeting. The meeting will be open to all persons on a space-available basis. There will be no admission fee or other charge to attend and participate.

Issued in Washington, DC, on December 7, 2018.

**Brandon Roberts,**

*Deputy Executive Director, Office of Rulemaking.*

[FR Doc. 2018–26934 Filed 12–10–18; 4:15 pm]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 600**

**[Docket No. FDA–2018–N–2732]**

**RIN 0910–AH57**

**Definition of the Term** ''**Biological Product**''

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Proposed rule.

**SUMMARY:** The Food and Drug Administration (FDA or the Agency) is proposing to amend its regulation that defines ''biological product'' to incorporate changes made by the Biologics Price Competition and Innovation Act of 2009 (BPCI Act), and to provide its interpretation of the statutory terms ''protein'' and ''chemically synthesized polypeptide.'' Under that interpretation, the term *protein* would mean any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. A *chemically synthesized polypeptide* would mean any alpha amino acid polymer that is made entirely by chemical synthesis and is greater than 40 amino acids but less than 100 amino acids in size. This proposed rule is intended to clarify the statutory framework under which such products are regulated.

**DATES:** Submit either electronic or written comments on the proposed rule by February 25, 2019.

**ADDRESSES:** You may submit comments as follows. Please note that late, untimely filed comments will not be considered. Electronic comments must be submitted on or before February 25, 2019. The *https://www.regulations.gov* electronic filing system will accept comments until midnight Eastern Time at the end of February 25, 2019. Comments received by mail/hand delivery/courier (for written/paper submissions) will be considered timely if they are postmarked or the delivery service acceptance receipt is on or before that date.

*Electronic Submissions*

Submit electronic comments in the following way:

• *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the instructions for submitting comments. Comments submitted electronically, including attachments, to *https://www.regulations.gov* will be posted to the docket unchanged. Because your comment will be made public, you are solely responsible for ensuring that your comment does not include any confidential information that you or a third party may not wish to be posted, such as medical information, your or anyone else's Social Security number, or confidential business information, such as a manufacturing process. Please note that if you include your name, contact information, or other information that identifies you in the body of your comments, that information will be posted on *https://www.regulations.gov.*

• If you want to submit a comment with confidential information that you do not wish to be made available to the public, submit the comment as a written/paper submission and in the manner detailed (see ''Written/Paper Submissions'' and ''Instructions.'')

*Written/Paper Submissions*

Submit written/paper submissions as follows:

• *Mail/Hand Delivery/Courier (for written/paper submissions):* Dockets Management Staff (HFA–305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

FDA001609

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 119 of 275 PageID
Case: 26-1301    Document: 13 #: 733    Filed: 04/01/2026    Pages: 301

**63818**    **Federal Register**/Vol. 83, No. 238/Wednesday, December 12, 2018/Proposed Rules

• For written/paper comments submitted to the Dockets Management Staff, FDA will post your comment, as well as any attachments, except for information submitted, marked and identified as confidential, if submitted as detailed in ''Instructions.''

*Instructions:* All submissions received must include the Docket No. FDA–2018–N–2732 for ''Definition of the Term 'Biological Product'.'' Received comments, those filed in a timely manner (see **ADDRESSES**), will be placed in the docket and, except for those submitted as ''Confidential Submissions,'' publicly viewable at *https://www.regulations.gov* or at the Dockets Management Staff between 9 a.m. and 4 p.m., Monday through Friday.

• Confidential Submissions—To submit a comment with confidential information that you do not wish to be made publicly available, submit your comments only as a written/paper submission. You should submit two copies total. One copy will include the information you claim to be confidential with a heading or cover note that states ''THIS DOCUMENT CONTAINS CONFIDENTIAL INFORMATION.'' The Agency will review this copy, including the claimed confidential information, in its consideration of comments. The second copy, which will have the claimed confidential information redacted/blacked out, will be available for public viewing and posted on *https://www.regulations.gov.* Submit both copies to the Dockets Management Staff. If you do not wish your name and contact information to be made publicly available, you can provide this information on the cover sheet and not in the body of your comments and you must identify this information as ''confidential.'' Any information marked as ''confidential'' will not be disclosed except in accordance with 21 CFR 10.20 and other applicable disclosure law. For more information about FDA's posting of comments to public dockets, see 80 FR 56469, September 18, 2015, or access the information at: *https://www.gpo.gov/fdsys/pkg/FR-2015-09-18/pdf/2015-23389.pdf.*

*Docket:* For access to the docket to read background documents or the electronic and written/paper comments received, go to *https://www.regulations.gov* and insert the docket number, found in brackets in the heading of this document, into the ''Search'' box and follow the prompts and/or go to the Dockets Management Staff, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Janice Weiner, Center for Drug Evaluation and Research, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 51, Rm. 6270, Silver Spring, MD 20993, 301–796–3475, *janice.weiner@fda.hhs.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
  A. Purpose of the Proposed Rule
  B. Summary of the Major Provisions of the Proposed Rule
  C. Legal Authority
  D. Costs and Benefits
II. Table of Abbreviations/Commonly Used Acronyms in This Document
III. Background
  A. Introduction
  B. History of the Rulemaking
IV. Legal Authority
V. Description of the Proposed Rule
VI. Proposed Effective Date
VII. Economic Analysis of Impacts
  A. Introduction
  B. Summary of Costs and Benefits
  C. Summary of Regulatory Flexibility Analysis
VIII. Analysis of Environmental Impact
IX. Paperwork Reduction Act of 1995
X. Consultation and Coordination With Indian Tribal Governments
XI. Federalism
XII. References

### I. Executive Summary

#### A. Purpose of the Proposed Rule

FDA proposes to amend its regulation that defines ''biological product'' to make a technical revision and to conform to the statutory definition enacted in the BPCI Act. The BPCI Act amended the definition of *biological product* in section 351(i) of the Public Health Service Act (PHS Act) to include a ''protein (except any chemically synthesized polypeptide).'' The proposed rule would make conforming changes to § 600.3 (21 CFR 600.3) to add ''protein'' and ''chemically synthesized polypeptide.''

#### B. Summary of the Major Provisions of the Proposed Rule

Under the proposed rule, the term *protein* would mean any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size, and the term *chemically synthesized polypeptide* would mean any alpha amino acid polymer that: (1) Is made entirely by chemical synthesis and (2) is greater than 40 amino acids but less than 100 amino acids in size. This is consistent with interpretations of these terms that FDA previously described in a final guidance document issued on April 30, 2015 (see 80 FR

24259 (announcing the availability of a guidance for industry entitled ''Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009,'' available at *https://www.regulations.gov* (Docket No. FDA–2011–D–0611) (Biosimilars Q&A Guidance)).

#### C. Legal Authority

FDA is proposing to amend its regulations to implement certain aspects of the BPCI Act. FDA's authority for this rule derives from the biological product provisions in section 351 of the PHS Act (42 U.S.C. 262), and the provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 321, *et seq.*) applicable to drugs. The rule is necessary to clarify the statutory authority under which biological products are regulated and to prevent inconsistent regulation.

#### D. Costs and Benefits

This proposed rule would codify FDA's interpretation of the statutory terms ''protein'' and ''chemically synthesized polypeptide'' in a manner that is consistent with interpretations of these terms that FDA previously described in guidance (see Biosimilars Q&A Guidance). Formalizing these interpretations would reduce regulatory uncertainty over whether certain products are regulated as drugs or biological products. This reduced uncertainty, under the ''bright-line'' approach described in the proposed rule, would allow both FDA and private industry to avoid spending hours and resources on case-by-case determinations for each product. Our primary estimate of the benefits from these cost savings in 2017 dollars annualized over 10 years is $340,766 using a 7 percent discount rate and $321,506 using a 3 percent discount rate. We also calculate ranges of benefits of $318,137 to $355,690 and $300,617 to $335,282, respectively. Additionally, drug manufacturers would need to spend time to read and understand the proposed rule. We monetize the time spent by industry and estimate an annualized cost range from $14,471 to $18,089, with a primary estimate of $16,079 using a 7 percent discount rate over a 10-year horizon. For a 3 percent discount rate, we estimate a range of $12,378 to $15,472, with a primary estimate of $13,753.

### II. Table of Abbreviations/Commonly Used Acronyms in This Document

| Abbreviation/acronym | What it means |
|---|---|
| BPCI Act ........................................................ | Biologics Price Competition and Innovation Act of 2009. |
| CFR ............................................................... | Code of Federal Regulations. |
| FD&C Act ...................................................... | Federal Food, Drug, and Cosmetic Act. |
| FDA ............................................................... | U.S. Food and Drug Administration. |
| PHS Act ........................................................ | Public Health Service Act. |
| U.S ............................................................... | United States. |
| U.S.C ............................................................ | United States Code. |

## III. Background

### A. Introduction

The BPCI Act amended the definition of *biological product* in section 351(i) of the PHS Act to include a ''protein (except any chemically synthesized polypeptide).'' As amended by the BPCI Act, a *biological product* is defined as ''a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings'' (see section 351(i)(1) of the PHS Act).

The BPCI Act clarified the statutory authority under which certain protein products are to be regulated. Although the majority of therapeutic biological products have been licensed under section 351 of the PHS Act, some protein products historically have been approved under section 505 of the FD&C Act (21 U.S.C. 355). The BPCI Act requires that a marketing application for a ''biological product'' (that previously would have been submitted under section 505 of the FD&C Act) must be submitted under section 351 of the PHS Act, subject to certain exceptions during a 10-year transition period ending on March 23, 2020 (see sections 7002(e)(1) through (3) and (e)(5) of the BPCI Act).

The BPCI Act also amended the PHS Act and other statutes to create an abbreviated licensure pathway in section 351(k) of the PHS Act for biological products shown to be biosimilar to, or interchangeable with, an FDA-licensed biological reference product (see sections 7001 through 7003 of the BPCI Act). The objectives of the BPCI Act are conceptually similar to those of the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub. L. 98–417) (commonly referred to as the ''Hatch-Waxman Amendments''), which established abbreviated pathways for the approval of drug products under section 505(b)(2) and (j) of the FD&C Act. FDA is proposing to provide its interpretation of the terms ''protein'' and ''chemically synthesized polypeptide'' to clarify the statutory framework under which such products are regulated.

### B. History of the Rulemaking

On October 5, 2010, the Agency published a notice of public hearing and request for comments concerning implementation of the BPCI Act (75 FR 61497). Information on this public hearing, including the **Federal Register** notice, meeting transcripts, and public comments can be found at *https://www.regulations.gov* (Docket No. FDA–2010–N–0477). In the notice, FDA addressed ''the absence of scientific consensus on the distinction between the categories of 'protein' and 'polypeptide' or 'peptide,' '' and requested comment concerning how these statutory terms should be interpreted. FDA also described its thinking on this topic and sought additional comments by opening a docket for the Agency's draft guidance document on ''Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009'' (see 77 FR 8885, February 15, 2012; available at *https://www.regulations.gov* (Docket No. FDA–2011–D–0611)) (Biosimilars Q&A Draft Guidance Docket). This draft guidance document issued in 2012 has been superseded by subsequent guidance documents.

FDA reviewed the relevant comments in these public dockets and conducted an extensive analysis of the scientific literature in considering how to interpret ''protein (except any chemically synthesized polypeptide)'' in the amended definition of ''biological product'' in section 351(i) of the PHS Act.

Some comments submitted to the public docket established for the Biosimilars Q&A Draft Guidance supported using the size of the alpha amino acid polymer as the basis for FDA's interpretation of the statutory term ''protein.'' Other comments suggested that FDA should consider structural and/or functional attributes and, for example, interpret the statutory term ''protein'' to mean an alpha amino acid polymer with a specific defined sequence that requires a stable multidimensional conformation for its function and is manufactured by a process that utilizes a biological system. Several comments suggested that FDA interpret the statutory term ''chemically synthesized polypeptide'' to mean any linear chain of alpha amino acids that is made entirely by chemical synthesis, irrespective of the size of the chain. Some, but not all, of these comments also suggested that a chemically synthesized polypeptide should not rely on higher order structure for functionality.

A review of the scientific literature and dictionaries demonstrates consensus on certain aspects of the definitions of the terms ''protein,'' ''polypeptide,'' and ''peptide,'' as well as how the definitions vary.

#### 1. Dictionary Definitions

##### a. Protein

• ''A complex, high polymer containing carbon, hydrogen, oxygen, nitrogen, and usually sulfur, and composed of chains of amino acids connected by peptide linkages .........'' (Ref. 1)

• ''Protein molecules consist of one or several long chains (polypeptides) of amino acids linked in a characteristic sequence.'' (Ref. 2)

• ''A high molecular weight polypeptide of L-amino acids that is synthesized by living cells. Proteins are biopolymers with a wide range of molecular weights, structural complexity, and functional properties.'' (Ref. 3)

• ''Any of a large class of complex organic chemical compounds that . . . . . . consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures.'' (Ref. 4)

##### b. Polypeptide

• ''The class of compounds composed of acid units chemically bound together with amide linkages (-CO·NH-) with elimination of water. A polypeptide is thus a polymer of amino acids. The chain of amino acids (less than 100) are linked by peptide bonds.'' (Ref. 1)

• ''A peptide comprising 20 or more amino acids. Polypeptides that

FDA001611

constitute proteins usually contain 100–300 amino acids.'' (Ref. 2)

• ''The term [polypeptide] is most often used for proteins, which can consist of one or more polypeptide chains, but can also be used more generally for all amino acid polymers including peptides, polyamino acids, and chemically synthesized polymers of amino acids.'' (Ref. 5)

• ''A linear polymer of more than 10 amino acids that are linked by means of peptide bonds.'' (Ref. 3)

• ''A peptide which on hydrolysis yields more than two amino acids. . . . See peptide.'' (Ref. 6)

c. Peptide

• ''See polypeptide.'' (Ref. 1)

• ''Any of a group of organic compounds comprising two or more amino acids linked by peptide bonds ......... Polypeptides contain more than 20 and usually 100–300.'' (Ref. 2)

• ''A chemical compound that is composed of a chain of two or more amino acids and is usually smaller than a protein.'' (Ref. 4)

• ''Any member of a class of compounds of low molecular weight which yield two or more amino acids on hydrolysis ......... Peptides form the constituent parts of proteins.'' (Ref. 6)

• ''Peptides ....... are oligomers in which the repeating units are amino acids. Peptides have a defined sequence of amino acids that are linked together by formation of peptide bonds. In contrast to polypeptides and proteins, peptides consist of a small number of amino acids. The distinction between a peptide and a polypeptide is somewhat arbitrary, but generally a peptide has between 2 and 50 amino acid residues .......... Most peptides are unstructured, described as having a random coil conformation, but others have highly ordered secondary and tertiary structure similar to that observed in larger proteins.'' (Ref. 5)

2. Textbook Definitions

• ''Most natural polypeptide chains contain between 50 and 2000 amino acid residues and are commonly referred to as proteins. Peptides made of small numbers of amino acids are called oligopeptides or simply peptides.'' (Ref. 7)

• ''Proteins are molecules that consist of one or more polypeptide chains. These polypeptides range in length from ~40 to ~33,000 amino acid residues.'' (Ref. 8)

• ''Proteins consist of one or more linear polymers called polypeptides . . . a minimum of 40 residues seems to be required for a polypeptide to adopt

a stable three-dimensional structure in water.'' (Ref. 9)

• ''Many terms are used to denote the chains formed by the polymerization of amino acids. A short chain of amino acids linked by peptide bonds and having a defined sequence is called an oligopeptide, or just peptide; longer chains are referred to as polypeptides. Peptides generally contain fewer than 20–30 amino acid residues, whereas polypeptides are often 200–500 residues long.'' (Ref. 10)

• ''A protein molecule is made from a long chain of these amino acids, each linked to its neighbor through a covalent peptide bond. Proteins are therefore also known as polypeptides. Each type of protein has a unique sequence of amino acids ..........Proteins come in a wide variety of shapes, and they are generally between 50 and 2000 amino acids long.'' (Ref. 11)

As the previous examples demonstrate, sources disagree over certain aspects of the definitions of these terms, especially the term ''polypeptide.''

At the same time, despite the lack of precise, agreed-upon definitions, most, if not all, sources agree about certain aspects of the meanings of these terms. These areas of agreement may be summarized in the following manner. First, all of the terms (*protein, polypeptide,* and *peptide*) refer to amino acid polymers (''chains'') made up of alpha amino acids linked by peptide bonds. Second, *protein* refers to chains containing a specific, defined sequence of amino acids, generally provided by a corresponding DNA or RNA sequence. As noted in one biochemistry textbook: ''In 1953, Frederick Sanger determined the amino acid sequence of insulin, a protein hormone [figure omitted]. *This work is a landmark in biochemistry because it showed for the first time that a protein has a precisely defined amino acid sequence.*'' (Ref. 7) (emphasis in original). Finally, *peptide* is a term distinct from *protein.* Most sources agree that the term *peptide* generally refers to smaller, simpler chains of amino acids, while *protein* is used to refer to longer, more complex chains. Based on these areas of agreement, the generally accepted meanings of *protein, polypeptide,* and *peptide* appear to include the following: All three terms refer to amino acid polymers. *Proteins* are long, complex polymers of alpha amino acids. Each protein has a specific, defined sequence. *Peptides* are distinct from proteins.

In applying its scientific expertise to interpret the statutory terms ''protein'' and ''chemically synthesized polypeptide,'' FDA seeks to establish a

scientifically reasonable, bright-line rule that provides regulatory clarity and facilitates the implementation of the BPCI Act. A clear rule facilitates efficient use of time and resources by both FDA and applicants and reduces regulatory uncertainty.

Under the Agency's proposed interpretation, the term ''protein'' in the amended definition of *biological product* would not include peptides. In general, most scientific sources describe the term *protein* as excluding ''peptides'' (*i.e.,* amino acid polymers or ''chains'' that are generally shorter and simpler than proteins). Thus, to the extent that there is a generally accepted meaning of ''protein,'' peptides appear to be outside the scope of the term.

With these considerations in mind, FDA is proposing a size-based cutoff for distinguishing peptides from proteins that is supported by scientific sources. This approach reflects the Agency's conclusion that, other than size, there does not appear to be a precise set of structural or functional attributes that would define a protein so as to clearly distinguish proteins from peptides. Specifically, for purposes of interpreting the BPCI Act, the Agency is proposing to codify that ''*protein* (except any chemically synthesized polypeptide)'' would mean any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. This threshold, based on a single, well-defined criterion, would supply a clear, bright-line rule.

**IV. Legal Authority**

FDA's authority for this proposed rule derives from the biological product provisions in section 351 of the PHS Act and the provisions of the FD&C Act (21 U.S.C. 321, *et seq.*) applicable to drugs. Under these provisions of the PHS Act and the FD&C Act, FDA has the authority to issue regulations designed to ensure, among other things, that biological products are safe, pure, and potent and manufactured in accordance with current good manufacturing practices. FDA also has general authority to issue regulations for the efficient enforcement of the FD&C Act and the PHS Act, under section 701 of the FD&C Act (21 U.S.C. 371) and section 351(j) of the PHS Act.

**V. Description of the Proposed Rule**

This proposed rule would amend the definition of *biological product* in § 600.3(h) to make a technical revision and to conform to changes in the statutory definition of ''biological product'' made by the BPCI Act.

We are proposing to revise the definition of *biological product* in

FDA001612

§ 600.3(h) by replacing the phrase ''means any'' with the phrase ''means a'' to conform to the text of section 351(i)(1) of the PHS Act. This proposed technical revision to the definition of *biological product* is not intended to alter our interpretation of § 600.3(h).

We also are proposing to define a *biological product* in § 600.3(h) to include a ''protein (except any chemically synthesized polypeptide).'' We are proposing to add paragraphs (h)(6) and (7) to this section to provide our interpretation of the terms ''protein'' and ''chemically synthesized polypeptide.''

Under the proposed rule, the term *protein* would mean any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. FDA's proposed interpretation of this statutory term is informed by several factors. The scientific literature describes a *protein* as a defined sequence of alpha amino acid polymers linked by peptide bonds and generally excludes ''peptides'' from the category of ''protein.'' Similarly, a *peptide* generally refers to polymers that are smaller, perform fewer functions, contain less three-dimensional structure, are less likely to be post-translationally modified, and, therefore, are generally characterized more easily than proteins. Consistent with the scientific literature, FDA is proposing to codify its interpretation of the term ''protein'' in a manner that does not include peptides. To enhance regulatory clarity and minimize administrative complexity, FDA is proposing to codify an approach that distinguishes proteins from peptides based solely on size (*i.e.,* number of amino acids).

In the absence of clear scientific consensus on definitive criteria that distinguish proteins from peptides, including the exact size at which a chain(s) of amino acids becomes a protein, FDA reviewed the pertinent literature and concluded that a threshold of 40 amino acids is appropriate for defining the upper size boundary of a peptide. Although there also is support in the scientific literature for a threshold of 50 amino acids, FDA believes that a threshold of 40 amino acids is more appropriate based on the scientific literature and alignment with current regulatory practice (see Refs. 5, 7, 8, 9, 11). FDA's proposal to use a threshold of 40 amino acids for its ''bright-line'' approach reflects that amino acid polymers that are greater than 40 amino acids may often assume several of the structural and functional characteristics that are generally associated with proteins, lending a higher level of complexity to these

products. Accordingly, FDA proposes to consider any polymer composed of 40 or fewer amino acids to be a peptide and not a protein. Therefore, unless a peptide otherwise meets the statutory definition of a ''biological product,'' it would be regulated as a drug under the FD&C Act.

Where an amino acid polymer is greater than 40 amino acids in size and is related to a naturally occurring peptide (*i.e.,* a polymer that is 40 or fewer amino acids in size), such a polymer would be reviewed to determine whether the additional amino acids that cause the peptide to exceed 40 amino acids in size raise any concerns about the risk/benefit profile of the product.

Some amino acid polymers are composed of multiple amino acid chains that are associated with each other. To determine the size of such an amino acid polymer for purposes of FDA's interpretation of the terms ''protein'' and ''chemically synthesized polypeptide,'' FDA would evaluate whether two or more of its amino acid chains are associated in a manner that is found in naturally occurring proteins. In proposed § 600.3(h)(6) and (7), FDA explains that when two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer would be based on the total number of amino acids in those chains, and would not be limited to the number of amino acids in a contiguous sequence. In other words, the amino acids in each such amino acid chain would be added together to determine whether the product meets the numerical threshold in FDA's interpretation of the terms ''protein'' and ''chemically synthesized polypeptide.'' However, for products with amino acid chains that are associated with each other in a manner that is not found in nature (*i.e.,* amino acid chains that are associated with each other in a novel manner that is not found in naturally occurring proteins), FDA would conduct a fact-specific, case-by-case analysis to determine whether the size of the amino acid polymer, for purposes of this definition, should be based on adding each of the amino acids in the amino acid chains together, or should be based on separate consideration of the amino acid chains (*e.g.,* the number of amino acids in the largest chain). In such cases, FDA would consider in its analysis, among other things, any structural or functional characteristics of the product.

The proposed rule would define *chemically synthesized polypeptide* to mean any alpha amino acid polymer

that: (1) Is made entirely by chemical synthesis and (2) is greater than 40 amino acids but less than 100 amino acids in size. As amended by the BPCI Act, the term ''protein'' specifically excludes chemically synthesized polypeptides. Thus, chemically synthesized polypeptides will continue to be regulated as drugs under the FD&C Act unless the product meets the statutory definition of a ''biological product'' on another basis.

Where an amino acid polymer is greater than 99 amino acids in size and is related to a naturally occurring peptide or polypeptide of shorter length, such a polymer would be reviewed to determine whether the additional amino acids that cause the polymer to exceed 99 amino acids in size raise any concerns about the risk/benefit profile of the product.

FDA's proposed interpretation of this statutory term is informed by several factors. The statutory category of ''protein'' parenthetically excludes ''any chemically synthesized polypeptide.'' There are several definitions of *polypeptide* in the scientific literature. Some are broad (*e.g.,* polypeptide means any amino acid polymer), while others are more narrow (*e.g.,* polypeptide means any amino acid polymer composed of fewer than 100 amino acids). FDA believes that a narrow definition of polypeptide is most appropriate in this context because, among other reasons, this avoids describing an exception to the statutory category of protein that includes a broader category of molecules. In addition, FDA believes that any chemically synthesized polypeptide composed of more than 99 amino acids would have, among other characteristics, a level of structural and functional complexity and sensitivity to environmental conditions that makes regulating such a protein under the same statutory authority as the majority of proteins more appropriate. Moreover, a narrow definition of polypeptide means that larger and/or more complex proteins (*i.e.,* amino acid polymers composed of more than 99 amino acids) are considered to be biological products regardless of their method of manufacture. This approach also addresses the concern raised in a public comment ''that reliance on the mode of manufacture will create incentives for a manufacturer to choose a process that may be suboptimal solely to enable its product to be regulated under a particular statute'' (Biosimilars Q&A Draft Guidance Docket). Therefore, FDA proposes to interpret the statutory exclusion for *chemically synthesized polypeptide* narrowly to mean any

FDA001613

molecule that is made entirely by chemical synthesis and that is composed of greater than 40 amino acids but less than 100 amino acids in size. The phrase ''made entirely by chemical synthesis'' would mean that all amino acids in the peptide chain were added to the peptide by a synthetic process that does not involve any synthesis of any portion of the peptide using cell-based or cell-free recombinant-DNA-directed synthesis or recombinant-RNA-directed synthesis. Chemically synthesized polypeptides would be regulated as drugs under the FD&C Act unless the molecule otherwise meets the statutory definition of a ''biological product.'' For example, vaccines are specifically identified as biological products under the statutory definition in section 351(i) of the PHS Act irrespective of their size, content, or method of manufacture. Accordingly, vaccines will continue to be regulated as such under the PHS Act, even if they contain, or are composed of, an amino acid chain of 40 or fewer amino acids and/or a chemically synthesized polypeptide composed of greater than 40 amino acids but less than 100 amino acids in size.

FDA seeks comment on any additional considerations for proposed products that are combination products or meet the statutory definition of both a ''device'' and a ''biological product.'' We also encourage prospective sponsors or applicants to contact FDA with product-specific questions. Any final rule that results from this proposed rule will become effective 60 days after publication in the **Federal Register** or on March 23, 2020, the end of the 10-year transition period specified in the BPCI Act, whichever is earlier (see sections 7002(e)(1) through (3) and (e)(5) of the BPCI Act).

## VI. Proposed Effective Date

If finalized, this rule would take effect 60 days after publication in the **Federal Register** or on March 23, 2020, whichever is earlier.

## VII. Economic Analysis of Impacts

### A. Introduction

We have examined the impacts of the proposed rule under Executive Order 12866, Executive Order 13563, Executive Order 13771, the Regulatory Flexibility Act (5 U.S.C. 601–612), and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4). Executive Orders 12866 and 13563 direct us to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). Executive Order 13771 requires that the costs associated with significant new regulations ''shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations.'' We believe that this proposed rule is not a significant regulatory action as defined by Executive Order 12866.

The Regulatory Flexibility Act requires us to analyze regulatory options that would minimize any significant impact of a rule on small entities. Because this rule does not impose new regulatory burden on small entities, other than administrative costs of reading and understanding the rule, we propose to certify that the proposed rule will not have a significant economic impact on a substantial number of small entities.

The Unfunded Mandates Reform Act of 1995 (section 202(a)) requires us to prepare a written statement, which includes an assessment of anticipated costs and benefits, before proposing ''any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year.'' The current threshold after adjustment for inflation is $150 million, using the most current (2017) Implicit

Price Deflator for the Gross Domestic Product. This proposed rule would not result in an expenditure in any year that meets or exceeds this amount.

### B. Summary of Costs and Benefits

This proposed rule would codify FDA's interpretation of the statutory terms ''protein'' and ''chemically synthesized polypeptide,'' in a manner that is consistent with interpretations of these terms that FDA previously described in the April 30, 2015, guidance (see Biosimilars Q&A Guidance). Formalizing these interpretations would reduce regulatory uncertainty introduced by the BPCI Act. Specifically, the proposed rule would clarify the criteria for whether certain products are regulated as drugs or biological products. The ''bright-line'' approach under the proposed rule would reduce the amount of time spent by FDA staff and industry in support of making such determinations.

In this regulatory impact analysis, we identify the products most likely to require a case-by-case determination under the baseline scenario. Under the proposed rule, these determinations would be made by FDA according to the bright-line standard proposed. We calculate the cost savings from the amount of time saved by both FDA and industry by avoiding a case-by-case determination. We also calculate the incremental costs to industry that are the result of reading and understanding the rule.

The primary estimate of the benefits in 2017 dollars annualized over 10 years is $340,766 using a 7 percent discount rate and $321,506 using a 3 percent discount rate. We also calculate ranges of benefits of $313,373 to $355,690 and $296,220 to $335,282, respectively. The estimated annualized costs range from $14,471 to $18,089, with a primary estimate of $16,079 using a 7 percent discount rate over a 10-year horizon. For a 3 percent discount rate, we estimate a range of $12,378 to $15,472, with a primary estimate of $13,753. These figures are shown in table 1 below.

TABLE 1—SUMMARY OF BENEFITS, COSTS, AND DISTRIBUTIONAL EFFECTS OF PROPOSED RULE

| Category | Primary estimate | Low estimate | High estimate | Units | | | Notes |
| | | | | Year dollars | Discount rate | Period covered | |
|---|---|---|---|---|---|---|---|
| Benefits: | | | | | | | |
| Annualized Monetized $/year ..... | $340,766 | $313,373 | $355,690 | 2017 | 7 | 10 | Cost savings to FDA and industry to avoid case-by-case review of applications. |
| | $321,506 | $296,220 | $335,282 | 2017 | 3 | 10 | |
| Annualized Quantified ................ | .................... | .................... | .................... | .................... | 7 | | |
| | .................... | .................... | .................... | .................... | 3 | | |
| Qualitative. | | | | | | | |
| Costs: | | | | | | | |
| Annualized Monetized $/year ..... | $16,079 | $14,471 | $18,089 | 2017 | 7 | 10 | Costs of reading the rule. |
| | $13,753 | $12,378 | $15,472 | 2017 | 3 | 10 | |

FDA001614

TABLE 1—SUMMARY OF BENEFITS, COSTS, AND DISTRIBUTIONAL EFFECTS OF PROPOSED RULE—Continued

| Category | Primary estimate | Low estimate | High estimate | Units | | | Notes |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Year dollars | Discount rate | Period covered | |
| Annualized Quantified ................ | .................... | .................... | .................... | .................... | 7 3 | | |
| Qualitative. | | | | | | | |
| Transfers: | | | | | | | |
| Federal Annualized Monetized $/ year. | .................... | .................... | .................... | .................... | 7 3 | | |
| From/To ..................................... | From: | | | To: | | | |
| Other Annualized Monetized $/ year. | .................... | .................... | .................... | .................... | 7 3 | | |
| From/To ..................................... | From: | | | To: | | | |

Effects:
  State, Local or Tribal Government:
  Small Business:
  Wages:
  Growth:

In line with Executive Order 13771, in table 2 we estimate present and annualized values of costs and cost savings over an infinite time horizon. Based on these cost savings, this proposed rule would be considered a deregulatory action under Executive Order 13771.

TABLE 2—EO 13771 SUMMARY TABLE

[In 2016 dollars, over a perpetual time horizon]

| | Primary (7%) | Lower bound (7%) | Upper bound (7%) | Primary (3%) | Lower bound (3%) | Upper bound (3%) |
| --- | --- | --- | --- | --- | --- | --- |
| Present Value of Costs ............................ | $110,574 | $99,517 | $124,396 | $114,868 | $103,382 | $129,227 |
| Present Value of Cost Savings ................ | $2,891,315 | $2,993,948 | $2,702,931 | $4,556,396 | $4,671,456 | $4,345,200 |
| Present Value of Net Costs ..................... | ¥$2,780,741 | ¥$2,894,431 | ¥$2,578,534 | ¥$4,441,527 | ¥$4,568,074 | ¥$4,215,973 |
| Annualized Costs ..................................... | $7,740 | $6,966 | $8,708 | $3,446 | $3,101 | $3,877 |
| Annualized Cost Savings ......................... | $202,392 | $209,576 | $189,205 | $136,692 | $140,144 | $130,356 |
| Annualized Net Costs .............................. | ¥$194,652 | ¥$202,610 | ¥$180,497 | ¥$133,246 | ¥$137,042 | ¥$126,479 |

*C. Summary of Regulatory Flexibility Analysis*

To determine the impact of the proposed rule on small entities, we first determined how many firms would be affected. We estimate that at least 1,615 firms classified in the Pharmaceutical and Medicine Manufacturing industry employ fewer than 1,250 employees and are therefore also classified as small businesses. Although a large number of small businesses will face costs under the proposed rule, the costs to these firms would be limited to the time burden of reading the proposed rule. We estimate that the time burden of reading the rule would be about $77 per firm, with a lower bound of $69 and upper bound of $86. This range of costs is unlikely to have a significant adverse impact on a substantial number of small entities.

We have developed a comprehensive Preliminary Economic Analysis of Impacts that assesses the impacts of the proposed rule. The full preliminary analysis of economic impacts is available in the docket for this proposed rule (Ref. 12) and at *https://www.fda.gov/AboutFDA/Reports ManualsForms/Reports/Economic Analyses/default.htm.*

**VIII. Analysis of Environmental Impact**

We have determined under 21 CFR 25.30(h) that this proposed rule is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

**IX. Paperwork Reduction Act of 1995**

FDA tentatively concludes that this proposed rule contains no collection of information. Therefore, clearance by the Office of Management and Budget under the Paperwork Reduction Act of 1995 is not required.

**X. Consultation and Coordination With Indian Tribal Governments**

We have analyzed this proposed rule in accordance with the principles set forth in Executive Order 13175. We have tentatively determined that the rule does not contain policies that would have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. The Agency solicits comments from tribal officials on any potential impact on Indian Tribes from this proposed action.

**XI. Federalism**

We have analyzed this proposed rule in accordance with the principles set forth in Executive Order 13132. We have determined that this proposed rule does not contain policies that have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, we conclude that the rule does not contain policies that have federalism implications as defined in the Executive

order and, consequently, a federalism summary impact statement is not required.

## XII. References

The following reference marked with an asterisk (*) is on display in the Dockets Management Staff (see **ADDRESSES**) and is available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; it is also available electronically at *https://www.regulations.gov.* References without asterisks are not available for electronic viewing because they have copyright restriction, or they are available as published articles and books, but these references are available for viewing by interested persons at the Dockets Management Staff (see **ADDRESSES**) between 9 a.m. and 4 p.m., Monday through Friday.

FDA has verified the website address, as of the date this document publishes in the **Federal Register**, but websites are subject to change over time.

1. Larrañaga, M.D., R.J. Lewis Sr., and R.A. Lewis, *Hawley's Condensed Chemical Dictionary,* 16th ed., New Jersey: Wiley (2016), s.vv. ''peptide,'' ''polypeptide,'' ''protein.''
2. Daintith, J. and E. Martin, *Dictionary of Science,* 6th ed., Oxford: Oxford University Press (2010), s.vv. ''peptide,'' ''polypeptide,'' ''protein.''
3. J. Stenesh, *Dictionary of Biochemistry and Molecular Biology,* 2nd ed., New Jersey: Wiley (1989), s.vv. ''polypeptide,'' ''protein.''
4. *The American Heritage Science Dictionary,* New York: Houghton Mifflin (2005), s.vv. ''peptide,'' ''protein.''
5. Creighton, T.E., *Encyclopedia of Molecular Biology,* New Jersey: Wiley (1999), s.vv. ''peptide,'' ''polypeptide.''
6. Newman, W.A., *Dorland's Illustrated Medical Dictionary,* 28th ed., Pennsylvania: W.B. Saunders Co. (1994), s.vv. ''peptide,'' ''polypeptide.''
7. Berg, J., J. Tymoczko, and L. Stryer, *Biochemistry,* 5th ed., New York: W.H. Freeman (2002), pp. 52–53.
8. Voet, D. and J. Voet, *Biochemistry,* 3rd ed., New Jersey: Wiley (2004), p.68.
9. Pollard, T., W. Earnshaw, et al., *Cell Biology,* New York: Elsevier (2002), p. 21.
10. Lodish, H., A. Berk, C.A. Kaiser, et al., *Molecular Cell Biology,* 6th ed., London, U.K., W.H. Freeman (2007), p. 66.
11. Alberts, B., A. Johnson, J. Lewis, et al., *Molecular Biology of the Cell,* 4th ed., New York: Garland Science (2002), pp. 129, 135.
* 12. Preliminary Regulatory Impact Analysis, Initial Regulatory Flexibility Analysis, and Unfunded Mandates Reform Act Analysis for Definition of the Term ''Biological Product''; Proposed Rule, 2018, available at *https://www.fda.gov/AboutFDA/Reports ManualsForms/Reports/Economic Analyses/default.htm.*

## List of Subjects in 21 CFR Part 600

Biologics, Reporting and recordkeeping requirements.

Therefore, under the Public Health Service Act and under authority delegated to the Commissioner of Food and Drugs, we propose that 21 CFR part 600 be amended as follows:

## PART 600—BIOLOGICAL PRODUCTS: GENERAL

■ 1. The authority citation for part 600 continues to read as follows:

**Authority:** 21 U.S.C. 321, 351, 352, 353, 355, 356c, 356e, 360, 360i, 371, 374, 379k–1; 42 U.S.C. 216, 262, 263, 263a, 264, 300aa–25.

■ 2. Amend § 600.3 by revising paragraph (h) introductory text and by adding paragraphs (h)(6) and (7) to read as follows:

### § 600.3 Definitions.

\*    \*    \*    \*    \*

(h) *Biological product* means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings:

\*    \*    \*    \*    \*

(6) A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

(7) A chemically synthesized polypeptide is any alpha amino acid polymer that is made entirely by chemical synthesis and is greater than 40 amino acids but less than 100 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(7) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

\*    \*    \*    \*    \*

Dated: December 6, 2018.

**Scott Gottlieb,**
*Commissioner of Food and Drugs.*

[FR Doc. 2018–26840 Filed 12–11–18; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF THE TREASURY

## Alcohol and Tobacco Tax and Trade Bureau

## 27 CFR Part 9

**[Docket No. TTB–2018–0008; Notice No. 177]**

**RIN 1513–AC40**

## Proposed Establishment of the West Sonoma Coast Viticultural Area

*Correction*

In proposed rule document 2018–26321 beginning on page 62750 in the issue of Thursday, December 6, 2018, make the following correction:

On page 62751, in the first column, in the **DATES** heading, the second line, ''January 7, 2018'' should read ''February 4, 2018''.

[FR Doc. C1–2018–26321 Filed 12–11–18; 8:45 am]

**BILLING CODE 1301–00–D**

Copyrighted Materials
Copyright © 2016 John Wiley & Sons Retrieved from app.knovel.com

# *Hawley's*
# Condensed Chemical Dictionary

### *Sixteenth Edition*

## Michael D. Larrañaga
## Richard J. Lewis, Sr.
## Robert A. Lewis

## WILEY

Copyright © 2016 by John Wiley & Sons, Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4470, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, or online at http://www.wiley.com/go/permission.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services or for technical support, please contact our Customer Care Department within the United States at (800) 762-2974, outside the United States at (317) 572-3993 or fax (317) 572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print may not be available in electronic formats. For more information about Wiley products, visit our web site at www.wiley.com.

*Library of Congress Cataloging-in-Publication Data is available.*

ISBN: 978-1-118-13515-0

Printed in the United States of America.

10  9  8  7  6  5  4  3  2  1

FDA001618

A.0137          A.0137          A.0137

PENTOSAN                                      1044

**pentosan.**    A complex carbohydrate (hemicellulose) present with the cellulose in many woody plant tissues, particularly cereal straws and brans, characterized by hydrolysis to give five-carbon-atom sugars (pentoses). Thus the pentosan xylan yields the sugar xylose (HOH$_2$C·CHOH·CHOH·CHOH·CHO) that is dehydrated with sulfuric acid to yield furfural (C$_5$H$_4$O$_2$).

**pentose.**    General term for sugars with five carbon atoms per molecule.

**pentose phosphate pathway.**    A pathway involved in the oxidation of glucose, and a source of reducing equivalents (NADPH) and pentoses for biosynthetic processes; present in most organisms. Also called the phosphogluconate pathway, pentose phosphate shunt, or hexose monophosphate shunt.

**"Pentothal"** *[Hospira].*    TM    for    sodium thiopental, a barbiturate.
See thiopental sodium.

**pentyl.**    Synonym for the amyl group, C$_5$H$_{11}$-.

**pentyl acetate.**    See amyl acetate.

*tert*-**pentyl alcohol.**    (*tert*-amyl alcohol; amylene hydrate; 2-methyl-2-butanol; dimethyl ethyl carbinol; ethyl dimethyl carbinol; 3-methylbutan-3-ol; *tert*-pentanol).
CAS: 75-85-4.   C$_5$H$_{12}$O. A commercially available branched-chain tertiary alcohol and isomer of amyl alcohol.
Properties: Volatile liquid with a characteristic odor.
Hazard: Moderately toxic; burning taste, irritates mucous membranes, narcotic action.

**pentylamine.**    See *n*-amylamine.

**α-pentylcinnamaldehyde.**    See    α-amylcinnamic aldehyde.

**pentylenetetrazole.**    **(6,7,8,9-tetrahydro-5H-tetrazolo[1,5-a]azepine; metrazol).**
CAS: 54-95-5.   C$_6$H$_{10}$N$_4$. It is considered a noncompetitive gamma-aminobutyric acid antagonist.
Use: A diagnostic tool in screening for latent epileptogenic foci and in basic research.
Hazard: Central nervous system stimulant, induce seizures.

*p-tert*-**pentylphenol.**    (*p-tert*-amylphenol).
CAS: 80-46-6.   C$_{11}$H$_{15}$OH.
Properties: Crystalline solid. Mp 95C, bp 261C. d 0.962 (20/4C). Insoluble in water; soluble in organic solvents.
Derivation: Condensation of *tert*-pentanol with phenol with aluminum chloride catalyst.
Use: Pesticide intermediate, oil-soluble resin manufacture, may be useful as germicide and fumigant.

**6-(pentylthio)purine.**
CAS: 5443-89-0.   C$_{10}$H$_{14}$N$_4$S.
Hazard: A reproductive hazard.

**1-(4-pentynyloxy)-4-phenoxybenzene.**
CAS: 42873-80-3.   C$_{17}$H$_{16}$O$_2$.
Hazard: A reproductive hazard.
Use: Agricultural chemical.

**Penzold's reagent.**    Solution of diazobenzosulfonic acid and potassium hydroxide.
Use: Testing for sugar in urine.

**Pepha-Ctive.**
Properties: Clear yellowish liquid. An algae extract.
Use: In cosmetics to protect the mitochondria and increases the ATP levels of skin cells leading to enhancement of cell turnovers.

**peppermint oil.**    Essential oil with strong aromatic odor and taste, levorotatory, chief component is menthol.
Use: To flavor mouthwashes, chewing gum, liqueurs, toothpastes; source of menthol.

**pepsin.**    (pepsinum).
CAS: 9001-75-6.
Properties: A digestive enzyme of gastric juice. White or yellowish-white powder or lustrous transparent or translucent scales; should have no odor; converts proteins into albumoses and peptones; soluble in water; insoluble in alcohol, chloroform, and ether.
Derivation: From the glandular layer of fresh hog stomachs.
Grade: Technical, NF.
Use: Medicine (digestive ferment); substitute for rennet in cheese making.

**pepsinogen.**    An inactive precursor of pepsin.

**peptidase.**    An enzyme that hydrolyzes a peptide bond.
See protease.

**peptide.**    Any of a class of low molecular weight organic compounds composed of two or more amino acids in which the alpha carboxyl group of one bonds covalently to the alpha amino group of a neighbor. These covalent amide bonds, called peptide bonds, are formed with the loss of a molecule of water. Peptides form the component parts of proteins.
See polypeptide.

**peptide bond.**    A planar, amide linkage between the a-amino group of one amino acid and the a-carboxyl group of another, with the elimination of a molecule of water.

FDA001619

## POLYOXYETHYLATED OLEYL AMINE    1108

**polyoxyethylated oleyl amine.**
CAS: 58253-49-9.    $(C_2H_4O)_n(C_2H_4O)_nC_{22}H_{45}NO_2$.
**Hazard:** A severe eye irritant.

**polyoxyethylene.**    See polyethylene glycol.

**polyoxyethylene(4)docyl alcohol phosphate potassium salt.**
CAS: 68070-99-5.
**Hazard:** A severe eye irritant.

**polyoxyethylene fatty acid ester.**    See polysorbate.

**polyoxyethylene lauryl ether phosphate.**
CAS: 39464-66-9.    $(C_2H_4O)_nC_{12}H_{26}O.xH_3O_4P$.
**Hazard:** Low toxicity by ingestion and skin contact. A severe skin and eye irritant.

**polyoxyethylene (40) monostearate.**
(polyethylene glycol stearate).
CAS: 9004-99-3. A mixture of the mono- and distearate esters of mixed polyoxyethylene diols and corresponding free glycols. The monostearate can be represented as $H(OCH_2CH_2)_nOCOC_{17}H_{35}$ (n is about 40).
**Properties:** Waxy, light-tan solid; nearly odorless. Congealing range 39–45C. Soluble in water, alcohol, ether, and acetone; insoluble in mineral and vegetable oils.
**Grade:** USP.
**Use:** Ointments, emulsifier, surfactant, food additive. See polysorbate.

**polyoxyethyleneoxypropylene.**    (POEOP). A polymer of ethylene and propylene glycols (ethylene oxide propylene oxide).
**Use:** Solvent.

**polyoxyethylene (8) stearate.**
CAS: 9004-99-3. A mixture of the mono- and diesters of stearic acid and mixed polyoxyethylene diols having an average polymer length of 7.5 oxyethylene units.
**Properties:** Cream-colored, soft, waxy, or pasty solid at 25C; faint, fatty odor; slightly bitter, fatty taste. Soluble in toluene, acetone, ether, and ethanol.
**Use:** Emulsifier in bakery products. See polysorbate.

**polyoxymethylene.**    Any of several polymers of formaldehyde and trioxane.
See acetal resin.

**polyoxypropylene diamine.**    (POPDA). Any of the six high molecular weight amines of low viscosity and vapor pressure, high primary amine content, and light color.
**Use:** As cross-linking agents in epoxy coatings, imparting high flexibility and adhesion at low temperatures. Other possible uses are in polyamide and polyurethane coatings, adhesives, elastomers and foams, as intermediates for textile and paper treatment, and viscosity-index improvers in lubricating oils.

**polyoxypropylene ester.**    See polypropylene glycol ester.

**polyoxypropylene-glycerol adduct.**    One of several condensation polymers of propylene oxide and glycerol with molecular weights in the range 1000–4000. Clear, stable, almost colorless, noncorrosive liquids.
**Use:** Similar to those of polypropylene glycol.

**polypeptide.**    (peptide). The class of compounds composed of acid units chemically bound together with amide linkages (–CONH–) with elimination of water. A polypeptide is thus a polymer of amino acids. The chain of amino acids (less than 100) are linked by peptide bonds. A segment of such a chain is as follows:

The sequence of amino acids in the chain is of critical importance in the biological functioning of the protein, and its determination is one of the most difficult problems in molecular biology. The chains may be relatively straight, or they may be coiled or helical. In the case of certain types of polypeptides, such as the keratins, they are cross-linked by the disulfide bonds of cystine. Linear polypeptides can be regarded as proteins. Synthesis of a 20-amino acid polypeptide that induces formation of antibodies for foot and mouth disease was announced in 1982. It is the first vaccine to be synthesized.
See protein; polyamide; keratin.

**polyphenylene triazole.**
$[-C_6H_4-C_2N_3(C_6H_5)-]_n$. A polymer stated to be serviceable up to 260C for films, coatings, adhesives, and lamination.

**Polyphos.**    A water-soluble glassy sodium phosphate of standardized composition, $(Na_{12}P_{10}O_{31})$, analyzing 63.5% $P_2O_5$ (ratio of $Na_2O:P_2O_5$ is 1.2:1). It is closely similar to a sodium hexametaphosphate and sodium tetraphosphate; frequently the three names are used interchangeably.
**Grade:** Ground, walnut-size to pea-size lumps.
**Use:** Boiler water compounds, detergents, textiles, leather tanning, photographic film developing, deflocculation of clays, flotation and desliming of minerals, dispersion of pigments, paper processing, industrial and municipal water treatment.

**polyphosphazene.**    See phosphazene.

**protamines.** Simplest proteins, without sulfur, molecular weights about ~3000.
  **Properties:** Water soluble, producing basic solutions.

**protease.** A proteolytic enzyme that weakens or breaks the peptide linkages in proteins. They include some of the more widely known enzymes such as pepsin, trypsin, ficin, bromelain, papain, and rennin. Being water soluble they solubilize proteins and are commercially used for meat tenderizers, bread baking, and digestive aids.

**protective coating.** A film or thin layer of metal glass or paint applied to a substrate primarily to inhibit corrosion, and secondarily for decorative purposes. Metals such as nickel, chromium, copper, and tin are electrodeposited on the base metal; paints may be sprayed or brushed on. Vitreous enamel coatings are also used; that require baking. Zinc coatings are applied by a continuous bath process in which a strip of ferrous metal is passed through molten zinc.
  See galvanizing; terne plate; electroplating; paint; corrosion; cladding.

**protective colloid.** See colloid, protective.

**protein.** A complex, high polymer containing carbon, hydrogen, oxygen, nitrogen, and usually sulfur, and composed of chains of amino acids connected by peptide linkages (–CO·NH–). Proteins occur in the cells of all living organisms and in biological fluids (blood plasma, protoplasm). They are synthesized by plants largely through the nitrogen-fixing ability of certain soil bacteria. Their molecular weight may be as high as 40 million (tobacco mosaic virus). They have many important functional forms: enzymes, hemoglobin, hormones, viruses, genes, antibodies, and nucleic acids. They also serve as the basic component of connective tissue (collagen), hair (keratin), nails, feathers, skin, etc. Some have been synthesized in the lab.
  The sequence of amino acids; in the polypeptide chain is of critical importance in genetics. Proteins can be hydrolyzed to their constituent amino acids and can be broken down into simpler forms by proteolytic enzymes. They form colloidal solutions, and behave chemically as both acids and bases simultaneously (amphoteric). They are denatured by changes in pH, and by heat, UV radiation, and many organic solvents.
  Simple proteins contain only amino acids, conjugated proteins contain amino acids plus nucleic acids, carbohydrates, lipids, etc. On the basis of solubility, they can be classified as albumins (water soluble), globulins (insoluble in water but soluble in aqueous salt solutions), and prolamins (soluble in alcohol-water mixture but not in alcohol or water alone). A number of proteins have been synthesized, notably the hormone insulin. Proteins are an essential component of the diet, occurring chiefly in meat, eggs, milk, and fish. Edible proteins suitable for human food as well as cattle feed can be produced from microorganisms grown in carbonaceous or nitrogenous media to form yeastlike materials. Paraffinic hydrocarbons (methane) and petroleum-derived ethanol can be used as growth media for protein biosynthesis.
  Industrial applications of proteins include plastics, adhesives, and fibers derived from casein and soybean protein, but these have been declining in recent years. Special forms in which proteins are commercially available include textured proteins for food products, and protein hydrolyzate and liquid predigested protein, both for medical use.
  See ribonuclease; deoxyribonucleic acid; nutrition; amino acid; protein, textured; protein, single-cell; polypeptide.

**protein hydrolyzate.** Solution of protein hydrolyzed into its constituent amino acids.
  **Grade:** USP.
  **Use:** Medicine and surgery. Usually administered by a stomach tube or intravenous injection.

**protein kinases.** Enzymes that phosphorylate certain amino acid residues (most often Ser, Thr, or Tyr) in specific proteins.

**protein, single-cell.** (SCP). A protein nutrient derived from bacteria or yeast by hydrocarbon fermentation or from fungi by fermentation on food-plant waste. A process developed in West Germany during the 1970s utilizes the bacterium *Methylomonas clara* cultured in a mixture of methanol, ammonia, water, and air. The continuous fermentation process is followed by dewatering and spray drying. The product contains 70% protein, 10% nucleic acids, 8% fats, and 7% minerals; in this form it is suitable for animal feeds. A purified type (90% protein) is made by dissolving the product in an ammonia-methanol mixture, followed by filtration to remove the fats, and then water-washing to extract the nucleic acids. The product may prove to be satisfactory for use in human foods. The presence of nucleic acids is undesirable, because they may lead to metabolic disorders such as gout. Commercial production awaits further testing.

**protein, spun.** See protein, textured.

**protein targeting.** The process by which newly synthesized proteins are sorted and transported to their proper locations in the cell.

**protein, textured.** A meat extender or substitute made from defatted soybean flour or similar protein, usually by an extrusion process. Some types are used to fortify cereals and other food products. The filaments produced by extrusion are designed to simulate the fibrous structure (texture) of meats. The term *spinning* is also used, and the products are often called spun proteins.

FDA001621

A.0140                    A.0140                    A.0140

Copyrighted Materials
Copyright © 2010 Oxford University Press Retrieved from www.knovel.com

A Dictionary of

# Science

SIXTH EDITION

**OXFORD**
UNIVERSITY PRESS

**OXFORD**

UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford New York

Auckland Cape Town Dar es Salaam Hong Kong Karachi
Kuala Lumpur Madrid Melbourne Mexico City Nairobi
New Delhi Shanghai Taipei Toronto

With offices in

Argentina Austria Brazil Chile Czech Republic France Greece
Guatemala Hungary Italy Japan Poland Portugal Singapore
South Korea Switzerland Thailand Turkey Ukraine Vietnam

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© Market House Books Ltd, 1984, 1991, 1996, 1999, 2005, 2010

The moral rights of the author have been asserted
Database right Oxford University Press (maker)

First published 1984 as *Concise Science Dictionary*
Second edition 1991
Third edition 1996
Fourth edition 1999
Fifth edition 2005
Sixth edition 2010

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
Data available

Typeset by Market House Books Ltd.
Printed in Great Britain by
Clays Ltd, St Ives plc

ISBN 978-0-19-956146-9

10 9 8 7 6 5 4 3 2 1

**pepsinogen**                                                    608

**Peptide.** Formation of a peptide bond.

breakdown of proteins to polypeptides in the vertebrate stomach. It is secreted as an inactive precursor, *pepsinogen.

**pepsinogen** The inactive precursor of the enzyme *pepsin. Pepsinogen is secreted by the lining of the vertebrate stomach into the lumen, where it is converted to pepsin by hydrochloric acid and also by the action of pepsin itself.

**peptidase** *See* ENDOPEPTIDASE; EXOPEPTIDASE; PROTEASE.

**peptide** Any of a group of organic compounds comprising two or more amino acids linked by **peptide bonds**. These bonds are formed by the reaction between adjacent carboxyl (–COOH) and amino (–NH₂) groups with the elimination of water (see illustration). **Dipeptides** contain two amino acids, **tripeptides** three, and so on. *Polypeptides contain more than 20 and usually 100–300. Naturally occurring **oligopeptides** (of less than 20 amino acids) include the tripeptide glutathione and the pituitary hormones antidiuretic hormone and oxytocin, which are octapeptides. Peptides also result from protein breakdown, e.g. during digestion.

**( ) SEE WEB LINKS**

• Information about IUPAC nomenclature of peptides

**per-** Prefix indicating that a chemical compound contains an excess of an element, e.g. a peroxide.

**percentile** For a random variable in *statistics, any of the 99 values that divide its distribution such that an integral percentage of the collection lies below that value. For example, the 85th percentile is the value of a variable that has 85% of the collection below that value. The 25th percentile is called the lower **quartile**, the 50th percentile is the **median**, and the 75th percentile is the upper quartile.

**perchlorate** *See* CHLORATES.

**perchloric acid** *See* CHLORIC(VII) ACID.

**Percus–Yevick approximation** An approximation used in *statistical mechanics to calculate the radial distribution function of a system. This approximation, which was devised by Jerome Percus and George Yevick in 1958, has been used extensively in the theory of liquids.

**perdisulphuric acid** *See* PEROXOSULPHURIC(VI) ACID.

**perennation** The survival of biennial or perennial plants from one year to the next by vegetative means. In biennials and herbaceous perennials the aerial parts of the plant die down and the plants survive by means of underground storage roots (e.g. carrot), *rhizomes (e.g. couch grass, Solomon's seal), *tubers (e.g. dahlia), *bulbs (e.g. daffodil, snowdrop), or *corms (e.g. crocus, gladiolus). These **perennating organs** are also frequently responsible for *vegetative propagation. Woody perennials survive the winter by reducing their metabolic activity (e.g by leaf loss in deciduous trees and shrubs).

**perennial** A plant that lives for a number of years. Woody perennials (trees and shrubs) have a permanent aerial form, which continues to grow year after year. Herbaceous (i.e. nonwoody) perennials have aerial shoots that die down each autumn and are replaced in spring by new shoots from an underground structure (see PERENNATION). Lupin and rhubarb are examples of herbaceous perennials. *Compare* ANNUAL; BIENNIAL; EPHEMERAL.

**perfect gas** *See* IDEAL GAS; GAS.

**perfect pitch** *See* ABSOLUTE PITCH.

**perfect solution** *See* RAOULT'S LAW.

**perianth** The part of a flower situated outside the stamens and carpels. In dicotyledons it consists of two distinct whorls, the outer of sepals (see CALYX) and the inner of petals (see COROLLA). In monocotyledons the two whorls are similar and often brightly coloured. In wind-pollinated flowers both

FDA001624

series of heating and cooling cycles, the DNA sequence flanked by the primers doubles with each cycle and is thus rapidly amplified.

**polymerization** A chemical reaction in which molecules join together to form a polymer. If the reaction is an addition reaction, the process is **addition polymerization**; condensation reactions cause **condensation polymerization**, in which a small molecule is eliminated during the reaction. Polymers consisting of a single monomer are **homopolymers**; those formed from two different monomers are **copolymers**.

**polymethanal** A solid polymer of methanal, formed by evaporation of an aqueous solution of methanal.

**polymethylmethacrylate** A clear thermoplastic acrylic material made by polymerizing methyl methacrylate. The technical name is **poly(methyl 2-methylpropenoate)**. It is used in such materials as **Perspex**.

**polymorphism** 1. (in biology) The existence of two or more distinctly different forms (**morphs**) within a plant or animal species. An example is the *caste system of social insects, in which there are workers, drones, and queens. This is an **environmental polymorphism**, i.e. the differences are caused by environmental rather than genetic factors, in this case by the larvae receiving different types of food. There are also **heritable** or **genetic polymorphisms**. An example is the occurrence of sickle-cell disease, a genetic disease that principally affects Black populations of central Africa and is characterized by an abnormal form of the blood pigment haemoglobin and sickle-shaped red blood cells. Three different types of individual occur in such populations: those who have two genes (*AA*) for normal haemoglobin and therefore do not suffer from the disease; those with one normal and one abnormal gene (*AS*), who are described as having the **sickle-cell trait** and generally suffer no symptoms; and those with two abnormal genes (*SS*), who suffer a chronic and eventually fatal form of anaemia. Normally such a harmful gene would have been eliminated from the population by the process of natural selection, but it is maintained in this case because people with the sickle-cell trait are resistant to a severe form of malaria endemic in central Africa. *See also* RESTRICTION FRAGMENT LENGTH POLYMORPHISM; SINGLE NUCLEOTIDE POLYMORPHISM. **2.** (in chemistry) The existence of chemical substances

in two (**dimorphism**) or more physical forms. *See* ALLOTROPY.

**polynomial** A mathematical expression containing three or more terms. It has the general form $a_0x^n + a_1x^{n-1} + a_2x^{n-2} + ... + a_n$, where $a_0$, $a_1$, etc., are constants and $n$ is the highest power of the variable, called the **degree** of the polynomial.

**polynucleotide** *See* NUCLEOTIDE.

**polyp** The sedentary stage in the life cycle of the *Cnidaria, consisting of a cylindrical body fixed at one end to a firm base and having a mouth surrounded by a ring of tentacles at the other. Some polyps (e.g. *Hydra*) are single; others (e.g. the corals and *Obelia*) form colonies. Polyps typically reproduce asexually by budding to form either new polyps or *medusae. The latter reproduce sexually giving rise to new polyps. Sea anemones are solitary polyps that reproduce sexually to form new polyps.

**polypeptide** A *peptide comprising 20 or more amino acids. Polypeptides that constitute proteins usually contain 100–300 amino acids. Shorter ones include certain antibiotics, e.g. gramicidin, and some hormones, e.g. *ACTH, which has 39 amino acids. The properties of a polypeptide are determined by the type and sequence of its constituent amino acids.

**polyphyletic** Denoting any group of organisms the members of which have originated from several different ancestors. An example is the group including all insectivorous animals. Polyphyletic groups are not natural groups and do not have any place in natural classifications. *Compare* MONOPHYLETIC.

**polyphyodont** Describing a type of dentition in which the teeth are continuously shed and replaced during the lifetime of the animal. Sharks and frogs have a polyphyodont dentition. *Compare* DIPHYODONT; MONOPHYODONT.

**polyploid** Describing a nucleus that contains more than two sets of chromosomes (*see* DIPLOID) or a cell or organism containing such nuclei. For example, *triploid plants have three sets of chromosomes and **tetraploid** plants have four. Polyploidy is far more common in plants than in animals; many crops, in particular, are polyploid (bread wheat, for example, is **hexaploid**, i.e. $6n$). It can be induced chemically with

FDA001625

where it leaves the bladder. During ejaculation it secretes a slightly alkaline fluid into the *semen that activates the sperms and prevents them from sticking together.

**prosthetic group** A tightly bound nonpeptide inorganic or organic component of a protein. Prosthetic groups may be lipids, carbohydrates, metal ions, phosphate groups, etc. Some *coenzymes are more correctly regarded as prosthetic groups.

**protactinium** Symbol Pa. A radioactive metallic element belonging to the *actinoids; a.n. 91; r.a.m. 231.036; r.d. 15.37 (calculated); m.p. <1600°C (estimated). The most stable isotope, protactinium–231, has a half-life of $3.43 \times 10^4$ years; at least ten other radioisotopes are known. Protactinium–231 occurs in all uranium ores as it is derived from uranium–235. Protactinium has no practical applications; it was discovered by Lise Meitner and Otto Hahn in 1917.

**(⊕) SEE WEB LINKS**

• Information from the WebElements site

**protamine** Any of a group of proteins of relatively low molecular weight found in association with the chromosomal *DNA of vertebrate sperm cells. They contain a single polypeptide chain comprising about 67% arginine. Protamines serve in packaging the highly condensed DNA of the germ-cell chromosomes. Protamine sulphate is used therapeutically to treat heparin overdosage.

**protandry** **1.** The condition in which the male reproductive organs (stamens) of a flower mature before the female ones (carpels), thereby ensuring that self-fertilization does not occur. Examples of protandrous flowers are ivy and rosebay willowherb. *Compare* PROTOGYNY; HOMOGAMY. *See also* DICHOGAMY. **2.** The condition in some hermaphrodite or colonial invertebrates in which the male gonads or individuals are sexually mature before the female ones. *Compare* PROTOGYNY.

**protease** (**peptidase**; **proteinase**; **proteolytic enzyme**) Any enzyme that catalyses the hydrolysis of proteins into smaller *peptide fractions and amino acids, a process known as **proteolysis**. Examples are *pepsin and *trypsin. Several proteases, acting sequentially, are normally required for the complete digestion of a protein to its constituent amino acids.

**protecting group** A group used to pro-tect a certain functional group in a chemical synthesis. For example, a hydroxyl group (–OH) can be converted into an acetyl group (–OOCCH₃) to protect it taking part in a certain step of the synthesis. In this case, the acetyl is the protecting group. Later it can easily be changed back into the original hydroxyl group.

**protein** Any of a large group of organic compounds found in all living organisms. Proteins comprise carbon, hydrogen, oxygen, and nitrogen and most also contain sulphur; molecular weights range from six to several thousand *kilodaltons. Protein molecules consist of one or several long chains (*polypeptides) of *amino acids linked in a characteristic sequence. This sequence is called the **primary structure** of the protein. These polypeptides may undergo coiling or pleating, the nature and extent of which is described as the **secondary structure**. The three-dimensional shape of the coiled or pleated polypeptides is called the **tertiary structure**. **Quaternary structure** specifies the structural relationship of the component polypeptides.

Proteins may be globular or fibrous, with various intermediate forms. **Globular proteins** have compact rounded molecules and are usually water-soluble. Of prime importance are the *enzymes, proteins that catalyse biochemical reactions. Other globular proteins include the *antibodies, which combine with foreign substances in the body; the carrier proteins, such as *haemoglobin; the storage proteins (e.g. *casein in milk and *albumin in egg white), and certain hormones (e.g. *insulin). **Fibrous proteins** are generally insoluble in water and consist of long coiled strands or flat sheets, which confer strength and elasticity. In this category are *keratin and *collagen. Actin and myosin are the principal fibrous proteins of muscle, the interaction of which brings about muscle contraction. *Blood clotting involves the fibrous protein called fibrin.

When heated over 50°C or subjected to strong acids or alkalis, proteins lose their specific tertiary structure and may form insoluble coagulates (e.g. egg white). This usually inactivates their biological properties.

**(⊕) SEE WEB LINKS**

• Comprehensive survey of protein biochemistry, from the Virtual Library of Biochemistry, Molecular Biology and Cell Biology

**protein blotting** *See* WESTERN BLOTTING.

FDA001626

A.0145          A.0145          A.0145

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 136 of 275 PageID
Case: 26-1301    Document: 13    #: 750    Filed: 04/01/2026    Pages: 301

# DICTIONARY OF BIOCHEMISTRY AND MOLECULAR BIOLOGY

## Second Edition

**J. STENESH**

*Professor of Chemistry*
*Western Michigan University*



WILEY

**A WILEY-INTERSCIENCE PUBLICATION**

**JOHN WILEY & SONS**

New York  /  Chichester  /  Brisbane  /  Toronto  /  Singapore

FDA00   27
A.0146        A.0146        A.0146

Copyright © 1989 by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.

Reproduction or translation of any part of this work
beyond that permitted by Section 107 or 108 of the
1976 United States Copyright Act without the permission
of the copyright owner is unlawful. Requests for
permission or further information should be addressed to
the Permissions Department, John Wiley & Sons, Inc.

*Library of Congress Cataloging in Publication Data:*

Stenesh, J., 1927–
    Dictionary of biochemistry and molecular biology  /  J. Stenesh. —
    2nd ed.
        p.    cm.
    Rev. ed. of: Dictionary of biochemistry, 1975.
    "A Wiley-Interscience publication."
    Bibliography: p.
    ISBN 0–471–84089–0
    1. Biochemistry—Dictionaries. 2. Molecular biology—
    —Dictionaries.   I. Stenesh, J., 1927–  Dictionary of biochemistry.
  II. Title.
  QP512.S73   1989
  574.19′2′0321—dc19                    88-38561
                                         CIP

Printed and bound by the Hamilton Printing Company.

Printed in the United States of America

10 9 8 7 6 5 4 3

FDA001628

A.0147                         A.0147                      A.0147

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 138 of 275 PageID
Case: 26-1301    Document: 13 #: 752  Filed: 04/01/2026    Pages: 301

their activities. *Abbr* PN.

**protecting group** A chemical group that is reacted with, and bound to, a functional group in a molecule to prevent the functional group from participating in subsequent reactions of the molecule.

**protective antigen** An antigen that is derived from a pathogenic microorganism and that, when injected into an animal, will produce an immune response that will provide protection for the animal against infection by that microorganism.

**protective colloid** A colloid that is added to a food to prevent the separation of components in that food.

**protective immunity** Immunity that is produced in an organism to protect the latter against possible exposure to a pathogen or other harmful agent.

**proteid** Obsolete term for either protein or conjugated protein.

**protein** A high molecular weight polypeptide of L-amino acids that is synthesized by living cells. Proteins are biopolymers with a wide range of molecular weights, structural complexity, and functional properties. Proteins are variously classified on the basis of their (a) solubility (albumins, globulins, scleroproteins, etc.); (b) function (transport proteins, storage proteins, contractile proteins, enzymes, hormones, antibodies, etc.); (c) shape (globular proteins and fibrous proteins); (d) composition (simple proteins, conjugated proteins, and derived proteins).

**protein A** A cell wall protein of some strains of *Staphylococcus aureus* that combines with most human immunoglobulin molecules of the IgG type.

**proteinaceous** Consisting in part, or entirely, of protein.

**proteinase** 1. PROTEOLYTIC ENZYME. 2. A protease that shows specificity for intact (native) proteins.

**protein biosynthesis** *See* protein synthesis.

**protein blotting** A method for identifying and characterizing proteins in complex mixtures. Involves separating the protein mixture into its components by some gel electrophoretic technique, most commonly by SDS–PAGE. After electrophoresis, the proteins are eluted from the gel by a second electrophoresis, diffusion, or convection, and are adsorbed onto an immobilized matrix (nitrocellulose membrane filters, nylon-based membranes, diazotized paper, etc.) such that the original electrophoretic separation pattern is maintained. The immobilizing matrix, or blot, is reacted with an appropriate probe (antibody, lectin, etc.) so that the protein of interest can be detected.

**protein-bound iodine** The iodine in the blood that is conjugated to protein and that is a measure of the concentration of circulating thyroid hormone. *Abbr* PBI.

**protein C** FACTOR XIV. *See also* C-protein.

**protein–calorie malnutrition** The combined deficiency of both calories and proteins as it occurs during famine; a combination of the conditions of marasmus and kwashiorkor.

**protein coat** The protein shell that surrounds the nucleic acid of a virus. *See also* capsid.

**protein conformation** *See* chain conformation; primary structure; secondary structure; tertiary structure; quaternary structure; super secondary structure; domain.

**protein domain** *See* domain.

**protein efficiency ratio** A measure of the nutritive value of a protein defined as the gain in weight (in grams) per gram of protein consumed; eggs are considered to have a maximum protein efficiency ratio of about 4.4.

**protein efficiency ratio method** A method for determining the nutritive value of a protein by measuring the gain in weight of young rats that are fed a diet containing 10% of the particular protein. *Abbr* PER method.

**protein engineering** The design and construction of new proteins or enzymes, which have novel properties, by the methods of recombinant DNA technology.

**protein error** The change in the relative amounts of the undissociated and dissociated forms of an indicator that is brought about by the binding of one of these forms to a protein. The change in the relative amounts of indicator forms leads to a change in color; such a color change forms the basis of the albustix test.

**protein evolution** The molecular evolution of proteins. *See also* chemical evolution.

**protein export** The transport of a protein out of a cell; the secretion of an extracellular protein.

**protein factor** The factor 6.25 that, when multiplied by the weight of nitrogen (in grams) derived from a sample containing protein, gives the approximate weight (in grams) of the protein in the sample.

**protein folding** The processes involved in the conversion of an ensemble of newly synthesized (or denatured) polypeptide chain conformations to the unique, three-dimensional conformation of the native protein.

**protein fractionation** The separation of a mixture of different proteins for the purpose of isolating one particular type of protein; requires the use of one or more physical–chemical techniques such as precipitation, chromatography, centrifugation, or electrophoresis.

phate compound, the hydrolysis of which has been used to drive the polymerization of amino acids in studies on the origin of life.

**polymorph**  POLYMORPHONUCLEAR LEUKOCYTE.

**polymorphic gene**  A gene that exists in the form of several prevalent alleles.

**polymorphism**  1. The occurrence of two or more forms, such as the different forms of a protein in individuals of the same species. 2. The occurrence of two or more genetically different individuals in the same breeding population.

**polymorphonuclear leukocyte**  A white blood cell that contains a lobed nucleus and granular cytoplasm; includes neutrophils, basophils, and eosinophils, so named because of the affinity of their cytoplasmic granules for specific dyes. *Aka* granulocyte, polymorph.

**polymyxin**  One of a group cyclic peptide antibiotics, produced by *Bacillus polymyxa*, that are surface active and that damage the bacterial cell membrane and increase its permeability to small molecules.

**polyneme hypothesis**  The hypothesis that a newly formed chromatid contains more than one double-stranded DNA molecule.

**polyneuritis**  A disease of birds caused by a deficiency of thiamine.

**polynomial function**  A function that is given by an equation of the form $Y = b_0 + b_1x + b_2x^2 + \cdots + b_kx^k$. The highest power of $x$, having a nonzero coefficient, is the degree of the polynomial.

**polynuclear complex**  A metal ion–ligand complex of the type —M—L—M—L—M— where the metal ions M are held together in chains by means of ligands L, each of which binds to two metal ions.

**polynucleotidase**  A polynucleotide phosphatase.

**polynucleotide**  A linear polymer of more than 10 nucleotides that are linked by means of 3′,5′-phosphodiester bonds. *See also* polydeoxyribonucleotide; polyribonucleotide.

**polynucleotide kinase**  An enzyme that catalyzes the transfer of a phosphate group from ATP to the 5′-hydroxyl group of RNA or DNA; useful for the terminal labeling of a nucleic acid with $^{32}$P.

**polynucleotide ligase**  DNA LIGASE.

**polynucleotide phosphorylase**  The enzyme that catalyzes the random polymerization of ribonucleoside diphosphates to polyribonucleotides, a reaction that is useful for the synthesis of synthetic mRNA molecules.

**polyol**  A polyhydroxy alcohol.

**polyoma virus**  A small, naked, icosahedral, oncogenic virus that contains double-stranded DNA and belongs to the group of papovaviruses; produces tumors in rodents.

**polyoxin**  One of a group of antibiotics, produced by *Streptomyces cacaoi*, that are active against fungi.

**polypeptide**  A linear polymer of more than 10 amino acids that are linked by means of peptide bonds.

**polypheny**  PLEIOTROPISM.

**polyphosphate granule**  VOLUTIN GRANULE.

**polyploid state**  The chromosome state in which each type of chromosome is represented more than twice. *Aka* polyploidy.

**polyprotein**  A polyfunctional protein; a large protein molecule that serves as a precursor for a number of biologically active peptides or proteins. Polyproteins are made from a polycistronic mRNA molecule and are cleaved by proteolytic enzymes after synthesis of the polypeptide chain has been completed.

**polyprotic acid**  An acid that has several dissociable protons.

**polyribonucleotide**  A linear polymer of more than 10 ribonucleotides that are linked by means of 3′,5′-phosphodiester bonds; a polynucleotide.

**polyribonucleotide phosphorylase**  POLYNUCLEOTIDE PHOSPHORYLASE.

**polyribosome**  POLYSOME.

**polysaccharide**  A linear or branched polymer of more than 10 monosaccharides that are linked by means of glycosidic bonds.

**polysaccharide phosphorylase**  *See* glycogen phosphorylase; starch phosphorylase.

**polysheath**  A long phage sheath that is produced by some phage mutants in the absence of a phage tube.

**polysome**  A strand of mRNA with two or more ribosomes attached to it.

**polysome profile**  The tracing that shows the types and the relative amounts of different polysomes in a sample, and that is obtained by monitoring the sample material after it has been fractionated by density gradient centrifugation.

**poly(T)**  Polythymidylic acid.

**polytailtube**  A long fiber, produced by some phage mutants, that has the diameter of a normal phage tube.

**polytene chromosome**  An exceptionally large chromosome that contains numerous strands of DNA attached side by side in the form of a giant cable. Polytene chromosomes are characterized by specific patterns of bands, perpendicular to the long axis of the chromosome, which result from the chromomeres being in register.

**polyteny**  The replication of chromosomes that results in the formation of polytene chromosomes.

**polyterpene**  *See* terpene.

**poly(U)**  Polyuridylic acid.

FDA001630
A.0149    A.0149    A.0149

Case 1:24-cv-01503-TWP-KMB   Document 38   Filed 04/30/25   Page 140 of 275 PageID
Case: 26-1301   Document: 13 #: 754 Filed: 04/01/2026   Pages: 301

*The*

# AMERICAN HERITAGE®

# Science

## *dic·tion·ar·y*





RHHU-KCY-TU41

## Houghton Mifflin Company
### Boston · New York

FDA001631

A.0150                          A.0150                          A.0150

Words included in this book that are known to have current trademark registrations are shown with initial capital and are also identified as trademarks. No investigation has been made of common-law trademark rights in any word, because such investigation is impracticable. The inclusion of any word in this book is not, however, an expression of the Publisher's opinion as to whether or not it is subject to proprietary rights. Indeed, no word in this book is to be regarded as affecting the validity of any trademark.

American Heritage® and the eagle logo are registered trademarks of Forbes Inc. Their use is pursuant to a license agreement with Forbes Inc.

Copyright © 2005 by Houghton Mifflin Company. All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying and recording, or by any information storage or retrieval system without the prior written permission of Houghton Mifflin Company unless such copying is expressly permitted by federal copyright law. Address inquiries to Reference Permissions, Houghton Mifflin Company, 222 Berkeley Street, Boston, MA 02116.

Visit our website: www.houghtonmifflinbooks.com

ISBN-13: 978-0-618-45504-1
ISBN-10: 0-618-45504-3

*Library of Congress Cataloging-in-Publication Data*

The American heritage science dictionary.– 1st ed.
    p. cm.
 ISBN 0-618-45504-3
 1. Science–Dictionaries.
 Q123.A5178 2005
 503–dc22

                              200419696

Manufactured in the United States of America

MP 10 9 8 7 6 5 4 3 2 1

FDA001632
A.0151                    A.0151                    A.0151

**pentode**

468

**pentode** (pĕn′tōd′) Any electron tube with the basic structure and functionality of a triode, but including two extra electrodes, a **screen** and a **suppressor grid**. The screen helps the tube respond well at high frequencies (as in a **tetrode**), while a negatively charged suppressor grid adjacent to the **plate** prevents **secondary emission** of electrons from the plate, increasing the efficiency of the tube. See more at **suppressor**.

**pentose** (pĕn′tōs′) Any of a class of simple sugars (monosaccharides) having five carbon atoms per molecule. Ribose and deoxyribose are pentoses.

**pentyl** (pĕn′təl) See **amyl**.

**penumbra** (pĭ-nŭm′brə) Plural **penumbras** or **penumbrae** (pĭ-nŭm′brē). **1.** A partial shadow between regions of full shadow (the umbra) and full illumination, especially as cast by Earth, the Moon, or another body during an eclipse. During a partial lunar eclipse, a portion of the Moon's disk remains within the penumbra of Earth's shadow while the rest is darkened by the umbra. See Note at **eclipse**. **2.** The grayish outer part of a sunspot. Compare **umbra**.

**pepsin** (pĕp′sĭn) Any of various digestive enzymes found in vertebrate animals that catalyze the hydrolysis of proteins to peptides.

**peptic** (pĕp′tĭk) **1.** Relating to the process of digestion or the secretions associated with it. **2.** Relating to or involving pepsin.

**peptide** (pĕp′tīd′) A chemical compound that is composed of a chain of two or more amino acids and is usually smaller than a protein. The amino acids can be alike or different. Many hormones and antibiotics are peptides.

**peptide bond** The chemical bond formed between amino acids, constituting the primary linkage in all protein structures. In a peptide bond, the carboxyl group (COOH) of one amino acid bonds with the amino group (NH$_2$) of another, forming the sequence CONH and releasing water (H$_2$O).

**percent** also **per cent** (pər-sĕnt′) One part in a hundred. For example, 62 percent (also written 62%) means 62 parts out of 100.

**percentile** (pər-sĕn′tīl′) Any of the 100 equal parts into which the range of the values of a set of data can be divided in order to show the distribution of those values. The percentile of a given value is determined by the percentage of the values that are smaller than that value. For example, a test score that is higher than 95 percent of the other scores is in the 95th percentile.

**perchlorate** (pər-klôr′āt′) A salt of perchloric acid, containing the group ClO$_4$.

**perchloric acid** (pər-klôr′ĭk) A clear, colorless liquid that is very corrosive and, under some conditions, extremely explosive. It is a powerful oxidant and is used as a catalyst and in explosives. *Chemical formula:* HClO$_4$.

**perchloroethylene** (pər-klôr′ō-ĕth′ə-lēn′) See **tetrachloroethylene**.

**perennial** (pə-rĕn′ē-əl) *Adjective.* **1.** Living for three or more years. —*Noun.* **2.** A perennial plant. Herbaceous perennials survive winter and drought as underground roots, rhizomes, bulbs, corms, or tubers. Woody perennials, including vines, shrubs, and trees, usually stop growing during winter and drought. Asters, irises, tulips, and peonies are familiar garden perennials. Compare **annual, biennial**.

**Perey** (pĕ-rā′), **Marguerite Catherine** 1909–1975. French physicist who discovered the element francium in 1939.



*Marguerite Perey*

**perfect flower** (pûr′fĭkt) A flower having both stamens and carpels. Most angiosperms have perfect flowers. Compare **imperfect flower**. See also **complete flower**.

**perfect fungus** Any of various fungi that have both a sexual phase and an asexual phase and

Copyrighted material

FDA001633

507

**propylene** (prō′pə-lēn′) A flammable gas produced by cracking (breaking down) petroleum and used to make plastics and isopropyl alcohol. Propylene is the second member of the alkene series. Also called *propene. Chemical formula:* $C_3H_6$.

**propylene glycol** A colorless, viscous liquid used in antifreeze solutions, in hydraulic fluids, and as a solvent. Unlike ethylene glycol, it is not toxic and is also used in foods, cosmetics, and oral hygiene products. *Chemical formula:* $C_3H_8O_2$.

**prosimian** (prō-sĭm′ē-ən) Any of various primates of the suborder Strepsirrhini (formerly Prosimii), considered the most primitive primates. Prosimians have a moist, bare muzzle and a retina that lacks a fovea but is backed by a reflective layer that increases night vision. Unlike other primates, female prosimians do not menstruate because the lining of their uteri is not built up each month to prepare for possible pregnancy. Prosimians are mostly small in size, and include the lemurs, aye-ayes, indris, and lorises. The tarsiers were once classified as prosimians but are now considered more closely related to the monkeys and apes. Compare **simian.**

**prostaglandin** (prŏs′tə-glăn′dĭn) Any of a group of substances that are derived from fatty acids and have a wide range of effects in the body. Prostaglandins influence the contraction of the muscles lining many internal organs and can lower or raise blood pressure.

**prostate gland** (prŏs′tāt′) A gland in male mammals located at the base of the bladder. The prostate gland opens into the urethra and secretes a milky fluid that is a major component of semen. —*Adjective* **prostatic** (prō-stăt′ĭk).

**prostate-specific antigen** A protease secreted by the epithelial cells of the prostate gland. Blood levels are elevated in patients with prostate enlargement and prostate cancer and are used as a screening test for prostate cancer.

**prosthesis** (prŏs-thē′sĭs) Plural **prostheses** (prŏs-thē′sēz). An artificial device used to replace a missing or defective body part, such as a limb or a heart valve. —*Adjective* **prosthetic** (prŏs-thĕt′ĭk).

**prosthetic group** The nonprotein component of a conjugated protein, as the heme group in hemoglobin.

**prostrate** (prŏs′trāt′) Growing flat along the ground. Creeping jenny, pennyroyal, and many species of ivy have a prostrate growth habit.

**protactinium** (prō′tăk-tĭn′ē-əm) *Symbol* **Pa** A rare, extremely toxic, radioactive metallic element of the actinide series that occurs in uranium ores. It has 13 known isotopes, the most stable of which is protactinium 231 with a half-life of 32,760 years. Atomic number 91; approximate melting point 1,550°C; specific gravity 15.37; valence 4, 5. See **Periodic Table.**

**protease** (prō′tē-ās′) Any of various enzymes that bring about the breakdown of proteins into peptides or amino acids by hydrolysis. Pepsin is an example of a protease.

**protein** (prō′tēn′) Any of a large class of complex organic chemical compounds that are essential for life. Proteins play a central role in biological processes and form the basis of living tissues. They consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures, usually containing **alpha helices** and **beta sheets** as well as looping and folded chains. Enzymes, antibodies, and hemoglobin are examples of proteins.

| A CLOSER LOOK **protein folding** |

*Proteins* are the true workhorses of the body, carrying out most of the chemical processes and making up the majority of cellular structures. Proteins are made up of long chains of amino acids, but they don't resemble linear pieces of spaghetti. The atoms in these long chains have their own attractive and repulsive properties. Some of the amino acids can form bonds with other molecules in the chain, kinking and twisting and folding into complicated, three-dimensional shapes, such as helices or densely furrowed globular structures. These folded shapes are immensely important because they define the protein's function in the cell. Some protein shapes fit perfectly in cell receptors, turning chemical processes on and off, like a key in a lock, whereas others work to transport molecules throughout the body (hemoglobin's shape is

FDA001634

# ENCYCLOPEDIA OF

# MOLECULAR

# BIOLOGY

## VOLUMES 1 - 4

**Thomas E. Creighton**

*European Molecular Biology Laboratory*
*London, England*



A Wiley-Interscience Publication
**John Wiley & Sons, Inc.**
New York / Chichester / Weinheim / Brisbane / Singapore / Toronto

FDA001635

A.0154                    A.0154                    A.0154

This book is printed on acid-free paper. ♾

Copyright © 1999 by John Wiley & Sons, Inc.

All rights reserved. Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system or transmitted
in any form or by any means, electronic, mechanical, photocopying, recording, scanning or
otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright
Act, without either the prior written permission of the Publisher, or authorization through
payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood
Drive, Danvers, MA 01923, (508) 750-8400, fax (508) 750-4744. Requests to the Publisher
for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc.,
605 Third Avenue, New York, NY 10158-0012, (212) 850-6011, fax (212) 850-6008,
E-Mail: PERMREQ@WILEY.COM.
For ordering and customer service, call 1-800-CALL-WILEY.

*Library of Congress Cataloging-in-Publication Data:*

Creighton, Thomas E., 1940–
   The encyclopedia of molecular biology / Thomas E. Creighton.
       p.   cm.
     Includes index.
     ISBN 0-471-15302-8 (alk. paper)
     1. Molecular biology–Encyclopedias.   I. Title.
   QH506.C74   1999                                          99-11575
   572.8'03—dc21                                                 CIP

Printed in the United States of America.

10  9  8  7  6  5  4  3  2  1

FDA001636

Peptidases have myriad functions. They activate or inactivate peptide hormones; they degrade dietary proteins and peptides; they participate in structural growth and remodeling by degrading collagen and other structural proteins; they protect against infectious agents; and they induce blood clotting. They regulate blood pressure, play an important role in fertilization, and control the cell cycle. They are ubiquitous and enormously diverse. As might be expected, inappropriate peptidase activity could have devastating consequences, so there are numerous peptidase inhibitors and other biological means of curtailing peptidase activity (see Proteinase Inhibitors).

While all peptidases catalyze peptide bond hydrolysis, they do not all do this the same way. In order to act under various conditions, four different mechanisms have evolved, and peptidases are classified as carboxyl proteinase, thiol proteinase, serine proteinase, and metalloproteinase, depending on the particular mechanism they employ. Even within these classes, there are many thematic variations such that it seems that there are almost as many peptidases as there are peptides.

Peptidases have a host of commercially significant uses ranging from "clot busters" (both in blood vessels and in drain pipes) to meat tenderizers. Peptidase inhibitors represent a multibillion dollar pharmaceutical market where they are important for controlling high blood pressure, as well as preventing the progress of acquired immune deficiency syndrome (AIDS).

## Peptide

Peptides, sometimes referred to as oligopeptides, are oligomers in which the repeating units are amino acids. Peptides have a defined sequence of amino acids that are linked together by formation of peptide bonds. In contrast to **polypeptides** and proteins, peptides consist of a small number of amino acids. The distinction between a peptide and a polypeptide is somewhat arbitrary, but generally a peptide has between 2 and 50 amino acid residues. A peptide of two amino acids may be more specifically referred to as a *dipeptide*, three repeating units as a *tripeptide*, four repeating units as a *tetrapeptide*, and so on.

Most peptides are unstructured, described as having a **random coil conformation**, but others have highly ordered **secondary** and tertiary structure similar to that observed in larger proteins. The more structured peptides often incorporate disulfide bonds. Many peptides have important biological functions. For example, the pentapeptide leucine-enkephalin (Fig. 1) is a neurotransmitter with opiate-like activity; the hormone insulin is formed from two disulfide cross-linked peptide chains;

FDA001637

A.0156                    A.0156                    A.0156

and the major toxins from venomous spiders and cone shells are disulfide-rich peptides (Fig. 2). Naturally occurring peptides are usually produced by hydrolysis or cleavage of precursor proteins, through the action of peptidases or proteinases.

Figure 1. Chemical structure of the pentapeptide Leu-enkephalin, which has the sequence Tyr–Gly–Gly–Phe–Leu.

Figure 2. Schematic representation of the structure of the 16-residue a-conotoxin PnIA (1), showing the backbone and disulfides. The two turns of a-helix are depicted as a coil. The two disulfide bonds are shown in ball-and-stick representation. This figure was generated using Molscript (2) and Raster3d (3, 4).



[See also **Polypeptide chain.**]

Bibliography

1. Hu et al. (1996) Structure **4**, 417–423.

2. P. J. Kraulis (1991) J. Appl. Crystallogr. **24**, 946–950.

3. E. A. Merritt and M. E. P. Murphy (1994) Acta Crystallogr. **D50**, 869–873.

4. D. J. Bacon and W. F. Anderson (1988) J. Mol. Graphics **6**, 219–222.

**Suggestions for Further Reading**

antigen by **cyclin**-dependent kinase is required for viral DNA replication.

The small T antigen forms a complex with protein **phosphatase** 2A and inhibits its enzymatic activity. Thereby, the enhanced mitogen-activated protein (MAP) kinase pathways stimulate cell proliferation. This function is dispensable for viral DNA replication, however, because a mutant lacking the small T antigen still produces progeny viruses at the same efficiency as wild type.

Transfection experiments using complementary DNAs encoding the large, middle, and small T antigens separately have produced the following results. First, the large T antigen alone can immortalize primary-cultured cells from both permissive and nonpermissive animals. Second, the middle T antigen alone can malignantly transform established cells, but not primary-cultured cells. Third, in addition to the middle T antigen, coexpression of the large or small T antigen is necessary for both transformation of primary-cultured cells and induction of tumors in newborn animals.

The oncoproteins c-src, c-yes, and c-fyn are associated with the region from residues 185 to 210 of the middle T antigen. The middle T antigen activates c-src by repressing **phosphorylation** at Tyr527 of c-src or by making the phosphorylated Tyr527 accessible to protein **phosphatase**. The middle T antigen can similarly activate c-yes, but not c-fyn. Once the activated c-src kinase phosphorylates Tyr250, 315, and 322 of the middle T antigen, the SH2 domains of SHC, the regulatory subunit of PI3 kinase, and **phospholipase** C-g1 recognize the amino acid sequence containing the respective phosphotyrosine residues. Then, the tyrosine residues of the three proteins are phosphorylated by the activated c-src associated with the middle T antigen. The other SH2 domain-containing proteins, such as Grb2 and IRS-1, form complexes with the SHC, phosphoinositide-3-kinase subunit, and phospholipase C-g1 through the phosphotyrosine residues. The subsequent unusual activation of the signal transduction pathways mediated by the Raf and/or S6 kinase cascade is considered to be the molecular basis of the transformation by the middle T antigen.

Suggestions for Further Reading

S. M. Dilworth (1995) Polyoma virus middle T antigen: meddler or mimic? Trends Microbiol. **3**, 31–35.

F. Kiefer, S. A. Courtneidge, and E. F. Wagner (1994) Oncogenic properties of the middle T antigen of polyomaviruses. Adv. Cancer Res. **64**, 125–157.

K. V. Shah (1996) "Polyomaviruses". In *Fields Virology*, 3rd edition (B. N. Fields et al., eds.), Lippincott-Raven, Philadelphia, pp. 2027–2043.

## Polypeptide Chain

Polypeptide chain is a term that describes the basic covalent structure of proteins. That is, proteins are **polymers** comprising peptide bond units (hence, *polypeptide*) that connect together a large number of amino acids into a linear chain. The polypeptide chain thus consists of a regularly repeating part, the backbone or main chain, and a variable part, the side chains, corresponding to the functional groups of the amino acids. The term is most often used for proteins, which can consist of one or more polypeptide chains, but can also be used more generally for all amino acid polymers including **peptides**, polyamino acids, and chemically synthesized polymers of amino acids.

The linear polypeptide chain is formed from amino acids by a condensation reaction between the acidic or carboxyl group of one amino acid and the amino group of another. Amino acid units within the polypeptide chain are referred to as *residues*. The backbone of a polypeptide chain is a repeating

FDA001639

sequence of three atoms corresponding to the amide nitrogen (N) of the peptide bond, the central tetrahedral carbon ($C_a$:), and the peptide carbonyl carbon (C) (Fig. 1 ). The variable side chains or functional groups (R) are covalently linked to $C_a$:. The amino acid sequence defines the order of the side chains throughout the polypeptide chain.

**Figure 1.** Schematic representation of the polypeptide chain of a protein, showing in square brackets the atoms of the peptide repeating unit (N, $C_a$: and C) that form the backbone. The functional group or side chain, R, of each residue varies, depending on the type of the amino acid residue. By convention, numbering of amino acid residues in the polypeptide chain is from the *N*-terminus (residue 1) to the *C*-terminus (residue *n*).

The two ends of the polypeptide chain differ from each other. At one end there is an uncondensed or free amino group, and at the other end there is a free carboxyl group. The ends of the chain are therefore referred to as the amino terminus or *N*-terminus and the carboxyl terminus or *C*-terminus. By convention, numbering of the amino acid residues in the polypeptide chain is from the *N*-terminus to the *C*-terminus (Fig. 1).

The chemical nature of the peptide bond in the polypeptide chain allows hydrogen bond formation between peptide bond units. The propensity of the polypeptide chain to form these intrachain interactions gives rise to the several types of regular backbone structure, or **secondary structure**, observed in protein structures including **a-helices**, **b-strands**, and turns .

[See also Peptide Bond and Protein Structure.]

Suggestion for Further Reading
   C. Branden and J. Tooze (1991) *Introduction to Protein Structure*, Garland, New York.

**Polyploid**

Cells with more than the normal complement of DNA in their **genomes**, usually with increased numbers of the standard chromosomes, are called polyploid. In many plants, but more rarely in animals, mutations occur that increase the normal number of chromosomes. For example, if the haploid set of chromosomes of a given plant is 7, the diploid set is 14. Mutants appear that contain 3, 4, 5, 6, 7, 8, etc. genomes. There are polyploid forms called **triploid** (three genomes), tetraploid (four genomes), pentaploid (five genomes), etc. Each of the chromosomes is repeated by the same



Edition
28

# Dorland's
## *Illustrated*
# Medical
# Dictionary

**W.B. SAUNDERS COMPANY**
*A Division of Harcourt Brace & Company*
Philadelphia   London   Toronto   Montreal   Sydney   Tokyo

FDA001641
A.0160

**W.B. SAUNDERS COMPANY**
*A Division of Harcourt Brace & Company*

The Curtis Center
Independence Square West
Philadelphia, PA 19106

Dorland's illustrated medical dictionary.
  Philadelphia: W.B. Saunders Co.,

      v.: ill.; 27 cm.

    Irregular.
    Began publication with 23rd ed.
    Description based on: 26th ed.
    Continues: American illustrated medical dictionary.

    1. Medicine—Dictionaries.  I. Dorland, W.A. Newman
(William Alexander Newman), 1864–1956.
    [DNLM: 1. Dictionaries, Medical.  2. Reference Books,
Medical]

    R121.D73          610'.3'21—dc19          0-6383
                                    AACR 2  MARC-S

    Library of Congress          [8607r85]rev6

Listed here are the latest translated editions of this book together with the languages for the translations and the publishers.

Italian *(27th Edition, revised)*—Edizioni Scientifiche Internazionali (ESI), Milan, Italy

Japanese *(27th Edition)*—Hirokawa Publishing Company, Tokyo, Japan

Spanish *(27th Edition)* (Adaption)—McGraw-Hill–Interamericana de España, Madrid, Spain

Dorland's Illustrated Medical Dictionary          ISBN   0–7216–2859–1(Standard)
                                                    0–7216–5577–7(Deluxe)
                                                    0–7216–5323–5(International)

© 1994 by W.B. Saunders Company. Copyright 1900, 1901, and 1903 by W.B. Saunders and Company.  Copyright 1906, 1909, 1911, 1913, 1915, 1917, 1919, 1921, 1923, 1927, 1929, 1932, 1935, 1938, 1941, 1944, 1947, 1951, 1957, 1965, 1974, 1981, 1985, and 1988 by W.B. Saunders Company.

Copyright under the Uniform Copyright Convention.  Simultaneously published in Canada.  All copyright renewals registered.

Derechos reservados conforme a la ley para la Republica Mexicana.

All rights reserved.  This book is protected by copyright.  No part of it may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without written permission from the publisher.  Made in the United States of America.

Some of the words appearing in the Dictionary are proprietary names (trademarks) even though no reference to this fact is made in the text.  The appearance of any name without designation as a trademark is therefore not to be regarded as a representation by the editors or publisher that it is not a trademark or is not the subject of proprietary rights.

The use of portions of the text of the *United States Pharmacopeia*, Twenty-second Revision, official from January 1, 1990, of the *National Formulary*, Seventeenth Edition, official from January 1, 1990, and of *USAN and the USP Dictionary of Drug Names 1994* is by permission received from the Board of Trustees of the United States Pharmacopeial Convention, Inc. The said Convention is not responsible for any inaccuracy of quotation, or for any false or misleading implication that may arise by reason of the separation of excerpts from the original context or by obsolescence resulting from the publication of a supplement.

Library of Congress catalog card number 78–50050

Last digit is the print number:    9    8    7    6    5    4    3    2    1

FDA001642

A.0161                              A.0161                              A.0161

**p. gallina'rum,** a form of polyneuritis seen in fowls fed a thiamine-deficient diet.

**Guillain-Barré p.,** acute idiopathic p.

**Jamaica ginger p.,** see under *paralysis.*

**leprous p.,** sensory or sensorimotor polyneuritis due to inflammation of nerve trunks in association with leprosy.

**postinfectious p.,** acute idiopathic p.

**poly·neu·ro·myo·si·tis** (pol"e-noor"o-mi"o-si'tis)  polyneuritis with polymyositis.

**poly·neu·rop·a·thy** (pol"e-noo-rop'ə-the) [*poly-* + *neuropathy*] neuropathy of several peripheral nerves simultaneously; called also *multiple* or *peripheral neuropathy.* Some conditions that are actually polyneuropathies are called neuropathies; see under *neuropathy.*

**acute postinfectious p.,** acute idiopathic polyneuritis.

**amyloid p.,** polyneuropathy caused by amyloidosis; symptoms may include dysfunction of the autonomic nervous system, carpal tunnel syndrome, and sensory disturbances in the extremities such as numbness, hyperesthesia, or paresthesia. See also *familial amyloid p.*

**Andrade type familial amyloid p.,** Portuguese type familial amyloid p.

**anemic p.,** polyneuropathy seen in subacute combined degeneration of the spinal cord (q.v.).

**arsenic p., arsenical p.,** polyneuropathy seen in cases of chronic arsenic poisoning, characterized by sensory disturbances of the extremities and sometimes by a syndrome resembling acute febrile polyneuritis.

**carcinomatous n.,** paraneoplastic polyneuropathy seen with carcinoma, especially of the lung; it consists of sensory and sensorimotor disturbances such as dysesthesias, paresthesias, and unsteadiness of gait. Cf. *carcinomatous neuromyopathy.*

**diphtheritic p.,** Dejerine's syndrome (def. 3).

**erythredema p.,** acrodynia.

**familial amyloid p.,** autosomal dominant amyloid polyneuropathy occurring in hereditary amyloidosis; major subtypes are *Portuguese type familial amyloid p., Indiana type familial amyloid p.,* and *Finnish type familial amyloid p.*

**Finnish type familial amyloid p.,** a slowly progressive form of familial amyloid polyneuropathy whose earliest symptom is usually lattice dystrophy of the cornea. Later developments include cranial nerve palsy, paresis along the upper branch of the facial nerve, and renal amyloidosis. Called also *Meretoja type familial amyloid p.* and *Meretoja's syndrome.*

**Indiana type familial amyloid p.,** a slowly progressive form of familial amyloid polyneuropathy with upper limb neuropathy in the distribution of the median nerves, leading to carpal tunnel syndrome and eventually trophic ulcers; ocular symptoms such as vitreous deposits may occur. Called also *Rukavina type familial amyloid p., Maryland type familial amyloid p.,* and *Rukavina's syndrome.*

**inflammatory demyelinating p.,** see under *polyradiculoneuropathy.*

**Iowa type familial amyloid p.,** a slowly progressive type of familial amyloid polyneuropathy affecting both the upper and lower limbs; renal amyloidosis is present and uremia is eventually fatal. It may be an advanced form of Portuguese type familial amyloid polyneuropathy. Called also *Van Allen type familial amyloid p.* and *Van Allen's syndrome.*

**Japanese type familial amyloid p.,** Portuguese type familial amyloid p.

**Maryland type familial amyloid p.,** Indiana type familial amyloid p.

**Meretoja type familial amyloid p.,** Finnish type familial amyloid p.

**nutritional p.,** polyneuropathy due to nutritional deficits, as seen with beriberi, pellagra, alcoholism, malabsorption syndromes, Strachan's syndrome, and other conditions. Cf. *anemic p.*

**paraneoplastic p.,** a paraneoplastic syndrome, sometimes seen with carcinoma, multiple myeloma, or Hodgkin's disease, consisting of polyneuropathy with sensory or sensorimotor symptoms. Cf. *carcinomatous p.* Called also *paraneoplastic neuropathy.*

**porphyric p.,** a severe, often symmetrical type of polyneuropathy that occurs with some varieties of porphyria.

**Portuguese type familial amyloid p.,** familial amyloid polyneuropathy with lower limb neuropathy, autonomic dysfunction, and paresis; death occurs within 7 to 10 years. Called also *Andrade type familial amyloid p., Japanese type familial amyloid p.,* and *Andrade's syndrome.*

**Rukavina type familial amyloid p.,** Indiana type familial amyloid p.

**uremic p.,** polyneuropathy caused by the uremia of chronic renal failure, characterized by painless bilateral sensorimotor deficits of the lower limbs and later the upper limbs.

**Van Allen type familial amyloid p.,** Iowa type familial amyloid p.

**poly·neu·ro·ra·dic·u·li·tis** (pol"e-noor"o-rə-dik"u-li'tis) [*poly-* + *neuro-* + L. *radix* root + *-itis*]  acute idiopathic polyneuritis.

**poly·nu·cle·ar** (pol"e-noo'kle-ər)  1. pertaining to or having several nuclei. 2. polymorphonuclear.

**poly·nu·cle·ate** (pol"e-noo'kle-āt)  having many nuclei.

**poly·nu·cle·at·ed** (pol"e-noo'kle-āt"əd)  polynuclear.

**poly·nu·cle·o·lar** (pol"e-noo-kle'o-lər)  having several nucleoli.

**poly·nu·cle·o·tide** (pol"e-noo'kle-o-tīd)  any polymer of mononucleotides; nucleic acid.

**poly·nu·cle·o·tide aden·yl·yl·trans·fer·ase** (pol"e-noo'kle-o-tīd ə-den"əl-əl-trans'fər-ās) [EC 2.7.7.19]  an enzyme of the transferase class that catalyzes the sequential addition of ATP-derived adenylate residues to the 3' end of a polynucleotide. The enzyme does not require a template. The reaction produces the polyadenylate (poly A) tail characteristic of most eukaryotic messenger RNA molecules. Called also *poly A polymerase.*

**poly·nu·cle·o·tide phos·phor·y·lase** (pol"e-noo'kle-o-tīd for'ə-lās)  polyribonucleotide nucleotidyltransferase.

**poly·odon·tia** (pol"e-o-don'sha) [*poly-* + Gr. *odous* tooth]  the presence of supernumerary teeth.

**poly·ol** (pol'e-ol)  an alcohol containing more than two hydroxyl groups, e.g., sugar alcohols, inositol. Called also *polyhydric alcohol.*

**poly·ol de·hy·dro·gen·ase** (pol'e-ol de-hi'dro-jən-ās)  L-iditol 2-dehydrogenase.

**poly·o·ma** (pol"e-o'mə)  a tumor caused by an oncogenic virus of broad host range, originally isolated from parotid gland tumors of mice inoculated with Gross leukemia virus; see also *polyomavirus.*

**Poly·o·ma·vi·ri·nae** (pol"e-o'mə-vir-i'ne)  the polyomaviruses, a subfamily of viruses of the family Papovaviridae, many members of which induce tumors in experimental animals (although not in their natural hosts); there is a single genus. *Polyomavirus.*

**Poly·o·ma·vi·rus** (pol"e-o'mə-vi"rəs) [*poly-* + *-oma* + *virus*]  polyomaviruses; a genus of viruses of the subfamily Polyomavirinae (family Papoviridae) that induce tumors in experimental animals. Two polyomaviruses (BK virus and JC virus) infect humans; others, including simian virus 40 (SV40), infect other mammals.

**poly·o·ma·vi·rus** (pol"e-o-mə-vi"rəs)  any member of the subfamily Polyomavirinae.

**poly·onych·ia** (pol"e-o-nik'e-ə) [*poly-* + Gr. *onyx* nail + *-ia*]  the occurrence of supernumerary nails.

**poly·opia** (pol"e-o'pe-ə) [*poly-* + *-opia*]  the condition in which one object appears as two or more objects.

**binocular p.,** diplopia.

**p. monophthal'mica,** a condition in which an object looked at by one eye appears double.

**poly·op·sia** (pol"e-op'se-ə)  polyopia.

**poly·opy** (pol'e-o"pe)  polyopia.

**poly·or·chi·dism** (pol"e-or'ki-diz-əm)  a developmental anomaly characterized by the presence of more than two testes.

**poly·or·chis** (pol"e-or'kis) [*poly-* + Gr. *orchis* testis]  a person with more than two testes.

**poly·or·chism** (pol"e-or'kiz-əm)  polyorchidism.

**poly·os·tot·ic** (pol"e-os-tot'ik) [*poly-* + L. *os* bone]  pertaining to or affecting many bones.

**poly·otia** (pol"e-o'sha) [*poly-* + Gr. *ous* ear]  the condition of having more than two ears.

**poly·ov·u·lar** (pol"e-ov'u-lər)  pertaining to or produced from more than one ovum, as polyovular twins.

**poly·ov·u·la·to·ry** (pol"e-ov'u-lə-tor"e)  ordinarily discharging several ova in one ovarian cycle.

**poly·oxy·eth·y·lene 50 ste·a·rate** (pol"e-oks"e-eth'ə-lēn)  polyoxyl 50 stearate.

**poly·ox·yl** (pol"e-oks'əl)  any of various mixtures of the mono- and distearate esters of mixed polyoxyethylene diols and the corresponding free diols. The term is used in combination with an identifying number which indicates the average polymer length in oxyethylene units: *p. 8 stearate* and *p. 40 stearate* [USP], in which the average polymer lengths in oxyethylene units are equivalent to about 8 and 40, respectively, are used as surfactants in pharmaceutical preparations.

**p. 5 oleate,** peglicol 5 oleate.

**p. 10 oleyl ether,** see under *ether.*

**p. 20 celostearyl ether,** see under *ether.*

**p. 50 stearate** [NF], a mixture of the mono- and distearate esters of mixed polyoxyethylene diols and the corresponding free diols, the average polymer length being equivalent to about 50 oxyethylene units, occurring as a soft, cream-colored, waxy solid; used as a surfactant and emulsifying agent in pharmaceutical preparations. Called also *polyoxyethylene 50 stearate.*

**pol·yp** (pol'ip) [Gr. *polypous* a morbid excrescence]  a morbid excrescence, or protruding growth, from mucous membrane; classi-

cally applied to a growth on the mucous membrane of the nose, the term is now applied to such protrusions from any mucous membrane.

**adenomatous p.,** a benign neoplastic growth representing proliferation of epithelial tissue in the lumen of the sigmoid colon, rectum, or stomach, seen in up to 50 per cent of people over age 60 and widely variable in malignant potential.

**adenomatous p. of the colon,** an adenomatous polyp in the sigmoid colon or rectum, sometimes preneoplastic; both tubular and villous varieties have been described. It may be sessile or pedunculated and solitary or multiple.

**adenomatous p. of the stomach,** a type of adenomatous polyp usually found in the antrum of the stomach, with branching tubules or fingerlike projections and glandular tissue; it may be premalignant or a sign of malignancy nearby. Called also *gastric adenoma.*

**cardiac p.,** a ball thrombus or tumor attached by a pedicle to the inside of the heart.

**cervical p.,** a common, relatively innocuous tumor of the uterine cervix, usually of the endocervical canal; size varies widely. Such tumors may produce irregular vaginal bleeding.

**choanal p's,** nasal polyps that project posteriorly into the nasopharynx.

**cystic p.,** a polyp in which the fibrous network is coarse, thus stimulating or producing cysts; called also *hydatid p.*

**endometrial p's,** small, sessile, benign projecting masses on the endometrium, composed of an edematous stroma containing cystically dilated glands.

**fibrinous p.,** an intrauterine polyp made up of fibrin from retained blood; it may grow from portions of an ovum or from a thrombus at the placental site.

**gelatinous p.,** myxoma.

**gum p.,** a small pedunculated growth on the gingiva.

**Hopmann's p.,** a mass produced by papillary hypertrophy of the nasal mucosa, having something of the appearance of a papilloma.

**hydatid p.,** cystic p.

**hyperplastic p.,** pseudopolyp.

**inflammatory p.,** pseudopolyp.

**juvenile p's,** small, benign hemispheric hamartomas of the large intestine occurring sporadically in children; histologically, there is an abundant loose fibrovascular stroma containing widely spaced glands; called also *retention p.*

**p's of larynx,** smooth, rounded, sessile or pedunculated swellings, occurring on the true vocal cords; caused by edema in the lamina propria of the mucous membrane.

**lymphoid p's,** rare, benign tumors of the colon composed of aggregates of lymphoid tissue, usually covered by a fairly regular colonic mucosa.

**nasal p's,** focal accumulations of edema fluid in the mucosa of the nose, with hyperplasia of the associated submucosal connective tissue.

**regenerative p.,** pseudopolyp.

**retention p's,** juvenile p's.

**poly·pap·il·lo·ma trop·i·cum** (pol"e-pap"i-lo'mə trop'i-kəm)  yaws.

**poly·para·si·tism** (pol"e-par'ə-si-tiz"əm)  infection or infestation by more than one variety of parasite.

**poly·path·ia** (pol"e-path'e-ə) [*poly-* + Gr. *pathos* disease + *-ia*]  the presence of several diseases at once.

**poly·pec·to·my** (pol"i-pek'tə-me) [*polyp* + Gr. *ektomē* excision]  surgical removal of a polyp.

**poly·pep·tide** (pol"e-pep'tīd) [*poly-* + *peptide*]  a peptide which on hydrolysis yields more than two amino acids; called tripeptides, tetrapeptides, etc., according to the number of amino acids contained. See *peptide.*

**gastric inhibitory p. (GIP),** glucose-dependent insulinotropic p.

**glucose-dependent insulinotropic p. (GIP),** a polypeptide hormone (molecular weight 5165; 43 amino acids) synthesized by K cells in the midzone of the duodenal and jejunal mucosa and released in response to oral glucose, fat, and amino acids; it is a potent insulin stimulant, increases insulin secretion, and inhibits gastric secretion and motility. Called also *gastric inhibitory p.*

**islet amyloid p. (IAPP),** amylin.

**pancreatic p.,** a hormone (4200 daltons, 36 amino acids) secreted by special endocrine cells in the periphery of some pancreatic islets, the exocrine pancreas, and the intestine; it inhibits pancreatic enzyme secretion and gallbladder contraction, but its physiologic role has not been identified.

**parathyroid-like p.,** a polypeptide with activity like that of parathyroid hormone, produced by tumors of the islet cells and some other organs and causes hypercalcemia.

**vasoactive intestinal p. (VIP),** a peptide hormone (3326 daltons, 28 amino acids) widely distributed throughout the body but found in highest concentrations in the nervous system and gut; it is released locally from nerve endings or endocrine cells. Its primary actions

are thought to be to serve as a neurotransmitter, to relax smooth muscles of the circulation, gut, and genitourinary system, to increase secretion of water and electrolytes from the pancreas and gut, and to release hormones from the pancreatic islets, gut, and hypothalamus. It is found in excess in the Verner-Morrison syndrome.

**poly·pep·ti·de·mia** (pol"e-pep"ti-de'me-ə) [*polypeptide* + Gr. *haima* blood + *-ia*]  the presence of polypeptides in the blood.

**poly·pep·ti·dor·rha·chia** (pol"e-pep"ti-do-ra'ke-ə) [*polypeptide* + Gr. *rhachis* spine + *-ia*]  the presence of polypeptides in the spinal fluid.

**poly·peri·os·ti·tis** (pol"e-per"e-os-ti'tis)  inflammation of the periosteum of several bones.

**p. hyperesthe'tica,** a chronic disease of the periosteum attended by extreme hyperesthesia of the skin and soft parts.

**poly·pha·gia** (pol"e-fa'jə) [*poly-* + Gr. *phagein* to eat]  excessive eating; gluttony.

**poly·pha·lan·gia** (pol"e-fə-lan'jə)  side-by-side duplication of one or more of the phalanges of a digit.

**poly·pha·lan·gism** (pol"e-fə-lan'jiz-əm)  polyphalangia.

**poly·phar·ma·ceu·tic** (pol"e-fahr"mə-soo'tik)  pertaining to several drugs, especially to the administration of several drugs together.

**poly·phar·ma·cy** (pol"e-fahr'mə-se) [*poly-* + Gr. *pharmakon* drug]  1. the administration of many drugs together. 2. the administration of excessive medication.

**poly·phase** (pol'e-fāz) [*poly-* + *phase*]  having several phases; containing colloids of several types.

**poly·pha·sic** (pol"e-fa'zik)  having or existing in many phases; having unlike particles in the disperse phase.

**poly·phen·ic** (pol"e-fen'ik)  see *pleiotropism.*

**poly·phe·nol ox·i·dase** (pol"e-fe'nol ok'si-dās)  see *catechol oxidase.*

**poly·pho·bia** (pol"e-fo'be-ə) [*poly-* + *phobia*]  irrational fear of many things.

**poly·phos·pho·ino·si·tide** (pol"e-fos"fo-in-o'si-tīd)  a multiply phosphorylated phosphoinositide (q.v.), such as phosphatidylinositol 4,5-bisphosphate.

**poly·phy·let·ic** (pol"e-fi-let'ik) [*poly-* + Gr. *phylē* tribe]  arising or descending from more than one cell type.

**poly·phy·le·tism** (pol"e-fi'lə-tiz-əm)  polyphyletic theory; see under *theory.*

**poly·phy·le·tist** (pol"e-fi'lə-tist)  an adherent of the polyphyletic theory, as in blood origin.

**poly·phy·odont** (pol"e-fi'o-dont) [*poly-* + Gr. *phyein* to produce + *odous* tooth]  developing several sets of teeth successively throughout life. Cf. *diphyodont* and *monophyodont.*

**poly·pi** (pol'i-pi) [L.]  plural of *polypus.*

**po·lyp·i·form** (po-lip'i-form)  resembling a polyp; polypoid.

**poly·pi·o·nia** (pol"e-pi-o'ne-ə) [*poly-* + Gr. *piōn* fat + *-ia*]  obesity.

**poly·plas·tic** (pol"e-plas'tik) [*poly-* + Gr. *plastos* molded]  1. containing many structural or constituent elements. 2. undergoing many changes of form.

**Poly·plax** (pol'e-plaks)  a genus of sucking louse of rats and mice. *P. miacan'thus,* a form found infrequently on rats; *P. serra'tus,* a louse of rabbits which transmits tularemia; and *P. spinulo'sa,* the common louse of rats, which transmits murine typhus.

**poly·ploid** (pol'e-ploid) [*poly-* + *haploid*]  1. having more than two full sets of homologous chromosomes. There may be three (triploid), four (tetraploid), five (pentaploid), six (hexaploid), seven (heptaploid), eight (octaploid), etc. 2. an individual or cell having more than two full sets of homologous chromosomes. Polyploid organisms, especially plants, are larger than normal and have larger cells. Affected animals are often abnormal in appearance and usually infertile. Cf. *aneuploid.*

**poly·ploi·dy** (pol'e-ploi"de)  the state of having more than two full sets of homologous chromosomes (see *polyploid*).

**poly·yp·nea** (pol"ip-ne'ə) [*poly-* + Gr. *pnoia* respiration]  a condition in which the rate of respiration is increased; hyperpnea.

**poly·po·dia** (pol"e-po'de-ə) [*poly-* + Gr. *pous* foot]  the presence of supernumerary feet.

**pol·yp·oid** (pol'i-poid) [*polyp* + Gr. *eidos* form]  resembling a polyp.

**poly·poi·do·sis** (pol"e-poi-do'sis)  polyposis.

**Pen·tids** (pen'tidz) trademark for preparations of penicillin G potassium.

**pen·tiz·i·done so·di·um** (pen-tiz'ĭ-dōn) chemical name: (R)-4-[(1-methyl-3-oxo-1-butenyl)amino]-3-isoxazolidinone monosodium salt hemihydrate; an antibacterial, $C_8H_{11}N_2NaO_3 \cdot \frac{1}{2}H_2O$.

**pen·to·bar·bi·tal** (pen"to-bahr'bĭ-tal) [USP] a short- to intermediate-acting barbiturate used as a sedative and hypnotic, administered orally. Called also pentobarbitone.
**p. sodium** [USP], the sodium salt of pentobarbital, a hypnotic used as a sedative, anticonvulsant, preanesthetic in surgery, an adjunct to anesthesia, and an amnesic in obstetrics.

**pen·to·bar·bi·tone** (pen"to-bahr'bĭ-tōn) pentobarbital.

**pen·to·lin·i·um tar·trate** (pen"to-lin'e-əm) a ganglionic blocking agent used as an antihypertensive, administered orally, intramuscularly, and subcutaneously.

**pen·to·san** (pen'to-san) any member of the class of polysaccharides composed of pentose residues, e.g., arabans or xylans. They occur widely in plants, serving structural and storage functions.

**pen·to·sa·zone** (pen"tōs'ə-zōn) any osazone formed from a pentose.

**pen·tose** (pen'tōs) a monosaccharide containing five carbon atoms in a molecule.

**pen·tos·emia** (pen"to-se'me-ə) the presence of pentose in the blood.

**pen·to·side** (pen'to-sīd) any glycoside in which the sugar component is a pentose, the most important being the nucleosides.

**pen·to·stat·in** (pen"to-stat'in) a drug used experimentally in the treatment of hairy cell leukemia refractory to interferon alfa. Called also deoxycoformycin.

**pen·tos·uria** (pen"to-su're-ə) excretion of pentoses in the urine.
**alimentary p.**, urinary excretion of pentoses, probably xylose and arabinose, as a normal consequence of excessive ingestion of some fruits such as cherries, plums, and grapes, or their juices.
**essential p.**, a benign autosomal recessive deficiency of L-xylulose reductase resulting in urinary excretion of high levels of the pentose L-xylulose. Called also L-xylulosuria.

**pen·tos·uric** (pen"to-su'rik) affected with pentosuria.

**pen·to·syl** (pen'tə-səl) a radical of pentose.

**pen·to·syl·trans·fer·ase** (pen"tə-səl-trans'fər-ās) [EC 2.4.2] any member of a sub-subclass of enzymes of the transferase class that catalyze the transfer of a pentose group from one compound to another.

**Pen·to·thal** (pen'to-thol) trademark for preparations of thiopental sodium.

**pen·tox·ide** (pən-tok'sīd) an oxide containing five atoms of oxygen in a molecule.

**pen·tox·i·fyl·line** (pen"tok-sif'ə-lin) chemical name: 2,2-bis[(nitrooxy)methyl]-1,3-propanediol mononitrate (ester); a coronary vasodilator, $C_5H_8N_3O_{10}$.

**pen·tri·ni·trol** (pen"trī-ni'trol) pentaerythritol trinitrate.

**Pen·tri·tol** (pen'trī-tol) trademark for a preparation of pentaerythritol tetranitrate.

**Pen·try·ate** (pen-trī'āt) trademark for preparations of pentaerythritol trinitrate.

**pen·tu·lose** (pen'tu-lōs) ketopentose.

**pent·yl·ene·tet·ra·zol** (pen"tə-lēn-tet'rə-zol) a synthetic camphor-like compound used to induce convulsions in the electroencephalographic evaluation of epilepsy and, formerly, in the treatment of mental disorders (see convulsive therapy, under therapy ).

**pen·um·bra** (pə-num'brə) [L. pēne almost + umbra] 1. the area of a shadow where there is partial illumination; it surrounds the umbra. 2. in radiography, an area of blurring around the edges of a structure.
**ischemic p.**, an area of moderately ischemic brain tissue surrounding an area of more severe ischemia; blood flow to this area may be enhanced in order to prevent the spread of a cerebral infarction.

**Pen-Vee** (pen've) trademark for preparations of penicillin V.

**Pen·zoldt's test, reagent** (pen'tsölts) [Franz Penzoldt, German physician, 1849–1927] see under tests.

**Pen·zoldt-Fisch·er test** (pen'tsölt-fish'ər) [F. Penzoldt; Emil Fischer, German chemist, 1852–1919] see under tests.

**peo·til·lo·ma·nia** (pe"o-til"o-ma'ne-ə) [Gr. peos penis + tillein to pull + mania madness] a ticlike movement consisting in constant pulling at the penis; called also pseudomasturbation.

**pe·ot·o·my** (pe-ot'ə-me) [Gr. peos penis + temnein to cut] surgical removal of the penis.

**PEP** phosphoenolpyruvate; preejection period.

**Pep·cid** (pep'sid) trademark for preparations of famotidine.

**pep·lo·mer** (pep'lo-mər) [peplos + Gr. meros part] knobs or projections, generally composed of glycoproteins, on the surface lipoprotein envelope of many enveloped viruses.

**pep·los** (pep'lōs) [Gr. "robe"] the envelope of a virus.

**pep·per** (pep'ər) [L. piper] black pepper; the dried unripe fruit of Piper nigrum L. (Piperaceae) and other plants of that genus. black pepper is the decorticated ripe fruit of black pepper, and is white pepper. Pepper contains piperine, an aromatic pungent volatile oil (1–2.5 per cent), minor alkaloids, fat, protein, and resins; used chiefly as a spice, but it also has diaphoretic, carminative, and gastric stimulant gogue properties.
**cayenne p.**, capsicum.

**pep·per·mint** (pep'ər-mint) [NF] the dried leaves and flowering tops of Mentha piperita L. (Labiatae), having carminative, stimulant, and counterirritant properties; used as an oil, spirit, or water extract as a flavored vehicle for drugs.

**pep·sic** (pep'sik) peptic.

**pep·sin** (pep'sin) a general name for several enzymes of the gastric juice that catalyze the hydrolysis of proteins to form polypeptides.
**p. A.** [EC 3.4.23.1], an enzyme of the hydrolase class that catalyzes the hydrolysis of proteins with preferential cleavage at phenylalanine, tryptophan, tyrosine, and leucine residues. It is secreted by the gastric mucosa in the form of pepsinogen and has an optimal pH of 1.5 to 2.0.
**p. B.** [EC 3.4.23.2], pepsin similar to pepsin A, formed from pepsinogen B. A related enzyme is found in human beings.
**p. C.**, pepsin similar to pepsin A but highly active with hemoglobin as substrate. In EC nomenclature called gastricsin.

**pep·sin·ate** (pep'sin-āt) to treat or charge with pepsin.

**pep·sin·ia** (pep-sin'e-ə) the secretion of pepsin; it may be normal, excessive (hyperpepsinia), deficient (hypopepsinia), or totally absent (apepsinia).

**pep·sin·if·er·ous** (pep"sin-if'ər-əs) [pepsin + L. ferre to bear] producing or secreting pepsin.

**pep·sin·o·gen** (pep-sin'ə-jən) a proenzyme secreted by chief cells, mucous neck cells, and pyloric gland cells, which is converted into pepsin in the presence of gastric acid or of pepsin itself.

**pep·sin·uria** (pep"sī-nu're-ə) the presence of pepsin in the urine; it may be associated with duodenal ulcer because of the increased volume of gastric secretion.

**pep·stat·in** (pep-stat'in) any of the pentapeptide pepsin inhibitors obtained from several species of Streptomyces, identified as pepstatin A, B, and C. The A component has been used in the treatment of gastric ulcer.

**Pep·tav·lon** (pep-tav'lon) trademark for a preparation of pentagastrin.

**pep·tic** (pep'tik) [Gr. peptikos] pertaining to pepsin or to digestion; related to the action of gastric juices.

**pep·ti·dase** (pep'tĭ-dās) [EC 3.4] any member of a subclass of enzymes of the hydrolase class that catalyze the hydrolysis of peptide bonds; it comprises the exopeptidases and endopeptidases. Called also peptide hydrolase.

**pep·tide** (pep'tīd) any member of a class of compounds of low molecular weight which yield two or more amino acids on hydrolysis. Formed by loss of water from the $NH_2$ and COOH groups of adjacent amino acids, they are known as di-, tri-, tetra- [etc.] peptides, depending on the number of amino acids in the molecule. Peptides form the constituent parts of proteins.
**atrial natriuretic p. (ANP)**, a hormone involved in natriuresis and the regulation of renal and cardiovascular homeostasis; it is synthesized as a prohormone in the granules of the atrial myocytes and released into the circulation in response to atrial dilatation or increased intravascular fluid volume. The peptide, generally 28 amino acids in length but somewhat variable, effects natriuresis, diuresis, and renal vasodilation, reduces circulating concentrations of renin, aldosterone, and antidiuretic hormone, and thereby normalizes circulating blood pressure and volume. Called also atriopeptin and atrial natriuretic factor.
**C p.**, the connecting peptide chain that is removed when proinsulin is cleaved to form insulin.
**calcitonin gene–related p.**, a 37–amino acid polypeptide encoded by the calcitonin gene, widely distributed in the central and peripheral nervous system and also occurring in the adrenal medulla and gastrointestinal tract; it is a potent vasodilator and a neurotransmitter.
**corticotropin-like intermediate lobe p. (CLIP)**, a peptide with a sequence identical to the C-terminal 22 residues of ACTH (adrenocorticotropic hormone, corticotropin), found in the intermediate lobe of the pituitary gland in lower animals; the function, if any, is unknown. It is also produced by human fetuses and may be a regulator of the fetal adrenal glands.
**N-formylmethionyl p's**, di- and tripeptides in which the N-terminal amino acid residue is N-formylmethionine (fMet), which are produced by bacteria in protein synthesis (fMet initiates each polypeptide chain in prokaryotes but is often removed after translation) and which are chemotactic for granulocytes and macrophages but not lymphocytes.
**opioid p.**, opioid (def. 2).
**signal p.**, signal sequence.
**vasoactive intestinal p. (VIP)**, vasoactive intestinal polypeptide.

**pep·tide hy·dro·lase** (pep'tīd hi'dro-lās) peptidase.

**pep·ti·der·gic** (pep"tī-der'jik) 1. having an action resembling that of a peptide hormone. 2. activated by, characteristic of, or secreting a peptide hormone or a neuropeptide.

**pep·ti·do·gly·can** (pep"tī-do-gli'kan) a high-molecular-weight polymer that forms the tough, rigid structure of bacterial cell walls. It is made up of three parts: (1) a backbone, composed of alternating N-acetylglucosamine and N-acetylmuramic acid; (2) a set of identical tetrapeptide side-chains attached to N-acetylmuramic acid; and (3) a set of identical peptide cross-bridges. The backbone is the same in all bacterial species; however, the tetrapeptide side-chains and the peptide cross-bridges vary from species to species.

**pep·ti·dyl·di·pep·ti·dase** (pep"tī-dəl di-pep'tī-dās) [EC 3.4.15] any member of a sub-subclass of enzymes of the hydrolase class that catalyze the cleavage of a dipeptide residue from a free C-terminal end of a peptide or polypeptide.

**pep·ti·dyl·di·pep·ti·dase A** (pep"tī-dəl di-pep'tī-dās) [EC 3.4.15.1] an enzyme of the hydrolase class that catalyzes the cleavage of a peptide from the C-terminal end of an oligopeptide. When catalyzing the cleavage of angiotensin I to form the activated angiotensin II, it is also called angiotensin-converting enzyme; when catalyzing the cleavage and inactivation of kinins, it is also called kininase II. The enzyme, a zinc protein, is found on the luminal surface of vascular endothelial cells in the lungs and other tissues. Called also dipeptidyl carboxypeptidase I.

**pep·ti·za·tion** (pep"tī-za'shən) increase in the degree of dispersion of a colloid solution; the liquefaction of a colloid gel to form a sol.

**Pep·to·coc·ca·ceae** (pep"to-kok-a'se-e) [Gr. pepton digestion + kokkus berry] a family of anaerobic, nonmotile, usually gram-positive bacteria, made up of spherical cells occurring singly or in pairs, tetrads, chains, or irregular masses. They are found in the mouth and intestinal and respiratory tracts of man and other animals, in the human female urogenital tract, and in soil. The family includes the genera Peptococcus, Peptostreptococcus, and Ruminococcus.

**Pep·to·coc·cus** (pep"to-kok'əs) [Gr. pepton digestion + kokkus berry] a genus of gram-positive, anaerobic, coccoid bacteria of the family Peptococcaceae, occurring singly or in pairs, tetrads, or irregular masses, which are chemo-organotrophic and capable of fermenting protein decomposition products. Part of the normal human flora of the mouth, upper respiratory tract, and large intestine, they also cause infections of soft tissues and bacteremias. The organisms also occur in the lower animals and soil.
**P. anaero'bius**, a microaerophilic or obligate anaerobe found in the appendix and the female genital tract, and in cystitis and draining sinus. Called also Diplococcus magnus.
**P. asaccharoly'ticus**, a species that does not ferment sugars, found in the human large intestine, oral cavity, pleura, uterus, and vagina.
**P. constella'tus**, a microaerophilic or obligate anaerobe found in purulent pleurisy and in the tonsils, appendix, nose, throat, gums, and infrequently the skin and vagina. Called also Diplococcus constellatus.
**P. mag'nus**, a species with large (1–2 μm in diameter) cells that is recovered most frequently from clinical specimens. It is a cause of septic arthritis and soft tissue infections.

**pep·to·gen·ic** (pep"to-jen'ik) [Gr. peptein to digest + gennan to produce] 1. producing pepsin or peptones. 2. promoting digestion.

**pep·tog·e·nous** (pep-toj'ə-nəs) peptogenic.

**pep·tol·y·sis** (pep-tol'ĭ-sis) [peptone + Gr. lysis dissolution] the hydrolysis of peptones.

**pep·to·lyt·ic** (pep"to-lit'ik) denoting an agent or process that hydrolyzes peptones.

**pep·tone** (pep'tōn) [Gr. pepton digesting] a derived protein, or a mixture of cleavage products produced by the partial hydrolysis of a native protein either by an acid or by an enzyme. Peptones are readily soluble in water, and are not precipitatable by heat, by alkalis, or by saturation with ammonium sulfate.

**pep·ton·ic** (pep-ton'ik) pertaining to or containing peptone.

**pep·to·nize** (pep'to-nīz) to convert a protein into peptone by the action of an acid or enzyme.

**pep·ton·uria** (pep"to-nu're-ə) the presence of peptones in the urine.
**enterogenous p.**, that which is due to disease of the intestine.
**hepatogenous p.**, that which is due to disease of the liver.
**nephrogenic p.**, that which is due to disease of the kidney.
**puerperal p.**, that which occurs during the puerperium.
**pyogenic p.**, that which is associated with a suppurative process.

**Pep·to·strep·to·coc·cus** (pep"to-strep"to-kok'əs) [Gr. pepton digestion + streptos twisted + kokkos berry] a genus of gram-positive, coccoid bacteria of the family Peptococcaceae, made up of obligately anaerobic, chemo-organotrophic cells. Part of the normal human flora of the mouth, upper respiratory tract, and large intestine, they are also opportunistic pathogens causing soft tissue infections and bacteremias.
**P. anaero'bius**, a species that ferments glucose only, isolated in humans from cases of gangrene, infected wounds, puerperal fever, appendicitis, pleurisy, paranasal sinusitis, and osteomyelitis, and from the intestinal tract, oral cavity, and genital secretions. Called also Streptococcus foetidus.
**P. lanceola'tus**, a species having large ovoid cells with pointed ends, occurring in short chains and in pairs, which has been isolated from humans in cases of diarrhea, dental infection, vulvovaginitis, and abscesses. Called also Streptococcus lanceolatus.
**P. mi'cros**, a nonfermentative species having small spheroid cells, isolated from cases of purulent pleurisy, puerperal sepsis, appendicitis, brain and dental abscesses, and actinomycosis. Called also Streptococcus micros.
**P. par'vulus**, a species with small spherical cells occurring in pairs and short chains, isolated from the human respiratory tract and oral cavity.
**P. produc'tus**, a species with spherical cells, occurring in chains, isolated from cases of gangrene and pelvic abscesses and from blood and urine.

**pep·to·tox·in** (pep"to-tok'sin) any toxin or poisonous base developed from a peptone; also a poisonous alkaloid or ptomaine occurring in certain peptones and putrefying proteins.

**per-** [L. per through] 1. a prefix meaning throughout in space or time, or completely or extremely. 2. a prefix used in chemical terms to denote a large amount or to designate combination of an element in its highest valence.

**per·a·ceph·a·lus** (per"ə-sef'ə-ləs) [per- + acephalus] a fetus with neither head nor upper limbs, and with a defective thorax.

**per·ac·e·tate** (per-as'ə-tāt) a salt or derivative of peracetic acid.

**per·ace·tic ac·id** (per"ə-se'tik) peroxyacetic acid, $CH_3COOOH$, a strong oxidizing agent.

**per·ac·id** (per-as'id) an acid containing more than the usual quantity of oxygen.

**per·acid·i·ty** (per"ə-sid'ĭ-te) excessive acidity.

**per·acute** (per"ə-kūt') [L. peracutus] excessively acute or sharp.

**Per·an·dren** (par-an'drən) trademark for a preparation of testosterone.

**per anum** (par a'nəm) [L.] through the anus.

**per·ar·tic·u·la·tion** (per"ahr-tik"u-la'shən) [per- + L. articulatio joint] diarthrosis.

**Per·a·zil** (per'ə-zil) trademark for preparations of chlorcyclizine hydrochloride.

**per·cen·tile** (pər-sen'tīl) [per cent + -ile (by analogy with quartile, quintile, etc.)] any one of the 99 values that divide the range of a probability distribution or sample into 100 intervals of equal probability or frequency, e.g., 45 per cent of a population scores below the 45th percentile.

**per·cen·tu·al** (pər-sen'choo-əl) pertaining to percentage; figured on the basis of 100.

**per·cept** (per'sept) 1. something perceived. 2. the mental image of an object in space perceived by the senses.

**per·cep·tion** (pər-sep'shən) [L. percipere to take in completely] the conscious mental registration of a sensory stimulus.
**depth p.**, the proper recognition of depth or the relative distances to different objects in space.
**extrasensory p. (ESP)**, knowledge of, or response to, an external thought or objective event by means other than the senses.
**stereognostic p.**, stereognosis.

**per·cep·tive** (pər-sep'tiv) 1. pertaining to perception. 2. having keen perception.

FDA001644

# BIOCHEMISTRY

## ▪ FIFTH EDITION ▪

### Jeremy M. Berg

*Johns Hopkins University School of Medicine*

### John L. Tymoczko

*Carleton College*

### Lubert Stryer

*Stanford University*

Web content by

### Neil D. Clarke

*Johns Hopkins University School of Medicine*

W. H. Freeman and Company
New York



FDA001645

A.0164                         A.0164                         A.0164

*About the cover: The back cover shows a complex between an aminoacyl-transfer RNA molecule and the elongation factor EF-Tu.*

PUBLISHER: Michelle Julet
DEVELOPMENT EDITOR: Susan Moran
NEW MEDIA AND SUPPLEMENTS EDITOR: Mark Santee
NEW MEDIA DEVELOPMENT EDITOR: Sonia DiVittorio
MEDIA DEVELOPERS: CADRE design; molvisions.com—
                 3D molecular visualization
MARKETING DIRECTOR: John Britch
MARKETING MANAGER: Carol Coffey
PROJECT EDITOR: Georgia Lee Hadler
MANUSCRIPT EDITOR: Patricia Zimmerman
COVER AND TEXT DESIGN: Victoria Tomaselli
COVER ILLUSTRATION: Tomo Narashima
ILLUSTRATION COORDINATOR: Cecilia Varas
ILLUSTRATIONS: Jeremy Berg with Network Graphics
PHOTO EDITOR: Vikii Wong
PHOTO RESEARCHER: Dena Betz
PRODUCTION COORDINATOR: Julia DeRosa
COMPOSITION: TechBooks
MANUFACTURING: RR Donnelley & Sons Company

**Library of Congress Cataloguing-in-Publication Data**
Berg, Jeremy Mark
  Biochemistry / Jeremy Berg, John Tymoczko, Lubert Stryer.—5th ed.
    p.   cm.
  Fourth ed. by Lubert Stryer.
  Includes bibliographical references and index.
  ISBN 0-7167-4955-6 (CH32–34 only)
  ISBN 0-7167-3051-0 (CH1–34)
  ISBN 0-7167-4684-0 (CH1–34, International edition)
  ISBN 0-7167-4954-8 (CH1–31 only)
    1. Biochemistry. I. Tymoczko, John L. II. Stryer, Lubert. III. Title.

QP514.2 .S66 2001
    572—dc21

2001051259

© 2002 by W. H. Freeman and Company; © 1975, 1981, 1988,
1995 by Lubert Stryer. All rights reserved

No part of this book may be reproduced by any mechanical, photographic, or
electronic process, or in the form of a phonographic recording, nor may it be stored in
a retrieval system, transmitted, or otherwise copied for public or private use, without
written permission from the publisher.

Printed in the United States of America

First printing 2001

W. H. Freeman and Company
41 Madison Avenue, New York, New York 10010
Houndmills, Basingstoke RG21 6XS, England

A.0165    NCI-FREDERICK-SCIENTIFIC LIBRARY    A.0165
A.0165
FDA001646

CHAPTER 3 · Protein Structure and Function



Tyr        Gly        Gly        Phe        Leu

Amino
terminal residue

Carboxyl
terminal residue

**FIGURE 3.19 Amino acid sequences have direction.** This illustration of the pentapeptide Try-Gly-Gly-Phe-Leu (YGGFL) shows the sequence from the amino terminus to the carboxyl terminus. This pentapeptide, Leu-enkephalin, is an opioid peptide that modulates the perception of pain. The reverse pentapeptide, Leu-Phe-Gly-Gly-Tyr (LFGGY), is a different molecule and shows no such effects.

**FIGURE 3.20 Components of a polypeptide chain.** A polypeptide chain consists of a constant backbone (shown in black) and variable side chains (shown in green).

good hydrogen-bond donor. These groups interact with each other and with functional groups from side chains to stabilize particular structures, as will be discussed in detail.

Most natural polypeptide chains contain between 50 and 2000 amino acid residues and are commonly referred to as *proteins*. Peptides made of small numbers of amino acids are called *oligopeptides* or simply *peptides*. The mean molecular weight of an amino acid residue is about 110, and so the molecular weights of most proteins are between 5500 and 220,000. We can also refer to the mass of a protein, which is expressed in units of daltons; one *dalton* is equal to one atomic mass unit. A protein with a molecular weight of 50,000 has a mass of 50,000 daltons, or 50 kd (kilodaltons).

In some proteins, the linear polypeptide chain is cross-linked. The most common cross-links are *disulfide bonds*, formed by the oxidation of a pair of cysteine residues (Figure 3.21). The resulting unit of linked cysteines is

**Dalton—**
A unit of mass very nearly equal to that of a hydrogen atom. Named after John Dalton (1766–1844), who developed the atomic theory of matter.

**Kilodalton (kd)—**
A unit of mass equal to 1000 daltons.

Cysteine

Oxidation ⇌ Reduction

Cysteine

Cystine

+ 2 H⁺ + 2 e⁻

**FIGURE 3.21 Cross-links.** The formation of a disulfide bond from two cysteine residues is an oxidation reaction.

FDA001647

called *cystine*. Extracellular proteins often have several disulfide bonds, whereas intracellular proteins usually lack them. Rarely, nondisulfide cross-links derived from other side chains are present in some proteins. For example, collagen fibers in connective tissue are strengthened in this way, as are fibrin blood clots.

## 3.2.1 Proteins Have Unique Amino Acid Sequences That Are Specified by Genes

In 1953, Frederick Sanger determined the amino acid sequence of insulin, a protein hormone (Figure 3.22). *This work is a landmark in biochemistry because it showed for the first time that a protein has a precisely defined amino acid sequence.* Moreover, it demonstrated that insulin consists only of L amino acids linked by peptide bonds between α-amino and α-carboxyl groups. This accomplishment stimulated other scientists to carry out sequence studies of a wide variety of proteins. Indeed, the complete amino acid sequences of more than 100,000 proteins are now known. *The striking fact is that each protein has a unique, precisely defined amino acid sequence.* The amino acid sequence of a protein is often referred to as its *primary structure*.

A series of incisive studies in the late 1950s and early 1960s revealed that the amino acid sequences of proteins are genetically determined. The sequence of nucleotides in DNA, the molecule of heredity, specifies a complementary sequence of nucleotides in RNA, which in turn specifies the amino acid sequence of a protein. In particular, each of the 20 amino acids of the repertoire is encoded by one or more specific sequences of three nucleotides (Section 5.5).

Knowing amino acid sequences is important for several reasons. First, knowledge of the sequence of a protein is usually essential to elucidating its mechanism of action (e.g., the catalytic mechanism of an enzyme). Moreover, proteins with novel properties can be generated by varying the sequence of known proteins. Second, amino acid sequences determine the three-dimensional structures of proteins. Amino acid sequence is the link between the genetic message in DNA and the three-dimensional structure that performs a protein's biological function. Analyses of relations between amino acid sequences and three-dimensional structures of proteins are uncovering the rules that govern the folding of polypeptide chains. Third, sequence determination is a component of molecular pathology, a rapidly growing area of medicine. Alterations in amino acid sequence can produce abnormal function and disease. Severe and sometimes fatal diseases, such as sickle-cell anemia and cystic fibrosis, can result from a change in a single amino acid within a protein. Fourth, the sequence of a protein reveals much about its evolutionary history (see Chapter 7). Proteins resemble one another in amino acid sequence only if they have a common ancestor. Consequently, molecular events in evolution can be traced from amino acid sequences; molecular paleontology is a flourishing area of research.



**A chain**
Gly-Ile-Val-Glu-Gln-Cys-Cys-Ala-Ser-Val-Cys-Ser-Leu-Tyr-Gln-Leu-Glu-Asn-Tyr-Cys-Asn

**B chain**
Phe-Val-Asn-Gln-His-Leu-Cys-Gly-Ser-His-Leu-Val-Glu-Ala-Leu-Tyr-Leu-Val-Cys-Gly-Glu-Arg-Gly-Phe-Phe-Tyr-Thr-Pro-Lys-Ala

**FIGURE 3.22 Amino acid sequence of bovine insulin.**

FDA001648
A.0167          A.0167          A.0167

Case 1:24-cv-01503-TWP-KMB   Document 38   Filed 04/30/25   Page 158 of 275 PageID #: 772
Case: 26-1301   Document: 13   Filed: 04/01/2026   Pages: 301

# $3$rd Edition

# BIOCHEMISTRY

## DONALD VOET
University of Pennsylvania

## JUDITH G. VOET
Swarthmore College



WILEY  JOHN WILEY & SONS, INC.

FDA001649
A.0168        A.0168        A.0168

UNIVERSITY OF MARYLAND
BALTIMORE

**About the Cover:** The cover is an illustration of horse heart cytochrome $c$ designed to show the influence of amino acid side chains on the protein's three-dimensional folding pattern. It was drawn by Irving Geis, in collaboration with Richard Dickerson, in 1972, the same year that the Protein Data Bank was established and had one structure deposited. As of the beginning of 2003, there were 20,000 structures available for download and visualization on desktop and laptop computers that did not even exist when this drawing was created. It reminds us that biochemistry is a process that is driven by the creativity of the human mind. Our visualization tools have developed from pen, ink, and colored pencils to sophisticated computer software available to all. Without creativity, however, these tools have little use.

Executive Editor      *David Harris/Patrick Fitzgerald*
Senior Marketing Manager      *Robert Smith*
Developmental Editor      *Barbara Heaney*
Production Editor      *Sandra Dumas*
Photo Editor      *Hilary Newman*
Photo Researcher      *Elyse Rieder*
Cover/Text Designer      *Madelyn Lesure*
Production Management Services      *Suzanne Ingrao*
Illustration Editor      *Sigmund Malinowski*
Cover illustration and Part Openers, Irving Geis. Image from the Irving Geis Collection/ Howard Hughes Medical Institute. Rights owned by HHMI. Reproduction by permission only.

This book was typeset in 9.5/11.5 Times Ten Roman by TechBooks and printed and bound by Von Hoffmann Corporation. The cover was printed by Von Hoffmann Corporation.

The paper in this book was manufactured by a mill whose forest management programs include sustained yield harvesting of its timberlands. Sustained yield harvesting principles ensure that the number of trees cut each year does not exceed the amount of new growth.

This book is printed on acid-free paper. $\infty$

Copyright © 2004 by Donald Voet and Judith G. Voet. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4470. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008, E-mail: PERMREQ@WILEY.COM. To order books or for customer service call 1-800-CALL-WILEY (225-5945).

Voet, Donald
Biochemistry, Third Edition Donald Voet, Judith G. Voet

ISBN 0-471-19350-x (cloth)

0-471-39223-5 (Wiley International Edition)

Printed in the United States of America.

10 9 8 7 6 5 4 3 2 1

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 160 of 275 PageID
Case: 26-1301    Document: 13 #: 774    Filed: 04/01/2026    Pages: 301

68    *Chapter 4. Amino Acids*

shall delve a bit deeper into the acid–base properties of the amino acids.

Molecules that bear charged groups of opposite polarity are known as **zwitterions** (German: *zwitter*, hybrid) or **dipolar ions.** The zwitterionic character of the α-amino acids has been established by several methods including spectroscopic measurements and X-ray crystal structure determinations (in the solid state the α-amino acids are zwitterionic because the basic amine group abstracts a proton from the nearby acidic carboxylic acid group). Because amino acids are zwitterions, their physical properties are characteristic of ionic compounds. For instance, most α-amino acids have melting points near 300°C, whereas their nonionic derivatives usually melt around 100°C. Furthermore, amino acids, like other ionic compounds, are more soluble in polar solvents than in nonpolar solvents. Indeed, most α-amino acids are very soluble in water but are largely insoluble in most organic solvents.

## B. *Peptide Bonds*

The α-amino acids polymerize, at least conceptually, through the elimination of a water molecule as is indicated in Fig. 4-3. The resulting CO—NH linkage, which was independently characterized in 1902 by Emil Fisher and Franz Hofmeister, is known as a **peptide bond.** Polymers composed of two, three, a few (3–10), and many **amino acid residues** (alternatively called **peptide units**) are known, respectively, as **dipeptides, tripeptides, oligopeptides,** and **polypeptides.** These substances, however, are often referred to simply as "peptides." *Proteins are molecules that consist of one or more polypeptide chains.* These polypeptides range in length from ~40 to ~33,000 amino acid residues (although few have more than 1500 residues) and, since the average mass of an amino acid residue is ~110 D, have molecular masses that range from ~4 to over ~3600 kD.

*Polypeptides are **linear polymers;** that is, each amino acid residue is linked to its neighbors in a head-to-tail fashion rather than forming branched chains. This observation reflects the underlying elegant simplicity of the way living systems construct these macromolecules for, as we shall see, the nucleic acids that encode the amino acid sequences of polypeptides are also linear polymers. This permits the direct correspondence between the monomer (nucleotide) sequence of a nucleic acid and the monomer (amino acid) sequence of the corresponding polypeptide without the added complication of specifying the positions and sequences of any branching chains.

With 20 different choices available for each amino acid residue in a polypeptide chain, it is easy to see that a huge number of different protein molecules can exist. For example, for dipeptides, each of the 20 different choices for the first amino acid residue can have 20 different choices for the second amino acid residue, for a total of $20^2 = 400$ distinct dipeptides. Similarly, for tripeptides, there are 20 possibilities for each of the 400 choices of dipeptides to yield a total of $20^3 = 8000$ different tripeptides. A relatively small protein molecule consists of a single polypeptide chain of 100 residues. There are $20^{100} = 1.27 \times 10^{130}$ possible unique polypeptide chains of this length, a quantity vastly greater than the estimated number of atoms in the universe ($9 \times 10^{78}$). Clearly, nature can have made only a tiny fraction of the possible different protein molecules. Nevertheless, *the various organisms on Earth collectively synthesize an enormous number of different protein molecules whose great range of physicochemical characteristics stem largely from the varied properties of the 20 "standard" amino acids.*

## C. *Classification and Characteristics*

The most common and perhaps the most useful way of classifying the 20 "standard" amino acids is according to the polarities of their side chains (**R groups**). This is because proteins fold to their native conformations largely in response to the tendency to remove their hydrophobic side chains from contact with water and to solvate their hydrophilic side chains (Chapters 8 and 9). According to this classification scheme, there are three major types of amino acids: (1) those with nonpolar R groups, (2) those with uncharged polar R groups, and (3) those with charged polar R groups.

### a. The Nonpolar Amino Acid Side Chains Have a Variety of Shapes and Sizes

Nine amino acids are classified as having nonpolar side chains. **Glycine** (which, when it was found to be a component of gelatin in 1820, was the first amino acid to be identified in protein hydrolyzates) has the smallest possible side chain, an H atom. **Alanine, valine, leucine,** and **isoleucine** have aliphatic hydrocarbon side chains ranging in size from a methyl group for alanine to isomeric butyl groups for leucine and isoleucine. **Methionine** has a thiol ether side chain that resembles an *n*-butyl group in many of its physical properties (C and S have nearly equal electronegativities and S is about the size of a methylene group). **Proline,** a cyclic secondary amino acid, has conformational constraints imposed by the cyclic nature of its pyrrolidine side group, which is unique among the "standard" 20 amino acids. **Phenylalanine,** with its phenyl moiety (Fig. 4-4), and **tryptophan,** with its indole group, contain aromatic

**FIGURE 4-3    Condensation of two α-amino acids to form a dipeptide.** The peptide bond is shown in red.

FDA001651

# CELL BIOLOGY



**Thomas D. Pollard, M.D.**
Higgins Professor of Molecular, Cellular and Developmental Biology
Yale University
New Haven, Connecticut

**William C. Earnshaw, Ph.D., FRSE**
Professor and Wellcome Trust Principal Research Fellow
University of Edinburgh
Scotland, United Kingdom

**Illustrated by Graham T. Johnson**

**SAUNDERS**
*An Imprint of Elsevier Science*
Philadelphia   London   New York   St. Louis   Sydney   Toronto

FDA001652

A.0171                    A.0171                    A.0171

SAUNDERS
An Imprint of Elsevier Science

The Curtis Center
Independence Square West
Philadelphia, Pennsylvania 19106

CELL BIOLOGY                                                    ISBN 0-7216-3997-6
**Copyright 2002, Elsevier Science (USA). All rights reserved.**

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher.

---

### Notice

Medicine is an ever-changing field. Standard safety precautions must be followed, but as new research and clinical experience broaden our knowledge, changes in treatment and drug therapy may become necessary or appropriate. Readers are advised to check the most current product information provided by the manufacturer of each drug to be administered to verify the recommended dose, the method and duration of administration, and contraindications. It is the responsibility of the treating physician, relying on experience and knowledge of the patient, to determine dosages and the best treatment for each individual patient. Neither the Publisher nor the author assume any liability for any injury and/or damage to persons or property arising from this publication.

The Publisher

---

**Library of Congress Cataloging-in-Publication Data**

Pollard, Thomas D.
  Cell biology / Thomas D. Pollard, William C. Earnshaw; illustrated by Graham T. Johnson.—
1st ed.
    p.  cm
  Includes bibliographical references and index.
  ISBN 0-7216-3997-6
    1. Cytology.   I. Earnshaw, William C.   II. Title.

QH581.2.P65 2002
571.6—dc21                                                    2002021189

*Acquisitions Editor:* William R. Schmitt
*Senior Developmental Editor:* Hazel N. Hacker
*Production Manager:* Donna Morrissey

PIT/QWK

Printed in the United States of America

Last digit is the print number:  9  8  7  6  5  4  3  2  1

FDA001653



# chapter 2

# MOLECULAR STRUCTURES

This chapter describes the essential properties of water, proteins, nucleic acids, and carbohydrates as they pertain to cell biology. Chapter 6 covers lipids in the context of biological membranes.

## Water

Water is the most abundant and important molecule in cells and tissues. Humans are about two thirds water. Water is not only the solvent for virtually all other compounds in the cell, but it is a reactant or product in thousands of different biochemical reactions catalyzed by enzymes, including the synthesis and degradation of proteins and nucleic acids and the synthesis and hydrolysis of adenosine triphosphate (ATP), to name a few examples. Water is also an important determinant of biological structure, as lipid bilayers, folded proteins, and macromolecular assemblies are all stabilized by the hydrophobic effect derived from the exclusion of water from nonpolar surfaces (see Chapter 3). Additionally, water forms hydrogen bonds with polar groups of many cellular constituents ranging in size from small metabolites to large proteins. It also associates with small inorganic ions.

Water is so familiar that one tends to neglect its role in cell biology and its fascinating properties. Despite years of research, a completely satisfactory understanding of the physical chemistry of water has not yet been achieved, largely because it is one of the most complex of all liquids. However, a few essential features of water relevant to its role in cell biology have been elucidated.

The water molecule is roughly tetrahedral in shape (Fig. 2–1) with two hydrogen bond donors and two hydrogen bond acceptors. The more electronegative oxygen withdraws the electrons from the O—H

covalent bonds, leaving a partial positive charge on the hydrogens and a partial negative charge on the oxygen. These properties give hydrogen bonds between water molecules a special character. They are partly electrostatic because of the charge separation (induced dipole), but they also have some covalent character owing to overlap of the electron orbitals. Thus, the strength of hydrogen bonds is dependent on their orientation, being strongest along the lines of tetrahedral orbitals. One can think of oxygens from two water molecules sharing a hydrogen-bonded hydrogen.

Given two hydrogen bond donors and acceptors, water can be fully hydrogen-bonded as it is in ice (Fig. 2–2). Crystalline water in ice has a well-defined structure with a complete set of tetragonal hydrogen bonds and a remarkable amount (35%) of unoccupied space.

Neither theoretical calculations nor physical observations of liquid water have revealed a consistent picture of its organization. When ice melts, the volume decreases by only about 10%, so liquid water has considerable empty space too. The heat required to melt ice is a small fraction (15%) of the heat required to convert ice to a gas, where all the hydrogen bonds are lost. Because the heat of melting reflects the number of bonds broken, liquid water must retain most of the hydrogen bonds that stabilize ice. These hydrogen bonds create a continuous, three-dimensional network of water molecules connected at their tetrahedral vertices, allowing water to remain a liquid at a higher temperature than a similar molecule, ammonia. On the other hand, because liquid water does not have a well-defined, long-range structure, it must be very heterogeneous and dynamic, with rapidly fluctuating regions of local order and disorder (see Fig. 2–1C). This incomplete picture of water structure limits our

19

FDA001654

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 164 of 275 PageID
Case: 26-1301    Document: 13 #: 778 Filed: 04/01/2026    Pages: 301

ability to understand macromolecular interactions in an aqueous environment.

The properties of water have profound effects on all other molecules in the cell. For example, ions organize shells of water around themselves that compete effectively with other ions with which they might interact electrostatically (Fig. 2–3). This shell of water travels with the ions, governing the size of pores that they can penetrate. Similarly, hydrogen bonding with water strongly competes with the hydrogen bonding that occurs between solutes, including macromolecules. By contrast, water does not interact as favorably with nonpolar molecules as it does with itself, so the solubility of nonpolar molecules in water is low, and they tend to aggregate to reduce their surface area in contact with water. These interactions of nonpolar groups are energetically favorable because they minimize the unfavorable interactions of water with the nonpolar groups and increase the favorable interactions of water molecules with each other—the hydrophobic effect (see Chapter 3). Collectively, these interactions of water dominate the behavior of solute molecules in an aqueous environment. They strongly influence the assembly of proteins, lipids, and nucleic acids into the structures that they assume in the cell, as well as the interactions of these molecules. On the other hand, strategically placed water molecules can bridge two macromolecules in functional assemblies.

# ▌ Proteins

Proteins are major components of all cellular systems. This section presents some basic concepts about protein structure that explain how proteins function in cells. More extensive coverage of this topic is available in biochemistry books and specialized books on protein chemistry.

Proteins consist of one or more linear polymers called **polypeptides,** which consist of various combinations of 20 different **amino acids** (Figs. 2–4 and 2–5) linked together by **peptide bonds** (Fig. 2–6). When linked in polypeptides, amino acids are referred to as residues. The sequence of amino acids in each type of polypeptide is unique. It is specified by the gene encoding the protein and is read out precisely during protein synthesis (see Chapter 18). The polypeptides of proteins with more than one chain are usually synthesized separately. However, in some cases, a single chain is divided into pieces by cleavage after synthesis.

Polypeptides have a wide range of lengths. Small peptide hormones, such as oxytocin, consist of as few as nine residues. By contrast, some giant structural proteins—titin, for example (see Chapter 42)—have more than 25,000 residues. Most cellular proteins fall in the range of 100 to 1000 residues. In the absence of stabilization by disulfide bonds or bound metal ions, a minimum of 40 residues seems to be required for a polypeptide to adopt a stable three-dimensional structure in water.

The sequence of amino acids in a polypeptide can be determined chemically by removing one amino acid at a time from the amino terminus and identifying the product. This procedure, called **Edman degradation,** can be repeated about 50 times before declining yields limit progress. Longer polypeptides can be divided into fragments of less than 50 amino acids by chemical or enzymatic cleavage, after which they are purified and sequenced separately. Even easier, one can sequence the gene or a complementary DNA **(cDNA)** copy of the messenger RNA for the protein (see Fig. 2–18) and use the genetic code to infer the amino acid sequence. Analysis of protein fragments by mass spectrometry can be used to sequence even tiny quantities of proteins.

## Properties of the Amino Acids

Every student of cell biology should know the chemical structures of the amino acids used in proteins (see Fig. 2–4). Without these structures in mind, reading the literature and this book would be like spelling without knowledge of the alphabet. In addition to their full names, amino acids are frequently designated by three-letter or single-letter abbreviations.

All but one of the 20 amino acids commonly used in proteins consist of an **amino group,** linked to the **α-carbon,** linked to a **carboxyl group.** The exception is proline, which has a cyclic side chain bonded back to the nitrogen to form an imino group. Both the amino group (pK ~7) and carboxyl group (pK ~4) are partially ionized under physiological conditions. All amino acids, with the exception of glycine, have a β-carbon and a proton bonded to the α-carbon. (Glycine has a second proton instead.) This makes the α-carbon an asymmetrical center with two possible configurations. The L-isomers are used almost exclusively in living systems. (Compared with natural proteins, proteins constructed artificially from D-amino acids have mirror-image structures and properties. In addition to the β-carbon, each amino acid has a distinctive **side chain,** or R group, that determines its unique chemical and physical properties.

The amino acids are conveniently grouped in small families according to their R groups (Figure 2–4 denotes the special features of each group of amino acids). These side chains are distinguished by the presence of ionized groups, polar groups capable of

FDA001655

**Figure 2-4** The 20 L-amino acids specified by the genetic code. For each is shown the full name, the three-letter abbreviation, the single-letter abbreviation, a stick figure of the atoms, and a space-filling model of the atoms where hydrogen is white, carbon is black, oxygen is red, nitrogen is blue, and sulfur is yellow. For all, the amino group is protonated and carries a +1 charge, whereas the carboxyl group is ionized and carries a −1 charge. The amino acids are grouped according to the side chains attached to the α-carbon. *Uncharged amino acids:* These side chains fall into three subgroups. The aliphatic (G, A, V, L, I, C, M, P) and aromatic (Y, F, W) side chains partition into nonpolar environments, as they interact poorly with water. The uncharged side chains with polar hydrogen bond donors, or acceptors (S, T, N, Q, Y) can hydrogen-bond with water. *Charged amino acids:* At neutral pH, the basic amino acids K and R are fully protonated and carry a charge of +1, the acidic amino acids (D, E) are fully ionized and carry a charge of −1, and histidine (pK ~6.0) carries a partial positive charge. All the charged residues interact favorably with water, although the aliphatic chains of R and K also give them significant nonpolar character.

forming hydrogen bonds, chemically reactive groups, and their apolar surface area, which interacts poorly with water. Glycine and proline are special cases owing to their unique effects on the polymer backbone (see later section).

This repertoire of amino acids is sufficient to construct tens of thousands of different proteins, each with different capacities for interacting with other cellular constituents. This is possible because each protein has a unique three-dimensional structure (Fig. 2–7), each displaying the relatively modest variety of functional groups in a different way on its surface.

Enzymes modify many amino acids after their incorporation into polypeptides. These **posttranslational modifications** can have both structural and regulatory functions. Figure 2–5 illustrates some of the

major modifications. These modifications will be referred to many times in this book, especially the reversible phosphorylation of amino acid side chains, the most common regulatory reaction in biochemistry (see Chapter 27).

### Architecture of Proteins

Our knowledge of protein structure is based largely on x-ray diffraction studies of protein crystals or nuclear magnetic resonance (NMR) spectroscopy studies of small proteins in solution. These methods provide us with pictures showing the arrangement of the atoms in space. X-ray diffraction requires three-dimensional crystals of the protein and yields a three-dimensional contour map showing the density of electrons



**Figure 2-5** Modified amino acids. Protein kinases add a phosphate group to serine, threonine, tyrosine, histidine, and aspartic acid (not shown). Other enzymes add one or more methyl groups to lysine or histidine (not shown), a hydroxyl group to proline, or an acetate to the N-terminus of many proteins. The reducing environment of the cytoplasm minimizes the formation of disulfide bonds, but under oxidizing conditions within the membrane compartments of the secretory pathway (see Chapters 20 to 22), intramolecular or intermolecular disulfide (S—S) bonds form between adjacent cysteine residues.

FDA001656

24    chapter 2: **MOLECULAR STRUCTURES**



**Figure 2-6** The polypeptide backbone. This perspective drawing shows three planar peptide bonds, the four participating $\alpha$-carbons (labeled 1 to 4), the R groups represented by the $\beta$-carbons, amide protons, carbonyl oxygens, and the two rotatable backbone bonds ($\phi$ and $\varphi$). (Adapted from Creighton TE: Proteins: Structure and Molecular Principles. New York: W.H. Freeman and Co., 1983.)



**Figure 2-7** A gallery of space-filling models of proteins compared with a lipid bilayer, transfer RNA, and DNA, all on the same scale. (Modified from, and reproduced with permission from Goodsell D, Olsen AJ: Soluble proteins: Size, shape, and function. Trends Biochem Sci 18:65–68, 1993. Copyright 1993, with permission from Elsevier Science.)

FDA001657

around each atom (Fig. 2–8). In the best cases, all the atoms except the hydrogens are clearly resolved, along with the water molecules occupying fixed positions in and around the protein. By contrast, NMR spectroscopy requires concentrated solutions of protein and reveals the distances between identified protons. Given enough distance constraints, it is possible to calculate the unique fold of the protein that is consistent with these spacings of the protons. In a few cases, electron microscopy of two-dimensional crystals has also revealed atomic structures (see Chapters 5, 6, and 37).

Each amino acid residue contributes three atoms to the polypeptide backbone: the nitrogen from the amino group, the α-carbon, and the carbonyl carbon from the carboxyl group (see Fig. 2–6). The peptide bond linking the amino acids together is formed by dehydration synthesis (see Chapter 18), a common chemical reaction in biological systems. Water is removed in the form of a hydroxyl from the carboxyl group of one amino acid and a proton from the amino group of the next amino acid in the polymer. Ribosomes catalyze this reaction in cells. Chemical synthesis can achieve the same result in the laboratory. The peptide bond nitrogen has an **(amide) proton,** and the carbon has a double-bonded **(carbonyl) oxygen.** The amide proton is an excellent hydrogen bond donor, whereas the carbonyl oxygen is an excellent hydrogen bond acceptor.

The end of a polypeptide with the free amino group is called the **amino terminus** or **N-terminus.** The numbering of the residues in the polymer starts with the N-terminal amino acid, as the biosynthesis of the polymer begins there. The other end of a polypeptide has a free carboxyl group and is called the **carboxyl terminus** or **C-terminus.**

The peptide bond has some characteristics of a double bond owing to resonance of the electrons, and it is relatively rigid and planar. The bonds on either side of the α-carbon can rotate through 360 degrees, although a relatively narrow range of bond angles is highly favored. Steric hindrance between the β-carbon (on all the amino acids but glycine) and the α-carbon of the adjacent residue favors a *trans* configuration in which the side chains alternate from one side of the polymer to the other (see Fig. 2–6). Folded proteins generally use a limited range of rotational angles to avoid steric collisions of atoms along the backbone. Glycine without a β-carbon is free to assume a wider range of configurations and is useful for making tight turns in folded proteins.

## Folding of Polypeptides

The three-dimensional structure of a protein is determined solely by the sequence of the amino acids in the polypeptide chain. This was established by reversi-



**Figure 2–8** Protein structure determination by x-ray crystallography. A small part of an electron density map at 1.5 Å resolution of the cytoplasmic T1 domain of the shaker potassium channel from *Aplysia*. The chicken-wire map shows the electron density. The stick figure shows the superimposed atomic model. (Based on original data from M. Nanao and S. Choe, Salk Institute for Biological Studies.)

bly unfolding and refolding proteins in a test tube. Many, but not all, proteins unfolded by harsh treatments (high concentrations of urea or extremes of pH), will refold to regain full activity when returned to physiological conditions. Although proteins may be flexible enough to undergo conformational changes (see later discussion), polypeptides rarely fold into more than one final stable structure.

A major unfulfilled goal in biology is to predict the three-dimensional structure of proteins from the sequence of amino acids. This ability would have profound practical consequences. Presently, the number of known protein sequences (>200,000) far exceeds the number of established protein structures (about 4000), and the disparity widens as the complete genomes of various organisms are sequenced. Some of the factors that dominate the folding process are known, but the rules derived to date fall short of enabling prediction of whole folded structures. Some of the parameters responsible for folding are as follows:

1. Hydrophobic side chains pack very tightly in the core of proteins to minimize their exposure to water. Little free space exists inside proteins; the hydrophobic core is more like a hydrocarbon crystal than like an oil droplet (Fig. 2–9). Accordingly, the most conserved residues in families of proteins are found in the interior. Nevertheless, the internal packing is malleable enough to tolerate mutations that change the size of buried side chains, as the neighboring chains can rearrange without changing the overall shape of the protein.

FDA001658

26   chapter 2: **MOLECULAR STRUCTURES**



**Figure 2-9** Space-filling *(A)* and ribbon *(B)* models of a cross section of the bacterial chemotaxis protein CheY illustrate some of the factors that contribute to protein folding. α-Helices pack on both sides of the central, parallel β-sheet. Most of the polar and charged residues are on the surface. The tightly packed interior of largely apolar residues excludes water. The buried backbone amides and carbonyls are fully hydrogen-bonded to other backbone atoms in both the α-helices and β-sheet. (From protein data base [PDB] file: 2chf.)

Although many hydrophobic residues are inside, roughly half the residues exposed to solvent on the outer surface are also hydrophobic.

2. Most charged and polar side chains are exposed on the surface, where they interact favorably with water. Amino acid residues on the surface typically appear to play a minor role in protein folding. Experimentally, one can substitute many residues on the surface of a protein with any other residue without changing the stability or three-dimensional structure. Interior charged or polar residues frequently form hydrogen bonds or salt bridges to neutralize their charge.

3. The polar amide protons and carbonyl oxygens of the polypeptide backbone maximize their potential to form hydrogen bonds with other backbone atoms, side chain atoms, or water. In the hydrophobic core of proteins, this is commonly achieved by hydrogen bonds with other backbone atoms in the two major types of **secondary structures:** **α-helices** and **β-sheets** (Fig. 2–10).

4. Elements of secondary structure usually extend

**Figure 2-10** Models of secondary structures and turns of proteins. *A,* α-Helix. The stick figure *(left)* shows a right-handed α-helix with the N-terminus at the bottom and side chains R represented by the β-carbon. The backbone hydrogen bonds are indicated by cyan dashed lines. In this orientation, the carbonyl oxygens point up, the amide protons point down, and the R groups trail toward the N-terminus. Space-filling models *(middle)* show a polyalanine α-helix. The end-on views show how the backbone atoms fill the center of the helix. A space-filling model *(right)* of α-helix 5 from bacterial rhodopsin shows the side chains. *B,* Stick figure and space-filling models of an antiparallel β-sheet. The arrows indicate the polarity of each chain. With the polypeptide extended in this way, the amide protons and carbonyl oxygens lie in the plane of the sheet, where they make hydrogen bonds with the neighboring strands. The amino acid side chains alternate pointing up and down from the plane of the sheet. *C,* Stick figure and space-filling models of a parallel β-sheet. All strands have the same orientation *(arrows).* The orientations of the hydrogen bonds are somewhat less favorable than in an antiparallel sheet. *D* and *E,* Stick figures of two types of reverse turns found between strands of antiparallel β-sheets. *F,* Stick figure of an omega loop. (*A,* From PDB file: 1BAD: *B,* From PDB file: 1SLK: *D* and *E,* From PDB file: 1IMM: *F,* From PDB file: 1LNC.)

FDA001659

28    chapter 2: **MOLECULAR STRUCTURES**



**Figure 2–11** Ribbon diagrams of protein structures showing β-strands as flattened arrows, α-helices as coils, and other parts of the polypeptide chains as ropes. *Left,* The β-subunit of hemoglobin consists entirely of tightly packed α-helices. *Middle,* CheY is a mixed α/β structure, with a central parallel β-sheet flanked by α-helices. Note the right-handed twist of the sheet (defined by the sheet turning away from the viewer at the upper right) and right-handed pattern of helices (defined by the helices angled toward the upper right corner of the sheet) looping across the β-strands. (Compare the cross section in Figure 2–9). *Right,* The immunoglobulin $V_L$ domain consists of a sandwich of two antiparallel β-sheets. (*Left,* From PDB file: 1MBA. *Middle,* From PDB file: 2CHf. *Right,* From PDB file: 2IMM.)

completely across compact domains. Consequently, loops connecting α-helices and β-strands are on the surface, not in the interior of proteins (Fig. 2–11).

All these features tend to maximize the stability of the folded protein, but folded proteins are relatively unstable. The standard free energy difference (see Chapter 3) between a folded and unfolded protein is only about 40 kJ mol⁻¹, much less than that of a single covalent bond! This allows proteins to make conformational changes as part of their biological function. On the other hand, minor changes in structure can destabilize a protein. This explains why subtle mutations almost anywhere in a protein can occasionally have global effects on protein structure and function, even causing a disease.

### Secondary Structure

Much of the polypeptide backbone of proteins folds into stereotyped elements of secondary structure, especially α-helices and β-sheets (see Fig. 2–10). They are shown as spirals and polarized ribbons in the ribbon diagrams of protein organization used throughout this book. Both α-helices and β-strands are linear, so that globular proteins can be thought of as compact bundles of straight or gently curving rods, laced together by surface turns.

α-Helices provide a way for a polypeptide to maximize hydrogen bonding of backbone polar groups while using highly favored rotational angles around the α-carbons and tight packing of atoms in the core of the helix (see Figs. 2–10 and 2–11). All these features stabilize the α-helix. Viewed with the

amino terminus at the bottom, the amide protons all point down and the carbonyl oxygens all point up. The side chains project radially around the helix, tilted toward its N-terminus. Given 3.6 residues in each right-handed turn of the helix, the carbonyl oxygen of residue number one is positioned perfectly to form a linear hydrogen bond with the amide proton of residue number five. This n to n+4 pattern of hydrogen bonds repeats along the whole α-helix.

The orientation of the backbone hydrogen bonds in α-helices has two important consequences. First, the whole helix has an electrical dipole moment, negative at the C-terminus. Second, the ends of the helices are less stable than the middle, as four potential hydrogen bonds are not completed by backbone interactions at each end. These unmet backbone hydrogen bonds can be completed by interaction with appropriate donors or acceptors on the side chains of the terminal residues. Interactions with serine and asparagine are favored as "caps" at the N-termini of helices because their side chains can complete the hydrogen bonding of the backbone amide nitrogens. Lysine, histidine, and glutamine are favored hydrogen bonding caps for the C-terminus of helices.

All the amino acids are found in naturally occurring α-helices, but glycine and proline are uncommon, as they tend to destabilize the configuration of the backbone of the helix. In fact, proline is favored to initiate helices and glycine to complete helices because they allow backbone conformations found in bends.

A second strategy used to stabilize the backbone structure of polypeptides is hydrogen bonding (see Chapter 3) of β-strands laterally to neighboring β-

FDA001660
A.0179                              A.0179                              A.0179

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 170 of 275 PageID
Case: 26-1301    Document: 13 #: 784 Filed: 04/01/2026    Pages: 301

chapter 2: **MOLECULAR STRUCTURES**   29

strands (see Figs. 2–10 and 2–11). A group of hydrogen-bonded $\beta$-strands is called a **$\beta$-sheet.** The peptide chain in the individual $\beta$-strands is extended in a configuration close to *all-trans* with side chains alternating on the top and bottom and the amide protons and carbonyl oxygens alternating to the right and left. $\beta$-Strands can form a complete set of hydrogen bonds, with neighboring strands running in the same or opposite directions in any combination. However, the hydrogen bond donors and acceptors are more favorably oriented to form linear hydrogen bonds in a $\beta$-sheet with antiparallel strands, compared with parallel strands. Largely parallel $\beta$-sheets are usually extensive and completely buried in proteins. $\beta$-Sheets have a natural right-handed twist in the direction along the strands. Antiparallel $\beta$-sheets are stable even if the strands are short and extensively distorted by twisting. Antiparallel sheets can wrap around completely to form a **$\beta$-barrel** with as few as five strands, but the natural twist of the strands and the need to fill the core of the barrel with hydrophobic residues favors eight strands.

Up to 25% of the residues in globular proteins are present in bends at the surface (see Fig. 2–10D to F). The residues that constitute the bends are generally hydrophilic. The presence of glycine or proline in a turn allows the backbone to deviate from the usual geometry in tight turns, but the composition of bends is highly variable and not a strong determinant of folding or stability. The turns of the polypeptide backbone between linear elements of secondary structure are called **reverse turns,** as they reverse the direction of the polypeptide chain. Those between $\beta$-strands have a few characteristic conformations and are called $\beta$-bends.

Many parts of polypeptide chains in proteins do not have a regular structure (see Fig. 2–11). At one extreme, small segments of polypeptide, frequently at the N- or C-terminus of the chain, are truly disordered in the sense that they are mobile. On the other hand, many irregular segments of polypeptide are tightly packed into the protein structure and should not be referred to as random coil. **Omega loops** are compact structures consisting of 6 to 16 residues, generally on the protein surface, that connect adjacent elements of secondary structure (see Fig. 2–10F). They lack regular structure but typically have the side chains packed in the middle of the loop. Some are mobile, but many are rigid. Omega loops form the antigen-binding sites of antibodies. In other proteins, they bind metal ions or participate in the active sites of enzymes.

### Packing of Secondary Structure in Proteins

The elements of secondary structure can pack together in almost any way (see Fig. 2–11), but a few themes are favored enough to be found in many proteins. For example, two $\beta$-sheets tend to pack face to face at an angle of about 40 degrees with nonpolar residues packed tightly, knobs into holes, in between. $\alpha$-Helices tend to pack at an angle of about 30 degrees across $\beta$-sheets, always in a right-handed arrangement (see Fig. 2–11). Adjacent $\alpha$-helices tend to pack together at an angle of either +20 degrees or −50 degrees owing to packing of side chains from one helix into grooves between side chains on the other helix.

**Coiled-coils** are an extreme example of regular superstructure (Fig. 2–12). Two $\alpha$-helices pair to form a fibrous structure that is widely used to create stable polypeptide dimers in structural proteins (see Chapter 39) and transcription factors (see Chapter 14). Typically two identical $\alpha$-helices wrap around each other in register in a left-handed super helix that is stabilized by hydrophobic interactions at the interface of the two helices. Intermolecular ionic bonds between the side chains of the two polypeptides also stabilize coiled-coils. Given 3.6 residues per turn, the sequence of a coiled-coil has hydrophobic residues regularly spaced at positions 1 and 4 of a **"heptad repeat."** This pattern allows one to predict the tendency of a polypeptide to form coiled-coils from its amino acid sequence.

### Interaction of Proteins with Solvent

The surface of proteins is almost entirely covered with protons (Fig. 2–13). Some are potential hydrogen bond donors, but many are inert, being bonded to backbone or side chain aliphatic carbons. Although most charged side chains are exposed on the surface, so are many nonpolar side chains. Many water molecules are ordered on the surface of proteins by virtue of hydrogen bonds to polar groups. These water molecules appear in electron density maps of crystalline proteins, but they exchange rapidly, on a picosecond ($10^{-12}$ second) time scale. Waters in contact with nonpolar atoms maximize hydrogen bonding with each other, forming a dynamic layer of water with reduced translational diffusion compared with the bulk water. This lowers the entropy of the water and provides a thermodynamic impetus to protein folding pathways that minimize the number of hydrophobic atoms displayed on the surface (see Chapter 3).

### Protein Dynamics

Pictures of proteins tend to give the wrong impression that they are rigid and static. On the contrary, even when packed in crystals, the atoms of proteins vibrate around their mean positions on a picosecond ($10^{-12}$ sec) time scale with amplitudes up to 0.2 nm and velocities of 200 m per second. This motion is an inevitable consequence of the kinetic energy of each

# MOLECULAR CELL BIOLOGY

## SIXTH EDITION

Harvey Lodish

Arnold Berk

Chris A. Kaiser

Monty Krieger

Matthew P. Scott

Anthony Bretscher

Hidde Ploegh

Paul Matsudaira



W. H. Freeman and Company

New York

# ABOUT THE AUTHORS



**HARVEY LODISH** is Professor of Biology and Professor of Bioengineering at the Massachusetts Institute of Technology and a member of the Whitehead Institute for Biomedical Research. Dr. Lodish is also a member of the National Academy of Sciences and the American Academy of Arts and Sciences and was President (2004) of the American Society for Cell Biology. He is well known for his work on cell-membrane physiology, particularly the biosynthesis of many cell-surface proteins, and on the cloning and functional analysis of several cell-surface receptor proteins, such as the erythropoietin and TGF-β receptors. His laboratory also studies hematopoietic stem cells and has identified novel proteins that support their proliferation. Dr. Lodish teaches undergraduate and graduate courses in cell biology and biotechnology.



**ARNOLD BERK** is Professor of Microbiology, Immunology, and Molecular Genetics and a member of the Molecular Biology Institute at the University of California, Los Angeles. Dr. Berk is also a fellow of the American Academy of Arts and Sciences. He is one of the original discoverers of RNA splicing and of mechanisms for gene control in viruses. His laboratory studies the molecular interactions that regulate transcription initiation in mammalian cells, focusing in particular on transcription factors encoded by oncogenes and tumor suppressors. He teaches introductory courses in molecular biology and virology and an advanced course in cell biology of the nucleus.



**CHRIS A. KAISER** is Professor and Head of the Department of Biology at the Massachusetts Institute of Technology. His laboratory uses genetic and cell biological methods to understand the basic processes of how newly synthesized membrane and secretory proteins are folded and stored in the compartments of the secretory pathway. Dr. Kaiser is recognized as a top undergraduate educator at MIT, where he has taught genetics to undergraduates for many years.



**MONTY KRIEGER** is Whitehead Professor in the Department of Biology at the Massachusetts Institute of Technology. For his innovative teaching of undergraduate biology and human physiology as well as graduate cell-biology courses, he has received numerous awards. His laboratory has made contributions to our understanding of membrane trafficking through the Golgi apparatus and has cloned and characterized receptor proteins important for the movement of cholesterol into and out of cells, including the HDL receptor.



**MATTHEW P. SCOTT** is Professor of Developmental Biology, Genetics, and Bioengineering at Stanford University School of Medicine and Investigator at the Howard Hughes Medical Institute. He is a member of the National Academy of Sciences and the American Academy of Arts and Sciences and a past president of the Society for Developmental Biology. He is known for his work in developmental biology and genetics, particularly in areas of cell-cell signaling and homeobox genes and for discovering the roles of developmental regulators in cancer. Dr. Scott teaches cell and developmental biology to undergraduate students, development and disease mechanisms to medical students, and developmental biology to graduate students at Stanford University.



**ANTHONY BRETSCHER** is Professor of Cell Biology at Cornell University and Associate Director of the Cornell Institute of Cell and Molecular Biology. His laboratory is well known for identifying and characterizing new components of the actin cytoskeleton and elucidating the biological functions of those components in relation to cell polarity and membrane traffic. For this work, his laboratory exploits biochemical, genetic, and cell biological approaches in two model systems, vertebrate epithelial cells and the budding yeast. Dr. Bretscher teaches cell biology to graduate students at Cornell University.



**HIDDE PLOEGH** is Professor of Biology at the Massachusetts Institute of Technology and a member of the Whitehead Institute for Biomedical Research. One of the world's leading researchers in immune system behavior, Dr. Ploegh studies the various tactics that viruses employ to evade our immune responses and the ways our immune system distinguishes friend from foe. Dr. Ploegh teaches immunology to undergraduate students at Harvard University and MIT.

FDA001663

A.0182        A.0182        A.0182

CHAPTER



# 3

# PROTEIN STRUCTURE AND FUNCTION



Ribbon diagram of a beta propeller domain from the human signaling protein Keap1. Ten water molecules (spheres) are bound to each of the six blades of the propeller. Many proteins are built from multiple, independently stable protein domains. [From L. J. Beamer, X. Li, C. A. Bottoms, and M. Hannink, 2005, *Acta Crystallogr. D: Biol. Crystallogr.* **61**(10):1335–1342.] Credit: Courtesy of Robert Huber, Martinsried.

Proteins, which are polymers of amino acids, come in many sizes and shapes. Their three-dimensional diversity reflects underlying structural differences: principally variations in their lengths and amino acid sequences, and in some cases, differences also in the number of disulfide bonds or the attachment of small molecules or ions to their amino acid side chains. In general, the linear, unbranched polymer of amino acids composing any protein will fold into only one or a few closely related three-dimensional shapes—called conformations. The conformation of a protein together with the distinctive chemical properties of its amino acid side chains determines its function. As a consequence, proteins can perform a dazzling array of distinct functions inside and outside of cells that either are essential for life or provide selective evolutionary advantage to the cell or organism that contains them. It is, therefore, not surprising that characterizing the structures and activities of proteins is a fundamental prerequisite for understanding how cells work. Much of this textbook is devoted to examining how proteins act together to enable cells to live and function properly.

Many proteins can be grouped into just a few broad functional classes. *Structural proteins,* for example, determine the shapes of cells and their extracellular environments, and serve as guide wires or rails to direct the intracellular movement of molecules and organelles. They usually are formed by the assembly of multiple protein subunits into very large, long structures. *Scaffold proteins* bring other proteins together into

ordered arrays to perform specific functions more efficiently than if those proteins were not assembled together. *Enzymes* are proteins that catalyze chemical reactions. *Membrane transport proteins* permit the flow of ions and molecules across cellular membranes. *Regulatory proteins* act as signals, sensors, and switches to control the activities of cells by altering the functions of other proteins and genes. These include *signaling proteins,* such as hormones and cell-surface receptors that transmit extracellular signals to the cell interior.

## OUTLINE

| | | |
|---|---|---|
| 3.1 | Hierarchical Structure of Proteins | 64 |
| 3.2 | Protein Folding | 74 |
| 3.3 | Protein Function | 78 |
| 3.4 | Regulating Protein Function I: Protein Degradation | 86 |
| 3.5 | Regulating Protein Function II: Noncovalent and Covalent Modifications | 88 |
| 3.6 | Purifying, Detecting, and Characterizing Proteins | 92 |
| 3.7 | Proteomics | 105 |

63

FDA001664

A.0183                    A.0183                    A.0183

*Motor proteins* are responsible for moving other proteins, organelles, cells—even whole organisms. Any one protein can be a member of more than one protein class, as is the case of some cell-surface signaling receptors that are both enzymes and regulator proteins because they transmit signals from outside to inside cells by catalyzing chemical reactions. To accomplish efficiently their diverse missions some proteins assemble into large complexes, often called *molecular machines*.

How do proteins mediate so many diverse functions? They do this by exploiting a few simple activities. Most fundamentally, proteins *bind*—to one another, to other macromolecules, such as DNA, and to small molecules and ions. In many cases such binding can induce a conformational change in the protein and thus influence its activity. Binding is based on molecular complementarity between a protein and its binding partner, as described in Chapter 2. A second key activity is enzymatic *catalysis*. Appropriate folding of a protein will place some amino acid side chains and carboxyl and amino groups of the backbone into positions that permit the catalysis of covalent bond rearrangements. A third activity involves *folding* into a channel or pore within a membrane through which molecules and ions flow. Although these are especially crucial protein activities, they are not the only ones. For example, fish that live in frigid waters—the Antarctic borchs and Arctic cods—have antifreeze proteins in their circulatory systems to prevent water crystallization at subzero temperatures.

A complete understanding of how proteins permit cells to live and thrive requires the identification and characterization of all the proteins used by a cell. In a sense, molecular cell biologists want to compile a complete protein 'parts list' and construct an all-inclusive "users manual" that describes how these proteins work. Compiling a comprehensive protein parts list has become feasible in recent years with the sequencing of entire genomes—complete sets of genes—of more and more organisms. From a computer analysis of genome sequences, researchers can deduce the number of amino acids and their sequence of most of the encoded proteins (Chapter 5). The term proteome was coined to refer to the entire protein complement of an organism. The human genome contains only 25,000 genes that encode proteins. However, variations in mRNA production (e.g., alternative splicing (Chapter 8)) and more than 100 types of protein modifications may generate hundreds of thousands of distinct human proteins. Remarkably, the human proteome is only about five times as large, comprising about 33,000 different proteins. By comparing protein sequences and structures of proteins of unknown function to those of known function, scientists can often deduce much about their functions. In the past, characterization of protein function by genetic, biochemical, or physiological methods often preceded the identification of particular proteins. In the modern genomic and proteomic era, a protein is usually identified prior to determining its function.

In this chapter, we begin our study of how the structure of a protein gives rise to its function, a theme that recurs throughout this book (Figure 3-1). The first section examines how chains of amino acid building blocks are arranged in a three-dimensional structural hierarchy. The next section discusses



▲ **FIGURE 3-1 Overview of protein structure and function.**
(a) Proteins are assembled according to a hierarchy of structures. A polypeptide's linear sequence of amino acids linked by peptide bonds (primary structure) folds into local helices or sheets (secondary structure) that pack into large (longer-range) complex three-dimensional structures (tertiary structure). Some individual polypeptides associate into multichain complexes (quaternary structure), which in some cases can be very large, consisting of tens to hundreds of subunits (supramolecular assemblies). (b) Protein function includes organization of the genome, other proteins, lipid bilayer membranes, and cytoplasm (structure); control of protein activity (regulation), monitoring of the environment and transmitting resultant information (signaling), flow of small molecules and ions across membranes (transport); catalysis of chemical reactions (via enzymes); and generation of force for movement (via motor proteins). These functions and others arise from specific binding interactions and conformational changes in the structure of a properly folded protein.

how proteins fold into these structures. We then turn to protein function, focusing on enzymes, the special class of proteins that catalyze chemical reactions. Various mechanisms that cells use to control the activities and life spans of proteins are covered in the next two sections. Next comes a section on commonly used techniques in the biologist's tool kit for isolating proteins and characterizing their properties. The chapter concludes with a discussion of the burgeoning field of proteomics.

## 3.1 Hierarchical Structure of Proteins

A protein chain folds into a distinct three-dimensional shape that is stabilized by noncovalent interactions between regions in the linear sequence of amino acids. A key concept in

FDA001665
A.0184          A.0184          A.0184



(a) Primary structure

−Ala−Glu−Val−Thr−Asp−Pro−Gly−

(b) Secondary structure

α helix

β sheet

(c) Tertiary structure

Domain

(d) Quaternary structure



▲ **FIGURE 3-2  Four levels of protein hierarchy.** (a) The linear sequence of amino acids linked together by peptide bonds is the primary structure. (b) Folding of the polypeptide chain into local α helices or β sheets represents secondary structure. (c) Secondary structural elements together with various loops and turns in a single polypeptide chain pack into a larger independently stable structure, which may include distinct domains; this is tertiary structure. (d) Some individual polypeptides with their own tertiary structures can associate into a quaternary structure defining a multichain complex.

understanding how proteins work is that *function is derived from three-dimensional structure, and three-dimensional structure, which is determined primarily by noncovalent interactions between regions in the linear sequence of amino acids, is specified by amino acid sequence.* Indeed, principles relating biological structure and function initially were formulated by the biologists Johann von Goethe (1749–1832), Ernst Haeckel (1834–1919), and D'Arcy Thompson (1860–1948). They greatly influenced the school of "organic" architecture pioneered in the early twentieth century that is epitomized by the dicta "form follows function" (Louis Sullivan) and "form is function" (Frank Lloyd Wright). Here, we consider the architecture of proteins at four levels of organization: primary, secondary, tertiary, and quaternary (Figure 3-2).

## The Primary Structure of a Protein Is Its Linear Arrangement of Amino Acids

As discussed in Chapter 2, proteins are constructed by the polymerization of 20 different types of amino acids. Individual amino acids are linked together in linear, unbranched chains by covalent amide bonds, called **peptide bonds**, with occasional disulfide bonds covalently linking side chains together. Peptide

bond formation between the amino group of one amino acid and the carboxyl group of another results in the net release of a water molecule (dehydration) (Figure 3-3a). The repeated amide N, α carbon ($C_\alpha$), carbonyl C and oxygen atoms of each amino acid residue form the backbone of a protein molecule from which the various side-chain groups project (Figure 3-3b, c). As a consequence of the peptide linkage, the backbone exhibits directionality because all the amino groups are located on the same side of the $C_\alpha$ atoms. Thus one end of a protein has a free (unlinked) amino group (the *N-terminus*), and the other end has a free carboxyl group (the *C-terminus*). The sequence of a protein chain is conventionally written with its

(a)

$$^+H_3N - \underset{R_1}{\overset{H \quad O}{C_\alpha - C}} - O^- \ + \ ^+H_3N - \underset{R_2}{\overset{H \quad O}{C_\alpha - C}} - O^-$$

$$\Downarrow \ H_2O$$

$$^+H_3N - \underset{R_1}{\overset{H \quad O}{C_\alpha - C}} - \underset{H}{\overset{}{N}} - \underset{R_2}{\overset{H \quad O}{C_\alpha - C}} - O^-$$

Peptide bond

(b)

$$^+H_3N - \underset{R_1}{\overset{H \quad O}{C_\alpha - C}} - \underset{H}{N} - \underset{R_2}{\overset{H \quad H}{C_\alpha - C}} - \underset{O}{N} - \underset{R_3}{\overset{H \quad O}{C_\alpha - C}} - \underset{H}{N} - \underset{R_4}{\overset{H \quad H}{C_\alpha - C}} - \underset{O}{N} - \underset{R_5}{\overset{H \quad H \quad O}{C_\alpha - C}} - O^-$$

Amino end
(N-terminus)

Carboxyl end
(C-terminus)

(c)



aa₁  aa₂  aa₃

Peptide bond

Peptide bond

▲ **FIGURE 3-3  Structure of a polypeptide.** (a) Individual amino acids are linked together by peptide bonds, which form via reactions that result in a loss of water (dehydration). $R_1$, $R_2$, etc., represent the side chains ("R groups") of amino acids. (b) Linear polymers of peptide bond–linked amino acids are called *polypeptides,* which have a free amino end (N-terminus) and a free carboxyl end (C-terminus). (c) A ball-and-stick model shows peptide bonds (yellow) linking the amino nitrogen atom (blue) of one amino acid (aa) with the carbonyl carbon atom (gray) of an adjacent one in the chain. The R groups (green) extend from the α carbon atoms (black) of the amino acids. These side chains largely determine the distinct properties of individual proteins.

FDA001666

A.0185    A.0185    A.0185

N-terminal amino acid on the left and its C-terminal amino acid on the right, and the amino acids are numbered sequentially starting from the amino terminus (number 1).

The **primary structure** of a protein is simply the linear arrangement, or sequence, of the amino acid residues that compose it. Many terms are used to denote the chains formed by the polymerization of amino acids. A short chain of amino acids linked by peptide bonds and having a defined sequence is called an **oligopeptide**, or just **peptide**; longer chains are referred to as **polypeptides**. Peptides generally contain fewer than 20–30 amino acid residues, whereas polypeptides are often 200–500 residues long. The longest protein described to date is the muscle protein titin with 26,926 residues. We generally reserve the term **protein** for a polypeptide (or complex of polypeptides) that has a well-defined three-dimensional structure. It is implied that proteins and peptides are the natural products of a cell.

The size of a protein or a polypeptide is reported as its mass in **daltons** (a dalton is 1 atomic mass unit) or as its molecular weight (MW), which is a dimensionless number. For example, a 10,000-MW protein has a mass of 10,000 daltons (Da), or 10 kilodaltons (kDa). In the penultimate section of this chapter, we will consider different methods for measuring the sizes and other physical characteristics of proteins. The known and predicted proteins encoded by the yeast genome have an average molecular weight of 52,728 and contain, on average, 466 amino acid residues. The average molecular weight of amino acids in proteins is 113, taking into account their average relative abundances. This value can be used to estimate the number of residues in a protein from its molecular weight or, conversely, its molecular weight from the number of residues.

## Secondary Structures Are the Core Elements of Protein Architecture

The second level in the hierarchy of protein structure is **secondary structure.** Secondary structures are stable spatial arrangements of segments of a polypeptide chain held together by hydrogen bonds between backbone amide and carbonyl groups and often involving repeating structural patterns. A single polypeptide may contain multiple types of secondary structure in various portions of the chain, depending on its sequence. The principal secondary structures are the alpha (α) **helix**, the beta (β) **sheet**, and a short U-shaped beta (β) **turn**. Portions of the polypeptide that don't form these structures, but nevertheless have a well-defined, stable shape, are said to have an *irregular* structure. The term *random coil* applies to highly flexible portions of a polypeptide chain that have no fixed three-dimensional structure. In an average protein, 60 percent of the polypeptide chain exists as α helices and β sheets; the remainder of the molecule is in coils and turns. Thus, α helices and β sheets are the major internal supportive elements in most proteins. In this section, we explore the shapes of secondary structures and the forces that favor their formation. In later sections, we examine how linear arrays of secondary structure fold together into larger, more complex arrangements called tertiary structure.



Amino terminus

3.6 residues/turn

Carboxyl terminus

▲ **FIGURE 3-4 The α helix, a common secondary structure in proteins.** The polypeptide backbone (seen as a ribbon) is folded into a spiral that is held in place by hydrogen bonds between backbone oxygen and hydrogen atoms. Only hydrogens involved in bonding are shown. The outer surface of the helix is covered by the side-chain R groups (green).

**The α Helix** In a polypeptide segment folded into an α helix, the backbone forms a spiral structure in which the carbonyl oxygen atom of each peptide bond is hydrogen-bonded to the amide hydrogen atom of the amino acid four residues farther along the chain (in the direction of the C-terminus) (Figure 3-4). Within an α helix, all the backbone amino and carboxyl groups are hydrogen-bonded to one another, except at the very beginning and end of the helix. This periodic arrangement of bonds confers an amino-to-carboxy-terminal directionality on the helix because all the hydrogen bond acceptors (e.g., the carbonyl groups) have the same orientation (pointing in the downward direction in Figure 3-4) and results in a structure in which there is a complete turn of the spiral every 3.6 residues. An α helix 36 amino acids long has 10 turns of the helix and is 5.4 nm long (0.54 nm/turn).

The stable arrangement of hydrogen-bonded amino acids in the α helix holds the backbone in a straight, rod-like cylinder from which the side chains point outward. The relative hydrophobic or hydrophilic quality of a particular helix within a protein is determined entirely by the

FDA001667

A.0186                    A.0186                    A.0186

characteristics of the side chains, because all the polar amino and carboxyl groups of the peptide backbone are engaged in hydrogen bonding with one another in the helix. In water-soluble proteins, the hydrophilic helices tend to be found on the outside surfaces, where they can interact with the aqueous environment, whereas hydrophobic helices tend to be buried within the core of the folded protein. The amino acid proline is usually not found in α helices, because the covalent bonding of its amino group with a carbon in the side chain prevents its participation in stabilizing the backbone through normal hydrogen bonding. While the classic α helix is the most intrinsically stable, and most common helical form in proteins, there are variations, such as more tightly or loosely twisted helices. For example, in a specialized helix called a coiled coil (described several sections farther on), the helix is more tightly wound (3.5 residues and 0.51 nm per turn).

**The β Sheet**    Another type of secondary structure, the β sheet, consists of laterally packed β strands. Each β strand is a short (5- to 8-residue), nearly fully extended polypeptide segment. Unlike in the α helix (where hydrogen bonding between the amino and carboxyl groups in the backbone occurs between nearly adjacent residues), hydrogen bonding in the β sheet occurs between backbone atoms in separate, but adjacent, β strands (Figure 3-5a). These distinct β strands may be either within a single polypeptide chain, with short or long loops be-



(a) Top view

Amino
terminus
Carboxyl
terminus

(b) Side view



▲ **FIGURE 3-5 The β sheet, another common secondary structure in proteins.** (a) Top view of a simple three-stranded β sheet with antiparallel β strands. The stabilizing hydrogen bonds between the β strands are indicated by green dashed lines. (b) Side view of a β sheet. The projection of the R groups (green) above and below the plane of the sheet is obvious in this view. The fixed bond angles in the polypeptide backbone produce a pleated contour.



▲ **FIGURE 3-6 Structure of a β turn.** Composed of four residues, β turns reverse the direction of a polypeptide chain (≈180° U-turn). The $C_\alpha$ carbons of the first and fourth residues are usually <0.7 nm apart, and those residues are often linked by a hydrogen bond. β turns facilitate the folding of long polypeptides into compact structures.

tween the β strand segments, or on different polypeptide chains. Figure 3-5b shows how two or more β strands align into adjacent rows, forming a nearly two-dimensional β pleated sheet (or simply *pleated sheet*), in which hydrogen bonds within the plane of the sheet hold the β strands together as the side chains stick out above and below the plane. Like α helices, β strands have a directionality defined by the orientation of the peptide bond. Therefore, in a pleated sheet, adjacent β strands can be oriented in the same (parallel) or opposite (antiparallel) directions with respect to each other. In some proteins, β sheets form the floor of a binding pocket or a hydrophobic core; in other proteins embedded in membranes the β sheets curve around and form a hydrophilic central pore through which ions and small molecules may flow (Chapter 11).

**β Turns**    Composed of four residues, β turns are located on the surface of a protein, forming sharp bends that reverse the direction of the polypeptide backbone, often toward the protein's interior. These short, U-shaped secondary structures are often stabilized by a hydrogen bond between their end residues (Figure 3-6). Glycine and proline are commonly present in turns. The lack of a large side chain in glycine and the presence of a built-in bend in proline allow the polypeptide backbone to fold into a tight U shape. β turns help large proteins to fold into highly compact structures. There are six types of well-defined turns, their detailed structures depending on the arrangement of H-bonding interactions. A polypeptide backbone also may contain longer bends, or loops. In contrast with tight β turns, which exhibit just a few well-defined conformations, longer loops can have many different conformations.

## Overall Folding of a Polypeptide Chain Yields Its Tertiary Structure

Tertiary structure refers to the overall conformation of a polypeptide chain—that is, the three-dimensional arrangement of all its amino acid residues. In contrast with secondary

FDA001668

**MEDIA CONNECTIONS**



▲ **FIGURE 3-7 Oil drop model of protein folding.** The hydrophobic residues of a polypeptide chain tend to cluster together, somewhat like an oil drop, on the inside, or core, of a folded protein, driven away from the aqueous surroundings by the hydrophobic effect (Chapter 2). Charged and uncharged polar side chains appear on the protein's surface where they can form stabilizing interactions with surrounding water and ions.

structures, which are stabilized only by hydrogen bonds, tertiary structure is primarily stabilized by hydrophobic interactions between nonpolar side chains, together with hydrogen bonds between polar side chains and peptide bonds. These stabilizing forces compactly hold together elements of secondary structure—α helices, β strands, turns, and coils. Because the stabilizing interactions are weak, however, the tertiary structure of a protein is not rigidly fixed but undergoes continual, minute fluctuations, and some segments within the tertiary structure of a protein can be so very mobile they are considered to be disordered (that is, lacking well-defined, stable, three-dimensional structure). This variation in structure has important consequences for the function and regulation of proteins.

Chemical properties of amino acid side chains help define tertiary structure. Disulfide bonds between the side chains of cysteine residues in some proteins covalently link regions of proteins, thus restricting the mobility of proteins and increasing the stability of their tertiary structures. Amino acids with charged hydrophilic polar side chains tend to be on the outer surfaces of proteins; by interacting with water, they help to make proteins soluble in aqueous solutions and can form noncovalent interactions with other water-soluble molecules, including other proteins. In contrast, amino acids with hydrophobic nonpolar side chains are usually sequestered away from the water-facing surfaces of a protein, in many cases forming a water-insoluble central core (called the *oil drop model of globular proteins,* because of the relatively hydrophobic, or 'oily', core, Figure 3-7). Uncharged hydrophilic polar side chains are found on both the surface and inner core of proteins.

Proteins usually fall into one of three broad categories, based on their tertiary structure: fibrous proteins, globular proteins, and integral membrane proteins. *Fibrous proteins* are large, elongated, stiff molecules often composed of many tandem copies of a short sequence that forms a single repeating secondary structure (see the structure of collagen, the most abundant protein in mammals, in Chapter 19). Fibrous proteins, which often aggregate into large multiprotein fibers that

do not readily dissolve in water, usually play a structural role or participate in cellular movements. *Globular proteins* are generally water-soluble, compactly folded structures, often but not exclusively spheroidal, that comprise a mixture of secondary structures (see the structure of myoglobin, below). *Integral membrane proteins* are embedded within the phospholipid bilayer of the membranes that serve as the walls of cells and organelles. The three broad categories of proteins noted here are not mutually exclusive—some proteins are made up of combinations of two or even all three of these categories.

## Different Ways of Depicting the Conformation of Proteins Convey Different Types of Information

The simplest way to represent three-dimensional protein structure is to trace the course of the backbone atoms, sometimes only the $C_\alpha$ atoms, with a solid line (called a $C_\alpha$ trace, Figure 3-8a); the most complex model shows every atom (Figure 3-8b). The former shows the overall fold of the polypeptide chain without consideration of the amino acid side chains; the latter, a ball-and-stick model, details the interactions between side-chain atoms, including those that stabilize the protein's conformation and interact with other molecules, as well as the atoms of the backbone. Even though both views are useful, the elements of secondary structure are not always easily discerned in them. Another type of representation uses common shorthand symbols for depicting secondary structure—for example, coiled ribbons or solid cylinders for α helices, flat ribbons or arrows for β strands, and flexible thin strands for β turns, coils, and loops (Figure 3-8c). In variations of ribbon diagrams, ball-and-stick or space-filling models of side chains can be attached to the backbone ribbon, while ribbon and cylinder models make the secondary structures of a protein easy to see.

However, none of these three ways of representing protein structure conveys much information about the protein surface, which is of interest because it is where other molecules usually bind to a protein. Computer analysis can identify the surface atoms that are in contact with the watery environment. On this water-accessible surface, regions having a common chemical character (hydrophobicity or hydrophilicity) and electrical character (basic or acidic) can be indicated by coloring (Figure 3-8d). Such models reveal the topography of the protein surface and the distribution of charge, both important features of binding sites, as well as clefts in the surface where small molecules bind. This view represents a protein as it is "seen" by another molecule.

## Structural Motifs Are Regular Combinations of Secondary and Tertiary Structures

Particular combinations of secondary and tertiary structures, called structural motifs or folds, appear often as segments within many different proteins. Structural motifs

FDA001669

A.0188                    A.0188                    A.0188

(a) C$_\alpha$ backbone trace



(b) Ball and stick



(c) Ribbons



(d) Solvent-accessible surface



◄ **FIGURE 3-8 Four ways to visualize protein structure.** Ras, a monomeric guanine nucleotide–binding protein, is shown in all four panels, with guanosine-diphosphate (GDP) always depicted in blue. (a) The C$_\alpha$ backbone trace demonstrates how the polypeptide is tightly packed into a small volume. (b) A ball-and-stick representation reveals the location of all atoms. (c) A ribbon representation emphasizes how β strands (light blue) and α helices (red) are organized in the protein. Note the turns and loops connecting pairs of helices and strands. (d) A model of the water-accessible surface reveals the numerous lumps, bumps, and crevices on the protein surface. Regions of positive charge are shaded purple; regions of negative charge are shaded red.

contribute to the global structure of the entire protein, and any particular structural motif often performs a common function in different proteins (e.g., binding to a particular small molecule or ion). The primary sequences responsible for any given structural motif may be very similar to one another. In other words, a common sequence motif can result in a common three-dimensional structural motif. However, it is possible for seemingly unrelated primary sequences to result in folding into a common structural motif. Conversely, it is possible that a commonly occurring sequence motif does not fold into a well-defined structural motif. Sometimes short sequence motifs that have an unusual abundance of a particular amino acid, e.g., proline or aspartate or glutamate, are called "domains"; however, these and other short contiguous segments are more appropriately called motifs than domains (which are defined below).

Many proteins, including fibrous proteins and DNA-regulating proteins called transcription factors (Chapter 7), assemble into dimers or trimers by using an α helix–based coiled coil, or heptad-repeat, structural motif. In this structural motif, α helices from two, three, or even four separate polypeptide chains coil about one another—resulting in a coil of coils, hence the name (Figure 3-9a). The individual helices bind tightly to one another because each helix has a strip of aliphatic (hydrophobic, but not aromatic) side chains (leucine valine, etc.) running along one side of the helix that interacts with a similar strip in the adjacent helix, thus sequestering the hydrophobic groups away from water

and stabilizing the assembly of multiple independent helices. These hydrophobic strips are generated along only one side of the helix because the primary sequences of the helices exhibit a motif of repeating segments of seven amino acids (heptads) in which the sides chains of the first and fourth residues are aliphatic and the other side chains are often hydrophilic (Figure 3-9a). Because hydrophilic side chains extend from one side of the helix and hydrophobic side chains extend from the opposite side, the overall helical structure is **amphipathic**. Because leucine frequently appears in the fourth positions and the hydrophobic side chains merge together like the teeth of a zipper, these structural motifs are also called **leucine zippers**.

Many other structural motifs employ α helices. A common calcium-binding motif called the **EF hand** uses two short helices connected by a loop (Figure 3-9b). This structural motif found in more than 100 proteins is used for sensing the calcium levels in cells. The binding of a Ca$^{2+}$ ion to oxygen atoms in conserved residues in the loop depends on the concentration of Ca$^{2+}$ and often induces a conformational change in the protein, altering its activity. Thus, calcium concentrations can directly control proteins' structures and functions. Somewhat different helix-turn-helix and basic helix-loop-helix (bHLH) structural motifs are used for protein binding to DNA and consequently the regulation of gene activity. Yet another motif commonly found in proteins that bind RNA or DNA is the **zinc finger**, which contains three secondary structures—an α helix and two β strands

HIERARCHICAL STRUCTURE OF PROTEINS ● 69

FDA001670



(a) Coiled-coil motif    (b) EFhand/helix-loop-helix motif    (c) Zinc-finger motif

▲ **FIGURE 3-9 Motifs of protein secondary structure.** (a) The parallel two-stranded coiled-coil motif (*Left*) is characterized by two α helices wound around each other. Helix packing is stabilized by interactions between hydrophobic side chains (red and blue) present at regular intervals along each strand, and found along the seam of the intertwined helices. Each α helix exhibits a characteristic heptad repeat sequence with a hydrophobic residue often, but not always, at positions 1 and 4, as indicated. The coiled-coil nature of this structural motif is more apparent in long coiled coils (*Right* drawn at different scale). (b) An EF hand a type of helix-loop-helix motif, consists of two helices connected by a short loop in a specific conformation common to many proteins, including many calcium-binding and DNA-binding regulatory proteins. In calcium-binding proteins such as calmodulin, oxygen atoms from five residues in the acidic glutamate- and aspartate-rich loop and one water molecule form ionic bonds with a $Ca^{2+}$ ion. (c) The zinc-finger motif is present in many DNA-binding proteins that help regulate transcription. A $Zn^{2+}$ ion is held between a pair of β strands (blue) and a single α helix (red) by a pair of cysteine residues and a pair of histidine residues. The two invariant cysteine residues are usually at positions 3 and 6, and the two invariant histidine residues are at positions 20 and 24 in this 25-residue motif. [See A. Lewit-Bentley and S. Rety, 2000, EF-hand calcium-binding proteins, *Curr. Opin. Struc. Biol.* **10**:637–643; S. A. Wolfe, L. Nekludova, and C. O. Pabo, 2000, DNA recognition by Cys2His2 zinc finger proteins, *Ann. Rev. Biophys. Biomol. Struc.* **29**:183–212.]

with an antiparallel orientation—that form a fingerlike bundle held together by a zinc ion (Figure 3-9c).

We will encounter numerous additional motifs in later discussions of other proteins in this and other chapters. The presence of the same structural motif in different proteins with similar functions clearly indicates that these useful combinations of secondary structures have been conserved in evolution.

## Structural and Functional Domains Are Modules of Tertiary Structure

Distinct regions of protein tertiary structure are often referred to as domains. There are three main classes of protein domains: functional, structural, and topological. A *functional domain* is a region of a protein that exhibits a particular activity characteristic of the protein, usually even when isolated from the rest of the protein. For instance, a particular region of a protein may be responsible for its catalytic activity (e.g., a kinase domain that covalently adds a phosphate group to another molecule) or binding ability (e.g., a DNA-binding domain or a membrane-binding domain). Functional domains are often identified experimentally by whittling down a protein to its smallest active fragment with the aid of proteases, enzymes that cleave one or more peptide bonds in a target polypeptide. Alternatively, the DNA encoding a protein can be modified so that when the modified DNA is used to generate a protein, only a particular region, or domain, of the full-length protein is made. Thus it is possible to determine if specific portions of a protein are responsible for particular activities exhibited by the protein. Indeed, functional domains are often also associated with corresponding structural domains.

A *structural domain* is a region ≈40 or more amino acids in length, arranged in a stable, distinct secondary or tertiary structure, that often can fold into its characteristic structure independently of the rest of the protein. As a consequence, distinct structural domains can be linked together—sometimes by short or long spacers—to form a large, multidomain protein. Each of the subunits in hemagglutinin, for example, contains

70   •   CHAPTER 3   |   PROTEIN STRUCTURE AND FUNCTION

FDA001671
A.0190                          A.0190                          A.0190



Sialic acid

◀ **FIGURE 3-10 Tertiary and quaternary levels of structure.** The protein pictured here, hemagglutinin (HA), is found on the surface of influenza virus. This long, multimeric molecule has three identical subunits, each composed of two polypeptide chains, $HA_1$ and $HA_2$. (a) Tertiary structure of each HA subunit comprises the folding of its helices and strands into a compact structure that is 13.5 nm long and divided into two domains. The membrane-distal domain (silver) is folded into a globular conformation. The membrane-proximal domain (gold) has a fibrous, stemlike conformation owing to the alignment of two long α helices (cylinders) of $HA_2$ with β strands in $HA_1$. Short turns and longer loops, often at the surface of the molecule, connect the helices and strands in each chain. (b) Quaternary structure of HA is stabilized by lateral interactions between the long helices (cylinders) in the fibrous domains of the three subunits (gold, blue, and green), forming a triple-stranded coiled-coil stalk. Each of the distal globular domains in HA binds sialic acid (red) on the surface of target cells. Like many membrane proteins, HA contains several covalently linked carbohydrate chains (not shown).

a globular domain and a fibrous domain (Figure 3-10a). Like structural motifs (composed of secondary structures), structural domains (composed of secondary and tertiary structures) are incorporated as modules into different proteins. The modular approach to protein architecture is particularly easy to recognize in large proteins, which tend to be mosaics of different domains that confer distinct activities and thus can perform different functions simultaneously. Structural domains frequently are also functional domains in that they can have an activity independent of the rest of the protein. In Chapter 6 we consider the mechanism by which the gene segments that correspond to domains became shuffled in the course of evolution, resulting in their appearance in many proteins.

The epidermal growth factor (EGF) domain is a structural domain present in several proteins (Figure 3-11). EGF is a small, soluble peptide hormone that binds to cells in the embryo and in skin and connective tissue in adults, causing them to divide. It is generated by proteolytic (breaking of peptide bond) cleavage between repeated EGF domains in the EGF precursor protein, which is anchored in the cell membrane by a membrane-spanning domain. EGF domains with sequences similar to, but not identical with, those in the EGF peptide hormone are present in other proteins and can be liberated by proteolysis. These proteins include tissue plasminogen activator (TPA), a protease that is used to dissolve blood clots in heart attack victims; Neu protein, which takes part in embryonic differentiation; and Notch protein, a receptor protein in the plasma membrane that

functions in developmentally important signaling (Chapter 16). Besides the EGF domain, these proteins have other domains in common with other proteins. For example, TPA possesses a trypsin domain, a functional domain in some proteases. It is estimated that there are about 1000 different types of structural domains in all proteins. Some of these are not very common, whereas others are found in many different proteins. Indeed, by some estimates only nine major types of domains account for as much as a third of all



EGF precursor

Neu

EGF

TPA

▲ **FIGURE 3-11 Modular nature of protein domains.** Epidermal growth factor (EGF) is generated by proteolytic cleavage of a precursor protein containing multiple EGF domains (green) and a membrane-spanning domain (blue). The EGF domain is also present in the Neu protein and in tissue plasminogen activator (TPA). These proteins also contain other widely distributed domains, indicated by shape and color. [Adapted from I. D. Campbell and P. Bork, 1993, *Curr. Opin. Struc. Biol.* 3:385.]

HIERARCHICAL STRUCTURE OF PROTEINS   •   71

FDA001672

the domains in all proteins. Structural domains can be recognized in proteins whose structures have been determined by x-ray crystallography or nuclear magnetic resonance (NMR) analysis or in images captured by electron microscopy.

Regions of proteins that are defined by their distinctive spatial relationships to the rest of the protein are *topological domains*. For example, some proteins associated with cell-surface membranes can have a portion extending inward into the cytoplasm (cytoplasmic domain), a portion embedded within the phospholipid bilayer membrane (membrane-spanning domain), and a portion extending outward into the extracellular space (extracellular domain). Each of these can comprise one or more structural motifs and structural and functional domains.

## Proteins Associate into Multimeric Structures and Macromolecular Assemblies

Multimeric proteins consist of two or more polypeptide chains or subunits. A fourth level of structural organization, **quaternary structure**, describes the number (stoichiometry) and relative positions of the subunits in multimeric proteins. Hemagglutinin, for example, is a trimer of three identical subunits (homotrimer) held together by noncovalent bonds (Figure 3-10b). Other multimeric proteins can be composed of various numbers of identical (homomeric) or different (heteromeric) subunits (see the discussion of hemoglobin, below). Often, the individual monomeric subunits of a multimeric protein cannot function normally unless they are assembled into the multimeric protein. In some cases, assembly into a multimeric protein (oligomerization) permits proteins that act sequentially in a pathway to increase their efficiency of operation owing to their juxtaposition in space.

The highest level in the hierarchy of protein structure is the association of proteins into macromolecular assemblies. Typically, such structures are very large, in some cases exceeding 1 MDa in mass, approaching 30–300 nm in size, and containing tens to hundreds of polypeptide chains, and sometimes other biopolymers such as nucleic acids. The capsid that encases the nucleic acids of the viral genome is an example of a macromolecular assembly with a structural function. The bundles of cytoskeletal filaments that support and give shape to the plasma membrane are another example. Other macromolecular assemblies act as molecular machines, carrying out the most complex cellular processes by integrating individual functions into one coordinated process. For example, a transcriptional machine is responsible for synthesizing messenger RNA (mRNA) using a DNA template. This transcriptional machine, the operational details of which are discussed in Chapter 4, consists of RNA polymerase, itself a multimeric protein, and at least 50 additional components including general transcription factors, promoter-binding proteins, helicase, and other protein complexes (Figure 3-12). Ribosomes, also discussed in Chapter 4, are complex multiprotein and multi-nucleic acid machines that synthesize proteins.



▲ **FIGURE 3-12 A macromolecular machine: the transcription-initiation complex.** The core RNA polymerase, general transcription factors, a mediator complex containing about 20 subunits, and other protein complexes not depicted here assemble at a promoter in DNA. The polymerase carries out transcription of DNA; the associated proteins are required for initial binding of polymerase to a specific promoter. The multiple components function together as a machine.

## Members of Protein Families Have a Common Evolutionary Ancestor

Studies of myoglobin and hemoglobin, the oxygen-carrying proteins in muscle and red blood cells, respectively, provided early evidence that a protein's function derives from its three-dimensional structure, which in turn is specified by amino acid sequence. X-ray crystallographic analysis showed that the three-dimensional structures of myoglobin (a monomer) and the α and β subunits of hemoglobin (a $\alpha_2\beta_2$ tetramer) are remarkably similar. Sequencing of myoglobin and the hemoglobin subunits revealed that many identical or chemically similar residues are found in identical positions throughout the primary structures of both proteins. A mutation in the gene encoding the β chain that results in the substitution of a valine for a glutamic acid disturbs the folding and function of hemoglobin and causes sickle-cell anemia.

Similar comparisons between other proteins conclusively confirmed the relation between the amino acid sequence, three-dimensional structure, and function of proteins. Use of sequence comparisons to deduce protein function has expanded substantially in recent years as the genomes of more and more organisms have been sequenced.

The molecular revolution in biology during the last decades of the twentieth century also created a new scheme of biological classification based on similarities and differences in the amino acid sequences of proteins. Proteins that have a common ancestor are referred to as homologs. The main evidence for homology among proteins, and hence for their common ancestry, is similarity in their sequences or

FDA001673
A.0192                    A.0192                    A.0192



**▲ FIGURE 3-13 Evolution of the globin protein family.** *Left:* A primitive monomeric oxygen-binding globin is thought to be the ancestor of modern-day blood hemoglobins, muscle myoglobins, and plant leghemoglobins. Sequence comparisons have revealed that evolution of the globin proteins parallels the evolution of animals and plants. Major junctions occurred with the divergence of plant globins from animal globins and of myoglobin from hemoglobin. Later gene duplication gave rise to the α and β subunits of hemoglobin. *Right:* Hemoglobin is a tetramer of two α and two β subunits. The structural similarity of these subunits with leghemoglobin and myoglobin, both of which are monomers, is evident. A heme molecule (red) noncovalently associated with each globin polypeptide is directly responsible for oxygen-binding in these proteins. [(*Left*) Adapted from R. C. Hardison, 1996, *Proc. Nat'l Acad. Sci. USA* **93**:5675.]

structures. We can therefore describe homologous proteins as belonging to a "family" and can trace their lineage from comparisons of their sequences. The folded three-dimensional structures of homologous proteins are similar even if parts of their primary structure show little evidence of homology. Initially, proteins with relatively high sequence similarities (>50 percent exact matches, or "identities") and related functions or structures were defined as an evolutionarily related *family*, while a *superfamily* encompassed two or more families in which the interfamily sequences matched less well (≈30–40 percent identities) than within one family. It is generally thought that proteins with 30 percent sequence identity are likely to have similar three-dimensional structures; however, proteins with far less sequence matching can have very similar structures. Recently, revised definitions of *family* and *superfamily* have been proposed, in which a family comprises proteins with a clear evolutionary relationship (>30 percent identity or additional structural and functional information showing common descent but <30 percent identity), while a superfamily comprises proteins with only a probable common evolutionary origin (e.g., lower percent sequence identities). Often investigators consider proteins to constitute a common superfamily (have a common evolutionary origin) when they contain one or more common motifs or domains.

The kinship among homologous proteins is most easily visualized by a tree diagram based on sequence analyses. For example, the amino acid sequences of globins, the proteins of hemoglobin and myoglobin and their relatives from bacteria, plants, and animals, suggest that they evolved from an ancestral monomeric, oxygen-binding protein (Figure 3-13). With the passage of time, the gene for this ancestral protein slowly changed, initially diverging into lineages leading to animal and plant globins. Subsequent changes gave rise to myoglobin, the monomeric oxygen-storing protein in muscle, and to the α and β subunits of the tetrameric hemoglobin molecule ($\alpha_2\beta_2$) of the circulatory system.

## KEY CONCEPTS OF SECTION 3.1

### Hierarchical Structure of Proteins

■ A protein is a linear polymer of amino acids linked together by peptide bonds. Various, mostly noncovalent, interactions between amino acids in the linear sequence stabilize a protein's specific folded three-dimensional structure, or conformation.

■ The α helix, β strand and sheet, and β turn are the most prevalent elements of protein secondary structure. Secondary structures are stabilized by hydrogen bonds between atoms of the peptide backbone.

■ Protein tertiary structure results from hydrophobic interactions between nonpolar side groups and hydrogen bonds between polar side groups and the polypeptide backbone.

FDA001674

These interactions stabilize folding of the secondary structure into a compact overall arrangement.

■ Certain combinations of secondary structures give rise to different motifs, which are found in a variety of proteins and are often associated with specific functions (see Figure 3-9).

■ Proteins often contain distinct domains, independently folded regions of secondary or tertiary structure with characteristic structural, functional, and topological properties (see Figure 3-10).

■ The incorporation of domains as modules in different proteins in the course of evolution has generated diversity in protein structure and function.

■ The number and organization of individual polypeptide subunits in multimeric proteins define their quaternary structure.

■ Cells contain large macromolecular assemblies in which all the necessary participants in complex cellular processes (e.g., DNA, RNA, and protein synthesis; photosynthesis; signal transduction) are integrated to form molecular machines.

■ Homologous proteins, which have similar sequences, structures, and functions, evolved from a common ancestor. They can be classified into families and superfamilies.

## 3.2 Protein Folding

As noted above, when it comes to biological structures such as proteins, "form follows function" and "form is function." Thus it is essential that when a polypeptide is synthesized with its particular primary structure (sequence), it folds into the proper three-dimension conformation with the appropriate secondary, tertiary, and possibly quaternary structure. A polypeptide chain is synthesized by a complex process called translation in which the assembly of amino acids in a particular sequence is dictated by messenger RNA (mRNA) and performed by a large protein–nucleic acid complex called a ribosome. The intricacies of translation are considered in Chapter 4. Here, we describe the key determinants of the proper folding of a *nascent* (newly formed or forming) polypeptide chain.

### Planar Peptide Bonds Limit the Shapes into Which Proteins Can Fold

A critical structural feature of polypeptides that limits how the chain can fold is the planar peptide bond. Figure 3-3 illustrates the amide group in peptide bonds in a polypeptide chain. Because the peptide bond itself behaves partially like a double bond,

the carbonyl carbon and amide nitrogen and those atoms directly bonded to them must all lie in a fixed plane (Fig-



▲ **FIGURE 3-14 Rotation between planar peptide groups in proteins.** Rotation about the $C_\alpha$–amino nitrogen bond (the $\phi$ angle) and the $C_\alpha$–carbonyl carbon bond (the $\psi$ angle) permits polypeptide backbones, in principle, to adopt a very large number of potential conformations. However steric restraints due to the structure of the polypeptide backbone and the properties of the amino acid side chains dramatically restrict the potential conformations that can be adopted by any given protein.

ure 3-14); there is no rotation possible about the peptide bond itself. As a consequence, the only flexibility in a polypeptide chain backbone, allowing it to adopt varying conformations (twists and turns to fold into different three-dimensional shapes), is rotation of the fixed planes of peptide bonds with respect to one another about two bonds—the $C_\alpha$–amino nitrogen bond (rotational angle called $\phi$) and the $C_\alpha$–carbonyl carbon bond (rotational angle called $\psi$).

Yet a further constraint on the potential conformations that a polypeptide backbone chain can adopt is that only a limited number of $\phi$ and $\psi$ angles are possible, because for most $\phi$ and $\psi$ angles the backbone or side chain atoms would come too close to one another and thus the associated conformation would be highly unstable or even physically impossible to achieve.

### Information Directing a Protein's Folding Is Encoded in Its Amino Acid Sequence

While the constraints of backbone bond angles seem very restrictive, any polypeptide chain containing only a few residues could, in principle, still fold into many conformations. For example, if the $\phi$ and $\psi$ angles were limited to only eight combinations, an $n$-residue-long peptide would potentially have $8^n$ conformations—a very large number for even a small polypeptide of only 10 residues long (about 8.6 million possible conformations)! In general, however, any particular protein adopts only one or just a few very closely related characteristic functional conformations called the *native state*; for the vast majority of proteins, the native state is the most stably folded form of the molecule. In thermodynamic terms, the native state is usually the conformation with the lowest free energy. What features of proteins limit their folding from very many conformations to just one? The properties of the side chains (e.g., size, hydrophobicity, ability

74   •   CHAPTER 3   |   PROTEIN STRUCTURE AND FUNCTION

FDA001675

A.0194                    A.0194                    A.0194

# MOLECULAR BIOLOGY OF
# THE CELL

## fourth edition

Bruce Alberts

Alexander Johnson

Julian Lewis

Martin Raff

Keith Roberts

Peter Walter



**Garland Science**
Taylor & Francis Group

*Garland*
Vice President: Denise Schanck
Managing Editor: Sarah Gibbs
Senior Editorial Assistant: Kirsten Jenner
Managing Production Editor: Emma Hunt
Proofreader and Layout: Emma Hunt
Production Assistant: Angela Bennett
Text Editors: Marjorie Singer Anderson and Betsy Dilernia
Copy Editor: Bruce Goatly
Word Processors: Fran Dependahl, Misty Landers and Carol Winter
Designer: Blink Studio, London
Illustrator: Nigel Orme
Indexer: Janine Ross and Sherry Granum
Manufacturing: Nigel Eyre and Marion Morrow

*Cell Biology Interactive*
Artistic and Scientific Direction: Peter Walter
Narrated by: Julie Theriot
Production, Design, and Development: Mike Morales

**Bruce Alberts** received his Ph.D. from Harvard University and is President of the National Academy of Sciences and Professor of Biochemistry and Biophysics at the University of California, San Francisco. **Alexander Johnson** received his Ph.D. from Harvard University and is a Professor of Microbiology and Immunology at the University of California, San Francisco. **Julian Lewis** received his D.Phil. from the University of Oxford and is a Principal Scientist at the Imperial Cancer Research Fund, London. **Martin Raff** received his M.D. from McGill University and is at the Medical Research Council Laboratory for Molecular Cell Biology and Cell Biology Unit and in the Biology Department at University College London. **Keith Roberts** received his Ph.D. from the University of Cambridge and is Associate Research Director at the John Innes Centre, Norwich. **Peter Walter** received his Ph.D. from The Rockefeller University in New York and is Professor and Chairman of the Department of Biochemistry and Biophysics at the University of California, San Francisco, and an Investigator of the Howard Hughes Medical Institute.

© 2002 by Bruce Alberts, Alexander Johnson, Julian Lewis, Martin Raff, Keith Roberts, and Peter Walter.
© 1983, 1989, 1994 by Bruce Alberts, Dennis Bray, Julian Lewis, Martin Raff, Keith Roberts, and James D. Watson.

All rights reserved. No part of this book covered by the copyright hereon may be reproduced or used in any format in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without permission of the publisher.

**Library of Congress Cataloging-in-Publicaton Data**
Molecular biology of the cell / Bruce Alberts ... [et al.].-- 4th ed.
p. cm
  Includes bibliographical references and index.
  ISBN 0-8153-3218-1 (hardbound) -- ISBN 0-8153-4072-9 (pbk.)
  1. Cytology. 2. Molecular biology. I. Alberts, Bruce.
  [DNLM: 1. Cells. 2. Molecular Biology. ]
QH581.2 .M64 2002
571.6--dc21

                                    2001054471 CIP

Published by Garland Science, a member of the Taylor & Francis Group,
29 West 35th Street, New York, NY 10001-2299

Printed in the United States of America

15  14  13  12  11  10  9  8  7  6  5  4  3  2  1

**Front cover** Human Genome: Reprinted by permission from *Nature*, International Human Genome Sequencing Consortium, 409:860–921, 2001 © Macmillan Magazines Ltd. Adapted from an image by Francis Collins, NHGRI; Jim Kent, UCSC; Ewan Birney, EBI; and Darryl Leja, NHGRI; showing a portion of Chromosome 1 from the initial sequencing of the human genome.

**Back cover** In 1967, the British artist Peter Blake created a design classic. Nearly 35 years later Nigel Orme (illustrator), Richard Denyer (photographer), and the authors have together produced an affectionate tribute to Mr Blake's image. With its gallery of icons and influences, its assembly created almost as much complexity, intrigue and mystery as the original. *Drosophila, Arabidopsis,* Dolly and the assembled company tempt you to dip inside where, as in the original, "a splendid time is guaranteed for all." (Gunter Blobel, courtesy of The Rockefeller University; Marie Curie, Keystone Press Agency Inc; Darwin bust, by permission of the President and Council of the Royal Society; Rosalind Franklin, courtesy of Cold Spring Harbor Laboratory Archives; Dorothy Hodgkin, © The Nobel Foundation, 1964; James Joyce, etching by Peter Blake; Robert Johnson, photo booth self-portrait early 1930s, © 1986 Delta Haze Corporation all rights reserved, used by permission; Albert L. Lehninger, (unidentified photographer) courtesy of The Alan Mason Chesney Medical Archives of The Johns Hopkins Medical Institutions; Linus Pauling, from Ava Helen and Linus Pauling Papers, Special Collections, Oregon State University; Nicholas Poussin, courtesy of ArtToday.com; Barbara McClintock, © David Micklos, 1983; Andrei Sakharov, courtesy of Elena Bonner; Frederick Sanger, © The Nobel Foundation, 1958.)



# 3

# PROTEINS



**Protein structure.** A small protein domain, the SH2 domain, is shown here in a space-filling representation. For further views, see Panel 3–2. (Courtesy of David Lawson.)

When we look at a cell through a microscope or analyze its electrical or biochemical activity, we are, in essence, observing proteins. Proteins constitute most of a cell's dry mass. They are not only the building blocks from which cells are built; they also execute nearly all cell functions. Thus, enzymes provide the intricate molecular surfaces in a cell that promote its many chemical reactions. Proteins embedded in the plasma membrane form channels and pumps that control the passage of small molecules into and out of the cell. Other proteins carry messages from one cell to another, or act as signal integrators that relay sets of signals inward from the plasma membrane to the cell nucleus. Yet others serve as tiny molecular machines with moving parts: *kinesin*, for example, propels organelles through the cytoplasm; *topoisomerase* can untangle knotted DNA molecules. Other specialized proteins act as antibodies, toxins, hormones, antifreeze molecules, elastic fibers, ropes, or sources of luminescence. Before we can hope to understand how genes work, how muscles contract, how nerves conduct electricity, how embryos develop, or how our bodies function, we must attain a deep understanding of proteins.

## THE SHAPE AND STRUCTURE OF PROTEINS

From a chemical point of view, proteins are by far the most structurally complex and functionally sophisticated molecules known. This is perhaps not surprising, once one realizes that the structure and chemistry of each protein has been developed and fine-tuned over billions of years of evolutionary history. We start this chapter by considering how the location of each amino acid in the long string of amino acids that forms a protein determines its three-dimensional shape. We will then use this understanding of protein structure at the atomic level to describe how the precise shape of each protein molecule determines its function in a cell.

### The Shape of a Protein Is Specified by Its Amino Acid Sequence

Recall from Chapter 2 that there are 20 types of amino acids in proteins, each with different chemical properties. A **protein** molecule is made from a long chain of these amino acids, each linked to its neighbor through a covalent peptide bond (Figure 3–1). Proteins are therefore also known as *polypeptides*. Each type of protein has a unique sequence of amino acids, exactly the same from one molecule to the next. Many thousands of different proteins are known, each with its own particular amino acid sequence.

A.0197                                    A.0197                                    FDA001678
                                                                                   A.0197





**Figure 3–1 A peptide bond.** This covalent bond forms when the carbon atom from the carboxyl group of one amino acid shares electrons with the nitrogen atom *(blue)* from the amino group of a second amino acid. As indicated, a molecule of water is lost in this condensation reaction.

The repeating sequence of atoms along the core of the polypeptide chain is referred to as the **polypeptide backbone**. Attached to this repetitive chain are those portions of the amino acids that are not involved in making a peptide bond and which give each amino acid its unique properties: the 20 amino acid **side chains** (Figure 3–2). Some of these side chains are nonpolar and hydrophobic ("water-fearing"), others are negatively or positively charged, some are reactive, and so on. Their atomic structures are presented in Panel 3–1, and a brief list with abbreviations is provided in Figure 3–3.

As discussed in Chapter 2, atoms behave almost as if they were hard spheres with a definite radius (their *van der Waals radius*). The requirement that no two atoms overlap limits greatly the possible bond angles in a polypeptide chain (Figure 3–4). This constraint and other steric interactions severely restrict the variety of three-dimensional arrangements of atoms (or *conformations*) that are possible. Nevertheless, a long flexible chain, such as a protein, can still fold in an enormous number of ways.

The folding of a protein chain is, however, further constrained by many different sets of weak *noncovalent bonds* that form between one part of the chain and another. These involve atoms in the polypeptide backbone, as well as atoms in the amino acid side chains. The weak bonds are of three types: *hydrogen bonds, ionic bonds,* and *van der Waals attractions,* as explained in Chapter 2 (see p. 57). Individual noncovalent bonds are 30–300 times weaker than the typical covalent bonds that create biological molecules. But many weak bonds can act in parallel to hold two regions of a polypeptide chain tightly together. The stability of each folded shape is therefore determined by the combined strength of large numbers of such noncovalent bonds (Figure 3–5).

A fourth weak force also has a central role in determining the shape of a protein. As described in Chapter 2, hydrophobic molecules, including the nonpolar side chains of particular amino acids, tend to be forced together in an aqueous environment in order to minimize their disruptive effect on the hydrogen-bonded network of water molecules (see p. 58 and Panel 2–2, pp. 112–113). Therefore, an important factor governing the folding of any protein is the distribution of its polar and nonpolar amino acids. The nonpolar (hydrophobic) side chains in a protein—belonging to such amino acids as phenylalanine, leucine, valine, and tryptophan—tend to cluster in the interior of the molecule (just as hydrophobic oil droplets coalesce in water to form one large droplet). This enables them to

**Figure 3–2 The structural components of a protein.** A protein consists of a polypeptide backbone with attached side chains. Each type of protein differs in its sequence and number of amino acids; therefore, it is the sequence of the chemically different side chains that makes each protein distinct. The two ends of a polypeptide chain are chemically different: the end carrying the free amino group ($NH_3^+$, also written $NH_2$) is the amino terminus, or N-terminus, and that carrying the free carboxyl group ($COO^-$, also written $COOH$) is the carboxyl terminus or C-terminus. The amino acid sequence of a protein is always presented in the N-to-C direction, reading from left to right.

| AMINO ACID | | | SIDE CHAIN | AMINO ACID | | | SIDE CHAIN |
|---|---|---|---|---|---|---|---|
| Aspartic acid | Asp | D | negative | Alanine | Ala | A | nonpolar |
| Glutamic acid | Glu | E | negative | Glycine | Gly | G | nonpolar |
| Arginine | Arg | R | positive | Valine | Val | V | nonpolar |
| Lysine | Lys | K | positive | Leucine | Leu | L | nonpolar |
| Histidine | His | H | positive | Isoleucine | Ile | I | nonpolar |
| Asparagine | Asn | N | uncharged polar | Proline | Pro | P | nonpolar |
| Glutamine | Gln | Q | uncharged polar | Phenylalanine | Phe | F | nonpolar |
| Serine | Ser | S | uncharged polar | Methionine | Met | M | nonpolar |
| Threonine | Thr | T | uncharged polar | Tryptophan | Trp | W | nonpolar |
| Tyrosine | Tyr | Y | uncharged polar | Cysteine | Cys | C | nonpolar |

—— POLAR AMINO ACIDS ——      —— NONPOLAR AMINO ACIDS ——

**Figure 3–3 The 20 amino acids found in proteins.** Both three-letter and one-letter abbreviations are listed. As shown, there are equal numbers of polar and nonpolar side chains. For their atomic structures, see Panel 3–1 (pp. 132–133).

THE SHAPE AND STRUCTURE OF PROTEINS

A.0198      A.0198      FDA001679      A.0198

**PANEL 3–1**  The 20 Amino Acids Found in Proteins

## THE AMINO ACID

The general formula of an amino acid is



R is commonly one of 20 different side chains. At pH 7 both the amino and carboxyl groups are ionized.

## OPTICAL ISOMERS

The α-carbon atom is asymmetric, which allows for two mirror image (or stereo-) isomers, L and D.

Proteins consist exclusively of L-amino acids.

## FAMILIES OF AMINO ACIDS

The common amino acids are grouped according to whether their side chains are

acidic
basic
uncharged polar
nonpolar

These 20 amino acids are given both three-letter and one-letter abbreviations.

Thus: alanine = Ala = A

## BASIC SIDE CHAINS

**lysine** (Lys, or K)

**arginine** (Arg, or R)

This group is very basic because its positive charge is stabilized by resonance.

**histidine** (His, or H)

These nitrogens have a relatively weak affinity for an H⁺ and are only partly positive at neutral pH.

## PEPTIDE BONDS

Amino acids are commonly joined together by an amide linkage, called a peptide bond.





Proteins are long polymers of amino acids linked by peptide bonds, and they are always written with the N-terminus toward the left. The sequence of this tripeptide is histidine-cysteine-valine.

Peptide bond: The four atoms in each *gray box* form a rigid planar unit. There is no rotation around the C–N bond.

amino- or N-terminus

carboxyl- or C-terminus

These two single bonds allow rotation, so that long chains of amino acids are very flexible.

## ACIDIC SIDE CHAINS

**aspartic acid** (Asp, or D)

**glutamic acid** (Glu, or E)

## UNCHARGED POLAR SIDE CHAINS

**asparagine** (Asn, or N)

**glutamine** (Gln, or Q)

Although the amide N is not charged at neutral pH, it is polar.

**serine** (Ser, or S)

**threonine** (Thr, or T)

**tyrosine** (Tyr, or Y)

The –OH group is polar.

## NONPOLAR SIDE CHAINS

**alanine** (Ala, or A)

**valine** (Val, or V)

**leucine** (Leu, or L)

**isoleucine** (Ile, or I)

**proline** (Pro, or P)

(actually an imino acid)

**phenylalanine** (Phe, or F)

**methionine** (Met, or M)

**tryptophan** (Trp, or W)

**glycine** (Gly, or G)

**cysteine** (Cys, or C)

Disulfide bonds can form between two cysteine side chains in proteins.

$$--CH_2-S-S-CH_2--$$

132

133

FDA001680

A.0199    A.0199



(A) amino acid

peptide bonds

(B) psi 0

-180°
-180°          0          +180°

phi

**Figure 3–4 Steric limitations on the bond angles in a polypeptide chain.** (A) Each amino acid contributes three bonds *(red)* to the backbone of the chain. The peptide bond is planar *(gray shading)* and does not permit rotation. By contrast, rotation can occur about the $C_\alpha$–C bond, whose angle of rotation is called psi ($\psi$), and about the N–$C_\alpha$ bond, whose angle of rotation is called phi ($\phi$). By convention, an R group is often used to denote an amino acid side chain *(green circles)*. (B) The conformation of the main-chain atoms in a protein is determined by one pair of $\phi$ and $\psi$ angles for each amino acid; because of steric collisions between atoms within each amino acid, most pairs of $\phi$ and $\psi$ angles do not occur. In this so-called Ramachandran plot, each dot represents an observed pair of angles in a protein. (B, from J. Richardson, *Adv. Prot. Chem.* 34:174–175, 1981. © Academic Press.)

avoid contact with the water that surrounds them inside a cell. In contrast, polar side chains—such as those belonging to arginine, glutamine, and histidine—tend to arrange themselves near the outside of the molecule, where they can form hydrogen bonds with water and with other polar molecules (Figure 3–6). When polar amino acids are buried within the protein, they are usually hydrogen-bonded to other polar amino acids or to the polypeptide backbone (Figure 3–7).

## Proteins Fold into a Conformation of Lowest Energy

As a result of all of these interactions, each type of protein has a particular three-dimensional structure, which is determined by the order of the amino acids in its chain. The final folded structure, or **conformation**, adopted by any polypeptide chain is generally the one in which the free energy is minimized. Protein folding has been studied in a test tube by using highly purified proteins. A protein can be unfolded, or *denatured*, by treatment with certain solvents, which disrupt the noncovalent interactions holding the folded chain together. This treatment converts the protein into a flexible polypeptide chain that has lost its

**Figure 3–5 Three types of noncovalent bonds that help proteins fold.** Although a single one of these bonds is quite weak, many of them often form together to create a strong bonding arrangement, as in the example shown. As in the previous figure, R is used as a general designation for an amino acid side chain.



ionic bond

hydrogen bond

van der Waals attractions between atoms *(black)* in contact

**134**   Chapter 3 : PROTEINS



side chains        side chains

hydrophobic        polar side chains
core region        on the outside
contains           of the molecule
nonpolar           can form hydrogen
side chains        bonds to water

unfolded polypeptide        folded conformation in aqueous environment

**Figure 3–6 How a protein folds into a compact conformation.** The polar amino acid side chains tend to gather on the outside of the protein, where they can interact with water; the nonpolar amino acid side chains are buried on the inside to form a tightly packed hydrophobic core of atoms that are hidden from water. In this schematic drawing, the protein contains only about 30 amino acids.

natural shape. When the denaturing solvent is removed, the protein often refolds spontaneously, or *renatures*, into its original conformation (Figure 3–8), indicating that all the information needed for specifying the three-dimensional shape of a protein is contained in its amino acid sequence.

Each protein normally folds up into a single stable conformation. However, the conformation often changes slightly when the protein interacts with other molecules in the cell. This change in shape is often crucial to the function of the protein, as we see later.

Although a protein chain can fold into its correct conformation without outside help, protein folding in a living cell is often assisted by special proteins called *molecular chaperones*. These proteins bind to partly folded polypeptide chains and help them progress along the most energetically favorable folding pathway. Chaperones are vital in the crowded conditions of the cytoplasm, since they prevent the temporarily exposed hydrophobic regions in newly synthesized protein chains from associating with each other to form protein aggregates (see p. 357). However, the final three-dimensional shape of the protein is still specified by its amino acid sequence: chaperones simply make the folding process more reliable.

Proteins come in a wide variety of shapes, and they are generally between 50 and 2000 amino acids long. Large proteins generally consist of several distinct *protein domains*—structural units that fold more or less independently of each other, as we discuss below. The detailed structure of any protein is complicated; for simplicity a protein's structure can be depicted in several different ways, each emphasizing different features of the protein.

**Figure 3–7 Hydrogen bonds in a protein molecule.** Large numbers of hydrogen bonds form between adjacent regions of the folded polypeptide chain and help stabilize its three-dimensional shape. The protein depicted is a portion of the enzyme lysozyme, and the hydrogen bonds between the three possible pairs of partners have been differently colored, as indicated. (After C.K. Matthews and K.E. van Holde, Biochemistry. Redwood City, CA: Benjamin/Cummings, 1996.)

hydrogen bond between atoms of two peptide bonds

hydrogen bond between atoms of a peptide bond and an amino acid side chain

hydrogen bond between two amino acid side chains

THE SHAPE AND STRUCTURE OF PROTEINS

**135**

FDA001681

A.0200

Issued in Washington, DC, on February 12, 2020.

**Mark Gauch,**

*Acting Manager, Rules and Regulations Group.*

[FR Doc. 2020–03283 Filed 2–20–20; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 600**

**[Docket No. FDA–2018–N–2732]**

**RIN 0910–AH57**

**Definition of the Term** "**Biological Product**"

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA, the Agency, or we) is issuing a final rule to amend its regulation that defines "biological product" to incorporate changes made by the Biologics Price Competition and Innovation Act of 2009 (BPCI Act) and the Further Consolidated Appropriations Act, 2020 (FCA Act), and to provide its interpretation of the statutory term "protein." Under this final rule, the term *protein* means any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. This final rule is intended to clarify the statutory framework under which such products are regulated.

**DATES:** This rule is effective March 23, 2020.

**ADDRESSES:** For access to the docket to read background documents or comments received, go to *https://www.regulations.gov* and insert the docket number found in brackets in the heading of this final rule into the "Search" box and follow the prompts, and/or go to the Dockets Management Staff, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Daniel Gottlieb, Center for Drug Evaluation and Research, Food and Drug Administration, 10903 New Hampshire Ave., Bldg. 51, Rm. 6208, Silver Spring, MD 20993, 301–796–6650, *daniel.gottlieb@fda.hhs.gov*.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Executive Summary
  A. Purpose of the Final Rule
  B. Summary of the Major Provisions of the Final Rule
  C. Legal Authority
  D. Costs and Benefits
II. Table of Abbreviations/Commonly Used Acronyms in This Document
III. Background
  A. History of this Rulemaking
  B. Summary of Comments on the Proposed Rule
IV. Legal Authority
V. Comments on the Proposed Rule and FDA Response
  A. Introduction
  B. Specific Comments and FDA Response
VI. Effective Date
VII. Economic Analysis of Impacts
  A. Introduction
  B. Summary of Costs and Benefits
  C. Summary of Regulatory Flexibility Analysis
VIII. Analysis of Environmental Impact
IX. Paperwork Reduction Act of 1995
X. Federalism
XI. Consultation and Coordination With Indian Tribal Governments
XII. References

**I. Executive Summary**

*A. Purpose of the Final Rule*

This final rule amends FDA's regulation that defines "biological product" by making a technical revision and conforming to the statutory definition enacted in the BPCI Act, as further amended by section 605 of the FCA Act (Pub. L. 116–94). The BPCI Act amended the definition of "biological product" in section 351(i) of the Public Health Service Act (PHS Act) (42 U.S.C. 262(i)) to include a "protein (except any chemically synthesized polypeptide)." After publication of the proposed rule, section 605 of the FCA Act further amended the definition of "biological product" in section 351(i) of the PHS Act to remove the parenthetical "(except any chemically synthesized polypeptide)" from the statutory category of "protein." The final rule makes conforming changes to § 600.3 (21 CFR 600.3) to add FDA's interpretation of the statutory term "protein."

*B. Summary of the Major Provisions of the Final Rule*

Under the final rule, the term *protein* means any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size. This is consistent with the interpretation of this term that FDA previously described in the notice of proposed rulemaking published in the **Federal Register** on December 12, 2018 (83 FR 63817) and in a final guidance document issued on April 30, 2015 (see 80 FR 24259 (announcing the availability of a guidance for industry entitled "Biosimilars: Questions and Answers

Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009," available at *https://www.regulations.gov* (Docket No. FDA–2011–D–0611) (2015 Biosimilars Q&A Guidance); see also "New and Revised Draft Q&As on Biosimilar Development and the Biologics Price Competition and Innovation Act

(Revision 2)" (December 2018; 83 FR 63898)).

*C. Legal Authority*

This final rule amends FDA's regulations to implement certain aspects of the BPCI Act and the FCA Act. FDA's authority for this rule derives from the biological product provisions in section 351 of the PHS Act and the provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 321, *et seq.*) applicable to drugs, as well as section 701 of the FD&C Act (21 U.S.C. 371). The rule is necessary to clarify the statutory authority under which biological products are regulated, to prevent inconsistent regulation of such products, and for the efficient enforcement of the FD&C Act.

*D. Costs and Benefits*

This final rule codifies FDA's interpretation of the statutory term "protein" in a manner that is consistent with the interpretation of this term that FDA previously described in guidance (see 2015 Biosimilars Q&A Guidance) and the proposed rule. Formalizing this interpretation will reduce regulatory uncertainty over whether certain products are regulated as drugs or biological products. This reduced uncertainty, under the "bright-line" approach described in the proposed rule, will allow both FDA and private industry to avoid spending time and resources on case-by-case determinations for each product. The primary estimate of the benefits in 2018 dollars annualized over 10 years is $394,562 using a 7 percent discount rate and $348,436 using a 3 percent discount rate. We also calculate ranges of benefits of $356,775 to $411,345 and $316,116 to $362,792, respectively. The estimated annualized costs range from $13,511 to $16,889, with a primary estimate of $15,012 using a 7 percent discount rate over a 10-year horizon. For a 3 percent discount rate, we estimate a range of $12,471 to $15,589, with a primary estimate of $13,857.

**II. Table of Abbreviations/Commonly Used Acronyms in This Document**

FDA001809

| Abbreviation/acronym | What it means |
| --- | --- |
| BPCI Act | Biologics Price Competition and Innovation Act of 2009. |
| CFR | Code of Federal Regulations. |
| EO | Executive Order. |
| FCA Act | Further Consolidated Appropriations Act, 2020. |
| FD&C Act | Federal Food, Drug, and Cosmetic Act. |
| FDA | U.S. Food and Drug Administration. |
| PHS Act | Public Health Service Act. |
| U.S. | United States. |
| U.S.C. | United States Code. |

## III. Background

### A. History of This Rulemaking

The BPCI Act amended the definition of ''biological product'' in section 351(i) of the PHS Act to include a ''protein (except any chemically synthesized polypeptide).'' After publication of the proposed rule, section 605 of the FCA Act further amended the definition of ''biological product'' in section 351(i) of the PHS Act to remove the parenthetical ''(except any chemically synthesized polypeptide)'' from the statutory category of ''protein.'' As amended by the BPCI Act and the FCA Act, a ''biological product'' is defined as ''a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings'' (see section 351(i)(1) of the PHS Act).

The BPCI Act clarified the statutory authority under which certain protein products are to be regulated. Although the majority of therapeutic biological products have been licensed under section 351 of the PHS Act, some protein products historically have been approved under section 505 of the FD&C Act (21 U.S.C. 355). The BPCI Act requires that a marketing application for a ''biological product'' (that previously would have been submitted under section 505 of the FD&C Act) must be submitted under section 351 of the PHS Act, subject to certain exceptions during a 10-year transition period ending on March 23, 2020 (see section 7002(e)(1) through (3) and (e)(5) of the BPCI Act). FDA is adding its interpretation of the term ''protein'' to the regulations to clarify the statutory framework under which such products are regulated.

The proposed rule includes a history of this rulemaking and cites several scientific resources, including textbooks and dictionaries, to illustrate the aspects of the meanings of the terms ''protein,'' ''polypeptide,'' and ''peptide'' on which there is or is not scientific consensus

(see 83 FR 63817 at 63819–63820). As discussed in the proposed rule, despite the lack of precise, agreed-upon definitions, most, if not all, sources agree about certain aspects of the meanings of these terms. First, all of the terms (''protein,'' ''polypeptide,'' and ''peptide'') refer to amino acid polymers (also referred to as ''amino acid chains'') made up of alpha amino acids that are linked by peptide bonds. Second, ''protein'' refers to chains containing a specific, defined sequence of amino acids, generally provided by a corresponding DNA or RNA sequence. Finally, the term ''protein'' is distinct from and excludes the term ''peptide'' (*i.e.,* amino acid chains that are generally shorter and simpler than a protein).

In the proposed rule, FDA described its proposed interpretation of the statutory terms ''protein'' and ''chemically synthesized polypeptide,'' which appeared in the definition of ''biological product'' in section 351(i) of the PHS Act prior to the enactment of the FCA Act. FDA is now finalizing its interpretation of the statutory term ''protein'' without change. However, in light of the recently enacted FCA Act, which removed the parenthetical exception for ''any chemically synthesized polypeptide'' from the category of ''protein'' in the statutory definition of ''biological product,'' FDA is not finalizing its interpretation of ''chemically synthesized polypeptide'' because it is no longer necessary.

### B. Summary of Comments on the Proposed Rule

We received four comments on the proposed rule. Two of the comments were general comments supporting FDA's proposed interpretations; one of these comments specifically supports FDA's proposal because the commenter stated that it enables insulin to be brought into the regulatory pathway for biological products, including biosimilar and interchangeable products. Two of the comments substantively addressed specific aspects of the proposed interpretations of

''protein'' and ''chemically synthesized polypeptide.''

## IV. Legal Authority

We are issuing this final rule under the biological product provisions in section 351 of the PHS Act and the provisions of the FD&C Act (21 U.S.C. 321, *et seq.*) applicable to drugs. See section 351(j) of the PHS Act. Under these provisions, FDA has the authority to issue regulations designed to ensure, among other things, that biological products are safe, pure, and potent and are manufactured in accordance with current good manufacturing practices. FDA also has general authority to issue regulations for the efficient enforcement of the FD&C Act and the PHS Act under section 701 of the FD&C Act and section 351(j) of the PHS Act.

## V. Comments on the Proposed Rule and FDA Response

### A. Introduction

We received four comments on the proposed rule by the close of the comment period, two of which contained one or more substantive comments on one or more issues. We received comments from trade organizations, a patient advocacy group, and a State bar association.

We describe and respond to the comments in section B of this rule. We have numbered each comment to help distinguish between different comments. We have grouped similar comments together under the same number, and in some cases, we have separated different issues discussed in the same comment and designated them as distinct comments for purposes of our responses. The number assigned to each comment or comment topic is purely for organizational purposes and does not signify the comment's value or importance or the order in which comments were received.

### B. Specific Comments and FDA Response

We proposed to amend § 600.3(h) to revise the definition of ''biological product'' in § 600.3(h) by replacing the phrase ''means any'' with the phrase

''means a'' to conform to the text of section 351(i)(1) of the PHS Act. This proposed technical revision to the definition of ''biological product'' was not intended to alter our interpretation of section 351(i) of the PHS Act. We also proposed to revise the definition of a ''biological product'' in § 600.3(h) to include a ''protein (except any chemically synthesized polypeptide).''

We received no comments regarding these proposed revisions. However, after publication of the proposed rule, section 605 of the FCA Act further amended the definition of ''biological product'' in section 351(i) of the PHS Act to remove the parenthetical ''(except any chemically synthesized polypeptide)'' from the statutory category of ''protein.'' Therefore, we are finalizing these revisions to the definition of ''biological product'' in § 600.3(h) with the following change: We are defining ''biological product'' in § 600.3(h) to include a ''protein'' instead of defining ''biological product'' in § 600.3(h) to include a ''protein (except any chemically synthesized polypeptide).''

We also proposed to amend § 600.3(h) to add FDA's interpretation of the statutory terms ''protein'' and ''chemically synthesized polypeptide.'' We proposed to interpret the term ''protein'' to mean any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. We proposed to interpret the term ''chemically synthesized polypeptide'' to mean any alpha amino acid polymer that is made entirely by chemical synthesis and is greater than 40 amino acids but less than 100 amino acids in size. We explained that when two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of our interpretations of the terms ''protein'' and ''chemically synthesized polypeptide'' will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

In the following paragraphs, we discuss comments on these proposed interpretations. After considering these comments, we are finalizing our interpretation of ''protein'' without change. We are not finalizing our interpretation of ''chemically synthesized polypeptide'' as it is no longer necessary because of the change to the statutory definition of ''biological product.''

1. Scientific Support for Interpretations of ''Protein'' and ''Chemically Synthesized Polypeptide''

(Comment 1) One comment asserts that FDA's interpretations of the statutory terms ''protein'' and ''chemically synthesized polypeptide'' do not reflect current science and maintains that there is more recent evidence that amino acid polymers composed of 40 or fewer amino acids are capable of assuming secondary and tertiary structural conformations indicative of proteins. For these reasons, the commenter requested that we revise and reissue the proposed rule.

(Response 1) We disagree with the comment's suggestion that FDA's interpretation of the term ''protein'' as set forth in the proposed rule and the textbooks we cited in the proposed rule no longer reflects current science. The textbooks cited in the proposed rule have been in use for decades and continue to be in use (*e.g.,* in college biochemistry classes). Moreover, the definitions and descriptions in these textbooks and dictionaries illustrate the point that there is not a scientific consensus on certain aspects of the definitions of the terms ''peptide'' and ''protein,'' an observation that is not refuted by more recent editions of these textbooks.

This lack of consensus is also reflected in several of the articles cited by the comment. For example, the comment cites two articles to support its claim of the existence of ''proteins'' composed of as few as 11 amino acids. However, these two articles describe the 11-amino acid polymer differently. One describes it as an 11-amino-acid ''protein'' (see Ref. 1) and the other describes it as an 11-amino-acid ''peptide'' (see Ref. 2).

Given the lack of a clear scientific consensus that FDA could consider for adoption, the Agency is applying its scientific expertise to interpret the statutory term ''protein'' in a manner that establishes a scientifically reasonable, bright-line rule that provides regulatory clarity and facilitates the implementation of the BPCI Act, as further amended by the FCA Act. A clear rule facilitates efficient use of time and resources by both FDA and applicants and reduces regulatory uncertainty. In deciding where to draw this bright-line rule, one of the factors that FDA considered is the number of amino acids understood to be generally necessary for an amino acid polymer to exhibit characteristics that are generally associated with ''proteins,'' lending a higher level of complexity to these products.

FDA considered whether to include structural or functional attributes (*e.g.,* folding, provides structural support to cellular macrostructures, catalyzes a biochemical reaction, transports other molecules, aids in the folding of other proteins) in its interpretation of the term ''protein,'' but determined that this would not serve to make the line between peptides and proteins any brighter. Among other things, relying on a factor such as ''folding'' would not provide regulatory certainty because it would raise questions about how much folding is sufficient to differentiate between ''peptides'' and ''proteins,'' as many peptides can arguably be said to exhibit some folding. Therefore, adopting this approach would not provide for a bright-line rule and would result in regulatory uncertainty and inefficiency.

(Comment 2) One comment asserts that ''proteins'' are a subset of ''polypeptides,'' yet FDA's interpretation of ''chemically synthesized polypeptide'' presumes that ''polypeptides'' are a subset of ''proteins.''

(Response 2) With the FCA Act's removal of the parenthetical exception for ''any chemically synthesized polypeptide'' from the category of ''protein'' in the statutory definition of ''biological product'' in section 351(i) of the PHS Act, all amino acid polymers that meet FDA's interpretation of the term ''protein'' (including an amino acid polymer that previously would have fallen within the term ''chemically synthesized polypeptide'' as interpreted by FDA) will be considered to fall within the statutory definition of ''biological product.''

(Comment 3) Two comments assert that the proposed interpretations that we have chosen were not supported by a scientific consensus and that there is a lack of scientific consensus for distinguishing between ''protein,'' ''polypeptide,'' and ''peptide'' based on a particular number of amino acids.

(Response 3) While we agree that there may not be clear scientific consensus for a particular number of amino acids to use when distinguishing between the terms ''protein'' and ''peptide,'' there is strong support in scientific literature for distinguishing between types of amino acid polymers based on the number of amino acids they contain. Specifically, the definitions cited in the preamble to the proposed rule are clear that ''peptides'' are distinct from ''proteins'' and that the term ''peptide'' generally refers to smaller, simpler chains of amino acids, while the term ''protein'' is used to refer to longer, more complex chains (83 FR

**10060**   **Federal Register** / Vol. 85, No. 35 / Friday, February 21, 2020 / Rules and Regulations

63817 at 63819–63820). Moreover, there is scientific support for the fact that amino acid polymers greater than 40 amino acids in size exhibit at least some of the characteristics that are generally associated with proteins (83 FR 63817 at 63820).

The removal of the parenthetical exception for ''any chemically synthesized polypeptide'' from the category of ''protein'' in the statutory definition of ''biological product'' has eliminated any need to distinguish between these terms.

(Comment 4) One comment asserts that FDA's example of insulin does not support the number of amino acids in FDA's interpretation of ''chemically synthesized polypeptide'' because insulin is composed of 2 polypeptide chain subunits, one containing 21 amino acids and the other containing 30 amino acids.

(Response 4) We disagree with the comment because it confuses the terms ''polypeptide'' and ''polypeptide chain.'' Even though the need to avoid confusion between the terms ''polypeptide'' and ''polypeptide chain'' has been eliminated by the removal of the parenthetical exception for ''any chemically synthesized polypeptide'' from the category of ''protein'' in the statutory definition of ''biological product'' in section 351(i) of the PHS Act, we note in passing that our interpretation of ''protein'' uses the phrase ''amino acid chain'' instead of the phrase ''polypeptide chain.'' In other words, instead of describing the two subunits of the insulin protein as polypeptides or polypeptide chains like the comment, we describe them as amino acid chains. It therefore follows that insulin clearly is a ''protein'' as interpreted in the final rule, because the total number of amino acids exceeds 40. In particular, insulin is an alpha amino acid polymer with a specific, defined sequence consisting of 2 amino acid chain subunits with 21 amino acids and 30 amino acids, respectively. As these amino acid chain subunits are associated with each other in a manner that occurs in nature, we add the number of amino acids in each amino acid chain together to determine whether insulin is an alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. Specifically, by adding together the number of amino acids in each of the two amino acid chain subunits that comprise insulin, we conclude that insulin is an alpha amino acid polymer with a specific, defined sequence of 51 amino acids. Therefore, according to the interpretation we are finalizing, insulin is a protein because it is an alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size.

2. Alternate Proposals

(Comment 5) One comment requests that FDA adopt functional definitions for ''protein'' and ''chemically synthesized polypeptides'' that are principally focused on the method of manufacture as well as the conformation of the amino acid polymer rather than the size of the amino acid polymer, reflecting the comment's view that the method of manufacture, not size, should be the determining factor.

(Response 5) We are not finalizing our interpretation of the term ''chemically synthesized polypeptide'' because of the removal, by section 605 of the FCA Act, of the parenthetical ''(except any chemically synthesized polypeptide)'' from the category of ''protein'' in the statutory definition of ''biological product.'' Also, we do not agree that we should adopt an interpretation of the statutory term ''protein'' that is principally focused on the method of manufacture for the following reasons.

First, we disagree with the comment's premise that the statutory definition of ''biological product,'' which included ''protein (except any chemically synthesized polypeptide)'' prior to the enactment of the FCA Act, was principally focused on the method of manufacture. We need not address whether the fact that the earlier version of the statute described the method of manufacture in the parenthetical clause (excluding chemically synthesized polypeptides from the scope of the term ''protein'') has any bearing on our current interpretation. However, we note in passing that, according to basic rules of statutory construction, if Congress wanted the term ''protein'' not to include any ''chemically synthesized proteins,'' then it seems unlikely that the statute would employ two different terms (''protein'' and ''polypeptide''). Accordingly, we had described the term ''polypeptide'' as it appeared in section 351(i) of the PHS Act prior to the enactment of the FCA Act as referring to a subset of ''protein.''

Second, as noted in the response to Comment 1, FDA considered whether to include structural or functional attributes in its interpretation of the term ''protein,'' but determined that doing so would not be appropriate as it would lead to regulatory uncertainty due to the lack of a bright-line rule.

Third, adopting an interpretation that focused on the method of manufacture could improperly incentivize product developers to choose a suboptimal method of manufacturing a product that

may be less efficient and/or more costly, based on a perceived regulatory advantage under a particular regulatory scheme.

It is FDA's view that the optimal policy for determining which products are subject to regulation under the PHS Act is to apply a bright-line rule that provides regulatory certainty. Thus, in order to provide regulatory certainty and provide a bright-line interpretation of the term ''protein,'' we are focusing on the number of amino acids in the amino acid polymer (irrespective of the method of manufacture).

(Comment 6) One comment urges the Agency to abandon the proposed case-by-case approach for determining whether a proposed product composed of amino acid chains that are associated with each other in a manner not found in nature constitutes a ''biological product.''

(Response 6) FDA is not persuaded by this comment because there are a number of ways in which amino acid chains could be associated with each other in a novel manner that is not found in naturally occurring proteins and we cannot predict all of these iterations. Although some of these combinations may result in amino acid polymers that exhibit characteristics generally associated with proteins, some may not.

We recognize that the application of the fact-specific, case-by-case analysis for proposed products composed of amino acid chains that are associated with each other in a manner not found in nature does not provide the same level of certainty that is provided by the other criteria in § 600.3(h)(6) (see 83 FR 63817 at 63821), but it appears that case-by-case analysis is currently the best means of addressing such cases. We encourage sponsors of these proposed products to reach out to FDA early in their development program to discuss issues related to product classification and the appropriate pathway for a marketing application.

3. Relationship to Other Regulatory Provisions

(Comment 7) One comment asserts that FDA's proposed definitions are inconsistent with § 601.2(a)(4) and (c) (21 CFR 601.2(a)(4) and (c)).

(Response 7) We disagree with the comment's assertion that our proposed interpretations are inconsistent with our current regulations in § 601.2(a)(4) and (c). The comment appears to interpret § 601.2(a)(4) and (c) to mean that if a product is a therapeutic recombinant DNA-derived product, then, regardless of size, the product is a biological product subject to licensure and should

FDA001812

be regulated in accordance with § 601.2(c). However, that conclusion seems to be based on a misreading of these provisions. We interpret our regulation at § 601.2(a)(4) and (c) to mean that if the product meets the definition of ''biological product'' under § 600.3(h), and also is a therapeutic recombinant DNA-derived product, then the application would be regulated in accordance with § 601.2(c).

(Comment 8) One comment requests that FDA propose a regulatory definition of products that are ''analogous'' to a protein and therefore are biological products.

(Response 8) We appreciate the comment. A definition of products that are ''analogous'' to a ''protein'' for purposes of section 351(i)(1) of the PHS Act is outside the scope of this rulemaking. We note, however, that it would not be appropriate for the statutory term ''analogous product'' to be interpreted in a way that would include products that are specifically excluded by this final rule.

(Comment 9) One comment requests that FDA clarify its approach to assessing the appropriate application type for combination products, including peptide-protein combination products.

(Response 9) We appreciate the comment. The Agency's approach for determining the appropriate type of marketing application for certain combination products is outside the scope of this rulemaking. If a sponsor is unsure of the appropriate marketing application for its combination product containing a biological constituent part, we encourage the sponsor to reach out to FDA at an appropriate time in its development program to discuss issues related to product classification and the appropriate pathway for a marketing application.

## VI. Effective Date

This final rule will become effective March 23, 2020.

## VII. Economic Analysis of Impacts

### A. Introduction

We have examined the impacts of the final rule under Executive Order (E.O.) 12866, E.O. 13563, E.O. 13771, the Regulatory Flexibility Act (5 U.S.C. 601–612), and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4). E.O.s 12866 and 13563 direct us to assess all costs and benefits of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity). E.O. 13771 requires that the costs associated with significant new regulations ''shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations.'' This final rule is a significant regulatory action under sec. 3(f) of E.O. 12866. Based on the cost savings summarized below and discussed further in the regulatory impact analysis, this final rule is considered a deregulatory action under E.O. 13771.

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as not a ''major rule,'' as defined by 5 U.S.C. 804(2).

The Regulatory Flexibility Act requires us to analyze regulatory options that will minimize any significant impact of a rule on small entities. Because this rule does not impose new regulatory burden on small entities other than administrative costs of reading and understanding the rule, we certify that the final rule will not have a significant economic impact on a substantial number of small entities.

The Unfunded Mandates Reform Act of 1995 (section 202(a)) requires us to prepare a written statement, which includes an assessment of anticipated costs and benefits, before issuing ''any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year.'' The current threshold after adjustment for inflation is $154 million, using the most current (2018) Implicit Price Deflator for the Gross Domestic Product. This final rule will not result in an expenditure in any year that meets or exceeds this amount.

### B. Summary of Costs and Benefits

This final rule codifies FDA's interpretation of the statutory term ''protein'' that the Agency previously described in guidance (see 2015 Biosimilars Q&A Guidance). This final rule does not codify the FDA's interpretation of the statutory term ''chemically synthesized polypeptide'' because section 605 of the FCA Act removed the parenthetical ''(except any chemically synthesized polypeptide)'' from the category of ''protein'' in the definition of ''biological product'' in section 351(i) of the PHS Act. Formalizing this interpretation will reduce regulatory uncertainty introduced by the BPCI Act and section 605 of the FCA Act. Specifically, the rule clarifies the criteria for whether certain products will be regulated as drugs or biological products. The ''bright-line'' approach under the rule will reduce the amount of time spent by FDA staff and industry in support of making such determinations.

In this regulatory impact analysis, we identify the products most likely to require a case-by-case determination under the baseline scenario. Under the rule, these determinations will be made by FDA according to the bright-line standard outlined in the final rule. We calculate the cost savings from the amount of time saved by both the FDA and industry by avoiding a case-by-case determination. We also calculate the incremental costs to industry that are the result of reading and understanding the rule.

The primary estimate of the benefits in 2018 dollars annualized over 10 years is $394,562 using a 7 percent discount rate and $348,436 using a 3 percent discount rate. We also calculate ranges of benefits of $356,775 to $411,345 and $316,116 to $362,792, respectively. The estimated annualized costs range from $13,511 to $16,889, with a primary estimate of $15,012 using a 7 percent discount rate over a 10-year horizon. For a 3 percent discount rate, we estimate a range of $12,471 to $15,589, with a primary estimate of $13,857. These figures are shown in table 1.

TABLE 1—SUMMARY OF BENEFITS, COSTS AND DISTRIBUTIONAL EFFECTS OF RULE

| Category | Primary estimate | Low estimate | High estimate | Units | | | Notes |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Year dollars | Discount rate | Period covered | |
| Benefits: | | | | | | | |
| Annualized Monetized $/year ..... | $394,562 | $356,775 | $411,345 | 2018 | 7% | 10 | Cost savings to FDA and industry to avoid case-by-case review of applications. |
| | $348,436 | $316,116 | $362,792 | 2018 | 3 | 10 | |

FDA001813

TABLE 1—SUMMARY OF BENEFITS, COSTS AND DISTRIBUTIONAL EFFECTS OF RULE—Continued

| Category | Primary estimate | Low estimate | High estimate | Units | | | Notes |
|---|---|---|---|---|---|---|---|
| | | | | Year dollars | Discount rate | Period covered | |
| Annualized Quantified ................ | .................... | .................... | .................... | .................... | 7 3 | .................... | |
| Qualitative. | | | | | | | |
| Costs: | | | | | | | |
| Annualized Monetized $/year ..... | $15,012 $13,857 | $13,511 $12,471 | $16,889 $15,589 | 2018 2018 | 7 3 | 10 10 | Costs of reading the rule. |
| Annualized Quantified ................ | .................... | .................... | .................... | .................... | 7 3 | | |
| Qualitative. | | | | | | | |
| Transfers: | | | | | | | |
| Federal Annualized Monetized $/ year. | .................... | .................... | .................... | .................... | 7 3 | | |
| From/To ..................................... | From: | | | To: | | | |
| Other Annualized Monetized $/ year. | .................... | .................... | .................... | .................... | 7 3 | | |
| From/To ..................................... | From: | | | To: | | | |
| Effects: State, Local, or Tribal Government:. Small Business:. Wages:. Growth:. | | | | | | | |

In line with E.O. 13771, in table 2 we estimate present and annualized values of costs and cost savings over an infinite time horizon. With a 7 percent discount rate, the estimated annualized net cost-savings equal $170,903 in 2016 dollars over an infinite horizon. Based on these cost savings, this final rule is considered a deregulatory action under E.O. 13771.

TABLE 2—E.O. 13771 SUMMARY TABLE

[In 2016 dollars, over an infinite time horizon]

| | Primary estimate (7%) |
|---|---|
| Present Value of Costs ........ | $91,971 |
| Present Value of Cost Savings ................................... | $2,533,439 |
| Present Value of Net Costs .. | ($2,441,468) |
| Annualized Costs ................... | $6,438 |
| Annualized Cost Savings ..... | $177,341 |
| Annualized Net Costs ........... | ($170,903) |

*C. Summary of Regulatory Flexibility Analysis*

To determine the impact of the final rule on small entities, we first determined how many firms would be affected. We estimate that at least 1,615 firms classified in the Pharmaceutical and Medicine Manufacturing industry employ fewer than 1,250 employees and are therefore also classified as small businesses. Although a large number of small businesses will face costs under the final rule, the costs to these firms would be limited to the time burden of reading the final rule. We estimate that the time burden of reading the rule would be about $79 per firm, with a lower bound of $71 and upper bound of $89. This range of costs is unlikely to have a significant adverse impact on a substantial number of small entities. We have developed a comprehensive Economic Analysis of Impacts that assesses the impacts of the final rule. The full analysis of economic impacts is available in the docket for this final rule (Ref. 3) and at *https://www.fda.gov/ AboutFDA/ReportsManualsForms/ Reports/EconomicAnalyses/default.htm.*

## VIII. Analysis of Environmental Impact

We have determined under 21 CFR 25.30(h) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

## IX. Paperwork Reduction Act of 1995

This final rule has an influence on previously approved collections of information found in FDA regulations. These collections of information are subject to review by the Office of Management and Budget (OMB) under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521). The collections of information in 21 CFR parts 601 and 610 for submission of BLAs and general biological standards have been approved under OMB control number 0910–0338; the collections of information in 21 CFR 600.80 through 600.90 for reporting of adverse experiences have been approved under OMB control number 0910–0308; and the collections of information in 21 CFR 201.56, 201.57, and 201.80 for labeling requirements of biological products have been approved under OMB control number 0910–0572.

## X. Federalism

We have analyzed this final rule in accordance with the principles set forth in E.O. 13132. We have determined that the rule does not contain policies that have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Accordingly, we conclude that the rule does not contain policies that have federalism implications as defined in the Executive order and, consequently, a federalism summary impact statement is not required.

## XI. Consultation and Coordination With Indian Tribal Governments

We have analyzed this rule in accordance with the principles set forth in E.O. 13175. We have determined that the rule does not contain policies that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

FDA001814

Accordingly, we conclude that the rule does not contain policies that have tribal implications as defined in the E.O. and, consequently, a tribal summary impact statement is not required.

## XII. References

The following references marked with an asterisk (*) are on display at the Dockets Management Staff (see **ADDRESSES**) and are available for viewing by interested persons between 9 a.m. and 4 p.m., Monday through Friday; they also are available electronically at *https://www.regulations.gov.* References without asterisks are not on public display at *https://www.regulations.gov* because they have copyright restriction. Some may be available at the website address, if listed. References without asterisks are available for viewing only at the Dockets Management Staff. FDA has verified the website addresses, as of the date this document publishes in the **Federal Register**, but websites are subject to change over time.

1. Su, M., Y. Ling, J. Yu, et al. ''Small Proteins: Untapped Area of Potential Biological Importance,'' *Frontiers in Genetics,* vol. 4, p.286, 2013.

2. Galindo, M. I., J. I. Pueyo, S. Foux, et al. ''Peptides Encoded by Short ORFs Control Development and Define a New Eukaryotic Gene Family'' *PLoS Biology,* vol. 5, p. e106, 2007.

3. *FDA, Regulatory Impact Analysis, ''Definition of the Term 'Biological Product,''' available at *https://www.fda.gov/AboutFDA/ReportsManualsForms/Reports/Economic Analyses/default.htm.*

### List of Subjects in 21 CFR Part 600

Biologics, Reporting and recordkeeping requirements.

Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs, 21 CFR part 600 is amended as follows:

## PART 600—BIOLOGICAL PRODUCTS: GENERAL

■ 1. The authority citation for part 600 continues to read as follows:

**Authority:** 21 U.S.C. 321, 351, 352, 353, 355, 356c, 356e, 360, 360i, 371, 374, 379k–1; 42 U.S.C. 216, 262, 263, 263a, 264.

■ 2. Amend § 600.3 by revising paragraph (h) introductory text and adding paragraph (h)(6) to read as follows:

### § 600.3 Definitions.

*     *     *     *     *

(h) *Biological product* means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

*     *     *     *     *

(6) A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

*     *     *     *     *

Dated: February 18, 2020.

**Stephen M. Hahn,**

*Commissioner of Food and Drugs.*

[FR Doc. 2020–03505 Filed 2–20–20; 8:45 am]

**BILLING CODE 4164–01–P**

---

## DEPARTMENT OF THE TREASURY

## Office of the Secretary of the Treasury

## 31 CFR Parts 27 and 50

## Inflation Adjustment of Civil Monetary Penalties

**AGENCY:** Departmental Offices Treasury.
**ACTION:** Final rule.

**SUMMARY:** The Department of the Treasury (''Department'' or ''Treasury'') publishes this final rule to adjust its civil monetary penalties (''CMPs'') for inflation as mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (collectively referred to herein as ''the Act''). This rule adjusts CMPs within the jurisdiction of two components of the Department to the maximum amount required by the Act.

**DATES:** The adjustments to the CMPs set forth in 31 CFR part 27 and 31 CFR part 50 are effective February 21, 2020.

**FOR FURTHER INFORMATION CONTACT:** For information regarding the Terrorism Risk Insurance Program's CMPs, contact Richard Ifft, Senior Insurance Regulatory Policy Analyst, Federal Insurance Office, Room 1410 MT, Department of the Treasury, 1500 Pennsylvania Avenue NW, Washington, DC 20220, at (202) 622–2922 (not a toll-free number), or Lindsey Baldwin, Senior Policy Analyst, Federal Insurance Office, at (202) 622–3220 (not a toll free number). Persons who have difficulty hearing or speaking may access these numbers via TTY by calling the toll-free Federal Relay Service at (800) 877–8339.

For information regarding the Treasury-wide CMP, contact Richard Dodson, Senior Counsel, General Law, Ethics, and Regulation, 202–622–9949.

**SUPPLEMENTARY INFORMATION:**

### I. Background

In order to improve the effectiveness of CMPs and to maintain their deterrent effect, the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461 note (''the Inflation Adjustment Act''), as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Pub. L. 114–74) (''the 2015 Act''), requires Federal agencies to adjust each CMP provided by law within the jurisdiction of the agency. The 2015 Act requires agencies to adjust the level of CMPs with an initial ''catch-up'' adjustment through an interim final rulemaking and to make subsequent annual adjustments for inflation, without needing to provide notice and the opportunity for public comment required by 5 U.S.C. 553. The Department's initial catch-up adjustment interim final rules were published on December 7, 2016 (Departmental Offices) (81 FR 88600), and for 31 CFR part 27, on February 11, 2019 (84 FR 3105). The Department's 2018 annual adjustment was published on March 19, 2018 (83 FR 11876), and the Department's 2019 annual adjustment was published on April 17, 2019 (84 FR 15955). The 2015 Act provides that any increase in a CMP shall apply to CMPs that are assessed after the date the increase takes effect, regardless of whether the underlying violation predated such increase.[1]

### II. Method of Calculation

The method of calculating CMP adjustments applied in this final rule is required by the 2015 Act. Under the 2015 Act and the Office of Management and Budget guidance required by the 2015 Act, annual inflation adjustments subsequent to the initial catch-up adjustment are to be based on the percent change between the Consumer Price Index for all Urban Consumers (''CPI–U'') for the October preceding the date of the adjustment and the prior

---

[1] However, the increased CMPs apply only with respect to underlying violations occurring after the date of enactment of the 2015 Act, *i.e.,* after November 2, 2015.

*Lilly*

**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

09 November 2023

Food and Drug Administration
Office of Combination Products
Office of the Commissioner

**REQUEST FOR DESIGNATION**

Enclosed please find the following:

- Request for Designation for Retatrutide (LY3437943)

This document contains trade secrets, or commercial or financial information, privileged and confidential, delivered in confidence and reliance that such information will not be released to the public without the express written consent of Eli Lilly and Company.

Sincerely,

**ELI LILLY AND COMPANY**



Digitally signed by KATHERIN
MARGARET RUIZ
Reason: I agree to the terms defined by
the placement of my signature on this
document
Date: 2023.11.09 07:12:01 -06'00'
Adobe Acrobat version: 2020.005.30524

Katherin M Ruiz
Sr. Director-Global Regulatory Affairs-NA

FDA001875

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

## Request for Designation

**1. Identity of the Sponsor [21 C.F.R. § 3.7(c)(1)]**

Eli Lilly and Company, Lilly Corporate Center, Indianapolis, IN 46285 U.S.A., FDA Establishment Identifier 1819470

Company Contact Person: Katherin Ruiz, 317-985-8745, ruiz_katherin_m@lilly.com

Alternate Contact: Susan D. Sutton, 317-627-8290, sutton_susan@lilly.com

**2. Product Name [21 C.F.R. § 3.7(c)(2)(i), 3.7(c)(2)(ii), and 3.7(c)(2)(iii)]**

Retatrutide (LY3437943); proprietary name to be determined

**3. Prior Approvals and Agreements [21 C.F.R. § 3.7(c)(2)(iv)]**

Investigational New Drug Application (IND) 145825, 154659, 161432, 162070, for which Lilly is the sponsor

**4. Chemical, Physical or Biological Composition [21 C.F.R. § 3.7(c)(2)(v)]**

Retatrutide (LY3437943) is an agonist of the glucose-dependent insulinotropic polypeptide (GIP), glucagon-like peptide-1 (GLP-1), and glucagon (Gcg) receptors. Retatrutide is an alpha amino acid polymer that contains a specific, defined sequence of 41 amino acids cumulatively, comprising a backbone of 39 alpha amino acids and a second (associated) chain of one residue each of gamma-glutamate and 8-amino-3,6-dioxaoctanoic acid (ADO). The associated chain of two amino acids is covalently bound to the backbone of 39 amino acids through an amide bond between the epsilon-amino group of a lysine residue and the carboxyl group of ADO. Retatrutide ▮▮▮▮▮▮▮▮▮▮▮▮▮ and has the structural formula $C_{221}H_{342}N_{46}O_{68}$ (as free acid). Its inactive ingredients are ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

As further explained below, retatrutide requires a biologics license application (BLA) because it is an alpha amino acid polymer that has more than 40 amino acids and thus qualifies as a "protein" under 21 C.F.R. § 600.3(h)(6). In the retatrutide structure above, we have numbered all the amino acids, including both the backbone of 39 amino acids and the associated chain of 2 amino acids. This numbering system is not only consistent with the regulation's instruction to count amino acids from associated chains when determining whether a product is a "protein," but also has broad benefits for the scientific community. Current industry numbering conventions that only count amino acids in the sequence of the main chain—

FDA001876
A.0209

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

omitting those present in associated chains—do not align with FDA's regulation and result in less-accurate descriptions of the total number of amino acids in complex peptides and proteins. Counting all amino acids in the main chain and any associated chain more accurately and appropriately characterizes the complexity of an alpha amino acid polymer.

Although not relevant to the total number of amino acids in the polymer under 21 C.F.R. § 600.3(h)(6), FDA may consider ADO to be a "non-alpha" amino acid. We have not identified any definition of "alpha amino acid" in this regulation or the preambles to it. An internal agency memo preceding the rulemaking states that "[a]ll amino acids that are constituents of proteins are alpha amino acids because they have the carboxyl group linked to the alpha carbon of their carbon chain," but FDA did not incorporate this definition into the rule. FDA, Memo to File, *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-2, at p.14 n.3 (Aug. 1, 2011) (citation omitted) (FDA Memo). ADO has additional carbons (and oxygens) between the amino group and the carboxyl group, as shown below in Figure 3, and it is more complex than many alpha amino acids that meet the definition in the FDA memo. For example, it is substantially more complex than glycine (which has hydrogens as its two R groups); it could even be viewed as glycine with four extra carbons (with eight accompanying hydrogens) and two extra oxygens between the alpha carbon and the carboxyl group. ADO is also much larger than many other common alpha amino acids, including alanine, valine, leucine, isoleucine, cysteine, methionine, serine, and threonine.



**Figure 2**
**"Alpha" amino acid per**
**FDA Memo**



**Figure 3**
**ADO**

## 5.   Proposed Use or Indications [21 C.F.R. § 3.7(c)(2)(viii)]

Chronic weight management (IND 154659): An adjunct to healthy diet and physical activity for treatment of chronic weight management in adults with a body mass index (BMI) of 30 kg/m$^2$ or greater or with a BMI from 27 kg/m$^2$ to less than 30 kg/m$^2$ with an obesity-related comorbidity.

Obstructive sleep apnea (IND 161432): An adjunct to healthy diet and physical activity to improve moderate to severe obstructive sleep apnea (OSA) in adults with a BMI of 27 kg/m$^2$ or greater.

Knee osteoarthritis (IND 162070): An adjunct to healthy diet and physical activity for treatment of osteoarthritis (OA) knee pain in adults with a BMI 27 kg/m$^2$ or greater.

CONTAINS CONFIDENTIAL INFORMATION THAT IS PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4), 18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

Type 2 diabetes (IND 145825): An adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

## 6.  Product Modes of Action [21 C.F.R. § 3.7(c)(2)(ix)]

Retatrutide is a triagonist, also known as a "GGG" agonist because it has the following three targets: GLP-1, GIP, and Gcg receptors.  To achieve substantial body weight loss, retatrutide acts on these three receptors simultaneously.  GLP-1 receptor activation reduces calorie intake.  GIP receptor activation enhances that calorie intake reduction and facilitates fat utilization in white adipose tissue.  Gcg receptor activation increases energy expenditure.

Retatrutide has a "biological product mode of action," which is defined in FDA regulations to mean that the product "acts by means of a [biological product] applicable to the prevention, treatment, or cure of a disease or condition of human beings, as described in section 351(i) of the Public Health Service Act [(PHSA)]."  21 C.F.R. § 3.2(k)(1).  FDA has explained, however, that its main consideration for whether a product is a "protein" and hence a "biological product" is whether it has more than 40 amino acids in a specific, defined sequence.  In adopting the definition of "protein" in 21 C.F.R. § 600.3(h)(6), "FDA considered whether to include structural or functional attributes in its interpretation of the term 'protein,' but determined that doing so would not be appropriate."  85 Fed. Reg. 10,057, 10,060 (Feb. 21, 2020).  Instead, "in order to provide regulatory certainty and provide a bright-line interpretation of the term 'protein,' [FDA] focus[es] on the number of amino acids in the amino acid polymer (irrespective of the method of manufacture)."  *Id.*  Under this standard, retatrutide qualifies as a protein and should be regulated as a biological product.

Lilly believes that the Center for Drug Evaluation and Research (CDER) would regulate this product regardless of whether it requires an NDA or BLA.

## 7.  Developmental Work and Testing [21 C.F.R. § 3.7(c)(2)(vi)]

Lilly has evaluated the pharmacokinetics (PK) of retatrutide after single- and repeat-dose administration in rats and monkeys, as well as the toxicokinetics in rats, monkeys, and rabbits.  Further, Lilly assessed the nonclinical safety profile of retatrutide in a cardiovascular safety pharmacology study in monkeys, 13-week and 6-month repeat-dose toxicology studies in rats and monkeys, a female fertility study in rats, embryo-fetal development studies in rats and rabbits, an in vitro human Ether-à-go-go-related gene (hERG) assay, and an in vivo micronucleus genotoxicity study in rats.  Findings in all studies were consistent with, or secondary to, retatrutide-related pharmacology and the mode of action described above.  Additional findings in monkeys included changes in cardiovascular parameters attributed to on-target GLP-1, GIP, and/or Gcg pharmacology.

Receptor binding, functional (cAMP), and proximal receptor activation (GTPγS) assays were employed to assess potencies of retatrutide and associated controls at target receptors: GIPR, GLP-1R, and GcgR.  On an equal concentration basis, retatrutide showed approximately 2-fold less GLP-1 intrinsic potency than native GLP-1; approximately 7-fold more GIP intrinsic potency than native GIP; and approximately 2.5-fold less Gcg intrinsic potency than native Gcg, on corresponding human receptors for cAMP stimulation without the presence of serum albumin.  Retatrutide was also found to be less potent than native Gcg at stimulating glucose output in human-induced pluripotent stem hepatocytes and to stimulate glycerol release (lipolysis) in differentiated human adipocytes with similar potency to an acylated GIP analog.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

In nonclinical in vivo models, retatrutide demonstrated potent activity in glucose-dependent insulin secretion using an intravenous glucose tolerance test (ivGTT) in rats.  In addition, simultaneous activation by retatrutide of GLP-1, GIP, and Gcg was found to result in more body weight reduction.  Retatrutide dose-dependently reduced body weight and food intake in diet-induced obese (DIO) mice.  The $ED_{50}$ (dose that produces 50% of a maximal response) of retatrutide for weight loss was 4.73 nmol/kg, and reduced body weight was primarily due to reduction in fat mass.  The GcgR activity in retatrutide accounted for 30% to 35% of the observed body weight loss in mice as a result of increased energy expenditure.  Overall, in DIO mice, retatrutide has been shown to reduce body weight by reducing food intake and increasing energy expenditure, reducing blood glucose and plasma insulin consistent with increased insulin sensitivity, and reducing plasma cholesterol.  It has also been shown to improve liver health, demonstrated by a decrease in plasma alanine aminotransferase (and liver triglyceride levels).  Finally, in a mouse nonalcoholic steatohepatitis (NASH) model, retatrutide reduced liver nonfibrosis scores, resulting in an overall reduction in NASH activity score.

Lilly has conducted two Phase 1 and two Phase 2 clinical studies of retatrutide.  Study GZBA was a Phase 1 single-ascending dose, placebo-controlled study to evaluate the safety, tolerability, and PK of retatrutide in healthy subjects.  With single-dose administration in healthy subjects, there were apparent dose-related mean increases from baseline for insulin and C-peptide.  There were no meaningful changes in glucose concentration, as expected in healthy, nondiabetic participants.  Decreases in body weight from baseline were observed following single doses of 0.3 mg through 6 mg of retatrutide, beginning at Day 8 through to Day 43, with statistically significant differences at the 4.5- and 6-mg dose levels, compared with placebo.  Study GZBB was a Phase 1 multiple-ascending dose study to evaluate the safety, tolerability, PK, and pharmacodynamics of retatrutide in patients with type 2 diabetes mellitus receiving retatrutide, dulaglutide, or placebo weekly for 12 weeks.  Retatrutide was associated with a reduction in daily mean glucose levels (based on 6-point glucose profiles) and glycated hemoglobin (HbA1c), with greater reductions at higher doses ($\geq$ 3 mg) compared to lower doses (< 3 mg).  In addition, retatrutide-associated decreases in fasting glucose exhibited trends similar to that of daily mean glucose, whereas no meaningful changes were observed for insulin and C-peptide.  Body weight generally decreased over time in a dose-dependent manner for retatrutide doses greater than 0.5 mg.

The two Phase 2 studies of retatrutide recently concluded.  The first study (NCT04881760) was a 48-week, randomized, double-blind, placebo-controlled trial evaluating the efficacy, tolerability, and safety of retatrutide in people with obesity or overweight with weight-related conditions, except type 2 diabetes.  The trial randomized 338 participants in a 2:1:1:1:1:2:2 ratio to receive retatrutide 1 mg, 4 mg (with initial dose of 2 mg), 4 mg (with initial dose of 4 mg), 8 mg (with initial dose of 2 mg), 8 mg (with initial dose of 4 mg), 12 mg (with initial dose of 2 mg), or placebo.  The primary endpoint was percent change in weight from baseline at 24 weeks.  Retatrutide (1 mg, 4 mg, 8 mg, or 12 mg) met the primary endpoint for the efficacy estimand, demonstrating a mean weight reduction up to 17.5% (41.2 lb. or 18.7 kg).  In a secondary endpoint, retatrutide demonstrated a mean weight reduction up to 24.2% (57.8 lb. or 26.2 kg) at the end of the 48-week treatment duration.  Treatment with retatrutide was associated with improvements in cardiometabolic measures (exploratory endpoints) including systolic and diastolic blood pressure, triglycerides, LDL-cholesterol, total cholesterol, HbA1c, and fasting glucose and insulin at weeks 24 and 48.  Gastrointestinal side effects were the most commonly reported adverse events, were generally mild-to-moderate in severity, and usually occurred during the dose escalation period.  *See* Jastreboff et al., Triple-Hormone-Receptor Agonist Retatrutide for Obesity - A Phase 2 Trial. N Engl J Med. 2023 Aug 10;389(6):514–26.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

The second study (NCT04867785) was a randomized, double-blind, double-dummy, placebo-controlled and active comparator-controlled, parallel-group, Phase 2 trial in adults with type 2 diabetes. Participants were randomly assigned to receive once-weekly injections of placebo, 1.5 mg dulaglutide, or retatrutide maintenance doses of 0.5 mg, 4 mg (starting dose 2 mg), 4 mg (no escalation), 8 mg (starting dose 2 mg), 8 mg (starting dose 4 mg), or 12 mg (starting dose 2 mg). The primary endpoint was change in HbA1c from baseline to 24 weeks. At 24 weeks, HbA1c reductions with retatrutide were significantly greater (p<0.0001) than placebo in all but the 0.5 mg group and greater than 1.5 mg dulaglutide in the 8 mg slow escalation group (p=0.0019) and 12 mg escalation group (p=0.0002). Findings were consistent at 36 weeks. For retatrutide doses of 4 mg and greater, decreases in weight were significantly greater than with placebo (p=0.0017 for the 4 mg escalation group and p<0.0001 for others) and 1.5 mg dulaglutide (all p<0.0001). Mild-to-moderate gastrointestinal adverse events, including nausea, diarrhea, vomiting, and constipation, were reported in 67 (35%) of 190 participants in the retatrutide groups, six (13%) of 45 participants in the placebo group, and 16 (35%) of 46 participants in the 1.5 mg dulaglutide group. There were no reports of severe hypoglycemia and no deaths during the study. *See* Rosenstock et al., Retatrutide, a GIP, GLP-1 and glucagon receptor agonist, for people with type 2 diabetes: a randomized, double-blind, placebo and active-controlled, parallel-group, Phase 2 trial conducted in the USA. Lancet. 2023 Aug 12;402(10401):529–44.

## 8. Manufacturing Information [21 C.F.R. § 3.7(c)(2)(vii)]

The retatrutide drug substance used for Lilly's Phase 3 clinical studies and intended for commercialization is manufactured using



CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS



**9. Schedule and Duration of Use [21 C.F.R. § 3.7(c)(2)(x)]**

Retatrutide is administered chronically once weekly.

**10. Dose and Route of Administration [21 C.F.R. § 3.7(c)(2)(xi)]**

Retatrutide is administered by subcutaneous injection.



FDA001881

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

## 11. Related Products [21 C.F.R. § 3.7(c)(2)(xii)]

Lilly holds NDAs 215866 and 217806 for tirzepatide. Tirzepatide is an alpha amino acid polymer that has 42 amino acids comprising a 39-amino acid backbone as well as two ADO residues and one gamma-glutamate residue attached as part of the associated chain to the epsilon-amino group in a side chain of a lysine residue. This RFD is limited to retatrutide. If FDA grants this RFD, Lilly commits to engage with FDA regarding the implications for tirzepatide. To Lilly's knowledge, and after a thorough search, tirzepatide is the only currently marketed product that is related for purposes of the issues addressed in this RFD.

Two investigational Lilly products—LY 3537021 and LY 3532226—also are alpha amino acid polymers that contain a 39-amino acid backbone as well as two ADO residues and one gamma-glutamate residue. Lilly has not requested designation of these products to date, but the designation of retatrutide could affect the eventual classification of these two products.

We have identified the withdrawn product Omontys® (peginesatide) as potentially related. Peginesatide appears to have consisted of two 21-amino acid chains bound together by a linker having both alpha amino acids and one non-alpha amino acid (3-aminopropanoic acid). Omontys Prescribing Information § 11 (Dec. 2012). This product was approved under an NDA, which was withdrawn in 2019, before finalization of the definition of "protein" in 21 C.F.R. § 600.3(h)(6) and before the transition of NDAs for proteins to BLA status on March 23, 2020. 84 Fed. Reg. 3,795, 3,795 (Feb. 13, 2019). In guidance, FDA had indicated that it would not transition withdrawn NDAs. *See* FDA, Guidance for Industry: The "Deemed To Be a License" Provision of the BPCI Act—Questions and Answers, at 9 (March 2020). We believe that this product should have been subject to the BLA transition had it still been approved on March 23, 2020.

Lilly also commissioned Clarivate to search their Cortellis Drug Discovery Intelligence for amino acid polymers: (a) having between 10-40 amino acids in the backbone; and (b) in active development, registered, and/or launched. This search identified 503 compounds. Lilly reviewed the structures of each of those compounds to determine whether any of these products would have more than 40 total amino acids if non-alpha amino acids (including those in associated chains) are counted. Other than the Lilly compounds described herein, we have identified no others that would be affected by this RFD. Also, Lilly is aware of a GIP-GLP compound believed to be in Phase 1 development, VK-2735, that might be structurally similar to retatrutide, but the specific structure of the molecule has not been disclosed, and we are aware of no prior FDA decisions as to whether VK-2735 is a biological product in any case.

Semaglutide and liraglutide are acylated GLP-1 analogs, but they are not related products because they have fewer than 41 total amino acids. Novo Nordisk and its affiliates hold various applications for products containing these active ingredients (NDA 206321, NDA 022341, BLA 208583 (insulin degludec and liraglutide), NDA 209637, NDA 215256, NDA 213051, and NDA 213182). Semaglutide has 34 total amino acids: a 31-amino acid backbone (corresponding to residues 7-37 of human GLP-1) and 3 amino acids attached to a lysine side chain. Liraglutide has 32 total amino acids: a 31-amino acid backbone and 1 amino acid attached to a lysine side chain. Thus, these products' classifications are not relevant to this RFD.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

**12. Other Relevant Information [21 C.F.R. § 3.7(c)(2)(xiii)]**

N/A

**13. Sponsor's Recommendation [21 C.F.R. § 3.7(c)(3)]**

Lilly recommends that CDER regulate retatrutide under a BLA.  Retatrutide, an alpha amino acid polymer consisting of 41 amino acids comprising a backbone of 39 amino acids and a second covalently bound associated chain with a gamma-glutamate residue and an ADO residue, meets the definition of "protein" under the applicable regulations and hence is a biological product requiring a BLA.  Consistent with the plain language of the operative regulation, FDA should count all amino acids in retatrutide, including non-alpha amino acids, if any, in assessing protein status.

This conclusion aligns with the PHSA and the text of 21 C.F.R. § 600.3(h)(6).  Most important, the regulation provides that a protein is "any alpha amino acid polymer" "that is greater than 40 amino acids in size."  Retatrutide falls within this definition—regardless of whether FDA considers ADO to be a non-alpha amino acid—because it is a polymer containing alpha amino acids that is greater than 40 total amino acids (alpha and non-alpha) in size.  This conclusion also reflects sound policy, as products with non-alpha amino acids may be more complex than polymers having only alpha amino acids.  Also, consistent with FDA's objective in promulgating 21 C.F.R. § 600.3(h)(6), counting all amino acids in assessing protein status establishes a bright-line rule, simplifying administration for FDA and enhancing predictability for sponsors.  It also aligns with FDA's goal to avoid determining protein status based on method of manufacture, in order to promote competition and encourage manufacturing improvements.  For all these reasons, FDA should classify retatrutide as a protein subject to a BLA.  Alternatively, and independently, FDA should classify retatrutide as an "analogous product" to a protein and thus a biological product warranting a BLA.

        A.       <u>Retatrutide Is a Protein and Hence, a Biological Product.</u>

The PHSA and 21 C.F.R. § 600.3(h)(6) confirm that retatrutide should be classified as a protein.

The PHSA defines "biological product" in relevant part to mean a "protein, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings."  PHSA § 351(i)(1).  Retatrutide is a protein within the ordinary meaning of the word, as used in many scientific publications.  *See, e.g.*, FDA Memo, at PDF pp.17–18 (referring to definitions of "protein" as "[a]ny of a large class of complex organic chemical compounds that . . . consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures").  Notably, the PHSA does not mention amino acids (alpha or otherwise) or any particular number thereof as being relevant to protein status, much less does it require proteins to be composed solely of alpha amino acids.  Moreover, as discussed in greater detail below, retatrutide's molecular structure is far more complex than that of typical products requiring NDAs.

Retatrutide also meets the regulatory definition of "protein."  FDA's implementing regulation at 21 C.F.R. § 600.3(h)(6) provides:

> A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size.  When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

Retatrutide meets this definition of "protein" because: (1) it has "a specific, defined sequence"; (2) its chains "are associated with each other in a manner that occurs in nature"; and (3) it is an "alpha amino acid polymer" that is "greater than 40 amino acids in size."

Retatrutide plainly meets the first condition because it is synthesized according to "a pre-defined template," and it has an "identical sequence across batches." *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106 (D.D.C. 2020) (citing administrative record). Similarly, it satisfies the second condition because retatrutide's chains are associated with each other in a "manner that occurs in nature." FDA has explained that chains do *not* meet this condition when they "are associated with each other in a novel manner that is not found in naturally occurring proteins." 83 Fed. Reg. 63,817, 63,821 (Dec. 12, 2018). That is not the case for retatrutide: its chains are joined by an isopeptide bond, which is found in naturally occurring proteins. Here, the isopeptide bond is an amide bond forming from an amino group in a side chain of one amino acid (the epsilon-amino group in a lysine residue in the case of retatrutide) to a carboxyl group of another amino acid, and an isopeptide bond is an association that commonly occurs in nature. Roger L. Lundblad, *Biochemistry and Molecular Biology Compendium* (2019). The regulation therefore instructs that amino acids from both of retatrutide's chains be counted to determine its total number of amino acids.

Retatrutide also meets the third condition because it is an "alpha amino acid polymer" that is "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). While the regulation does not define "alpha amino acid polymer," the best reading is a polymer containing at least some alpha amino acids, not a polymer containing *only* alpha amino acids. Indeed, the latter reading would conflict with precedent. FDA approved a BLA for Sogroya® (somapacitan-beco), which has a 191-amino acid backbone and an associated chain that contains two gamma-glutamate residues as well as two units of ADO—the same amino acids in retatrutide's associated chain. *See* Sogroya Prescribing Information § 11 (April 2023). If the presence of ADO or non-alpha amino acids prevented a product from qualifying as an "alpha amino acid polymer," Sogroya would not have been regarded as a protein requiring a BLA. More fundamentally, interpreting "alpha amino acid polymer" as a polymer containing only alpha amino acids would lead to irrational outcomes: A polymer containing 60 alpha amino acids would be a protein, but the same polymer with an *additional* associated chain containing at least one non-alpha amino acid would *not* be, even though the second product would be more complex and have more amino acids. Retatrutide is thus an "alpha amino acid polymer" under 21 C.F.R. § 600.3(h)(6).

Retatrutide is also "greater than 40 amino acids in size." The regulation expressly directs FDA to sum "the total number of amino acids" for chains associated with each other in a manner that occurs in nature, and retatrutide contains a total of 41 amino acids. 21 C.F.R. § 600.3(h)(6). Once again, any other reading would conflict with the plain regulatory text. The requirement that the polymer have "greater than 40 amino acids" follows the initial reference to "*alpha* amino acid polymer" but omits the word "alpha," and bedrock principles of textual interpretation require giving effect to this omission. *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 US 438, 452 (2002). In addition, the regulatory text requires summing "the total

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

number of amino acids"—not the total number of only alpha amino acids—for chains associated with each other in a manner that occurs in nature.[1]

In sum, retatrutide is an alpha amino acid polymer with a specific, defined sequence that contains 41 total amino acids that are associated with each other in a manner that occurs in nature. It therefore qualifies as a protein under 21 C.F.R. § 600.3(h)(6).

  B.    Classifying Retatrutide As a Biological Product Aligns with Precedent and Is Appropriate As a Scientific and Policy Matter.

Science, sound policy, and precedent likewise support regulating retatrutide as a biological product.

FDA has expressed a preference for using its BLA authorities when handling complex products. For example, the agency has stated in guidance that the BLA "provide[s] the more appropriate application type for antibody-drug conjugates [(ADCs)]," "irrespective of whether the biological product constituent part or the drug constituent part is determined to have the primary mode of action" (PMOA). FDA, Guidance for Industry: Questions and Answers on Biosimilar Development and the BPCI Act, at 23 (Sept. 2021). FDA reached this conclusion after considering several factors, "including the relative significance of the safety and effectiveness questions raised by the constituent parts, particularly the highly specific molecular targeting by the antibody to a cell type, cellular compartment, or other marker at the site of action (as distinguished from mere alteration of systemic [pharmacokinetics])." Id. FDA also extended this approach to other products. In transitioning NDAs for drug-biologic combination products and complex mixtures to BLAs, for instance, FDA explained that its action "was informed by a general consideration of the factors used to determine the appropriate marketing application type for [ADCs]." 85 Fed. Reg. 12,930, 12,931–32 (Mar. 5, 2020). Accordingly, FDA has recognized that the BLA authorities may be better suited to the regulation of complex products.

Because non-alpha amino acids may be more complex than alpha amino acids—and thus polymers containing more than 40 alpha and non-alpha amino acids may be more complex than polymers of the same size containing *only* alpha amino acids—regulating alpha amino acid polymers with more than 40 alpha and non-alpha amino acids as proteins reflects sound policy and aligns with precedent for regulating complex products under BLAs. Non-alpha amino acids contain additional atoms between the amino group and the carboxylic acid, often several more carbons. For example, as noted above, compared to a simple alpha amino acid such as glycine, ADO has four extra carbons (with eight accompanying hydrogens) and two extra oxygens, and it is also larger and more complex than many other common alpha amino acids. These considerations warrant application of FDA's BLA authorities to polymers with more than 40 total alpha and non-alpha amino acids. Otherwise, novel polymers of potentially hundreds of total amino acids could be regulated as NDAs, as long as only 40 of the amino acids are alpha amino acids, despite the obvious complexity of such polymers.

Moreover, retatrutide has other complex elements. The retatrutide associated chain is regioselectively incorporated at Lysine 17 even though other acylation positions exist in the sequence (Lysine 16 and at the

---

[1] This conclusion also aligns with the regulatory history of 21 C.F.R. § 600.3(h)(6), as we have identified no agency statement in the rulemaking suggesting that only alpha amino acids count, or that non-alpha amino acids do not count, when assessing protein status. We also have not identified any scientific literature providing that a protein may contain only alpha amino acids.

CONTAINS CONFIDENTIAL INFORMATION THAT IS PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4), 18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

N-Terminus). The substantial difference in both molecular weight and total number of chiral centers between retatrutide and small molecules that are the typical subjects of NDAs is illustrative. A statistical analysis of 64 different small molecule drug manufacturing processes showed that these drugs had an average molecular weight, net of salts, of 449 g/mol and an average of 0.9 chiral centers. *See* Frank Roschangar et al., Inspiring process innovation via an improved green manufacturing metric: iGAL, J. of Green Chemistry, Feb. 24, 2018. By contrast, retatrutide has a molecular weight of 4731.4 g/mol and contains 34 chiral centers. In view of this complexity and the potential for even more complex polymers composed of both alpha and non-alpha amino acids to be developed over time, FDA should designate retatrutide as a biological product.

This approach also best advances FDA's objective of providing a bright-line rule to determine protein status. In the rulemaking to adopt 21 C.F.R. § 600.3(h)(6), FDA stated that the regulation's 41-amino-acid requirement "will reduce regulatory uncertainty over whether certain products are regulated as drugs or biological products," and "[t]his reduced uncertainty, under the 'bright-line' approach described . . . will allow both FDA and private industry to avoid spending time and resources on case-by-case determinations for each product." 85 Fed. Reg. at 10,057. An interpretation in which *all* amino acids count in assessing the protein status of an alpha amino acid polymer best advances this objective.

It is also fully consistent with FDA's determination that protein status must be assessed "irrespective of the method of manufacture," 85 Fed. Reg. at 10,060, and with the agency's related policy goals. In supporting legislation that eliminated the statutory exception from protein status for "chemically synthesized polypeptides," FDA stated: "Removing this exclusion will help patients because it provides the potential for chemically synthesized follow-on insulins and other protein products to come to market through more efficient abbreviated pathways, regardless of how they are manufactured. In addition to expanding access to lower-cost biosimilar and interchangeable protein products, removing this exclusion will help to promote potential innovation in manufacturing methods, which could lead to future efficiencies in manufacturing processes." FDA, Statement on low-cost biosimilar and interchangeable protein products (Dec. 17, 2019). For these reasons, FDA rejected comments that "protein" should be limited to products manufactured by a process that utilizes a biological system. The interpretation advanced here, which is neutral regarding method of manufacture, and which allows for chemically synthesized long-chain alpha amino acid polymers such as retatrutide to be regulated as biological products, similarly will advance these goals.

The legal and scientific considerations discussed above warrant classifying retatrutide as a biological product, notwithstanding FDA's prior approval of NDAs for tirzepatide. In fact, that result is required by principles of administrative law. It is blackletter law that agencies are bound to follow their own regulations. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (citing *Nat'l Fam. Plan. and Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 234 (D.C. Cir. 1992)) ("[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked."). As FDA has previously acknowledged, "a possible fact-based error" made while reviewing a previously approved or cleared product "would not bind the agency to perpetuating the error in the analysis of other products." Def.'s Mot. for Summ. J., *Prevor v. FDA*, Docket No. 1:13-cv-01177 (D.D.C. Dec. 20, 2013). As FDA put it, "to bind FDA to [incorrect] past practices would be to, in effect, prevent FDA from acting in accordance with its own regulations." *Id.*

Precedent is also supportive. FDA's approach to ADCs establishes that the agency may approve a product under a BLA even if it is related to a different product that was previously approved under an NDA. FDA

CONTAINS CONFIDENTIAL INFORMATION THAT IS PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4), 18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

approved an NDA for the first-approved ADC, Mylotarg, in 2000. *See* 76 Fed. Reg. 72,955 (Nov. 28, 2011). Thereafter, Genentech filed an RFD proposing that a different ADC required a BLA. *See* Biological Product Classification Subcommittee, Memorandum to the Directors of CDER, CBER, & Office of Combination Products (OCP), *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-3, at 540 (BLA Transition Memo) (Mar. 18, 2020). In May 2010, FDA asked that Wyeth voluntarily withdraw the NDA for Mylotarg. *See* 76 Fed. Reg. at 72,955. In June 2010, FDA issued a memorandum explaining its decision to require a BLA for Genentech's ADC. *See* BLA Transition Memo, at PDF p.540. FDA subsequently withdrew the NDA for Mylotarg in November 2011. 76 Fed. Reg. at 72,955. When Mylotarg was resubmitted for approval, FDA approved a BLA for it. *See* Approval Letter, BLA 761060 (Sept. 1, 2017). FDA explained this history as follows:

> FDA previously has determined that the PMOA for the withdrawn NDA for Mylotarg . . . was attributable to the drug constituent part. However, FDA also has described its consideration, to enhance regulatory clarity and promote consistency, of several factors leading to a determination that submission of a BLA would provide the more appropriate application type for [ADCs], a type of drug-biologic combination product that is assigned to CDER regardless of the PMOA of the combination product. [Guidance] describes this determination.

BLA Transition Memo, at PDF p.537. Accordingly, FDA has determined that a BLA is proper for a proposed product in the context of an RFD, even if the agency previously approved an NDA for a related product, provided that the proposed product is "more appropriate[ly]" classified as a biological product. *Id.* Because retatrutide meets the regulatory definition of a protein, it must be regulated as a biological product.

### C.    Alternatively, Retatrutide is Analogous to a Protein.

In the alternative, retatrutide independently qualifies as a biological product because it is analogous to a protein. Under the PHSA, a "biological product" includes "a protein, or analogous product." PHSA § 351(i)(1). The statute does not define "analogous product," nor has FDA adopted a regulation or guidance document defining products analogous to proteins. *Teva*, 514 F. Supp. 3d at 112. One court has referred favorably to a dictionary definition of "analogous" as "[s]imilar or comparable to something else either in general or in some specific detail." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, No. 22-CV-860, 2023 WL 3319366, at *13 (D.D.C. May 8, 2023) (referring to Analogous, Merriam-Webster Dictionary, https://tinyurl.com/y49khdfa).

Even if FDA concludes that retatrutide is not a protein because it has 40 *alpha* amino acids—and for the reasons set forth above, FDA should not—retatrutide is analogous to a protein. Retatrutide contains 41 total amino acids in a specific, defined sequence, and the vast majority of those (40 of them) are indisputably alpha amino acids. It also shares structural and functional characteristics in common with a protein comprising 41 alpha amino acids. In particular, retatrutide, like other proteins, has a consistent three-dimensional structure. It has structural features similar to the 42-amino acid GIP, which is a naturally occurring protein hormone. The two-amino-acid chain of ADO and gamma-glutamate (along with the fatty acid) helps facilitate binding to albumin to extend pharmacokinetic half-life while providing desired pharmacological properties. These two amino acids serve as a structural bridge, similar to a typical function of amino acids in a protein. The inclusion of one non-alpha amino acid among the 41 total amino acids does not change the fact that the molecule functions analogously to other proteins.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

Accordingly, retatrutide is similar in structure, complexity, and function to proteins comprising all alpha amino acids. In fact, retatrutide is more similar to a protein composed of 41 alpha amino acids than are naturally derived mixtures comprising a protein and a lipid—and FDA has identified the latter as an example of an "analogous product" to a protein. *Ipsen*, 2023 WL 3319366, at *13.

The conclusion that retatrutide is analogous to a protein is also consistent with the *Teva* and *Ipsen* cases interpreting the term "analogous product." In *Teva*, the court found that "FDA's limited interpretation of the 'analogous product' provision indicates that . . . a product 'analogous' to a 'protein' must have a 'specific, defined sequence' of amino acids." *Teva*, 514 F. Supp. 3d at 113. Retatrutide indisputably meets that requirement. In *Ipsen*, the court upheld FDA's conclusion that lanreotide acetate, which has chains of eight amino acids that are linked together through nanotubes, was not analogous to a protein. FDA based its conclusion on its assessment of the active ingredient without the nanotubes, which FDA considered to be formulation properties, and much of the opinion focused on how to define the product's active ingredient. *Ipsen*, 2023 WL 3319366, at *11–*13. Here, the active ingredient is retatrutide, as the amino acids are manufactured together, not joined by formulation properties. Unlike lanreotide acetate, retatrutide has a total of 41 amino acids standing alone, and the identity of the active ingredient is not in question.

Of course, neither case addressed how to count non-alpha amino acids or whether polymers containing a mix of alpha and non-alpha amino acids are "analogous" to polymers composed solely of alpha amino acids. Tellingly, however, the *Ipsen* court described the regulatory definition of "protein" in a manner that supports Lilly's recommendation: "[Lanreotide acetate] is in no way comparable or 'analogous' to a protein, which is *40 or more amino acids* in size." *Id.* at *13 (emphasis added). Similarly, the court described FDA's position that "the *40-amino-acid* size requirement is a 'critical characteristic' of a protein, and to be analogous to a protein 'a product must share [that] critical characteristic.'" *Id.* at *12 (quoting administrative record) (emphasis added). Both references indicate that the size requirement takes into account *all* "amino acids."

Finally, while FDA has said "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are *specifically excluded* by this final rule," that concern is not implicated here. 85 Fed. Reg. at 10,061 (emphasis added). The final rule does not specifically discuss whether to include non-alpha amino acids in the amino acid count, and the text of the regulation is best read to include them, as discussed above.

Thus, an alpha amino acid polymer that contains 41 amino acids, 40 of which are *alpha* amino acids, should at a minimum be considered "analogous" to a protein that contains 41 alpha amino acids, and it therefore should be regulated as a biological product under PHSA § 351(i)(1).

D.    Conclusion

For all these reasons, FDA should classify retatrutide as a biological product as defined in section 351(i)(1) of the PHSA.

**FDA** FOOD AND DRUG ADMINISTRATION

Office of Combination Products
10903 New Hampshire Ave (WO32)
Suite 5129
Silver Spring, MD 20993-0002

11/17/2023

Katherin Ruiz
Eli Lilly and Company
Eli Lilly and Company, Lilly Corporate Center, Indianapolis, IN 46285

Re:  Request for Designation
     Retatrutide (LY3437943);
     Our File Number: RFD 230056
     Received: 11/09/2023

Dear Katherin Ruiz,

    Your Request for Designation RFD 230056 has not been filed because it does not contain the information required by our regulation, 21 CFR Part 3. The attached document explains those sections of the RFD that need to be added or modified in order to meet the requirements of the regulation. Your submission has been closed. Please submit a new RFD that includes the requested information.

    Additional information about the RFD process, and in particular, the information that must be included in an RFD (see section 3.7) can be found at the following websites:
    https://www.fda.gov/CombinationProducts/RFDProcess/default.htm
    https://www.fda.gov/CombinationProducts/GuidanceRegulatoryInformation/

    We also encourage you to review our guidance document "How to Write a Request for Designation" available at:
    https://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm

    The guidance explains the Part 3 requirements and the kind of information we need to make an appropriate jurisdictional determination.

    Please don't hesitate to contact combination@fda.gov if you have any questions or need additional information.

                    Sincerely yours,

                    Leigh Hayes, J.D.
                    Lead Product Jurisdictional Officer
                    Office of Combination Products

CC: LEOPOLD L KONG

FDA001889

A.0222                    A.0222                    A.0222

ATTACHMENT

Re:  Request for Designation
     Retatrutide (LY3437943);
     <u>Our File Number:</u> RFD 230056
     Received: 11/09/2023

Request for Designation RFD 230056 has not been filed because it does not include:

- Chemical, physical, or biological composition.

  *We need to understand the complete composition of your product to proceed with an RFD evaluation. However, the description of your product's composition and/or configuration in your submission is incomplete. For example, you state that the "inactive ingredients are tris base, mannitol, water for injection, and, in the preserved formulation, phenol." However, you have not provided the exact amounts and purpose(s) of every ingredient in your finished product. Therefore, please list all ingredients in your finished product, including their amounts and purposes. Additionally, it is not clear what the purpose(s) are of all the non-coded amino acids are in your product. Please clarify. Also, you state that "retatrutide, like other proteins, has a consistent three-dimensional structure." However, you have not provided any information on the three-dimensional molecular structure of retatrutide. Finally, it is not clear how your product is presented. For example, is your product presented in a pre-filled syringe? Please clarify. We need these clarifications to understand the composition and/or configuration of the product. This information is needed for us to evaluate your product's classification and Center assignment.*

- Status and brief reports of the results of developmental work, including animal testing.

  *You describe the developmental work, including the results of potency assays, non-clinical, and clinical studies, in your RFD. However, it is not clear how these studies would pertain to the classification of your product. Please clarify. Additionally, these studies are difficult to interpret based on the limited information provided. For instance, you have not provided any information on how the potency assays were performed. Therefore, please clarify if the relevant these studies can be cited to a publicly available source (e.g., a scientific journal article) that includes a more complete description of the experiments. If these studies cannot be cited to a publicly available source, a complete description of each study should be provided. The description should include how the study was conducted, identification of all controls, conditions of testing, results, and conclusions. We need this clarification to understand these materials so that we may consider them in our evaluation of your product's classification and Center assignment.*

- Description of the manufacturing processes, including the sources of all components.

  *We need a complete description of the manufacturing process for your product in order to proceed with an RFD evaluation. However, your submission does not contain adequate information regarding the manufacturing process for your proposed product. As an initial matter, you state that that "[a]dditional information on the manufacturing process and the source of all components can be found in prior submissions to FDA including IND 145825, Sequence 0056." However, an IND is not a publicly available source (e.g., a scientific journal article), and therefore you will need to provide the relevant manufacturing information in the RFD submission. Additionally, you state that "SPPS, including resin soft cleavage (to retain protection groups) and isolation, for the synthesis of three fragments. Each fragment is manufactured separately and can be done in parallel." You also state that "[f]ragment coupling using LPPS for the sequential joining of the three fragments followed by global deprotection and isolation of retatrutide." However, it is not clear what are the three fragments that are manufactured separately or how they are sequentially joined. Please clarify. We need these clarifications to understand how your product is manufactured. This information is needed for us to evaluate your product's classification and Center assignment.*

- Proposed use or indications.

  *You state that the indication for use of your product includes "Chronic weight management (IND 154659)," "Obstructive sleep apnea (IND 161432)," "Knee osteoarthritis (IND 162070)," and "Type 2 diabetes (IND 145825)." Therefore, it appears that your product has multiple indications. Please note that we are unable to accept multiple indications for use in a single RFD (i.e., because they suggest that there may be different*

FDA001890

A.0223                          A.0223                          A.0223

*versions of your product). We are only able to evaluate a single product in an RFD. Accordingly, please clarify the indication of your product. We need this clarification to understand the proposed use or indications of your product. This information is needed to evaluate your product's classification and Center assignment.*

- Description of all known modes of action, the sponsor's identification of the single mode of action that provides the most important therapeutic action of the product, and the basis for that determination.

*(1) You state that "Retatrutide is a triagonist, also known as a "GGG" agonist because it has the following three targets: GLP-1, GIP, and Gcg receptors. To achieve substantial body weight loss, retatrutide acts on these three receptors simultaneously. GLP-1 receptor activation reduces calorie intake. GIP receptor activation enhances that calorie intake reduction and facilitates fat utilization in white adipose tissue. Gcg receptor activation increases energy expenditure." However, it is not clear from the description you have provided how your product acts as a triagonist or how acting as a triagonist would achieve the primary intended purpose(s) of your product. Please clarify. For example, which amino acids in Retatrutide bind to GLP-1, GIP and Gcg receptors? Does the C20 fatty diacid moiety, gamma-glutamate, and/or 8-amino-3,6-dioxaoctanoic acid bind to these receptors? Are monomeric and/or oligomeric Retatrutide binding to the receptors? If oligomeric Retatrutide binds to the receptors, does the C20 diacid moiety facilitate oligomerization? Also, is binding intended to induce a specific conformational change that leads to receptor activation? Additionally, how does receptor activation achieve the primary intended purpose(s) of your product? We need these clarifications to understand how your product works. This information is needed to evaluate your product's classification and Center assignment. (2) You state that "[t]he two-amino-acid chain of ADO and gamma-glutamate (along with the fatty acid) helps facilitate binding to albumin to extend pharmacokinetic half-life while providing desired pharmacological properties. These two amino acids serve as a structural bridge, similar to a typical function of amino acids in a protein." However, it is not clear how the two-amino-acid chain of ADO and gamma-glutamate (along with the fatty acid) help facilitate binding to albumin. For example, is only fatty acid binding to the albumin? Also, how is this two-amino-acid chain serving as a structural bridge and how have you concluded that serving as a "structural bridge" is similar to a typical function of amino acids in a protein? Please clarify. We need these clarifications to understand how your product works. This information is needed to evaluate your product's classification and Center assignment.*

- Description of related products, including the regulatory status of those related products.

*Your submission references the subjects of NDA 215866, NDA 217806, as well as LY 3537021, LY 3532226, and peginesatide as related products. However, it is not clear how your description of these products and of the way they are regulated would be relevant for the classification of Retatrutide. Please clarify. Additionally, please provide the regulatory numbers associated with LY 3537021 and LY 3532226, if available. We need these clarifications so that we can establish the relationship(s) between Retatrutide and these products. This information is needed for us to evaluate your product's classification and Center assignment.*

FDA001891

# COVINGTON

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

**Krista Hessler Carver**

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5197
kcarver@cov.com

**Via Electronic Mail**                                                    December 1, 2023

Mark J. Raza, Esq.
Chief Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705

> Re:   **RFD 230056: Legal Issues Raised by Not Filed Letter for Request for Designation for Retatrutide**

Dear Mr. Raza:

I write on behalf of Eli Lilly and Company (Lilly) regarding the refusal by the Office of Combination Products (OCP) to file Lilly's request for designation (RFD) for retatrutide. We request involvement of the Office of Chief Counsel (OCC) in resolving the legal issues presented by OCP's refusal, including OCC's participation in a meeting with OCP in December to discuss this matter.

On November 9, 2023, Lilly submitted the RFD (Exhibit A), which requests that OCP designate retatrutide as a "biological product" requiring a biologics license application (BLA) for marketing. Retatrutide is an alpha amino acid polymer that contains a specific, defined sequence of 41 amino acids cumulatively, comprising a backbone of 39 alpha amino acids and a second (associated) chain of one gamma-glutamate amino acid and one 8-amino-3,6-dioxaoctanoic acid (ADO) amino acid. The RFD explains that retatrutide meets the Food and Drug Administration's (FDA's) regulatory definition of "protein" in 21 C.F.R. § 600.3(h)(6). Consistent with FDA's intent that this regulation should provide "a bright-line interpretation of the term 'protein' [that] "focus[es] on the number of amino acids in the amino acid polymer,"[1] Lilly's RFD principally focuses on how to count the amino acids in retatrutide while including the other information described in FDA's RFD regulation, 21 C.F.R. § 3.7. In particular, the RFD explains that, although the ADO amino acid in the associated chain might he considered a "non-alpha" amino acid, it must he counted in assessing protein status under 21 C.F.R. § 600.3(h)(6).

On November 17, 2023, however, OCP issued a Not Filed Letter (Exhibit B) stating that substantial additional information is needed to review the RFD and instructing that Lilly submit a new RFD with this information. For example, OCP requires that Lilly provide detailed information about the animal and clinical studies that have been conducted and asks for

---

[1] 85 Fed. Reg. 10,057, 10,060 (Feb. 21, 2020).

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001892
A.0225                          A.0225                          A.0225

Mark J. Raza, Esq.
Page 2

detailed information about the manufacturing process.  In the email transmitting the Not Filed Letter (Exhibit C), OCP also proposes a teleconference to discuss the matter.

The Not Filed Letter raises legal concerns that warrant OCC's involvement.  The additional information described in the Not Filed Letter—which we estimate alone would comprise 10 or more pages—would cause the RFD to exceed the 15-page limit in FDA's RFD regulations.[2]  But Section 563 of the Federal Food, Drug, and Cosmetic Act (FDCA) contemplates no page limit—or refuse-to-file process—for RFDs.  Instead, both the page limit and the refuse-to-file process were created by an FDA rulemaking without an opportunity for public comment.[3]  Rigid application of these "rules" would effectively deny Lilly its statutory right under section 563 to obtain a timely response to its RFD.  Indeed, section 563(b) is unequivocal that the Secretary "shall determine the classification of the [relevant] product . . . [n]ot later than 60 days after the receipt" of an RFD.  These legal issues are particularly concerning since the vast majority of the information that OCP seeks is not relevant to administration of the "bright line" rule reflected in 21 C.F.R. § 600.3(h)(6), which defines the "protein" component of the biological product definition based primarily on amino acid count.

In light of the legal issues presented by the Not Filed letter, we ask for OCC's involvement and its participation in the requested teleconference with OCP.  In particular, we request that OCC advise OCP on withdrawing most or all of the asserted deficiencies described in the Not Filed Letter; allowing cross-references to information in Lilly's files with FDA if expansive information is required; and/or narrowing the scope of the additional required information.  If the information necessary to decide this RFD exceeds what can be provided in 15 pages, Lilly requests that FDA grant a waiver of the substantive limitation imposed by the 15-page rule.  Given that section 563 expressly provides that FDA's inaction on an RFD results in the sponsor's proposed classification going into effect 60 days after FDA's receipt of the RFD,[4] and since Lilly's timeline for submitting the retatrutide marketing application is approaching, we respectfully request your prompt attention to this matter.

## I.      Background

### A.      The RFD Process

In 1997, Congress amended the FDCA to add section 563, which is codified at 21 U.S.C. § 360bbb-2.  Section 563 provides a process under which an applicant "may submit a request to [FDA] requesting the classification of [a] product as a drug, biological product, device, or a combination product."[5]  No later than "60 days after the receipt of [such a] request," FDA "shall

---

[2] 21 C.F.R. § 3.7(c) (stating that an RFD "must not exceed 15 pages, including attachments").

[3] 56 Fed. Reg. 58,754 (Nov. 21, 1991).

[4] FDCA § 563(c) (providing that, if FDA does not issue a Letter of Designation within 60 days of receiving an RFD, the submitter's recommended classification "shall be considered to be a final determination by [FDA] of such classification of the product").

[5] *Id.* § 563(a).

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001893

A.0226                          A.0226                          A.0226

Mark J. Raza, Esq.
Page 3

determine the classification of the product" and "shall provide to the person a written statement that identifies such classification . . . and the reasons for such determination."[6]  If FDA "does not provide the statement within the 60-day period," then "the recommendation made by the person . . . shall be considered to be a final determination by [FDA] of such classification of the product," and it "may not be modified by [FDA] except with the written consent of the person, or for public health reasons based on scientific evidence."[7]

### B.   Lilly's RFD

Lilly's RFD presents a straightforward question: Is retatrutide a protein or analogous product and thus a biological product subject to premarket review under a BLA?

The Public Health Service Act (PHSA) defines "biological product" in relevant part to mean a "protein, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings."[8]  21 C.F.R. § 600.3(h)(6) defines a "protein" as "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size."[9]  In promulgating this regulation, FDA set a clear goal: to provide "regulatory certainty and provide a bright-line interpretation of the term 'protein.'"[10]  The singular focus of the protein definition, FDA explains, is "the number of amino acids in the amino acid polymer (irrespective of the method of manufacture)."[11]  In addition to rejecting comments that the method of manufacture should determine whether a product is a "protein," the agency also rejected the relevance of other product properties to this inquiry, stating, for example:

> FDA considered whether to include structural or functional attributes (*e.g.*, folding, provides structural support to cellular macrostructures, catalyzes a biochemical reaction, transports other molecules, aids in the folding of other proteins) in its interpretation of the term "protein," but determined that this would not serve to make the line between peptides and proteins any brighter.  Among other things, relying on a factor such as "folding" would not provide regulatory certainty because it would raise questions about how much folding is sufficient to differentiate between "peptides" and "proteins," as many peptides can arguably be said to exhibit some folding.  Therefore, adopting

---

[6] *Id.* § 563(b).

[7] *Id.* § 563(c).

[8] PHSA § 351(i)(1).

[9] 21 C.F.R. § 600.3(h)(6).

[10] 85 Fed. Reg. at 10,060.

[11] *Id.*

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001894

A.0227                                   A.0227                                   A.0227

Mark J. Raza, Esq.
Page 4

>this approach would not provide for a bright-line rule and would
>result in regulatory uncertainty and inefficiency.[12]

Consistent with the protein definition's singular focus, the retatrutide RFD presents the narrow issues of whether the ADO amino acid, which FDA might consider to be a "non-alpha" amino acid, counts in assessing protein status, and, if not, whether retatrutide is an analogous product requiring a BLA. Lilly's RFD recommends that retatrutide be classified as a protein because it is an alpha amino acid polymer that contains a specific, defined sequence of 41 amino acids cumulatively, comprising a backbone of 39 alpha amino acids and a second (associated) chain of one gamma-glutamate amino acid and one ADO amino acid. The RFD asks OCP to confirm that the ADO is not excluded when determining whether retatrutide has more than 40 amino acids, given that 21 C.F.R. § 600.3(h)(6) requires counting "the total number of amino acids" and does not specify that only alpha amino acids count.[13] This conclusion aligns with FDA's stated goal to adopt a "bright-line" approach under that rule.[14] The RFD also explains that, in the alternative, retatrutide is an analogous product under PHSA § 351(i)(1): An alpha amino acid polymer that contains 41 amino acids, 40 of which are alpha amino acids, should at a minimum be considered "analogous" to a protein that contains 41 alpha amino acids.

Lilly recognizes that FDA has published guidance creating an alternative process to the RFD, the Pre-Request for Designation (Pre-RFD), and that this alternative process may be useful to some sponsors.[15] The Pre-RFD process does not meet Lilly's needs in this case, however. Lilly exercised its statutory right to submit an RFD for two reasons: (1) to obtain a binding decision from FDA regarding the classification of retatrutide;[16] and (2) to ensure that classification is timely completed. The Pre-RFD process does not result in the definitive determination that Lilly seeks, as a Pre-RFD provides "informal, non-binding feedback regarding the regulatory identity or classification of a human medical product."[17] There also is no statutory timeline for action on a Pre-RFD. Instead, FDA's "goal is to provide feedback on a Pre-RFD within 60 calendar days" of submission, but, in certain circumstances, "it may be necessary for [FDA] to take longer than [its] goal of 60 calendar days to fully consider the information provided."[18] In practice, FDA has often taken longer than 60 days to resolve a Pre-RFD.[19] In contrast, section 563 of the FDCA requires FDA to respond to an RFD "[n]ot later

---

[12] *Id.* at 10,059.

[13] 21 C.F.R. § 600.3(h)(6).

[14] 85 Fed. Reg. at 10,0061.

[15] *See* FDA, Guidance for Industry: How to Prepare a Pre-Request for Designation (Pre-RFD) (Feb. 2018) (Pre-RFD Guidance).

[16] *See* FDCA § 563(b) ("The Secretary may not modify [the classification] except with the written consent of the person, or for public health reasons based on scientific evidence.").

[17] Pre-RFD Guidance, at 3.

[18] *Id.* at 7–8.

[19] FDA, *FDA-TRACK: Office of Clinical Policy and Programs - Office of Combination Products Dashboard* (current through Nov. 7, 2023) (reporting that OCP met the 60-day goal for 100% of pre-

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001895

A.0228                          A.0228                          A.0228

Mark J. Raza, Esq.
Page 5

than 60 days after the receipt" of the RFD and provides a clear consequence for FDA not doing so: the submitter's recommended classification governs.[20]

Lilly requires a prompt classification for purposes of retatrutide's development. The product is currently undergoing phase 3 clinical studies,[21] and Lilly plans to submit a marketing application shortly after completion of these trials. Once the classification of the product is clear, Lilly plans to immediately request a meeting with the review division to discuss how the classification affects application requirements, including validation, given the differential requirements for BLAs and new drug applications in certain respects. Due to our need for a prompt and binding classification of retatrutide, Lilly has elected to exercise its statutory right to an RFD and does not intend to pursue a Pre-RFD.

### C.    The Not Filed Letter

The Not Filed Letter states that the RFD does "not contain the information required by [OCP's] regulation, 21 CFR Part 3" namely information about (1) the product's chemical, physical, or biological composition; (2) the status and brief reports of the results of developmental work, including animal testing; (3) the manufacturing processes, including the sources of all components; (4) proposed uses or indications; (5) all known modes of action, the sponsor's identification of the single mode of action that provides the most important therapeutic action of the product, and the basis for that determination; and (6) related products, including the regulatory status of those related products.[22] Concurrently, OCP asked Lilly for "a short teleconference (i.e., 30 minutes) prior to re-submission," noting that such a meeting "would be helpful to ensure that your next submission will be filed."[23]

### II.    Legal Issues Raised by the Not Filed Letter

The Not Filed letter effectively denies Lilly's statutory right to timely classification of retatrutide under section 563 of the FDCA, including by demanding significant additional information, the majority of which appears immaterial to whether retatrutide is a "biological product" and would necessarily cause the RFD to exceed 15 pages.

---

RFDs in three months between October 2022 and September 2023 and acted within 60 days on 29-67% of pre-RFDs in 60 days during the other months).

[20] FDCA § 563(b) & (c).

[21] *See* ClinicalTrials.gov, A Study of Retatrutide (LY3437943) in Participants With Obesity and Cardiovascular Disease (TRIUMPH-3) (last visited Dec. 1, 2023).

[22] *See generally* Not Filed Letter.

[23] Email from Office of Combination Products to Katherin M Ruiz, Nov. 17, 2023.

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE FREEDOM OF INFORMATION ACT (FOIA)

FDA001896

A.0229                    A.0229                    A.0229

Mark J. Raza, Esq.
Page 6

### A.   The Not Filed Letter frustrates Lilly's statutory right to utilize the RFD process.

Section 563 entitles the submitter of an RFD to a binding determination on product classification within 60 days.  Specifically, section 563(b) states that "[n]ot later than 60 days after the receipt of the [RFD]," FDA "shall determine the classification of the product" and provide "a written statement that identifies such classification or such component, and the reasons for such determination."[24]  Section 563(c) also specifies the consequences of FDA's failure to timely issue a Letter of Designation: "If [FDA] does not provide the statement within the 60-day period described in subsection (b), the recommendation made by the person under subsection (a) shall be considered to be a final determination by [FDA] of such classification of the product."[25]  Neither provision contemplates that FDA may apply an interim filing review in which it seeks significant additional information after receiving an RFD but before the 60-day period begins to run.

The Not Filed Letter asserts that Lilly's RFD "has not been filed."  Section 563 does not provide that the 60-day timeline runs from a "filing date," however.  Rather, it expressly states that the timeline runs from "*receipt* of the [RFD]" by FDA.  Here, FDA received Lilly's RFD on November 9, 2023, such that the statutory period will elapse on January 8, 2024.  If FDA does not provide a "written statement" ruling on Lilly's RFD by that date, Lilly's recommendation "shall be considered to be a final determination by [FDA] of such classification of the product."[26]

This conclusion is not altered by the fact that FDA has adopted regulations specifying a process for "review[ing]" RFDs "for completeness" and "accept[ing]" complete requests for "filing,"[27] nor by the fact that those regulations assert that the FDA will issue a Letter of Designation "[w]ithin 60 days of the *filing* date of a request for designation."[28]  This regulatory process cannot override Congress's clear instruction that the agency "shall" respond within 60 days of "*receipt* of the [RFD]" and that failure to respond "shall be considered to be a final determination" applying the submitter's recommended classification.  Congress also did not impose any prerequisite on RFD content—such as a requirement to provide information on composition, developmental testing, manufacturing process, indication, modes of action, or related products—other than a requirement that submissions must "recommend a classification for the product, or a component to regulate the product, as appropriate."[29]  Lilly's RFD indisputably does so.

---

[24] FDCA § 563(b).

[25] *Id.* § 563(c).

[26] *Id.*

[27] 21 C.F.R. § 3.8(a).

[28] *Id.* § 3.8(b) (emphasis added).

[29] FDCA § 563(a).

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001897

A.0230                              A.0230                              A.0230

Mark J. Raza, Esq.
Page 7

Beyond their inconsistency with Section 563, the Part 3 provisions imposing the filing review and 15-page limit did not go through the notice and comment rulemaking process, and hence they do not provide an appropriate basis to reject Lilly's RFD.[30]  In the preamble to the final rule adopting Part 3, FDA stated that it had "determined that this is 'a matter relating to agency management' and a rule of 'agency organization, procedure, or practice' and, as such, it is exempt from notice and comment under the Administrative Procedure Act."[31]  FDA's explanation was limited to stating that "[t]his rule provides an administrative mechanism to determine which agency component has responsibility for the review of an application."[32]  But the proper classification of a product such as retatrutide is more than a procedural matter; it has significant practical and legal consequences, such as the type of statutory exclusivity available for the product and the relevant application requirements, as discussed above.  FDA further stated that "[t]he Commissioner also finds good cause under 5 U.S.C. 553(b)(B) and 21 CFR 10.40(e) to forgo notice and comment as it would be unnecessary and contrary to the public interest to delay implementation of this rule."[33]  But FDA did not explain its basis for determining that good cause existed, and an "unsupported assertion" that good cause exists is insufficient to justify a direct final rule.[34]  Indeed, FDA used notice and comment rulemaking to later add provisions to Part 3 that define the "primary mode of action" of a combination product,[35] and to propose amendments to modernize Part 3.[36]  The latter proposed rule even characterizes various provisions of Part 3 as "recommendations," e.g., explaining that "FDA included advisory content in part 3 in light of the novelty of the regulatory topic at the time [of promulgation]."[37]  Such advisory content adopted without public comment does not provide a sufficient legal basis for the Not Filed Letter.

Finally, even if the regulations had gone through notice and comment, they cannot override the plain text of section 563 itself.  Congress provided unqualified instructions in section 563 even though FDA's Part 3 regulations had been in effect since 1991,[38] thereby making clear that Congress made a conscious choice *not* to adopt a filing-based timeline like the one reflected in the regulations.  In sum, nothing in OCP's Not Filed letter justifies the agency's failure to act on Lilly's RFD within the statutory deadline—that is, no later than January 8,

---

[30] 56 Fed. Reg. at 58,755.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Sorenson Comm'ns Inc. v. F.C.C.*, 755 F.3d 702, 707 (D.C. Cir, 2014) ("Though no particular catechism is necessary to establish good cause, something more than an unsupported assertion is required.").

[35] 70 Fed. Reg. 49,848 (Aug. 25, 2005) (final rule); 69 Fed. Reg. 25,527 (May 7, 2004) (proposed rule).

[36] 83 Fed. Reg. 22,428 (May 15, 2018).

[37] *Id.* at 22,431; *see id.* ("Sections 3.7(a) and (b) include recommendations regarding who should file an RFD and when they should file them, respectively.").

[38] 56 Fed. Reg. at 58,754.

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001898

Mark J. Raza, Esq.
Page 8

2024.  As noted above, FDA's failure to issue a classification determination by the statutory deadline will result in acceptance of Lilly's recommendation under section 563(c).

**B.   The Not Filed Letter requests substantial additional information, much of which is not needed to adjudicate the RFD.**

Further underscoring that the Not Filed Letter effectively denies Lilly's statutory right to resolution of an RFD, the vast majority of the information in the Letter appears immaterial to OCP's determination of whether retatrutide is a protein or analogous product, and including the requested information would require the RFD to far exceed the 15-page limit.

1.   Chemical, physical, or biological composition.

OCP states that it cannot adjudicate the RFD because, among other things, it lacks information on retatrutide's inactive ingredients and its presentation.[39]  This information is not required by the statute, which merely requires that an RFD contain the submitter's recommended classification for the product or agency component to regulate it.[40]  The RFD regulation provides that the RFD must contain information about the product's "[c]hemical, physical, or biological composition," which Lilly provided, but does not require the requested level of detail.[41]  Although FDA's guidance calls for sponsors to "identify all of the components or the ingredients, the purpose of each, and their concentration or amount,"[42] the guidance is non-binding, as specified both by the FDCA and by FDA's own regulations.[43]

Moreover, this information is irrelevant to the question of whether retatrutide satisfies the regulatory definition of a "protein" or is an "analogous product."  As noted, FDA expressly rejected that structural or functional attributes beyond amino acid count are relevant to assessing protein status.  Inactive ingredient composition and product presentation in a prefilled syringe or otherwise are equally immaterial to this inquiry.  Nor do they have any obvious relevance to analysis of whether the retatrutide active ingredient is an analogous product.  Here, Lilly has, in line with the FDCA and regulations, provided a sufficient description of these compositional elements for OCP to adjudicate the questions presented in the RFD.

---

[39] Not Filed Letter at 2.

[40] FDCA § 563(a).

[41] 21 C.F.R. § 3.7(c)(2)(v).

[42] *See* FDA, Guidance for Industry: How to Write a Request for Designation (Apr. 2011) (RFD Guidance), at 9.

[43] FDCA § 701(h)(2) ("[FDA] shall ensure that guidance documents . . . indicate the nonbinding nature of the documents"); 21 C.F.R. § 10.115(d) (noting that guidance documents do not "legally bind the public or FDA" and sponsors may use an "alternative approach [that complies] with the relevant statutes and regulations").

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001899

Mark J. Raza, Esq.
Page 9

       2.      <u>Status and brief reports of the results of developmental work, including animal testing.</u>

Consistent with the RFD regulations, the RFD included information on "[s]tatus and brief reports of the results of developmental work, including animal testing."[44] The Not Filed Letter states that "it is not clear how these studies would pertain to the classification of your product" and asks for clarification, but nevertheless asserts that additional information regarding the "results of potency assays, non-clinical, and clinical studies" is needed.[45] The Not Filed Letter asks for citation of a "publicly available source" for a description of the experiments and "[i]f these studies cannot be cited to a publicly available source, a complete description of each study should be provided," including "how the study was conducted, identification of all controls, conditions of testing, results, and conclusions."[46]

Lilly believes that the RFD provides adequate information about developmental testing to satisfy 21 C.F.R. § 3.7(c)(2)(vi) and that no further information about this topic is needed to adjudicate the RFD. This information is not relevant to the regulatory definition of "protein." To the contrary, it is exactly the type of functional information that FDA, in the protein rulemaking, deemed irrelevant to ascertaining protein status. This information also has no clear relevance to whether retatrutide is an analogous product. Moreover, nothing in section 563 of the FDCA or the regulations requires sponsors to submit a complete description of each experiment if public sources are not available.

       3.      <u>Description of the manufacturing processes, including the sources of all components.</u>

The Not Filed Letter states that OCP needs "a complete description of the manufacturing process" of retatrutide, including how fragments of the product are joined together.[47] Yet, in the protein rulemaking, FDA expressly rejected that manufacturing process information bears on protein status: "[T]o provide regulatory certainty and provide a bright-line interpretation of the term 'protein,' we are focusing on the number of amino acids in the amino acid polymer *(irrespective of the method of manufacture)*."[48] OCP's statement also conflicts with 21 C.F.R. § 3.7(c)(2)(vii), which calls only for the RFD to contain a "[d]escription of the manufacturing processes, including the sources of all components," and with the RFD guidance, which explains that "[a] brief description and/or flowchart [of the manufacturing process] will generally suffice."[49] Lilly provided such a brief description in its RFD.

---

[44] 21 C.F.R. § 3.7(c)(2)(vi).

[45] Not Filed Letter at 2.

[46] *Id.*

[47] *Id.*

[48] 85 Fed. Reg. at 10,060 (emphasis added).

[49] 21 C.F.R. § 3.7(c)(2)(vii); RFD Guidance, at 9.

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

Mark J. Raza, Esq.
Page 10

Moreover, as Lilly made clear in the RFD, the complete manufacturing information can be found in Lilly's investigational new drug application (IND) submissions for retatrutide.  OCP asserts that Lilly cannot cross-reference its IND for retatrutide for any supportive information.[50]  But the statute and regulations contain no such restriction.

### 4.   Proposed use or indications.

The Not Filed Letter notes that OCP is "unable to accept multiple indications for use in a single RFD" and asks Lilly to clarify which of the four proposed indications for retatrutide should be considered.  Taken to its logical conclusion, this request suggests that Lilly must submit four nearly identical RFDs—one for each proposed indication—to have retatrutide fully evaluated by OCP.  But 21 C.F.R § 600.3(h)(6) does not contemplate that protein status would differ based on indication—as long as the product is "applicable to the prevention, treatment, or cure of a disease or condition of human beings," as specified in the statute.  Nor are we aware of any basis for FDA to consider analogous product status as differing by indication.

### 5.   Description of all known modes of action, the sponsor's identification of the single mode of action that provides the most important therapeutic action of the product, and the basis for that determination.

OCP stated that it needs significant additional information related to the mode of action of retatrutide.  For example, the Not Filed Letter states that "it is not clear from the description you have provided how your product acts as a triagonist or how acting as a triagonist would achieve the primary intended purpose(s) of your product."[51]  The Not Filed Letter also seeks clarification as well as detailed information about which amino acids in retatrutide bind to receptors, whether retatrutide is monomeric or oligomeric when binding, and the impact of binding on conformational changes, among other things.[52]  This information is exactly the type of information about "structural or functional attributes" that FDA said was inconsequential to assessing protein status under 21 C.F.R. § 600.3(h)(6).[53]  Moreover, in adopting the mode of action provisions of the RFD regulation, FDA had noted that the rule was inapplicable to non-combination products[54] and also stated that "[t]he statute defines biological products based on

---

[50] Not Filed Letter at 2.

[51] *Id.* at 3.

[52] *Id.*

[53] With regard to the sixth deficiency regarding information on related products including their regulatory status, Lilly interpreted the regulatory requirement to list "related products" as applying to investigational products, consistent with FDA's guidance.  RFD Guidance, at 13.  We understand OCP's comment in the Not Filed Letter as proposing a narrowing of the content in this section of the RFD.  We respectfully request confirmation of that interpretation.

[54] 70 Fed. Reg. at 49,856 ("FDA notes that some of the comment's examples are not combination products and, therefore, fall outside the scope of the rule"); *see also* FDCA § 503(g)(1) (requiring FDA to determine "the primary mode of action of a combination product").

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001901

A.0234                              A.0234                              A.0234

Mark J. Raza, Esq.
Page 11

their composition rather than their effects or mechanisms of action."[55]  It is therefore unclear why mode of action information would be relevant to determining whether retatrutide is an "analogous product" as well.

>**C.** **The Not Filed Letter's information requests, when viewed in combination with the 15-page limit for RFDs, are arbitrary and capricious.**

The 15-page limit in 21 C.F.R. § 3.7(c) frustrates any attempt by Lilly to respond to the alleged deficiencies identified by OCP and is therefore unreasonable.[56]  Although section 563 of the FDCA makes no mention of a page limit or any other content or format restrictions for an RFD, Lilly endeavored to follow the regulations and drafted the RFD both to include all the elements described in 21 C.F.R. § 3.7(c) and to stay within the 15-page limit.  The Not Filed Letter demands significant additional information that would cause a new RFD to well exceed 15 pages.  For example, based on preliminary estimates, providing the requested information about the manufacturing process would require approximately 6 more pages.  In total, Lilly estimates that it would need an additional 10 to 11 pages to fully respond to OCP's Not Filed Letter.  The Not Filed Letter thus places Lilly in a bind, where it must either comply with OCP's demands for detailed information about an advanced development program for a complex product—information that has already been provided to FDA in an IND filing—and thus run afoul of the page limit or stay within the page limit and risk OCP's repeated non-filing of the submission.  Given that Congress did not include the 15-page limit in section 563, and since the regulation imposing this limit was promulgated without public comment, this 15-page limit effectively denies Lilly's right to use the statutory RFD process.

In sum, through its RFD regulations, FDA has taken a straightforward statutory process and turned it into an administrative loop in which statutorily protected rights are at the mercy of OCP's "acceptance" of an RFD.  Lilly finds itself in a position where its statutory right to an RFD is stymied by a review process that is not based in the statute or created using full administrative processes, and any efforts to remedy the alleged issues runs the risk of violating an arbitrary page limit that itself has no basis in the statute.  For these reasons, OCP's Not Filed Letter is inconsistent with Lilly's statutory right to a jurisdictional determination via the RFD process.

**III.   Action Requested**

Lilly respectfully requests OCC's involvement to resolve the above legal issues.  Lilly values its collaborative relationship with FDA and, to that end, proposes the following possible solutions to resolve the current impasse:

- **Modify OCP's requests for information:**  Consistent with the discussion in section II.B of this letter, OCP should withdraw or narrow the deficiencies asserted in the Not Filed Letter and ensure that additional information requested from Lilly, if any, is limited to what is necessary to address the central question of the RFD, namely, the

---

[55] 70 Fed. Reg. at 49,851.

[56] 21 C.F.R. § 3.7(c) (stating that an RFD "must not exceed 15 pages, including attachments").

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

FDA001902

A.0235                              A.0235                              A.0235

Mark J. Raza, Esq.
Page 12

application of the statutory and regulatory definitions of "biological product," "protein," and "analogous product."

- **Waiving the 15-page limit:**  If OCP insists that Lilly include all the additional information highlighted in the Not Filed Letter, Lilly urges OCP to waive the 15-page limit.  We understand that FDA has permitted such waivers before.

- **Allow cross-referencing of information:**  As noted above, OCP has taken issue with certain cross-references in the RFD (e.g., to manufacturing information in retatrutide's IND).  Accepting cross-referenced information could reduce the number of pages needed to address information being requested by OCP.

Particularly in light of the practical and legal deadlines at issue, we thank you for considering our request promptly.  Please do not hesitate to contact me with any questions.  We look forward to your response.

Sincerely,

*Krista Carver*

Krista Carver
Partner, Covington & Burling LLP
Counsel to Lilly

Enclosures

cc:    James Bertram, Ph.D., Director, Office of Combination Products
Leigh Hayes, J.D., Lead Product Jurisdictional Officer, Office of Combination Products
Leopold Kong, Ph.D., Senior Scientific Reviewer, Office of Combination Products
David V. Ceryak, J.D., Vice President, Assistant General Counsel, Leader of Regulatory, Lilly

CONTAINS CONFIDENTIAL AND PROPRIETARY INFORMATION SUBJECT TO EXEMPTION FOUR OF THE
FREEDOM OF INFORMATION ACT (FOIA)

**Eli Lilly and Company**

Lilly Corporate Center
Indianapolis, Indiana 46285
U.S.A.
+1.317.276.2000
www.lilly.com

19 January 2024

Food and Drug Administration
Office of Combination Products
Office of the Commissioner

**REQUEST FOR DESIGNATION:  Retatrutide (LY3437943)**

On 09 November 2023, Lilly submitted a Request for Designation (RFD) for retatrutide (FDA File Number 230056) to the Office of Combination Products.  On 17 November 2023, FDA communicated to Lilly that the November 9th RFD was not filed and issued a Not Filed Letter, in which FDA requested additional information.  On 15 December 2023, FDA and Lilly met via teleconference to discuss the November 9th RFD.

The submission contains a new Request for Designation for retatrutide and supersedes the prior submission (Number 230056).  We look forward to receiving a response to this RFD within 60 days of its receipt by FDA, in compliance with statutory requirements.

This document contains trade secrets, or commercial or financial information, privileged and confidential, delivered in confidence and reliance that such information will not be released to the public without the express written consent of Eli Lilly and Company.

Sincerely,

**ELI LILLY AND COMPANY**

SAFE-BioPharma.

Digitally signed by KATHERIN MARGARET RUIZ
Reason: I agree to the terms defined by the placement of my signature on this document
Date: 2024.01.19 15:10:02 -05'00'
Adobe Acrobat version: 2020.005.30539

Katherin M Ruiz
Sr. Director-Global Regulatory Affairs-NA

FDA001904
A.0237                                    A.0237                                    A.0237

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

# Request for Designation

## 1. Identity of the Sponsor [21 C.F.R. § 3.7(c)(1)]

Eli Lilly and Company, Lilly Corporate Center, Indianapolis, IN 46285 U.S.A., FDA Establishment Identifier 1819470

Company Contact Person: Katherin Ruiz, 317-985-8745, ruiz_katherin_m@lilly.com

Alternate Contact: Susan D. Sutton, 317-627-8290, sutton_susan@lilly.com

## 2. Product Name [21 C.F.R. § 3.7(c)(2)(i), 3.7(c)(2)(ii), and 3.7(c)(2)(iii)]

Retatrutide (LY3437943); proprietary name to be determined

## 3. Prior Approvals and Agreements [21 C.F.R. § 3.7(c)(2)(iv)]

Investigational New Drug Application (IND) 145825, 154659, 161432, 162070, for which Lilly is the sponsor.

## 4. Chemical, Physical or Biological Composition [21 C.F.R. § 3.7(c)(2)(v)]

Retatrutide (LY3437943) is an agonist of the glucose-dependent insulinotropic polypeptide (GIP), glucagon-like peptide-1 (GLP-1), and glucagon (Gcg) receptors.  Retatrutide is an alpha amino acid polymer that contains a specific, defined sequence of 41 amino acids cumulatively, comprising a backbone of 39 alpha amino acids and a second (associated) chain of one residue each of gamma-glutamate and 8-amino-3,6-dioxaoctanoic acid (ADO).  The associated chain of two amino acids is covalently bound to the backbone of 39 amino acids through an amide bond between the epsilon-amino group of a lysine residue and the carboxyl group of ADO.  Retatrutide ███████████████████ █████████ and has the structural formula $C_{221}H_{342}N_{46}O_{68}$ (as free acid).  Its inactive ingredients are ██ ██████████████████████████████████████████████

██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

The design of retatrutide is based on the primary sequence of native human GIP-(1-42) and incorporates amino acids that are present in native Gcg and GLP-1 (shown in green below in **Table 1**, which uses conventional amino acid abbreviations) and mutating other residues (shown in red) for purposes such as specific receptor activity ratio, proteolytic stability, lower immunogenicity risk, optimal albumin binding, and desired physiochemical properties.  In plasma, approximately 99% of retatrutide is bound to serum albumin, thereby reducing renal clearance and improving proteolytic stability. ████████████████ ██████████████████████████████████████████████████

CONTAINS CONFIDENTIAL INFORMATION THAT IS PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4), 18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

██████████ All residues of retatrutide, including those in the whole associated chain, are important for binding and subsequently activating each of the three receptors. ████████████████████████████████████████████████████

Furthermore, Y at position 1, αMeL at position 13, and Aib at position 20 are all essential for high activity on the GIP receptor (higher than native GIP) while still tolerated for desired activity on the Gcg and GLP-1 receptors.

In addition to the backbone, the entire associated chain ████████████ is part of the pharmacophore for receptor binding and downstream signaling. ████████████████████████████████████████████████████████████████████

████████████████████ All residues of retatrutide, including the whole associated chain, also are important for binding human albumin. ████████████████████████████████████████████████

████████████████ The retatrutide backbone also binds to the surface of albumin with the ADO serving as a bridge of the two albumin binding moieties.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ ADO offers optimal activity on the Gcg receptor and enhanced solubility. The gamma glutamate is needed for optimal receptor activities, serum albumin binding/PK, and high solubility in a neutral pH formulation.

The three-dimensional structure of retatrutide is consistent with native GIP-(1-42), and retatrutide behaves like other proteins that have α-helices. Native GIP adopts an α-helical conformation in aqueous solution as determined by circular dichroism (CD) and nuclear magnetic resonance (NMR) spectroscopy. *See* Alaña et al., The bioactive conformation of glucose-dependent insulinotropic polypeptide by NMR and CD spectroscopy. Proteins 2007 Jul 1;68(1):92-9. In purified water, retatrutide also shows a clear α-helical structure ████████████████████████████████

FDA001906

A.0239

CONTAINS CONFIDENTIAL INFORMATION THAT IS PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4), 18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS



As further explained below, retatrutide requires a biologics license application (BLA) because it is an alpha amino acid polymer that has more than 40 amino acids and thus qualifies as a "protein" under 21 C.F.R. § 600.3(h)(6).  In the retatrutide structure in **Figure 1**, we have numbered the amino acids, including both the backbone of 39 amino acids and the associated chain of 2 amino acids.  This numbering system is not only consistent with the regulation's instruction to count amino acids from associated chains when determining whether a product is a "protein," but also has broad benefits for the scientific community.  Current industry numbering conventions that only count amino acids in the sequence of the main chain—omitting those present in associated chains—do not align with FDA's regulation and result in less-accurate descriptions of the total number of amino acids in complex peptides and proteins.  Counting all amino acids in the main chain and any associated chain more accurately and appropriately characterizes the complexity of an alpha amino acid polymer.

Although not relevant to the total number of amino acids in the polymer under 21 C.F.R. § 600.3(h)(6), FDA may consider ADO to be a "non-alpha" amino acid.  We have not identified any definition of "alpha amino acid" in this regulation or the preambles to it.  An internal agency memo preceding the rulemaking states that "[a]ll amino acids that are constituents of proteins are alpha amino acids because they have the carboxyl group linked to the alpha carbon of their carbon chain," (**Figure 3**) but FDA did not incorporate this definition into the rule.  FDA, Memo to File, *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-2, at p.14 n.3 (Aug. 1, 2011) (citation omitted) (FDA Memo).  ADO has additional carbons (and oxygens) between the amino group and the carboxyl group, as shown below in **Figure 4**, and it is more complex than many alpha amino acids that meet the definition in the FDA memo.  For example, it is substantially more complex than glycine (which has hydrogens as its two R groups); it could even be viewed as glycine with four extra carbons (with eight accompanying hydrogens) and two extra oxygens between the alpha carbon and the carboxyl group.  ADO is also much larger than many other common alpha amino acids, including alanine, valine, leucine, isoleucine, cysteine, methionine, serine, and threonine.  As explained above, the ADO amino acid is essential for optimal GcgR activity and for binding human albumin.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

**Figure 3**
"Alpha" amino acid per
FDA Memo

**Figure 4**
ADO

## 5.  Proposed Use or Indications [21 C.F.R. § 3.7(c)(2)(viii)]

Chronic weight management (IND 154659): An adjunct to healthy diet and physical activity for treatment of chronic weight management in adults with a body mass index (BMI) of 30 kg/m$^2$ or greater or with a BMI from 27 kg/m$^2$ to less than 30 kg/m$^2$ with an obesity-related comorbidity.

Obstructive sleep apnea (IND 161432): An adjunct to healthy diet and physical activity to improve moderate to severe obstructive sleep apnea (OSA) in adults with a BMI of 27 kg/m$^2$ or greater.

Knee osteoarthritis (IND 162070): An adjunct to healthy diet and physical activity for treatment of osteoarthritis (OA) knee pain in adults with a BMI 27 kg/m$^2$ or greater.

Type 2 diabetes (IND 145825): An adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

## 6.  Product Modes of Action [21 C.F.R. § 3.7(c)(2)(ix)]

Lilly includes information about retatrutide's mechanism of action for completeness per 21 C.F.R. § 3.7(c)(2)(ix), although FDA has indicated that this provision is meant to apply to combination products rather than to address whether a product is a drug or biological product.  *See* 70 Fed. Reg. 49,848, 49, 856 (Aug. 25, 2005); *see also* FDCA § 503(g)(1) (requiring FDA to determine "the primary mode of action of a combination product").

Retatrutide is a high-affinity agonist of each of the GLP-1, GIP, and Gcg receptors, which are G protein-coupled receptors known for regulating body weight control and glucose homeostasis.  The mode of action of retatrutide is demonstrated by receptor pharmacology studies using individual receptor binding assays and cells expressing the individual receptors, where retatrutide is shown to bind and induce receptor-mediated cAMP signaling via the GLP-1, GIP, or Gcg receptors.  These findings support retatrutide's underlying mechanism of action, as mono-agonists of these receptors (such as the native ligands GLP-1, GIP, or Gcg) have been shown to induce certain metabolic benefits by activating their respective receptor systems.  For example, GLP-1 and GIP receptor agonism enhances insulin secretion and reduces energy consumption, with GIP receptor activation also facilitating fat utilization, and Gcg receptor agonism increasing energy expenditure.  The complementary nature of activating these three receptor pathways as a means to improve metabolic control underlies the premise of developing a single

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

therapeutic agent possessing multi-receptor pharmacology, namely retatrutide.  In line with this therapeutic approach, the metabolic consequences that result from treatment with retatrutide have been shown in experimental rodent models of obesity and in obese humans, where substantial weight loss is observed upon treatment with the drug.  *See* Coskun et al., LY3437943, a novel triple glucagon, GIP, and GLP-1 receptor agonist for glycemic control and weight loss: from discovery to clinical proof of concept. Cell Metab 2022;34(9):1234-1247.e9.[1]

Retatrutide has a "biological product mode of action," which is defined in FDA regulations to mean that the product "acts by means of a [biological product] applicable to the prevention, treatment, or cure of a disease or condition of human beings, as described in section 351(i) of the Public Health Service Act [(PHSA)]."  21 C.F.R. § 3.2(k)(1).  FDA has explained, however, that its main consideration for whether a product is a "protein" and hence a "biological product" is whether it has more than 40 amino acids in a specific, defined sequence.  In adopting the definition of "protein" in 21 C.F.R. § 600.3(h)(6), "FDA considered whether to include structural or functional attributes in its interpretation of the term 'protein,' but determined that doing so would not be appropriate."  85 Fed. Reg. 10,057, 10,060 (Feb. 21, 2020). Instead, "in order to provide regulatory certainty and provide a bright-line interpretation of the term 'protein,' [FDA] focus[es] on the number of amino acids in the amino acid polymer (irrespective of the method of manufacture)."  *Id.*  Under this standard, retatrutide qualifies as a protein and should be regulated as a biological product.

Lilly believes that the Center for Drug Evaluation and Research (CDER) would regulate this product regardless of whether it requires an NDA or BLA.

## 7.   Developmental Work and Testing [21 C.F.R. § 3.7(c)(2)(vi)]

To develop retatrutide, modifications of native GIP(1-42) were made that enabled the drug to activate each of the GLP-1, GIP, and Gcg receptors.  We have accordingly employed receptor binding, functional (cAMP), and proximal receptor activation (GTPγS) assays to assess potencies of retatrutide and associated controls at the target receptors (GIPR, GLP-1R, and GcgR).  The results of these studies provide the most relevant information on the mechanism of action.  On an equal concentration basis, retatrutide showed approximately 2-fold less GLP-1 intrinsic potency than native GLP-1; approximately 7-fold more GIP intrinsic potency than native GIP; and approximately 2.5-fold less Gcg intrinsic potency than native Gcg, on corresponding human receptors for cAMP stimulation without the presence of serum albumin. Retatrutide was also found to have similar potency to native Gcg at stimulating glucose output in human-induced pluripotent stem hepatocytes and to stimulate glycerol release (lipolysis) in differentiated human adipocytes with higher potency versus native GIP.  *See* Coskun et al. 2022.

Lilly believes that further nonclinical work and clinical developmental data supporting the continued clinical development of retatrutide in Phase 3 are not relevant to disposition of this RFD because they do not bear on whether retatrutide is an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size" and hence is a protein, nor whether retatrutide is an "analogous product."  Nevertheless, they are briefly summarized below for completeness.

---

[1] These articles report amino acid counts using only amino acids in the sequence of the main chain.  As noted, these counts do not align with FDA's regulation and result in less-accurate descriptions of the total number of amino acids in complex peptides and proteins.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

Lilly has evaluated the PK of retatrutide after single- and repeat-dose administration in rats and monkeys, as well as the toxicokinetics in rats, monkeys, and rabbits.  Further, Lilly assessed the nonclinical safety profile of retatrutide in a cardiovascular safety pharmacology study in monkeys, 13-week and 6-month repeat-dose toxicology studies in rats and monkeys, a female fertility study in rats, embryo-fetal development studies in rats and rabbits, an in vitro human Ether-à-go-go-related gene (hERG) assay, and an in vivo micronucleus genotoxicity study in rats.  Findings in all studies were consistent with, or secondary to, retatrutide-related pharmacology and the mode of action described above.  Additional findings in monkeys included changes in cardiovascular parameters attributed to on-target GLP-1, GIP, and/or Gcg pharmacology.

Lilly has completed two Phase 1 and two Phase 2 clinical studies of retatrutide.  The clinical studies demonstrate that retatrutide is associated with significant and meaningful reductions in body weight, daily mean glucose levels, and glycated hemoglobin (HbA1c), as well as improvements in other cardiometabolic measures, including systolic and diastolic blood pressure, triglycerides, LDL-cholesterol, and total cholesterol.  *See* Coskun et al. 2022; Urva et al., LY3437943, a novel triple GIP, GLP-1, and glucagon receptor agonist in people with type 2 diabetes: a phase 1b, multicentre, double-blind, placebo-controlled, randomised, multiple-ascending dose trial.  Lancet 2022;400:1869-1881; Rosenstock et al., Retatrutide, a GIP, GLP-1 and glucagon receptor agonist, for people with type 2 diabetes: a randomized, double-blind, placebo and active-controlled, parallel-group, Phase 2 trial conducted in the USA.  Lancet. 2023 Aug 12;402(10401):529–44; Jastreboff et al., Triple-Hormone-Receptor Agonist Retatrutide for Obesity—A Phase 2 Trial.  N Engl J Med. 2023 Aug 10;389(6):514–26.

## 8.  Manufacturing Information [21 C.F.R. § 3.7(c)(2)(vii)]

The retatrutide drug substance used for Lilly's Phase 3 clinical studies and intended for commercialization is manufactured using ███████████████████████████████████████████
███████████████████████

███████████████████████████████████████
████████████████████████████████

███████████████████████████████████████████
███████████████████████████

███████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████

██████  This synthetic process has produced retatrutide of consistent quality.

FDA001910
A.0243

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS



## 9. Schedule and Duration of Use [21 C.F.R. § 3.7(c)(2)(x)]

Retatrutide is administered chronically once weekly.

## 10. Dose and Route of Administration [21 C.F.R. § 3.7(c)(2)(xi)]

Retatrutide is administered by subcutaneous injection.

## 11. Related Products [21 C.F.R. § 3.7(c)(2)(xii)]

Lilly holds NDAs 215866 and 217806 for tirzepatide, an approved product that Lilly believes would be considered "related" because it presents similar issues, namely whether ADO amino acids count in assessing protein status. Tirzepatide is an alpha amino acid polymer that has 42 amino acids comprising a

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

39-amino acid backbone as well as two ADO residues and one gamma-glutamate residue attached as part of the associated chain to the epsilon-amino group in a side chain of a lysine residue.  This RFD is limited to retatrutide.  If FDA grants this RFD, Lilly commits to engage with FDA regarding the implications for tirzepatide.

To Lilly's knowledge, and after a thorough search, tirzepatide is the only currently marketed product that is related for purposes of the issues addressed in this RFD.  Although semaglutide and liraglutide are acylated GLP-1 analogs and are the active ingredients for currently marketed products, they are not related products under this RFD because they have fewer than 41 total amino acids.

For completeness, we note that the withdrawn product Omontys® (peginesatide) appears to have consisted of two 21-amino acid chains bound together by a linker having both alpha amino acids and one non-alpha amino acid (3-aminopropanoic acid).  Omontys Prescribing Information § 11 (Dec. 2012).  This product was approved under an NDA, which was withdrawn in 2019, before finalization of the definition of "protein" in 21 C.F.R. § 600.3(h)(6) and before the transition of NDAs for proteins to BLA status on March 23, 2020.  84 Fed. Reg. 3,795, 3,795 (Feb. 13, 2019).  In guidance, FDA had indicated that it would not transition withdrawn NDAs.  See FDA, Guidance for Industry: The "Deemed To Be a License" Provision of the BPCI Act—Questions and Answers, at 9 (March 2020).  We believe that this product should have been subject to the BLA transition had it still been approved on March 23, 2020.

Lilly is not aware of any investigational products that have been classified and are relevant for purposes of this RFD.

## 12. Other Relevant Information [21 C.F.R. § 3.7(c)(2)(xiii)]

N/A

## 13. Sponsor's Recommendation [21 C.F.R. § 3.7(c)(3)]

Lilly recommends that CDER regulate retatrutide under a BLA.  Retatrutide, an alpha amino acid polymer consisting of 41 amino acids comprising a backbone of 39 amino acids and a second covalently bound associated chain with a gamma-glutamate residue and an ADO residue, meets the definition of "protein" under the applicable regulations and hence is a biological product requiring a BLA.  Consistent with the plain language of the operative regulation, FDA should count all amino acids in retatrutide, including non-alpha amino acids, if any, in assessing protein status.

This conclusion aligns with the PHSA and the text of 21 C.F.R. § 600.3(h)(6).  Most important, the regulation provides that a protein is "any alpha amino acid polymer" "that is greater than 40 amino acids in size."  Retatrutide falls within this definition—regardless of whether FDA considers ADO to be a non-alpha amino acid—because it is a polymer containing alpha amino acids that is greater than 40 total amino acids (alpha and non-alpha) in size.  This conclusion also reflects sound policy, as products with non-alpha amino acids may be more complex than polymers having only alpha amino acids.  Also, consistent with FDA's objective in promulgating 21 C.F.R. § 600.3(h)(6), counting all amino acids in assessing protein status establishes a bright-line rule, simplifying administration for FDA and enhancing predictability for sponsors.  It also aligns with FDA's goal to avoid determining protein status based on method of manufacture, in order to promote competition and encourage manufacturing improvements.  For all these reasons, FDA should classify retatrutide as a protein subject to a BLA.  Alternatively, and

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

independently, FDA should classify retatrutide as an "analogous product" to a protein and thus a biological product warranting a BLA.

> A. Retatrutide Is a Protein and Hence, a Biological Product.

The PHSA and 21 C.F.R. § 600.3(h)(6) confirm that retatrutide should be classified as a protein.

The PHSA defines "biological product" in relevant part to mean a "protein, or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings." PHSA § 351(i)(1). Retatrutide is a protein within the ordinary meaning of the word, as used in many scientific publications. *See, e.g.*, FDA Memo, at PDF pp.17–18 (referring to definitions of "protein" as "[a]ny of a large class of complex organic chemical compounds that . . . consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures"). Notably, the PHSA does not mention amino acids (alpha or otherwise) or any particular number thereof as being relevant to protein status, much less does it require proteins to be composed solely of alpha amino acids. Moreover, as discussed in greater detail below, retatrutide's molecular structure is far more complex than that of typical products requiring NDAs.

Retatrutide also meets the regulatory definition of "protein." FDA's implementing regulation at 21 C.F.R. § 600.3(h)(6) provides:

> A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

Retatrutide meets this definition of "protein" because: (1) it has "a specific, defined sequence"; (2) its chains "are associated with each other in a manner that occurs in nature"; and (3) it is an "alpha amino acid polymer" that is "greater than 40 amino acids in size."

Retatrutide plainly meets the first condition because it is synthesized according to "a pre-defined template," and it has an "identical sequence across batches." *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106 (D.D.C. 2020) (citing administrative record). Similarly, it satisfies the second condition because retatrutide's chains are associated with each other in a "manner that occurs in nature." FDA has explained that chains do *not* meet this condition when they "are associated with each other in a novel manner that is not found in naturally occurring proteins." 85 Fed. Reg. at 10,060; 83 Fed. Reg. 63,817, 63,821 (Dec. 12, 2018). That is not the case for retatrutide: its chains are joined by an isopeptide bond, which is found in naturally occurring proteins. Here, the isopeptide bond is an amide bond forming from an amino group in a side chain of one amino acid (the epsilon-amino group in a lysine residue in the case of retatrutide) to a carboxyl group of another amino acid, and an isopeptide bond is an association that commonly occurs in nature. Lundblad, *Biochemistry and Molecular Biology Compendium* 175-176 (2019). The regulation therefore instructs that amino acids from both of retatrutide's chains be counted to determine its total number of amino acids.

FDA001913

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

Retatrutide also meets the third condition because it is an "alpha amino acid polymer" that is "greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). While the regulation does not define "alpha amino acid polymer," the best reading is a polymer containing at least some alpha amino acids, not a polymer containing *only* alpha amino acids. Indeed, the latter reading would conflict with precedent. FDA approved a BLA for Sogroya® (somapacitan-beco), which has a 191-amino acid backbone and an associated chain that contains two gamma-glutamate residues as well as two units of ADO—the same amino acids in retatrutide's associated chain. *See* Sogroya Prescribing Information § 11 (April 2023). If the presence of ADO or non-alpha amino acids prevented a product from qualifying as an "alpha amino acid polymer," Sogroya would not have been regarded as a protein requiring a BLA. More fundamentally, interpreting "alpha amino acid polymer" as a polymer containing only alpha amino acids would lead to irrational outcomes: A polymer containing 60 alpha amino acids would be a protein, but the same polymer with an *additional* associated chain containing at least one non-alpha amino acid would *not* be, even though the second product would be more complex and have more amino acids. Retatrutide is thus an "alpha amino acid polymer" under 21 C.F.R. § 600.3(h)(6).

Retatrutide is also "greater than 40 amino acids in size." The regulation expressly directs FDA to sum "the total number of amino acids" for chains associated with each other in a manner that occurs in nature, and retatrutide contains a total of 41 amino acids. 21 C.F.R. § 600.3(h)(6). Once again, any other reading would conflict with the plain regulatory text. The requirement that the polymer have "greater than 40 amino acids" follows the initial reference to "*alpha* amino acid polymer" but omits the word "alpha," and bedrock principles of textual interpretation require giving effect to this omission. *See, e.g., Barnhart v. Sigmon Coal Co.*, 534 US 438, 452 (2002). In addition, the regulatory text requires summing "the total number of amino acids"—not the total number of only alpha amino acids—for chains associated with each other in a manner that occurs in nature.[2]

In sum, retatrutide is an alpha amino acid polymer with a specific, defined sequence that contains 41 total amino acids that are associated with each other in a manner that occurs in nature. It therefore qualifies as a protein under 21 C.F.R. § 600.3(h)(6).

> B. Classifying Retatrutide As a Biological Product Aligns with Precedent and Is Appropriate As a Scientific and Policy Matter.

Science, sound policy, and precedent likewise support regulating retatrutide as a biological product.

FDA has expressed a preference for using its BLA authorities when handling complex products. For example, the agency has stated in guidance that the BLA "provide[s] the more appropriate application type for antibody-drug conjugates [(ADCs)]," "irrespective of whether the biological product constituent part or the drug constituent part is determined to have the primary mode of action" (PMOA). FDA, Guidance for Industry: Questions and Answers on Biosimilar Development and the BPCI Act, at 23 (Sept. 2021). FDA reached this conclusion after considering several factors, "including the relative significance of the safety and effectiveness questions raised by the constituent parts, particularly the highly specific molecular targeting by the antibody to a cell type, cellular compartment, or other marker at the site of

---

[2] This conclusion also aligns with the regulatory history of 21 C.F.R. § 600.3(h)(6), as we have identified no agency statement in the rulemaking suggesting that only alpha amino acids count, or that non-alpha amino acids do not count, when assessing protein status. We also have not identified any scientific literature indicating that a protein may contain only alpha amino acids.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

action (as distinguished from mere alteration of systemic [pharmacokinetics]).” *Id.* FDA also extended this approach to other products. In transitioning NDAs for drug-biologic combination products and complex mixtures to BLAs, for instance, FDA explained that its action “was informed by a general consideration of the factors used to determine the appropriate marketing application type for [ADCs].” 85 Fed. Reg. 12,930, 12,931–32 (Mar. 5, 2020). Accordingly, FDA has recognized that the BLA authorities may be better suited to the regulation of complex products.

Because non-alpha amino acids may be more complex than alpha amino acids—and thus polymers containing more than 40 alpha and non-alpha amino acids may be more complex than polymers of the same size containing *only* alpha amino acids—regulating alpha amino acid polymers with more than 40 alpha and non-alpha amino acids as proteins reflects sound policy and aligns with precedent for regulating complex products under BLAs. Non-alpha amino acids contain additional atoms between the amino group and the carboxylic acid, often several more carbons. For example, as noted above, compared to a simple alpha amino acid such as glycine, ADO has four extra carbons (with eight accompanying hydrogens) and two extra oxygens, and it is also larger and more complex than many other common alpha amino acids. These considerations warrant application of FDA’s BLA authorities to polymers with more than 40 total alpha and non-alpha amino acids. Otherwise, novel polymers of potentially hundreds of total amino acids could be approved under NDAs, as long as only 40 of the amino acids are alpha amino acids, despite the obvious complexity of such polymers.

Moreover, retatrutide has other complex elements. The retatrutide associated chain is regioselectively incorporated at Lysine 17 even though other acylation positions exist in the sequence (Lysine 16 and at the N-Terminus). The substantial difference in both molecular weight and total number of chiral centers between retatrutide and small molecules that are the typical subjects of NDAs is illustrative. A statistical analysis of 64 different small molecule drug manufacturing processes showed that these drugs had an average molecular weight, net of salts, of 449 g/mol and an average of 0.9 chiral centers. *See* Frank Roschangar et al., Inspiring process innovation via an improved green manufacturing metric: iGAL, J. of Green Chemistry, Feb. 24, 2018. By contrast, retatrutide has a molecular weight of 4731.4 g/mol and contains 34 chiral centers. In view of this complexity and the potential for even more complex polymers composed of both alpha and non-alpha amino acids to be developed over time, FDA should designate retatrutide as a biological product.

This approach also best advances FDA’s objective of providing a bright-line rule to determine protein status. In the rulemaking to adopt 21 C.F.R. § 600.3(h)(6), FDA stated that the regulation’s 41-amino-acid requirement “will reduce regulatory uncertainty over whether certain products are regulated as drugs or biological products,” and “[t]his reduced uncertainty, under the ‘bright-line’ approach described . . . will allow both FDA and private industry to avoid spending time and resources on case-by-case determinations for each product.” 85 Fed. Reg. at 10,057. An interpretation in which *all* amino acids count in assessing the protein status of an alpha amino acid polymer best advances this objective.

It is also fully consistent with FDA’s determination that protein status must be assessed “irrespective of the method of manufacture,” 85 Fed. Reg. at 10,060, and with the agency’s related policy goals. In supporting legislation that eliminated the statutory exception from protein status for “chemically synthesized polypeptides,” FDA stated: “Removing this exclusion will help patients because it provides the potential for chemically synthesized follow-on insulins and other protein products to come to market through more efficient abbreviated pathways, regardless of how they are manufactured. In addition to expanding access to lower-cost biosimilar and interchangeable protein products, removing this exclusion

FDA001915

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

will help to promote potential innovation in manufacturing methods, which could lead to future efficiencies in manufacturing processes." FDA, Statement on low-cost biosimilar and interchangeable protein products (Dec. 17, 2019). For these reasons, FDA rejected comments that "protein" should be limited to products manufactured by a process that utilizes a biological system. The interpretation advanced here, which is neutral regarding method of manufacture, and which allows for chemically synthesized long-chain alpha amino acid polymers such as retatrutide to be regulated as biological products, similarly will advance these goals.

The legal and scientific considerations discussed above warrant classifying retatrutide as a biological product, notwithstanding FDA's prior approval of NDAs for tirzepatide. In fact, that result is required by principles of administrative law. It is blackletter law that agencies are bound to follow their own regulations. *See, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (citing *Nat'l Fam. Plan. and Reprod. Health Ass'n, Inc. v. Sullivan,* 979 F.2d 227, 234 (D.C. Cir. 1992)) ("[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked."). As FDA has previously acknowledged, "a possible fact-based error" made while reviewing a previously approved or cleared product "would not bind the agency to perpetuating the error in the analysis of other products." Def.'s Mot. for Summ. J., *Prevor v. FDA*, Docket No. 1:13-cv-01177 (D.D.C. Dec. 20, 2013). As FDA put it, "to bind FDA to [incorrect] past practices would be to, in effect, prevent FDA from acting in accordance with its own regulations." *Id.*

Precedent is also supportive. FDA's approach to ADCs establishes that the agency may approve a product under a BLA even if it is related to a different product that was previously approved under an NDA. FDA approved an NDA for the first-approved ADC, Mylotarg, in 2000. *See* 76 Fed. Reg. 72,955 (Nov. 28, 2011). Thereafter, Genentech filed an RFD proposing that a different ADC required a BLA. *See* Biological Product Classification Subcommittee, Memorandum to the Directors of CDER, CBER, & Office of Combination Products (OCP), *Teva Pharms. USA v. FDA*, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-3, at 540 (BLA Transition Memo) (Mar. 18, 2020). In May 2010, FDA asked that Wyeth voluntarily withdraw the NDA for Mylotarg. *See* 76 Fed. Reg. at 72,955. In June 2010, FDA issued a memorandum explaining its decision to require a BLA for Genentech's ADC. *See* BLA Transition Memo, at PDF p.540. FDA subsequently withdrew the NDA for Mylotarg in November 2011. 76 Fed. Reg. at 72,955. When Mylotarg was resubmitted for approval, FDA approved a BLA for it. *See* Approval Letter, BLA 761060 (Sept. 1, 2017). FDA explained this history as follows:

> FDA previously has determined that the PMOA for the withdrawn NDA for Mylotarg . . . was attributable to the drug constituent part. However, FDA also has described its consideration, to enhance regulatory clarity and promote consistency, of several factors leading to a determination that submission of a BLA would provide the more appropriate application type for [ADCs], a type of drug-biologic combination product that is assigned to CDER regardless of the PMOA of the combination product. [Guidance] describes this determination.

BLA Transition Memo, at PDF p.537. Accordingly, FDA has determined that a BLA is proper for a proposed product in the context of an RFD, even if the agency previously approved an NDA for a related product, provided that the proposed product is "more appropriate[ly]" classified as a biological product. *Id.* Because retatrutide meets the regulatory definition of a protein, it must be regulated as a biological product.

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

C.    Alternatively, Retatrutide is Analogous to a Protein.

In the alternative, retatrutide independently qualifies as a biological product because it is analogous to a protein.  Under the PHSA, a "biological product" includes "a protein, or analogous product."  PHSA § 351(i)(1).  The statute does not define "analogous product," nor has FDA adopted a regulation or guidance document defining products analogous to proteins.  *Teva*, 514 F. Supp. 3d at 112.  One court has referred favorably to a dictionary definition of "analogous" as "[s]imilar or comparable to something else either in general or in some specific detail."  *Ipsen Biopharmaceuticals, Inc. v. Becerra*, No. 22-CV-860, 2023 WL 3319366, at *13 (D.D.C. May 8, 2023) (referring to Analogous, Merriam-Webster Dictionary, https://tinyurl.com/y49khdfa).

Even if FDA concludes that retatrutide is not a protein because it has 40 *alpha* amino acids—and for the reasons set forth above, FDA should not draw that conclusion—retatrutide nonetheless is analogous to a protein.  Retatrutide contains 41 total amino acids in a specific, defined sequence, and the vast majority of those (40 of them) are indisputably alpha amino acids.  As outlined in Section 4, retatrutide also shares structural and functional characteristics in common with a protein comprising 41 alpha amino acids.  In particular, retatrutide, like other proteins, has a consistent three-dimensional structure.  As shown in **Figure 2** above, retatrutide shows a clear α-helical structure.  It has structural features similar to the 42-amino acid GIP, which is a naturally occurring protein hormone.  The two-amino-acid associated chain of ADO and gamma-glutamate (along with the fatty acid) helps facilitate binding to albumin to extend pharmacokinetic half-life while providing desired pharmacological properties.  The gamma-glutamate is directly involved in binding to albumin.  The ADO is a bridge to the backbone that also binds to albumin, similar to a typical function of amino acids in a protein.  The inclusion of one non-alpha amino acid among the 41 total amino acids does not change the fact that the molecule functions analogously to other proteins.  Accordingly, retatrutide is at a minimum similar in structure, complexity, and function to proteins comprising all alpha amino acids.  In fact, retatrutide is more similar to a protein composed of 41 alpha amino acids than are naturally derived mixtures comprising a protein and a lipid—and FDA has identified the latter as an example of an "analogous product" to a protein.  *Ipsen*, 2023 WL 3319366, at *13.

The conclusion that retatrutide is analogous to a protein is also consistent with the *Teva* and *Ipsen* cases interpreting the term "analogous product."  In *Teva*, the court found that "FDA's limited interpretation of the 'analogous product' provision indicates that . . . a product 'analogous' to a 'protein' must have a 'specific, defined sequence' of amino acids."  *Teva*, 514 F. Supp. 3d at 113.  Retatrutide indisputably meets that requirement.  In *Ipsen*, the court upheld FDA's conclusion that lanreotide acetate, which has chains of eight amino acids that are linked together through nanotubes, was not analogous to a protein. FDA based its conclusion on its assessment of the active ingredient without the nanotubes, which FDA considered to be formulation properties, and much of the opinion focused on how to define the product's active ingredient.  *Ipsen*, 2023 WL 3319366, at *11–*13.  Here, the active ingredient is retatrutide, as the amino acids are manufactured together, not joined by formulation properties.  Unlike lanreotide acetate, retatrutide has a total of 41 amino acids standing alone, and the identity of the active ingredient is not in question.

Of course, neither case addressed how to count non-alpha amino acids or whether polymers containing a mix of alpha and non-alpha amino acids are "analogous" to polymers composed solely of alpha amino acids.  Tellingly, however, the *Ipsen* court described the regulatory definition of "protein" in a manner that supports Lilly's recommendation: "[Lanreotide acetate] is in no way comparable or 'analogous' to a

CONTAINS CONFIDENTIAL INFORMATION THAT IS
PROTECTED FROM DISCLOSURE PER 5 U.S.C. § 552(b)(4),
18 U.S.C. § 1905, AND OTHER APPLICABLE LAWS

protein, which is *40 or more amino acids* in size." *Id.* at *13 (emphasis added). Similarly, the court described FDA's position that "the *40-amino-acid* size requirement is a 'critical characteristic' of a protein, and to be analogous to a protein 'a product must share [that] critical characteristic.'" *Id.* at *12 (quoting administrative record) (emphasis added). Both references indicate that the size requirement takes into account *all* "amino acids."

Finally, while FDA has said "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are *specifically excluded* by this final rule," that concern is not implicated here. 85 Fed. Reg. at 10,061 (emphasis added). The final rule does not specifically discuss whether to include non-alpha amino acids in the amino acid count, and the text of the regulation is best read to include them, as discussed above.

Thus, an alpha amino acid polymer that contains 41 amino acids, 40 of which are *alpha* amino acids, should at a minimum be considered "analogous" to a protein that contains 41 alpha amino acids, and it therefore should be regulated as a biological product under PHSA § 351(i)(1).

        D.     <u>Conclusion</u>

For all these reasons, FDA should classify retatrutide as a biological product as defined in section 351(i)(1) of the PHSA.



# RFD Review Memorandum

**To:** Leigh Hayes
Lead Jurisdiction Officer
Office of Combination Products (OCP)

**From:** Kristina Lauritsen, PhD
Product Jurisdiction Officer
Combination Product Policy Advisor
Center for Drug Evaluation and Research
Office of Executive Programs

Kristina J.
Lauritsen -S

Digitally signed by
Kristina J.
Lauritsen -S
Date: 2024.03.18
13:15:28 -04'00'

**Date:** March 18, 2024

**Subject:  CDER Review – RFD240003 retatrutide (LY3437943)**

## I.      Summary

The proposed product, retatrutide, is an amino acid polymer comprising a backbone of 39 alpha amino acids and a second (associated) chain of one residue each of gamma-glutamate and 8-amino-3,6-dioxaoctanoic acid (ADO). It is a high-affinity agonist of each of the GLP-1, GIP, and Gcg receptors, which are G protein-coupled receptors known for regulating body weight control and glucose homeostasis. It is currently being studied under four INDs, for various indications (Section IV below). The sponsor recommends that retatrutide be classified as a biological product because the sponsor contends that it meets the definition of a protein (21 CFR 600.3(h)(6)) or alternatively, that it is an "analogous product" to a protein. CDER disagrees. CDER recommends the product be classified as a drug for the reasons laid out in Section V below.

## II.      History

This is the first RFD submission CDER has reviewed for this product. The product was previously submitted in RFD230056, but the RFD was not filed on November 9, 2023.

## III.      Product Description

The sponsor describes retatrutide as *"an alpha amino acid polymer that contains a specific, defined sequence of 41 amino acids cumulatively, comprising a backbone of 39 alpha amino acids and a second (associated) chain of one residue each of gamma-glutamate and 8-amino-*

1

*3,6-dioxaoctanoic acid (ADO). The associated chain of two amino acids is covalently bound to the backbone of 39 amino acids through an amide bond between the epsilon-amino group of a lysine residue and the carboxyl group of ADO. Retatrutide* ▮▮▮▮▮▮▮▮▮▮▮▮ *and has the structural formula C221H342N46O68 (as free acid). Its inactive ingredients* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The sponsor explains that "*retatrutide is administered by subcutaneous injection.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It is intended to be "*administered chronically once weekly.*"

## IV.    Proposed Intended Use/Indications for Use

- Chronic weight management (IND 154659): An adjunct to healthy diet and physical activity for treatment of chronic weight management in adults with a body mass index (BMI) of 30 kg/m2 or greater or with a BMI from 27 kg/m2 to less than 30 kg/m2 with an obesity-related comorbidity.
- Obstructive sleep apnea (IND 161432): An adjunct to healthy diet and physical activity to improve moderate to severe obstructive sleep apnea (OSA) in adults with a BMI of 27 kg/m2 or greater.
- Knee osteoarthritis (IND 162070): An adjunct to healthy diet and physical activity for treatment of osteoarthritis (OA) knee pain in adults with a BMI 27 kg/m2 or greater.
- Type 2 diabetes (IND 145825): An adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

## V.    CDER Classification Analysis

The sponsor offers three sets of arguments for why retatrutide should be classified as a biological product: (1) it meets the definition of a biological product because it is a protein, (2) classification as a biological product is consistent with precedent and is appropriate as a scientific and policy matter, or (3) should FDA not agree that retatrutide is a protein, then retatrutide should be considered analogous to a protein. We address each of these in order.

### 1. Definition of protein

The sponsor argues that retatrutide should be classified as a biological product, as defined in the Public Health Service Act (PHSA), because it contends that retatrutide meets the definition of a protein as defined at 21 CFR 600.3(h)(6).

*Biological product means "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of*

2

*human beings." Section 351(i)(1) of PHSA, 42 U.S.C. 262(i)(1).*

*"A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence." 21 CFR 600.3(h)(6)*

First, the sponsor argues that retatrutide is a protein because it is "*a protein within the ordinary meaning of the word, as used in many scientific publications. See, e.g., FDA Memo, at PDF pp.17–18 (referring to definitions of 'protein' as '[a]ny of a large class of complex organic chemical compounds that . . . consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures'). Notably, the PHSA does not mention amino acids (alpha or otherwise) or any particular number thereof as being relevant to protein status, much less does it require proteins to be composed solely of alpha amino acids.*" (RFD p10)

Next the sponsor asserts that retatrutide meets the regulatory definition of "protein" as codified at 21 CFR 600.3(h)(6) because it has "*a specific, defined sequence*";  its chains "*are associated with each other in a manner that occurs in nature*"; and it is an "*alpha amino acid polymer*" that is "*greater than 40 amino acids in size.*" In support, the sponsor states that "*retatrutide plainly meets the first condition because it is synthesized according to "a pre-defined template," and it has an "identical sequence across batches. Teva Pharms. USA, Inc. v. FDA, 514 F. Supp. 3d 66, 106 (D.D.C. 2020) (citing administrative record)."* The sponsor also asserts that retatrutide's amino acid "*chains are joined by an isopeptide bond, which is found in naturally occurring proteins,*" citing Lundblad, Biochemistry and Molecular Biology Compendium 175-176 (2019). (RFD pp9-10 of 14)

The sponsor goes on to explain why it believes that that retatrutide is an alpha amino acid polymer that is greater than 40 amino acids. It states that "*[t]he regulation expressly directs FDA to sum 'the total number of amino acids' for chains associated with each other in a manner that occurs in nature, and retatrutide contains a total of 41 amino acids. 21 C.F.R. § 600.3(h)(6). Once again, any other reading would conflict with the plain regulatory text. The requirement that the polymer have 'greater than 40 amino acids' follows the initial reference to 'alpha amino acid polymer' but omits the word 'alpha,' and bedrock principles of textual interpretation require giving effect to this omission. See, e.g., Barnhart v. Sigmon Coal Co., 534 US 438, 452 (2002). In addition, the regulatory text requires summing 'the total number of amino acids'—not the total number of only alpha amino acids—for chains associated with each other in a manner that occurs in nature.*" (RFD p10 of 14)

Further, the sponsor also argues that "*[w]hile the regulation does not define 'alpha amino acid polymer,' the best reading is a polymer containing at least some alpha amino acids, not a polymer containing only alpha amino acids. Indeed, the latter reading would conflict with*

3

*precedent. FDA approved a BLA for Sogroya® (somapacitan-beco), which has a 191-amino acid backbone and an associated chain that contains two gamma-glutamate residues as well as two units of ADO—the same amino acids in retatrutide's associated chain. See Sogroya Prescribing Information § 11 (April 2023). If the presence of ADO or non-alpha amino acids prevented a product from qualifying as an 'alpha amino acid polymer,' Sogroya would not have been regarded as a protein requiring a BLA. More fundamentally, interpreting 'alpha amino acid polymer' as a polymer containing only alpha amino acids would lead to irrational outcomes: A polymer containing 60 alpha amino acids would be a protein, but the same polymer with an additional associated chain containing at least one non-alpha amino acid would not be, even though the second product would be more complex and have more amino acids. Retatrutide is thus an 'alpha amino acid polymer' under 21 C.F.R. § 600.3(h)(6)."* (RFD p10 of 14)

**CDER disagrees.** Retatrutide is not an alpha amino acid polymer with a specific defined sequence greater than 40 amino acids in size. 21 CFR 600.3(h)(6) defines a protein as

> any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this [definition] will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

Even if we were to assume (without conceding) that retatrutide has a specific defined sequence and that the gamma glutamate and ADO side chain is associated with the main 39-amino-acid chain in a manner that occurs in nature, retatrutide is not an alpha amino acid polymer greater than 40 amino acids in size because it is not composed of more than 40 alpha amino acids.

An alpha amino acid is an amino acid in which there is only one carbon atom between an amino group and a carboxy group. If there are any additional carbons between the amino group and carboxy group, it is not an alpha amino acid. It is common scientific knowledge that proteins are composed of alpha amino acids.  For example, textbooks describe that alpha amino acids are the building blocks for all proteins found in nature. Although more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20 alpha amino acids.[1,2,3,4]  While the definition of protein in 21 CFR 600.3 does not repeat the "alpha" modifier each time the definition uses the term amino acid, doing so was not necessary given that "alpha amino acid polymer" was used at the beginning of the definition. That is, the reference to "alpha amino acid polymer" at the beginning of the definition makes clear that only alpha amino acids are relevant to determining whether

---

[1] Molecular Biology of the Cell. 4th edition. Alberts B, Johnson A, Lewis J, et al. New York: Garland Science; 2002.
[2] Biochemistry 5th Edition, Jeremy Berg, John Tymoczko, Luber Stryer. W. H. Freeman and Company; 2002
[3] Takayoshi Ubuka, in Handbook of Hormones (Second Edition), 2021
[4] S. Maloy, in Brenner's Encyclopedia of Genetics (Second Edition), 2013

4

FDA001922

A.0255            A.0255            A.0255

something is a protein, which is consistent with commonly understood scientific principles.

The sponsor refers to an internal FDA memo explaining that "[a]ll amino acids that are constituents of proteins are alpha amino acids because they have the carboxyl group linked to the alpha carbon of their carbon chain," and notes that FDA did not explicitly incorporate this definition into the rule.[5] As noted above, this description of an alpha amino acid was not necessary to codify as part of the protein definition because, (1) the protein definition expressly refers to "alpha amino acid polymers", and (2) it is common scientific knowledge that alpha amino acids are the only relevant amino acids for determining whether something is a protein.[6]

With regard to retatrutide, the main 39-amino-acid chain is composed of 39 alpha amino acids.  Retatrutide also contains a side chain composed of ADO and gamma glutamate. Even if we assume ADO is an amino acid, ADO is not an *alpha* amino acid because it does not contain an amino group and a carboxylic acid group separated by a single carbon, called the alpha carbon. For purposes of this RFD response, we will assume, without deciding, that gamma glutamate is an alpha amino acid and that the side chain composed of ADO and gamma glutamate is associated with the main 39-alpha amino acid chain in a manner that occurs in nature. As such, there are arguably 40 alpha amino acids in retatrutide to count in determining whether retatrutide is a protein. ADO is not counted because it is not an alpha amino acid. Accordingly, even if FDA were to consider gamma glutamate to be an alpha amino acid (i.e., in addition to the 39 alpha amino acids in the main chain), retatrutide is not greater than 40 alpha amino acids in size and is therefore not a protein.

The sponsor points to Sogroya as an example of a product that supports its arguments. Sogroya (somapacitan-beco) consists of a 191 alpha amino acid chain and an albumin binding moiety (side-chain). Sogroya's labeling does not identify the ADO units as amino acids, simply calling them an albumin-binding moiety and specifying that the protein part of Sogroya is the 191 alpha amino acids. Specifically, section 11 of Sogroya's Prescribing Information states: "Somapacitan-beco is a human growth hormone (hGH) analog with a single substitution in the amino acid backbone (L101C) to which an albumin-binding moiety has been attached. The albumin-binding moiety (side-chain) consists of an albumin binder and a hydrophilic spacer attached to position 101 of the protein. The protein part consists of 191 amino acids."[7]  Because Sogroya consists of an alpha amino acid polymer with a specific defined sequence that is greater than 40 alpha amino acids in size (i.e., 191 alpha amino acids), it meets the definition of a protein. The addition of other moieties like the albumin-binding moiety, (side-chain) to the alpha amino acid polymer that is greater than 40 alpha amino acids in size, does not change that Sogroya is a protein.

Of note, scientific publications describing studies sponsored by Lilly describe retatrutide

---

[5] FDA, Memo to File, Teva Pharms. USA v. FDA, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-2, at p.14 n.3 (Aug. 1, 2011) (citation omitted) (FDA Memo)
[6] Antonin Ginguay, Luc A. Cynober, in Encyclopedia of Biological Chemistry (Third Edition), 2021
[7] https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/761156s000lbl.pdf

5

(LY3437943) as a 39 amino acid peptide and do not describe the components of the associated chain as amino acids. In one instance these publications describe retatrutide as "a 39 amino acid single peptide conjugated to a C20 fatty diacid moiety that possesses agonist activity at the glucagon, GIP, and GLP-1 receptors."[8] In another they expand on the description of the 39 amino acid peptide, describing that it "contains three non-coded amino acid residues at positions 2, 20, and 13. Aib2 (α-amino isobutyric acid) … Aib20… [and] αMeL13 (α-methyl-L-leucine)…[and is] conjugated to a C20 fatty diacid moiety via a linker."[9]

## 2. Science, policy and precedent

The sponsor states that "*science, sound policy and precedent*" support regulation of retatrutide as a biological product. The sponsor argues that retatrutide is a complex product and that it should therefore be regulated as a biological product under a BLA rather than a drug under an NDA.  In support, the sponsor cites: (1) FDA's guidance recommending that sponsors submit BLAs for antibody-drug conjugates (ADCs), a type of biologic-drug combination product; and (2) FDA's transition of certain complex mixtures from NDAs to BLAs on March 23, 2020. The sponsor asserts that these examples show that "*FDA recognized that the BLA authorities may be better suited to the regulation of complex products.*"  (RFD p11 of 14)

We disagree with the sponsor's interpretation of these examples.

First, FDA regulates many complex products as drugs rather than biological products. Whether or not a product is complex, FDA cannot classify it as a "biological product" unless it falls within the statutory definition in section 351(i)(1) of the PHS Act. Complexity is not a prerequisite for classification as a "biological product" under section 351(i) of the PHS Act.[10]  Nor does the definition of "drug" in section 201(g) of the FD&C Act exclude complex products.  Thus, for example, glatiramer acetate, the active ingredient of Copaxone[11], is regulated as a drug rather than a biological product. Glatiramer acetate is a heterogenous mixture of copolymers, containing four naturally occurring amino acids: L-glutamic acid, L-alanine, L-tyrosine, and L-lysine.

---

[8] Lancet. 2022 Nov 26;400(10366):1869-1881

[9] Cell Metab. 2022 Sep 6;34(9):1234-1247

[10] In fact, the definition of "biological product" in section 351(i)(1) of the PHS Act includes certain small-molecule products, such as "arsphenamine," "derivative of arsphenamine," and "any other trivalent organic arsenic compound."

[11] NDA 020622, https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020622s116lbl.pdf

6

FDA also regulates some other complex mixtures such as those found in certain botanical products as drugs.[12]

Second, FDA's analysis and recommendation for ADCs is not relevant to retatrutide. The ADC analysis was about the appropriate premarket application type (i.e., NDA or BLA) for a type of combination product (ADCs) that is composed of a "biological product" constituent part—a monoclonal antibody—that is physically combined with a "drug" constituent part, where each constituent part contributes to the overall intended therapeutic effects of the combination product.[13] This analysis regarding the most appropriate premarket application type for ADC combination products did not consider whether the ADC as a whole meets the definition of "biological product" because FDA does not conduct such an analysis for a combination product.[14] Therefore, FDA's decision that BLAs are the appropriate marketing application type for ADCs is not relevant to determining whether retatrutide is a protein or whether it otherwise meets the biological product definition.

Third, FDA has already explained that the agency generally does not intend to consider other attributes of a molecule in determining whether a molecule meets the definition of a protein. Specifically, in the preamble to the final rule defining a protein, FDA stated:

> *FDA considered whether to include structural or functional attributes (e.g., folding, provides structural support to cellular macrostructures, catalyzes a biochemical reaction, transports other molecules, aids in the folding of other proteins) in its interpretation of the term "protein," but determined that this would not serve to make the line between peptides and proteins any brighter. Among other things, relying on a factor such as "folding" would not provide regulatory certainty because it would raise questions about how much folding is sufficient to differentiate between "peptides" and "proteins," as many peptides can arguably be said to exhibit some folding. Therefore, adopting this approach would not provide for a bright-line rule and would result in regulatory uncertainty and inefficiency. (85 FR 10057)*

Finally, contrary to the sponsor's assertion, FDA's determination that certain naturally derived mixtures that include an identified protein component should transition from regulation under the NDA pathway to regulation under the BLA pathway under section 7002(e) of the Biologics Price Competition and Innovation Act of 2009 (BPCI Act) was

---

[12] Veregen, NDA 021902, label at https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021902s033lbl.pdf; Mytesi, NDA 202292, label at https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/202292s007lbl.pdf; FILSUVEZ, NDA 215064, label at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/215064s000lbl.pdf

[13] FDA, Guidance for Industry: Questions and Answers on Biosimilar Development and the BPCI Act (Sept. 2021), at 23. As described in the guidance, FDA considered several factors, including the relative significance of the safety and effectiveness questions raised by the different constituent parts of the combination product, in considering which application type was most appropriate for an ADC.

[14] 21 CFR Part 3. See also FDA, Guidance for Industry: How to Write a Request for Designation (Apr. 2011).

FDA001925

not based on complexity alone. As explained in FDA's memorandum titled "Recommendations on Factors for Determining Whether Certain Combination Products and Naturally Derived Mixtures Are Subject to the BPCI Act's Transition Provisions,"[15] FDA considered several factors in determining whether to regulate certain naturally derived mixtures as biological products, including the "general complexity of the product." However, the memorandum goes on to explain that the focus of the analysis was not on complexity, but rather on whether naturally derived mixtures that include identified biological product components (e.g., protein) and identified non-biological product components that can contribute to the product's activity are "biological products" under section 351(i) of the PHS Act because they are "analogous" to a protein. For such products, FDA considered the naturally derived mixture to be "analogous" to a protein if the identified biological product component (the protein) in the mixture is necessary for the activity of the product and contributes to achieving the intended therapeutic effect of the product. The analysis in FDA's memorandum is not applicable here because retatrutide is not a naturally derived mixture that contains both biological product and non-biological product components.

The sponsor has not identified any related products that are classified as biological products regulated under a BLA.  The sponsor claims that "*tirzepatide is the only currently marketed product that is related for purposes of the issues addressed in this RFD*" but acknowledges that tirzepatide is currently marketed as a drug under an NDA. The sponsor also mentions semaglutide and liraglutide, which are not biological products.  (RFD p8 of 14)

The sponsor asserts that Omontys (peginesatide), which is composed of two identical 21-amino acid chains covalently bonded to a linker derived from iminodiacetic acid and β-alanine, "should have been subject to the BLA transition had it still been approved on March 23, 2020."  We note that Omontys did not transition to a BLA and remains a listed drug in the Orange Book.[16][17]

### 3.   Analogous to a protein

Finally, the sponsor asserts  "even if FDA concludes that retatrutide is not a protein because it has 40 *alpha* amino acids . . . retatrutide nonetheless is analogous to a

---

[15] Biological Product Classification Subcommittee, Memorandum to the Directors of CDER, CBER, & Office of Combination Products (OCP), Teva Pharms. USA v. FDA, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-3 (Mar. 18, 2020).

[16] https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=202799#17610

[17] Under the protein definition in 21 CFR 600.3(h)(6), to determine whether an alpha amino acid polymer with two or more alpha amino acid chains is an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size," FDA counts the total number of alpha amino acids in each chain only if those chains are associated "in a manner that occurs in nature."  The two 21-alpha-amino acid chains in Omontys are not associated with each other in a manner that occurs in nature. Thus, Omontys is not a protein under 600.3(h)(6) because it is not an alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size.

8

FDA001926

protein." (RFD p13 of 14) FDA has already stated that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule."[18] Adopting the sponsor's argument would undo the bright line principle established by the rule, and effectively include alpha amino acid polymers with fewer than 41 alpha amino acids within the scope of a rule that was intended to exclude them. This would in turn defeat the purpose of the bright line rule because FDA would frequently have to evaluate on a case-by-case basis the features of a particular molecule to determine if it is analogous to a protein.

With regard to retatrutide specifically, as described above, being greater than 40 *alpha* amino acids is a fundamental, defining property of a protein, which retatrutide does not have. As a result, retatrutide cannot be analogous to a protein because it does not share this fundamental defining property. This reasoning was upheld in *Teva Pharms. USA, Inc. v. FDA, 514 F. Supp. 3d 66, 106 (D.D.C. 2020),* in which the court stated:

> FDA's stance, that a product cannot fail entirely to meet one of the agency's definitional criteria for a category of biological products yet nonetheless become a biological product, offers a reasonable method by which to distinguish sufficiently similar products from products that are too distinct to be considered analogous. The agency appears to understand the "analogous product" category as a narrow residual provision meant to accommodate products that satisfy the regulatory definitions of each category in most, if not all, regards, but are not an exact fit for whatever reason.

## VI.    CDER Recommendation

As described in the analysis above, CDER disagrees with the sponsor and recommends that retatrutide be classified as a drug instead of a biological product.

---

[18] 85 Fed. Reg. 10057, 10061 (Feb. 21, 2020).

9

FDA001927

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

_____

Food and Drug Administration
Silver Spring, MD 20993

Office of Combination Products
WO 32, Room 5129
10903 New Hampshire Avenue
Silver Spring, MD 20993

March 18, 2024

Katherin Ruiz
Sr. Director-Global Regulatory Affairs-NA
Eli Lilly and Company
Lilly Corporate Center
Indianapolis, IN 46285
FDA Establishment Identifier: 1819470

Re: Request for Designation
    Retatrutide (LY3437943)
    Our file:  RFD 240003
    Dated:  January 19, 2024
    Received:  January 19, 2024
    Filed:  January 23, 2024

Dear Katherin Ruiz:

The Food and Drug Administration ("FDA") has completed its review of the request for designation (RFD) for retatrutide (LY3437943 or the "product") that you submitted.  We have determined that the product is a drug assigned to the Center for Drug Evaluation and Research (CDER).

<u>Description of the Product</u>

You state that your product is a solution containing retatrutide, an amino acid polymer, formulated in ███████████████████████████.[1,2] You explain that the

_____

[1] We note that the specific presentation of your product may affect whether your product is classified as a combination product. However, because we do not currently have information regarding the presentation of your product (e.g., in a pre-filled syringe versus a vial), we have evaluated your RFD for the retatrutide solution alone, i.e., as a non-combination product.
[2] You have not specified the exact composition of your product's formulation (e.g., the exact concentrations of the inactive ingredients). For the purposes of the evaluation of your product that clearly consists of a single active ingredient, the exact composition of your product's formulation is not needed because it would not impact its classification or the Center assignment.

FDA001928

A.0261                            A.0261                            A.0261

retatrutide amino acid polymer consists of a linear 39 amino acid polymer chain[3] connected to an associated chain of one residue each of gamma-glutamate and 8-amino-3,6-dioxaoctanoic acid (ADO).[4] The gamma-glutamate is linked to a C20 fatty diacid moiety.[5] You also explain that the amino acid sequence of retatrutide is based on the primary sequence of native human glucose-dependent insulinotropic polypeptide (GIP)- (1-42) and incorporates amino acids that are present in native glucagon-like peptide-1 (GLP-1), and glucagon (Gcg). Additionally, you conclude from the results of Far-UV CD spectroscopy that retatrutide exhibits an α-helical structure in pure water.

You state that retatrutide is intended for use as "an adjunct to healthy diet and physical activity" for the treatment of "[c]hronic weight management," "[o]bstructive sleep apnea," "[k]nee osteoarthritis," and "[t]ype 2 diabetes." You also state in your RFD that "[r]etatrutide is administered by subcutaneous injection."

With regard to how your product acts to achieve its primary intended purpose(s), you state that "[r]etatrutide is a high-affinity agonist of each of the GLP-1, GIP, and Gcg receptors, which are G protein-coupled receptors known for regulating body weight control and glucose homeostasis." You explain that "GLP-1 and GIP receptor agonism enhances insulin secretion and reduces energy consumption, with GIP receptor activation also facilitating fat utilization, and Gcg receptor agonism increasing energy expenditure. The complementary nature of activating these three receptor pathways as a means to improve metabolic control underlies the premise of developing a single therapeutic agent possessing multi-receptor pharmacology, namely retatrutide."

You recommend that retatrutide be classified as a biological product and be assigned to CDER because it is your view that your product meets the definition of a protein as described in 21 CFR 600.3(h)(6)[6] or, in the alternative, that your product is an "analogous product" to a protein.[7]

<u>Product Classification and Assignment: Drug assigned to CDER</u>

We have considered the information in the RFD and we have discussed the issues with staff in CDER. We agree that retatrutide is appropriately regulated by CDER. However, we disagree

---

[3] You indicate that the amino acid sequence of this polymer is:
Y[Aib]QGTFTSDYSI[αMeL]LDKK*AQ[Aib]AFIEYLLEGGPSSGAPPPS where Aib is 2-Aminoisobutyric acid, and αMeL is alpha-methyl-L-Leucine. K* refers to lysine residue 17 that is linked by an isopeptide bond to the associated chain described below.

[4] The ADO moiety is linked to the epsilon amino group of lysine residue 17 and to the gamma carboxyl group of the gamma glutamate via iso-peptide bonds.

[5] You explain that retatrutide is manufactured ████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

[6] For example, you state that "[r]etatrutide, an alpha amino acid polymer consisting of 41 amino acids comprising a backbone of 39 amino acids and a second covalently bound associated chain with a gamma-glutamate residue and an ADO residue, meets the definition of "protein" under the applicable regulations and hence is a biological product requiring a BLA."

[7] You state that "[e]ven if FDA concludes that retatrutide is not a protein…retatrutide nonetheless is analogous to a protein."

Retatrutide                                                                                    Page 3 of 9
RFD240003

with your recommendation that retatrutide is a biological product and have determined that your product is a drug, for the reasons explained below.

Your product is a drug[8] because it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of a disease(s) or condition(s). Your product is intended to treat chronic weight management, obstructive sleep apnea, knee osteoarthritis, and type 2 diabetes.[9]

You offer three sets of arguments for why retatrutide should be classified as a biological product: (1) it meets the definition of a biological product because it is a protein; (2) classification as a biological product is consistent with precedent and is appropriate as a scientific and policy matter; or (3) should FDA not agree that retatrutide is a protein, then retatrutide should be considered analogous to a protein. We do not agree that retatrutide should be classified as a biological product and address each of your arguments in order.

### 1. Definition of protein

Biological product means "a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings."[10]

"A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence."[11]

You argue that retatrutide should be classified as a biological product, as defined in the Public Health Service Act (PHSA), because you assert that retatrutide meets the definition of a protein as defined at 21 CFR 600.3(h)(6).  First, you argue that retatrutide is a protein because it is "a protein within the ordinary meaning of the word, as used in many scientific publications. See, e.g., FDA Memo, at PDF pp.17–18 (referring to definitions of 'protein' as '[a]ny of a large class of complex organic chemical compounds that . . . consist of long chains of amino acids connected by peptide bonds and have distinct and varied three-dimensional structures'). Notably, the PHSA does not mention amino acids (alpha or otherwise) or any particular number thereof as being relevant to protein status, much less does it require proteins to be composed solely of alpha amino acids."

---

[8] Under section 201(g) of the Federal Food, Drug, and Cosmetic Act ("the Act" or "the FD&C Act"), the term "drug" includes articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and articles (other than food) intended to affect the structure or any function of the body of man or other animals.

[9] We note that your product is not a device because your product achieves its primary intended purposes through chemical action, such as by acting as an agonist to GLP-1, GIP, and Gcg receptors to improve metabolic control. See section 201(h) of the FD&C Act.

[10] Section 351(i)(1) of PHSA, 42 U.S.C. 262(i)(1).

[11] 21 CFR 600.3(h)(6).

FDA001930

Next you assert that retatrutide meets the regulatory definition of "protein" as codified at 21 CFR 600.3(h)(6) because it has "a specific, defined sequence;" its chains "are associated with each other in a manner that occurs in nature;" and it is an "alpha amino acid polymer" that is "greater than 40 amino acids in size." In support, you state that "retatrutide plainly meets the first condition because it is synthesized according to "a pre-defined template," and it has an "identical sequence across batches. *Teva Pharms. USA, Inc. v. FDA*, 514 F. Supp. 3d 66, 106 (D.D.C. 2020) (citing administrative record)." You also assert that retatrutide's amino acid "chains are joined by an isopeptide bond, which is found in naturally occurring proteins," citing Lundblad, Biochemistry and Molecular Biology Compendium 175-176 (2019).

You go on to explain why you believe that retatrutide is an alpha amino acid polymer that is greater than 40 amino acids. Your RFD states that "[t]he regulation expressly directs FDA to sum 'the total number of amino acids' for chains associated with each other in a manner that occurs in nature, and retatrutide contains a total of 41 amino acids. 21 C.F.R. § 600.3(h)(6). Once again, any other reading would conflict with the plain regulatory text. The requirement that the polymer have 'greater than 40 amino acids' follows the initial reference to 'alpha amino acid polymer' but omits the word 'alpha,' and bedrock principles of textual interpretation require giving effect to this omission. See, e.g., Barnhart v. Sigmon Coal Co., 534 US 438, 452 (2002). In addition, the regulatory text requires summing 'the total number of amino acids'—not the total number of only alpha amino acids—for chains associated with each other in a manner that occurs in nature."

We disagree. Your product does not meet the definition of a protein because it is not an alpha amino acid polymer with a specific defined sequence greater than 40 amino acids in size.  21 CFR 600.3(h)(6) defines a protein as:

> "any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this [definition] will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence."

Even if we were to assume (without conceding) that retatrutide has a specific defined sequence and that the gamma glutamate and ADO chain is associated with the main 39-amino-acid chain in a manner that occurs in nature, retatrutide is not an alpha amino acid polymer greater than 40 amino acids in size because it is not composed of more than 40 alpha amino acids.

An alpha amino acid is an amino acid in which there is only one carbon atom between an amino group and a carboxy group. If there are any additional carbons between the amino group and carboxy group, it is not an alpha amino acid. It is common scientific knowledge that proteins are composed of alpha amino acids.  For example, textbooks describe that alpha amino acids are the building blocks for all proteins found in nature. Although more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20 alpha amino

Retatrutide                                                                                                     Page 5 of 9
RFD240003

acids.[12,13,14,15]

While the definition of protein in 21 CFR 600.3 does not repeat the "alpha" modifier each time the definition uses the term amino acid, doing so was not necessary given that "alpha amino acid polymer" was used at the beginning of the definition. That is, the reference to "alpha amino acid polymer" at the beginning of the definition makes clear that only alpha amino acids are relevant to determining whether something is a protein, which is consistent with commonly understood scientific principles.

You refer in your RFD to an internal FDA memo explaining that "[a]ll amino acids that are constituents of proteins are alpha amino acids because they have the carboxyl group linked to the alpha carbon of their carbon chain," and note that FDA did not explicitly incorporate this definition into the rule.[16] As noted above, this description of an alpha amino acid was not necessary to codify as part of the protein definition because (1) the protein definition expressly refers to "alpha amino acid polymers;" and (2) it is common scientific knowledge that alpha amino acids are the only relevant amino acids for determining whether something is a protein.[17]

With regard to retatrutide, the main 39-amino-acid chain is composed of 39 alpha amino acids. Retatrutide also contains an associated chain composed of ADO and gamma glutamate. Even if we assume that ADO is an amino acid, ADO is not an *alpha* amino acid because it does not contain an amino group and a carboxylic acid group separated by a single carbon, called the alpha carbon. For purposes of this RFD response, we will assume, without deciding, that gamma glutamate is an alpha amino acid and that the associated chain composed of ADO and gamma glutamate is associated with the main 39-alpha amino acid chain in a manner that occurs in nature. As such, there are arguably 40 alpha amino acids in retatrutide to count in determining whether retatrutide is a protein. ADO is not counted because it is not an alpha amino acid. Accordingly, even if FDA were to consider gamma glutamate to be an alpha amino acid (i.e., in addition to the 39 alpha amino acids in the main chain), retatrutide is not greater than 40 alpha amino acids in size and is therefore not a protein.

Furthermore, you claim in your RFD submission:

> While the regulation does not define "alpha amino acid polymer," the best reading is a polymer containing at least some alpha amino acids, not a polymer containing only alpha amino acids. Indeed, the latter reading would conflict with precedent. FDA approved a BLA for Sogroya® (somapacitan-beco), which has a 191-amino acid backbone and an associated chain that contains two gamma-glutamate residues as well as two units of ADO—the same amino acids in retatrutide's associated chain.

---

[12] Molecular Biology of the Cell. 4th edition. Alberts B, Johnson A, Lewis J, et al. New York: Garland Science; 2002.

[13] Biochemistry 5th Edition, Jeremy Berg, John Tymoczko, Luber Stryer. W. H. Freeman and Company; 2002.

[14] Takayoshi Ubuka, in Handbook of Hormones (Second Edition), 2021.

[15] S. Maloy, in Brenner's Encyclopedia of Genetics (Second Edition), 2013.

[16] FDA, Memo to File, Teva Pharms. USA v. FDA, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-2, at p.14 n.3 (Aug. 1, 2011) (citation omitted) (FDA Memo).

[17] Antonin Ginguay, Luc A. Cynober, in Encyclopedia of Biological Chemistry (Third Edition), 2021.

See Sogroya Prescribing Information § 11 (April 2023). If the presence of ADO or non-alpha amino acids prevented a product from qualifying as an "alpha amino acid polymer," Sogroya would not have been regarded as a protein requiring a BLA. More fundamentally, interpreting "alpha amino acid polymer" as a polymer containing only alpha amino acids would lead to irrational outcomes: A polymer containing 60 alpha amino acids would be a protein, but the same polymer with an additional associated chain containing at least one non-alpha amino acid would not be, even though the second product would be more complex and have more amino acids. Retatrutide is thus an "alpha amino acid polymer" under 21 C.F.R. § 600.3(h)(6).

Sogroya (somapacitan-beco) consists of a 191 alpha amino acid chain and an albumin binding moiety (side-chain). Sogroya's labeling does not identify the ADO units as amino acids, simply calling them an albumin-binding moiety and specifying that the protein part of Sogroya is the 191 alpha amino acids. Specifically, section 11 of Sogroya's Prescribing Information states: "Somapacitan-beco is a human growth hormone (hGH) analog with a single substitution in the amino acid backbone (L101C) to which an albumin-binding moiety has been attached. The albumin-binding moiety (side-chain) consists of an albumin binder and a hydrophilic spacer attached to position 101 of the protein. The protein part consists of 191 amino acids."  Because Sogroya consists of an alpha amino acid polymer with a specific defined sequence that is greater than 40 alpha amino acids in size (i.e., 191 alpha amino acids), it meets the definition of a protein. The addition of other moieties like the albumin-binding moiety, (side-chain) to the alpha amino acid polymer that is greater than 40 alpha amino acids in size, does not change that Sogroya is a protein.

### 2. Science, Policy, and Precedent

In your RFD submission, you also assert that "science, sound policy and precedent" support regulation of retatrutide as a biological product. For example, you assert that retatrutide is a complex product and that it should therefore be regulated as a biological product under a BLA rather than a drug under an NDA. In support, you refer to the following examples: (1) FDA's guidance recommending that sponsors submit BLAs for antibody-drug conjugates (ADCs), a type of biologic-drug combination product; and (2) FDA's transition on March 23, 2020, of certain complex mixtures from NDAs to BLAs. You explain that these examples show that "FDA recognized that the BLA authorities may be better suited to the regulation of complex products." We disagree with your interpretation of these examples.

First, FDA regulates many complex products as drugs rather than biological products.  Whether or not a product is complex, FDA cannot classify it as a "biological product" unless it falls within the statutory definition in section 351(i)(1) of the PHS Act.  Complexity is not a prerequisite for classification as a "biological product" under section 351(i) of the PHS Act.[18] Nor does the definition of "drug" in section 201(g) of the FD&C Act exclude complex products.  Thus, for example, glatiramer acetate, the active ingredient of Copaxone,[19] is regulated as a drug

---

[18] In fact, the definition of "biological product" in section 351(i)(1) of the PHS Act includes certain small-molecule products, such as "arsphenamine," "derivative of arsphenamine," and "any other trivalent organic arsenic compound."

[19] NDA 020622, https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/020622s116lbl.pdf.

Retatrutide                                                                                      Page 7 of 9
RFD240003

rather than a biological product. Glatiramer acetate is a heterogenous mixture of copolymers, containing four naturally occurring amino acids: L-glutamic acid; L-alanine; L-tyrosine; and L-lysine. FDA also regulates some other complex mixtures such as those found in certain botanical products as drugs.[20]

Second, FDA's analysis and recommendation for ADCs is not relevant to retatrutide. The ADC analysis was about the appropriate premarket application type (i.e., NDA or BLA) for a type of combination product (ADCs) that is composed of a "biological product" constituent part—a monoclonal antibody—that is physically combined with a "drug" constituent part, where each constituent part contributes to the overall intended therapeutic effects of the combination product.[21] This analysis regarding the most appropriate premarket application type for ADC combination products did not consider whether the ADC as a whole meets the definition of "biological product" because FDA does not conduct such an analysis for a combination product.[22] Therefore, FDA's decision that BLAs are the appropriate marketing application type for ADCs is not relevant to determining whether retatrutide is a protein or whether it otherwise meets the biological product definition.

Third, FDA has already explained that the agency generally does not intend to consider other attributes of a molecule in determining whether a molecule meets the definition of a protein. Specifically, in the preamble to the final rule defining a protein, FDA stated:[23]

> FDA considered whether to include structural or functional attributes (e.g., folding, provides structural support to cellular macrostructures, catalyzes a biochemical reaction, transports other molecules, aids in the folding of other proteins) in its interpretation of the term "protein," but determined that this would not serve to make the line between peptides and proteins any brighter. Among other things, relying on a factor such as "folding" would not provide regulatory certainty because it would raise questions about how much folding is sufficient to differentiate between "peptides" and "proteins," as many peptides can arguably be said to exhibit some folding. Therefore, adopting this approach would not provide for a bright-line rule and would result in regulatory uncertainty and inefficiency.

Finally, contrary to your assertion, FDA's determination that certain naturally derived mixtures that include an identified protein component should transition from regulation under the NDA pathway to regulation under the BLA pathway under section 7002(e) of the Biologics Price Competition and Innovation Act of 2009 (BPCI Act) was not based on complexity alone. As

---

[20] Veregen, NDA 021902, label at https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/021902s033lbl.pdf; Mytesi, NDA 202292, label at https://www.accessdata.fda.gov/drugsatfda_docs/label/2020/202292s007lbl.pdf; FILSUVEZ, NDA 215064, label at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/215064s000lbl.pdf.
[21] FDA, Guidance for Industry: Questions and Answers on Biosimilar Development and the BPCI Act (Sept. 2021), at 23. As described in the guidance, FDA considered several factors, including the relative significance of the safety and effectiveness questions raised by the different constituent parts of the combination product, in considering which application type was most appropriate for an ADC.
[22] 21 CFR Part 3. See also FDA, Guidance for Industry: How to Write a Request for Designation (Apr. 2011).
[23] 85 Fed. Reg. 10057, 10059 (Feb. 21, 2020).

FDA001934
A.0267                          A.0267                          A.0267

Retatrutide                                                                                      Page 8 of 9
RFD240003

explained in FDA's memorandum titled "Recommendations on Factors for Determining Whether Certain Combination Products and Naturally Derived Mixtures Are Subject to the BPCI Act's Transition Provisions,"[24] FDA considered several factors in determining whether to regulate certain naturally derived mixtures as biological products, including the "general complexity of the product." However, the memorandum goes on to explain that the focus of the analysis was not on complexity, but rather on whether naturally derived mixtures that include identified biological product components (e.g., protein) and identified non-biological product components that can contribute to the product's activity are "biological products" under section 351(i) of the PHS Act because they are "analogous" to a protein. For such products, FDA considered the naturally derived mixture to be "analogous" to a protein if the identified biological product component (the protein) in the mixture is necessary for the activity of the product and contributes to achieving the intended therapeutic effect of the product. The analysis in FDA's memorandum is not applicable here because retatrutide is not a naturally derived mixture that contains both biological product and non-biological product components.

Finally, you have not identified any related products that are classified as biological products regulated under a BLA. You claim that "tirzepatide is the only currently marketed product that is related for purposes of the issues addressed in this RFD," but you acknowledge that tirzepatide is currently marketed as a drug under an NDA. You also mention semaglutide and liraglutide, which are not biological products.

You also assert that Omontys (peginesatide), which is composed of two identical 21-amino acid chains covalently bonded to a linker derived from iminodiacetic acid and β-alanine, "should have been subject to the BLA transition had it still been approved on March 23, 2020." However, we note that Omontys did not transition to a BLA and remains a listed drug in the Orange Book.[25]

### 3. Analogous to a Protein

Additionally, you assert in your RFD submission that "even if FDA concludes that retatrutide is not a protein because it has 40 *alpha* amino acids . . . retatrutide nonetheless is analogous to a protein." We note that FDA has already stated that "it would not be appropriate for the statutory term 'analogous product' to be interpreted in a way that would include products that are specifically excluded by this final rule."[26] Adopting your argument would undo the bright line principle established by the rule, and effectively include alpha amino acid polymers with fewer than 41 alpha amino acids within the scope of a rule that was intended to exclude them. This would in turn defeat the purpose of the bright line rule because FDA would frequently have to evaluate on a case-by-case basis the features of a particular molecule to determine if it is analogous to a protein.

---

[24] Biological Product Classification Subcommittee, Memorandum to the Directors of CDER, CBER, & Office of Combination Products (OCP), Teva Pharms. USA v. FDA, Docket No. 1:20-cv-808 (D.D.C. 2020), Document 42-3 (Mar. 18, 2020).

[25] See FDA's publication *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly known as the Orange Book), listing Omontys, https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=202799#17610.

[26] 85 Fed. Reg. 10057, 10061 (Feb. 21, 2020).

Retatrutide                                                                                      Page 9 of 9
RFD240003

With regard to retatrutide specifically, as described above, being greater than 40 *alpha* amino acids is a fundamental, defining property of a protein, which retatrutide does not have. As a result, retatrutide cannot be analogous to a protein because it does not share this fundamental defining property. This reasoning was upheld in *Teva Pharms. USA, Inc. v. FDA, 514 F. Supp. 3d 66, 106 (D.D.C. 2020),* in which the court stated:

> FDA's stance, that a product cannot fail entirely to meet one of the agency's definitional criteria for a category of biological products yet nonetheless become a biological product, offers a reasonable method by which to distinguish sufficiently similar products from products that are too distinct to be considered analogous. The agency appears to understand the "analogous product" category as a narrow residual provision meant to accommodate products that satisfy the regulatory definitions of each category in most, if not all, regards, but are not an exact fit for whatever reason.

In sum, as described in the analysis above, we disagree with your recommendation that retatrutide should be classified as a biological product. Your product is appropriately classified as a drug. In terms of Center assignment, as a drug, retatrutide is assigned to CDER.

Conclusion

For the reasons explained above, we have determined that your product is a drug assigned to CDER for premarket review and regulation. For further information about review requirements and how to proceed, please contact Dr. Kristina Lauritsen, Combination Product Policy Advisor, at CDERProductJurisdiction@fda.hhs.gov.

Please include a copy of this letter with your initial submission to CDER.

If you have any questions about this letter, please contact me at combination@fda.gov. Finally, OCP is available to you as a resource for questions or issues that may arise throughout the development of your product. You may reach us at the above address or by the above email.

Sincerely,

*Leigh Hayes*

Leigh Hayes
Product Assignment Officer

cc:    Dr. Kristina Lauritsen

A.0269                                A.0269

FDA001936
A.0269

Case 1:24-cv-01503-TWP-KMB   Document 38   Filed 04/30/25   Page 260 of 275 PageID
Case: 26-1301   Document: 13 #: 874   Filed: 04/01/2026   Pages: 301

# Volume 2

# Handbook of Hormones

## Comparative Endocrinology for Basic and Clinical Research

### Second Edition

**Edited by**
Hironori Ando • Kazuyoshi Ukena • Shinji Nagata

 **The Japan Society for Comparative Endocrinology**



FDA001937

A.0270                          A.0270                          A.0270

Case 1:24-cv-01503-TWP-KMB    Document 38    Filed 04/30/25    Page 261 of 275 PageID

Case: 26-1301    Document: 13 #: 875  Filed: 04/01/2026    Pages: 301

# HANDBOOK OF HORMONES

## Comparative Endocrinology for Basic and Clinical Research

## SECOND EDITION

## Volume 2

*Edited by*

HIRONORI ANDO

*Marine Biological Station, Sado Island Center for Ecological Sustainability, Niigata University, Niigata, Japan*

KAZUYOSHI UKENA

*Graduate School of Integrated Sciences for Life, Hiroshima University, Hiroshima, Japan*

SHINJI NAGATA

*Graduate School of Frontier Sciences, The University of Tokyo, Chiba, Japan*

Produced in association with the *Japan Society for Comparative Endocrinology*



ELSEVIER

**ACADEMIC PRESS**
An imprint of Elsevier

FDA001938

A.0271                A.0271                A.0271

Academic Press is an imprint of Elsevier
125 London Wall, London EC2Y 5AS, United Kingdom
525 B Street, Suite 1650, San Diego, CA 92101, United States
50 Hampshire Street, 5th Floor, Cambridge, MA 02139, United States
The Boulevard, Langford Lane, Kidlington, Oxford OX5 1GB, United Kingdom

Copyright © 2021 Elsevier Inc. All rights reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or
mechanical, including photocopying, recording, or any information storage and retrieval system, without
permission in writing from the publisher. Details on how to seek permission, further information about the
Publisher's permissions policies and our arrangements with organizations such as the Copyright Clearance
Center and the Copyright Licensing Agency, can be found at our website: www.elsevier.com/permissions.

This book and the individual contributions contained in it are protected under copyright by the Publisher (other
than as may be noted herein).

**Notices**

Knowledge and best practice in this field are constantly changing. As new research and experience broaden our
understanding, changes in research methods, professional practices, or medical treatment may become
necessary.

Practitioners and researchers must always rely on their own experience and knowledge in evaluating and using
any information, methods, compounds, or experiments described herein. In using such information or methods
hey should be mindful of their own safety and the safety of others, including parties for whom they have a
professional responsibility.

To the fullest extent of the law, neither the Publisher nor the authors, contributors, or editors, assume any liability
for any injury and/or damage to persons or property as a matter of products liability, negligence or otherwise, or
from any use or operation of any methods, products, instructions, or ideas contained in the material herein.

**Library of Congress Cataloging-in-Publication Data**
A catalog record for this book is available from the Library of Congress

**British Library Cataloguing-in-Publication Data**
A catalogue record for this book is available from the British Library

ISBN Set – 978-0-12-820649-2

Volume 1 – 978-0-12-820651-5

Volume 2 – 978-0-323-85194-7

For information on all Academic Press publications
visit our website at https://www.elsevier.com/books-and-journals

*Publisher:* Stacy Masucci
*Acquisitions Editor:* Ana Claudia A. Garcia
*Editorial Project Manager:* Billie Jean Fernandez
*Production Project Manager:* Omer Mukthar
*Cover Designer:* Victoria Pearson

Typeset by SPi Global, India



Working together
to grow libraries in
developing countries

www.elsevier.com • www.bookaid.org

FDA001939

A.0272                    A.0272                    A.0272

CHAPTER

# 132

# Amino acids

*Takayoshi Ubuka*

**Gan Medical Service Co., Ltd., Tokyo, Japan**

## History

Louis Vauquelin and Pierre Robiquet isolated asparagine from asparagus in 1806; it was the first amino acid to be discovered.[1,2] Although cystine was discovered in 1810,[3] its monomer cysteine was undiscovered until 1884.[4] William Rose discovered threonine in 1935; it was the last of the 20 amino acids present in proteins.[5] Emil Fischer and Franz Hofmeister independently proposed that proteins are made by bonds of amino acids between the amino group of one amino acid and the carboxyl group of the next amino acid, forming a linear structure that was termed "peptide" by Fischer.[6] Although many fungi, bacteria, and protista can synthesize all 20 amino acids contained in a protein, animals lack a number of amino acid synthetic pathways or the synthesis is insufficient to meet the metabolic needs; these are termed "essential" amino acids. All vertebrates have the same nine essential amino acids, which are threonine, valine, methionine, leucine, isoleucine, phenylalanine, histidine, lysine, and tryptophan. Some vertebrates have additional essential amino acids. Five coral species can synthesize eight amino acids normally considered essential for animals.[7]

## Structure

### Structural features

An amino acid is a group of organic molecules that have both amino ($-NH_2$) and carboxyl ($-COOH$) groups. α-amino acids are the amino acids in which amino and carboxyl groups are bound to the same carbon atom. Although more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20 L-α-amino acids, which have the L-configuration at the α-carbon (Fig. 132.S1). The properties of L-α-amino acids are characterized by their characteristic side chains (R group, Fig. 132.1). R groups are characterized as being hydrophilic or hydrophobic (Fig. 132.S1).[8]

### Selenocysteine

Selenocysteine is an L-α-amino acid present in proteins (Fig. 132.S2). Humans have approximately two dozen selenoproteins, including peroxidases, reductases, selenoprotein P, and iodothyronine deiodinases. Selenocysteine is commonly termed the 21st amino acid.[8]

### D-Amino acids

The human brain contains free D-serine and D-aspartate. Bacteria, fungi, reptiles, and amphibians produce peptides and antibiotics containing D-amino acids.[8] Certain microorganisms secrete free D-amino acids or peptides that contain D-amino acids. Several of these bacterial peptides are clinically valuable as antibiotics such as bacitracin and gramicidin, and as an antitumor agent such as bleomycin. Certain other microbial peptides containing D-amino acids are toxic.

### Properties

The functional groups of amino acids exhibit characteristic chemical reactions. Carboxylic acid groups form esters, amides, and acid anhydrides. Amino groups are involved in acylation, amidation, and esterification. $-OH$ and $-SH$ groups are involved in oxidation and esterification. The hydrophobic side chains of alanine, valine, leucine, and isoleucine as well as the aromatic side chains of phenylalanine, tyrosine, and tryptophan typically exist in the interior of cytosolic proteins. The charged side chains of basic and acidic amino acids stabilize protein conformations by ionic interactions or salt bridges.

*Handbook of Hormones*
https://doi.org/10.1016/B978-0-12-820649-2.00295-3

Copyright © 2021 Elsevier Inc. All rights reserved.

FDA001940

A.0273                           A.0273                           A.0273

1062                                    132. Amino acids

FIG. 132.1   L-α-Amino acids. The chemical structure is depicted by Fisher's projection.

## Biological functions

Amino acids provide the monomer units of peptides or the polypeptide chains of proteins. Amino acids and their derivatives are involved in various cellular functions such as signaling molecules and the biosynthesis of porphyrins, purines, pyrimidines, and urea.[8] Some amino acids function in the organism as neurotransmitters or hormones.[8] Glutamic acid, or glutamate, is the most abundant excitatory neurotransmitter in vertebrate nervous systems.[9] Many synapses use multiple types of glutamate receptors, including ionotropic and metabolic receptors. Glutamatergic synapses in the hippocampus, neocortex, and other parts of the brain have plasticity for long-term potentiation that enables learning and memory. Glutamate also functions as a spillover synaptic crosstalk between synapses where released glutamate creates extrasynaptic signaling, named volume transmission.[10] γ-Aminobutyric acid (GABA) is not an α-amino acid in which amino and carboxyl groups are bound to the same carbon atom.[8] GABA is the major inhibitory neurotransmitter in the central nervous system.[11] GABA acts by binding to transmembrane receptors in the plasma membrane of pre- and postsynaptic neurons. In the pancreas, β-cells secrete GABA along with insulin. GABA inhibits glucagon secretion from α-cells.[12] GABA also promotes the replication and survival of β-cells[13] and the conversion of α-cells to β-cells.[14] Glycine is the simplest amino acid that has a single hydrogen atom at the side chain.[8] Glycine is an inhibitory neurotransmitter mediating its inhibitory effect by chloride current.[15] Glycine also acts as a coagonist along with glutamate facilitating the excitatory potential at the NMDA glutamate receptor.[16]

## Supplemental information available on companion website

- L-α-Amino acids present in proteins/Fig. 132.S1.
- Selenocysteine and cysteine/Fig. 132.S2.

Supplementary data to this article can be found online at https://doi.org/10.1016/B978-0-12-820649-2.00295-3.

## References

1. Vauquelin LN, Robiquet PJ. The discovery of a new plant principle in Asparagus sativus. *Ann Chim.* 1806;57:88–93.
2. Vickery HB, Schmidt CL. The history of the discovery of the amino acids. *Chem Rev.* 1931;9:169–318.
3. Wollaston WH. On cystic oxide, a new species of urinary calculus. *Philos Trans R Soc.* 1810;100:223–230.
4. Anfinsen CB, Edsall JT, Richards FM. *Advances in Protein Chemistry.* New York: Academic Press; 1972:99–103.
5. Simoni RD, Hill RL, Vaughan M. The discovery of the amino acid threonine: the work of William C. Rose. *J Biol Chem.* 2002;277:E25.
6. Fruton JS. Contrasts in scientific style. Emil Fischer and Franz Hofmeister: their research groups and their theory of protein structure. *Proc Am Philos Soc.* 1985;129:313–370.
7. Fitzgerald LM, Szmant AM. Biosynthesis of 'essential' amino acids by scleractinian corals. *Biochem J.* 1997;322:213–221.
8. Kennelly PJ, Rodwell VW. Amino acids & peptides. In: *Harper's Illustrated Biochemistry.* 31st ed. New York, NY: McGraw-Hill Education; 2018:14–22.
9. Hayashi T. A physiological study of epileptic seizures following cortical stimulation in animals and its application to human clinics. *Jpn J Physiol.* 1952;3:46–64.
10. Okubo Y, Sekiya H, Namiki S, et al. Imaging extrasynaptic glutamate dynamics in the brain. *Proc Natl Acad Sci U S A.* 2010;107:6526–6531.
11. Krnjević K, Schwartz S. The action of γ-aminobutyric acid on cortical neurones. *Exp Brain Res.* 1967;3:320–336.
12. Rorsman P, Berggren PO, Bokvist K, et al. Glucose-inhibition of glucagon secretion involves activation of GABA_A-receptor chloride channels. *Nature.* 1989;341:233–236.
13. Soltani N, Qiu H, Aleksic M, et al. GABA exerts protective and regenerative effects on islet beta cells and reverses diabetes. *Proc Natl Acad Sci U S A.* 2011;108:11692–11697.
14. Ben-Othman N, Vieira A, Courtney M, et al. Long-term GABA administration induces alpha cell-mediated beta-like cell neogenesis. *Cell.* 2017;168:73–85.
15. Eccles JC, Fatt P, Koketsu K. Cholinergic and inhibitory synapses in a pathway from motor-axon collaterals to motoneurones. *J Physiol.* 1954;126:524–562.
16. Piña-Crespo JC, Talantova M, Micu I, et al. Excitatory glycine responses of CNS myelin mediated by NR1/NR3 "NMDA" receptor subunits. *J Neurosci.* 2010;30:11501–11505.

A.0274                          A.0274                          A.0274

FDA001941

# Amino Acids

**S Maloy,** San Diego State University, San Diego, CA, USA

© 2013 Elsevier Inc. All rights reserved.

This article is a revision of the previous edition article by B Willis, P A Lessard, A J Sinskey, volume 1, pp 54–56, © 2001, Elsevier Inc.

### Glossary

**Chiral** An asymmetric molecule that cannot be superimposed on its mirror image.
**Essential amino acids** Amino acids that cannot be synthesized by an organism and therefore must be supplied in the diet. There are nine essential amino acids for humans: histidine, isoleucine, leucine, lysine, methionine, phenylalanine, threonine, tryptophan, and valine.

## Introduction

Amino acids are a class of important biomolecules that contain both amino groups ($-NH_3^+$) and carboxylate groups ($-COO^-$). In most contexts, the term 'amino acids' refers to the α-amino acids, so-called because both the amino and carboxyl groups are attached to the α-carbon of the structure depicted in Figure 1(**a**). However, other types of amino acids are encountered in nature, such as the β-amino acids, in which the amino and carboxyl groups are attached to different carbons in the backbone (Figure 1(**b**)).

All α-amino acids (with the exception of glycine) have four different substituents attached to the α-carbon and are therefore chiral molecules. Chirality, also called handedness, is a special subset of asymmetry describing objects that have no internal plane of symmetry and are not superimposable upon their own mirror image. Almost all of the amino acids found in nature have the same chirality with respect to the α-carbon and are referred to as L-amino acids based on chemical nomenclature guidelines. Their rare, stereoisomer, mirror-image counterparts are called D-amino acids. Just as your right hand will not fit properly into a left-hand glove, a D-amino acid will not fit properly in a space that fits an L-amino acid.

Although hundreds of amino acids have been identified or synthesized, 20 of these are often designated the common amino acids. These are shown in Figure 2. In biological systems, these amino acids are the building blocks of proteins. Under the direction of messenger RNA during protein synthesis, the amino and carboxyl side chains of two amino acids are condensed chemically on the ribosome, which acts as an amino acid polymerase. This reaction releases water and is called peptide bond formation (Figure 1(**c**)). Chains of amino acids linked in this manner are thus called polypeptides or, more simply, proteins.

Proteins are polymers with a constant backbone region (the peptide bonds) and variable side chains (the 'R' side chains of amino acids). The chemical properties of the side chain of each amino acid (e.g., its size, charge, or hydrophobicity) and the order in which the amino acids are polymerized contribute to the overall shape and chemical properties and therefore the function of each protein. These functions can vary widely, from proteins that form physical structures for maintaining cell shape to elegant and delicate enzymatic machines that carry out highly regulated chemical reactions.

## Sources and Uses of Amino Acids

Plants and many bacteria synthesize all 20 of the amino acids listed in Figure 2. Amino acids are synthesized from a variety of primary metabolites in living cells. However, vertebrates, including humans, are only able to manufacture a subset of these amino acids. Hence, they must obtain the remainder of their amino acids from their diet. Amino acids that must be obtained in this manner are known as essential amino acids (Figure 2). Since proteins are composed of amino acids, diets that are rich in protein are more likely to contain sufficient amounts of each of the essential amino acids to preclude any deficiencies.

In animal feeds, however, where the bulk of the protein present may come from a single source such as grain, imbalances in the individual essential amino acids can occur. For example, corn (maize) provides the bulk of protein in feed for livestock. Yet the protein found in normal field corn is disproportionately low in lysine. To compensate, farmers routinely add lysine to animal feed to improve its nutritional value.

Amino acids are produced commercially from a variety of sources and for a variety of uses. For example, lysine, tryptophan, and threonine to be used as feed supplements are produced by fermentation. In these processes, genetically altered bacteria that produce more of an amino acid than they need for their own growth excrete the excess amino acid into their growth medium. Once the desired amino acid accumulates to a sufficient level, the bacteria can be removed and the amino acid purified for use directly or as an ingredient in feed formulations. Glutamic acid, which is often used as the flavor-enhancer monosodium glutamate (MSG), is similarly produced by microbial fermentation. Other amino acids are produced commercially by chemically hydrolyzing proteins. Thus, cysteine, which is particularly abundant in the protein keratin, is produced from hair.

In addition, amino acids have many other functions as well, including osmoregulation (proline), neurotransmitters

Brenner's Encyclopedia of Genetics, 2nd edition, Volume 1       doi:10.1016/B978-0-12-374984-0.00051-6

A.0275                          A.0275                          A.0275 FDA001942

(a)

α-Carbon atom

(b)

(c)

**Figure 1**   Structural features of amino acids. (a) Common structure of α-amino acids, position of the α-carbon is labeled; 'R' represents any number of possible chemical structures, which may be as simple as a single hydrogen atom (–H, as in the amino acid glycine) or more complex chemical groups, as in (b); (b) Examples of naturally occurring amino acids, with different 'R' groups. From left to right: alanine, β-alanine, and phosphinothricine. Note that in β-alanine the amino group is attached to the β-carbon. Phosphinothricin, a herbicide, is an unusual amino acid in that it contains phosphorus; (c) Representation of peptide bond formation.

| | | | |
|---|---|---|---|
| Alanine | Ala | A | $-CH_3$ |
| Arginine | Arg | R | $-CH_2-CH_2-CH_2-NH-C-NH_2$ (=NH) |
| Asparagine | Asn | N | $-CH_2-C-NH_2$ (=O) |
| Asparate | Asp | D | $-CH_2-C-OH$ (=O) |
| Cysteine | Cys | C | $-CH_2-SH$ |
| Glutamate | Glu | E | $-CH_2-CH_2-C-OH$ (=O) |
| Glutamine | Gln | Q | $-CH_2-CH_2-C-NH_2$ (=O) |
| Glycine | Gly | G | $-H$ |
| *Histidine | His | H | $-CH_2$ |
| *Isoleucine | Ile | I | $-C-CH_2-CH_3$ (CH₃) |
| *Leucine | Leu | L | $-CH_2-CH-CH_3$ (CH₃) |
| *Lysine | Lys | K | $-CH_2-CH_2-CH_2-CH_2-NH_2$ |
| *Methionine | Met | M | $-CH_2-CH_2-S-CH_3$ |
| *Phenylalanine | Phe | F | $-CH_2$ |
| Proline | Pro | P | |
| Serine | Ser | S | $-CH_2-OH$ |
| *Threonine | Thr | T | $-CH-CH_3$ (OH) |
| *Tryptophan | Trp | W | $-H_2C$ |
| *Tyrosine | Tyr | Y | $-CH_2$–OH |
| *Valine | Val | V | $-CH-CH_3$ (CH₃) |

**Figure 2**   The 20 common amino acids. Three- and one-letter abbreviations and the composition of the 'R' side chain group are shown. Asterisks indicate which amino acids are essential for humans. Proline is an imino acid; not just the side group but the entire structure is shown. Tyrosine can be synthesized from phenylalanine and therefore is not essential if phenylalanine is provided.

(gamma-aminobutyric acid), metabolic intermediates (ornithine and citrulline), and inhibitors (dehydroproline).

Amino acids are also important components of cosmetics and medications. Amino acids or their chemical analogs can be used as precursors for synthesis of pharmaceutical agents. Synthetic polymers of amino acids are used to encapsulate drugs so as to aid in their absorption or to control their release into the bloodstream. Current research into amino acids promises to yield new polymers that can be used as textile fibers, novel antibiotics to combat infectious diseases, and nutritionally enhanced plants to feed a hungry world.

*See also:* Biotechnology; Genetic Code; Translation.

## Further Reading

Berg JM, Tymoczko JL, and Stryer L (2002) *Biochemistry*, 5th edn. New York: WH Freeman. http://www.ncbi.nlm.nih.gov/books/NBK21154/

## Relevant Websites

http://biomodel.uah.es – A primer on the three-dimensional structure.
http://prowl.rockefeller.edu – Properties of amino acids.

FDA001944

# Amino Acids | Amino Acid Metabolism☆

**Antonin Ginguay and Luc A Cynober,** Paris Descartes University, Paris, France

© 2021 Elsevier Inc. All rights reserved.

This is an update of L. Cynober, Amino Acid Metabolism, in Encyclopedia of Biological Chemistry (Second Edition), Edited by: William J. Lennarz, M. Daniel Lane, Elsevier Inc., 2013, https://doi.org/10.1016/B978-0-12-378630-2.00029-3.

### Glossary

**Ammoniagenesis**   De novo ammonia synthesis from amino acids. The main precursor is glutamine and this process occurs mainly in the kidney. Ammoniagenesis plays a key role in acid–base homeostasis.

**Enterocyte**   A cell that ensures the transport of nutrients from the gut lumen to the bloodstream and protects the internal milieu from invasion by bacteria and other microorganisms.

**Essential amino acid**   An amino acid that cannot be synthesized by humans; hence, their provision is strictly dependent on alimentation.

**Gluconeogenesis**   Glucose synthesis from nonglucidic precursors. The main precursors are amino acids (AAs; mainly alanine, glutamine, glycine, and proline); lactate; pyruvate; and glycerol. Gluconeogenesis occurs during fasting, mainly in the liver and also in the kidney.

**Ketogenesis**   Synthesis of ketone bodies. Fatty acids are the main substrates. Some AAs are also involved, especially leucine. Ketogenesis occurs specifically in the liver.

**Ureagenesis**   Synthesis of urea from ammonia or from ammonia derived from amino acids. This allows removal of AAs in excess and/or the incorporation of the carbon moiety of AAs into glucose (i.e., gluconeogenesis). Ureagenesis occurs in the liver.

## Structure, Functions, and Classification of Amino Acids

α-Amino acids (AAs) are defined as organic molecules possessing an amino moiety located at the α-position relative to a carboxylic group. AAs therefore have the following general formula:

$$R–CH \diagup NH_2 \diagdown COOH$$

where R may be an aliphatic, acyclic structure or H.

Note that proline (Pro) is considered as an AA even though its –NH$_2$ group is part of a heterocycle. Also, taurine (Tau) is considered to be an AA even though it does not possess a carboxylic acid, but rather a sulfonic acid in the $\beta$ position.

Except for glycine (Gly) and Tau, which have no asymmetric carbon, most AAs exist predominantly as either L- or D-enantiomers, the former usually being the dominant physiologic isomers in mammals.

The common AAs can be classified in three different ways (**Table 1**):

*Chemical classification*. This classification is based on structure and identifies different chemical families of AAs: aliphatic (subdivided into several subgroups – See **Table 1** for details), e.g., aromatic, heterocyclic.

*Metabolic classification*. Although in theory most AAs can be precursors of glucose, in vivo, because most AAs preferentially are metabolized by other pathways, only alanine (Ala), glutamine (Gln), and, to a lesser extent, Pro and Gly contribute significantly to gluconeogenesis.

Only AAs engaged in protein bonds are presented. Note that there are numerous other AAs: (1) Intermediary metabolites (ornithine (Orn), citrulline (Cit)) and (2) post-transcriptionally formed (hydroxyproline, $\gamma$-carboxyglutamate acid).

Certain AAs can be precursors of ketone bodies (ketogenic AAs). Again, in vivo, only leucine (Leu) contributes significantly to ketogenesis.

Finally, some AAs can be both glucogenic and ketogenic: Isoleucine (Ile) and Phe.

*Nutritional classification*. This is based on what AAs the human body can or cannot synthesize. The former are called nonessential AAs (NEAAs) and the latter EAAs. There are nine EAAs in humans (**Table 1**). Note that NEAAs can become EAAs in specific situations where synthesis does not match requirements (e.g., arginine (Arg) during growth, tyrosine during renal failure, or Gln in trauma or severely burned patients).

## General Reaction of Amino Acid Metabolism

There is a considerable number of metabolic reactions involving AAs. The general reactions (i.e., concerning a significant number of AAs) relate to the (1) amino group(s), (2) the carboxylic group, and (3) the carbon structure.

---

☆*Change History*: November 2019. Luc A. Cynober and Antonin Ginguay updated the abstract, text, and references.

A.0278      A.0278      A.0278   FDA001945

**Table 1**    Classifications of amino acids

| Aliphatic | Aromatic | Dibasic | Diacid | Heterocyclic | Imino acid |
|---|---|---|---|---|---|
| ● Short-chain<br>  **Glycine**<br>  **Alanine**<br>● Alcohol<br>  ***Threonine***<br>  **Serine**<br>● Branched-chain<br>  *Leucine*<br>  *Isoleucine*<br>  *Valine*<br>● Sulfur<br>  *Methionine*<br>  Cysteine | ***Phenylalanine***<br>**Tyrosine** | **Arginine**<br>*Histidine*<br>*Lysine* | **Glutamate**<br>**Glutamine**<br>**Aspartate**<br>**Asparagine** | *Tryptophan* | **Proline** |

(a) in italics: Essential AAs (EAAs); (b) in bold type: Gluconeogenic AAs; and (c) underlined: Ketogenic AAs.

## Reactions Involving the Amino Group

### Transamination reaction

This is a quite general reaction, present in all tissues. In most cases this is both a synthesis and a catabolic reaction since it is the reversible transfer of an amino group from an AA (AAR1) (becoming a keto acid) to a keto acid (becoming an AAR2):

$$R_1\text{--CH--COOH} + R_2\text{--C--COOH} \rightleftharpoons R_1\text{--C--COOH} + R_2\text{--CH--COOH}$$
$$\quad\quad | \quad\quad\quad\quad || \quad\quad\quad\quad || \quad\quad\quad\quad |$$
$$\quad\quad NH_2 \quad\quad\quad O \quad\quad\quad\quad O \quad\quad\quad NH_2$$

It should be noted that, for one given AA, a transamination reaction may be an anabolic process in one organ (e.g., Ala in muscles) and a catabolic process in another (e.g., Ala in the liver).

The transamination enzymes possess a prosthetic group: Pyridoxal 5′-phosphate, which binds the AA during the reaction. So the reaction follows a ping-pong-type mechanism:

$$A - X + enzyme \rightleftharpoons A - X - enzyme \rightleftharpoons A + X - enzyme$$
$$B + X - enzyme \rightleftharpoons B - X - enzyme \rightleftharpoons B - X + enzyme$$

where $A - X$ and $B - X$ are AAs, A and B are keto acids, and X is an amino group.

### Oxidative deamination

The best example of oxidative deamination is the L-glutamate dehydrogenase.
The direction in this reaction depends on the rate of use of the product of the reaction:

$$\text{L-Glu} \xrightarrow[\text{NAD}^+\ \ \text{NADH, H}^+]{} \text{α-Iminoglutaric acid} \xrightarrow[\text{NH}_3]{} \text{α-Ketoglutaric acid}$$

.

● Degradation of Glu into the intestine (to fuel the Krebs cycle) and in the kidney (for ammoniagenesis)
● Synthesis of Glu in perivenous hepatocytes (for resynthesis of Gln)

## Non-oxidative Decarboxylation Reactions

These reactions generate amines:



$$R\text{--CH} \Big\langle {}^{COOH}_{NH_2} \longrightarrow R\text{--CH}_2\text{--NH}_2 + CO_2$$

the most important ones include putrescine (from ornithine), histamine (from histidine), and tyramine (from tyrosine).

FDA001946

### Metabolism of the Carbon Skeleton

The metabolism is specific for each AA but metabolites converge toward a limited number of end products (e.g., intermediary of the Krebs cycle, glucose, and ketone bodies).

### Intestinal Absorption of Amino Acids

Digestion of proteins (a discussion of which is beyond the scope of this article) releases a mixture of free AAs and short-chain peptides. Nitrogen is absorbed mainly in the jejunum and the ileum in the form of free AAs and di- and tripeptides. It is now well recognized that the latter have a kinetic advantage for uptake. To date, two peptide transporters have been cloned: PEPT-1 and PEPT-2.

AAs are taken up by systems that are rather different from those found in other cells and also from those located at the basolateral side of enterocytes. The groups of transporters are relatively specific to:

- Neutral AAs
- Imino acids
- Dibasic AAs + cysteine (Cys)
- Dicarboxylic AAs

### Intestinal Metabolism

It was long thought that when it comes to AAs the gut had a single function, namely, taking up AAs from the lumen for transport into the bloodstream.

In fact, the intestine avidly consumes some AAs for its energy requirements: Gln and Glu are used to the same extent as glucose by enterocytes, producing $\alpha$-ketoglutarate, which is oxidized in the Krebs cycle. After a balanced meal, approximately 70% of Gln and 95% of Glu in the enteral diet are catabolized by the small intestine during the first pass. As a consequence of Gln catabolism, ammonia is released in the portal vein. Interestingly, when Gln is taken up at the luminal side of enterocytes, its uptake at the basolateral side decreases. The reverse is true in the postabsorptive state, so that the supply of Gln to enterocytes remains roughly constant.

Also, the turnover of enterocytes is very rapid, causing a strong requirement for purine and pyrimidine precursors (e.g., Gln).

Similarly to Gln, Arg is largely metabolized by the intestine. In adults, 40% of dietary Arg is removed in the first pass within the splanchnic area and catabolized mainly by the small intestine into Pro, Orn, and Cit. However, the metabolism of Arg itself and metabolically linked AA changes during development in order to meet the body's requirement for Arg (see later "Some Specificities of Amino Acid Metabolism along the Life Cycle. *Neonates/Suckling period*").

### Cellular Transport of Amino Acids

Once AAs appear in the circulation, cellular transport is a critical step in AA metabolism, since it is a prerequisite for any further metabolism. In certain cases this step may even be rate limiting or rate controlling for metabolic pathways.

The systems of transport have long been classified according to their preferred substrates, their dependency toward sodium, their sensitivity to pH, and their ability to transport nonmetabolizable analogs. Based on these criteria, a large number of transport systems have been identified. The most ubiquitous systems are system A (A for Ala-preferring); system ASC (Ala-, serine (SER-), and Cys-preferring); system L (Leu-preferring); y + (Arg being the main substrate); N (for the transport of Gln and histidine), etc. With progress in molecular biology methods, a number of transporters have been cloned, allowing a new classification. Not surprisingly, the number of transport systems was found to be greater than initially anticipated. For example, for Arg, four transporters have been cloned (CAT-1, CAT-2A, CAT-2B, and CAT-3) with different cell localizations, properties, and affinities for the different cationic AAs. The organs that contribute most to AA metabolism are the liver and muscle.

### Liver Metabolism

The liver holds a central place in the metabolism of AAs because it is responsible for the synthesis of most circulating proteins; utilizes AAs as energy sources (i.e., glucose and ketone bodies) for other tissues; and eliminates surplus nitrogen.

AAs supplied via the portal vein after a meal are heavily metabolized (50%). The carbon chain is oxidized or forms glucose, which is stored as glycogen, while the N-moiety (ies) is (are) removed in ureagenesis.

The reason for this process is that whereas the intestinal absorption of AAs is not limiting (95%–99% of nitrogen is absorbed over a large range of protein intake), the brain must be protected against excessive AA exposure because several of them are

**Table 2**    Some amino acid functions

| Function | Amino acid | Example |
|---|---|---|
| Constituent of proteins | 20 AAs | |
| Hormone precursor | Phenylalanine | Thyroxine |
| | Tyrosine | Catecholamines |
| | Tryptophan | Serotonin |
| Mediators | Glutamate | Glutamate, GABA |
| | Glutamine | Glutamine |
| | Arginine | Nitric oxide |
| Binding of calcium | Glutamate | $\gamma$-Carboxyglutamate |
| Collagen structure | Proline | Hydroxyproline |

neurotoxic at elevated concentrations or are the precursors of potent neuromediators (see **Table 2**). Thus, the liver acts as a filter, limiting the amount of AAs released to the general circulation. Notable exceptions are the branched-chain AAs (BCAAs; valine, Ile, Leu), which are poorly metabolized in the liver: BCAAs form 22% of AAs in food proteins but almost 50% of AAs reaching the general circulation.

The biochemical explanation for this effect is that hepatocytes contain little BCAA transaminase (BCAA-T), which mediates the first step of BCAA metabolism. The physiological reason may be related to the fact that Leu plays a critical role in the stimulation of muscle protein synthesis in the postprandial phase.

In the postabsorptive state, with glycogen exhaustion, gluconeogenesis increases to maintain glucose homeostasis. As stated above, Ala is the main gluconeogenic substrate among AAs: In healthy humans fasted for 8 h, 30% of perfused Ala carbon is incorporated into glucose, and, under these conditions, 11% of glucose formed by the liver is derived from Ala. When the fasting time is increased, and in situations of hyperglucagonemia (e.g., during response to injury such as burn, trauma, or sepsis), the contribution of Ala to gluconeogenesis increases like those of other AAs, in particular Gln. In these situations, most AAs taken up by the liver come from the muscles.

During starvation, another metabolic pathway is activated: Ketogenesis is mainly supported by free fatty acid metabolism, but one AA, Leu, also contributes. This may seem paradoxical because, as stated above, hepatocytes express little BCAA-T. However, hepatocytes express all the other enzymes required for ketone body (KB) production, in particular the highly regulated enzyme branched-chain ketoacid-dehydrogenase complex (BCKA-dh) and so can metabolize branched-chain keto acids (BCKAs) emanating from muscles. Thus, as described below, the production of KB from Leu is a typical example of the importance of interorgan exchanges in AA metabolism.

## Muscle Metabolism

Muscles contain 50% of the proteins in the human body and the largest pool of free AAs (i.e., 87 g in a male weighing 70 kg as compared to a plasma pool of only 1.2 g). Therefore, muscles are often considered as a reserve of AAs, either directly (i.e., as free AAs) or indirectly (i.e., in the form of proteins). This is not exact because every protein has a function (note: Whereas glycogen is only a reserve of glucose and has no other function). Therefore, in catabolic states or starvation, loss of proteins is accompanied with a loss of functions.

After a meal, arterio-venous measurements indicate that all AAs are taken up by the muscles to support protein synthesis.

At the postabsorptive state, all but one (i.e., Glu) are released by the muscles. It is noteworthy that Ala + Gln together represent 60% of the total AAs released by muscle, whereas they form less than 20% of protein content. This underlies the fact that most Ala and Gln arise via de novo synthesis in the muscle. The carbon chain required for Ala synthesis is derived from anaerobic degradation of glucose, and the amino moiety is derived from transamination with Glu. The resulting $\alpha$-KG is retransaminated by BCAA-T releasing BCKAs from BCAAs (**Fig. 1**). Ultimately, 18% of the glucose taken up by muscle is metabolized into Ala and 12.5% of the nitrogen contained in circulating Ala is derived from Leu. For Gln, the carbon chain is synthesized from Glu, and Glu is derived both from transamination and from the bloodstream. The ammonia required for the amidation of Glu is derived from oxidative deamination of AAs and from the degradation of purine bases (**Fig. 1**).

## Interorgan Exchanges

Every tissue or organ possesses enzymatic equipment that is specific both qualitatively and quantitatively. Correspondingly, each tissue plays a specific role in nitrogen homeostasis. This explains the importance of interorgan exchanges, with each organ contributing as a provider of those AAs that others are unable (or not sufficiently able) to produce. The interorgan exchanges

FDA001948

A.0281                    A.0281                    A.0281



**Fig. 1**   De novo synthesis of alanine and glutamine in muscles at the postabsorptive state. IMP, inosine monophosphate; BCAA, branched-chain amino acid; BCKA, branched-chain keto acid.

highly depend on the feeding state (i.e., postprandial vs. postabsorptive). Of note, some AAs are subject to major interorgan exchanges (e.g., Gln) while some others are characterized by an intense intracellular metabolism and few interorgan exchanges (e.g., Glu).

At the postprandial state, as mentioned above, there is major AA splanchnic sequestration. AAs appearing in the general circulation are taken up by peripheral tissues, especially muscles.

At the postabsorptive state, the body must use its stores to generate the energy required. Lipolysis and glycogenolysis contribute to this process. However, the glycogen stores are limited, and as fasting progresses, the glucose supply becomes more and more dependent on gluconeogenesis. This process necessitates the transfer to the liver of gluconeogenic AAs such as Ala and Gln. As described earlier in this article, the nitrogen moiety ultimately is derived from BCAAs. This fact has two consequences:

(1)  Since BCAAs are EAAs (i.e., no possibility of net synthesis in humans), their sole source is protein breakdown. Hence, gluconeogenesis in the liver results in net protein breakdown in muscle.
(2)  BCKAs resulting from BCAA transamination are poorly metabolized in muscles (except in severe catabolic situations where BCKA-dh is activated by proinflammatory cytokines) and therefore released in the bloodstream. They are then taken up by the liver, where the carbon of two of them (α-ketoisocaproate and α-ketomethylvalerate) contribute to ketogenesis.

Gluconeogenic AAs taken up by the liver are readily transformed into glucose, and this is favored by increased glucagon levels and decreased insulin secretion. Of course, synthesis of one molecule of glucose from one molecule of AA requires the removal of the N-residues. This is the job of ureagenesis. This process has an important consequence: each molecule of glucose produced in this pathway leads to the irreversible loss of (at least) one N-residue from net muscle proteolysis. This explains why in conditions of prolonged food restriction or when energy demand increases (e.g., in injury) a characteristic sign of metabolic adaptation is loss of muscle mass.

Glucose produced by the liver is taken up by glucose-dependent tissues. In the muscle, part of this glucose is used anaerobically, leading to further generation of Ala, producing an Ala–glucose–Ala cycle also called the Cahill cycle.

At the whole-body level, this cycle makes no sense energetically because anaerobic glucose consumption generates little adenosine triphosphate (ATP) and gluconeogenesis consumes at least the same amount of ATP. However, reasoning at the tissue level casts a different light: In the postabsorptive state the liver is rich in energy owing to $\beta$-oxidation of free fatty acids from lipolysis in adipose tissue, whereas muscle is somewhat depleted in energy. Therefore, the Cahill cycle corresponds ultimately to the transfer of energy from an organ that is energy rich (the liver) to a tissue that demands energy (muscle) at the cost of net protein breakdown.

### Final Products of Amino Acid Metabolism, Elimination of Surplus Nitrogen

N-metabolic products of AAs are mostly excreted in urine. Only an average $7\,\mathrm{mg\,kg^{-1}}$ body weight in males and $8\,\mathrm{mg\,kg^{-1}}$ in females is removed daily in other ways: Shedded skin (e.g., $5\,\mathrm{mg\,kg^{-1}}$), nasal secretions, shedded hair, and menstrual losses.

Elimination of nitrogen cannot be carried out directly as ammonia because this substance is toxic for the central nervous system at plasma concentrations above $50\,\mu\mathrm{mol\,l^{-1}}$. Yet the equivalent of a mole of $NH_3$ has to be cleared every day. For this reason, in humans, the main form of nitrogen elimination is urea, a water-soluble nontoxic compound synthesized by the liver.

However, not all the ammonia must be converted into urea, because ammonia plays a key role in acid–base homeostasis, in particular in the kidney.

## Ureagenesis

The urea cycle is partly cytoplasmic and partly mitochondrial. Only the liver possesses all the enzymes required to synthesize urea from ammonia, and this pathway is strictly located in periportal hepatocytes.

Five enzymes are involved: Carbamoyl phosphate synthase (CPS), ornithine carbamoyltransferase (OCT), argininosuccinate synthase, argininosuccinate lyase, and arginase.

Ureagenesis is governed by three different types of regulations:

(1) Regulation by the availability of precursors: The rate of flux of AAs toward the liver is a key regulator of ureagenesis; the more AAs the liver takes up, the higher the rate of ureagenesis. AAs may arise from food in the postprandial phase or from muscles in the postabsorptive phase. Conversely, during prolonged starvation, urea production declines simply because the muscle efflux of AAs decreases. All the AAs are not equally ureogenic: Gln, Ala, and Arg contribute the most.

   (a) Gln is hydrolyzed into Glu and ammonia by glutaminase present in large amounts in periportal hepatocytes. This reaction forms a ureagenesis amplification loop because the product of the reaction (ammonia) has the unusual property of feed-forward activating glutaminase. The accumulation of Glu, the other product of the reaction, allows the synthesis of N-acetylglutamate, the regulatory role of which is described next.

   (b) Ala is transaminated into pyruvate (PYR) and in parallel α-ketoglutarate gives rise to Glu. This Glu forms a pool distinct from those described above: A second transamination reaction converts oxaloacetate into aspartate, which provides the second nitrogen donor in ureagenesis.

   (c) Arg is strongly ureagenic because (1) it is the direct precursor of urea and (2) it plays a key role in the allosteric regulation of ureagenesis.

(2) Allosteric regulation: Role of N-acetylglutamate. This substance plays a key role in ureagenesis regulation because it is the allosteric regulator of CPS, the enzyme controlling the entry of ammonia into the cycle. N-acetylglutamate synthesis is catalyzed by N-acetylglutamate synthase, which is strongly activated by Arg. Hence, the flux of substrates (Gln, $NH_3$, and Arg) and the allosteric regulation of CPS act synergistically to modulate ureagenesis both upstream and downstream.

   (a) When protein intake is low or nill, the availability of precursors also plays a key role. In this situation, there is an inhibition of arginase and OCT activities in the enterocytes and since in adults (see below for the specific situation of babies) the gut does not express argininosuccinate synthase (ASS) and argininosuccinate lyase (ASL); this organ releases Cit instead of Arg in the portal vein. Of major importance if the fact that Cit is not taken up by the liver. Hence, a decrease in Arg availability for the liver slows down ureagenesis. Of note, Cit is largely extracted by the kidneys, which exhibit ASS and ASL activities but not those of other urea cycle enzymes. Thus, the kidney releases Arg, which is required by other tissues. Taken as a whole, this forms the Arg–Cit–Arg interorgan cycle.

(3) *Hormonal regulation*. This regulation operates at two levels:

   (a) On substrate availability: Cortisol increases proteolysis and muscle efflux of AAs; glucagon promotes their transport into hepatocytes and further metabolism into ureagenesis and gluconeogenesis.

   (b) On the activity of enzymes, especially ASS and ASL.

## Ammoniagenesis

This pathway is located in kidney tubular cells and is 80% supported by Gln. The first step is mediated by type I phosphode-pendent glutaminase, an enzyme activated by acidosis; Glu can then be transaminated into α-ketoglutarate or deaminated by Glu dehydrogenase (Glu-dh). This last reaction is strongly activated by acidosis, further increasing the flux of $NH_3$. $NH_3$ passes freely into the lumen, where it combines with protons to form the ammonium ion, which cannot return to cells.

The one-way flux of $NH_3$ means that during acidosis (i.e., high amount of $H^+$ in the lumen) the intra-cellular $NH_3$ level is low, derepressing Glu-dh. In turn, this favors Glu metabolism and low Glu derepresses glutaminase. Hence, it appears that ammoniagenesis is an adaptative pathway that plays a fundamental role in combating metabolic acidosis.

## Relationship Between Ureagenesis and Ammoniagenesis: A Contribution to Acid–Base Homeostasis

The observations described above underline the unique role of Gln as a donor of nitrogen for both ureagenesis and ammonia-genesis. However, heavy consumption of Gln in ureagenesis is not compatible with an increased demand by the kidney in acidosis. A balance between these two almost exclusive processes is achieved as a result of an anatomical detail – The liver contains two different hepatocyte populations:

FDA001950
A.0283                    A.0283                    A.0283

- Periportal hepatocytes (93% of the total), which possess glutaminase activity and enzymes of the urea cycle.
- Perivenous hepatocytes, which form only 7% of the total, but have a metabolic activity 100 times higher. These cells possess Gln synthase activity. Hence, catabolism and synthesis of Gln are two processes that occur simultaneously in the liver, but at a different rate according to the situation.

Physiologically, most of the Gln from the portal vein is taken up by periportal hepatocytes, and the liver is a net consumer of Gln. In acidosis, hepatic glutaminase is inhibited (note: Acidosis activates kidney glutaminase and inhibits the liver isozyme). Consequently, Gln remains available for amino acid metabolism into the kidney.

### Hormonal Control of Amino Acid Metabolism

Physiologically as well as in disease, hormones play a key role in the control of AA metabolism, with a balance between anabolic and catabolic hormones.

### Anabolic Hormones

(1)  *Insulin:* Insulin exerts actions at every level of AA metabolism at the postprandial state:
    (a)  It increases the cell transport of numerous AAs, especially in muscle and liver.
    (b)  It favors net protein anabolism by increasing protein synthesis and by decreasing protein breakdown. The insulin effect is re-enforced by Leu. Both positively regulate the mammalian target of rapamycin (mTOR) signaling pathway. Upstream to mTOR, insulin action is dependent of AKT, whereas Leu is not.
    (c)  It decreases gluconeogenesis both by decreasing the availability of precursors and by inhibiting key enzymes of this pathway.
(2)  *Growth hormone (GH)*: GH stimulates protein synthesis and decreases protein breakdown both at the whole body level and in muscles. However, in the basal state, the effects of GH on protein metabolism are likely of minor biological importance. Conversely, during fasting (where GH is the only anabolic hormone to increase), the anabolic effects of GH are consistent, certainly as a counter-regulatory agent in order to avoid excessive protein loss.

### Catabolic Hormones

(1)  *Glucagon:* Like insulin, glucagon activates the A system of AA transport, but unlike insulin, glucagon favors the use of AAs in gluconeogenesis. In addition, glucagon favors proteolysis (through macro-autophagy) in the liver.
(2)  *Cortisol:* Cortisol induces hyper-amino-acidemia because although it increases hepatic, intestinal, and renal uptake of AAs, it increases their muscle release even more strongly. In addition, cortisol favors net protein breakdown. Hence in a stress situation, cortisol and glucagon have a synergistic action (**Fig. 2**) leading to a unidirectional flux of nitrogen from the muscle to the liver.



**Fig. 2**  Cortisol and glucagon act synergistically to drive AAs from muscle to the liver.

FDA001951

A.0284    A.0284    A.0284

(3) *Cytokines:* Physiologically, their role is minor except in advanced age (see below). However, in disease, proinflammatory cytokines (e.g., tumor necrosis factor α, interleukins 1 and 6) are overproduced and act synergistically with glucagon and cortisol on AA metabolism.

## Some Specificities of Amino Acid Metabolism along the Life Cycle

### Neonates/Suckling period

In neonates and during the suckling period, the low Arg content in maternal milk is balanced by a limited intestinal catabolism and an enhanced intestinal Arg production. The low intestinal arginase activity during the suckling period allows a sparing of dietary Arg for peripheral tissues requirements. In addition, amino acid metabolism shifts toward Arg synthesis. In the suckling period, contrary to what is observed in the postweaning period, enterocytes express ASS and ASL allowing them to synthetize Arg from Cit. Note that intestinal ornithine aminotransferase (Oat), which leads to Orn synthesis from glutamate, plays a crucial role in the metabolic pathway allowing intestinal Arg production from proline during the suckling period. Contrary to what is observed in most tissues such as liver, in which Oat catalyzes Orn degradation, intestinal Oat works in a "reverse way" allowing physiologic adaptation to dietary Arg restriction in the neonatal period.

*Elderly.* With aging there is an increased sequestration of AAs into the splanchnic area after a protein meal and therefore a decrease in availability of AAs at the periphery to stimulate muscle protein synthesis. In addition, the anabolic signal of insulin and Leu is blunted at the muscle level. One possible explanation is the low-grade inflammation that develops with aging: The increase in proinflammatory cytokine secretion may be involved in the metabolic alterations described above. This explains the occurrence of sarcopenia (a decrease in muscle mass and functions) in the elderly.

## References

Curis, E., Nicolis, I., Moinard, C., *et al.*, 2005. Almost all about citrulline in mammals. Amino Acids 29, 177–205.

Cynober, L. (Ed.), 2004. Metabolic and Therapeutic Aspects of Amino Acids in Clinical Nutrition. Boca Raton, FL: CRC Press.

Cynober, L., 2018. Metabolism of dietary glutamate in adults. Annals of Nutrition and Metabolism 73 (Suppl. 5), 5–14.

Cynober, L.A., 2002. Plasma amino acid levels with a note on membrane transport: Characteristics, regulation, and metabolic significance. Nutrition 18, 761–766.

Ginguay, A., Cynober, L., Curis, E., *et al.*, 2017. Ornithine aminotransferase, an important glutamate-metabolizing enzyme at the crossroads of multiple metabolic pathways. Biology 6, 18. doi:10.3390/biology6010018.

Haussinger, D., 1990. Nitrogen metabolism in liver: Structural and functional organization and physiological relevance. Biochemical Journal 267, 281–290.

Hou, Y., Wu, G., 2017. Nutritionally non essential amino acids: A misnomer in nutritional sciences. Advance in Nutrition 8, 137–139.

Husson, A., Brasse-Lagnel, C., Fairand, A., *et al.*, 2003. Argininosuccinate synthetase from the urea cycle to the citrulline-NO cycle. European Journal of Biochemistry 270, 1887–1899.

Meijer, A.J., Lamers, W.H., Chamuleau, R.A., 1990. Nitrogen metabolism and ornithine cycle function. Physiological Review 70, 701–748.

Millward, D.J., 1990. The hormonal control of protein turnover. Clinical Nutrition 9, 115–126.

Møller, N., Jørgensen, J.O.L., 2009. Effects of growth hormone on glucose, lipid and protein metabolism in human subjects. Endocrine Reviews 30, 152–177.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ELI LILLY AND COMPANY, | ) |
| | ) Cause No. |
| Plaintiff, | ) 1:24-cv-1503-TWP-KMB |
| | ) Indianapolis, Indiana |
| vs. | ) **August 7, 2025** |
| | ) 9:55 a.m. |
| ROBERT F. KENNEDY JR., in his | ) |
| official capacity, and U.S. | ) |
| DEPARTMENT OF HEALTH AND HUMAN | ) |
| SERVICES, and MARTIN MAKARY, | ) |
| in his official capacity, and | ) |
| FOOD AND DRUG ADMINISTRATION, | ) |
| | ) |
| Defendants. | ) |

**Before the Honorable
TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
ORAL ARGUMENT

Court Reporter:                    David W. Moxley, RMR, CRR, CMRS
                                   United States District Court
                                   46 East Ohio Street, Room 340
                                   Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

Case 1:24-cv-01503-TWP-KMB    Document 45    Filed 08/14/25    Page 21 of 45 PageID #:
Case: 26-1301    Document: 13    922    Filed: 04/01/2026    Pages: 301

21

of something other than alpha amino acids does not destroy a product's status as a protein.  Sure enough, we fully agree with them.  A product having something other than a non-alpha amino acid, if it is otherwise a protein product, that fact will not take away, so --

THE COURT:  Counsel.

MR. CRANE-HIRSCH:  Yes?

THE COURT:  I need you to tell me in lay terms, what is the difference between an alpha amino acid and a non-alpha amino acid?

MR. CRANE-HIRSCH:  Yes, Your Honor.  The question is, what separates the two portions of the molecule that make it be an amino acid in the first place.  So there is a carbon molecule in the middle.  On one side is the amine group.  That's why it's called an amino acid, the amine group on one side.  On the other side is a carboxyl group.  So the carboxyl group includes a carbon atom, and so typically there's a carboxyl group, a carbon atom, and an amine.  That is constitutive of an alpha amino acid.

Other sorts of amino acids, though, will have something more than just a single carbon atom separating the amine from the carboxyl group.  And so ADO, for example, you've got at least five carbon atoms separating the one from the other.  In gamma-glutamate, rather than having the carbon molecule that separates the one from the other, being a

so-called alpha carbon molecule in the atom chain -- or in the amino acid chain, what you find in gamma-glutamate is that it's attached to a third carbon molecule.

So we've got alpha -- the molecule -- the beta molecule -- the gamma carbon molecule. And so the fact that gamma-glutamate relies upon a connection through the gamma carbon molecule is the reason that it's called "gamma" and also the reason that there's good reason to anticipate there would be some engagement, whether or not gamma-glutamate should be counted as an alpha amino acid if the case is remanded.

THE COURT: So, Counsel, is it the FDA's position that all proteins contain only alpha amino acids?

MR. CRANE-HIRSCH: No, not at all. And, in fact, in the case of Sogroya, the product does include the side step with two gamma-glutamate units and the two ADO units. So we don't at all dispute that the presence of those gamma-glutamates, molecules -- those are amino acids, yes. It's just that there's dispute whether they can be considered alpha amino acids.

But the presence of those non-alpha amino acids does not take away that Sogroya does have a protein chain, a chain of 191 alpha amino acids. So the reason that the labeling for Sogroya references the protein part of the molecule, the 191 alpha amino acids, those alpha amino acids, 191 of them, are sufficient to satisfy the regulatory definition of a protein.

Case 1:24-cv-01503-TWP-KMB    Document 45    Filed 08/14/25    Page 23 of 45 PageID #:
Case: 26-1301    Document: 13    924    Filed: 04/01/2026    Pages: 301

23

THE COURT: Okay.

MR. CRANE-HIRSCH: Yes. So before we go into -- further into the biochemistry, if we need to at all, it's useful to take a step back and look at the framework for deciding this case. Eli Lilly references the *Loper Bright* decision, and it's true that *Loper Bright* bears upon this, but does not do a whole lot of work. The reason is that *Loper Bright* explicitly recognized that the -- there is a category of statutes in which Congress explicitly delegates to an agency the authority to exercise discretionary authority. So this is around page 395 in *Loper Bright*.

The statute before us is one such that, according to *Loper Bright*, the Court will fulfill its role so long as it ensures that the agency was acting within its delegation of authority and acting reasonably. So, in other words, reasonably, they support by citing to *Michigan* and other cases decided under the APA, and specifically the APA's arbitrary and capricious clause, 706(2)(a).

So what counts as an explicit delegation of authority? In our view, there are two of them here. The first of them is in the early portion of the biological licensing portion of the Public Health Service Act. So this is Title 42 U.S.C., Section 262(a)(2)(A). So subsection 262(a)(2)(A) provides that the secretary shall establish, by regulation, requirements for biological licensing. So this is a "shall establish." It

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

|  |  |
|---|---|
| ELI LILLY AND COMPANY, *Plaintiff*, v. ROBERT F. KENNEDY JR., in his official capacity, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, and MARTIN MAKARY, in his official capacity, and FOOD AND DRUG ADMINISTRATION, *Defendants*. | Case No. 24-cv-1503-TWP-KMB |

**JOINT POSITION STATEMENT**

Plaintiff Eli Lilly and Company and Defendants Robert F. Kennedy Jr., Martin Makary, the Department of Health and Human Services, and the Food and Drug Administration (FDA) have conferred and jointly submit this position statement pursuant to the Court's Order of October 3, 2025, ECF 49. The parties are in agreement that the Court's Amended Order on Cross-Motions for Summary Judgment, ECF 48, has fully resolved the disputed issues presented in the parties' motions, and that the Court should proceed to enter a final and appealable judgment consistent with that Order.

1.     On September 3, 2024, Plaintiff filed its complaint challenging FDA's refusal to designate retatrutide as a biological product. ECF 1. Plaintiff's complaint asserted three claims

under the Administrative Procedure Act: agency action in excess of statutory authority (First Claim for Relief); agency action in violation of the agency's own regulations (Second Claim for Relief); and arbitrary and capricious agency action (Third Claim for Relief).

2.      The parties understand the Court's Amended Order on Cross-Motions for Summary Judgment as resolving all three claims raised in Plaintiff's complaint. Specifically, in the parties' understanding, the Court rejected Plaintiff's argument that the agency misapplied its own regulatory definition of "protein," *see* ECF 48, at 12, yet agreed with Plaintiff that "[b]ecause the agency's decision that retatrutide is not at least analogous to a protein was not in accordance with the law, it was arbitrary and capricious and must be set aside," *id.* at 15. In so ruling, the Court addressed all of the arguments raised by Plaintiff. The parties do not believe that any claims in Plaintiff's complaint remain unresolved or that there are any remaining merits issues for the Court to decide.

3.      Accordingly, the parties agree that the proper course is for the Court to enter a final and appealable judgment that: grants in part and denies in part each party's cross-motion for summary judgment, in accordance with the Court's Amended Order on Cross-Motions for Summary Judgment; vacates FDA's designation decision; and remands to the agency for further proceedings on the "analogous" products claim consistent with the Court's Order.

4.      Plaintiff further states that two years have now passed since Plaintiff submitted its first request for designation to FDA in November 2023, which the agency was required to resolve within "60 days," 21 U.S.C. § 360bbb-2(b), and that Phase III trials for retatrutide are nearing completion. Plaintiff will soon need to make critical decisions about the manufacturing and application pathway for the product. Plaintiff accordingly has an acute need for FDA's prompt

resolution on remand of Plaintiff's request for designation. Plaintiff respectfully requests that the Court order FDA to act expeditiously following remand.

5.    Defendants believe it would be inappropriate for the Court to order FDA to "act expeditiously" on remand. Generally, "a reviewing court may not, after" remanding a matter to an agency, "proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544–45 (1978) (quoting *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). There is no "substantial justification for doing otherwise" here. *Id.* Contrary to Plaintiff's suggestion, the record reveals no history of agency delay. On November 9, 2023, Plaintiff submitted an initial request for product designation with FDA. On November 17, 2023, FDA advised Plaintiff that the request was not filed because it lacked information required by FDA regulations. ECF No. 38, Redacted Joint Appendix at 212-14, PageID 826-28, FDA001889-91. Plaintiff and FDA met by teleconference on December 15, 2023, and discussed the request for designation. *Id.* at 227, PageID 841, FDA1904. Plaintiff then submitted a revised request for product designation on January 19, 2024, *id.*, to which FDA timely responded within 60 days, on March 18, 2024, *id.* at 251, PageID 865, FDA1928. Plaintiff filed this suit challenging FDA's response on September 3, 2024. ECF No. 1. Thus, there is no legal or factual basis for the Court to add Plaintiff's sought-after "time dimension" to the final judgment or remand order.

Dated: December 15, 2025    Respectfully submitted,


*/s/* Jayna M. Cacioppo

Jayna M. Cacioppo, Attorney No. 25514-49  BRETT A. SHUMATE
Donald Morgan, Attorney No. 30776-49   Assistant Attorney General
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500     JORDAN C. CAMPBELL
Indianapolis, IN 46204       Deputy Assistant Attorney General
Ph. No. (317) 713-3500
Fax No. (317) 713-3699       SARMAD KHOJASTEH
              Senior Counsel
              Civil Division
Allon Kedem (pro hac vice)
Jeffrey L. Handwerker (pro hac vice)   LISA K. HSIAO
Daniel Yablon (pro hac vice)      Acting Director
ARNOLD & PORTER
 KAYE SCHOLER LLP        /s/  Daniel K. Crane-Hirsch
601 Massachusetts Ave., NW     DANIEL K. CRANE-HIRSCH
Washington, DC 20001-3743     Senior Trial Attorney
Tel: (202) 942-5000        Enforcement & Affirmative Litigation
allon.kedem@arnoldporter.com     Branch
jeffrey.handwerker@arnoldporter.com  Civil Division
daniel.yablon@arnoldporter.com    U.S. Department of Justice
              P.O. Box 386
*Counsel for Plaintiff Eli Lilly and Company* Washington, DC  20044-0386
              (202) 616-8242
              daniel.crane-hirsch@usdoj.gov

              OF COUNSEL:

              MICHAEL B. STUART
              General Counsel
              U.S. Department of Health and Human
               Services

              SEAN R. KEVENEY
              Chief Counsel

              WENDY S. VICENTE
              Deputy Chief Counsel, Litigation

BARBARA ALKALAY
Senior Counsel
Office of the Chief Counsel
U.S. Food and Drug Administration
10903 New Hampshire Avenue
White Oak 32, Room 4520
Silver Spring, MD 20993-0002

*COUNSEL FOR DEFENDANTS*

5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

ELI LILLY AND COMPANY,

    *Plaintiff*,

  v.

ROBERT F. KENNEDY JR., in his official
capacity, and U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

and

MARTIN MAKARY, in his official capacity, and
FOOD AND DRUG ADMINISTRATION,

    *Defendants*.

Case No. 1:24-cv-1503-TWP-KMB

## PLAINTIFF ELI LILLY AND COMPANY'S NOTICE OF APPEAL

Pursuant to Federal Rules of Appellate Procedure 3(a)(1) and 4(a)(1)(B), notice is hereby

given that Plaintiff Eli Lilly and Company appeals to the United States Court of Appeals for the

Seventh Circuit from this Court's order and final judgment dated December 17, 2025, as well as

from all interlocutory and preceding orders subsumed in the final judgment. Pursuant to Seventh

Circuit Rule 3(c), Lilly's docketing statement is being simultaneously filed.

Dated: February 12, 2026    Respectfully submitted,

        *Jayna M. Cacioppo*
        Jayna M. Cacioppo, Attorney No. 25514-49
        Donald Morgan, Attorney No. 30776-49
        TAFT STETTINIUS & HOLLISTER LLP
        One Indiana Square, Suite 3500
        Indianapolis, IN 46204

A.0295        A.0295        A.0295

Ph. No. (317) 713-3500
Fax No. (317) 713-3699
jcacioppo@taftlaw.com
dmorgan@taftlaw.com

Allon Kedem* (pro hac vice)
Jeffrey L. Handwerker (pro hac vice)
Daniel Yablon (pro hac vice)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
allon.kedem@arnoldporter.com
jeffrey.handwerker@arnoldporter.com
daniel.yablon@arnoldporter.com

*Counsel for Plaintiff Eli Lilly and Company*

* Allon Kedem will serve as counsel of record in
the Court of Appeals

A.0296                    A.0296                    A.0296

**CERTIFICATE OF SERVICE**

I hereby certify that on February 12, 2026, the foregoing *Plaintiff Eli Lilly and Company's Notice of Appeal* was filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*Jayna M. Cacioppo*
Jayna M. Cacioppo

## CERTIFICATE OF FILING AND SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I hereby certify that on March 30, 2026, I electronically filed the foregoing Appendix via ECF, and service was accomplished on counsel of record by that means. I certify that service of Sealed Appendix Volume II will be accomplished by email.

s/ *Allon Kedem*
Allon Kedem