**No. 26-1301**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———————————

ELI LILLY AND COMPANY,

Plaintiff-Appellant,

v.

ROBERT F. KENNEDY, JR., in his official capacity, et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Southern District of Indiana, No. 1:24-cv-01503 (Pratt, J.)

———————————

## BRIEF FOR APPELLEES

———————————

*Of Counsel:*

*MICHAEL B. STUART*
*General Counsel*
*U.S. Department of Health and*
  *Human Services*

*SEAN R. KEVENEY*
  *Chief Counsel*

*WENDY S. VICENTE*
  *Deputy Chief Counsel, Litigation*

*BARBARA ALKALAY*
  *Senior Counsel for Litigation*

*U.S. Food and Drug Administration*

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS E. WHEELER II
  *United States Attorney*

DANIEL TENNY
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF JURISDICTION ......................................................1

STATEMENT OF THE ISSUES.........................................................3

PERTINENT STATUTES AND REGULATIONS ..................................4

STATEMENT OF THE CASE ...........................................................4

      A.    Statutory Background......................................................4

      B.    Regulatory Background ...................................................6

      C.    Prior Proceedings ..........................................................9

SUMMARY OF ARGUMENT ...........................................................12

STANDARD OF REVIEW................................................................16

ARGUMENT .................................................................................16

      I.    FDA Correctly Concluded That Retatrutide Is Not A Protein ..............................................................16

      II.   Lilly's Alternative Argument Is Not Properly Before This Court And Is Meritless In Any Event .........................36

CONCLUSION ..............................................................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                          <u>**Page(s)**</u>

*American Gas. Ass'n v. U.S. DOE,*
157 F.4th 476 (D.C. Cir. 2025) ........................................................ 32

*Bew v. City of Chicago,*
252 F.3d 891 (7th Cir. 2001) ........................................................ 25

*City & County of San Francisco v. EPA,*
604 U.S. 334 (2025) ........................................................ 33

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.,*
536 U.S. 424 (2002) ........................................................ 34

*Edgewater Found. v. Thompson,*
350 F.3d 694 (7th Cir. 2003) ........................................................ 1, 37, 38

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
460 F.3d 13 (D.C. Cir. 2006) ........................................................ 37

*Genus Med. Techs. LLC v. U.S. FDA,*
994 F.3d 631 (D.C. Cir. 2021) ........................................................ 41

*Hope v. Acorn Fin. Inc.,*
731 F.3d 1189 (11th Cir. 2013) ........................................................ 34

*Illinois Ins. Guar. Fund v. Becerra,*
33 F.4th 916 (7th Cir. 2022) ........................................................ 30

*Ipsen Biopharmaceuticals, Inc. v. Becerra,*
108 F.4th 836 (D.C. Cir. 2024) ........................................................ 4, 5, 17

*Kemp v. Liebel,*
877 F.3d 346 (7th Cir. 2017) ........................................................ 16

*Kisor v. Wilkie,*
588 U.S. 558 (2019) ........................................................ 25

*Leocal v. Ashcroft,*
543 U.S. 1 (2004) ...................................................................... 28

*Lopez v. Gonzales,*
549 U.S. 47 (2006) .................................................................... 27

*Mayo Clinic v. United States,*
997 F.3d 789 (8th Cir. 2021) .................................................. 34

*Port Auth. Trans-Hudson Corp. v. Secretary, U.S. DOL,*
776 F.3d 157 (3d Cir. 2015) ................................................... 34

*Prevor v. U.S. FDA,*
67 F. Supp. 3d 125 (D.D.C. 2014) ......................................... 41

*Pulsifer v. United States,*
601 U.S. 124 (2024) .................................................................. 33

*Rush Univ. Med. Ctr. v. Leavitt,*
535 F.3d 735 (7th Cir. 2008) ......................................... 1-2, 38

*Russello v. United States,*
464 U.S. 16 (1983) .................................................................... 32

*Sandoz Inc. v. Amgen Inc.,*
582 U.S. 1 (2017) ...................................................................... 18

*SEC v. Chenery Corp.,*
318 U.S. 80 (1943) .................................................................... 35

*United States v. Reed,*
734 F.3d 881 (9th Cir. 2013) .................................................. 34

*United States v. Uriarte,*
975 F.3d 596 (7th Cir. 2020) .................................................. 40

**Statutes:**

5 U.S.C. § 706(2)(A) .................................................................. 16

21 U.S.C. § 321(g)(1)(B) .............................................................. 5

21 U.S.C. § 355 ............................................................................... 4

21 U.S.C. § 355(c)(3) ..................................................................... 17

21 U.S.C. § 355(c)(3)(E)(ii) ............................................................. 4

21 U.S.C. § 360bbb-2 ................................................................... 36

21 U.S.C. § 360bbb-2(a) ................................................................. 5

21 U.S.C. § 360bbb-2(a)-(b) ......................................................... 39

21 U.S.C. § 360bbb-2(b) ........................................................... 5, 43

21 U.S.C. § 360bbb-2(c) ............................... 6, 15, 39, 40, 41, 43

21 U.S.C. § 371(a) ........................................................................... 6

28 U.S.C. § 1291 ............................................................................. 1

28 U.S.C. § 1291(a) ....................................................................... 37

28 U.S.C. § 1292(a) ....................................................................... 38

28 U.S.C. § 1292(a)(1) ..................................................................... 2

28 U.S.C. § 1331 ............................................................................. 1

42 U.S.C. § 262 ..................................................................... 4, 6, 17

42 U.S.C. § 262(i)(1) ......................................................... 5, 10, 17, 26

42 U.S.C. § 262(k)(7) ................................................................ 4, 17

**Regulation:**

21 C.F.R. § 600.3(h)(6) ................... 3, 9, 10, 13, 20, 21, 23, 27, 33, 34, 35

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ............................................................... 1

Fed. R. App. P. 43 ........................................................................ 11

**Other Authorities:**

B. Alberts, et al., *Molecular Biology of the Cell*
(4th ed. 2002) ............................................................................. 31

T. Creighton, *Encyclopedia of Molecular Biology Volumes 1-4*
(John Wiley & Sons, Inc. 1999) .................................................... 7, 19

FDA, *2023 Mounjaro Product Labeling*,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/215866Ori
g1s002s006lbl.pdf (last visited May 15, 2026).............................. 23-24

83 Fed. Reg. 63,817 (2018) ......................................... 6-7, 18, 21, 23, 31

85 Fed. Reg. 10,057 (2020) ................................... 6, 8, 18, 20, 23, 25, 29

1 A. Ginguay et al., *Encyclopedia of Biological Chemistry,*
*Amino Acid Metabolism* (3d ed. 2021) .............................................. 30

H. Lodish et al., *Molecular Cell Biology* (6th ed. 2007) ................ 7, 8, 19

1 S. Maloy, *Brenner's Encyclopedia of Genetics, Amino Acids*
(2d ed. 2013) ............................................................ 7, 19, 22, 28, 31

T. Pollard, *Cell Biology* (Elsevier Science 2002) .................................... 7

2 T. Ubuka, *Handbook of Hormones: Comparative Endocrinology for*
*Basic and Clinical Research, Amino Acids* (2nd ed. 2021) ................ 31

D. Voet, et al., *Biochemistry* (Wiley 2004) ............................................. 7

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Eli Lilly and Company (Lilly)'s jurisdictional statement is not complete and correct. Lilly properly invoked the district court's jurisdiction under 28 U.S.C. § 1331. In its complaint, Lilly brought three Administrative Procedure Act (APA) claims challenging the U.S. Food and Drug Administration (FDA)'s decision declining to designate Lilly's investigational new drug retatrutide as a biological product. On December 16, 2025, the district court entered a final judgment that resolved two claims in FDA's favor but vacated and remanded for the agency to revisit its decision in light of the third claim. ShA.18-19. Lilly filed a timely notice of appeal on February 12, 2026. A.295; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit in cases involving the federal government).

