Case No. 26-1301

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

_____

ELI LILLY AND COMPANY,

*Plaintiff-Appellant*

v.

ROBERT F. KENNEDY JR., ET AL.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Southern District of Indiana
No. 24-cv-1503 (Hon. Tanya Walton Pratt)

_____

## BRIEF *AMICUS CURIAE* OF OUTSOURCING FACILITIES ASSOCIATION IN SUPPORT OF DEFENDANTS-APPELLEES

_____

ANDREW M. GROSSMAN
BENJAMIN D. JANACEK
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., N.W.
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com
bjanacek@bakerlaw.com

*Attorneys for Amicus Curiae
Outsourcing Facilities Association*

**Save As** | **Clear Form**

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1301</u>

Short Caption: <u>Eli Lilly and Company v. Robert F. Kennedy, Jr., et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Outsourcing Facilities Association</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Baker & Hostetler LLP</u>

(3)   If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

       <u>None</u>

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       <u>None</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

Attorney's Signature: <u>/s/ Andrew M. Grossman</u>    Date: <u>May 18, 2026</u>

Attorney's Printed Name: <u>Andrew M. Grossman</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [✓]  **No** [ ]

Address: <u>Baker & Hostetler LLP</u>

   <u>1050 Connecticut Ave., N.W., Suite 1100, Washington, D.C. 20036</u>

Phone Number: <u>(202) 861-1697</u>    Fax Number: <u>(202) 861-1783</u>

E-Mail Address: <u>agrossman@bakerlaw.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>26-1301</u>

Short Caption: <u>Eli Lilly and Company v. Robert F. Kennedy, Jr., et al.</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐  **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Outsourcing Facilities Association</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Baker & Hostetler LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

      <u>None</u>

   ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

      <u>None</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

Attorney's Signature: <u>/s/ Benjamin D. Janacek</u>    Date: <u>May 18, 2026</u>

Attorney's Printed Name: <u>Benjamin D. Janacek</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐  **No** ☑

Address:  <u>Baker & Hostetler LLP</u>

   <u>1050 Connecticut Ave., N.W., Suite 1100, Washington, D.C. 20036</u>

Phone Number: <u>(202) 861-1649</u>    Fax Number:  <u>(202) 861-1783</u>

E-Mail Address: <u>bjanacek@bakerlaw.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .........................................i, ii

TABLE OF CONTENTS ....................................................................iii

TABLE OF AUTHORITIES.................................................................iv

INTEREST OF *AMICUS CURIAE*.......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................2

ARGUMENT ......................................................................................3

    I.    Lilly's Financial Interests Cannot Override the
        FDA's Expert Judgment .......................................................3

        A. Lilly Seeks a Windfall at the Expense of Patients ............5

        B. The Regulatory Definition of "Protein"
           is Unambiguous ............................................................. 14

        C. If the Definition Were Ambiguous, FDA's
           Interpretation Would Be Entitled to Deference .............. 16

    II.    Lilly's Demand for Immediate Designation Is Not
        Properly Before the Court and Fails on the Merits.............. 18

CONCLUSION ..................................................................................23

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of*
  *Fed. Rsrv. Sys.,*
  745 F.2d 677 (D.C. Cir. 1984)..............................................................21

*Baltimore Gas & Elec. Co. v. NRDC, Inc.,*
  462 U.S. 87 (1983) ...............................................................................17

*Cascadia Wildlands v. United States BLM,*
  153 F.4th 869 (9th Cir. 2025)..............................................................17

*Facebook, Inc. v. Duguid,*
  592 U.S. 395 (2021) .............................................................................14

*Families for Freedom v. Napolitano,*
  628 F.Supp.2d 535 (S.D.N.Y. 2009) ....................................................21

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) .............................................................................22

*Five Points Road Joint Venture v. Johanns,*
  542 F.3d 1121 (7th Cir. 2008) .............................................................20

*General Motors Corp. v. United States,*
  496 U.S. 530 (1990) .............................................................................20

*Huntington Ingalls, Inc. v. Dir., Office of Workers' Comp. Progs.,*
  *United States Dept. of Labor,*
  70 F.4th 245 (5th Cir. 2023)................................................................18

*INS v. Orlando Ventura,*
  537 U.S. 12 (2002) ...............................................................................22

*Johnson v. United States Office of Personnel Mgmt.,*
  783 F.3d 655 (7th Cir. 2015) ...............................................................21

*Kisor v. Wilkie,*
  588 U.S. 558 (2019) ....................................................................... 16, 18

iv

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ................................................................. 16

*Marcello v. Bonds,*
  349 U.S. 302 (1955) ................................................................. 21

*Negusie v. Holder,*
  555 U.S. 511 (2009) ................................................................. 22

