No. 26-1301

# In the United States Court of Appeals for the Seventh Circuit

―――――――――――――――――――

ELI LILLY AND COMPANY,

*Plaintiff-Appellant,*

v.

ROBERT F. KENNEDY JR., ET AL,

*Defendants-Appellees.*

―――――――――――――――――――

On Appeal from the United States District Court
for the Southern District of Indiana
No. 24-cv-1503 (Hon. Tanya Walton Pratt)

―――――――――――――――――――

## REPLY BRIEF OF APPELLANT

―――――――――――――――――――

Allon Kedem
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

*Counsel for Eli Lilly and Company*

June 5, 2026

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 2

I.  RETATRUTIDE IS A PROTEIN AND THUS A BIOLOGICAL PRODUCT ...................................2

    A.  Retatrutide Is a Protein Under the Protein Definition's Plain Text .......................3

    B.  The Government Cannot Avoid a Plain Reading of the Text by Appealing to Unstated Assumptions and Deference to FDA .....................................................10

II.  THE DISTRICT COURT INDEPENDENTLY ERRED IN REMANDING TO THE AGENCY.............................................................................................................18

    A.  This Court Has Jurisdiction to Review the Remedy Entered by the District Court ...............................................................................................................18

    B.  Remand after Expiration of the Statutory Deadline Conflicts with the Statute's Automatic Take-Effect Provision.............................................................21

CONCLUSION ......................................................................................................... 26

CERTIFICATE OF COMPLIANCE .................................................................................. 27

CERTIFICATE OF FILING AND SERVICE ....................................................................... 28

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Am. Gas. Ass'n v. DOE,*
    157 F.4th 476 (D.C. Cir. 2025) ..............................................................11

*Am. Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (D.C. Cir. 2020).........................................................25, 26

*City & Cnty. of San Francisco v. EPA,*
    604 U.S. 334 (2025)..........................................................................1, 6

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.,*
    536 U.S. 424 (2002)...............................................................................7

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024)..............................................................................25

*Forney v. Apfel,*
    524 U.S. 266 (1998)........................................................................19, 20

*Hope v. Acorn Fin., Inc.,*
    731 F.3d 1189 (11th Cir. 2023) ...........................................................8, 9

*Kisor v. Wilkie,*
    588 U.S. 558 (2019)................................................................11, 12, 13

*Loper Bright v. Raimondo,*
    603 U.S. 369 (2024).............................................................................11

*Mayo Clinic v. United States,*
    997 F.3d 789 (8th Cir. 2021) .................................................................8

*Ortiz v. McDonough,*
    6 F.4th 1267 (Fed. Cir. 2021) .............................................................12

*Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan,*
    195 F.3d 975 (7th Cir. 1999)...............................................................20

*Port Authority Trans-Hudson Corp. v. Sec'y,*
    776 F. 3d 157 (3d Cir. 2015) .................................................................9

*Pulsifer v. United States,*
    601 U.S. 124 (2024)..........................................................................9, 10

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin,*
    174 F.4th 81 (D.C. Cir. 2026) ................................................................23

*Rush Univ. Med. Ctr. v. Leavitt,*
    535 F.3d 735 (7th Cir. 2008) .........................................................19, 20

*Russello v. United States,*
    464 U.S. 16 (1983)..................................................................................6

*Sandoz Inc. v. Amgen Inc.,*
    582 U.S. 1 (2017)..................................................................................14

*Scheidelman v. Comm'r,*
    682 F.3d 189 (2d Cir. 2012) ................................................................12

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943)................................................................................17

*Sullivan v. Finkelstein,*
    496 U.S. 617 (1990)..............................................................................20

*In re Sw. Airlines Voucher Litig.,*
    799 F.3d 701 (7th Cir. 2015) .................................................................6

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ...............................................................23

*United States v. Reed,*
    734 F.3d 881 (9th Cir. 2013) .............................................................7, 8

*United States v. Uriarte,*
    975 F.3d 596 (7th Cir. 2020)................................................2, 21, 22, 23

*W. Transp. Co. v. Webster City Iron & Metal Co.,*
    657 F.2d 116 (7th Cir. 1981)................................................................12

**Statutes**

18 U.S.C.
    § 3553(f)(1) ...........................................................................................10

21 U.S.C.
    § 360bbb-2(b) .......................................................................................21
    § 360bbb-2(c)............................................................................21, 23, 25

28 U.S.C.
    § 1291...................................................................................................19
    § 1292(a)(1) .........................................................................................20

42 U.S.C.
    § 262(i) (2018)......................................................................................14

49 U.S.C.
    § 14501(c)(1) ..........................................................................................7
    § 20109(c) ..............................................................................................9

First Step Act of 2018, § 403(b), Pub. L. No. 115-391, 132 Stat. 5194, 5222
    (Dec. 21, 2018) ...................................................................................22

Pub. L. No. 116-94, Div. N, Title I, § 605, 133 Stat. 3127 (2019)...........................14

## Regulations

21 C.F.R. § 600.3(h)(6)..................................................................1, 2, 3, 10, 17

36 C.F.R. § 4.2(a).........................................................................................7

85 Fed. Reg. 10,057 (Feb. 21, 2020) ...........................................................13

## Other Authorities

B. Garner, Dictionary of Legal Usage 639 (3d ed. 2011)........................................9

**INTRODUCTION**

The government does not dispute that retatrutide is an "alpha amino acid polymer" that is "greater than 40 amino acids in size" when counting the "total number of amino acids in [its] chains." 21 C.F.R. § 600.3(h)(6). Retatrutide is therefore a protein under FDA's own definition and properly classified as a biological product. The government defends FDA's decision not to classify retatrutide as a biological product based on an unstated "implication" supposedly underlying the protein definition: that only alpha amino acids should count toward the size requirement. This "implication" supposedly transforms the phrase "amino acid" into "*alpha* amino acid" whenever it appears in the regulatory text— contrary to the normal presumption that drafters of legal text do not omit words "simply because [they] wanted to save ink or assumed that … interested parties would understand that the omission … was inconsequential." *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025).