Although Lilly invokes this Court's jurisdiction under 28 U.S.C. § 1291, remand orders are generally "not appealable, because they are not 'final' decisions." *Edgewater Found v. Thompson*, 350 F.3d 694, 696 (7th Cir. 2003). In nonetheless asserting appellate jurisdiction, Lilly relies on an exception treating "remand to an agency [as] final when the proceedings may end without further litigation." *Rush Univ. Med. Ctr.*

*v. Leavitt*, 535 F.3d 735, 738 (7th Cir. 2008). This exception creates jurisdiction over Lilly's argument that insofar as the district court upheld FDA's designation decision, it erred in doing so. The exception does not, however, establish jurisdiction over Lilly's alternative argument that, because the vacatur of FDA's designation decision allegedly rendered the agency noncompliant with a statutory deadline, FDA is compelled to treat retatrutide as a biological product on remand. As discussed in greater detail below, Lilly's objection to a remand decision that FDA has not yet issued is not properly before this Court. *See infra* pp. 36-38.

Contrary to Lilly's suggestion, 28 U.S.C. § 1292(a)(1) does not provide an "[i]ndependent" basis for appellate jurisdiction. Br. 2. That provision establishes jurisdiction over certain "[i]nterlocutory" orders, including orders granting or denying requests for preliminary injunctions. 28 U.S.C. § 1292(a)(1). Here, Lilly did not request a preliminary injunction, and the district court did not address any such request.

## STATEMENT OF THE ISSUES

This case is about how to interpret FDA's regulatory definition of the term "protein." Congress has distinguished biological products such as proteins from other drugs and has subjected them to a different review process. Because Congress did not define the term protein, FDA promulgated a regulatory definition that draws on the agency's scientific expertise. Under the definition, a protein is an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). FDA understands this definition to require that a protein contain more than 40 alpha amino acids. On that basis, the agency denied Lilly's request to designate its investigational new drug retatrutide as a protein. The questions presented are:

1. Whether the district court correctly upheld FDA's construction of its regulation, and,

2. Whether Lilly's alternative arguments regarding FDA's forthcoming remand decision are properly before this Court and, if so, whether FDA should be treated as having missed a statutory

3

deadline when it issued a timely decision that was ultimately vacated by a district court.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The central question in this case is whether Lilly's investigational new drug retatrutide qualifies as a "biological product" (sometimes referred to as a "biologic") regulated under the Public Health Service Act. *See* 42 U.S.C. § 262. Such products are subject to a somewhat different regulatory scheme than drugs that are not biologics, which are regulated solely under the Federal Food, Drug, and Cosmetic Act. *See* 21 U.S.C. § 355. Regardless of which statute governs, Lilly's product will be subject to a detailed FDA review process. *See Ipsen Biopharmaceuticals, Inc. v. Becerra*, 108 F.4th 836, 838 (D.C. Cir. 2024). But despite that basic similarity, there are "significant difference[s]" between the two statutory schemes, *id.* at 839, including that biologics generally benefit from a substantially longer exclusivity period before

4

follow-on products can enter the market.  *Compare* 42 U.S.C. § 262(k)(7), *with* 21 U.S.C. § 355(c)(3)(E)(ii).

While Congress adopted a relatively "broad[]" understanding of drugs, it "narrowly defined" biological products.  *Ipsen*, 108 F.4th at 839.  A drug is generally any "article[] intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man."  21 U.S.C. § 321(g)(1)(B).  To qualify as a biologic, however, a substance must be a "protein," "virus," "blood," or other listed substance that is "applicable to the prevention, treatment, or cure of a disease or condition of human beings."  42 U.S.C. § 262(i)(1).

Congress established a process for determining the regulatory classification of a product.  Under that process, a sponsor seeking FDA approval to market a new product "may submit a request" seeking "classification of the product as a . . . biological product."  21 U.S.C. § 360bbb-2(a).  Within 60 days of receiving such a request, the agency "shall determine the classification of the product" and "shall provide . . . a written statement that identifies such classification."  *Id*. § 360bbb-2(b).  If FDA "does not provide the statement within [a] 60-day period," the sponsor's request "shall be considered to be a final determination" of

the agency, subject to modification in limited circumstances, including

"for public health reasons based on scientific evidence." *Id*. § 360bbb-

2(c).

### B.　Regulatory Background

This appeal concerns whether retatrutide qualifies as a biological

product subject to regulation under the Public Health Service Act on the

ground that it is a protein. Because Congress did not define the term

"protein," FDA exercised its statutory authority to promulgate a

regulatory definition. *See, e.g.,* 21 U.S.C. § 371(a); 42 U.S.C. § 262. In

developing that definition, FDA "appli[ed] its scientific expertise,"

considered public comments (including comments received in extensive

proceedings before publication of the proposed rule), and "conducted an

extensive analysis of the scientific literature." *Definition of the Term*

*"Biological Product,"* 83 Fed. Reg. 63,817, 63,8219-20 (Dec. 12, 2018)

(Notice of Proposed Rulemaking).

Based on those inputs and after considering comments received in

response to the proposed rule, FDA determined that "most, if not all"

sources "agree" on certain defining features of a protein. *Definition of*

*the Term "Biological Product*," 85 Fed. Reg. 10,057, 10,058 (Feb. 21,

6

2020) (Final Rule).  As particularly relevant here, the agency found that a protein is a "long, complex polymer[] of alpha amino acids."  83 Fed. Reg. at 63,820.  An "alpha amino acid is an amino acid in which there is only one carbon atom between an amino group and a carboxy group."  A.264; *see also* A.174 (T. Pollard, *Cell Biology* 21 (Elsevier Science 2002)).  As a result of that structure, alpha amino acids can establish connections with each other known as "peptide bonds."  A.459 (D. Voet, et al., *Biochemistry* 68 (Wiley 2004)).  Those bonds enable alpha amino acids to coalesce into "longer, more complex chains," 83 Fed. Reg. at 63,820 (Notice of Proposed Rulemaking), that consist of a "regularly repeating" pattern of peptide-bond units composed of alpha amino acids that together form a protein's "backbone or main chain," A.447-48 (T. Creighton, *Encyclopedia of Molecular Biology Volumes 1-4* (Wiley 1999)).  The main chain's sequence of alpha amino acids informs a protein's "three-dimensional structure," which in turn determines the protein's "function."  A.474 (emphases omitted) (H. Lodish et al., *Molecular Cell Biology* 65 (6th ed. 2007)).