*Rempfer v. Von Eschenbach,*
  535 F.Supp.2d 99 (D.D.C. 2008) ............................................. 17

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) ................................................................. 22

*Talk Am., Inc. v. Mich. Bell Tel. Co.,*
  564 U.S. 50 (2011) ................................................................... 17

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
  566 U.S. 560 (2012) ................................................................. 16

*Teva Pharms. USA, Inc. v. United States FDA,*
  514 F.Supp.3d 66 (D.D.C. 2020) ............................................. 17

*Thompson v. W. States Med. Ctr.,*
  535 U.S. 357 (2002) ................................................................... 9

*Wright v. Califano,*
  587 F.2d 345 (7th Cir. 1978) ................................................... 20

**Statutory and Regulatory Authorities**

5 U.S.C. § 555 ............................................................................ 20

5 U.S.C. § 559 ...................................................................... 18, 21

5 U.S.C. § 702 ............................................................................ 21

5 U.S.C. § 706 ...................................................................... 19-21

21 U.S.C. § 355(c)(3)(E) ............................................................. 5

21 U.S.C. § 360bbb-2(b) ......................................................... 19-22

42 U.S.C. § 262(k)(7) ...............................................................5

83 Fed. Reg. 63817 (Dec. 12, 2018) ........................................15

85 Fed. Reg. 10057 (Feb. 21, 2020) .................................. 14, 15

**Other Authorities**

A. Scalia & B. Garner, Reading Law: The Interpretation of
Legal Texts (2012) ...............................................................14

AARP, Proposed Change to Medicare Drug Price Negotiation
Warrants Deeper Scrutiny (Apr. 29, 2025)................................. 6, 8, 9

Andrew Monge and Linda Thai, Office of Science and Data
Policy, Competition in the U.S. Therapeutic Biologics
Market (July 2025) ...............................................................8

Anupama Sapkota, Proteins: Properties, Structure, Types,
Functions, Microbe Notes (Nov. 13, 2023) ...........................15

Biotechnology Innovation Organization, Compounding: BIO
Comments on FDA Draft Guidance Prescription Requirement
Under Section 503A of the Federal Food, Drug, and Cosmetic
Act (July 19, 2016)...............................................................9

Brittanica, Amino Acid (May 15, 2026) .................................16

Cleveland Clinic, Amino Acids (Dec. 22, 2021)......................16

FDA, Biological Product Definitions.......................................7

FDA, Biosimilars Action Plan: Balancing Innovation and
Competition (July 2018).......................................................5

FDA, Compounding when Drugs are on FDA's Drug Shortages
List (Aug. 8, 2025) ..............................................................10

Jonathan Gardner, A three-decade monopoly:
How Amgen built a patent thicket around its top-selling drug,
BioPharmaDive (Nov. 1, 2021).............................................11

Kaiser Family Foundation, Key Facts About Medicare Drug Price
    Negotiations (Mar. 11, 2026) ............................................................. 6

Initiative for Medicines, Access and Knowledge, Biologics,
    Biosimilars and Patents: A Beginner's Guide ......................... 7, 11, 12

IQVIA, Assessing the Biosimilar Void in the
    U.S. (Feb. 3, 2025) .............................................................................. 8

L.G. Wade, Jr., Organic Chemistry Ch. 24 – Amino Acids, Peptides,
    and Proteins (7th ed. 2010) .............................................................. 15

Oliver J. Wouters, et al., Differential Legal Protections for Biologics
    vs Small-Molecule Drugs in the US (Dec. 24, 2024) ........................... 6

West Virginia University Today, WVU legal scholar makes
    case for equal protection among different medication
    classes (Jan. 24, 2025) ................................................................. 7, 12

Western Oregon University,
    Chemistry Chapter 2: Protein Structure ........................................... 15

2A Singer, Sutherland Statutes and Statutory Construction § 47:26 ... 14

## INTEREST OF *AMICUS CURIAE*

The Outsourcing Facilities Association (OFA) is the trade association representing FDA-registered Section 503B outsourcing facilities who focus on providing patients and healthcare providers with safe and effective compounded medications. OFA members work with patients, healthcare providers, and facilities on a daily basis to ensure the specific needs, of both providers and patients, for compounded medications are satisfied. OFA works with industry, governmental agencies, and healthcare providers to educate and advocate for outsourcing facilities and the critical need to ensure that patients and providers have access to the medications they need.

OFA has a fundamental interest in the resolution of this case, and those like it, which are directed at aggrandizing the market position and power of large manufacturers like Eli Lilly & Company (Lilly). A victory for Lilly in this case will come at the expense of patient needs and patient access.