The government's attempt to rewrite the regulatory text based on implicit subtext fails. FDA claims that only *alpha* amino acids count toward the size requirement because they are the building blocks of proteins that naturally occur in "the human body." A.278. But the PHSA *does not* limit its definition of "proteins" to human proteins or even those produced through natural biosynthesis; on the contrary, Congress amended the Act's biological product definition specifically to *include* chemically synthesized proteins in addition to those derived from biological processes. And the government's newfound focus on peptide bonding—a point raised nowhere in the regulatory record or district court briefing—directly contradicts the regulation itself, which expressly embraces all "amino

acid chains" that "are associated with each other *in a manner that occurs in nature*," 21 C.F.R. § 600.3(h)(6) (emphasis added), not just those connected via peptide bonding.

The government fares no better trying to defend the district court's decision to remand on the analogous-product issue long after the statute's mandatory deadline had already passed. Under this Court's precedent, "the ordinary effect of [a] vacatur" is to treat the vacated decision as if it had not been made in the first place. *United States v. Uriarte*, 975 F.3d 596, 602 (7th Cir. 2020). It makes no sense to depart from that approach here: Giving FDA unlimited time to replace a vacated designation decision would effectively nullify the FDCA's 60-day deadline and automatic take-effect provision. It would also create perverse incentives for the agency to churn out quick but unlawful decisions, or to parcel out its reasoning piecemeal. The result more consistent with the text and Congress's clear intention to provide manufacturers with timely certainty is to put the onus on FDA to seek a stay or remand without vacatur in appropriate cases.

In any event, almost *six months* have now passed since the district court's decision, with no FDA action in sight. In fashioning an appropriate remedy for the agency's APA violation (which is unchallenged here), this Court need not permit the agency to keep Lilly in perpetual limbo. Lilly is entitled to finality on the decision of whether retatrutide is a biological product, just as the FDCA prescribes.

## ARGUMENT

## I.     RETATRUTIDE IS A PROTEIN AND THUS A BIOLOGICAL PRODUCT

As the government does not dispute, retatrutide is an "alpha amino acid polymer"; it has "a specific, defined sequence"; and its amino acid chains are "associated with each other in a manner that occurs in nature." 21 C.F.R. § 600.3(h)(6); *see* A.246-47, 264-65. The

key dispute here is about whether retatrutide satisfies the regulation's size requirement. Retatrutide satisfies that requirement because it has 41 amino acids, so is "greater than 40 amino acids in size" when counting "the total number of amino acids." 21 C.F.R. § 600.3(h)(6). The government's contrary arguments constitute an impermissible attempt to rewrite the regulation's plain text based on FDA's unstated assumptions and gestures toward scientific consensus.

### A.    Retatrutide Is a Protein Under the Protein Definition's Plain Text

The government's textual argument rests on the fact that the protein definition "refer[s] at the outset to an 'alpha amino acid polymer.'" U.S.Br.22 (quoting ShA.10). According to the government, the use of "alpha amino acid polymer" in an "introductory phrase" reflects FDAs "choice to narrow the type of polymer," which "by implication" also limits "the type of amino acid relevant for determining whether a product is a 'protein.'" U.S.Br.22 (quoting ShA.10). This argument ignores the plain text and structure of the regulation.

1.    Most importantly, both sides agree on a key premise: An alpha amino acid polymer *can* contain non-alpha amino acids. Given that premise, the initial reference to an "alpha amino acid polymer" *does not* imply anything about the type of amino acids that count towards satisfying the size requirement. That is especially true here, since the regulation goes on to say that "the size of the amino acid polymer for purposes of [the protein definition] will be based on *the total number of amino acids*." 21 C.F.R. § 600.3(h)(6) (emphasis added). The government's narrowed-by-implication argument is at war both with the text and with FDA's own understanding of an alpha amino acid polymer.

The government's hypothetical "rule [for] high-school classrooms with more than 20 students," U.S.Br.20, illustrates the problem. The government contends "an ordinary reader would understand that only high-school students count as students—not student-teachers assigned to the classrooms." U.S.Br.20. Put aside the fact that, to be textually comparable to the protein definition, the rule would have to partially repeat a phrase—first *with* a modifier, and later *without* it. The government's rule generates its desired outcome only by making assumptions that contradict the parties' shared premise here. First, it assumes that high-school classrooms contain *only* high-school students. But here, both sides agree an alpha amino acid polymer *can* contain alpha and non-alpha amino acids. Second, it also assumes that student-teachers *are not* "students" as the term is commonly understood. But here, both sides agree that non-alpha amino acids *are* amino acids.

Consider a more-comparable rule: "High-school student clubs must have at least ten students to receive funding." If one starts with the premise that high-school student clubs *can* include non-high-school students—for example, advanced middle-school students—then no one would say that the math club was disqualified from receiving funding because it had nine highschoolers and two brainy middle-schoolers. That is especially true if the rule *also* said that "the size of clubs will be based on the total number of students in a club"—indicating that the type of student simply has no bearing on a club's "size," as judged by the "total number of students." So too here. Starting from the undisputed premise that an "alpha amino acid polymer" *can* contain both alpha and non-alpha amino acids, use of that phrase at the beginning of the protein definition does not support an implicit "alpha"

4

limitation in the definition's size requirement ("greater than 40 amino acids") or in its counting instruction ("total number of amino acids").