For the same reason that alpha amino acids are the "building blocks of proteins," other types of amino acids are not.  A.275 (1 S.

Maloy, *Brenner's Encyclopedia of Genetics, Amino Acids* 108 (2d ed. 2013)).  Unlike alpha amino acids, other amino acids include "additional carbons" between their "amino group" and "carboxyl group."  A.264. That prevents non-alpha amino acids from forming the peptide bonds that are essential to a protein's sequence, which determines its structure and associated function.  *See* A.474-77 (Lodish, et al., *Molecular Cell Biology* 65-68 (6th Ed. 2007)) (explaining how the sequence of alpha amino acids linked by peptide bonds determines a protein's primary, secondary, and tertiary structure).

During the rulemaking process, some commenters disagreed with FDA's determination that, to "provide[] regulatory clarity," it was appropriate to identify a minimum number of alpha amino acids that must be present in a protein.  85 Fed. Reg. at 10,059.  No commenter disputed, however, that the only relevant amino acids are alphas. Indeed, in a 2014 comment submitted in response to an FDA guidance document that was a precursor to the rule challenged here, Lilly argued that "[b]ased on [its] review of the scientific literature," a protein "is a linear polymer of α[alpha]-amino acids with a specific defined sequence joined together by peptide bonds . . . ."  A.61.

8

FDA's regulatory definition of a "protein" accords with these scientific principles. Under the definition, a protein is an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). The regulation goes on to clarify that when calculating "the size of the amino acid polymer," FDA will count the "total number of amino acids" in any chains that "are associated with each other in a manner that occurs in nature." *Id.*

## C.    Prior Proceedings

**1.** Lilly is the sponsor of retatrutide, an investigational new drug intended to treat obesity and related conditions. A.262. According to Lilly, retatrutide contains a chain of "39 alpha amino acids" and an "associated" chain of two additional amino acids, A.238, at least one of which is not an alpha amino acid, A.265. It is therefore undisputed that retatrutide does not include over 40 alpha amino acids, even if FDA were to agree with Lilly's assertion that the "second (associated) chain" should count toward the total number of alpha amino acids, A.238.

Lilly has nonetheless requested that FDA designate retatrutide as a biological product. It claims that "FDA should count all amino acids in retatrutide, including non-alpha amino acids, . . . in assessing protein

9

status."  A.245.  It also argues, in the alternative, that retatrutide falls within a separate statutory provision addressing products that are "analogous" to proteins.  A.250; *see* 42 U.S.C. § 262(i)(1).  That argument is not at issue in this appeal.

When Lilly first submitted a request for designation, FDA declined to accept it for filing, explaining that the request "does not contain the information required by [the] regulation[s]."  A.222-24.  Following discussions with the agency, Lilly submitted a new request on January 19, 2024, *see* A.237, and FDA issued a decision addressing the request on March 18, 2024, less than 60 days later.

In its decision, FDA concluded that retatrutide is not a biological product.  The agency explained that to qualify as a protein, a molecule must be "greater than 40 alpha amino acids in size," and that retatrutide has at most "40 alpha amino acids."  A.265.  In rejecting Lilly's contrary interpretation of the size requirement, FDA explained that "the reference to 'alpha amino acid polymer' at the beginning of the definition makes clear that only alpha amino acids are relevant to determining whether something is a protein."  A.265-66 (citing 21 C.F.R. § 600.3(h)(6)).  The agency also emphasized that "it is common

scientific knowledge that alpha amino acids are the only relevant amino acids for determining whether something is a protein." A.265. FDA went on to reject Lilly's alternative argument that retatrutide is analogous to a protein. A.268-69.

**2.** After FDA issued its decision, Lilly initiated this suit. As relevant here, Lilly alleges that FDA's refusal to designate retatrutide as a biological product is inconsistent with the regulatory text and therefore violates the APA. ShA.7. Lilly requests vacatur of the designation decision and an order compelling the agency to classify retatrutide as a biological product. A.10.

When the parties submitted cross-motions for summary judgment, the district court upheld FDA's determination that retatrutide is not a protein. The court concluded that the "most natural reading of" the phrase "alpha amino acid polymer . . . that is more than 40 amino acids" is "a polymer with more than forty *alpha* amino acids." ShA.10. It explained that FDA "made the deliberate choice to narrow the type of polymer—and by implication, the type of amino acid—relevant for determining whether a product is a 'protein.'" ShA.10. It also observed that "[o]ther contextual and historical clues support this reading."

11

ShA.11. For example, the court emphasized that "[s]cientific texts confirm" that alpha amino acids are the "building blocks of proteins." ShA.11 (quotation marks omitted). For these reasons, the court concluded that the regulation "unambiguously requires that proteins contain at least forty-one alpha amino acids." ShA.12.

Although the district court upheld FDA's determination that retatrutide is not a protein, it vacated the agency's decision and remanded for FDA to revisit its analysis of whether retatrutide is analogous to a protein. ShA.19. In doing so, the court took pains to note that "there is a 'meaningful possibility that the agency could lawfully reach the same conclusion'" on remand. ShA.16.

## SUMMARY OF ARGUMENT

**I.** This case is about how to interpret FDA's regulatory definition of a scientific term. Congress has distinguished biological products such as proteins from other drugs and has subjected them to different review procedures. Because Congress did not define the term protein, FDA promulgated a regulatory definition. In developing that definition, the agency reviewed scientific sources, including by applying its own technical expertise and canvassing scientific textbooks and dictionaries.

12

Based on that review, FDA determined that a protein is defined by its specific, defined sequence of alpha amino acids above a size threshold that typically is large enough to exhibit several of the structural and functional characteristics that generally are associated with proteins.  Alpha amino acids can establish peptide bonds with one another, allowing them to form a backbone of repeating peptide-bond units that enable proteins to form precise structures from which their function is derived.  For that reason, scientists regard alpha amino acids as the "building blocks of proteins."  A.275.  By contrast, non-alpha amino acids cannot form peptide bonds.  It is therefore "common scientific knowledge" that "alpha amino acids are the only relevant amino acids for determining whether something is a protein."  A.265.