No party's counsel authored this brief in whole or in part. No party or its counsel contributed financial support intended to fund the preparation or submission of this brief. No individual or organization other than OFA and its counsel contributed financial support intended to fund the preparation or submission of this brief. Counsel for the Appellees consent to the filing of this brief, and Counsel for the Appellant do not oppose it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Lilly asks this Court to ignore plain text, disregard agency scientific expertise, and direct an extraordinary remedy at odds with the Administrative Procedure Act (APA). Lilly never articulates what the point of all this is, probably because the answer has nothing to do with scientific integrity or patient benefit. While the line between drug and biologic is unknown to most of the public, drug manufacturers like Lilly stand to recover a massive financial windfall and competitive advantage if the Food and Drug Administration (FDA) deems Lilly's product—in this case, the weight-loss drug retatrutide—to be a biologic instead of a drug.

Though the precise definition of "protein" may sound academic, this determination has significant implications for millions of Americans. If retatrutide is a biologic, Lilly's monopoly on its production and sale will be extended by an additional seven years. Lilly also stands to reap numerous other benefits, including over would-be competition, with respect to patent rights, and in relation to retatrutide's status for pharmacies. All of these advantages would make Lilly much wealthier, but they come at the expense of patients, who could expect to see reduced access and higher prices for a minimum of twelve years, but likely much longer than that.

Lilly's money grab should not be sanctioned by this Court. First, the FDA and District Court correctly concluded that the definition of

"protein" is unambiguous. And even if it were ambiguous, the agency's interpretation of the definition is the type of scientific and technical judgment for which agencies are due deference. Second, the District Court issued the proper remedy in remanding to the agency to apply a proper legal standard in determining whether retatrutide is "analogous" to a protein. Lilly's request that this Court direct the agency to make such a finding, before the agency has even applied the proper framework, is at odds with the APA and finds no support in statutory text or precedent.

Because the District Court correctly applied both the FDA's regulatory framework and the APA's procedural and remedial rules, its judgment should be affirmed.

## ARGUMENT

### I. Lilly's Financial Interests Cannot Override the FDA's Expert Judgment

Congress created distinct regimes for biologics and drugs, and FDA properly determined retatrutide is not a biologic. Lilly's opening brief never answers the first question many people may have about this case: why would Lilly care whether FDA determines that retatrutide is a "drug" or a "biological product"? After all, FDA has already determined other weight loss products, such as semaglutide and tirzepatide, are drugs. Indeed, the vast majority of therapeutic agents are drugs. Lilly evades that question because, as one might suspect, the answer is unseemly. If retatrutide is a biological product, Lilly will receive an

enormous windfall at the expense of patients. That is no basis for overriding the FDA's reasoned decisionmaking that was both consistent with statutory text and scientific context.

Biologic designation confers a bundle of powerful market advantages unavailable to ordinary drugs. If retatrutide is classified as a biologic, Lilly will gain: (1) extended exclusivity; (2) a significant advantage over others attempting to develop and gain approval of competitors; (3) potential limits on compounding; (4) patent-litigation benefits; and (5) limited automatic substitution by pharmacists. None of these benefits further patient interests, but they all further the interest of Lilly's bottom line.

Lilly's attempted money grab not only contradicts Lilly's purported commitment to patients, but is also contrary to plain text and well-established precedent. The FDA's definition of "protein" is unambiguous, and the District Court properly held that the FDA's regulation "unambiguously forecloses Lilly's reading." ShA.8. Even if the definition of protein were ambiguous, resolving that ambiguity is a technical, scientific inquiry for which the FDA is naturally entitled to deference. The Court should decline Lilly's invitation to disrupt the distinction Congress drew between drugs and biologics and undermine the FDA's administration of that distinction just so Lilly can reap greater profits.

### A. Lilly Seeks a Windfall at the Expense of Patients

If retatrutide is a biologic, Lilly will be able to charge higher prices and reap a windfall, and patients will suffer from reduced availability and affordability, fewer alternative formulations, and constraints on physician ability to tailor treatment to individual needs. Indeed, without these advantages, "prices can fall dramatically once follow-on products are available, potentially lowering costs for patients and payors and expanding access to these innovations." FDA, Biosimilars Action Plan: Balancing Innovation and Competition (July 2018).[1] A few examples of the financial and competitive advantages Lilly seeks underscore what this case is really about.

**Extended Exclusivity**. Biologic status first extends Lilly's monopoly over retatrutide. The Biologics Price Competition and Innovation Act (BPCIA) grants biologics a 12-year window of product exclusivity, 42 U.S.C. § 262(k)(7), compared to the normal 5-year window for drugs, 21 U.S.C. § 355(c)(3)(E). This exclusivity window means the FDA is prevented from approving a biosimilar product[2] until 12 years have passed from the biologic's date of first approval.

---

[1] *Available at* https://www.fda.gov/media/114574/download.