The government's response to the "chocolate layer cake" example (U.S.Br.27) also cuts against its narrowed-by-implication argument. A customer promised a "chocolate layer cake more than five layers tall" would be "dissatisf[ied]," the government says, if she received a layer cake "with four chocolate layers and two vanilla ones." U.S.Br.27. Yet the government admits that the "consumer's dissatisfaction would stem from a perceived violation of the requirement that the cake be a 'chocolate layer cake,'" rather than from "the requirement that the cake have more than five layers." U.S.Br.27.

The key dispute here, by contrast, is about whether retatrutide satisfies the size requirement of a protein (whether the cake has more than five layers), *not* whether it is an alpha amino acid polymer (whether it is a chocolate cake), because FDA *agrees* that alpha amino acid polymers can contain non-alpha amino acids. Translated to the hypothetical: A customer who starts from the understanding that her chocolate layer cake can have both chocolate and non-chocolate layers would agree that "a cake with four chocolate layers and two vanilla ones" is indeed a "chocolate layer cake more than five layers tall"—especially if the customer was told that the size of the cake would be based on "the total number of layers." Precisely *how many* chocolate layers a cake needs to be considered a "chocolate layer cake" is simply not presented in this case.

2.      The government's narrowed-by-implication argument runs contrary to the *Russello* presumption. Rather than attributing textual differences to shorthand or a need for efficiency, *Russello* presumes that a legal drafter "act[ed] intentionally and purposely

in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted). Just last year, the Supreme Court rejected an argument that Congress used "shorthand" by dropping a modifier after the first use and assuming that readers would understand that a later phrase "would be of the same kind as the ones preceding it." Reply Br. for Pet. at 8-9, *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334 (2025) (No. 23-753), 2024 WL 4360488. The Court declared the *Russello* presumption "fatal" to that line of reasoning. 604 U.S. at 344. Here, the government makes precisely the same argument. *See* U.S.Br.33 ("adopt[ing] a 'shorthand' … is exactly what FDA did here"); U.S.Br.32 ("'more efficient' to spell out the phrase initially but to omit it in subsequent iterations").

The government cites cases (U.S.Br.33-34) for the proposition that "other interpretative principles [can] prevail over *Russello*." But the only countervailing factor the government invokes here is its unsubstantiated assertion that everyone knows only alpha amino acids are relevant to proteins—not an "interpretative principle[]" at all. *See infra*, pp. 10-18. The government cannot have it both ways. If everyone knows that only alpha amino acids matter, then including the word "alpha" in the phrase "alpha amino acid polymer" would have been superfluous, causing the government's interpretation to contravene the "canon against surplusage." *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 710 (7th Cir. 2015). If the choice to specify "*alpha* amino acid" was meaningful, then FDA's decision to *omit* it from the size requirement (twice) must be given effect.

Regardless, the government's cases do not help its argument. Each involved distinctive textual features that overcame the normal interpretive presumption. Indeed, the contrast between those cases and this one only reinforces why *Russello* prevails here.

6

In *City of Columbus v. Ours Garage & Wrecker Service, Inc.*, 536 U.S. 424, 428 (2002), the Supreme Court considered whether a statute that exempted from preemption "the safety regulatory authority of a State with respect to motor vehicles" applied to municipal regulations, even though municipalities were not expressly mentioned. The Court said yes, despite acknowledging that a nearby provision did expressly refer to regulations from "a State *or political subdivision of a State*," *Id.* (quoting 49 U.S.C. § 14501(c)(1)) (emphasis added; brackets omitted). The Court admitted "that § 14501(c)'s 'disparate inclusion and exclusion' of the words 'political subdivisions' support an argument of some force." *Id.* at 434 (citation omitted). Nevertheless, given "the basic tenets of our federal system," the Court concluded that the statute lacked "the requisite clear and manifest indication that Congress sought to supplant local authority." *Id.* at 432, 434 (cleaned up). Thus, in *Columbus*, an interpretive canon gave way to a constitutionally grounded structural canon. Here, by contrast, there is no interpretative cannon that justifies departing from the best reading of the text.

The government's other cases confirm the sort of strong textual clues necessary to overcome the *Russello* presumption. In *United States v. Reed*, 734 F.3d 881 (9th Cir. 2013), in interpreting federal regulations governing crimes on federal property, the Ninth Circuit declined to interpret the failure of the regulations to mention a specific criminal offense as evidence that that offense was excluded from the regulations. But the court did so based on "a unique statutory framework with respect to gap filling, under which the federal traffic regulations explicitly incorporate all state vehicle and traffic laws, 'unless specifically addressed' by the federal regulations." *Id.* at 889 (quoting 36 C.F.R. § 4.2(a)) (cleaned up).

7

Thus, there was an "explicit[]" textual provision that reversed the default *Russello* presumption: The regulations incorporated local traffic laws unless "specifically" exempted. *Id.* Here, no such "unique … framework" overrides *Russello*.

In *Mayo Clinic v. United States*, 997 F.3d 789 (8th Cir. 2021), the Eighth Circuit upheld the validity of an Internal Revenue Service regulation construing a statutory provision. The court found the *Russello* presumption overcome by "[t]he settled *judicial* interpretation of [the provision], established and consistently followed for nearly a century"—which included "[a] century of judicial decisions," a Supreme Court decision, and "Treasury Regulations summarizing those decisions." *Id.* at 800. Needless to say, nothing comparable supports FDA's interpretation here, which the agency articulated for the first time in its decision rejecting retatrutide's classification as a biological product.