FDA's regulatory definition implements these scientific principles by focusing on alpha amino acids.  Under the definition, a protein is an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size."  21 C.F.R. § 600.3(h)(6).  FDA thus identified a protein as a polymer whose defining component is alpha amino acids.  The size requirement that follows the term "alpha amino acid polymer" is naturally read as establishing that the polymer must

13

contain a minimum number of alpha amino acids—the components that make it an alpha amino acid polymer.  No ordinary reader would interpret the size requirement as including other amino acids that are not essential to a protein's structure and its associated function.  Other parts of the regulatory text and history confirm this understanding.

Lilly's contrary argument strips the size requirement from its regulatory and scientific context.  Lilly principally contends that because the definition first describes an "alpha amino acid polymer," but omits the "alpha" modifier in later references to amino acids, those references must encompass all amino acids, not just alphas.  But given that the definition identifies alpha amino acids as the relevant type of amino acid at the outset, it would have been redundant to reiterate the word "alpha."  Indeed, FDA and many scientific reference texts routinely use the term amino acid as a shorthand for alpha amino acids, and FDA appropriately did so in the regulation here.

Despite the obvious importance of scientific principles, Lilly fails to marshal any evidence that scientists consider non-alpha amino acids relevant when identifying what is a protein.  Notwithstanding Lilly's focus on the question whether additional material can be appended to

14

the required chain(s) of more than 40 alpha amino acids without affecting product classification, that question has no evident relevance to the issue presented here. Lilly points to no evidence that non-alpha amino acids have been considered, by anyone, to contribute to establishing that a particular substance is a protein.

**II.** Lilly fares no better in invoking a statutory provision specifying that if FDA fails to address a request for designation within 60 days, the requester's proposal generally "shall be considered to be" the agency's "final determination." 21 U.S.C. § 360bbb-2(c). Lilly does not dispute that FDA issued a timely designation decision regarding retatrutide. Lilly maintains, however, that the district court's vacatur of that decision means that FDA should be treated as if it had missed the statutory deadline and thus compelled to designate retatrutide as a biological product on remand.

As an initial matter, this argument, which addresses what FDA should conclude in a remand decision that the agency has not yet issued, is not properly before this Court. If FDA renders a remand decision with which Lilly disagrees, the appropriate course will be to initiate a new suit challenging that decision, not to inject new issues

15

into this case when it is on appeal.  In any event, the statute only applies when FDA fails to issue a decision in response to a request for designation within 60 days; it does not address a scenario where the agency provides a timely decision that is later vacated.  Lilly cites no case adopting its extraordinary understanding of vacatur's effect on statutory deadlines, and that understanding would create serious practical problems, including by transforming the limited vacatur here into a complete and final victory for Lilly.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment.  *See Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).  A reviewing court must uphold an agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## ARGUMENT

## I.    FDA Correctly Concluded That Retatrutide Is Not A Protein

**A.** This case concerns whether Lilly's investigational new drug retatrutide qualifies as a "biological product" (also known as a biologic) regulated under the Public Health Service Act.  *See* 42 U.S.C. § 262.

16

That designation is relevant because sponsors of biological products receive certain advantages relative to sponsors of products that are regulated as drugs under the Federal Food, Drug, and Cosmetic Act. For example, sponsors of biologics typically benefit from a substantially longer exclusivity period before follow-on products can enter the market. *Compare* 21 U.S.C. § 355(c)(3), *with* 42 U.S.C. § 262(k)(7).

In contrast to the relatively "broad[]" statutory definition of drugs, Congress "narrowly defined" biological products. *Ipsen Biopharmaceuticals, Inc. v. Becerra,* 108 F.4th 836, 839 (D.C. Cir. 2024). For a substance to qualify as a biologic, it must—in addition to being applicable to the prevention or treatment of human diseases or conditions—be a "protein," "virus," "blood," or other listed substance. 42 U.S.C. § 262(i)(1).

Despite including proteins in the list of substances that can qualify as biologics, Congress did not define the word "protein." The Supreme Court has recognized, however, that Congress generally had in mind substances "derived from natural, biological sources." *Sandoz Inc. v. Amgen Inc.,* 582 U.S. 1, 6 (2017). In establishing a regulatory definition of the term protein, FDA accordingly looked to scientific

17

sources, including by "applying its scientific expertise" and conducting "an extensive analysis of the scientific literature." 83 Fed. Reg. at 63,819-20.

Following that review, FDA determined that "most, if not all" sources "agree" on certain defining features of a protein. 85 Fed. Reg. at 10,058. Among other things, scientists agree that a protein is a "long, complex polymer[] of alpha amino acids." 83 Fed. Reg. at 63,820. An "alpha amino acid is an amino acid in which there is only one carbon atom between an amino group and a carboxy group." A.264. Because of that structure, alpha amino acids can establish chemical bonds with each other known as "peptide bonds." 85 Fed. Reg. at 10,058. Those bonds allow alpha amino acids to form "longer, more complex chains," *id.*, that consist of a "regularly repeating" pattern of peptide-bond units of alpha amino acids that together comprise a protein's "backbone or main chain," A.447-48 (T. Creighton, *Encyclopedia of Molecular Biology* (Wiley 1999)). The main chain's sequence of alpha amino acids informs a protein's "three-dimensional structure," which in turn determines the protein's "function." A.474 (emphases omitted) (H. Lodish et al., *Molecular Cell Biology* 65 (6th ed. 2007)).

18

Just as alpha amino acids are the "building blocks of proteins," other types of amino acids are not. A.275 (1 S. Maloy, *Brenner's Encyclopedia of Genetics, Amino Acids* 108 (2d ed. 2013)). Unlike alpha amino acids, other amino acids include "additional carbons" between their "amino group" and "carboxy group." A.264. That prevents non-alpha amino acids from forming the peptide bonds that are essential to a protein's structure and its associated function. *See* A.474-77 (Lodish, et al., *Molecular Cell Biology* 65-68 (6th ed. 2007) (explaining how a sequence of alpha amino acids linked by peptide bonds determines a protein's primary, secondary, and tertiary structure).

**B.** FDA's regulatory definition implements these scientific principles. Under that definition, a protein is an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). Thus, the agency identified a protein as a polymer whose defining component is alpha amino acids. Had this definition ended with the word "polymer," it would have left unaddressed the number of those alpha amino acids and how they are organized. To "provide[] regulatory clarity," 85 Fed. Reg. at 10,059,

19

FDA specified how the alpha amino acids in a protein must be ordered (a "specific, defined sequence") and how many must be present ("greater than 40 amino acids"), 21 C.F.R. § 600.3(h)(6).

As the district court recognized, "the most natural reading of" the definition's size requirement "requires analyzing that phrase in conjunction with, rather than in isolation from," the term "alpha amino acid polymer." ShA.10-11. When a definition refers to a noun with certain characteristics, those characteristics are normally construed in light of the noun they modify. For example, if a rule applied to high-school classrooms with more than 20 students, an ordinary reader would understand that only high-school students count as students— not student-teachers assigned to the classrooms. Here, likewise, a size requirement following the term "alpha amino acid polymer" is logically read as referring to the number of alpha amino acids in the polymer. 21 C.F.R. § 600.3(h)(6). No ordinary reader would regard the size requirement as encompassing other amino acids that are not essential to a protein's structure and its associated function.