[2] A "biosimilar" is to a biologic what a "generic drug" is to a drug. Both can only be produced and approved following the expiration of the exclusivity window.

5

Moreover, under the Inflation Reduction Act, biologics are exempt from selection for Medicare price negotiation for 11 years compared to the 7-year window for drugs. Kaiser Family Foundation, Key Facts About Medicare Drug Price Negotiations (Mar. 11, 2026).[3] The ability for Medicare to negotiate prices "is expected to save Medicare and taxpayers billions of dollars." AARP, Proposed Change to Medicare Drug Price Negotiation Warrants Deeper Scrutiny (Apr. 29, 2025).[4] This ensures Lilly can keep retatrutide's price artificially high for an additional 4 years.

Unsurprisingly, these competitive advantages produce financial advantages. From 2009 through 2023, new biologics averaged more than twice the median peak revenues of drugs. Oliver J. Wouters, et al., Differential Legal Protections for Biologics vs Small-Molecule Drugs in the US (Dec. 24, 2024).[5] And the annual cost of treatment for a biologic was nearly three times higher than for a drug.[6] The bottom line is clear: "biologics earn much higher revenues, both at their peak and overall, and are significantly more expensive for patients compared to small-molecule

---

[3] *Available at* https://www.kff.org/medicare/key-facts-about-medicare-drug-price-negotiation/?entry=table-of-contents-drugs-qualify-for-price-negotiations-if-they-have-high-total-medicare-spending-no-generic-or-biosimilar-equivalents-and-are-several-years-past-fda-approval.
[4] *Available at* https://www.aarp.org/pri/topics/health/prescription-drugs/medicare-drug-price-negotiation-deeper-scrutiny/.
[5] *Available at* https://pubmed.ncbi.nlm.nih.gov/39585667/.
[6] *Id.*

6

drugs." West Virginia University Today, WVU legal scholar makes case for equal protection among different medication classes (Jan. 24, 2025).[7] While Lilly profits, patients get squeezed.

**Crowding Out Competitors.** In addition to the obvious competitive disadvantages that result from longer exclusivity windows, it is much harder for competitors to develop and gain approval for biosimilar products when they are finally permitted to try. The FDA defines a "biosimilar" as a biological product that is "highly similar" and has no clinically meaningful differences from an existing FDA approved reference product with respect to its safety, purity and potency. FDA, Biological Product Definitions.[8] Because biologics are produced by living cells and contain a structure much more complex than drugs, each batch of branded biologics varies slightly from the last.

Given the relatively complexity of biologics, the regulatory standards for proving that a biologic is "highly similar" require costly and complex clinical trials. Since biologic batches have slight variations from one batch to the next, a biosimilar manufacturer must show that a biosimilar is as similar to the biologic as the biologic is to itself. Initiative for Medicines, Access and Knowledge, Biologics, Biosimilars and Patents:

---

[7] *Available at* https://wvutoday.wvu.edu/stories/2025/01/24/wvu-legal-scholar-makes-case-for-equal-protection-among-different-medication-classes.

[8] *Available at* https://www.fda.gov/files/drugs/published/Biological-Product-Definitions.pdf (last visited May 4, 2026).

7

A Beginner's Guide.[9] This differentiates the process from that of generic drugs, which generally only require demonstrating bioequivalence.[10] The FDA then undertakes a 12-month review process which may result in approval or rejection of the biosimilar application.

The difficulty and expense of obtaining approval of biosimilars have crushed competition in the biologics market. As of July 2025, there are 226 marketed biologics the United States, 62 of which are eligible for competition. Andrew Monge and Linda Thai, Office of Science and Data Policy, Competition in the U.S. Therapeutic Biologics Market (July 2025).[11] Of those 62, only 12 have a marketed biosimilar—meaning that over 80 percent of competition-eligible biologics have no competition.[12] Further, "only 10 percent of the nearly 120 biologic drugs whose monopoly periods are expected to end over the next decade have biosimilar competitors in development." AARP, *supra*; *see also* IQVIA, Assessing the Biosimilar Void in the U.S. (Feb. 3, 2025).[13] This means

---

[9] *Available at* https://www.i-mak.org/wp-content/uploads/2024/05/Biologics-Biosimilars-Guide_IMAK.pdf (last visited May 4, 2026).

[10] *Id.*

[11] *Available at* https://aspe.hhs.gov/sites/default/files/documents/3a05af053eeeaa4c7c95457dcafefa68/ASPE-Competition-in-the-Biologics-Market.pdf.