In *Hope v. Acorn Financial, Inc.*, 731 F.3d 1189 (11th Cir. 2023), the Eleventh Circuit considered whether a provision regarding the effect of confirmation of a bankruptcy plan was binding on the trustee, even though the trustee was not mentioned in that provision. The court found numerous textual indicia demonstrating that trustees were bound. Two separate provisions of the bankruptcy code "require the trustee to make certain distributions as required by the confirmed plan, and one would think that no duty to distribute can or would arise unless such a plan was binding on the trustee." *Id.* at 1193. And several additional provisions "would be unnecessary if the confirmed plan did not already bind the trustee as it does the debtor." *Id.* (cleaned up). Thus, multiple "other provisions" of the bankruptcy code "strongly suggest[ed] that a confirmed plan is binding

8

for at least some purposes on the trustee." *Id.* Yet despite all of these contrary textual clues, the court *still* found the question "close" in light of the *Russello* presumption. *Id.* at 1192.

*Port Authority Trans-Hudson Corp. v. Sec'y*, 776 F. 3d 157 (3d Cir. 2015), was not a *Russello* case. At issue there were two provisions of the Federal Railroad Safety Act: a substantive prohibition against denying medical care to "an employee who is injured during the course of employment," and an anti-retaliation provision forbidding retaliation against an employee for requesting medical care. *Id.* at 161 (emphasis omitted) (quoting 49 U.S.C. § 20109(c)). The court held that the anti-retaliation provision was implicitly limited by the "course of employment" qualification in the substantive provision—but *not* because the *Russello* presumption was overcome. *Id.* at 164. Instead, the presumption was inapplicable from the outset because the relevant question was "whether [the substantive provision] operates to cabin the scope of [the anti-retaliation provision]," a question *Russello* could not be "meaningfully invoked" to answer. *Id.* The court thus concluded that because "an antiretaliation provision seeks to secure the primary objective advanced by the substantive provision," it incorporated the substantive provision's language. *Id.* at 162-63 (cleaned up). Nothing comparable here renders the *Russello* presumption inapplicable or deprives it of its normal force.

Finally, the government (U.S.Br.32) invokes *Pulsifer v. United States*, 601 U.S. 124, 134 (2024), for the proposition that "'an introductory phrase' informs the meaning of 'several terms coming after it.'" But *Pulsifer* concerned a distinct and narrow grammatical question: whether a modifier immediately preceding a list "'distributes' to every item on the ensuing list." *Id.* (cleaned up) (quoting B. Garner, Dictionary of Legal Usage 639 (3d

9

ed. 2011)). The statute at issue rendered a criminal defendant eligible for sentencing relief if:

> the defendant does not have—
>
> (A) more than 4 criminal history points, excluding any criminal history points resulting from a 1-point offense, as determined under the sentencing guidelines;
>
> (B) a prior 3-point offense, as determined under the sentencing guidelines; and
>
> (C) a prior 2-point violent offense, as determined under the sentencing guidelines.

*Id.* at 129 (quoting 18 U.S.C. § 3553(f)(1)). The Court explained that the statute's "grammatical structure" meant that "the verb phrase ['does not have'] operates on each term *seriatim*, not on the combination of the three." *Id.* at 132-35.

That distribution principle has no application in this case, because the protein definition has no introductory phrase that precedes multiple "item[s] on [an] ensuing list." *Id.* at 134. Rather, scattered across the regulatory definition's two sentences are three different phrases that mention "amino acid(s)" in some form, only the first of which mentions "*alpha* amino acid[s]." 21 C.F.R. § 600.3(h)(6) (emphasis added). Under those circumstances, *Russello*, not *Pulsifer*, supplies the relevant interpretative canon.

### B.     The Government Cannot Avoid a Plain Reading of the Text by Appealing to Unstated Assumptions and Deference to FDA

To avoid a plain reading of the regulation at issue, the government appeals to an unstated premise—supposedly grounded in FDA's "scientific" judgment—that only alpha amino acids are relevant for the protein size requirement. That attempt to elevate unstated assumptions over regulatory text fails on multiple grounds.

### 1. *Deference*

FDA's reliance on the unstated assumption that the protein definition's size requirement counts only alpha amino acids cannot be justified as a matter of "deference" under *Kisor v. Wilkie*, 588 U.S. 558 (2019). As an initial matter, it is doubtful that this species of administrative deference survives the holding in *Loper Bright v. Raimondo* that "questions of law [a]re for courts to decide, exercising independent judgment." 603 U.S. 369, 387 (2024). Indeed, that decision makes clear that what matters is faithful interpretation of the text, *not* agency preference or expertise. *See id.* at 374; *accord id.* at 452 (Kagan, J., dissenting) (identifying question of when "an alpha amino acid polymer qualif[ies]" as "a protein" as one that courts must now decide). Regardless, contrary to the government's assertion (U.S.Br.31), this dispute does not involve an agency's case-by-case application of its expertise to open-ended statutory language that calls for agency judgment, like deciding whether condensing and non-condensing appliances are "substantially the same." *Am. Gas. Ass'n v. DOE*, 157 F.4th 476, 492-93 (D.C. Cir. 2025). Rather, the question here concerns the proper interpretation of legal text, a matter the APA reserves to federal courts. *See Loper Bright*, 603 U.S. at 393-94.

Even if *Kisor* deference remains viable, any request for deference here to the agency's interpretation of the protein size requirement was long-ago forfeited. The government studiously avoided requesting such deference below. Indeed, Lilly argued in its summary-judgment motion that FDA "would not be entitled to *Kisor* deference," D. Ct. Dkt. 26, at 14, and the government declined to seek such deference in its opposition, *see* D. Ct. Dkt. 31. And after Lilly explained in its response to the government's cross-motion that

"FDA has not requested *Kisor/Auer* deference," D. Ct. Dkt. 33, at 15, the government *again* declined to request such deference in its reply, *see* D Ct. Dkt. 34. *Kisor* deference is inapplicable where an agency "does not invoke the doctrine." *Ortiz v. McDonough*, 6 F.4th 1267, 1275-76 (Fed. Cir. 2021) (collecting cases); *accord Scheidelman v. Comm'r*, 682 F.3d 189, 197 n.6 (2d Cir. 2012) (*Auer* deference "forfeited" where agency "failed to argue for such deference").