This understanding of the regulation accords with FDA's "extensive analysis of the scientific literature." 83 Fed. Reg. at 63,819.

20

"Scientific texts confirm" that alpha amino acids are the "building blocks of proteins." ShA.11 (quotation marks omitted). Indeed, "it is common scientific knowledge" that "only alpha amino acids are relevant to determining whether something is a protein." A.265 (FDA decision). Nothing in the regulatory definition's text or history suggests that FDA intended to deviate from that paradigm.

FDA's interpretation of the size requirement is reinforced by the parallel requirement that an alpha amino acid polymer have "a specific, defined sequence." 21 C.F.R. § 600.3(h)(6). In the context of a protein, a scientist would normally understand such a sequence as describing a chain of pre-determined length with a pre-determined order of alpha amino acids linked by peptide bonds. *See supra* pp. 18-19; *see also* 83 Fed. Reg. at 63,820 (explaining that the prototypical example of a polymer with a specific, defined sequence is insulin, which has a precisely defined alpha amino acid sequence consisting of two alpha amino acid chains that are associated with each other in a manner that occurs in nature). Given that the sequence requirement focuses on alpha amino acids, it is unsurprising that the adjacent size requirement shares the same focus.

21

Because FDA identified alpha amino acids as the defining components of proteins "at the beginning of the definition," it was unnecessary to "repeat the 'alpha' modifier each time the [agency] use[d] the term amino acid." A.265 (FDA decision). As the district court explained, by referring at the outset to an "alpha amino acid polymer," FDA "made the deliberate choice to narrow the type of polymer—and by implication, the type of amino acid—relevant for determining whether a product is a 'protein.'" ShA.10. This drafting approach reflects scientific practice. "In most [scientific] contexts"—including when discussing proteins—"the term 'amino acids' refers to a[lpha]-amino acids." A.275 (1 S. Maloy, *Brenner's Encyclopedia of Genetics, Amino Acids* 108 (2d ed. 2013)). The record is replete with examples of FDA and scientific authorities initially referring to alpha amino acids but later discussing the same substances without reiterating the "alpha" modifier. *See, e.g.*, 83 Fed. Reg. at 63,821 (using "amino acid polymer" in reference to alpha amino acid polymers); 85 Fed. Reg. at 10,059-60 (same); A.275 (similar); A.280 (similar).

That the regulatory definition's uses of the term amino acids refer only to alpha amino acids is confirmed by part of the regulatory text

22

that Lilly overlooks.  After defining the term protein, the regulation

goes on to clarify how FDA will calculate the size of "the amino acid

polymer" when it contains multiple chains.  21 C.F.R. § 600.3(h)(6).

Although the quoted phrase does not include the "alpha" modifier, it

indisputably points to the "alpha amino acid polymer" described in the

protein definition.  *Id.*  The regulatory definition at issue thus

illustrates that FDA used the terms "amino acid" and "alpha amino

acid" interchangeably.

Even Lilly accepted FDA's understanding of a protein before it

initiated these proceedings.  Lilly previously described a product that

contains a 39-alpha amino acid chain and a "side chain" similar to that

of retatrutide (but with an additional component that is not an alpha

amino acid) as "a 39-amino-acid . . . peptide"—not a protein.  *See* FDA,

2023 Mounjaro Product Labeling 9,

https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/215866Orig

1s002s006lbl.pdf (last visited May 15, 2026).[1]  That product description

---

[1] Lilly submitted the relevant new drug application in September 2021, well after FDA finalized the protein definition at issue here.  *See* FDA, Mounjaro Approval Letter, https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/215866 Orig1s000ltr.pdf.

is significant both insofar as Lilly itself used "39-amino-acid" as a shorthand for "39-alpha-amino-acid" and insofar as it demonstrates Lilly's understanding that a drug cannot be classified as a protein unless it contains over 40 alpha amino acids. It also reflects Lilly's longstanding recognition that only alpha amino acids are relevant to characterization as a protein. In a 2014 comment submitted in response to an FDA guidance document that was a precursor to the rule challenged here, Lilly argued that a protein should be defined as "[a] linear polymer of α[alpha]-amino acids with a specific defined sequence joined together by peptide bonds . . . ." A.61. Lilly nowhere suggested that non-alpha amino acids were relevant.

For these reasons, the district court correctly recognized that "the regulation unambiguously requires that proteins contain at least forty-one alpha amino acids." ShA.12. And even if this Court were to conclude, after considering "the standard tools of interpretation," that the protein definition is "genuinely ambiguous," FDA's construction would at a minimum reflect a "reasonable" interpretation of the agency's own regulations that is entitled to deference. *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). Although Lilly faults (Br. 35) the government

24

for failing to cite *Kisor* in its district-court papers, the government specifically argued that "even if FDA's regulatory definition" had not "expressly address[ed]" the issue here, "the agency nonetheless reasonably applied its scientific expertise" in construing the definition. Dkt. No. 31, at 17; *see Bew v. City of Chicago*, 252 F.3d 891, 895-96 (7th Cir. 2001) (noting that "parties are not limited to the precise arguments they made below"). And contrary to Lilly's suggestion (Br. 36), FDA's construction is not new, *see, e.g.*, 85 Fed. Reg. at 10,058 (describing a protein as a polymer "made up of alpha amino acids"), and the agency's scientific expertise is plainly implicated here.

There is no dispute that, so long as only alpha amino acids are considered in evaluating the size requirement, retatrutide is not a protein. The agency determined, and Lilly does not contest, that retatrutide contains at most "40 alpha amino acids," not the "greater than 40" that the regulatory definition requires. A.265. The district court's judgment should therefore be affirmed in relevant part.[2]

---

[2] The separate analysis of whether retatrutide falls within the statutory provision addressing products that are "analogous" to a protein, 42 U.S.C. § 262(i)(1), is not before this Court because the district court remanded to the agency for further proceedings on that issue, ShA.16.

**C.** Lilly's construction of the size requirement is notable for how many interpretive tools it ignores. Lilly strips the size requirement from the sentence in which it appears and analyzes the requirement as though it does not modify the term "alpha amino acid polymer." Lilly likewise has no answer to the regulatory history—including the final rule's preamble—reflecting FDA's understanding that only alpha amino acids are relevant when identifying proteins. *See supra* pp. 18-19, 22-23. Perhaps most telling, Lilly fails to marshal any scientific evidence supporting its position, nor does it even attempt to explain why any protein definition would turn on the presence or absence of amino acids that are not alphas.