[12] *Id.*

[13] *Available at* https://www.iqvia.com/insights/the-iqvia-institute/reports-and-publications/reports/assessing-the-biosimilar-void-in-the-us.

biologics "are at significantly lower risk of facing direct competition from biosimilar drugs once their monopoly period ends."[14]

**Potential Compounding Limits.** Compounding is "a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a modification." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360 (2002). OFA has many members who have helped fulfill the massive market demand for GLP-1 weight loss drugs in recent years. Indeed, millions of weight-loss drug dosages have been satisfied by compounders. Compounders have ensured patients have affordable access to important medications and custom formulations, otherwise unavailable, prescribed by their physicians.

Consistent with their general views on market competition, manufacturers generally contend that the law forbids the compounding of biologics. *See, e.g.*, Biotechnology Innovation Organization, Compounding: BIO Comments on FDA Draft Guidance Prescription Requirement Under Section 503A of the Federal Food, Drug, and Cosmetic Act (July 19, 2016).[15] Under that view, if retatrutide is classified as a biologic rather than a drug, then it will be immune to competition from compounders.

---

[14] AARP, *supra*.

[15] *Available at* https://www.bio.org/letters-testimony-comments/compounding-bio-comments-fda-draft-guidance-prescription-requirement. Lilly is a BIO member.

9

This again would come at the expense of patients, and not only in dollars and cents. First, barring compounding would prevent compounders from stepping in to satisfy demand if and when manufacturers like Lilly are unable to do so. *See generally* FDA, Compounding when Drugs are on FDA's Drug Shortages List (Aug. 8, 2025)[16]. Indeed, compounders have served a vital role in ensuring patient access during times that GLP-1 drugs were in shortage. Lilly seeks to weld shut this vital safety valve to protect patient access. Second, barring compounding would prevent patients from obtaining custom formulations prescribed by their physicians to meet individual patients' specific needs. Compounding is often used, for example, to substitute out inactive ingredients to which certain patients are allergic, to tailor formulations to specific conditions or treatments, and to ease administration for patients with conditions that complicate administration of the branded drug. In Lilly's view, these vital services are simply competition to quelched at all costs.

**Patent-Litigation Benefits.** Under the BPCIA, patents (and patent litigation) play an important role in determining when biosimilars may enter the market and compete with biologics. Oftentimes, biologic manufacturers will develop and use a "patent thicket" strategy to maintain a monopoly on their market far longer than the normal

---

[16] *Available at* https://www.fda.gov/drugs/human-drug-compounding/compounding-when-drugs-are-fdas-drug-shortages-list.

exclusivity window. Patent thickets are a complex web of dozens or hundreds of overlapping patent applications that, in this instance, drug makers file with the Patent and Trademark Office.

Manufacturers use many patent thicket strategies to deter competition and increase their profits. For example, manufacturers may apply for patents regarding specific steps in the manufacturing process. And "[e]ven if these manufacturing process patents are not used for the [biologic], biosimilar manufacturers still have to design around them all to avoid any claim of infringement, which is often not possible." Initiative for Medicines, Access and Knowledge, *supra*. This helps Lilly make money, but it does not help patients access their medications.

Manufacturers may also build a patent thicket around different biologic formulations. One prominent example is Amgen's drug Enbrel, which treats different types of arthritis. Enbrel was first patented in 1992, but 14 years after that patent expired, Amgen has still faced no competition for Enbrel. That is because Amgen has built "an interlocking wall of intellectual property protection that's often referred to as a 'patent thicket.'" Jonathan Gardner, A three-decade monopoly: How Amgen built a patent thicket around its top-selling drug, BioPharmaDive (Nov. 1, 2021).[17] Amgen has received at least 68 granted patents around Enbrel, ranging from manufacturing process and formulation to methods of use

---

[17] *Available at* https://www.biopharmadive.com/news/amgen-enbrel-patent-thicket-monopoly-biosimilar/609042/.

11

and administration.[18] This resulted in Enbrel continuing to hold a monopoly far longer than its normal exclusivity window, allowing Humira to increase its profits, while American consumers paid artificially high prices and suffered reduced access. Indeed, Enbrel will still not face any competition until, at least, 2029.[19]

This high-volume web creates significant uncertainty, litigation risk, and deters biosimilar manufacturers from acting. Patent thickets are why "biosimilars haven't had their intended impact" in bringing down prices and improving patient access.[20] These thickets ultimately constitutes a barrier to entry for many would-be competitors and "creates ambiguity for Americans regarding the availability of more affordable medications." Initiative for Medicines, Access and Knowledge, *supra*. Biologic patents are "more effective at delaying biosimilar entry than patents on small-molecule drugs are at delaying generic entry." West Virginia University Today, *supra*. That, of course, is the entire point: block competition, extend exclusivity, and reap monopoly profits from patients.

**Limited Pharmacy Substitution.** Pharmacists routinely substitute generic drugs for brand name drugs without consulting the prescriber. Most of the time, patients do not even know this process, known as

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

automatic pharmacy substitution, is happening. The process has significant advantages for patients, allowing greater access to important medications at affordable prices.