The government claims Lilly is faulting it "for failing to cite *Kisor* in its district-court papers." U.S.Br.24-25. But the issue is not that the government failed to cite *Kisor*; rather, the government made no argument whatsoever that the agency's regulatory interpretation was entitled to deference. Merely defending the agency's interpretation as "reasonabl[e]," *id.* (quoting D. Ct. Dkt. 31, at 17), is different from requesting deference to an agency's interpretation of regulatory text. And the "general rule that an appellate court will not consider issues raised for the first time on appeal," *W. Transp. Co. v. Webster City Iron & Metal Co.*, 657 F.2d 116, 119 (7th Cir. 1981), applies with particular force here, where the government had repeated opportunities to develop the argument below—but did not.

Even if the government had preserved the issue, *Kisor* itself limits deference to narrow circumstances not present here. "First and foremost, a court should not afford … deference unless the regulation is genuinely ambiguous." *Kisor*, 588 U.S. at 574. As discussed above, the regulation's plain text and "all the traditional tools of construction" unambiguously foreclose the agency's reading that only alpha amino acids count. *Id.* at 575 (cleaned up). Second, FDA's position here is a "new interpretation," *id.* at 579, which the agency debuted for the first time to defend its classification of retatrutide, rather than an

12

"authoritative" and generally applicable statement of agency policy, *id.* at 577. The government asserts (U.S.Br.25) that FDA's construction is "not new," but merely observing that human proteins are "made up of alpha amino acids," 85 Fed. Reg. at 10,058, is not equivalent to announcing—as FDA did for the first time here—that *only* alpha amino acids count towards the regulatory definition's size requirement.

Finally, the government's appeal (U.S.Br.25) to FDA's "scientific expertise" is equally misplaced. By its own admission, FDA adopted the "greater than 40 amino acids in size" requirement on grounds of administrative convenience, not any agency assessment of scientific consensus. *See* 85 Fed. Reg. at 10,059 (acknowledging "the lack of a clear scientific consensus" on the typical size of proteins and instead "adopting a bright-line rule that provides regulatory clarity"). That practical consideration does not implicate FDA's "substantive expertise," and so warrants no deference. *Kisor*, 588 U.S. at 577. Indeed, the fact that FDA adopted the protein size requirement to avoid "regulatory uncertainty and inefficiency," rather than to achieve scientific precision, 85 Fed. Reg. at 10,059, weighs strongly *against* elevating the agency's litigation position over the most natural reading of the regulatory text.

### 2. *"Common scientific knowledge"*

The government repeatedly invokes supposed "'common scientific knowledge' that 'only alpha amino acids are relevant to determining whether something is a protein.'" U.S.Br.21 (quoting A.265). But that argument runs counter to the PHSA and fails on its own terms.

***First***, the government's reliance on "common scientific knowledge" makes the same basic error that FDA made in denying Lilly's request for designation: focusing exclusively on the characteristics of naturally occurring human proteins, even though the protein definition *is not* limited to proteins produced in nature. *See* U.S.Br.22, 29-32; A.264-65.

In drafting the PHSA, Congress may initially have "had in mind substances 'derived from natural, biological sources.'" U.S.Br.17 (quoting *Sandoz Inc. v. Amgen Inc.*, 582 U.S. 1, 6 (2017)). As originally written, the "biological product" definition included a "protein (except any chemically synthesized polypeptide)." 42 U.S.C. § 262(i) (2018). But Congress amended the PHSA in 2019 to remove that exclusion, thus specifically including proteins *not* produced by natural biosynthesis (*i.e.*, synthesized proteins that do not occur in nature). Pub. L. No. 116-94, Div. N, Tit. I, § 605, 133 Stat. 3127 (2019); *see* Lilly.Br.31-32. FDA's reliance on the premise that only the type of amino acids present in human proteins count for the regulatory definition's size requirement thus flouts Congress's express choice to ensure that synthesized proteins can be biological products.

The government claims (U.S.Br.8) its sources establish that "the only relevant amino acids" are alpha amino acids. But every source upon which it relies—in devising the regulatory "protein" definition, in the designation decision for retatrutide, and in this appeal—discusses *naturally occurring* proteins such as those in "the human body." A.278-80; *see, e.g.*, U.S.Br.31 n.4 ("Although more than 300 amino acids exist in nature, *proteins of humans* are synthesized almost exclusively from 20L-[alpha]-amino acids.") (emphasis added) (quoting A.273)). Indeed, the government repeatedly cites an encyclopedia entry for the proposition that "alpha amino acids 'are the building blocks of proteins.'" U.S.Br.7,

14

13, 19, 28, 31 (quoting A.275). Each time, however, the government omits critical language making clear that this holds true only for proteins produced by natural biosynthesis: "*In biological systems*, these amino acids are the building blocks of proteins." A.275 (emphasis added). The government's contrary assertion that "[t]he sources cited in [its] brief and in FDA's rule and designation decision discuss proteins generally," U.S.Br.31-32, identifies no source for this claim—because none exists.

**Second**, FDA's focus on proteins produced by human biosynthesis creates internal contradictions. If the regulatory definition tracks "proteins of humans," as the agency asserted in its designation decision, A.264-65, then its position that a protein must be greater than 40 *alpha* amino acids in size is both over- and underinclusive. It is overinclusive because some alpha amino acids *do not* naturally occur in humans, yet FDA would count them anyway. And it is underinclusive because, under the agency's stated definition of an alpha amino acid, proline—a common amino acid used in natural human protein synthesis— would not count. *See* Lilly.Br.32.