**1.** Lilly's argument depends on artificially splitting the protein definition into parts and considering those parts in isolation. FDA defined a protein as an "alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size." 21 C.F.R. § 600.3(h)(6). For much of its brief, however, Lilly discusses only the "greater than 40 amino acids" clause, without noting that the clause modifies and closely follows the term "alpha amino acid polymer." *See, e.g.*, Br. 4-6, 18. Even when Lilly recites the full regulatory definition, it

atextually inserts numbers dividing that definition into separate elements. *See, e.g.*, Br. 20. That is not a plausible approach to interpreting a definition that comprises a single sentence setting out interconnected rather than independent requirements. *See Lopez v. Gonzales*, 549 U.S. 47, 56 (2006) ("[O]ur interpretive regime reads whole sections of a statute together to fix on the meaning of any one of them . . . .").

Even Lilly's preferred analogy demonstrates the error of Lilly's isolated approach to each part of the definition. According to Lilly (Br. 34), "if someone asked for a 'chocolate layer cake more than five layers tall,' no baker would think that only chocolate layers could count towards the size requirement." At the outset, that is an odd hypothetical: if Lilly would be satisfied in those circumstances with a cake with four chocolate layers and two vanilla ones, it is more lenient than many consumers. Perhaps a consumer's dissatisfaction would stem from a perceived violation of the requirement that the cake be a "chocolate layer cake" rather than of the requirement that the cake have more than five layers, but the relevant point is that it makes no sense to treat each component of the definition in isolation. Further, a

27

customer who received three layers of chocolate cake and three layers of frosting could justifiably complain of having been deceived.  In any event, even if various consumers and bakers could quibble about the details, assessing whether the request has been satisfied requires assessing the request as a whole, in the context of some background understanding of the ultimate thing being defined.  *Cf. Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004) ("[W]e cannot forget that we ultimately are determining the meaning of the term 'crime of violence.'").  There, the question is how bakers count layers; here, the key background principle is that alpha amino acids are the "building blocks of proteins." A.275 (1 S. Maloy, *Brenner's Encyclopedia of Genetics, Amino Acids* 108 (2d ed. 2013)).

When Lilly finally addresses the entire regulatory definition, it struggles to offer a coherent construction.  At times, Lilly claims (Br. 34) that an alpha amino acid polymer need only "contain[] [some] alpha amino acids."  On that theory, a polymer with a specific, defined sequence of 40 non-alpha amino acids, plus one or two alphas, would qualify as a protein.  Such a molecule would bear no resemblance to any known protein.  On other occasions, Lilly suggests (Br. 21) that an

28

alpha amino acid polymer must be "composed primarily of alpha amino acids." But the regulatory text provides no such definition, and Lilly's suggestion would leave open the question of what "primarily" might mean—an odd result for a regulation that was designed to "reduce[] regulatory uncertainty" in this area by creating a "bright-line rule" about the number of alpha amino acids. 85 Fed. Reg. at 10,059.

Lilly's abbreviated attempt to identify scientific support for its construction underscores the absence of any such support. Lilly's only affirmative example is advanced in support of the uncontested proposition that the presence of additional amino acids does not necessarily prevent a polymer from being an "alpha amino acid polymer." *See* Br. 21. To that end, Lilly points to Sogroya, an FDA-approved protein that contains, in addition to an "191 alpha amino acid chain," a "side-chain" that includes at least two components that are not alpha amino acids. A.266.[3] The question of what additional material

---

[3] Lilly also briefly mentions (Br. 32) proline, an amino acid that does not include a single carbon atom connecting the carboxyl and amino groups. Lilly forfeited this argument by failing to present it to the agency. *See Illinois Ins. Guar. Fund v. Becerra*, 33 F.4th 916, 922 (7th Cir. 2022). In any case, proline "is considered as an AA"—an alpha amino acid—notwithstanding its atypical structure. A.278 (1 A.

*Continued on next page.*

can be appended to the required chain(s) of more than 40 alpha amino acids has no evident relevance to the issue presented in this case, and Sogroya itself did not present that issue because it had 150 more alpha amino acids than the definition requires. And to the extent Sogroya is relevant, its regulatory history undermines Lilly's argument. Sogroya's sponsor described the product's alpha amino acids as its "protein part," and neither the sponsor nor FDA suggested that removing the non-alpha amino acids would "change that [the product] is a protein." A.266.

Lilly's related effort (Br. 30-31) to cast doubt on FDA's scientific conclusions fails to come to grips with the extensive scientific support for FDA's approach. As discussed, FDA "conducted an extensive analysis of the scientific literature" and found that "most, if not all, sources" agree that proteins are chains "made up of alpha amino acids." 83 Fed. Reg. at 63,819-20; *see also id.* at 63,824 (referring to more than 10 different scientific dictionaries and textbooks). Without engaging

---

Ginguay et al., *Encyclopedia of Biological Chemistry*, *Amino Acid Metabolism* 2 (3d ed. 2021)). Consistent with that scientific consensus, FDA counted the four prolines in retatrutide as alpha amino acids. A.265.

with that analysis, Lilly insists that FDA's designation decision relied on a "single source" that does not "address[] the definition of a protein *at all*." Br. 30. Even putting aside that the designation decision was not required to retread ground covered by the regulation, the decision cites at least five science textbooks, *see* A.264-65, which confirm that alpha amino acids "are the building blocks of proteins," A.275 (1 S. Maloy, *Brenner's Encyclopedia of Genetics, Amino Acids* 108 (2d ed. 2013)).[4] Lilly provides no basis for second-guessing "the agency's evaluations of scientific data within its area of expertise." *American Gas. Ass'n v. U.S. DOE*, 157 F.4th 476, 492-93 (D.C. Cir. 2025) (citation omitted). The sources cited in this brief and in FDA's rule and designation decision discuss proteins generally, not just proteins found

---

[4] *See also, e.g.*, A.197 (B. Alberts, et al., *Molecular Biology of the Cell* 129 (4th ed. 2002)) ("[A] protein molecule is made from a long chain of these amino acids, each linked to its neighbor through a covalent peptide bond"—a type of bond formed only by alpha amino acids); A.273 2 T. Ubuka, *Handbook of Hormones: Comparative Endocrinology for Basic and Clinical Research, Amino Acids* 1061 (2nd ed. 2021)) ("Although more than 300 amino acids exist in nature, proteins of humans are synthesized almost exclusively from 20L-a[alpha]-amino acids," where L refers to a particular "configuration" of an alpha amino acid).

31

in humans, so Lilly's protestations (Br. 31-32) about focusing on human proteins alone are beside the point.

**2.** Most of Lilly's remaining arguments depend on an interpretive presumption that does not apply here. As Lilly notes, "[w]here [a drafter] includes particular language in one section of [a text] but omits it in another section of the same [text], it is generally presumed that [the drafter] acts intentionally." Br. 22 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Lilly's reliance (Br. 22-26) on that presumption fails on multiple levels.