But for biologics, automatic pharmacy substitution is a much more complicated and costly path. To allow a biosimilar to qualify for automatic pharmacy substitution, the manufacturer must take the additional step of ensuring the biosimilar qualifies as an interchangeable biologic. This entails an even more cumbersome process than creating an ordinary biosimilar, which, as described above, is already far more costly than creating a generic drug.

Interchangeable biologics are biosimilars that meet the additional regulatory burden of producing the same clinical result as the biologic in any given patient. To gain this status, biosimilar manufacturers must conduct more clinical studies that investigate the effect of switching a patient back and forth between the biosimilar and the biologic. These studies cost tens of millions of dollars, and most biosimilar manufacturers therefore forego the option. This means that most of these products are not eligible for automatic pharmacy substitution, which means patients have less access and must pay higher prices.[21] Once again, a strategy that helps Lilly and harms patients.

---

[21] This process is more cumbersome than the process in places such as Europe and Canada. There, biosimilars automatically qualify as interchangeable biologics without the need for further testing and study.

## B. The Regulatory Definition of "Protein" Is Unambiguous

The District Court correctly concluded that the regulatory definition of "protein" is unambiguous. OFA agrees with the government and the District Court in their analysis that both text and context foreclose Lilly's argument divorcing "alpha" from "alpha amino acid."

Rather than retread the (correct) points made by the court below and FDA in its appeal briefing, *amicus* instead focuses on the importance of context in resolving the statutory inquiry here. As relevant, courts routinely examine both "text and statutory context" when determining how a qualifier applies in a sentence. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 406 (2021); *see also* 2A Singer, Sutherland Statutes and Statutory Construction § 47:26, at 448 (Courts should "apply the words to the subjects which, by context, they seem most properly to relate."). How a descriptor applies is "highly sensitive to context. Often the sense of the matter prevails: *He went forth and wept bitterly* does not suggest that he went forth bitterly." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 150 (2012).

Start with the text. The question here is whether "alpha" qualifies all uses of the phrase "amino acids" in the regulatory definition of "protein." ShA.4. The agency first said "the term *protein* means any alpha amino acid polymer with a specific defined sequence that is greater than 40 amino acids in size." 85 Fed. Reg. 10057, at 10057/2 (Feb. 21, 2020). The agency later provided that protein "refer[s] to amino acid

14

polymers…made up of alpha amino acids that are linked by peptide bonds." 85 Fed. Reg. at 10058/2; *see also* 83 Fed. Reg. 63817, 63820/2 (Dec. 12, 2018) (Proposed rule stating that "protein…refer[s] to amino acid polymers ('chains') made up of *alpha* amino acids linked by peptide bonds.") (emphasis added). In the first example, the agency used "alpha amino acid polymer" and "amino acids," and in the second example, the agency used "amino acid polymers" and "alpha amino acids." It is clear, then, that the agency applied "alpha" interchangeably to describe "amino acid polymer" and "amino acid" because "alpha" applied to both terms.

The broader context confirms as much. It is well known in the scientific community that the term "amino acid" "is almost always used to refer to an a-amino [alpha amino] carboxylic acid." L.G. Wade, Jr., Organic Chemistry Ch. 24 – Amino Acids, Peptides, and Proteins, at 1154 (7th ed. 2010)[22]; *see also* Western Oregon University, Chemistry Chapter 2: Protein Structure (Proteins "are all…polymers of alpha amino acids.").[23] Indeed, the "term amino acid is short for alpha-amino carboxylic acid." Anupama Sapkota, Proteins: Properties, Structure, Types, Functions, Microbe Notes (Nov. 13, 2023)[24]; Brittanica, Amino

---

[22] *Available at* https://web.pdx.edu/~wamserc/C336S09/Wade_Ch24.pdf (last visited May 4, 2026).

[23] *Available at* https://wou.edu/chemistry/courses/online-chemistry-textbooks/ch450-and-ch451-biochemistry-defining-life-at-the-molecular-level/chapter-2-protein-structure/ (last visited May 4, 2026).

[24] *Available at* https://microbenotes.com/amino-acids-proteins/.

15

Acid (May 15, 2026) (same)[25]; Cleveland Clinic, Amino Acids (Dec. 22, 2021) (same).[26] Both the agency and the regulated community know exactly what the FDA means when it defines protein as an "alpha amino acid polymer…greater than 40 amino acids in size."

In sum, both the "technical meaning[]" and the "statutory context" support the FDA's interpretation of the term "protein." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012).