The government makes no attempt to defend the over-inclusivity created by its position. And its only defense of under-inclusivity is to disclaim FDA's stated definition of an alpha amino acid, A.265, which the agency relied on to conclude that one of retatrutide's 41 amino acids (ADO) was not an alpha amino acid, *see* U.S.Br.29 n.3 (noting that *some* sources treat proline as an alpha amino acid, but not attempting to reconcile that position with *FDA's* stated definition). The government argues (U.S.Br.29 n.3) that Lilly forfeited its under-inclusivity argument by not discussing proline in its request for designation. But Lilly had no way of knowing FDA would debut its novel "proteins of humans"

15

interpretation. Administrative exhaustion does not require preemptive responses to never-before-asserted agency arguments—especially meritless ones.

***Finally***, the government's attempts (U.S.Br.23-24) to rely on Lilly's past statements do not withstand scrutiny. According to the government, Lilly previously "used '39-amino-acid' as a shorthand for '39-alpha-amino-acid'" in describing a different molecule. U.S.Br.24 (quoting 2023 Mounjaro Product Labeling). Lilly's generic use of the term "amino acid" there says nothing about the proper interpretation of the text at issue here or whether non-alpha amino acids count towards the size requirement. The 2014 comment cited by the government is no different: Lilly noted that a "protein is a linear polymer of alpha amino acids" but *also* that "there is no precise number of amino acids" required to qualify as a protein. AR 1318. Those observations, which track the regulation, do not suggest the relevant number of amino acids must be limited to alpha amino acids.

### 3.    *Peptide bonds*

The government equally errs in relying (U.S.Br.6-8, 18-19) on the structural and functional characteristics of human proteins created by "peptide bonds" between alpha amino acids.

As an initial matter, FDA itself did not articulate or rely on this rationale—in formulating the protein definition, in rejecting Lilly's proposed designation for retatrutide, or in defending that decision before the district court. To the contrary, *Lilly* urged the agency to consider structural and functional characteristics because "retatrutide … shares structural and functional characteristics in common with a protein comprising 41 alpha amino acids." A.250. But the agency *refused* to consider "structural or functional

16

attributes," A.258, instead insisting on a "bright line rule" that only products containing more than 40 alpha amino acids qualify, A.263-69; *see* A.258 ("[T]he agency generally does not intend to consider other attributes of a molecule in determining whether a molecule meets the definition of a protein."). Courts may sustain an agency's decision only on the grounds the agency offered at the time that decision was made. *SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943).

In any event, the government's newfound reliance (U.S.Br.13) on the ability of alpha amino acids to "establish peptide bonds with one another" is meritless. The government contends that the presence of an additional carbon in non-alpha amino acids "prevents [them] from forming the peptide bonds that are essential to a protein's structure and its associated function." U.S.Br.19. That contention fails several times over.

Most importantly, the regulatory definition itself conclusively *refutes*—in two different ways—that only peptide bonds matter. For one thing, the regulatory text provides that amino acid chains need only be "associated with each other *in a manner that occurs in nature*," not by peptide bonds specifically. 21 C.F.R. § 600.3(h)(6) (emphasis added). It is undisputed that other bonds, like the isopeptide bond linking retatrutide's chains, are also "naturally occurring." A.217; *see* Lilly.Br.21. For another thing, the regulatory text reiterates that a protein's size is based on "the total number of amino acids in those chains, *and will not be limited to the number of amino acids in a contiguous sequence*." 21 C.F.R. § 600.3(h)(6) (emphasis added). Even under the government's interpretation, proteins may include alpha amino acids that *are not* contiguously bound to other alpha amino acids with peptide bonds.

The government's focus on the structural and functional characteristics of proteins also fails on its own terms. The government asserts (U.S.Br.18) that peptide bonds between alpha amino acids are relevant because they determine a protein's "three-dimensional structure" and "function." But retatrutide's ADO and gamma-glutamate chain contributes to key functional characteristics shared by other proteins, as FDA does not dispute. *See* A.238-39. Retatrutide's side chain also contributes to a "three-dimensional structure" that "is consistent with native [human proteins]" and "behaves like other proteins." A.239. So if function and complexity were the key factors—as Lilly argued, but FDA rejected— retatrutide would qualify.

## II.    THE DISTRICT COURT INDEPENDENTLY ERRED IN REMANDING TO THE AGENCY

The FDCA provides that a sponsor's requested designation "shall" take effect by operation of law if the agency has not issued a decision after the mandatory 60-day deadline has elapsed. Since that deadline had long since passed, the district court erred by remanding to the agency after vacating FDA's analogous-product decision, rather than entering the injunction that Lilly sought. At a minimum, *this Court* should order FDA to designate retatrutide as a biological product, given the agency's nearly six-month inaction following remand. The government's insistence that the agency may sit on its hands *indefinitely* is contrary to the FDCA's text and would produce perverse results that this Court can and should prevent.

### A.    This Court Has Jurisdiction to Review the Remedy Entered by the District Court

The government acknowledges (U.S.Br.1-2) that the district court's judgment upholding FDA's ruling on the protein definition was a "final decision of the district court[]."

28 U.S.C. § 1291. It nevertheless argues that the same judgment was *non*final with respect to the district court's remand to FDA after determining that the agency's analogous-products decision was contrary to law. That is incorrect.