As an initial matter, *Russello*'s rationale does not extend to the provision here. Where unconnected clauses use different variants of a term, it makes sense to infer a difference in intended meaning. As the Supreme Court has recognized, however, that inference disappears where "an introductory phrase" informs the meaning of "several terms coming after it." *Pulsifer v. United States*, 601 U.S. 124, 134 (2024). In those circumstances, it may be "more efficient" to spell out the phrase initially but to omit it in subsequent iterations—just as FDA did with the word "alpha." *Id.*

32

In any event, *Russello*'s general presumption is incompatible with the protein definition's particular text and history. Lilly appears to believe that regulatory drafters never adopt a "shorthand" for a longer term. Br. 25-26 (citing *City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025)). But that is exactly what FDA did here. As explained above, the regulatory definition first describes an "alpha amino acid polymer," and later points back to "the amino acid polymer." *See supra* p. 23 (citing 21 C.F.R. § 600.3(h)(6)). The agency followed the same approach in the final rule's preamble, which repeatedly uses the term "amino acids" to refer to alpha amino acids alone. *See supra* p. 22 (citing examples). So whatever the utility of *Russello*'s presumption in other contexts, it is not a reliable guide to the agency's intent here.

Even if the presumption were relevant, it would be overcome by the interpretive principles favoring FDA's construction. Although Lilly depicts the *Russello* presumption as "dispositive," Br. 25, it "is only a presumption, and a rebuttable one at that," *Hope v. Acorn Fin. Inc.*, 731 F.3d 1189, 1192 (11th Cir. 2013). Indeed, the Supreme Court and other courts have repeatedly concluded that other interpretive principles prevail over *Russello*. *See, e.g.*, *City of Columbus v. Ours Garage &*

33

*Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002); *United States v. Reed*, 734 F.3d 881, 889 (9th Cir. 2013); *Mayo Clinic v. United States*, 997 F.3d 789, 794 (8th Cir. 2021); *Port Auth. Trans-Hudson Corp. v. Secretary, U.S. DOL*, 776 F.3d 157, 165 (3d Cir. 2015). In this case, likewise, other interpretive clues—including the regulation's text and history as well as its scientific context—provide overwhelming support for FDA's reading.

Lilly similarly fails to advance its argument by highlighting the regulation's reference to "the total number of amino acids." 21 C.F.R. § 600.3(h)(6). Contrary to Lilly's suggestion (Br. 24-25), the word "total" does not refer to a combination of alpha and non-alpha amino acids. Instead, it clarifies that when considering a polymer with "two or more amino acid chains," FDA will count the "total number" of amino acids in chains that are "associated with each other in a manner that occurs in nature." 21 C.F.R. § 600.3(h)(6). That clarification does not answer the antecedent question of whether the regulation addresses only alpha amino acids, as FDA has recognized, or instead encompasses other amino acids that do not form the peptide bonds generally considered

34

essential to a protein's structure and its associated function, as Lilly claims.

No more successful is Lilly's suggestion (Br. 31) that FDA's construction "render[s] the word 'alpha' in the protein definition superfluous." There is nothing superfluous about FDA's use of the term "alpha amino acid" at the beginning of the definition to make clear that the definition focuses on the subset of amino acids that scientists regard as relevant to proteins. The same approach—referring to alpha amino acids at the outset and then using the phrase amino acids as a shorthand—appears in the final rule's preamble and in many scientific sources. *See supra* pp. 22-23.

It is likewise error for Lilly to suggest that the district court "upheld the agency's decision on a theory that the agency itself expressly disclaimed." Br. 33 (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943)). Lilly portrays the district court as holding that an "alpha amino polymer" must be composed exclusively "of alpha amino acids" even though FDA did not advance that argument in its designation decision. But the court rejected Lilly's arguments for the same reason

35

as FDA: "the regulation unambiguously requires that proteins contain at least forty-one alpha amino acids."  ShA.12.

## II.    Lilly's Alternative Argument Is Not Properly Before This Court And Is Meritless In Any Event

Lilly also argues that even if retatrutide does not qualify as a protein, FDA should be compelled to treat it as one because of the procedural history of this case.  Under 21 U.S.C. § 360bbb-2, if FDA fails to address a request for designation within 60 days, the sponsor's recommendation must generally "be considered to be" the agency's "final determination."  Lilly does not dispute that FDA issued its designation decision within the 60-day window.  Lilly maintains, however, that the district court's vacatur of that decision means that FDA should be treated as if it had missed the deadline, converting the court's limited remand order into a complete victory for Lilly.  This argument is not properly before this Court and fails on the merits in any event.

**A.** As an initial matter, Lilly's argument about what it believes FDA must do on remand is not appropriately presented in this appeal. This case involves Lilly's challenge to FDA's March 2024 decision declining to designate retatrutide as a biological product.  Dkt. No. 1, at

26-28 (Compl.).  Lilly's Section 360bbb-2 argument, by contrast, asserts that in FDA's future remand decision, the agency must treat retatrutide as a biologic regardless of whether it meets the governing criteria. Lilly's anticipated objections to a decision the agency has not yet rendered are not part of this appeal.  If FDA issues a remand decision with which Lilly disagrees, the appropriate course would be for Lilly to initiate a new action challenging the decision, not to inject new issues into this case when it is on appeal.  *See Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) (recognizing that "[r]eview under the APA" is limited to the particular "final agency action" challenged) (emphasis and quotation marks omitted).

This threshold problem with Lilly's argument is underscored by the unusual jurisdictional basis for this case.  Generally, remand orders "are not appealable, because they are not 'final' decisions."  *Edgewater Found. v. Thompson*, 350 F.3d 694, 696 (7th Cir. 2003); *see* 28 U.S.C. § 1291(a).  In nonetheless asserting jurisdiction, Lilly relies on a limited exception to that rule.[5]  Under the exception, a "remand to an agency is

---

[5] Although Lilly also invokes (Br. 2) a provision creating appellate jurisdiction over orders granting or denying requests for preliminary

*Continued on next page.*

37

final when the proceedings may end without further litigation—for, if the private claimant prevails [on remand], the agency cannot obtain judicial review of its own decision." *Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735, 738 (7th Cir. 2008).  That logic does not support jurisdiction over Lilly's Section 360bbb-2 argument.  Should FDA again decline to designate retatrutide as a biological product, Lilly will have an opportunity to challenge that decision in district court, and whichever party loses there can then appeal in the normal course.  There is thus no basis for Lilly to invoke an exception premised on the need to prevent issues from "escap[ing] appellate review." *Edgewater*, 350 F.3d at 696.

**B.** In any event, FDA satisfied the statutory deadline.  Congress specified that after FDA receives a request "respecting the classification of [a] product," the agency "shall determine the classification" and "provide . . . a written statement that identifies such classification . . . and the reasons for such determination."  21 U.S.C. § 360bbb-2(a)-(b).  Congress further specified, in a provision titled "[i]naction of [the]

---

injunctions, that provision does not apply here because Lilly never requested such an injunction.  *See* 28 U.S.C. § 1292(a).

Secretary," that "[i]f the Secretary does not provide the [designation] statement within [a] 60-day period," the manufacturer's request "shall be considered to be a final determination by the [agency]." *Id.* § 360bbb-2(c).