### C. If the Definition Were Ambiguous, FDA's Interpretation Would Be Entitled to Deference

Even if the definition of "protein" were ambiguous, the FDA's interpretation would be entitled to deference. In this context, the FDA is applying its judgment in defining and interpreting a scientific and technical term over which it possesses unique insight and expertise. And the Supreme Court has recently held that when an agency has a "comparative expertise in resolving a regulatory ambiguity," the agency's resolution of such ambiguity receives deference, and courts should ask only whether the agency's interpretation is reasonable. *See Kisor v. Wilkie*, 588 U.S. 558, 578 (2019); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401 (2024) (overruling *Chevron*, but leaving *Kisor*'s deference framework in place). As other courts have recognized,

---

[25] *Available at* https://www.britannica.com/science/amino-acid/Standard-amino-acids.

[26] *Available at* https://my.clevelandclinic.org/health/articles/22243-amino-acids.

the term "protein" is a "scientific term of art." *Teva Pharms. USA, Inc. v. United States FDA*, 514 F.Supp.3d 66, 102 (D.D.C. 2020). When an agency makes judgments at "frontiers of science," a "reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 103 (1983); *see also Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50 (2011) (deferring to agency's administration of a technical regulatory scheme based on agency's particular expertise).

FDA's interpretation of the definition of "protein" is clearly reasonable and within its area of technical and scientific expertise. After all, FDA is the federal agency tasked with making "complex chemical and pharmacological" judgments based on its "scientific expertise." *Rempfer v. Von Eschenbach*, 535 F.Supp.2d 99, 107 (D.D.C. 2008). And, no surprise, FDA's interpretation is plainly a reasonable one. As shown, the scientific community widely understands proteins to be composed of alpha amino acids. The agency's interpretation of its definition consistent with the scientific consensus is the height of reasonableness. The Court should decline Lilly's invitation for the Court to "act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Cascadia Wildlands v. United States BLM*, 153 F.4th 869, 906 (9th Cir. 2025) (deferring to agency's reasonable approach on a "technical, scientific issue where deference to agency technical expertise is at its apogee").

17

Indeed, an "agency is at its strongest when the interpretation is within the bounds of its ordinary duty and implicates technical matters." *Huntington Ingalls, Inc. v. Dir., Office of Workers' Comp. Progs., United States Dept. of Labor*, 70 F.4th 245, 256 (5th Cir. 2023) (citing *Kisor*, 588 U.S. at 577). In *Huntington*, the Fifth Circuit deferred to the Department of Labor's interpretation of whether audiologists are "physicians" under the Longshore and Harbor Workers' Compensation Act. Writing for the Court, Judge Elrod held the interpretation was "directly related to the Department's expertise—work-related injuries and the compensation and medical care that accompany them." *Id.* So too here, where the definition of "protein" fits squarely within the FDA's scientific and technical expertise regarding a "scientific term of art."

## II.  Lilly's Demand for Immediate Designation Is Not Properly Before the Court and Fails on the Merits

Lilly's demand that this Court compel FDA to designate retatrutide as a biologic is both not properly before the Court and makes a hash of the APA's appellate-review model. It is wrong three times over. First, this appeal challenges the district court's judgment regarding the agency's interpretation of "protein"; it does not challenge any failure to act on the part of the agency. Second, Lilly's argument improperly seeks to override the default remedy provided by the APA (vacatur) in the absence of any statutory language expressly displacing the APA's default, as required by APA § 559. Third, where Congress committed classification in the first

18

instance to the FDA, appellate courts may not override that assignment by deciding the classification de novo.

*First*, Lilly's demand for immediate designation of retatrutide as a biologic is in the nature of a claim under APA § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed," but there is no such claim in this case or before this Court. Lilly's claims, under APA § 706(2), seek to hold unlawful and set aside FDA's determination that retatrutide is not a biologic. *See* ShA.5 ("Lilly requests that the Court (1) declare that Defendants' denial of Plaintiff's request for designation of retatrutide as a biological product is…unlawful under the APA."). The district court upheld the FDA's interpretation of "protein" and consequent determination that retatrutide is not a protein, but vacated and remanded the FDA's second determination that retatrutide is not analogous to a protein for the FDA to apply a proper framework concerning the meaning of "analogous protein." ShA.16. Remand is the remedy that the APA prescribes, 5 U.S.C. § 706(2)(A), when a court finds an agency's action was arbitrary and capricious and must be set aside.

Lilly now argues (at 41) that, because the FDA has not issued a designation for retatrutide in the months since the district court's judgment, this Court must direct FDA to designate retatrutide as a biologic. This argument rests on 21 U.S.C. § 360bbb-2(b), which generally provides that FDA must "determine the classification" of a proposed biologic "[n]o later than 60 days after the receipt of [a] request" made

19

pursuant to subsection (a). But Lilly brought no claim under APA § 706(1) challenging "agency action unlawfully withheld or unreasonably delayed"; instead, it challenged only the agency's determination. Moreover, FDA did exactly what the statute requires: it issued a determination within 60 days of Lilly's request under Section 360bbb-2(a). A.261-69. The administrative record in this case contains no subsequent request by Lilly to which FDA failed to timely respond.