As a primary matter, the government misconstrues Lilly's position, which is not an "argument about what [Lilly] believes FDA must do on remand." U.S.Br.36. Instead, Lilly challenges the remedy entered *by the district court*: "the court erred in remanding to the agency rather than entering the injunction that Lilly sought." Lilly.Br.37. That argument has nothing to do with "anticipated objections to a decision the agency has not yet rendered." U.S.Br.37. The question is not what the agency must do on remand but whether, in light of the FDCA's automatic take-effect provision, the district court should have given FDA a second bite at the apple.

The district court's remedial decision thus falls squarely within the rule that a party "ordinarily can appeal a decision granting in part and denying in part the remedy requested," even in the context of an administrative remand. *Forney v. Apfel*, 524 U.S. 266, 271 (1998) (citation omitted). *Forney* makes clear that "any decision final from the agency's perspective is also final from the private litigant's." *Rush Univ. Med. Ctr. v. Leavitt*, 535 F.3d 735, 738 (7th Cir. 2008). For that reason, when a court remands to the agency, the possibility that *either* party—including the agency—might be "unable to obtain review after its own action" on remand means that the court's decision is appealable for *both* parties. *Id.* Under this principle, appellate jurisdiction over a remand order is *not* "unusual," as the government asserts. U.S.Br.37. Indeed, Supreme Court precedent

19

"mak[es] administrative remands generally appealable." *Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 979 (7th Cir. 1999).

The government sees no possibility that the district court's analogous-product decision will be insulated from appellate review, U.S.Br.38, but only because it considers half the picture. To be sure, Lilly could seek judicial review of an adverse decision on remand. But "if FDA *sides with Lilly* on remand, then neither party would return to court, and the issues decided by the district court 'might never be open to appellate review.'" Lilly.Br.1 (emphasis added) (quoting *Rush*, 535 F.3d at 738). Indeed, that was the precise situation in *Rush*. *See* 535 F.3d at 738 ("[I]f the private claimant prevails [on remand], the agency cannot obtain judicial review of its own decision (even when that decision has been compelled by a judicial decision with which the agency disagrees)."). That makes the district court's remand decision final under Section 1291, because there is no such thing as an order that is final for an agency but "not final for the claimant." *Apfel*, 524 U.S. at 270; *see Sullivan v. Finkelstein*, 496 U.S. 617, 628 (1990) (finality turns on the "class of order[]," not on which party seeks to appeal). In arguing otherwise, the government simply ignores the possibility that Lilly could prevail on remand.

Moreover, even if the district court's denial of Lilly's requested relief was nonfinal—that is, interlocutory—Section 1292(a) would provide jurisdiction. The government argues that the denial of Lilly's requested injunctive relief falls outside Section 1292(a) because that provision applies only to "requests for preliminary injunctions." U.S.Br.37 n.5. Yet Section 1292(a)(1) provides for jurisdiction over *all* "[i]nterlocutory orders … refusing … injunctions," not just preliminary injunctions.

In sum, if the district court's decision to remand rather than enjoin the agency was "final," Section 1291 provides jurisdiction; if it was "interlocutory," Section 1292(a) provides jurisdiction. The government's position that the decision occupies some heretofore unknown category—*neither* final *nor* interlocutory—lacks support in statutory text or precedent.

**B.    Remand after Expiration of the Statutory Deadline Conflicts with the Statute's Automatic Take-Effect Provision**

The government argues that once FDA issues *any* designation decision, the FDCA's automatic take-effect provision becomes irrelevant even if a court vacates that decision and even if the agency refuses to take any steps following remand. *See* U.S.Br.39-40. Under that theory, FDA could issue a summary denial without stating "the reasons for such determination," 21 U.S.C. § 360bbb-2(b); wait for its deficient decision to be vacated; and then sit on the remand indefinitely. Indeed, the government (U.S.Br.43) affirmatively embraces that perverse result. Congress could not have intended FDA to so easily circumvent the FDCA's mandatory deadline and automatic take-effect provision— designed to ensure timely regulatory clarity for manufacturers and access to new treatments for patients. This Court should not tolerate it.

**A.    ** After a designation decision is set aside, the decision is "a nullity," *Uriarte*, 975 F.3d at 601, and thus FDA has not "provide[d] the [required] statement within the 60-day period." 21 U.S.C. § 360bbb-2(c). The statute's remedy at that point is automatic: By operation of law, "the recommendation made by the [sponsor] shall be considered to be a final determination … of such classification of the product." *Id.* Nothing in the FDCA tolls or extends that deadline in the event a court vacates FDA's designation decision.

21

The government dismisses *Uriarte* (U.S.Br.38-40) as merely "reflect[ing] the uncontroversial proposition that when a criminal sentence is vacated resentencing is needed." But its reasoning is directly on point. At issue there was a sentencing provision that applied "*if a sentence for the offense has not been imposed* as of [the statute's] date of enactment." First Step Act of 2018, § 403(b), Pub. L. No. 115-391, 132 Stat. 5194, 5222 (Dec. 21, 2018) (emphasis added). The question presented was whether criminal defendants sentenced before the First Step Act's enactment could still be considered "unsentenced"— that is, situated as if no sentence had been imposed—if their sentence was vacated on appeal. *Uriarte*, 975 F.3d at 601. This Court said yes. Even though these defendants had literally received a sentencing decision prior to the First Step Act, when their sentence was vacated it became a legal "nullity" and the defendants "lack[ed] a sentence." *Id.* (cleaned up).

The Court rejected the government's argument—mirroring the position it advances here—that "neither an appeal nor anything else that happens after a district court imposes sentence can change the fact that sentence has been 'imposed.'" U.S. Br. at 14, *Uriarte*, 975 F.3d 596 (No. 19-2092), 2019 WL 6248116. "Congress writes statutes against the backdrop of the existing legal landscape," the Court explained, and it is "well understood" that judicial vacatur "wipe[s] the slate clean." *Uriarte*, 975 F.3d at 602 (citation omitted). It was accordingly appropriate to apply "a 'legal lens'" to the text, rather than "an historical lens." *Id.* Additionally, the Court "dr[e]w significance from the fact that Congress did not use the words '*an original sentence*' or '*an initial sentence*,'" *id.* at 604, indicating Congress's intention for the Act to apply to all defendants without operative sentences.