FDA timely provided the required statement. When Lilly submitted its initial request for designation, the agency declined to accept it for filing, explaining that the request "does not contain the information required by our regulation" and providing specific examples. A.222-24. Following discussions with FDA, Lilly filed a new request for designation on January 19, 2024, *see* A.237, and FDA issued a written statement addressing the request on March 18, 2024, *see* A.261—within the 60-day window.

Lilly does not argue that FDA's March 2024 statement failed to satisfy the statutory timing requirements. Instead, Lilly contends (Br. 38) that the district court's vacatur of the FDA decision "require[s] treating Lilly's request for designation of retatrutide as having been granted." Lilly grounds this argument in a decision of this Court noting, in passing, that the vacatur of a criminal sentence renders it a "nullity." *Id.* (quoting *United States v. Uriarte*, 975 F.3d 596, 601 (7th

Cir. 2020) (en banc)).  The cited passage reflects the uncontroversial proposition that when a criminal sentence is vacated, resentencing is needed.  It does not remotely suggest that an agency or a court should be regarded as having missed applicable deadlines if it issues a timely order that is subsequently vacated.

Nothing in the statutory text supports Lilly's construction.  The provision Lilly invokes only applies when FDA fails to "provide the [designation] statement within [a] 60-day period" following receipt of a request for designation; it does not address a scenario where the agency provides such a statement but the statement is later vacated.  21 U.S.C. § 360bbb-2(c).  And the cited provision's title confirms that Congress was concerned with "[i]naction of [the] Secretary"—not timely action that is subject to litigation and ultimately vacated.  *Id.*  Congress thus left it to courts to determine what conditions, if any, to impose when vacating and remanding an FDA designation decision.

Although statutory deadlines are commonplace, Lilly has not identified any precedent treating such deadlines as violated when the relevant agency decision is vacated.  Notably, Section 360bbb-2 has been on the books for decades and FDA designation decisions have

sometimes been subject to vacatur, yet no court has suggested that the statute transforms those vacaturs into "final determination[s]" in the sponsor's favor. *See, e.g.*, *Genus Med. Techs. LLC v. U.S. FDA*, 994 F.3d 631, 664 (D.C. Cir. 2021) (affirming a district court's vacatur of a request for designation while discussing various paths the agency might take on remand); *Prevor v. U.S. FDA*, 67 F. Supp. 3d 125, 139-40 (D.D.C. 2014) (similar).

Lilly's contrary approach would create serious practical problems. Under Lilly's theory, even a vacatur reflecting relatively minor concerns about an agency decision would dictate a "final determination" in the sponsor's favor. 21 U.S.C. § 360bbb-2(c). This is a case in point: although the district court vacated the part of FDA's decision concluding that retatrutide is not analogous to a protein, the court took pains to emphasize that "there is a 'meaningful possibility that the agency could lawfully reach the same conclusion'" on remand. ShA.16. Nowhere does the statute suggest that Congress meant to eliminate the possibility of a limited vacatur and instead mandate that any vacatur results in complete victory for a product's sponsor. If that were the rule, FDA might need to seek an immediate stay of any vacatur order,

41

creating significant and unnecessary burdens for courts and litigants alike. Alternatively, FDA would much more aggressively seek, and district courts would presumably be more likely to grant, remand without vacatur to avoid the anomalous result that an erroneous classification must be adopted.

Without acknowledging these problems, Lilly insists that its unprecedented construction of the statute is necessary to prevent a parade of horribles, including "*seriatim* litigation," "perverse incentives" for FDA to decide fewer than all possible issues presented by a designation request, and even the possibility that in this case, the "parties could be in for at least *five more* trips to this Court." Br. 40. It is true that transforming the district court's limited vacatur into a complete and final victory for Lilly would prevent further administrative proceedings or litigation. What is also true is that although no court has adopted Lilly's approach, its concerns have not materialized. That is unsurprising, as FDA has no more cause to invite protracted litigation than Lilly. To the extent that Lilly expresses concern (*id.*) about "depriving the public of prompt access to new medicines," Lilly could have accepted FDA's March 2024 designation of

42

retatrutide as a drug that is not a biological product and sought approval under the relevant statutory framework, rather than litigating for the past two years. And expedition and other docket-control measures are available in appropriate cases, an approach that is far superior to arbitrarily calling time and forcing an erroneous designation.

Similarly unsupported is Lilly's fallback argument (Br. 41-42) that the statute compels FDA to complete the remand within 60 days of the district court's vacatur. For the reasons given above, the statute has no application when FDA "provide[s] the statement within [a] 60-day period" but the statement is later vacated. 21 U.S.C. § 360bbb-2(c). The 60-day clock starts upon the agency's "receipt of the [designation] request," not when a court vacates a designation decision. *Id*. § 360bbb-2(b). Lilly's contrary argument is particularly puzzling in the context of this case. It was Lilly, not FDA, that opted to appeal to this Court. It is difficult to understand why FDA would be required to race to issue a decision on remand at the same time that this Court is considering issues that could supersede that decision. And for its part, Lilly would be entitled to await the outcome of the remand and then, if it were

43

adverse, return to the district court and then if necessary bring the whole case to this Court at once.  Lilly's decision to take advantage of an opportunity for a piecemeal appeal is not a reason to authorize it to declare victory in the name of judicial economy.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed insofar as it upheld FDA's determination that retatrutide is not a protein.

Respectfully submitted,

*Of Counsel:*

MICHAEL B. STUART
  *General Counsel*
  *U.S. Department of Health*
  *and Human Services*

SEAN R. KEVENEY
  *Chief Counsel*

WENDY S. VICENTE
  *Deputy Chief Counsel, Litigation*

BARBARA ALKALAY
  *Senior Counsel for Litigation*
  *Food and Drug Administration*

BRETT A. SHUMATE
  *Assistant Attorney General*

THOMAS E. WHEELER II
  *United States Attorney*

DANIEL TENNY

*s/ Steven H. Hazel*
STEVEN H. HAZEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7217*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-2498*

May 2026

45

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,471 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ Steven H. Hazel*
Steven H. Hazel

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Steven H. Hazel*

Steven H. Hazel

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 262 .............................................................................. A1

21 C.F.R. § 600.3 ........................................................................... A2

**42 U.S.C. § 262**

**§ 262. Regulation of Biological Products**

. . . .

**(i)** "Biological product" defined

In this section:

> **(1)** The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

. . . .

**21 C.F.R. § 600.3**

**§ 600.3. Definitions**

. . . .

(h) Biological product means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

. . . .

(6) A protein is any alpha amino acid polymer with a specific, defined sequence that is greater than 40 amino acids in size. When two or more amino acid chains in an amino acid polymer are associated with each other in a manner that occurs in nature, the size of the amino acid polymer for purposes of this paragraph (h)(6) will be based on the total number of amino acids in those chains, and will not be limited to the number of amino acids in a contiguous sequence.

. . . .