Lilly is also wrong in its contention (at 42) that, if the Court allows the remand to stand, "the agency would have an unlimited amount of time to reach a new decision." Under the APA, agencies must act on matters before it with "due regard for the convenience and necessity of the parties or their representatives and within a reasonable time." 5 U.S.C. § 555(b); *see generally General Motors Corp. v. United States*, 496 U.S. 530, 539 (1990) (recognizing agencies are "subject to the APA's statutory requirements of timeliness"); *Wright v. Califano*, 587 F.2d 345, 351 (7th Cir. 1978) (recognizing Section 555(b) gives parties the "right to prompt action upon their requests"). Nothing in the FDCA supersedes that provision, so it controls. *See Five Points Road Joint Venture v. Johanns*, 542 F.3d 1121, 1126-27 (7th Cir. 2008) ("Congress made it clear that the APA would apply *unless* there was some expression by Congress that the APA was being superseded.").

If FDA does unreasonably delay on remand, Lilly could seek to vindicate its right to a decision within a reasonable time. *See* 5 U.S.C

§ 706(1) (A "reviewing court shall…compel agency action unlawfully withheld or unreasonably delayed."); *Families for Freedom v. Napolitano*, 628 F.Supp.2d 535, 540 (S.D.N.Y. 2009) (holding that agency delay was unreasonable and ordering response within thirty days). The problem for Lilly is that it hasn't brought such a claim in this case.

*Second*, Lilly's remedial argument improperly seeks to override the APA, which prescribes only vacatur as a remedy for unlawful agency action, not ordering an agency to reach a particular outcome. APA § 706(2) provides that a court may "set aside" unlawful agency action. 5 U.S.C. § 702(2). This Court has recognized that vacatur is the standard remedy for an APA claim. *See Johnson v. United States Office of Personnel Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015).

Lilly's argument assumes that 21 U.S.C. § 360bbb-2(b) overrides the APA's remedial framework, but that position is unsupportable. Another statute supersedes the APA's default procedures only "to the extent that it does so expressly." 5 U.S.C. § 559. Such exemptions "are not lightly to be presumed," *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); instead, "Congress's intent to make a substantive change [must] be clear," *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 686 (D.C. Cir. 1984). Lilly does not contend there is anything in the FDCA that expressly supersedes or conflicts with APA

21

procedures, nor could it: 21 U.S.C. § 360bbb-2 does not evince any intent to override the APA's default remedy of vacatur.

*Third*, Lilly's extraordinary demand that this Court substitute its judgment for that of the FDA by requiring FDA to designate retatrutide a biologic is difficult to take seriously. That is not how any of this works. A court reviewing agency action "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Rather, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* Thus, "a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002). A court should not "disregard[] the agency's legally mandated role." *Id.* at 17.

Those principles squarely apply here, where it is the FDA that is tasked with determining whether a product is a biologic or a drug. *See Negusie v. Holder*, 555 U.S. 511, 524 (2009) (remanding for agency to make an "initial determination of the statutory interpretation question and its application to this case"). The FDA has already done so once—within the prescribed statutory framework—and it will do so again, in due course. Courts may then evaluate the FDA's actions based on "the grounds invoked by the agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 196

22

(1947). Lilly provides no basis for this Court to override FDA's statutorily mandated consideration.

## CONCLUSION

The district court's judgment should be affirmed.


Dated: May 18, 2026                    Respectfully submitted,

                                        /s/ Andrew M. Grossman
                                        ANDREW M. GROSSMAN
                                        BENJAMIN D. JANACEK
                                        BAKER & HOSTETLER LLP
                                        Washington Square, Suite 1100
                                        1050 Connecticut Ave., N.W.
                                        Washington, D.C. 20036
                                        (202) 861-1697
                                        agrossman@bakerlaw.com
                                        bjanacek@bakerlaw.com

                                        *Attorneys for Amicus Curiae
                                        Outsourcing Facilities
                                        Association*

23

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(b)(4) as the text consists of 4,815 words as counted by Word for the Microsoft 365 program used to generate this brief. This brief also complies with the type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) as it was prepared using Word for Microsoft 365 in 14-point Century Schoolbook font.

Dated: May 18, 2026                                     */s/ Andrew M. Grossman*
                                                        Andrew M. Grossman

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Seventh Circuit using the Court's CM/ECF system, which will send a notification of such filing to all counsel of record for all parties.

/s/ Andrew M. Grossman
Andrew M. Grossman