22

The same reasoning applies here. When FDA's designation decision was vacated, there was no longer a decision "provide[d]" "within the 60-day period" and so Lilly's proposed classification "shall be considered to be a final determination" by the agency. 21 U.S.C. § 360bbb-2(c). Congress could have, but did not, specify that the deadline and automatic take-effect provision apply only to FDA's "original" or "initial" decision. Instead, the "well understood" rule governing vacatur controls. *Uriarte*, 975 F.3d at 602. Vacatur "re-establish[es] the status quo absent the unlawful agency action." *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119 (D.C. Cir. 2026) (quoting *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022)).

Moreover, even if the district court's vacatur merely reset the 60-day clock, the agency has *still* failed to provide a decision within the 60-day deadline. This Court should therefore order that retatrutide be classified as a biological product. If Lilly had submitted a *new* designation request for retatrutide on the same day that the district court issued its remand order, FDA would have been obligated to respond within 60 days. A different result is not warranted merely because, when FDA said it would act expeditiously on remand, Lilly took the agency at its word.

**B.** The government insists that it has "satisfied the statutory deadline" by issuing its initial designation decision within the 60-day window—albeit one vacated as contrary to law. U.S.Br.38-39. If accepted, the government's position would render the FDCA's mandatory 60-day deadline and automatic take-effect provision functionally meaningless, because FDA could circumvent them simply by issuing a threadbare denial incapable of withstanding judicial review. At that point, it could then delay a classification

23

decision indefinitely, or issue further incomplete decisions necessitating wasteful *seriatim* litigation.

This case proves the point: the agency has taken no action on Lilly's request for designation for nearly six months following the district court's remand order, while at the same time insisting that appellate review is inappropriate because a remand remains pending. *See* ShA.18-19; U.S.Br.43. And while the agency's original decision identified only a single ground for denying retatrutide's designation as a biological product, the government has asserted in litigation that there remain "multiple scientific issues" it has yet to decide. D. Ct. Dkt. 31, at 30. As a result, the parties could be in for at least *five more* trips to this Court if the agency continues to parcel out its decision-making issue by issue, which the government (U.S.Br.42) concedes. This cannot be what Congress envisioned when it paired a mandatory statutory deadline with an automatic take-effect provision.

Finally, contrary to the government's assertion (U.S.Br.43), there is nothing "difficult to understand" about why Lilly insists that FDA must timely act on the district court's remand notwithstanding Lilly's appeal. The FDCA requires *all* designation decisions—even those starting from scratch—to be made within 60 days, and there is no legal or practical reason that the agency's partial do-over here should take any longer. Regardless, the government cannot claim that this appeal has nothing to do with the remand to advance its jurisdictional argument, while simultaneously blaming this appeal for FDA's prolonged inaction. Nor has the government identified any other reason for FDA's idleness.

24

**C.** As a fallback, the government argues that Congress "left it to courts to determine what conditions, if any, to impose when vacating and remanding an FDA designation decision." U.S.Br.40. But when Lilly asked the district court to impose conditions on the timing for an agency decision on remand, the government argued successfully that "it would be inappropriate for the Court to order FDA to 'act expeditiously' on remand" because "a reviewing court may not, after remanding a matter to an agency, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry." A.292 (cleaned up).

In any event, Congress has already prescribed a statutory remedy here: "the recommendation made by the [sponsor] shall be considered to be a final determination … of such classification of the product." 21 U.S.C. § 360bbb-2(c). The government argues (U.S.Br.40) that "statutory deadlines are commonplace." But automatic take-effect provisions are not; they indicate special congressional concern with providing timely clarity to regulated parties. Any judicial remedy must accord that concern appropriate respect. The government's argument that FDA may indefinitely delay final determination surely does not.

Insofar as the statutory remedy provided by Congress creates "practical problems" that, according to the government (U.S.Br.41), might arise in unusual cases, the government may ask a court either to stay its decision or to remand *without* vacatur. *See Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020); *see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 837 n.6 (2024) (Kavanaugh, J., concurring) ("Remand without vacatur is essentially a shorthand way of vacating a rule

25

and staying the vacatur pending the agency's completion of an additional required action"). The government did neither here. Instead, the government wants the equivalent of an indefinite stay of its statutory obligation to respond to Lilly's designation request—essentially seeking the benefit of an "exceptional remedy" without requesting or demonstrating its entitlement to that relief. *Am. Great Lakes*, 962 F.3d at 519.

## CONCLUSION

The Court should reverse the district court's "protein" determination, vacate the district court's remand order, and remand with instructions to order FDA to designate retatrutide as a biological product.

Dated: June 5, 2026

Respectfully submitted,

*s/ Allon Kedem*
Allon Kedem
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 942-5000
allon.kedem@arnoldporter.com

26

**CERTIFICATE OF COMPLIANCE**

The foregoing brief complies with the type-volume limitation of Circuit Rule 32(c). The brief contains 6,999 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 365 (2016) in Century Expanded BT 12-point font.

_s/ Allon Kedem_
Allon Kedem

## CERTIFICATE OF FILING AND SERVICE

Pursuant to Federal Rule of Appellate Procedure 25, I hereby certify that on June 5, 2026, I electronically filed the foregoing Reply Brief of Appellant via ECF, and service was accomplished on counsel of record by that means.

s/ *Allon Kedem*
Allon Kedem